## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**GORDON J. COBURN and**<br>**STEVEN SCHWARTZ,**<br><br>**Defendants.** | Crim. No. 19-120 (KM)<br><br>**MEMORANDUM and ORDER**<br>(Motions, DE 72 & 79) |

This Memorandum covers several motions submitted to the Court on behalf of two defendants, Gordon J. Coburn and Steven Schwartz. Defendants are accused of offenses committed in their capacities as Chief Legal Officer and President of Cognizant Technology Solutions Corporation ("CTS" or "Cognizant"). The submissions on the motions fall into two categories.

The first category relates to a motion to compel discovery pursuant to Federal Rule of Criminal Procedure 16, and for other miscellaneous relief:

- Motion to Compel Discovery, filed by Coburn ("R. 16 Brf.", DE 79)
- Schwartz's letter joining in Coburn's motion (DE 80)
- Opposition to the motion, filed by the prosecution ("R. 16 Gov. Opp.", DE 87)
- Reply in response to prosecution's opposition, filed by Coburn ("R. 16 Def. Reply", DE 89)

The second category relates to the issuance of third party subpoenas to CTS and another company, Larsen & Toubro Construction ("LT"), pursuant to Federal Rule of Criminal Procedure 17(c):

- Application for Ex Parte Issuance of Rule 17(c) Subpoenas, filed by Schwartz (DE 72)
- Application for Ex Parte Issuance of Rule 17(c) Subpoenas, filed by Coburn (DE 73)

- Opposition to these applications, filed by the prosecution (DE 76)
- Defendants' joint reply to the prosecution's opposition (DE 78)

Part I of this Opinion covers the Rule 16 motion to compel discovery of materials in the possession of the SEC. Part II covers the applications for issuance of Rule 17(c) subpoenas to CTS and LT. Part III covers miscellaneous requests contained within the Rule 16 motion.

## I.   Rule 16 Motion: Materials in the possession of the SEC (DE 79)

I assume for purposes of the analysis that the SEC may possess materials related to the case. The question is whether the prosecution[1] has a duty to review material possessed by the SEC and to produce any discoverable material found therein.

Of paramount importance is the prosecutors' obligation to deliver potentially exculpatory material to a criminal defendant. *See U.S. v. Risha*, 445 F. 3d 298, 303 (3d Cir. 2006); *see generally Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972) (extending disclosure obligation to include witness impeachment material). This so-called *Brady* obligation applies most obviously to material within the prosecutor's possession, but also in some circumstances beyond that. For example, prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555 (1995). Under certain circumstances, *Brady* obligations apply to materials that the prosecution does not actually possess or even know about, if it can be deemed to have constructive possession. *See Risha*, 445 F. 3d at 303.

In *Risha*, the Third Circuit discussed constructive possession of evidence held by state authorities in connection with a federal prosecution for arson.[2] Initially, the federal government and the state attorney general's office

---

[1]   I use that terminology advisedly to avoid ambiguity. Both the SEC and the Department of Justice, of course, are part of "the government."

[2]   Although *Risha* specifically addressed the relationship between state and federal governments, its logic has been applied in other cross-jurisdictional contexts.

jointly investigated the arson. *Id.* at 302. At the federal trial, the government
called a witness who had been charged with both a state firearms charge and a
federal arson charge. *Id.* at 299. He testified that he did not receive any special
treatment with respect to the state charge in exchange for testifying on the
federal charge. *Id.* at 300. In reality, it appears that the witness did in fact
receive special treatment. *Id.* at 299. Although the federal government did not
have actual knowledge of any such arrangement, the Third Circuit considered
whether the government had constructive knowledge of it. If so, said the court,
the government should have provided this impeachment evidence to the
defense. *Id.* at 302.

The court then laid out three factors to be considered when evaluating
constructive knowledge:

> [(1) W]hether the party with knowledge of the information is
> acting on the government's "behalf" or is under its "control"; (2) the
> extent to which state and federal governments are part of a "team,"
> are participating in a "joint investigation" or are sharing resources;
> and (3) whether the entity charged with constructive possession
> has "ready access" to the evidence.

*Id.* at 304.

Here, the defendants' argument focuses on the second *Risha*
factor; they assert that the prosecution and the SEC jointly investigated
their alleged crimes. They cite two cases from the U.S. District Court for
the Southern District of New York in which the court concluded that the
SEC and USAO/DOJ did engage in a joint investigation. The first, *U.S. v.
Gupta*, required the government to search SEC materials created during
joint fact-gathering for potential *Brady* material. 848 F. Supp. 2d 491,
494-495 (S.D.N.Y. 2012). That obligation applied even though the

---

*See, e.g.*, *United States v. Holovacko*, 781 F. App'x 100, 105 (3d Cir. 2019) (applying
*Risha* factors to possession of evidence by a business); *United States v. Reyeros*, 537 F.
3d 270, 283-285 (3d Cir. 2008) (applying *Risha* factors to possession of evidence by a
foreign government). The court in *Reyeros* did note that evidence held by a foreign
government might actually present more sensitive and demanding considerations than
those embodied in the *Risha* factors, but proceeded to apply the *Risha* factors as a
threshold question. *Id.* at 283.

criminal prosecution and the remainder of the investigation diverged in other respects. In *Gupta*, the DOJ and SEC jointly interviewed forty-four witnesses; in the course of those interviews, representatives of both agencies asked questions. The SEC's personnel did not take notes during the interviews, but prepared post-interview summaries in consultation with the DOJ. *Id.* The prosecution was deemed to be in constructive possession of the SEC's post-interview memoranda for purposes of its discovery obligations. *Id.* at 493-494.

The second case cited by Defendants is *U.S. v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014). There, the court ordered submission of affidavits regarding the extent of cooperation between the SEC and USAO. It found that the two agencies jointly interviewed twelve witnesses and discussed between themselves the evidence obtained as a result of their parallel investigations. *Id.* at 460-462. There, however, the concerns raised by the defense were not general or exploratory, but quite specific. The defendant knew that one of the prosecution's witnesses had made contradictory statements, and the motion was targeted to evidence of such statements in the possession of the SEC. *Id.* at 462. Here, Defendants do not point to any specific, discoverable evidence they expect the SEC possesses.

Finally, Defendants cite an order from this district in *United States v. Blumberg*, No. 14-cr-458 at DE 69 (D.N.J. March 23, 2015). In that case, Judge Linares concluded that the DOJ prosecutors and the SEC had pursued a joint investigation, chiefly because they jointly conducted over forty witness interviews and coordinated document requests from third parties. *Id.* at 5-6. The response to that finding of cooperation, however, was not to throw open all SEC files. The court, citing *Gupta*, held the prosecution responsible only for reviewing the documents arising from those *specific* joint efforts. *Id.* at 6. The court

4

denied the request to compel documents in the SEC's possession that fell outside the scope of the joint portion of fact gathering. *Id.* at 7.

The principle that emerges from these cases is this: For discovery purposes, the prosecution is deemed to be in constructive possession of SEC materials arising from the particular components of the investigation that were conducted jointly.

Defendants argue that the prosecution and SEC did engage in a joint investigation here. That contention is primarily based on the SEC agents' presence during about half of the prosecution's interviews of Cognizant employees. Defendants also cite the press releases announcing the indictments, in which the prosecution praised the SEC's "significant cooperation." (In its press release announcing its civil action against Cognizant, the SEC reciprocally praised the prosecution's "assistance.") (R. 16 Brf. at 6). Finally, the prosecution acknowledges in its opposition to the motion that the SEC attended some of the meetings between the prosecution and Cognizant, during which Cognizant's counsel imparted information about the company's internal investigation. (R. 16 Gov. Opp. at 10 n. 4).

The prosecution responds that its own investigation and that of the SEC were separate, if parallel. Factually, the prosecution's argument is that, although SEC personnel attended thirteen of its twenty-four witness interviews, SEC personnel did not ask questions or take their own notes. Nor did they participate in any way in the prosecution's decision-making process and grand jury activities. Legally, the prosecution's argument is two-fold. First, it argues that *Blumberg* misapplied *Risha*; constructive possession, says the prosecution, exists only when all three *Risha* factors are found. Second, it argues that this case is factually distinguishable from the SDNY cases cited by the Defendants. The prosecution cites a number of cases, also principally from the SDNY, holding that an agency's participation in witness interviews was not sufficient to render an investigation joint.

5

Initially, I do not agree that all three *Risha* factors need be present to support a finding of constructive possession. *Risha* does not mandate such a rigid ticking of boxes; rather, the factors are intended to guide a more flexible "case-by-case analysis." 445 F. 3d at 306.[3] If the prosecution's view were accepted, the DOJ might closely partner with the SEC yet ignore potentially exculpatory material in the possession of the SEC, so long as it did not directly order the SEC to do anything. The *Risha* factors, I think, are intended to guide a more general inquiry into whether the two worked so closely that the prosecution may be deemed to be in constructive possession of the materials gathered by the agency.

The parties seem to agree that the most critical *Risha* factor here is the second, *i.e.*, the extent to which the two authorities were part of a "team" or conducted a "joint investigation." Even some joint fact gathering, says the prosecution, is not enough to support an inference of a joint investigation. The Third Circuit did not deeply analyze this factor in *Risha*, since it remanded to the district court for more fact-finding. 445 F. 3d at 305. The Court of Appeals did emphasize, however, that an important consideration is whether the two agencies had "a close working relationship." *See id.* And Judge Linares, contrary to the prosecution's position here, expressly stated in *Blumberg* that, to determine if parallel investigations are joint, "it is enough that the agencies are engaged in joint-fact gathering . . . ." No. 14-cr-00458 at DE 69 at 5 (quoting *Gupta*, 848 F. Supp. at 494).

---

[3]     The first, "control" factor, for example, would tend to swallow the others if applied as an independent prerequisite. It is hard to imagine a case where the agency was taking orders from the prosecution, satisfying factor 1, but the two were not acting "jointly" for purposes of factor 2; the reverse, however, is not necessarily the case. Defendants do argue in their reply brief that the SEC was acting at the behest of the prosecution. The basis for the argument is slim—they speculate, for example, that if the SEC did not ask questions or take notes at the interviews, the reason must have been that the prosecution did not permit it. (R. 16 Def. Reply at 6-7). That is not nearly enough to support a finding that the SEC acted at the government's direction. I am also wary of the self-proving argument that an agency's *non*-participation, too, must be taken as evidence that it was acting hand-in-glove with the prosecution.

There will be borderline cases, and the issue is one of degree. Nevertheless, I accept that joint fact gathering may be enough to establish constructive possession. That there was some joint activity, however, does not render the entire investigation a joint effort. Constructive possession should be confined to the particular facts and materials that were gathered in joint fashion. Where such materials exist and are in the possession of the prosecution's investigative partner, the prosecution is deemed to constructively possess them and is required to review them for discoverability.[4]

As to the third *Risha* factor, the prosecution argues it does not have ready access to the files because the SEC is a separate agency. The prosecution admits it could simply ask the SEC for these files, but does not appear to have done so. (R. 16 Gov. Opp. at 17). Both are agencies of the federal government, and they have concededly cooperated when it suited them.[5] The prosecution is correct that the mere possibility of obtaining access, standing alone, does not amount to constructive possession. Nevertheless, where the context is one of cooperation, this factor does tend to support an inference of constructive possession.

The prosecution is correct that the facts, as it has presented them, fall short of those in the cases cited by Defendants. The SEC sat in on about half of the interviews, but there is no current indication that it played any role in the selection of the interviewees, the selection of questions, the questioning itself, or the prosecution's analyses of the results. Moreover, the efficiency rationale for permitting the SEC to

---

[4]   As noted above, the prosecution argues that the *Risha* factors are independent requirements. In the alternative, however, the prosecution suggests that the second, joint fact-gathering factor is negated or diminished by the other *Risha* factors. I have considered the other factors, but I find they do not outweigh the conclusion that there is sufficient evidence of joint fact-gathering to require a hearing.

[5]   Distinctions among branches and agencies of the federal government are, of course, real. Still, this case does not require us to consider the dignity of separate sovereigns, as in *Reyeros, supra* n. 1, or even *Risha* itself.

attend such sessions is obvious, and it does not depend on the existence of a joint investigation. It would exalt form over substance—and would perhaps ask too much of citizen witnesses—to require that the prosecution conduct its interviews alone, leaving the SEC to re-summon the same witnesses for questioning on the same subjects.

The prosecution cites *U.S. v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019), which held that joint interviews did not suffice to establish that there was a joint investigation. That holding, however, also rested on other factors prescribed by Second Circuit precedent, which places an emphasis on whether the SEC participated in the more prosecutorial aspects of the case. As in our case, however, the SEC did not have any notes or reports of the joint interviews, and had participated in only some of the interviews (sixteen of sixty), which were all arranged by the DOJ. *Id.*

Defendants request in their reply brief an evidentiary hearing to determine the extent of the cooperation between the prosecution and SEC. I agree that there remain questions of fact. The prosecution denies that certain joint steps were taken, but does not provide a comprehensive explanation as to what kind of cooperation there was. The admission that the SEC attended meetings with Cognizant counsel and the press release's praise of "significant cooperation"—perhaps a bit of interagency diplomacy, but perhaps not— provide enough of a basis for inquiry into whether there was more to the relationship than the SEC's merely sitting in on witness interviews. I have not concluded on this record that the prosecution does in fact have constructive possession of materials the SEC might have, or indeed that the SEC possesses responsive materials at all. Assuming that there is responsive material, it is not within the prosecution's constructive possession unless it falls within the scope of the joint aspects of the investigation. And if it fell within that scope, it

must be produced only if it is discoverable for some reason. The issue here is merely whether the prosecution is obligated to look.[6]

In short, I will grant the defense's request for an evidentiary hearing to determine the extent of the investigative cooperation between the prosecution and the SEC. As in the case of an ordinary suppression hearing, the prosecution and not the defense is in possession of most of the relevant facts. I anticipate that such a hearing would be relatively brief; it shall not explore the entirety of the investigation, but shall be confined to the relevant issues as identified above. Within five days, counsel shall confer as to the identity and number of witnesses and report the results of such discussions in a filed joint letter, which shall also propose three alternative dates for a hearing. Subject to any objection any party may wish to make and conditions at the time, the hearing will be held by video.[7]

## II.    Rule 17 Motion: Subpoenas to CTS and LT (DE 72)

### A. Standards and summary of ruling

Schwartz's motion for Rule 17 subpoenas is more comprehensive than Coburn's, so I use it as a vehicle for the analysis.[8] Here, the issue is not

---

[6]    Of course, should the prosecution simply obtain the material, review it for discoverability, and produce discoverable items, that might place the matter on a different footing. The SEC materials would then be in the actual, not constructive, possession of the prosecution and would be subject to the usual discovery rules and procedures.

[7]    The U.S. District Court for the District of New Jersey, like the rest of the nation, has had to adjust to the COVID-19 pandemic. Among other things, the Chief Judge of the Court has declared what amounted to an extended continuance of deadlines in criminal matters. Thankfully, conditions have eased in our State, seemingly as a result of widespread restrictions on personal contact. To relax such restrictions, however, would surely risk a second wave of infections, and no cure or vaccine appears to be in our short-term future. Under the circumstances, I will not compel personal appearances unless strictly necessary. I have proposed video evidentiary hearings on certain of these pretrial matters, because I believe they may be conducted by video without harm to the interests of justice. Trial, of course, may present a separate set of constitutional and practical issues.

[8]    Coburn's Rule 17 subpoenas seek substantially the same items relating to the "outsourcing" issue and the DOJ/CTS & LT investigation. Coburn does not seem to be

cooperation between the prosecution and an executive branch agency, but rather cooperation between the prosecution and a private company.

Schwartz requests that trial subpoenas, with a pretrial return date, be issued to Cognizant, which is his former employer, and also to Larsen & Toubro Construction (LT), a different company involved in the case.[9] Schwartz's requests fall into two categories: (a) documents relating to the prosecution's role in CTS's and LT's internal investigations, and (b) documents relating to evidence of Schwartz's culpability generally. (I refer to these as "category (a)" and "category (b).") This opinion focuses on category (a). Schwartz's argument for the relevance of the documents in category (a) builds off the case of *United States v. Connolly,* Crim. No. 16-370, 2019 WL 2120523 (S.D.N.Y. May 2, 2019). There, Chief Judge McMahon found that the government had effectively outsourced its investigation to a company and its law firm. That in itself would not necessarily have been an issue, except that the defendant had been compelled to sit for an interview by the company, his employer.[10]

Interviews by an employer under the implicit compulsion of "cooperate or be fired" can be suppressed as involuntary under *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616 (1967). In *Garrity* the employer was the State, so any compulsion would have been state compulsion, triggering a suppression

---

seeking the same scope of documents relating to the underlying offense (category (b), *see infra*), that Schwartz is.

[9]      L&T is a company independent of Cognizant, which allegedly acted as a conduit for the bribe and was reimbursed by Cognizant.

[10]      Coburn adds that certain of the subpoena requests are "essential to evaluating whether the companies' cooperation with the government implicates the government's *Brady* obligations." (DE 73 at 8). The implication seems to be that because the government "outsourced" its investigation to the companies, the companies hid potentially exculpatory information not only from the Defendants, but from the government itself. The hearings ordered by the Court here may alter the picture as to the "outsourcing" claim. As things stand, however, Defendants have not made any threshold showing that the prosecution failed in its *Brady* obligations, and the prosecution is not generally answerable under *Brady* for facts and documents that were concealed from it by third parties. Nor can the limits on Rule 16 disclosure be so easily circumvented by subpoenas "just to check."

remedy under the Fifth and Fourteenth Amendments. Where, as here, a private employer conducted the interview, there is another step to the analysis; under the Second Circuit's approach, statements obtained in a coerced interview may be suppressed only if the interview is "fairly attributable" to the government. *Connolly*, 2019 WL 2120523 at 10–11 (citing *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008)). But, as *Connolly* made clear, "it is not enough under *Garrity* that [the company's] investigation was *generally* fairly attributable to the prosecution. The [Company's] interviews of [the defendant] must have been Government-engineered interviews." 2019 WL 2120523 at *12.

To obtain suppression, Schwartz (and likewise Coburn) would first need to show that the prosecution directed or "engineered" his employer's interview *of himself* in particular. Second, he would have to demonstrate that the interview was coerced in the *Garrity* sense of "submit or be fired." Any such coercion argument must deal with the fact that Schwartz and Coburn were no ordinary employees, but the Chief Legal Officer and President of CTS. Finally, he would need to identify self-incriminating statements during such an interview that the prosecution would seek to introduce in evidence or (perhaps) otherwise exploit.[11]

Thus far, Schwartz has not made a showing akin to the fairly extreme facts in *Connolly*—*i.e.*, that the prosecution actually outsourced its investigation, let alone that it engineered Cognizant's interview of him. He refers, for example, to CTS's having shared its 100,000 search terms with and provided its interview notes to the government. That falls far short of any

---

[11]    I focus here on *Garrity* and *Connolly* themselves and the suppression of the defendants' statements. Schwartz does mention "testimonial concerns," citing *Kastigar v. United States*, 406 U.S. 441 (1972) (requiring government to demonstrate that its evidence was not "tainted" by the exploitation of immunized testimony). In *Connolly*, as it happened, the Court found clear evidence of outsourcing, but did not require a further hearing because the outsourcing had not tainted the remainder of the investigation in the *Kastigar* sense. Here, the defense desires a hearing on outsourcing, and one senses some strategy in the soft-pedaling, for now, of the *Kastigar* aspect. Because I have a less complete record than the one that was before Judge McMahon, I will convene a hearing on the outsourcing itself.

scenario whereby CTS acted as a cat's paw for the government. As to LT, the relevance is unclear; Schwartz was not an employee of LT and it never interviewed him.

Rule 17 is not a pretrial discovery device. The general test for Rule 17 subpoenas involves relevance, admissibility, and specificity. Even assuming that there is some statement potentially subject to suppression, the subpoena requests are facially overbroad, and substantially so. Schwartz is trying to compel production of basically all the fruits of CTS's investigation, as well as its cooperation with the government.

In summary, I will place these subpoenas on a double track:

(a) I will grant the issuance of trial subpoenas relevant to the narrow issue of investigative "outsourcing," as it relates to a potential pretrial motion for suppression of coerced statements of Coburn and Schwartz. (These would fall within the "category (a)" requests.) I will, however, require that they be narrowed and made the subject of a separate subpoena.

(b) I will deal with the far broader requests for information and evidence relating to the merits of the case (category (b), *infra*) in a separate opinion, on a sealed basis as appropriate, to avoid revealing trial strategy. Category (b) I regard as far more relevant to the gathering of evidence for trial.

This two-track strategy has the advantage of permitting issues relating to any suppression motion to be severed and poised for decision well in advance of trial.

## B. Discussion

### 1. Prosecution's standing to oppose the motion

Defendants argue most broadly that they must be given free rein, because the prosecution lacks standing to oppose the issuance of third-party subpoenas. Neither side cites Third Circuit authority that is directly on point. I

note that in *Blumberg, supra,* Judge Linares allowed the defendants to serve the subpoena on the third party, with the expectation that it would file a motion to quash.

Rule 17 states that the court may quash or modify a subpoena "upon motion." Fed. R. Crim. P. 17(c)(2). There is no explicit authorization for a court to do so *sua sponte*. I do not accept, however, that my hands are tied. The Court has an upstream responsibility, not merely to quash an overbroad subpoena, but to ensure that a Rule 17 subpoena is properly issued in the first place. *See generally Bowman Dairy v. United States*, 341 U.S. 214, 221 (1951). That is particularly the case where the subpoena is not issued in aid of the presentation of evidence at trial, but rather is sought in aid of pretrial motions which are themselves still at the hypothetical stage. I will police the use of the Court's processes for overbreadth or abuse.

The prosecution cites a case from the Western District of Virginia which allowed the government to oppose a subpoena prior to issuance. The argument there was not that the government had the right to file a motion to quash a third-party subpoena *per se.* Rather, the government was afforded the right to be heard in connection with a motion for issuance of subpoenas, as it would be heard in connection with almost any motion in a criminal case. *See United States v. Modi*, 2002 WL 188327 at *1 (W.D. Va. Feb. 6, 2002). I will consider the prosecution's argument, or indeed anything else, to the extent I find it persuasive.

On balance, I think it is fair to perform at least a preliminary analysis of the scope of the subpoena. As to that issue, the Court's oversight function is critical; I will not, to borrow Defendants' terminology, outsource it to the companies being subpoenaed. That said, it may be that the subpoenaed parties will have their own additional arguments to make on a motion to quash. Claims of privilege, for example, belong to the subpoenaed party, and indeed may be waived if not asserted. I will not anticipate such arguments.

### 2. Whether the motion can be considered *ex parte*

Schwartz argues that the application must be considered *ex parte,* because revealing the requests to the prosecution in unredacted form will reveal his trial strategy. With respect to the category (a) requests, I disagree. As to matters expected to be the subject of contested pretrial motions, there is no basis to draw a pretrial veil. In short, there are or soon will be no secrets here. However, as to the category (b) requests, which relate more directly to obtaining evidence for a defense at trial, I do see the sense of Schwartz's argument. These will be dealt with at the proper time in a separate opinion, on a sealed basis as appropriate.

Schwartz cites a few cases supporting the *ex parte* approach. He did, however, generally inform the prosecution of the plan to request the subpoenas, while redacting specific information relevant to his defense. The prosecution agrees that *ex parte* treatment may be afforded to protect trial strategy, but notes that in some of the cited cases only targeted confidentiality was granted. It also requests that Schwartz produce copies of any evidence produced in response to the subpoenas.

I will not disturb the defendants' redaction of the category (b) requests, the structure of which might reveal trial strategies. The category (a) documents required to be produced pursuant to this Opinion and Order shall be furnished to the Court on a date to be set, and will be shared on an equal basis with both sides.

### 3. Whether issuance of pretrial subpoenas should be granted

As noted, I focus here on the category (a) requests. Rule 17(c) subpoenas cannot be used as a vehicle for general pretrial discovery. *See United States v. Eisenhart*, 43 F. App'x 50, 505 (3d Cir. 2002). "Courts must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16." *US v. Cuthbertson*, 630 F. 2d 139, 146 (3d Cir. 1980).

The parties generally agree that the test articulated by the Supreme Court in *Nixon* applies to Rule 17 subpoenas. Schwartz cites stray authority to the effect that a lower burden could apply, but no court in this Circuit has yet held that. *See, e.g., United States v. Onyenso*, Civ. No. 12-602, 2013 WL 5322651 at *2 (D.N.J. Sept. 13, 2013).

The *Nixon* test is as follows:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon*, 418 U.S. 683, 699–700 (1974). Those requirements may be shorthanded as "(1) relevancy; (2) admissibility; [and] (3) specificity." *Id.* at 700.

In general, Schwartz has made a strong enough argument to require production of some category (a) documents in advance of a hearing on a potential motion to suppress. They are (1) relevant to the "outsourcing" issue and there is reason to believe they would be (2) admissible in a hearing on a potential motion to suppress defendants' statements in interviews. As for (3) availability, Schwartz requested the outsourcing documents from the prosecution, which responded that they were not discoverable. For material in the sole possession of corporate third parties, there appears to be no other reasonable avenue of access aside from the subpoena process. I note also that Schwartz has attempted to avoid redundancy, requesting items only "to the extent not produced to the USAO or DOJ" already. Finally, given the category (a) material's potential relevance to an identified pretrial motion, it makes sense to place it on a separate pretrial track.

### 4. "Relevance" of category (a) limited to a *Garrity* motion to suppress

"Relevance" for these purposes means relevance to a potential *Garrity* motion to suppress the coerced statements of Schwartz or Coburn. I therefore focus on accelerated, pretrial production of category (a) items germane to such a hearing.[12] Of course any direct command that one defendant or the other be interviewed would be most relevant, but I will also allow some breathing room for the surrounding context. I repeat, for clarity, that subpoenas for a broader range of documents may be appropriate in connection with obtaining evidence for a defense at trial.

I will require the defense to narrow the category (a) subpoenas as follows, in each instance with the agreed carve-out for documents that are already in the possession of the prosecution.[13]

#### a. Cognizant Subpoena

| Request # | Request | Ruling |
|---|---|---|
| **1.** | Communications between DOJ and CTS regarding searching for, identifying, and/or producing information concerning the subject matter of the Allegations [in the indictment], including but not limited to:<br><br>a. The collection and/or review of documents by CTS in connection with any voluntary production by CTS to DOJ;<br><br>b. The collection and/or review of documents by CTS in response to DOJ document requests and/or subpoenas; | Further limited to communications related to the investigation and interview of Schwartz. |

---

[12]    Counsel are also directed, however, to Rule 17(h) and 26.2, governing impeachment material for witnesses.

[13]    For convenience, this section discusses Schwartz's subpoena requests. Coburn shall make similar alterations to his parallel subpoena requests.

| | | |
|---|---|---|
| | c. The parameters of and responses to such requests and/or subpoenas; and<br><br>d. Communications regarding search terms, date ranges, and/or custodians. | |
| **2.** | Memoranda of, and communications between DOJ and CTS pertaining to, CTS and/or government interviews of CTS employees concerning the subject matter of the Allegations, including but not limited to:<br><br>a. Guidance or instructions of any kind, whether oral or written, provided by DOJ as to the timing of, substance of, or participants in CTS and/or government interviews, including notes, questions, or talking points provided to CTS to be used in connection with CTS interviews;<br><br>b. Communications, correspondence or representations of any kind provided to DOJ concerning the substance of communications between CTS and its employees regarding CTS and/or government interviews, including any communications to employees, oral or written, regarding whether and how employees were encouraged or compelled to participate, as well as the dates on which CTS provided such information to DOJ; and<br><br>c. Memoranda, notes, or other communications of any kind from CTS to DOJ reporting the substance of CTS interviews, or memoranda, notes, or other communications of any kind on which CTS relied in orally | Further limited to communications related to the investigation and interview of Schwartz. |

| | | |
|---|---|---|
| | reporting to DOJ the substance of CTS interviews, including any conclusions, opinions, or credibility assessments regarding such interviews, as well as the dates on which CTS provided such information to DOJ. | |
| **3.** | All written CTS policies, whether in draft or final form, including but not limited to compliance policies, concerning employee cooperation with or participation in CTS and/or government investigations. | No additional limitation. |
| **4.** | Communications between CTS and its employees regarding CTS and/or government interviews concerning the subject matter of the Allegations, including but not limited to:<br><br>a. Communications from CTS encouraging or compelling or otherwise addressing employee cooperation with or participation in such investigations;<br><br>b. Talking points or other notes prepared by counsel for CTS for any executive, officer, director, or counsel (in-house or outside) in connection with any communication with any employee concerning the CTS and/or government investigations, including but not limited to talking points or other notes prepared for Francisco D'Souza in connection with D'Souza's communications with Steven Schwartz in August 2016; and<br><br>c. Documents provided to CTS employees during such CTS and/or government interviews. | 4(a) and (b) further limited to communications related to the investigation and interview of Schwartz.<br><br>4(c) rejected. |

| 5. | Communications or other documents relating to findings from CTS investigations provided to DOJ by CTS concerning the subject matter of the Allegations, including but not limited to: | Further limited to communications from CTS to DOJ regarding to the investigation and interview of Schwartz. |
|---|---|---|
| | a. Presentations to DOJ or notes of such presentations; | |
| | b. Communications or other documents containing legal and/or factual analysis; and | |
| | c. Communications or other documents pertaining to proffers, as well as a list of the dates, locations, and attendees (whether in person or remote) of any such proffers. | |
| 6. | Communications between DOJ and CTS pertaining to the subject matter of the Allegations and CTS's cooperation with DOJ, including but not limited to: | 6(a) further limited to communications related to the investigation and interview of Schwartz. |
| | a. Communications between DOJ and CTS pertaining to CTS' continued cooperation with DOJ following CTS' agreement to "continue to fully cooperate in the Department's ongoing investigations and any prosecutions that might result," as reflected in the February 13, 2019 declination letter from DOJ to CTS; and | 6(b) rejected. |
| | b. Agreements between DOJ and Francisco D'Souza, P Ganesh, Biswajit Ghosh, Raj Ghosh, Dana Gilbert, Lakshmi Narayanan, Karen McLoughlin, Srimanikandan Ramamoorthy, Chandra Sekaran, and/or Sridhar Thiruvengadam. | |

| | | |
|---|---|---|
| 7. | Communications between DOJ and CTS pertaining to the statement of facts in the February 13, 2019 declination letter from DOJ to CTS and/or the February 15, 2019 United States Securities and Exchange Commission Order, all drafts thereof, and all communications pertaining to revisions of all such drafts. | Further limited to communications related to the investigation and interview of Schwartz. |
| 8. | Communications between DOJ and CTS pertaining to the scope of attorney-client privilege, work product protection, and/or the crime-fraud exception applied by CTS in producing materials to DOJ concerning the subject matter of the Allegations, including but not limited to all communications pertaining to the scope of materials required or not required to be included on privilege logs provided to DOJ. | Rejected. Scope of privilege has no bearing on whether Schwartz was coerced, or more broadly on whether the investigation was outsourced. Any claim of privilege must await assertion by the subpoena recipient. |
| 9. | Communications between DOJ and CTS pertaining to the agreement between DOJ and CTS dated October 6, 2016 regarding the confidentiality and privilege status of materials CTS provided to DOJ, including but not limited to communications concerning determinations as to which materials were or were not within the scope of such agreement, and how and by whom such determinations were to be made. | Rejected. Scope of privilege has no bearing on whether Schwartz was coerced, nor more broadly, whether the investigation was outsourced. Any claim of privilege must await assertion by the subpoena recipient. |
| 10. | Communications between DOJ and CTS pertaining to the agreement between DOJ and CTS concerning Federal Rule of Evidence 502(e) dated April 26, 2018 and/or the court order pursuant to Federal Rule of Evidence 502(d) dated April 30, | Rejected. See # 8, *supra*. |

|  | 2018, including but not limited to communications concerning the terms of such agreement, determinations as to which materials were or were not within the scope of such agreement and/or order, and how and by whom such determinations were to be made. |  |

### b. LT Subpoena

| Request # | Request | Ruling |
|---|---|---|
| **1.** | Correspondence, other than production cover letters, between L&T Construction and DOJ concerning the subject matter of the Allegations [in the indictment]. | Further limited to communications related to the investigation and interview of Schwartz. |
| **2.** | Communications between DOJ and L&T Construction regarding searching for, identifying, and/or producing information concerning the subject matter of the Allegations, including but not limited to:<br><br>a. The collection and/or review of documents by L&T Construction in response to DOJ document requests and/or subpoenas;<br><br>b. The parameters of and responses to such requests and/or subpoenas; and<br><br>c. Communications regarding search terms, date ranges, and/or custodians. | Further limited to communications related to the investigation and interview of Schwartz. |
| **3.** | Communications between DOJ and L&T Construction pertaining to the scope of attorney-client privilege, work product protection, and/or the crime-fraud exception applied by L&T Construction in producing materials to DOJ concerning the subject matter of the Allegations, including but not limited to all communications pertaining to the scope of materials required or not | Rejected. Any claim of privilege must await assertion by the subpoena recipient. |

21

| | | |
|---|---|---|
| | required to be included on privilege logs provided to DOJ. | |
| **4.** | Memoranda of, and communications between DOJ and L&T Construction pertaining to, L&T Construction and/or government interviews of L&T Construction employees concerning the subject matter of the Allegations, including but not limited to: | Further limited to communications related to the investigation and interview of Schwartz. |
| | a. Guidance or instructions of any kind, whether oral or written, provided by DOJ as to the timing of, substance of, or participants in L&T Construction and/or government interviews, including notes, questions, or talking points provided to L&T Construction to be used in connection with L&T Construction interviews; | |
| | b. Communications, correspondence or representations of any kind provided to DOJ concerning the substance of communications between L&T Construction and its employees regarding L&T Construction and/or government interviews, including any communications to employees, oral or written, regarding whether and how employees were encouraged or compelled to participate; and | |
| | c. Memoranda, notes, or other communications of any kind from L&T Construction to DOJ reporting the substance of L&T Construction interviews, or memoranda, notes, or other communications of any kind on which L&T Construction relied in orally reporting to DOJ the substance of L&T Construction interviews including any conclusions, opinions, or credibility assessments regarding such interviews, as well as the dates on which L&T Construction provided such information to DOJ. | |

| 5. | All written L&T Construction policies, whether in draft or final, including but not limited to compliance policies, concerning employee cooperation with or participation in L&T Construction and/or government investigations. | No additional limitation required. |
|---|---|---|
| 6. | Communications between L&T Construction and its employees regarding L&T Construction and/or government interviews concerning the subject matter of the Allegations, including but not limited to:<br><br>a. Communications from L&T Construction encouraging or compelling or otherwise addressing employee cooperation with or participation in such investigations;<br><br>b. Talking points or other notes prepared by counsel for L&T Construction for any executive, officer, director, or counsel (in-house or outside) in connection with any communication with any employee concerning in any way the L&T Construction and/or government investigations; and<br><br>c. Documents provided to L&T Construction employees during such L&T Construction and/or government interviews. | 6(a) & (b) further limited to communications related to the investigation and interview of Schwartz.<br><br>6(c) rejected. |
| 7. | Communications or other documents relating to findings from L&T Construction's investigations provided to DOJ by L&T Construction concerning the subject matter of the Allegations, including but not limited to:<br><br>a. Presentations to DOJ or notes of such presentations;<br><br>b. Communications or other documents containing legal and/or factual analysis; and<br><br>c. Communications or other documents pertaining to proffers, as well as a list of | Further limited to communications related to the investigation and interview of Schwartz. |

|   | the dates, locations, and attendees (whether in person or remote) of any such proffers. | |
|---|---|---|
| **8.** | Communications between DOJ and L&T Construction pertaining to the subject matter of the Allegations and L&T Construction's cooperation with DOJ. | Further limited to communications related to the investigation and interview of Schwartz. |

### 5. Scope of category (b) requests

The more general requests for information (category (b)) I will deal with in a separate ruling which will be partially or completely sealed as appropriate.

### 6. Procedure

The procedure going forward shall be in accordance with the Order. *See* pp. 27–28, *infra.*

## III. Miscellaneous requests from the Rule 16 motion (DE 79)

### A. Evidence of other corrupt payments

Defendants seek to compel the prosecution to produce evidence related to other payments made to government officials in India that are not subject to the indictment. The prosecution responds that it has already provided all it has. (R. 16 Gov. Opp. at 18-19). To this, Defendants respond that the prosecution ought to (1) "identify specifically what other allegedly corrupt payments were made, because the summary records it has produced are not clear on this point" and (2) "identify the specific individual payments and other documents and information it has produced relating to them." (R. 16 Def. Brf. at 10-11).

The prosecution represents that its production has been complete. That Defendants consider the information to be unclear does not mean that the prosecution has not satisfied its discovery obligations. As to specifically identifying the individual payments, Defendants cite to two out-of-circuit cases requiring the government to identify the *Brady* material within the discovery it has already produced. (R. 16 Def. Reply

at 11). But those cases involve the needle-in-a-haystack scenario—*i.e.,* voluminous discovery in which any exculpatory information cannot be identified with reasonable effort. Here, the prosecution has identified a small collection of relevant documents. (*See* R. 16 Gov. Opp. at 18). Here, the request would seem to serve no further purpose than pinning down the prosecution and creating grounds for further motion practice. The prosecution has been forthcoming and is expected to remain so, but it is not required to analyze and organize this information to the Defendants' satisfaction.

Accordingly, the motion to compel further discovery relating to other corrupt payments is denied.

### B. Expert information

Defendants seek to compel information regarding potential expert witnesses and the subject matter about which they will testify. The prosecution responds that it has not yet determined what experts, if any, it will call as witnesses. I will require that the parties confer on a schedule for the exchange of expert-related discovery, sufficiently in advance of trial to permit the filing of any *Daubert* motions and the retention of rebuttal experts if appropriate. Should they be unable to agree, I will resolve any scheduling disputes.

### C. Technical deficiencies in production

Defendants move to order the prosecution to cure various technical deficiencies in its productions, arguing that the prosecution is obligated to provide discovery in a reasonably usable form. The Government responds that it has done all it can to resolve these issues, including seeking assistance from the parties that originally produced the materials. In their reply brief, Defendants state that they will endeavor to resolve these issues without intervention from the court. (R. 16 Def. Reply at 13). Counsel have been cooperative thus far, and I will therefore reserve judgment on this issue.

### D. Withholding of non-privileged materials

Defendants request that the prosecution produce certain materials that Cognizant has withheld on the basis of privilege. They suspect that Cognizant is improperly withholding information that is not in fact subject to privilege. The Government responds that it has given the defendants all the information it possesses regarding Cognizant's invocation of privilege.

Here, the Defendants' only legal argument is that the prosecution cannot blind itself to potentially discoverable evidence. True enough, but the principle does not extend so far as to deputize the prosecution to press privilege arguments on the Defendants' behalf.[14]

### E. Potential impeachment evidence

Defendants argue that the prosecution should turn over all evidence in its possession that might be used to impeach or undermine he testimony of its witnesses. They specifically call attention to immunity agreements that the prosecution entered into with certain potential witnesses. (R. 16 Def. Brf. at 14). The Government responds that it will turn over such *Giglio* material in advance of the final pre-trial conference. That is actually in excess of the usual requirements in this district, and should provide more than ample time for its use in cross-examination, even in this complex matter.

### F. Information regarding a prosecution witness

Defendants seek further information regarding a particular potential prosecution witness. The prosecution disclosed to the Defendants that it believed Cognizant's counsel had conducted additional interviews of this witness. It represents, however, that it does not possess any materials relating

---

[14]    Defendants request that the prosecution turn over materials related to an order for disclosure of records in relation to an email account. (R. 16 Def. Reply at 14 n. 7). I cannot fairly rule on a request in a footnote to their reply brief. It seems that the Defendants want to check whether the application was appropriately granted, although it is not clear that they would have standing to suppress the results if it were not.

to such an interview. In their reply, Defendants state they will address the issue in forthcoming discovery motions. Accordingly, relief is denied, subject to whatever further facts Defendants may bring to the Court's attention.

## ORDER

**IT IS THEREFORE** this 14th day of September, 2020

**ORDERED** that the defense motions (DE 72, 73, 79) are decided as follows:

A. The Rule 16 Motion to Compel (DE 79) is **GRANTED IN PART AND DENIED IN PART**, insofar as it seeks information in the possession of the SEC, in accordance with the foregoing Opinion. Within five days, counsel shall confer as to the identity and number of witnesses and report the results of such discussions in a filed joint letter, which shall also propose three alternative dates for a hearing. Subject to any objections and conditions at the time, the hearing will be held by video.

B. The Rule 16 Motion to Compel (DE 79) is otherwise **DENIED**, insofar as it seeks the following miscellaneous relief:

    a. disclosure evidence of other, uncharged corrupt payments;

    b. immediate disclosure regarding potential expert witnesses, as such discovery will be exchanged in due course;

    c. cure of various technical deficiencies in the government's production, which appear likely to be resolved without Court intervention;

    d. disclosure of materials related to Cognizant's assertions of privilege;

    e. immediate disclosure of potential impeachment

evidence, which will be produced in due course;

   f.  disclosure of information, not in the government's possession, relating to additional interviews of a particular witness;

all in accordance with the foregoing Opinion.

C.  The applications of Defendants Schwartz and Coburn for issuance of Rule 17 subpoenas are **GRANTED IN PART AND DENIED IN PART**, in accordance with the foregoing Opinion.

   a.  Within five days, the defense shall present to the court redrafted document subpoenas, confined to category (a) and narrowed in accordance with the rulings above. If they are acceptable, the court will direct service forthwith.

   b.  The subpoenas shall be made returnable before the Court on October 20, 2020 at the earliest. They shall state that a personal appearance is not required, and that the subpoenaed party may comply by delivering the responsive items to the Court, which will arrange for distribution to counsel for the parties.

   c.  The subpoenas shall contain a notice that any motion to quash must be filed five days before the return date, and that the recipient is not thereby relieved of the obligation to produce timely such items as to which it has not moved to quash.

   d.  After receipt of the documents and resolution of any motions to quash, the defense may file a *Garrity* motion to suppress. In any such suppression motion, the defense shall proffer affidavits in lieu of direct testimony of witnesses, and shall attach copies of documents it expects to offer in evidence at a hearing.

   e.  The hearing will be scheduled for a date convenient for

28

all parties. Subject to any objections and conditions at the time, the hearing will be held by video.

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**