# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

GORDON J. COBURN and
STEVEN SCHWARTZ

Hon. Kevin McNulty

Crim. No. 19-cr-120 (KM-MAH)

**Confidential – Submitted Under Seal**

---

## BRIEF IN SUPPORT OF DEFENDANT GORDON J. COBURN'S MOTION TO COMPEL *BRADY* SEARCHES, TO SUPPRESS, AND FOR OTHER RELIEF

---

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ............................................................................... 5

   A.   DOJ Launches its FCPA Pilot Program With a Focus on Corporate Cooperation Against Individuals Weeks Before Cognizant Initiates this Investigation ...................................... 5

   B.   Cognizant Immediately Pursues a Strategy Keyed to the DOJ Policies to Maximize Cooperation Credit ................................................................................................ 7

   C.   Cognizant Compels Numerous Employee Interviews in Close Coordination With the Government ............................................................................................................ 9

   D.   Cognizant Interviews Forty-Seven (47) of its Employees – and Provides the Government "Readouts" of them – Before the Government Conducts a Single Interview of a Cognizant Employee ............................................................................... 13

   E.   Cognizant Compels Schwartz and Coburn to Sit for Interviews and Turn Over Their Devices Under Extraordinarily Restrictive Conditions .................................... 14

   F.   Cognizant and the Government are Closely Communicating and Coordinating During the Days Surrounding Coburn and Schwartz's Interviews ....................................... 16

   G.   Cognizant Abruptly Pulls and Then Waters Down Its Draft Press Release ................... 18

   H.   Cognizant Continues to Work in Close Coordination With the Government as the Investigation Progresses ....................................................................................... 19

   I.   Cognizant's Close Coordination with the Government Focused on Coburn and Schwartz Specifically ............................................................................................ 23

PROCEDURAL HISTORY ............................................................................... 25

ARGUMENT ................................................................................................... 26

   A.   The Government Should Be Required to Search Cognizant's Files For Brady Materials and Report Back to the Court on the Search and Its Results ........................................ 28

     1.   The Government Has a Duty to Search an Investigating Company's Files When Those Files Are Within the Government's Constructive Possession ........................ 28

     2.   Cognizant's Investigative Files Are in The Government's Constructive Possession.................................................................................................. 30

     3.   Cognizant, a Cooperating Witness, is Uniquely Ill-Suited to be Being the Arbiter of the Government's Disclosure Obligations ................................................. 32

   B.   The Government Should Be Precluded From Using Schwartz's and Coburn's Statements Made During Company Interviews and Any Evidence Derived Therefrom ................................................................................................. 33

1.  Compelled Interviews by Employers Carry Fifth Amendment Implications When the Employer's Actions Are Fairly Attributable to the Government ............................... 33

2.  Cognizant Compelled Schwartz's and Coburn's Interviews in Violation of Garrity. 35

C.  If the Court Determines that Any Aspect of the Cognizant Investigation Is Fairly Attributable to the Government, Defendants Should be Permitted to Brief the Due Process Implications of Such a Finding ........................................................................ 39

**CONCLUSION** ................................................................................................................ 40

## **TABLE OF AUTHORITIES**

### **Cases**

*Brady v. Maryland*,
373 U.S. 83 (1963) …………………………………………………...…. *passim*

*California v. Trombetta*,
467 U.S. 479 (1984) ………………...……………………………………………30

*Flagg v. Yonkers Sav. & Loan Ass'n*,
396 F.3d 178 (2d Cir. 2005) …...……………………………………………...34

*Garrity v. New Jersey*,
385 U.S. 493 (1967) …...……………………………………………….. *passim*

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) …………………………………………………28, 33

*Kartorie v. Dunham*,
108 F. App'x 694 (3d Cir. 2004) ……………………………………………..34

*Kastigar v. United States*,
406 U.S. 441 (1972) …………………………………………………33, 41

*Kyles v. Whitley*,
514 U.S. 419 (1995) …………………………………………………….28

*Lyons v. Oklahoma*,
322 U.S. 596 (1944) …………………………………………………….40

*Missouri v. Seibert*,
542 U.S. 600 (2004) …………………………………………………40, 42

*Skinner v. Ry. Lab. Executives' Ass'n*,
489 U.S. 602 (1989) …………………………………………………….34

*United States v. Bernal-Obeso*,
989 F.2d 331 (9th Cir. 1993) …………………………………………………32

*United States v. Blumberg*,
No. 14 Cr. 458 (JLL) (D.N.J. 2016) ……………………………………… *passim*

*United States v. Bonner*,

469 F. App'x 119 (3d Cir. 2012) ……………………………………………………..40

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992) ………………………………………………………29

*United States v. Chiavola*,
    744 F.2d 1271 (7th Cir. 1984) ………………………………………………………40, 41

*United States v. Connolly*,
    No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) …………….. *passim*

*United States v. Duronio*,
    No. 02 Cr. 933 (JAG), 2006 WL 1457936 (D.N.J. May 23, 2006) ……………….. *passim*

*United States v. Folad*,
    877 F.3d 250 (6th Cir. 2017) ……………………………………………………30

*United States v. Ghailani*,
    743 F. Supp. 2d 261 (S.D.N.Y. 2010) ……………………………………………..39

*United States v. Gonzales*,
    164 F.3d 1285 (10th Cir. 1999)) ……………………………………………39-40, 41

*United States v. Menendez*,
    No. 15 Cr. 155, 2015 WL 5703199 (D.N.J. Sept. 28, 2015) ………………………..39, 41

*United States v. Merkt*,
    764 F.2d 266 (5th Cir. 1985) ………………………………………………………40, 41

*United States v. Patane*,
    542 U.S. 630 (2004) ………………………………………………………………39

*United States v. Reyeros*,
    537 F.3d 270 (3d Cir. 2008) ……………………………………………28, 29, 41

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) ……………………………………………… *passim*

*United States v. Starusko*,
    729 F.2d 256 (3d Cir. 1984) ………………………………………………………29

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) ……………………………………………..37

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ……………………………………………… *passim*

*United States v. Vangates*,
   287 F.3d 1315 (11th Cir. 2002) …………………………………………………………36

*United States v. Walther*,
   652 F.2d 788 (9th Cir. 1981) …………………………………………………………34

## **Other Authorities**

Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot
Program (Apr. 5, 2016) …………………………………………………………………...6

Memorandum from Andrew Weissmann, Chief, Fraud Section, Criminal Division, The Fraud
Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance (Apr. 5, 2016)
………………………………………………………………………………………5, 6, 37

Memorandum from Sally Quillian Yates, Deputy Att'y Gen., U.S. Dep't of Justice to All U.S.
Att'ys, *et al.*, Individual Accountability for Corporate Wrongdoing (Sept. 9, 2015) …… 6, 27, 34

Justice Manual 9-47.120 ………………………………………………………………………6

SEC Charges Cognizant and Two Former Executives With FCPA Violations (Feb. 15, 2019),
available at https://www.sec.gov/news/press-release/2019-12 …………………………………24

Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and
the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann. Rev. Crim. Proc. III
(2011) …………………………………………………………………………………....35

## PRELIMINARY STATEMENT

In May 2016, a team of experts with many years of federal investigative experience opened an investigation into allegations of Foreign Corrupt Practices Act ("FCPA") violations at Cognizant Technology Solutions Corporation ("Cognizant").  By late August 2016, Gordon Coburn and Steven Schwartz were the targets of that investigation, and the U.S. Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") were its intended beneficiaries.

In the first several months of the investigation, the investigators conducted dozens of interviews of Cognizant employees and provided near-real-time updates on the progress of many of those interviews to prosecutors.  The investigators interviewed company leadership – including Coburn and Schwartz – and did so under highly coercive conditions designed to compel participation in those interviews.

The investigators provided oral "readouts" of the substance of employee interviews, in most instances long before the prosecution team conducted interviews of its own.  In addition to sharing with the prosecutors what the interviewees actually said during the interviews, the investigators repeatedly shared their assessments of the credibility of many of those interviewees with prosecutors.

The investigators also collected and reviewed a massive quantity of electronic documents, requesting direction from the prosecutors on what "search strategies" to employ in order to identify the most important documents for the prosecutors.  Then the investigators combed through the resulting documentary record and provided multiple binders – hundreds of pages – of self-described "hot docs" to the prosecutors – again before those prosecutors

1

conducted a single interview (and thousands more pages of identified "hot docs" after that first interview).

The investigators analyzed those records and offered to provide that analysis to the prosecutors, in order to ensure the prosecutors understood the significance of certain of those "complex" records.

And the investigators kept in close and regular contact with the prosecution team: for example, across a four-week period shortly after learning of the investigation in September 2016, there are records of at least 29 communications between the two teams. That close coordination continued throughout the remaining months of the investigation with dozens – or more – phone and email communications between these investigators and the prosecutors.

Any federal prosecutor would be grateful for such dogged and communicative investigators.

But, of course, here, the investigators were not federal agents, they were Cognizant's private law-firm lawyers. And the entire investigation described above was done by Cognizant's investigators, in close coordination with the government. Thus, at the critical initial stages of this case, the government chose to rely almost entirely upon a private investigation – freed of the strictures of the Constitution – to labor the oar. In consequence, by the time the government started rowing, Cognizant had already provided it with the cultivated fruits of a mature investigation along with a detailed roadmap for its case.

Through at least early 2017, when the government conducted its very first interview, it had already received the fruits of Cognizant's investigation: large volumes of information – analyzed, summarized and interpreted for it by Cognizant, with a focus on Coburn and Schwartz

2

– while seemingly doing very little work of its own.  To wit, across the first seven months of the investigation:

- Cognizant conducted 44 interviews of its employees that were shared with DOJ, while DOJ did not conduct a single interview;

- Cognizant collected and reviewed hundreds-of-thousands of documents and repeatedly provided DOJ with binders of self-styled "hot docs," again before DOJ conducted a single interview.

Importantly, there is nothing intrinsically improper with DOJ's chosen investigative strategy.  If the government elects to rely on a private investigative team to carry out all or part of an investigation, there is no reason why it should be prohibited from doing so.  Indeed, as a matter of policy or of strategy, it may well be desirable for DOJ to be permitted to coordinate with, and rely upon, the activities of a company's investigators, and to follow the roadmap given to it by the company.  Certainly, various DOJ policies powerfully incentivize active cooperation with DOJ, and reward such cooperation handsomely.

But when DOJ relies on a private actor to carry out core governmental investigative functions, that has consequences.  It must.  The Constitution requires it: the government cannot evade its constitutional and statutory obligations by relying on a private actor to carry out government action.

Applying those constitutional protections is critical where, as here, the deputized private actor is the government's own cooperating witness – and therefore has "obvious incentives to shift blame" from itself to others and to identify materials that would "exculpat[e] itself" in order to "dissuade the government from pursuing criminal charges against" it and, perhaps, to focus its attention on others.  January 24 Order and Opinion at 23-24 (ECF No. 263).

3

As set forth in detail below, the evidence already produced powerfully supports the notion that, in various ways, Cognizant was *de facto* the government.  Indeed, the evidence that Cognizant was *de facto* the government for interview purposes is at least as compelling as that which was present in *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019).

But, critically, the joint-investigative effort was not limited to the interviews.  Far from it.  As described in further detail below, throughout the course of this case, Cognizant has acted as an arm of the prosecution: time and again, DOJ delegated fundamentally governmental tasks to Cognizant, including interviews, document collection and reviews, factual and legal analysis, and the production of discovery.  That too has constitutional implications.  *See United States v. Blumberg*, No. 14-cr-458 (JLL), ECF No. 113 at 2 (D.N.J. June 7, 2016).

While the discovery ordered by this Court pursuant to the Rule 17 subpoenas has revealed aspects of the relationship between DOJ and Cognizant, the evidentiary hearing that this Court ordered in its Order of September 14, 2020 (ECF No. 96) (the "Hearing") will, we expect, further illuminate the nature of the relationship, and the consequences that flow from it.  *See Blumberg*, No. 14-cr-458 (JLL), ECF No. 113 at 2 (D.N.J. June 7, 2016).  Throughout this brief, we highlight additional facts we will seek to explore at the Hearing.

Accordingly, by this Motion – and pending the additional evidence to be adduced at the Hearing – Coburn moves this Court for the following remedies:

(1)     The government should be directed to search Cognizant's files for *Brady* material, to produce any such materials, and to provide a detailed report to the Court about that search and its results.

(2)     The government should be precluded from using at trial any statements made by Coburn during Cognizant's interview, as well as any evidence derived from those statements.

(3)     If the Court finds that some or all of the investigation conducted by Cognizant is fairly attributable to the government, Coburn should be permitted to file supplemental briefing addressing whether the Due Process Clause of the Fifth Amendment requires the suppression of other evidence or dismissal of the Indictment.

## I.     FACTUAL BACKGROUND

### A. DOJ Launches Its FCPA Pilot Program with a Focus on Corporate Cooperation Against Individuals Weeks Before Cognizant Initiates This Investigation

In May 2016, Cognizant initiated the investigation that would give rise to this criminal case.[1]  It did so in the shadow of a new, weeks-old, DOJ FCPA program explicitly designed to incentivize corporate cooperation relating to the conduct of individual employees.  Specifically, in April 2016, with much fanfare, DOJ announced the launch of the "FCPA Pilot Program," which was aimed at "motivat[ing] companies to voluntarily self-disclose FCPA-related misconduct."  Memorandum from Andrew Weissmann, Chief, Fraud Section, Criminal Division, The Fraud Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance at 2 (Apr. 5, 2016) ("Weissmann Memo").

---

[1] Prior to May 2016, an internal group at Cognizant known as Global Security Investigations was undertaking a "separate investigation" of potentially improper payments by Cognizant.  Ex. 1 (CTS_R17_0005257) (May 1, 2018 DOJ/SEC Meeting Draft Talking Points). The alleged payments at issue in this case were "raised" during that separate investigation in August 2016.  *Id.*

The FCPA Pilot Program, and the foundational memorandum of Deputy Attorney General Sally Quillian Yates issued seven months earlier ("Yates Memo"),[2] signaled a new, more aggressive approach in DOJ's efforts specifically to encourage companies to investigate and report on the conduct of their employees.[3] *See, e.g.*, Weissmann Memo at 9 (explaining that the newly launched FCPA Pilot Program would "promote aggressive enforcement of the FCPA and the investigation and prosecution of culpable individuals"); *see also* Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016) (announcing the launch of the FCPA Pilot Program as part of "significant enhancements to the [DOJ]'s ability to investigate and prosecute FCPA cases"); Yates Memo at 2 ("[C]orporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct" in order to receive cooperation credit.).

DOJ's directive to corporations within the ambit of the FCPA was unmistakable: self-disclose and fully cooperate with DOJ, specifically by "disclos[ing] all relevant facts about the individuals involved in the wrongdoing," or lose the opportunity for mitigation credit. *Id.* Thus, DOJ delivered to corporations in writing the same message that its individual prosecutors deliver *in personam* to individual targets: help yourself by cooperating against others.

---

[2] Memorandum from Sally Quillian Yates, Deputy Att'y Gen., U.S. Dep't of Justice to All U.S. Att'ys, *et al.*, Individual Accountability for Corporate Wrongdoing (Sept. 9, 2015).

[3] The core principles of these policies were later incorporated into permanent DOJ policy. *See* Justice Manual 9-47.120

### B. Cognizant Immediately Pursues a Strategy Keyed to the DOJ Policies to Maximize Cooperation Credit

Documents produced by Cognizant illustrate how, before even a single conversation with DOJ, Cognizant moved swiftly to follow DOJ's cooperation directive.[4]

(In this context, it must be observed that virtually every Cognizant document cited throughout this section only became known to defense counsel as a product of the extensive Rule 17 litigation. As the Court is well-aware (and as is set forth *infra* at Section II), that litigation was conducted over the repeated and vigorous objections of Cognizant and – notably – the government. Put differently: none of these documents were collected and produced in the ordinary course of criminal discovery by the government.)

Between April and August 2016, before any known contact with DOJ, Cognizant: retained Karl Buch of DLA Piper ("DLA"), a former Assistant United States Attorney in the U.S. Attorney's Office for the District of New Jersey, to lead the investigation; retained Ernst & Young ("EY") to conduct a forensic accounting review; retained Brackett Denniston, a former senior federal prosecutor, to coordinate with DLA and Cognizant's Audit Committee; and then directed this team of former federal prosecutors to conduct myriad employee interviews in highly coercive circumstances.[5]

Indeed, it appears that, when counsel on two occasions briefed Cognizant's Board on the investigation at the end of August, and days before their first known communication with DOJ,

---

[4] The exact timing and motivations behind Cognizant's initiation of the investigation require additional factual development, which we will elicit at the Hearing.

[5] By August 28, 2016, DLA had conducted twelve interviews of ten employees, including three interviews of Srimanikandan Ramamoorthy.

Cognizant's potential eligibility under the FCPA Pilot Program was a focus of discussion.[6]  *See* Ex. 3 (Preferred Short Script for Requesting Meeting to Report FCPA Concerns) (draft of Aug. 31, 2016) (CTS_R17_0005220) ("August 31, 2016 Short Script"). Throughout this time period, Cognizant was having internal discussions regarding self-disclosure to the government.

Of course, Cognizant did not wait long to convey its chosen strategy of cooperation against individuals directly to the government.  In its very first disclosed substantive communication with DOJ,[7] on September 1, 2016, Cognizant stated that it "would ultimately like to be considered for inclusion in the FCPA Pilot Program."[8]  Ex. 3.  And Cognizant understood exactly what it had to do in order to get the benefits of that Program: in a hypothetical response to a potential question about Cognizant's intentions with respect to the investigation, Cognizant planned to tell the government that it would "cooperate fully with the government, including with respect to the continued investigations of individuals pursuant to the Yates Memo and related criteria in the FCPA Pilot Program."  *Id.* ("Potential Q&A"); *see also* Ex. 4 (CTS_R17_0004276) (comment bubble from Brian Benjet (DLA) on 9/20/2016 draft press release asking: "Can or should we say something about the [FCPA] pilot program?").

---

[6] Minutes of the August 24, 2016 and August 31, 2016 Board meetings have not been produced.  Certain documents identify August 31, 2016 as the date of the "[f]irst full Board update."  *See, e.g.*, Ex. 2, at 12 (CTS_R17_0005299) (Filip Factors & FCPA Corporate Enforcement Policy Presentation) (draft of May 9, 2018).  This issue requires additional factual development, which we will elicit at the Hearing.

[7] Whether Cognizant engaged in any informal communications with the government prior to this time requires additional factual development, which we will elicit at the Hearing.

[8] Throughout this memorandum of law, actions taken by DLA on behalf of Cognizant are imputed to Cognizant.

### C. Cognizant Compels Numerous Employee Interviews in Close Coordination with the Government

Both before and after it self-reported to the government, Cognizant compelled numerous employee interviews under threat of termination,[9] with the clear intent of conveying the substance of those interviews to the government. Between August 20, 2016 and September 23, 2016, Cognizant conducted 22 interviews that were read out, or "downloaded," to the government, including two of Schwartz and one of Coburn. *See infra* Section I.D. Cognizant was closely coordinating its interviews with the prosecutors; they were in frequent, often daily contact. By September 28, in addition to Cognizant's self-disclosure on September 1, Cognizant and the government had communicated with each other on at least eleven days, for a total of at least 29 individual communications (9 phone calls and 20 email exchanges).[10]

Cognizant has not produced any outlines or talking points for those calls, and the government, likewise, has steadfastly refused to disclose the nature of them.[11] But contemporaneous emails between Cognizant and the prosecutors nonetheless show that the government had requested real-time updates from Cognizant regarding the investigation, and that Cognizant complied with that request. *See, e.g.*, Ex. 6 CTS_R17_0000251 (Sept. 9, 2016 email from DLA to DOJ: "As you requested, I write to let you know that we intend to interview

---

[9] *See, e.g.*, Ex. 5 (Memorandum of Oct. 19, 2016 Interview of T. Sridhar) (CTS_R17_0004917) ("If we conclude at the end of the interview if someone is not truthful or cooperative [sic], the consequence could be up to termination.").

[10] The relevant communications appear to have occurred on September 8 (emails and call with DOJ); September 9 (email to DOJ); September 14 (emails and calls with DOJ and SEC); September 15 (call with DOJ and SEC); September 20 (email with DOJ); September 21 (email with DOJ); September 22 (emails with DOJ and SEC); and September 23 (emails and call with DOJ and SEC).

[11] The content of these communications requires additional factual development, which we will elicit at the Hearing.

Lakshmi Narayanan, Cognizant's Vice Chairman of the Board, on Monday."); Ex. 6 CTS_R17_0000251 (Sept. 14, 2016 email from DLA to DOJ: "Please let me know if you are available for a call with John, Gray and me between 2-4 pm today.  We would like to raise some recent developments with you.").

Cognizant has not produced its subsequent communications with the government, and the summaries of the oral readouts provided to the Defendants by the government have been written specifically to omit the dates on which prosecutors received these readouts from Cognizant; indeed, the government has repeatedly, and as recently as June 2022, refused to disclose the date(s) on which it received these oral interview readouts from Cognizant.[12]  The timing of these readouts requires additional factual development at the Hearing.

Nonetheless, the available evidence demonstrates clearly that Cognizant continued to coordinate closely with the prosecutors in scheduling, conducting, and conveying the substance of its employee interviews.[13]  *See, e.g.*, Ex. 8 June 15, 2022 DOJ Letter to Defendants at 2 (noting that in February 2017 the government, *inter alia*: (i) "said that it wanted [Sridhar] Thiruvengadam's counsel to have access to documents that Thiruvengadam would have had access to during the relevant time period; (ii) "advised that it would be helpful if DLA kept track

---

[12] Despite having produced the notes of the interview downloads it received from Cognizant, the government has explicitly refused to provide the dates on which it received those downloads, stating that it does not view that information as relevant.  *See* Ex. 7 (June 15, 2022 Email from N. Grippo).  In follow-up correspondence, the government also refused to state (i) whether it interviewed any employees, who had previously been interviewed by Cognizant, *without* first receiving a download of the Cognizant interview(s) or (ii) approximately how many interview downloads it received from Cognizant prior to February 7, 2017.  *See* Ex. 7 (June 22, 2022 Email from N. Grippo).

[13] The extent to which the government specifically instructed Cognizant as to whom to interview, and when, requires additional factual development, which we will elicit at the Hearing.

of documents shown to the witness for the first time"; (iii) "noted that it wanted to interview Thiruvengadam first"; and (iv) "asked DLA whether, for any future witness interviews DLA conducted, DLA could first speak with the Government before showing a witness a document that he/she might not have received" (to which DLA "said yes")).

In addition, Cognizant provided at least 20 assessments of the credibility or inconsistency of employees' statements.[14]  The vast majority of those employees were unrepresented during their interviews.[15]

Years later, in May 2018, when Cognizant was showcasing the extent of its cooperation to DOJ in seeking the benefit of its cooperation, it emphasized the extent of its coordination with DOJ regarding employee interviews.  The following are excerpts (screenshots) from Cognizant's May 2018 "Filip Factors & FCPA Corporate Enforcement Policy Presentation" to DOJ describing the extent of its own cooperation, in the hopes of receiving the benefits of its cooperation:

---

[14] *See, e.g.*, Ex. 1 (CTS_R17_0005257) (May 1, 2018 DOJ/SEC Meeting Draft Talking Points) ("We have reason to doubt Deepa [Baburaaj's] credibility."); Ex. 9 (Information Provided by DLA Regarding August 20, 2016 Interview of Srimanikandan Ramamoorthy) at 58 ("DLA stated that Ramamoorthy is a truth-teller, but that the Government should make its own judgment."); Ex. 10 (Information Provided by DLA Regarding August 29, 2016 Interview of Francis D'Souza) at 3 ("DLA stated that they were not aware of any evidence suggesting that, prior to D'Souza's conversations with Schwartz in August 2016, D'Souza had information about the bribe demand that Cognizant had received."); Ex. 11 at 86 (Information Provided by DLA Regarding August 23, 2016 Interview of Sridhar Thiruvengadam) ("DLA . . . noted that Sridhar was very cagey, was not telling the truth."); Ex. 8 (June 15, 2022 Ltr. from Government at 2) ("During the [February 14, 2017 call with the Government], DLA stated that [Sridhar] Thiruvengadam's testimony has evolved and his memory has gotten better.".

[15] The manner in which these interviews were conducted, and the extent to which they are accurately summarized in the interview memoranda produced to the Defendants, require additional factual development, which we will elicit at the Hearing.

> e.   Providing witness interview readouts and custodial files to DOJ to facilitate productive discussions with key witnesses;

> f.   Cooperating extensively with the DOJ through investigative counsel, including providing:
>
>    (1)   10 in-person subject matter briefings
>
>    (2)   More than 40 telephonic investigation updates
>
>    (3)   8-10 subject-matter/ hot doc binders
>
>    (4)   More than 20 interview readouts

*Source*: Cognizant Filip Factors & FCPA Corporate Enforcement Policy Presentation ("Cognizant's May 10, 2018 DOJ Presentation"), Ex. 2 CTS_R17_0005299, at 7-10 (draft of May 9, 2018).

All told, throughout the course of its investigation, Cognizant conducted at least 45 interviews of its own employees that were downloaded directly to the prosecutors. *See* Ex. 12 DOJ-302-00000078-DOJ-302-00000096; Ex. 13 Government Meeting Talking Points, CTS_R17_0005246 (draft of Feb. 3, 2017) (downloading summaries of readouts of Cognizant interviews of Karen McLoughlin and Raj Ghosh, who were later interviewed by the government on June 19, 2017 and August 17, 2018, respectively); Draft Talking Points, Ex. 14 CTS_R17_0005207 (draft of July 13, 2018) (listing "interview readouts" of interviews of Ganesh Paramasivam, Lakshmi Narayanan, Krishna Subramanian, and Raghu Raman); Draft Testimony Talking Points, Ex. 15 CTS_R17_0005286 (draft of Oct. 8, 2017) (bullet points summarizing testimony of seven individuals). In addition to the 45 interviews that Cognizant – then a cooperating witness – elected to share with the government, it conducted an additional approximately 400 interviews that it determined not to share. *See* Ex. 2 at 7-10.

**D. Cognizant Interviews Forty-Four (44) of its Employees – and Provides the Government "Readouts" of Them – Before the Government Conducts a Single Interview of a Cognizant Employee**

Forty-four (44) of the forty-five interviews that Cognizant downloaded to the government were conducted before February 7, 2017 – which is the first time the government interviewed a single Cognizant employee.  *See* Ex. 12 DOJ-302-00000078-DOJ-302-00000096.

TABLE 1: DOWNLOADED INTERVIEWS OF COGNIZANT EMPLOYEES
CONDUCTED BETWEEN AUGUST 8, 2016 AND FEBRUARY 6, 2017

| Cognizant Interviews of Cognizant Employees | DOJ/FBI Interviews of Cognizant Employees |
|---|---|
| 1.  Srimanikandan Ramamoorthy | |
| 2.  Shekar Subramanian | |
| 3.  Srimanikandan Ramamoorthy | |
| 4.  Dana Gilbert | |
| 5.  Francisco D'Souza | |
| 6.  Srimanikandan Ramamoorthy | |
| 7.  Francisco D'Souza | |
| 8.  Sridhar Thiruvengadam | |
| 9.  P. Ganesh | |
| 10. Biswajit Ghosh | |
| 11. Karen McLoughlin | |
| 12. Steven Schwartz | |
| 13. Dana Gilbert | |
| 14. Gordon Coburn | |
| 15. Francisco D'Souza | |
| 16. Lakshmi Narayanan | |
| 17. Srimanikandan Ramamoorthy | |
| 18. P. Ganesh | |
| 19. Sridhar Thiruvengadam | |
| 20. Biswajit Ghosh | |
| 21. Krishna Subramanian | |
| 22. Chandrasekaran Ramakrishnan | |
| 23. Raghu Raman | |
| 24. Steven Schwartz | |
| 25. Raj Gosh | |
| 26. Sridhar Thiruvengadam | |
| 27. Steven Casari | |
| 28. Karen McLoughlin | |
| 29. Rob Telemanic | |
| 30. Krishna Subramanian | |
| 31. Sridhar Thiruvengadam | |
| 32. P. Ganesh | |

| | |
|---|---|
| 33. Biswajit Ghosh<br>34. Sambhaji Bhor<br>35. Raj Ghosh<br>36. Sambhaji Bhor<br>37. Lakshmi Narayanan<br>38. Sambhaji Bhor<br>39. Chandrasekaran Ramakrishnan<br>40. Karen McLoughlin<br>41. Sridhar Thiruvengadam<br>42. Lakshmi Narayanan<br>43. Sambhaji Bhor<br>44. Biswajit Ghosh | |

Those interviews were then downloaded to the prosecutors, typically, or perhaps always, before the DOJ conducted its own interviews of those employees.[16]  *See, e.g.*, Ex. 13 Government Meeting Talking Points, CTS_R17_0005246 (draft of Feb. 3, 2017).

### E.  Cognizant Compels Schwartz and Coburn to Sit for Interviews and Turn Over Their Devices Under Extraordinarily Restrictive Conditions

Cognizant's conduct with respect to Coburn and Schwartz in August and September 2016 epitomized its coercive and prosecutorial approach to employee interviews.  Days before its September 1, 2016 outreach to the government expressing a desire to be included in the FCPA Pilot Program, and with the decision to make such a request effectively made,[17] Cognizant demanded that Schwartz and Coburn sit for interviews.  Schwartz and Coburn knew they would need to accede to Cognizant's demand or face termination – an implicit threat that was reinforced by Cognizant's internal policies.[18]

---

[16] The government's refusal to provide the dates of those downloads makes this impossible to confirm.  *See supra* n.12.  We will explore the timing and context of these downloads at the Hearing.

[17] Cognizant's intent with respect to self-disclosure at the time of the Defendants' initial interviews requires additional factual development, which we will elicit at the Hearing.

[18] The company's Code of Business Conduct and Ethics provided that: "Employees, officers and Directors are expected to cooperate fully with any inquiry or investigation by the

Indeed, in its May 2018 presentation, Cognizant told DOJ (in its own words and with the underlined emphasis depicted in its presentation, as illustrated in this screenshot):

> b.   The Company underlined on cooperation (including interviews) from both Schwartz and Coburn.

Source: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299), at 13.

In that same presentation, Cognizant further stated that not only had it cooperated "proactive[ly]," but it had also "pressur[ed]" Schwartz and Coburn to do the same.  Ex. 2 CTS_R17_0005299 at 19; *see infra* Section I.I.  It described its conduct with respect to Schwartz and Coburn as follows:

> e.   Doggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already);

Source: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299), at 8.

Cognizant conducted initial interviews of Schwartz on August 28, 2016, and of Coburn on August 29, 2016.  Cognizant set the ground rules unilaterally: Schwartz was permitted to bring only one lawyer into the room, and that lawyer was not permitted to take notes or to speak

---

Company regarding an alleged violation of this Code.  Failure to cooperate fully with any such inquiry or investigation may result in disciplinary action, up to and including discharge."  Ex. 16 (CTS_R17_0000001) at 36.  Cognizant's Core Values and Standards of Business Conduct stated that: "As part of our commitment to our stakeholders, we are also expected to cooperate fully with any investigation into any actual or potential violation" of Cognizant's Standards and Company policies.  Ex. 17 (CTS_R17_0000060) at 5.  Violation of Cognizant's standards could result in disciplinary action, including "termination or legal action."  *Id.*  Likewise, Schwartz and Coburn's employment agreements made failure to comply with company policies, including the Core Values and Standards of Business Conduct, cause for termination.  *See, e.g.*, Ex. 19 (CTS-0638406) ¶ 1(c).

during the interview.  Ex. 18 (CTS-0103589).  Coburn was interviewed without counsel present.
The summaries alone of these interviews, which Cognizant later read out to the prosecutors,
spanned a total of 20 single-spaced pages.[19]  *See* Ex. 20 (CTS_R17_0004324); Ex. 21
(CTS_R17_0004337).  Cognizant also demanded, and Schwartz and Coburn provided, various
electronic devices for imaging.

Weeks later, in September 2016, Cognizant sought follow-up interviews of Schwartz and
Coburn, imposing the same restrictions on Schwartz and Coburn's counsel – only one lawyer
present, no notetaking, and no questions or comments during the interview – that it had imposed
in the initial interviews.[20]

## F. Cognizant and the Government Closely Communicate and Coordinate During the Days Surrounding Coburn and Schwartz's Interviews

As with other employees, Cognizant and the prosecutors were in extraordinarily close
contact immediately around Schwartz's second interview (on September 23, 2016) and Coburn's
planned second interview (scheduled for September 28, 2016).  On the morning of September
23, right around the time Schwartz's interview began, Cognizant sent an email to the prosecutors
requesting a call that would occur shortly after Schwartz's interview concluded that same
afternoon.  Ex. 22 (CTS_R17_0000278) (Sept. 23, 2016, 9:03 a.m. email from DLA to the
government: "Are you available for a short call this afternoon for a quick update . . . .").
Twenty-three minutes later, beginning at approximately 9:30 a.m., Schwartz proceeded with the

---

[19] The manner in which these initial interviews and Schwartz's follow-up interview were
conducted, including length, tone and structure, requires additional factual development, which
we will elicit at the Hearing.

[20] Whether the government directed Cognizant to re-interview Schwartz and Coburn
requires additional factual development, which we will elicit at the Hearing.

September 23 interview, which, like his first interview, was prosecutorial in nature and sought to elicit questions that might bear on his potential criminal liability.[21]

Coburn declined to sit for an interview under the conditions imposed by Cognizant and, instead, resigned from Cognizant on September 27, 2016, the day before his scheduled interview. Cognizant asked for the government's availability to "discuss a significant development" on September 28, 2016, the day after Coburn resigned from Cognizant. Ex. 23 (CTS_R17_0000245). Three hours later, DOJ asked to "pop back on a call" with Cognizant and the SEC "for some follow up." Ex. 23 (CTS_R17_0000245).

No record of the substance of any of these discussions has been produced to date.[22]

### TABLE 3: TIMELINE OF EVENTS (SEPTEMBER 22–30, 2016)

| | |
|---|---|
| *September 22, 2016* *9:30 a.m.* | Date and time of last known edits to draft press release. Ex. 24 (CTS_R17_0004279). |
| *September 23, 2016* *9:03 a.m.* | Cognizant writes to DOJ and SEC requesting "a short call . . . for a quick update" later that afternoon. Ex. 22 (CTS_R17_0000278). |
| *September 23, 2016* *9:30 a.m.* | Cognizant Second Interview of Steven Schwartz.[23] |
| *September 27, 2016* | Gordon Coburn resigns. |
| *September 28, 2016* *9:59 a.m.* | Cognizant writes to DOJ and the SEC requesting "a call to discuss a significant development that we would like to share with you." Ex. 25 (CTS_R17_0000266). |

---

[21] Schwartz ultimately resigned on November 3, 2016, having been asked to sit for a third interview under threat of termination.

[22] The content of Cognizant's numerous non-email communications with the government calls for additional factual development, which we will elicit at the Hearing.

[23] Whether or not DOJ and Cognizant had a call on the afternoon of September 23 – as requested by Cognizant that morning – and if they did, whether the Schwartz interview was discussed in that call, remains unknown, but will be the subject of additional factual development at the Hearing.

| | |
|---|---|
| *September 28, 2016*<br>*1:00 p.m.* | DOJ writes to Cognizant to see if it has "time to pop back on a call" with the SEC, DNJ, and DOJ "for some follow up." Ex. 25 (CTS_R17_0000266). |
| *September 28, 2016*<br>*6:35 p.m.* | DNJ asks Cognizant if it has "a few minutes tomorrow for some quick questions." Ex. 26 (CTS_R17_0000627). |
| *September 29, 2016* | Scheduled date for issuance of Cognizant's draft press release regarding the investigation; no press release is issued. Ex. 27 (CTS_R17_0004168). |
| *September 29, 2016*<br>*12:09 a.m.* | Cognizant writes to DNJ: "[h]ere is the email that we discussed earlier today" and forwarding Cognizant's September 8 email containing a list of four personal email addresses (*see above*). Ex. 28 (CTS_R17_0000499). |
| *September 29, 2016*<br>*9:07 a.m.* | Cognizant sends DOJ, DNJ, and the SEC an additional list of "personal email accounts that we've identified up to this point," noting that "[a]s we identify additional accounts, we will pass them to you." Ex. 25 (CTS_R17_0000266). |
| *September 30, 2016* | Cognizant issues and shortened and significantly modified press release, as well as a Form 8-K. Ex. 30 (CTS_R17_0000271). |
| *September 30, 2016*<br>*10:31 a.m.* | Cognizant sends DOJ "an updated (inclusive) list of personal email addresses that we have identified to date." Ex. 25 (CTS_R17_0000266). |
| *September 30, 2016*<br>*11:48 a.m.* | Cognizant sends an email to DOJ asking if DOJ is "available for a quick call." Ex. 32 (CTS_R17_0000287). |
| *September 30, 2016*<br>*12:23 p.m.* | Cognizant sends DOJ and DNJ a copy of Cognizant's press release and Form 8-K. Ex. 30 (CTS_R17_0000271). |

## G. Cognizant Abruptly Pulls and Waters Down Its Draft Press Release

Unbeknownst to Coburn and Schwartz, by September 19, 2016, Cognizant was working with a public relations firm, CLS Strategies, on a detailed press release that would announce that Coburn, Schwartz, and another Cognizant employee had been terminated in connection with an FCPA-related investigation into potential improper payments relating to Cognizant's facilities in India. *See, e.g.*, Ex. 33 (CTS_R17_0004148). The draft press release, which underwent

18

numerous rounds of edits, was originally scheduled to be issued on September 29, 2016.  *See* Crisis Communications Plan, Ex. 27 (CTS_R17_0004168).  The draft press release was never issued, however.  It appears to have been last edited on September 22, 2016 – the day before Schwartz's second interview and a call between Cognizant and the government.  *See* Ex. 34 CTS_R17_0004279. Ultimately, it was replaced with a much shorter press release issued on September 30, 2016, which announced Coburn's resignation but did not mention Schwartz, the investigation, or the reasons for Coburn's resignation.[24]  *See* Ex. 36 (CTS_R17_0000719). Cognizant has not produced any documents that shed light on its reasons for this abrupt change of course, raising the likely prospect that even its public-relations strategy was influenced by the September 23, 2016 or September 28, 2016 calls with the government discussed above.[25]  *See supra* Section I.F.

## H.  Cognizant Continues to Work in Close Coordination with the Government as the Investigation Progresses

Although the full measure of the government's reliance on Cognizant will not be known until the Hearing, the available documents reflect repeated and extensive coordination with the government over the course of years, extending far beyond employee interviews and readouts. Cognizant exchanged dozens of letters and participated in countless phone and email communications with the government, many of which included information regarding, and responses to questions about, Schwartz and Coburn, right up until the date the Indictment was

---

[24] Cognizant filed a Form 8-K disclosing the existence of an investigation on September 30, 2022.  *See* Ex. 35 CTS_R17_0000714.

[25] The reasons for this change of course require additional factual development, which we will elicit at the Hearing.

filed.  *See* Email from Gray Stratton to Karl Buch re: "DOJ TPs Regarding Schwartz Production," Ex. 37 (CTS_R17_0005202) (Feb. 14, 2019).

The coordination encompassed virtually every aspect of the "internal" investigation:

1.     <u>Document Search Strategies</u>: Cognizant sought input from the government regarding search terms and even "search strategies" for document collection and review.  *See* July 13, 2018 DOJ Meeting Draft Talking Points, Ex. 14 (CTS_R17_0005207).

2.     <u>Document Productions</u>: Cognizant made numerous document productions, at least nine of which were specifically focused on materials concerning (and collected from) Schwartz and Coburn.  *See* Ex. 38 (DOJ-CTS-LTR-00000257).

3.     <u>Identification of Helpful Documents and "Hot Docs"</u>: Cognizant anticipated what information and documents would be most helpful to the government.  *See, e.g.*, Email from Gray Stratton to Karl Buch re: "DOJ TPs," Ex. 39 (CTS_R17_0005206) (Nov. 21, 2018) ("Review these [documents relating to internal accounting controls] and let us know if you need more but we anticipate that these documents will satisfy your needs."); *see also* Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299) at 9 (describing the company's identification of as many as ten different binders containing "hot docs").  It then provided hard-copy binders of such "hot docs" to the government, including on October 10, 2016 and February 3, 2017 – before the government had conducted a single interview.  *See* Ex. 40, App. A (May 11, 2022 Ltr.).  And, even after that first interview, Cognizant provided binders of "hot docs" to the government on at least four different occasions: June 1, 2017, October 10, 2017, December 6, 2017 and May 1, 2018.  *See id*.

4.     <u>Factual Analysis</u>: Cognizant offered to help explain complex records for the government.  *See, e.g.*, DOJ Talking Points – 10/17/16 Call, Ex. 41 (CTS_R17_0005177) ("The

payment records are moderately complex, so we would be happy to walk you through them if you have questions.").

5.   <u>Legal Analysis</u>: Cognizant offered to share legal analysis with the government. *See* Ex. 42 (DOJ-CTS-LTR-00001187) ("[W]e appreciate this opportunity to present our perspective regarding the appropriate legal framework . . . .").

6.   <u>Cognizant Employment Decisions</u>: Cognizant sought input from the government regarding employment decisions pertaining to employees involved in the investigation.  *See* October 6, 2016 Meeting Outline, Ex. 43 (CTS_R17_0005168) ("The Company wants to begin taking [sic] employment decisions subject to any concerns you may have about that.").

7.   <u>Discovery Production and Troubleshooting</u>: Since the indictment, Cognizant has addressed discovery-related requests and inquiries from the defense. Acting essentially as a discovery pass-through, DOJ has conveyed to Cognizant issues concerning missing discovery or document-access issues, and then provided Cognizant's responses back to the Defendants.  *See, e.g.*, Ex. 44 (September 27, 2019 DOJ Ltr. to Jones Day); Ex. 45 (October 11, 2019 DOJ Ltr. to Jones Day); Ex. 46 (October 30, 2019 DOJ Ltr. to Jones Day); Ex. 47 (December 10, 2019 DOJ Ltr. to Jones Day) & Ex. 48 (DOJ-CTS-LTR-00001363); *see also* Ex. 49 (August 26, 2019 DOJ Ltr. to Jones Day & Ex. 48 (DOJ-CTS-LTR-00001343-47); Ex. 50 (November 14, 2019 DOJ Ltr. to Jones Day) & Ex. 51 (DOJ-LT-LTR-00000073-79) (instances in which spreadsheets identifying outstanding document issues, which the Defendants gave to the government, were returned to Defendants with annotations from Cognizant).

8.   <u>Collecting Evidence from Other Companies to Provide to the Government</u>: Cognizant also "leverage[d]" its resources to seek information from third parties.  Ex. 2 CTS_R17_0005299, at 8.  As part of Cognizant's "internal" investigation, it apparently

21

attempted to pressure other parties to provide information to Cognizant that Cognizant would

then presumably provide to the government.  This screenshot from Cognizant's May 10, 2018

presentation to the government illustrates how Cognizant promoted these third-party evidence-

collection activities:

> f.   Using the full weight of the Company's commercial leverage to try
>       to gain information from L&T and other third parties, including
>
>   (1)   executing audit rights with L&T, CDS, and others (L&T
>         provided very few documents, CDS did not provide any);
>
>   (2)   engaging in multiple meetings with L&T via its lawyers
>         (L&T refused to be interviewed); and
>
>   (3)   withholding payments owed to L&T that lack credible
>         supporting documentation.

*Source*: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299, at 8).

But Cognizant's evidence-collection was not limited to leveraging its commercial

relationships to gain information from other companies.  Cognizant apparently provided to the

government travel information for one if its own directors in order to facilitate DOJ's service of a

grand jury subpoena on that director.  *See* Ex. 53 (CTS_R17_0005399).

9.   <u>Seeking Advisory Opinions from DOJ Regarding Business Decisions</u>: Cognizant

affirmatively sought input from the government on prospective business decisions.  *See* 2/24/17

DOJ/SEC Meeting Talking Points/Agenda, Ex. 52 (CTS_R17_0005240) (in connection with

████, a company with potential compliance issues that Cognizant was considering acquiring,

asking the government to "advise" whether it saw "grounds for enforcement against ████ and/or

[Cognizant] if [Cognizant] were to assume ownership and control of ████"); Ex. 13

(Government Meeting Talking Points) (CTS_R17_0005246) (draft of Feb. 3, 2017) (in

connection with construction at ██████████████, describing a plan to reject

requests for payment for statutory approvals until L&T had provided supporting documentation, and stating that Cognizant "would like DOJ/SEC input on this proposed course of action or, at least, we hope you would let us know if you had concerns").  It is not immediately clear how the government could share non-public information about the existence *vel non* of derogatory information about other companies – such as ▮▮▮ – without revealing confidential investigative information.[26]

## I.   Cognizant's Close Coordination with the Government Focused on Coburn and Schwartz Specifically

Many of Cognizant's investigative steps focused specifically on Schwartz and Coburn. In its May 2018 presentation to the government, Cognizant touted various aspects of that Defendants-specific coordination and cooperation:

---

[26] The context for, and propriety of, requesting this information from the government and what, if anything, it demonstrates about the relationship between the government and Cognizant, are topics we expect to further explore at the Hearing.

> c.  Conducting a thorough internal investigation, including the collection and review of <u>over 400 sources of electronic data</u> and conducting approximately <u>450 witness interviews</u>;
>
>> (1)  This included a review of over 1.5 million document, in addition to a "page-turn" review through Gordon Coburn and Steven Schwartz's data during key periods of time.[10]

> **4.**  The Company also provided further cooperation <u>specific to Steven Schwartz</u>, including:
>
>> a.  Investigating his alleged amnesia defense, including collecting medical records from Schwartz, which the Company produced to DOJ/SEC, and conducting targeted electronic data review regarding his activities during the week of the relevant conference calls in April 2014, relevant non-privileged portions of which were produced to DOJ/SEC;

*Source*: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299), at 7-10.

Again referencing Schwartz and Coburn, Cognizant argued to DOJ that a criminal resolution was not warranted in light of:

> (1)  the speed with which the Company moved forward against these senior executives (including sidelining them, pressuring them to cooperate, and ultimately separating with them); and
>
> (2)  the extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives.

*Source*: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299), at 19

Cognizant stated that "[c]ompanies with potential exposure and their counsel are watching to see how the new [DOJ FCPA] policy is carried out in practice." *Id.* at 20.

Cognizant would obtain the declination it had sought on February 13, 2019 – the day before Schwartz and Coburn were indicted.[27]  The declination agreement recognized "Cognizant's thorough and comprehensive investigation [and] Cognizant's full and proactive cooperation in this matter (including its provision of all known relevant facts about the misconduct) and its agreement to continue to cooperate in the Department's ongoing investigations and any prosecutions that might result."  DOJ-CTS-LTR-00000008.

*     *     *

In short, as Cognizant itself put it:

> b.     Cognizant did everything the DOJ could have asked for here.

<em>Source</em>: Cognizant's DOJ Presentation, Ex. 2 (CTS_R17_0005299), at 4.

## II.   <u>PROCEDURAL HISTORY</u>

As the Court is well aware, Cognizant and the government have resisted the Defendants' efforts to obtain information relevant to their outsourcing claims at every turn.

Defendants first requested that DOJ turn over documents relevant to their outsourcing claims on October 3, 2019.  (ECF No. 60).  The government refused to produce any other documents, but requested that the Defendants set forth the legal basis and factual predicate for their requests, which Defendants did in a letter dated January 8, 2020.  (ECF No. 60).  In response, the government again declined to produce any documents, and invited the Defendants to pursue Rule 17 subpoenas to obtain the requested materials from Cognizant.  (ECF No. 60)

---

[27] On February 15, 2019, Cognizant also settled related charges with the SEC and consented to a Cease and Desist Order which notes Cognizant's "self-disclosure, cooperation, and remedial efforts" and that Cognizant "timely shared the facts developed during the course of an internal investigation."  SEC Charges Cognizant and Two Former Executives With FCPA Violations (Feb. 15, 2019), available at https://www.sec.gov/news/press-release/2019-12.

25

("To the extent you seek additional information, you are free to pursue it directly from the companies through Rule 17 subpoenas.").

When the Defendants filed applications for Rule 17 subpoenas – which were, of course, directed at Cognizant, not the government – the government nonetheless filed a letter brief opposing the Defendants' applications.  (ECF No. 76 at 1).  The government acknowledged the unusual nature of opposing Rule 17 subpoenas directed to a third party, noting that it "does not always take a position with respect to requests for Rule 17 subpoenas issued to third parties," but had done so here because "the fundamental premise of the Defendants' application . . . targets the Government's conduct in investigating and prosecuting this case."  *Id.*

On September 14, 2020, the Court granted, in substantial part, the Defendants' applications for the issuance of Rule 17 subpoenas to Cognizant.  (ECF No. 96).  The Court ruled that several of the requests in the Defendants' proposed subpoenas would be "limited to communications related to the investigation and interview of Schwartz [or Coburn]."  (ECF No. 96 at 16-24).

The Court also determined that, because it had "a less complete record than the one that was before Judge McMahon" in *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), it would "convene a hearing on the outsourcing itself."  (ECF No. 96 at 11 n.11).  The Court made clear that "[t]he hearings ordered by the Court here may alter the picture as to the 'outsourcing' claim," (ECF No. 96 at 10 n.10), and that the approved subpoena requests (as revised in accordance with the September 14 Order) would not be limited to the Defendants' interviews but, instead, were intended to allow "some breathing room for the surrounding context" as well.  (ECF No. 96 at 16).

26

Cognizant moved to quash the Rule 17 subpoenas and the Defendants filed cross-motions to compel.  (ECF Nos. 167, 169).  On January 24, 2022, the Court issued an Order and Opinion granting the Defendants' motion to compel with respect to much of the requested materials (the "January 24 Order and Opinion"), holding that Cognizant had waived privilege over a wide swath of documents through its disclosures to the government.  (ECF Nos. 264, 268).  The Court clarified that its September 14 Order had approved an inquiry encompassing whether "the government pulled the strings to implement investigative techniques that would violate the Constitution if done directly by the government."  (ECF No. 268 at 16).

Cognizant moved for reconsideration of the portion of the January 24 Order and Opinion compelling the production of certain public-relations documents, which the Court denied on March 23, 2022.  (ECF Nos. 319, 320).

Cognizant then sought "clarification" of the January 24 Order and Opinion, arguing that it was authorized to redact interview memoranda made during its investigation and notes used by its attorneys in preparation for disclosures to the government.  On April 27, 2022, the Court rejected Cognizant's interpretation and ordered Cognizant to produce the documents without redactions, noting that the January 24 Order and Opinion "seem[ed] clear enough" and that Cognizant's objections "serve[d] only to delay this case."  (ECF No. 339 at 1, 5).

## III.   <u>ARGUMENT</u>

For the entirety of August 2016, September 2016, October 2016, November 2016, December 2016, and January 2017, Cognizant – effectively alone – investigated this case for

DOJ.  Cognizant conducted numerous interviews, 44 of which were "downloaded" to DOJ.[28]
DOJ conducted none.  Cognizant seized devices and analyzed the take from them.  DOJ waited
to receive the largess.  And even once DOJ initiated its investigation in earnest, it remained a
joint investigation which was coordinated with and directed by the government and is thus
attributable to it.  This was no independent investigation.  The evidence produced pursuant to the
Rule 17 litigation demonstrates the nature, scope and extent of the coordination between DOJ
and Cognizant.

Critically, though, there is nothing intrinsically improper about this coordination.  The
government is permitted to use a corporate investigation in lieu of, or to supplement, its own
investigation.  Indeed, DOJ policy, such as the Yates Memo and the FCPA Pilot Program, lays
the groundwork for, and provides clear direction to, corporate investigators to prepare them to do
just that.

But when the government elects for its investigation to proceed in that manner, there
must be consequences.  Because when the government encourages and relies on private
investigators, that private conduct becomes attributable to the government.  And here, that means
that the government must assume responsibility for Cognizant's investigation team.  *See United
States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) ("Actions of a private entity are attributable to
the [government] 'if there is a sufficiently close nexus between the [government] and the
challenged action of the . . . entity so that the action of the latter may be fairly treated as that of
the [government] itself '") (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

---

[28] The fact that Cognizant did *not* share readouts of numerous other interviews raises
additional concerns—either that the government directed Cognizant as to which interviews to
read out, or that the government empowered Cognizant, effectively a cooperating witness, to
make unilateral decisions about what testimony not to share.

The government's responsibility for Cognizant's actions implicates Schwartz and Coburn's due process rights and rights against compelled self-incrimination under the Fifth Amendment.

    **A. The Government Should Be Required to Search Cognizant's Files For *Brady* Materials and Report Back to the Court on the Search and Its Results**

        1. <u>The Government Has a Duty to Search an Investigating Company's Files When Those Files Are Within the Government's Constructive Possession</u>

"It is well-settled that the prosecution has a duty to learn of and disclose information 'known to the others acting on the government's behalf in the case.'" *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). When such information is in the prosecutor's constructive possession and favorable to a criminal defendant, failure to disclose it violates due process. *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

The government is deemed to have constructive possession of materials in another entity's files for the purposes of *Brady* where, among other things, (1) the entity is under the "government's control or acting on its behalf"; (2) the entity and the government "are part of a team, are participating in a joint investigation or are sharing resources"; and (3) the government "has ready access to the evidence." *Risha*, 445 F.3d at 304-05 (internal quotation marks omitted); *see also United States v. Duronio*, No. 02 Cr. 933 (JAG), 2006 WL 1457936, at *3-4 (D.N.J. May 23, 2006) (applying *Risha* factors to evaluate whether government had constructive possession of companies' files). The Third Circuit has instructed that, in evaluating these factors, "a case-by-case analysis is appropriate," and has noted that the inquiry is a "fact-driven determination." *Risha*, 445 F.3d at 306, 309 n.8.

The first and second prongs of the *Risha* test are closely related. *See Risha*, 445 F.3d at 305; *Reyeros*, 537 F.3d at 282. As to the first factor, the assessment of whether an entity is

acting on the government's behalf, courts look to the duration of the entity's assistance to the government and "whether the entity conducts interrelated or independent investigations from the government." *Duronio*, 2006 WL 1457936, at *3.  As to the second factor, the assessment of whether an entity is participating in a "joint effort" with the government, courts look to whether there was a "'close working relationship'" between that entity and the government.  *Risha*, 445 F.3d at 305 (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).

As then-District Judge Greenaway observed in *Duronio*, "courts have found team efforts and joint investigations where the entity and the federal government pooled their investigative energies to a considerable extent and the entire effort was marked by a spirit of cooperation." *Duronio*, 2006 WL 1457936, at *3 (internal quotation marks and emendations omitted).

This Court "has general discretionary authority to order the pretrial disclosure of *Brady* material to ensure the effective administration of the criminal justice system." *United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) (internal quotation marks omitted).  For example, in *United States v. Blumberg*, No. 14 Cr. 458 (JLL), Judge Linares ordered an evidentiary hearing in order to determine whether to direct the government to search the files of the cooperating company, ConvergEx, for *Brady* materials.  ECF No. 113 at 2 (D.N.J. June 7, 2016).  There, the Court observed that questions existed "regarding the exact relationship between the Government and ConvergEx. . . and also the extent to which the Government outsourced and/or delegated discovery and investigation tasks to ConvergEx." *Id.*  *Blumberg* thus illustrates that investigative outsourcing may trigger *Brady* obligations with respect to files in the actual possession of a cooperating company, and therefore in the constructive possession of the government.[29]

---

[29] In addition, to the extent favorable evidence within Cognizant's possession has been destroyed, such spoliation would constitute a due process violation.  *See, e.g., California v.*

2.   Cognizant's Investigative Files Are in The Government's Constructive Possession

The government should be deemed to be in constructive possession of Cognizant's files under *Risha*.

With respect to the first two *Risha* factors – whether Cognizant was under the "government's control or acting on its behalf" and whether Cognizant and the government were "part of a team, [and] participating in a joint investigation [and] sharing resources," *see Risha*, 445 F.3d at 304-05 – the evidence already available to the Defendants demonstrates extraordinarily close coordination between Cognizant and the government.  As set forth above, Cognizant conducted a multi-year investigation with the explicit purpose of receiving lenient treatment under recently promulgated DOJ policies.  *See supra* Sections I.A, I.B.  The government, over the course of numerous phone and email communications between itself and Cognizant, accepted, facilitated, guided, and, ultimately, rewarded Cognizant's investigation.  Cognizant's relationship with the government was so close that it sought the government's feedback not only on investigative steps, but also on prospective business decisions.  *See supra* Section I.H.9.  Cognizant, in return, compelled and conducted numerous employee interviews on the government's behalf, and in close coordination with the government.  *See supra* Sections I.C, I.F.  And it provided numerous other forms of substantial assistance: analysis of complex records and legal issues, detailed subject matter briefings, interview memo readouts, real-time updates on investigative developments, and efforts to obtain information from third parties.  *See supra* Section I. H.  Indeed, there does not appear to be a single aspect of the investigation that was not

---

*Trombetta*, 467 U.S. 479, 488 (1984) (stating that the Due Process Clause imposes a duty on law enforcement to preserve "evidence that might be expected to play a significant role in the suspect's defense"); *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (stating that the failure to preserve evidence that was "apparently exculpatory at the time it was destroyed . . . violates due process regardless of the government's good or bad faith").

"marked by a spirit of cooperation," *see Duronio*, 2006 WL 1457936, at *3, or that did not

reflect a "close working relationship," *see Risha*, 445 F.3d at 305, between Cognizant and the

government.  That joint effort, of course, was largely aimed at uncovering evidence of Schwartz

and Coburn's guilt, *see supra* Section I.I, not exculpatory or otherwise favorable evidence.  *See*

ECF No. 263 at 23, 25 (describing the incentives behind Cognizant's investigation).  And the

government was heavily reliant on Cognizant's efforts, encouraging those efforts while

seemingly taking few or no investigative steps of its own during the first seven months of the

investigation – the period in which the overwhelming majority of witnesses were interviewed

and documents were collected.  *See supra* Section I.D.

With respect to the third *Risha* factor, the government plainly had, and continues to have,

"ready access" to Cognizant's evidence.  *See Risha*, 445 F.3d at 304.  During the investigation of

this case, Cognizant went to great lengths to coordinate its collection and review of documents in

response to requests from the government; made voluminous productions of those documents to

the government; and provided summaries, "hot doc" identifications, and other assistance to help

the government digest those productions.  *See supra* Sections I.H.1-1.H.3.  Since the indictment,

Cognizant has continued to handle discovery-related tasks on the government's behalf, with the

government acting essentially as a discovery pass-through.  *See supra* Section 1.H.7.

Accordingly, each of the three *Risha* factors is amply satisfied here.

> 3.  Cognizant, a Cooperating Witness, is Uniquely Ill-Suited to be Being the Arbiter
>     of the Government's Disclosure Obligations

Cognizant, and not the government, has been principally responsible for the collection

and review of millions of company documents.  Cognizant, and not the government, has made

decisions – often invisible to the government – on what documents to disclose and what

documents to withhold.  Accordingly, the government presumably has received only a fraction of

the documents reviewed by Cognizant and has likely reviewed a subset of even those, with the assistance of the summaries, roadmaps, and "hot doc" identifications provided by Cognizant. Moreover, to the Defendants' knowledge, virtually no effort has been made by Cognizant – much less by the government itself – to search Cognizant's files for evidence favorable to the Defendants.[30]

These facts are particularly troubling in light of Cognizant's status as a cooperating witness. As this Court observed, Cognizant, which was "perform[ing] an investigation for the purpose of exculpating itself," has "obvious incentives to shift blame" to Coburn and Schwartz in order to protect its own interests. (ECF No. 263 at 23, 25). Accordingly, the government's failure to ensure a sufficient search of its cooperating witness is deeply problematic. *See*, *e.g.*, *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) ("[C]riminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent . . . . A prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system."). This is particularly problematic in light of the fact that Cognizant unilaterally decided which interviews to download to the government (45) and which interviews to withhold from the government. *See supra* n.28.

*   *   *

As in *Blumberg*, the Hearing will further assist in assessing (i) the extent to which the government delegated discovery-related tasks to Cognizant and (ii) the nature of the searches that must be conducted by Cognizant and/or the government to identify and produce *Brady*

---

[30] In a November 27, 2019 letter, the government stated that it had "not request[ed] or direct[ed] CTS . . . 'to search for, identify, and/or produce exculpatory and/or impeachment information.'" ECF No. 60, Ex. B.

materials.  If the government is ultimately unable to conduct a sufficient *Brady* review – a review

that is akin to what it would do with FBI case files – then due process may require further

remedies.

**B.  The Government Should Be Precluded From Using Schwartz's and Coburn's Statements Made During Company Interviews and Any Evidence Derived Therefrom**

1.  Compelled Interviews by Employers Carry Fifth Amendment Implications When the Employer's Actions Are Fairly Attributable to the Government

The government's use of coerced statements – or fruits thereof – made by an employee

under threat of termination violates the Fifth Amendment.  *See, e.g.*, *Garrity v. New Jersey*, 385

U.S. 493, 497-98 (1967) ("The choice given petitioners was either to forfeit their jobs or to

incriminate themselves. . . .  We think the statements were infected by the coercion inherent in

this scheme of questioning and cannot be sustained as voluntary under our prior decisions."

(footnote omitted)); *see also Kastigar v. United States*, 406 U.S. 441, 453 (1972) ("Immunity

from the use of compelled testimony, as well as evidence derived directly and indirectly

therefrom . . . prohibits the prosecutorial authorities from using the compelled testimony in any

respect. . . .").

This rule extends to a private employer where the employer's actions are "fairly

attributable" to the government, *i.e.*, where "there is a sufficiently close nexus between the

[government] and the challenged action of the . . . entity so that the action of the latter may be

fairly treated as that of the [government] itself."[31]  *Stein*, 541 F.3d at 146 (quoting *Jackson v.*

---

[31] Similarly, in the Fourth Amendment context, searches and seizures by a private actor are attributed to the government where the private actor "acted as an instrument or agent of the Government."  *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989).  In considering whether a private actor acted as an instrument or agent of the government, courts generally consider (i) whether the government knew of and acquiesced in the private actor's conduct, and

*Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  The nexus requirement is satisfied where, *inter alia*: (i) the government "exercises coercive power"; (ii) the government "provides the private actor with significant encouragement, either overt or covert"; or (iii) "the private actor . . . is entwined with governmental policies."  *Stein*, 541 F.3d at 147 (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005)).

In *Connolly*, the Court considered whether Deutsche Bank, through outside counsel, had obtained employee statements in violation of *Garrity* as part of an internal investigation.  The Court found that the defense had made a "rather convincing showing that Deutsche Bank and its outside counsel . . . were *de facto* the Government for *Garrity* purposes."  2019 WL 2120523 at *1; *see also id. at* *12 ("[T]he Government outsourced the important developmental stage of its investigation to [the] Bank – the original target of that investigation – and then built its own 'investigation' into specific employees, such as [defendant], on a very firm foundation constructed for it by the Bank and its lawyers.").

The Court discussed several factors supporting its conclusion that Deutsche Bank had stepped into the shoes of the government, including that: (i) the company faced "the threat of ruin" if it failed to cooperate with the Government, *id.* at *13; (ii) the government directed the

---

(ii) whether the private actor had an independent motivation to conduct the search, other than to assist law enforcement.  *See United States v. Walther*, 652 F.2d 788, 793 (9th Cir. 1981) (holding that a search conducted by an airline employee and DEA informant without *ex ante* approval or direct encouragement from the DEA was attributable to the government, where the employee-informant expected a reward from the DEA in exchange for his assistance and the DEA had acquiesced in a pattern of similar conduct in the past); *cf. Kartorie v. Dunham*, 108 F. App'x 694, 699 (3d Cir. 2004) (citing *Walther* and holding that a medical test forcibly performed on a patient at a doctor's instruction, while the patient was in police custody, was not attributable to the police, since the doctor "had a legitimate independent motivation," *i.e.*, the doctor's own medical judgment, for ordering the test).

.

company and its counsel "whom to interview and when," *id* at *12; (iii) the defendant "was compelled, upon pain of losing his job, to sit for" multiple interviews with company counsel, *id.* at *11; (iv) company counsel provided the Government with timely, detailed information from interviews, including assessments of credibility, *see id.* at *12; and (v) the company "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect. . . ." *Id.* In addition, with respect to internal investigations more broadly, the Court observed:

> [T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be, and the government knows all too well that it can then use its leverage over the company to compel the company to tell it what the employees say, even if that requires the waiver of the attorney-client privilege or work product doctrine.

*Id.* at *11 (citing Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 GEO. L. J. ANN. REV. CRIM. PROC. III at xiii n.75 (2011)).

### 2.   Cognizant Compelled Schwartz's and Coburn's Interviews in Violation of *Garrity*

The available documents make clear, and the Hearing will further demonstrate, that Cognizant's interviews of Schwartz (on August 28, 2016 and September 23, 2016) and Coburn (on August 29, 2016) were compelled in violation of *Garrity*.

As Cognizant reminded the government in its May 2018 presentation, Cognizant "pressured" Schwartz and Coburn, and "insisted" on their initial interviews under plain threat of termination.[32]  *See supra* Section I.E.  That threat was reinforced by Cognizant's internal policies

---

[32] As this Court has observed, cognizable threats include "implicit compulsion" (ECF No. 96 at 10); no explicit threat is required.  *See also, e.g.*, *United States v. Vangates*, 287 F.3d 1315,

and Defendants' employment agreements, which entitled Cognizant to terminate them for failure to comply with an internal investigation.  *See supra* n.18.  Coburn and Schwartz understood Cognizant's ultimatum: each of them cancelled their follow-up interviews (in Schwartz's case, his second follow-up interview) and resigned from Cognizant *simultaneously*.  *See supra* Section I.F.  In other words, the Defendants' decisions not to be interviewed and their decisions to relinquish their positions at Cognizant were one and the same.

The Defendants' compelled initial interviews are "fairly attributable" to the government under several prongs of *Stein*.  First, the government, through the Yates Memo and FCPA Pilot Policy, "exercise[d] coercive power," *see Stein*, 541 F.3d at 147, over Cognizant and other similarly situated companies by threatening the loss of mitigation credit – *i.e.*, of the potential to avoid criminal charges and substantially reduce financial penalties, among other benefits – if companies did not proactively investigate the actions of their employees.[33]  Second, even if the government's policies fell short of coercing Cognizant, they constituted "significant

1321 (11th Cir. 2002) ("[S]elf-executing *Garrity* immunity . . . may arise without an explicit threat of employment sanctions.") (citing, *inter alia*, *Garrity*, 385 U.S. at 496 ("Subtle pressures may be as telling as coarse and vulgar ones.")); *Connolly*, 2019 WL 2120523, at *3 (S.D.N.Y. May 2, 2019) (emphasizing provision in employee policy stating that employees "must fully cooperate with . . . internal and external examinations, investigations and other reviews" or risk "disciplinary action" as supporting finding that defendant had a "reasonable" and "subjective understanding" that he had no choice but to be interviewed or else risk termination, and finding *Garrity* violation notwithstanding no direct threat that defendant would be fired).

[33] The DOJ's promulgation of a policy statement alone can be sufficient to establish state action.  In holding that state action was established in *Stein*, the Second Circuit affirmed the district court's finding that the relevant DOJ policy statement on the prosecution of business organizations had caused the self-reporting company "to consider departing from its long-standing policy of paying legal fees and expenses of its personnel in all cases and investigations *even before it first met with the USAO*."  541 F.3d at 141 (emphasis added) (quoting *United States v. Stein*, 435 F. Supp. 2d 330, 352 (S.D.N.Y. 2006)).  In other words, both the district court and the Second Circuit held that there was a "threat inherent in" the DOJ policy statement itself, which was later "reinforced" by the government's invocation of the DOJ policy statement in discussions with the company.  *Id.* at 143-44.

encouragement," *see id.*, and were in fact described by DOJ as such in almost those precise terms. *See* Weissmann Memo at 9 ("[T]his pilot program is intended to encourage companies to disclose FCPA misconduct to permit the prosecution of individuals whose criminal wrongdoing might otherwise never be uncovered by or disclosed to law enforcement."). Third, and at a minimum, Cognizant was "entwined with governmental policies," *see id.*; indeed, securing the involvement of companies like Cognizant in FCPA investigations was the very aim of the governments' policies. *See supra* Section I.A. Thus, by the time of the Defendants' initial interviews, the then-recently released FCPA Pilot Program had already dictated Cognizant's primary investigative objective: "the disclosure of all relevant facts about the individuals [allegedly] involved in the wrongdoing." *See* Weissmann Memo at 2. Cognizant needed no more specific directive than that.

The fact that Cognizant does not appear to have formally self-reported to the government until a few days after the Defendants' initial interviews is of little consequence. By the time of the initial interviews on August 28 and 29, Cognizant was, in every respect, conducting its investigation in the same way it would following its self-disclosure to the government on September 1 – and in much the same way as Deutsche Bank had in *Connolly*. Cognizant was gathering immense volumes of documents; imposing extreme restrictions on counsel; conducting lengthy interviews, led by a former Assistant U.S. Attorney, that were prosecutorial in nature; and asking questions aimed at eliciting self-incriminating answers. *See supra* Sections I.C, I.F.

As the investigation progressed, Cognizant would treat those initial interviews (and the information obtained from them) no differently than it treated interviews conducted after it had self-reported. *See supra* Section I.E.

The parallels with the indicia of coordination identified in *Connolly* are striking:

Cognizant "effectively deposed [its] employees by company counsel," *see* 2019 WL 2120523 at

*12; "turned over the resulting questions and answers" to the government, *see id.*; "digested the

vast information it collected" for the government, *see id.*; provided "an exhaustive overview of

[its] substantial cooperation with the Government" in a Filip factors presentation requesting

leniency, *see id.* at *7; and achieved a "conspicuous success" in the form of a favorable

resolution with DOJ as a reward for its cooperation. *See id.* at *8.[34]  The government, for its

part, "let the [company] carry its water for it" for a substantial period of time, not conducting any

interviews until Cognizant had conducted dozens of its own (and even then, conducting a

comparatively small number). *See id.* at *13.  Just as Deutsche Bank, via counsel, "did

everything that the Government could, should, and would have done had the Government been

doing its own work," *see id.* at *12, Cognizant "did everything the DOJ could have asked for

here."[35]  Ex. 2 (CTS_R17_0005299) at 4.

Following its compelled interviews of the Defendants, Cognizant made derivative use of

the substance of their interviews throughout its investigation, most notably in approximately 36

subsequent employee interviews – all or many of which, themselves, likely were compelled

under threat of termination.  *See supra* Section I.C.  Whether or not Cognizant's practice in this

---

[34] In this regard it is notable that Cognizant's May 10, 2018 presentation to DOJ in which it advocates for a lenient corporate resolution is titled with reference to DOJ policy, including the FCPA Pilot Program.  *See* Filip Factors & FCPA Corporate Enforcement Policy Presentation, Ex. 2 (CTS_R17_0005299).

[35] For the same reasons, Schwartz's second interview, on September 23, 2016, was also compelled in violation of *Garrity*.  As set forth above, Schwartz sat for his second interview under threat of termination, amidst a flurry of communications between Cognizant and the government, including real-time updates on Schwartz's interview.  *See supra* Section I.F.  As he had been in his first interview, Schwartz was forced to accept extreme restrictions on counsel and prosecution-style interrogation from Cognizant.

39

regard was proper, the government shaped it and encouraged it, and therefore cannot make use of its fruits except as permitted by the Fifth Amendment and its prophylactic rules. *See, e.g.*, *United States v. Ghailani*, 743 F. Supp. 2d 261 (S.D.N.Y. 2010) (following a suppression hearing, analyzing the extent to which witness testimony was derived from and "tainted" by the defendant's impermissibly coerced statements); *see also United States v. Patane*, 542 U.S. 630, 644 (2004) (noting prohibition against use of fruits of compelled testimony).

### C.  If the Court Determines that Any Aspect of the Cognizant Investigation Is Fairly Attributable to the Government, Defendants Should be Permitted to Brief the Due Process Implications of Such a Finding

If, as it appears to have done, Cognizant brought to bear with other employees the same interrogation tactics that it used with Coburn and Schwartz, and if the Court finds that those tactics are, in fact, attributable to the government, the use or introduction of those coerced third-party statements could violate due process. *See, e.g.*, *United States v. Menendez*, No. 15 Cr. 15 155, 2015 WL 5703199, at *4 (D.N.J. Sept. 28, 2015) (recognizing that, while "[d]efendants cannot challenge the alleged violation of a witness's [self-incrimination] rights on the witness's behalf," defendants can nonetheless "challenge, on due process grounds, the introduction of any coerced witnesses' statements against [them] at trial") (citing *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999)); *United States v. Merkt*, 764 F.2d 266, 274 (5th Cir. 1985) ("A defendant may assert [his] own fifth amendment right to a fair trial as a valid objection to the introduction of statements extracted from a non-defendant by coercion or other inquisitional tactics."); *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) ("[A] violation of another person's fifth amendment rights may rise to the level of a violation of his rights to a fair trial. . . .   The issue is whether the government's investigation methods resulted in a fundamentally unfair trial.").  Should the Court so find, the Defendants should be permitted to

brief what improperly obtained evidence and testimony is required by due process to be suppressed.  In addition, Cognizant's compelled interviews of those employees raise the prospect that the government's later interviews of them were similarly compelled.  *See, e.g.*, *United States v. Bonner*, 469 F. App'x 119, 126-27 (3d Cir. 2012) (stating that "[i]f the prior statement was coerced . . . '[t]he question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances'") (quoting *Lyons v. Oklahoma*, 322 U.S. 596, 602 (1944)); *cf. Seibert*, 542 U.S. 600 (describing generally the effects of the conduct of a two-step interrogation).

## CONCLUSION

The government's decision to use Cognizant's investigation as a tool to build its case is not *per se* improper.  But it is a choice.  And it is a choice with consequences of constitutional import.

The government could have chosen to build an investigation of its own, on a separate foundation, and thereby forgo some of the benefits, and all of the legal burdens of Cognizant's "internal" investigation.  Or it could have chosen to coordinate with Cognizant's investigators, and relied upon – and, ultimately, rewarded – Cognizant's investigative methods and the results that flowed from them, and thereby assume constitutional responsibility for that joint investigation.  Here, the government chose the latter course.

At base, this Motion is just about fairness to criminal defendants.  The government's ability to rely upon corporate "internal" investigations to create an investigative roadmap and

soften the investigative ground tilts the playing field in its favor in myriad ways, some obvious and some less obvious.

Among the former, the government benefits from the ability to use coerced statements and the fruits that flow from them, *see Garrity*, 385 U.S. at 497-98; *Kastigar*, 406 U.S. at 453; *Stein*, 541 F.3d at 146; *Connolly,* 2019 WL 2120523 at *12; *see also supra* Section III.A, and it also benefits from a documentary production that is curated by the cooperating-witness company, without the requirement that the government itself review all documents for potentially exculpatory materials, *see Brady*, 373 U.S. at 87; *Risha*, 445 F.3d at 303; *Reyeros*, 537 F.3d at 281; *Blumberg*, No. 14 Cr. 458 (JLL), ECF No. 113 at 2; *Duronio*, 2006 WL 1457936, at *3; ECF No. 263 at 23, 25; *see also supra* Section III.B.

Among the latter, the use or introduction of the coerced statements of others against the Defendants may well violate the Defendants' own due process rights, *see Menendez*, 2015 WL 5703199, at *4; *Gonzales*, 164 F.3d at 1289; *Merkt*, 764 F.2d at 274; *Chiavola*, 744 F.2d at 1273, and the government benefits from a stable of potential cooperating witnesses in the form of employees who have already been subject to a coerced company interview under threat of termination, the substance of which is then shared by the company with prosecutors so prosecutors can conduct a subsequent "voluntary" interview – a paradigmatic two-step interrogation.  *See, e.g.*, *Seibert*, 542 U.S. 600.

It is thus left to this Court to remedy the unfairness that flows from these practices by applying constitutional protections to evidence collected by Cognizant on behalf of the government.

Accordingly, and pending additional evidence to be adduced at the forthcoming Hearing, the Court should grant Mr. Coburn's Motion and grant the following remedies:

(1)    The government should be directed to search Cognizant's files for *Brady* material, to produce any such materials, and to provide a detailed report to the Court about that search and its results.

(2)    The government should be precluded from using at trial any statements made by Coburn during Cognizant's interview, as well as any evidence derived from those statements.

(3)    If the Court finds that some or all of the investigation conducted by Cognizant is fairly attributable to the government, Coburn should be permitted to file supplemental briefing addressing whether the Due Process Clause of the Fifth Amendment requires the suppression of other evidence or dismissal of the Indictment.

Dated: July 8, 2022                    Respectfully submitted,


/s/ Nicholas J. Lewin
Nicholas J. Lewin
Henry L. Ross
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue
New York, NY 11215
(212) 390-9559
*Attorneys for Defendant Gordon J. Coburn*