**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

v.

GORDON J. COBURN and
STEVEN SCHWARTZ,

Defendants.

Crim. No. 19-120 (KM)

Hon. Kevin McNulty

---

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW WITH RESPECT TO DEFENDANTS'
*GARRITY/CONNOLLY/BRADY* MOTIONS AND THE APRIL 18–19, 2023
HEARING**

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ............................................................. 1

I.   COGNIZANT EFFECTED ITS SELF-DISCLOSURE AND COOPERATIVE EFFORTS IN COORDINATION WITH THE GOVERNMENT AND CONSISTENT WITH THE DOJ POLICIES THEN IN EFFECT............................ 1

   A.   The Yates Memo and FCPA Pilot Program..................................... 1

   B.   Cognizant Retains DLA Piper and Initiates Its Investigation Against the Backdrop of the Yates Memo and FCPA Pilot Program. ................................ 3

   A.   Schwartz and Coburn Were Interviewed Under Threat of Termination.......... 5

   B.   Schwartz's and Coburn's Interviews Were Conducted Under Threat of Termination and Pursuant to Ground Rules That DLA Selectively Applied and the Government Could Never Impose. ........................... 7

   C.   Facing Substantial Pressure to Cooperate, Cognizant Self-Discloses to the Government and, In Accordance with DOJ Policies, Coordinates Its Investigation with the Government to Avoid Its Own Prosecution. ................ 9

   D.   Cognizant's Immediate, Pronounced Coordination with the Government..... 12

   E.   Despite Having Already Decided to Terminate Schwartz and Coburn, Cognizant Interviews Schwartz Again Under Threat of Termination to Elicit Statements For Use in the Government's Prosecution. ................................ 15

   F.   Schwartz's Second Interview........................................................ 21

   G.   Cognizant's Coordination with the Government Continues, Coburn Resigns, and Schwartz Resigns After Facing a Demand for a Third Interview and the Threat of Termination. ........................................................ 26

II.  COGNIZANT PROVIDES THE GOVERNMENT WITH A ROADMAP FOR ITS INVESTIGATION BEFORE THE GOVERNMENT CONDUCTS A SINGLE INTERVIEW. ........................................................................ 32

III. COGNIZANT CONTINUES TO COOPERATE CLOSELY WITH THE GOVERNMENT, FOCUSING ON THE DEFENDANTS AND PERFORMING DISTINCTLY PROSECUTORIAL FUNCTIONS.................................... 35

   A.   Cognizant Investigated Potential Criminal Defenses and Conducted Forensic Analyses For the Government. ................................................ 35

   B.   Cognizant Sequenced Witness Interviews, Heeded the Government's Directions When Conducting Interviews, and Facilitated Subsequent Government Interviews.................................................... 38

   C.   Cognizant Identified "Hot Docs" for the Government and Made Relevance Determinations Throughout the Two-Plus Year Investigation...................... 40

   D.   Cognizant Repeatedly Shared Credibility Assessments of Witnesses, Touting Those Who Fit Cognizant's Desired Narrative................................ 42

   E.   DLA Identified Potential Witnesses for the Government, At Its Request..... 43

   F.   Cognizant Used Its Commercial Leverage to Assist the Government. .......... 45

# TABLE OF CONTENTS

Page

IV.     COGNIZANT'S PRIVILEGE ASSERTIONS GO UNPOLICED AT THE SAME TIME THE COMPANY UNDERTAKES A *BRADY* REVIEW ON BEHALF OF THE GOVERNMENT. ............................................................................................... 46

    A.     The Government Does Not Challenge Cognizant's Dubious Privilege Assertions and Is Rebuffed When It Inquires Over Two Years Into the Investigation Regarding the Privilege Lines Cognizant Was Drawing. ......... 46

    B.     Cognizant Undertakes a *Brady* Review for the Government. ......................... 49

V.     COGNIZANT IS REWARDED WITH A DECLINATION—THE BEST POSSIBLE OUTCOME, AND THE ONE COGNIZANT SOUGHT FROM THE OUTSET. ..... 52

CONCLUSIONS OF LAW ............................................................................................. 54

I.     SCHWARTZ'S AND COBURN'S STATEMENTS WERE COMPELLED FOR PURPOSES OF *GARRITY* AND COGNIZANT'S ACTIONS IN OBTAINING THEM ARE FAIRLY ATTRIBUTABLE TO THE GOVERNMENT. ..................... 54

    A.     Schwartz's and Coburn's Statements During Their Interviews Were Compelled Under Threat of Termination. ....................................................... 54

        1.     The Coercion Standard. .................................................................... 54

        2.     Schwartz's and Coburn's Statements Were Compelled. ................... 56

    B.     Cognizant's Actions In Obtaining Schwartz's and Coburn's Coerced Statements Are "Fairly Attributable to the Government." .............................. 59

        1.     The "Fairly Attributable" Standard. ................................................. 59

        2.     Relevant Factors When Evaluating Whether a Company's Actions Are Fairly Attributable to the Government. .............................................. 62

        3.     Cognizant's Actions In Compelling Schwartz's and Coburn's Statements Are Fairly Attributable to the Government. ..................... 65

            a.     Cognizant Faced Substantial Pressure to Cooperate With the Government and Tailored Its Self-Disclosure and Cooperative Efforts, Including Schwartz's and Coburn's Interviews, to the DOJ Policies Then in Effect. ................................................... 65

            b.     Cognizant's Interviews of Schwartz and Coburn Were Significantly Influenced by the Government and Conducted for Its Benefit. ................................................................................. 67

            c.     Cognizant Provided the Government with a Clear Investigative Roadmap, and the Government Accepted the Results of Cognizant's Investigation in Lieu of Conducting Its Own Independent Investigation. ...................................................... 75

II.     THE CONSTITUTION AFFORDS SCHWARTZ AND COBURN THE DUE PROCESS PROTECTIONS SET FORTH IN *BRADY* AND ITS PROGENY: ACCESS TO EXCULPATORY MATERIAL IN THE POSSESSION OF THE GOVERNMENT AND THOSE THAT ENGAGE IN A JOINT EFFORT WITH THE GOVERNMENT. ................................................................................................... 83

<u>**PROPOSED FINDINGS OF FACT**</u>

I.    **COGNIZANT EFFECTED ITS SELF-DISCLOSURE AND COOPERATIVE EFFORTS IN COORDINATION WITH THE GOVERNMENT AND CONSISTENT WITH THE DOJ POLICIES THEN IN EFFECT.**

   A.    **The Yates Memo and FCPA Pilot Program.**

   1.    On September 1, 2016, Cognizant Technology Solutions Corporation ("Cognizant") self-disclosed to the Government the alleged Foreign Corrupt Practices Act ("FCPA") violations that form the basis for the Indictment in this criminal case.  The historical context in which Cognizant made the decision to self-disclose, and the influence that the widely-publicized United States Department of Justice ("DOJ") policies then in effect had on Cognizant's actions before then and after, is essential to the resolution of the Defendants' motions to suppress and for other relief pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), *Brady v. Maryland*, 373 U.S. 83 (1963), and other authorities.  ECF Nos. 376, 377.  This section provides that historical context.

   2.    On September 9, 2015, less than one year before Cognizant self-disclosed, the DOJ released the so-called Yates Memo, formally entitled "Individual Accountability for Corporate Wrongdoing."  DX-47 ("Individual Accountability for Corporate Wrongdoing, Memorandum from Deputy Attorney General," Sally Q. Yates (September 9, 2015) ("Yates Memo")); Apr. 18, 2023 Hr'g Tr. 165:20-24 (Last).

   3.    The Yates Memo emphasized that "criminal and civil corporate investigations should focus on individuals from the inception of the investigation" and alerted the public and the legal community that "in order to qualify for any cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct." DX-47 at 2-3; Apr. 18, 2023 Hr'g Tr. 166:18-19 (Last) ("It does say that we should focus on individuals from the inception of the investigation."); Apr. 18, 2023 Hr'g Tr. 169:22-170:1 (Last) ("So the

memo on page 3 says, 'In order for a company to receive any consideration for cooperation under the principles of federal prosecution of business organizations, the company must completely disclose to the department all relevant facts about individual misconduct.'"); Apr. 18, 2023 Hr'g Tr. 248:17-249:2 (Buch) ("The subject of the Yates Memo, Exhibit 47, is individual accountability for corporate wrongdoing, right? A. Correct. Q. And what does that mean? A. Focusing on the individual actors who are responsible for the corporate wrongdoing. Q. And one of the things that the Yates Memo sets forth is that if corporations do that -- in fact, corporations have to do that if they're to qualify for more lenient treatment by DOJ; is that right? A. Correct.").

4.      On April 5, 2016, at about the same time as Cognizant's investigation expanded to include allegations of bribes in India, the DOJ launched its FCPA Pilot Program.  DX-48 ("Enforcement Plan and Guidance, The Fraud Section's Foreign Corrupt Practices Act," U.S. Department of Justice (April 5, 2016) ("FCPA Pilot Program")).

5.      The FCPA Pilot Program, through which the DOJ "motivate[d] companies to voluntarily self-disclose FCPA-related misconduct" and "encourage[d] companies to disclose FCPA misconduct to permit the prosecution of individuals," built on the Yates Memo.  DX-48; *see also* DX-64 (Remarks by Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016)) (FCPA Pilot Program "should encourage voluntary corporate self-disclosure of overseas bribery, and thus more prosecutions of the individuals responsible"); Apr. 18, 2023 Hr'g Tr. 170:15-25 (Last) ("Q. And this pilot program builds on the Yates Memo, correct? A. I think that's probably fair. Does it say that in here? Q. No. It says it in a speech that was given the same day, but -- A. Okay. Q. Okay. And fair to say that the policies in this memo were designed to motivate companies to voluntarily self-disclose FCPA-

related misconduct? A. That seems right. Q. And to fully cooperate with the fraud section? A. Yes.").

6.      Each of these DOJ policies "sets out incentives for companies that cooperate." Apr. 18, 2023 Hr'g Tr. 174:14-17 (Last); Apr. 18, 2023 Hr'g Tr. 32:15-18 (Gingras); Apr. 18, 2023 Hr'g Tr. 247:2-21, 252:7-8 (Buch). The Yates Memo and the FCPA Pilot Program—which later became the FCPA Enforcement Policy—"certainly focused on incentivizing corporations to cooperate with the government because the government's focus is supposed to be for a variety [of] reasons on holding individuals accountable." Apr. 18, 2023 Hr'g Tr. 121:24-122:6 (Gingras).

7.      A declination of prosecution is among the potential benefits of a company's decision to self-disclose and cooperate with the Government in accordance with DOJ policies. Apr. 18, 2023 Hr'g Tr. 252:7-9 (Buch) ("the policy sets forth the potential benefits, including a declination or a reduction in a fine. So those are potential benefits of self-reporting."); Apr. 18, 2023 Hr'g Tr. 192:12-17 (Last) ("a declination with disgorgement . . . is available under the pilot program and then later under the corporate enforcement policy where, if a company meets certain requirements, self -- voluntarily self-discloses, fully cooperates, and appropriately remediates, they can -- they can get a declination provided they also pay disgorgement."); Apr. 18, 2023 Hr'g Tr. 120:22-121:15 (Gingras).

**B.      Cognizant Retains DLA Piper and Initiates Its Investigation Against the Backdrop of the Yates Memo and FCPA Pilot Program.**

8.      Cognizant's investigation began in early 2016, when a report was made to its compliance hotline regarding potential kickbacks to a cafeteria vendor at one of its India facilities. In April 2016, at Schwartz's urging, Cognizant expanded the scope of the investigation to include allegations of bribes paid by its administration team, the group responsible for infrastructure and real estate at its India facilities. DX-61 (CTS_R17_0005257-5258).

9.      Cognizant retained DLA Piper ("DLA") to perform an internal investigation.  DX-53 (CTS_R17_0005407-416).  Karl Buch, a DLA partner who was previously an Assistant United States Attorney in the U.S. Attorney's Office for the District of New Jersey for five years, became involved in the investigation in April 2016 and oversaw it through the unsealing of the Indictment in this matter on February 14, 2019.  Apr. 18, 2023 Hr'g Tr. 235:23-236:11, 238:6-10 (Buch).

10.     Buch and the other DLA attorneys who conducted the investigation on Cognizant's behalf, including Jonathan Haray and Grayson Stratton, were familiar with and co-authored articles during the investigation about the then-operative Yates Memo, FCPA Pilot Program, and FCPA Enforcement Policy.  Apr. 18, 2023 Hr'g Tr. 246:5-251:19 (Buch); DX-45; DX-50; DX-51; DX-52.

11.     In those articles, DLA and Buch highlighted the benefits of self-disclosure and "full cooperation" as provided for in those DOJ policies, which included "[c]oordination of investigative steps a company intends to take as part of its internal investigation with the steps the DOJ may take as part of its investigation, including witness interviews."  DX-50 ("New FCPA Enforcement Policy presumes declination for companies that voluntarily disclose, cooperate and, remediate," Karl Buch et al. (November 30, 2017)); Apr. 18, 2023 Hr'g Tr. 246:5-251:19 (Buch).

12.     DLA's articles also focused specifically on the incentives that the DOJ policies provided to companies that self-disclose and cooperate in a manner consistent with DOJ's stated priorities and expectations, up to and including declinations.  Apr. 18, 2023 Hr'g Tr. 246:5-251:19 (Buch); DX-45; DX-50.  Buch understood that, under the DOJ policies, "one of the advantages of self-disclosure is that there can be a more lenient penalty, maybe even no penalty at the end of the day."  Apr. 18, 2023 Hr'g Tr. 253:21-24 (Buch).

13.     In May 2016, Cognizant began collecting documents from custodians, initiated a forensic audit, and conducted initial interviews.  DX-53 (CTS_R17_0005407-5408).

14.     By no later than June 2016, Cognizant, through its counsel at DLA, was contemplating self-disclosure to the Government.  DX-53 (CTS_R17_0005407-5416).

15.     On August 8 and 20, 2016 (among other dates), DLA interviewed Srimanikandan Ramamoorthy ("Mani"), Cognizant's Vice President of Administration during the relevant period (and "CC#1" in the Indictment), who was responsible for managing Cognizant's real estate projects in India.  DX-61 (CTS_R17_0005257-5258).

16.     Although he had not done so during his August 8, 2016 interview—when he was questioned regarding other allegations related to the same Indian facility, KITS—during his August 20, 2016 interview, Mani claimed that Schwartz and Coburn authorized the bribe payment which is now the subject of the Indictment.  ECF No. 169 at 6.  As a result, Schwartz and Coburn were immediately relieved of any responsibilities for the conduct of the investigation.  *Id.*

17.     On August 22 and 24, 2016, upon Cognizant's demand, Schwartz provided his MacBook Air laptop, Lenovo laptop, and backup hard drive to Cognizant for forensic imaging. DX-37 (CTS_R17_0005195, -5196).

###     A.     Schwartz and Coburn Were Interviewed Under Threat of Termination.

18.     Cognizant "insisted on cooperation (including interviews) from both Schwartz and Coburn" as part of the investigation.  DX-29 (CTS_R17_0005311) (emphasis in original).

19.     Cognizant's employee policies and Schwartz's and Coburn's employment agreements mandated cooperation with the investigation in order for them to maintain their employment with Cognizant.

20.     Cognizant's Code of Business Conduct and Ethics provided that: "Employees, officers and Directors are expected to cooperate fully with any inquiry or investigation by the

Company regarding an alleged violation of this Code.  Failure to cooperate with any such inquiry or investigation may result in disciplinary action, up to and including discharge."  ECF No. 377-1, Ex. 7 (CTS_R17_0000040).

21.    Employees, including Schwartz and Coburn, were required to certify compliance with the Code, acknowledging that violation of Cognizant's standards could subject them to disciplinary action, including "termination or legal action."  ECF No. 377-1, Exs. 51-52 (CTS-0102721, CTS-0102750).

22.    Cognizant's Core Values and Standards of Business Conduct stated that: "As part of our commitment to our stakeholders, we are also expected to cooperate fully with any investigation into any actual or potential violation" of Cognizant's Standards and Company policies.  DX-101 (CTS_R17_0000064).

23.    Schwartz's and Coburn's employment agreements incorporated Cognizant's Core Values and Standards of Business Conduct by reference and provided that: "Cause [for termination] shall mean . . . (iii) failure by the Employee to observe material policies of the Company applicable to the Employee."  ECF No. 377-1, Ex. 9 (Schwartz's employment agreement); *see also* DX-102 (CTS-0638406 ¶ 1(c)) (Coburn's employment agreement with the identical provision).

24.    Cognizant would later tout to the Government that its efforts in "[d]oggedly persisting in securing additional interviews with" Schwartz and Coburn, "pressuring them to cooperate," and "insist[ing] on cooperation (including interviews) from both Schwartz and Coburn" led to their resignations.  DX-29 (CTS_R17_00005299, -5306) ("Cognizant has done everything within its power to investigate and root out misconduct at the Company, including . . . [d]oggedly persisting in securing additional interviews with both the President and the General

Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already)."); (*id.* at -5317) (highlighting the "speed with which the Company moved forward against these senior executives (including sidelining them, pressuring them to cooperate, and ultimately separating with them)"); (*id.* at -5311) ("The Company <u>insisted</u> on cooperation (including interviews) from both Schwartz and Coburn. Both resigned after DLA confronted Schwartz with his notes of the April 2014 telephone call, and before completing additional follow-up interviews.") (emphasis in original).  Coburn declined to sit for an interview under the ground rules imposed by Cognizant (*see infra* at ¶¶ 26-32) and, instead, resigned from Cognizant on September 27, 2016, the day before his scheduled second interview.  *See* ECF No. 376-4 at 17.

> **B.    Schwartz's and Coburn's Interviews Were Conducted Under Threat of Termination and Pursuant to Ground Rules That DLA Selectively Applied and the Government Could Never Impose.**

25.    On August 28, 2016, DLA interviewed Schwartz for the first time.

26.    The DLA attorneys who interviewed Schwartz, including Buch, set and enforced strict ground rules for the interview, including prohibiting Schwartz from having more than one lawyer at the interview and not allowing that lawyer to speak or take notes during the interview. Apr. 19, 2023 Hr'g Tr. 301:3-21 (Buch); ECF No. 377-2, Certification of Steven E. Schwartz ("Schwartz Cert.") ¶ 6.

27.    These same ground rules were also imposed by DLA for Schwartz's second interview on September 23, 2016, DX-8 (CTS-0103589); Apr. 19, 2023 Hr'g Tr. 301:3-21 (Buch), and for the planned second interview of Coburn that had been scheduled for September 28, 2016. *See* ECF No. 376-4 at 17.

28.    DLA did not impose these rules on all Cognizant employees who were interviewed. Apr. 19, 2023 Hr'g Tr. 304:15-18 (Buch).  For example, at Coburn's August 29, 2016 interview:

according to Buch, the rules "wouldn't be necessary because he [Coburn] didn't have a lawyer present."  Apr. 19, 2023 Hr'g Tr. 375:3-4 (Buch).

29.     DLA also imposed different rules on Cognizant employees other than Schwartz who were interviewed, like he was, more than once: "different rules were imposed on him [Schwartz] than were imposed on other people who were appearing for a second interview."  Apr. 19, 2023 Hr'g Tr. 305:7-10 (Buch).

30.     According to Buch, if a Cognizant employee did not have a lawyer present during his or her first interview, the rules would not be imposed at any subsequent interview of that employee with one or more lawyers present.  Apr. 19, 2023 Hr'g Tr. 305:11-17 (Buch).  Although this would then mean that DLA would not have sought to impose these rules for Coburn's planned second interview on September 28, 2016—as Coburn was not represented by a lawyer during his first interview, but was going to be at his second—Buch did, in fact, seek to impose the same rules Schwartz was subjected to in advance of Coburn's planned second interview.  Apr. 19, 2023 Hr'g Tr. 375:8-17 (Buch) ("Q. So there was going -- there was a first interview, no lawyer, and a second interview. Do you recall that a lawyer was going to be present for that second interview? A. I do. Q. So this is the scenario in which you would not have imposed these rules according to your testimony, correct? A. Logically, yes. Q. Did you, in fact, impose those same rules on the second interview? A. I don't remember. Q. So you don't remember saying to counsel for Mr. Coburn that, with respect to that second interviews, those exact same rules would apply? A. I don't remember."); ECF No. 376-4 at 16 ("Weeks later, in September 2016, Cognizant sought follow-up interviews of Schwartz and Coburn, imposing the same restrictions on Schwartz and Coburn's counsel – only one lawyer present, no notetaking, and no questions or comments during the interview – that it had imposed in the initial interviews.").

31.     While Schwartz's lawyer was not permitted to take notes during his client's interviews on August 28 and September 23, 2016, Cognizant's lawyers at DLA were permitted to do so and in fact did take contemporaneous notes.  This provided DLA and Cognizant certain "advantages," including insofar as the contemporaneous notes they took could later be viewed as "probably more accurate" than a memorandum or notes prepared by Schwartz's lawyer after the fact.  Apr. 19, 2023 Hr'g Tr. 303:8-22 (Buch).

32.     The interview rules enforced by DLA for Schwartz's interviews could not have been imposed by the Government.  Apr. 18, 2023 Hr'g Tr. 48:6-10 (Gingras) ("Q. But you would admit that those types of rules are not rules that the government could use in interviewing witnesses, could they? A. No, those are not rules -- the rules for the government would certainly be different than they would be for a company"); Apr. 18, 2023 Hr'g. Tr. 145:19-21 (Gingras) ("Q. I think we are in agreement. The DOJ couldn't impose conditions like that on an interview? A. Certainly. Certainly not I should say.").

C.     **Facing Substantial Pressure to Cooperate, Cognizant Self-Discloses to the Government and, In Accordance with DOJ Policies, Coordinates Its Investigation with the Government to Avoid Its Own Prosecution.**

33.     On August 31, 2016, DLA requested a call with the Government to effect Cognizant's self-disclosure.  DX-54 (CTS_R17_0000246); DX-55 (CTS_R17_0000953); Apr. 18, 2023 Hr'g Tr. 259:13-261:18 (Buch).

34.     The following day, on September 1, 2016, Cognizant, through DLA, self-disclosed to the Government potential FCPA violations.  DX-54 (CTS_R17_0000246); DX-55 (CTS_R17_0000953); Apr. 18, 2023 Hr'g Tr. 261:19-264:24 (Buch).

35.     During that call, DLA, on behalf of Cognizant, asked "to be considered for inclusion in the FCPA Pilot Program" and advised that Cognizant's Board had, the day prior, "charged DLA with voluntarily reporting this matter to the DOJ and SEC, along with its stated intention to cooperate

fully with the government, including with respect to the continued investigations of individuals pursuant to the Yates Memo and related criteria in the FCPA Pilot Program." DX-56 (CTS_R17_0005220, -5223) ("The Company intends to fully cooperate with the DOJ and the SEC."); Apr. 18, 2023 Hr'g Tr. 261:19-264:24 (Buch).

36.     Cognizant, a publicly traded company, faced substantial pressure to self-disclose to and cooperate with the Government.  As Cognizant described it to the Government:  "Suffice it to say, if the Company were prosecuted, it would be very detrimental to [the] Company's business." DX-29 (CTS_R17_0005313) ("Given the nature of Cognizant's business as a trusted technology services provider, we believe there would be client and customer flight if the Company were prosecuted, which would impact the business, Cognizant's employees, and potentially shareholders."); DX-29 (CTS_R17_0005314) ("Issuing a declination for Cognizant would be mindful of that potential collateral damage, and would be consistent with Department's FCPA Corporate Enforcement Policy goals of focusing on bad actors.").

37.     Cognizant "was aware that the company could be convicted of a crime" and "was concerned about reputational damage to the company."  Apr. 19, 2023 Hr'g Tr. 387:6-25 (D'Souza).

38.     Throughout the ensuing two-plus year investigation, Cognizant and its counsel remained guided by, and tailored their investigative activities to fit the expectations and stated priorities of the then-operative DOJ policies—all in pursuit of a corporate declination.

39.     On May 10, 2018, Cognizant made a presentation to the Government entitled "Filip Factors & FCPA Corporate Enforcement Policy Presentation," prepared for the purpose of arguing for the declination of prosecution that Cognizant sought through its self-disclosure.  DX-29 (CTS_R17_0005299-5321); Apr. 19, 2023 Hr'g Tr. 369:25-370:3 (Buch) ("So with regard to the

Filip's Factor presentation, that presentation was your effort to attempt to persuade the government to provide a declination, right? A. Correct.").

40.    Cognizant detailed in its Filip Factors Presentation the "extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives [Schwartz and Coburn]" and was explicit that its cooperative efforts were in furtherance of "DOJ's policies and priorities governing FCPA prosecutions of corporations." DX-29 (CTS_R17_0005299, -5317); Apr. 18, 2023 Hr'g Tr. 61:14-62:20 (Gingras); *see also* Apr. 18, 2023 Hr'g Tr. 181:4-6 (Last) ("Q. Is it fair to say that Cognizant didn't just passively provide information as part of their cooperation? A. No, they were proactive.").

41.    Cognizant emphasized, for example, that "[t]he Yates Memo requires companies to 'provide all relevant facts relating to individuals responsible for the misconduct' in order to qualify for cooperation credit.  Cognizant has gone above and beyond that here.  The Company has repeatedly and proactively provided the Government with information regarding the individual bad actors, including incriminating information."  DX-29 (CTS_R17_0005315) (emphasis in original).

42.    Cognizant also highlighted that "[t]he FCPA Corporate Enforcement Policy makes clear that the DOJ's policy and priority in FCPA matters is for companies to come in and self-disclose the matters, which is rewarded by a presumption that voluntary disclosure, full cooperation, and remediation will result in a corporate declination.  Cognizant did everything the DOJ could have asked for here."  DX-29 (CTS_R17_0005301-5302) (emphasis in original).

43.    Cognizant noted further that, "[i]n addition to fulfilling the objectives of the Yates Memo, a declination will also move the ball forward toward one of the stated goals of the FCPA

Corporate Enforcement Policy: <u>to enhance the DOJ's ability to identify and punish culpable individuals</u>." DX-29 (CTS_R17_0005315) (emphasis in original).

44.    And Cognizant concluded that "[a] declination here would be fair to the Company, would be consistent with DOJ precedent, would still allow the DOJ to prosecute the bad actors, and would incentivize voluntary reporting in the way envisioned by the new DOJ policy." DX-29 (CTS_R17_0005319).

45.    The Government, for its part, "certainly understood that those policies [including the Yates Memo and FCPA Pilot Program] were probably driving what they [Cognizant and its counsel] were doing." Apr. 18, 2023 Hr'g Tr. 127:18-128:2 (Gingras); Apr. 18, 2023 Hr'g Tr. 128:12-12 (Gingras) ("[T]he fact that they self-reported and were trying to cooperate with the government was indicative . . . that they're trying to get cooperation credit. And the process for getting that is out in various policies and in the U.S. Attorneys' Manual and in the sentencing guidelines.").

**D.    Cognizant's Immediate, Pronounced Coordination with the Government.**

46.    Between September 1, 2016 and September 23, 2016, when Schwartz was interviewed for the second time, Cognizant and the Government communicated on at least eight separate days, often more than once per day, for a total of no fewer than 19 telephone calls and email exchanges: on September 8 (emails and call with DOJ); September 9 (email to DOJ); September 14 (emails and calls with DOJ and SEC); September 15 (call with DOJ and SEC); September 20 (email with DOJ); September 21 (email with DOJ); September 22 (emails with DOJ and SEC); and September 23 (emails and call with DOJ and SEC). DX-2, DX-3, DX-12, DX-54; ECF No. 377-1 at 8-9.

47.     Throughout this period, the Government made requests of Cognizant and asked it questions.  Apr. 18, 2023 Hr'g Tr. 88:3-5 (Gingras) ("there's no dispute, right, that you would ask questions of the -- of Cognizant lawyers, right? A. Correct, and make requests.").

48.     On September 8, 2016, DLA emailed the Government to notify it that DLA had left a voicemail to "follow up on a question [DOJ] asked us last week" and then sent a list of four personal email addresses "in response to [DOJ's] request during our call last week."  DX-2 (CTS_R17_0000248).  This type of request, according to the Government, is not "unusual at the beginning of any of these corporate investigations."  Apr. 18, 2023 Hr'g Tr. 38:8-12 (Gingras) ("Q. Was that unusual for the government to request information from Cognizant during that period. A. I don't think it was unusual at the beginning of any of these corporate investigations to ask for this kind of information.").

49.     The Government also requested, within the first week of Cognizant's self-report, that Cognizant advise the Government of upcoming interviews.  Apr. 18, 2023 Hr'g Tr. 38:15-39:17, 40:24-41:3 (Gingras) ("Q. The government has asked, you think, based on this, to know when Cognizant was going to interview certain people or what interviews Cognizant was going to do. That was the inference that you drew, right? A. Correct."); DX-3 (CTS_R17_0000251); Apr. 19, 2023 Hr'g Tr. 277:4-11, 286:20-24 (Buch).

50.     Cognizant promptly complied with the Government's request and solicited input from the Government regarding its planned interviews.  DX-3 (CTS_R17_0000252) (Sept. 9, 2016 email from DLA to DOJ) ("As you requested, I write to let you know that we intend to interview Lakshmi Narayanan, Cognizant's Vice Chairman of the Board, on Monday.  Please let me know if you have any questions.").

51.     Cognizant also provided frequent updates to the Government in real time, including on September 14, 2016 when Cognizant discovered notes on Schwartz's laptop from April 22, 2014 that would become a focus of questioning at Schwartz's second interview the following week.  Apr. 18, 2023 Hr'g Tr. 42:23-44:16; DX-3 (CTS_R17_0000251) (Sept. 14, 2016 email from DLA to DOJ) ("Please let me know if you are available for a call with John [Haray], Gray [Stratton] and me [Karl Buch] between 2-4 pm today.  We would like to raise some recent developments with you."); *see also* DX-61 (CTS_R17_0005258) (DLA "[i]nformed DOJ/SEC about Schwartz's notes" on September 14, 2016); DX-29 (CTS_R17_0005306) (DLA touting to the Government having turned "over the former General Counsel's facially privileged (but incriminating) notes of the April 2014 conference calls within days of discovering them").

52.     In accordance with the Government's prior request to be advised of upcoming interviews, Cognizant advised the Government during a call on September 14, 2016 that it planned to interview Schwartz and Coburn the following week.  DX-4 (DOJ-EH-0000000005); Apr. 19, 2023 Hr'g Tr. 286:7-24 (Buch) ("Q. Okay. Why did you tell them you were going to be meeting with Mr. Schwartz? A. Based on the document you showed me earlier, there must have been a request at some point by the government to let them know when we intended to interview a witness[.]").

53.     Cognizant told the Government on their September 14, 2016 call that it planned to ask Schwartz questions about the notes Cognizant had recently discovered on Schwartz's laptop.  Apr. 18, 2023 Hr'g Tr. 155:6-8 (Gingras) ("I think they may have told me that they were going to ask him about the notes I think which they recently discovered.").

54.     Cognizant also advised the Government on September 14, 2016 of other upcoming interviews, including those of Lakshmi Narayanan, Mani and Biswajit Gosh.  Apr. 18, 2023 Hr'g

Tr. 45:18-46:3 (Gingras); DX-4 (DOJ-EH-0000000006); Apr. 19, 2023 Hr'g Tr. 288:9-14 (Buch) ("Q. At the time of that meeting and pursuant to their prior request, as you said, you told them that you had other interviews coming up as well, correct? You can look – A. Yeah. Based on these notes, that appears to be the case. Q. It looks like Lakshmi, Mani, and B. Gosh; is that right? A. Yes.").

55.      By DLA's account, during the period from September 1, 2016 to October 6, 2016, Cognizant shared with the Government, among other things: "1. Key points from witness interviews; 2. Steven Schwartz's notes from the April 22, 2014 conference call; 3. Personal email and identifying information for a number of Cognizant associates; 4. Upcoming interviews; [and] 5. Information about witnesses and their counsel."  DX-18 (CTS_R17_0005170); Apr. 18, 2023 Hr'g Tr. 69:10-70:8 (Gingras).

56.      Throughout this period, the Government was not "interviewing witnesses, gathering documents, [or] doing the kinds of things that DLA was doing at the time."  Apr. 18, 2023 Hr'g Tr. 49:10-19 (Gingras).

**E.      Despite Having Already Decided to Terminate Schwartz and Coburn, Cognizant Interviews Schwartz Again Under Threat of Termination to Elicit Statements For Use in the Government's Prosecution.**

57.      By no later than September 20, 2016, three days before its second interview of Schwartz, Cognizant had memorialized its decision to terminate Schwartz and Coburn.

58.      A draft press release prepared by Cognizant's public relations firm, and reviewed and edited by Cognizant and DLA on September 20, 2016, announced both of their terminations. DX-13 (CTS_R17_0004226, -4227) ("Coburn and Schwartz along with Sridhar Thiruvengadam … were terminated. … Based on information learned in the early stage of the investigation, the Company concluded that these executives violated significant company policies and made the decision to terminate them.").

59.     The September 20, 2016 draft press release announcing the terminations of Schwartz and Coburn was shared with, among others, "three people who reported to Mr. Schwartz and one who reported to Mr. Coburn."  Apr. 19, 2023 Hr'g Tr. 400:18-20 (D'Souza); DX-90 (CTS_R17_0004164-197).  Buch's "best recollection" is that "an actual decision had not been made to terminate" Schwartz at the time, but "there was a contingency plan to terminate" him. Apr. 19, 2023 Hr'g. Tr. 290:9-14 (Buch).  Cognizant's CEO, Francisco D'Souza, testified that the company was "working through contingency plans" at the time but does not recall another instance in his career having sent draft press releases announcing supervisors' terminations to their direct reports before a decision to terminate those supervisors had been made.  Apr. 19, 2023 Hr'g Tr. 402:21-404:23 (D'Souza).  Nor is there any documentary evidence of contemporaneous discussions at Cognizant regarding a "contingency plan" to terminate Schwartz or of any other contingencies being considered with respect to Schwartz's employment status at Cognizant.

60.     Following an "all hands meeting at DLA" the following day, on September 21, 2016, Cognizant revised the press release to remove the anticipated publication date of September 29—*i.e.*, after Schwartz's planned interview on September 23 and a planned second interview of Coburn scheduled for September 28—but still included modified language regarding the plans to terminate Schwartz and Coburn.  DX-13 (CTS_R17_0004226-4229).

61.     This language remained in updated draft press releases prepared on both September 21 and September 22, 2016.  DX-13 (CTS_R17_0004273) (Sept. 21, 2016 email attaching revised draft press release); DX-13 (CTS_R17_0004279) (Sept. 22, 2016 draft press release) ("Mehta replaces Gordon Coburn, whose employment has been terminated. The Company has also terminated the employment of Steven Schwartz, Executive Vice President, Chief Legal and Corporate Affairs Officer. … Cognizant has voluntarily notified the United States Department of

Justice and United States Securities and Exchange Commission and is keeping both agencies informed as the investigation continues.").

62.     Cognizant and its counsel did not advise Schwartz of his impending termination and instead required him, on pain of termination, to continue cooperating, including by sitting for a second interview on September 23, 2016.

63.     The Government "assumed" that Schwartz would have been fired if he did not submit to his second interview.  Apr. 18, 2023 Hr'g Tr. 65:23-66:4 (Gingras) ("Q. Were you aware that, if he did not submit to a second interview, he would have been fired?  Is that something you were aware was Cognizant's policy? A. . . . I don't think I would have been surprised to know that, or I probably assumed it.").

64.     Cognizant and its counsel revealed to the Government that they held off on terminating Schwartz because they were attempting to elicit additional information from him to then provide to the Government, in furtherance of Cognizant's cooperative efforts.  Cognizant's counsel told the Government that the Company's "preferred course is to tell him [Schwartz] to resign" or else Cognizant would "terminate him," but that Cognizant was "[t]rying to get as much as we can" in the meantime.  DX-14 (DOJ-EH-0000000015-017) (Kevin Gingras Notes from Oct. 6, 2016 Meeting); DX-19 (DOJ-EH-0000000018-023) (DOJ Paralegal Notes from Oct. 6, 2016 Meeting) ("our preferred course is for him to resign or we'll terminate"); Apr. 18, 2023 Hr'g Tr. 75:23-76:11 (Gingras) ("Q. DLA says, 'We do want to do an additional interview with him and have asked for medical records for this alibi.' So I want to [ask] just you about that statement. 'We want to do an additional interview with him.' This comes after a statement about 'our preferred course is for him to resign or we'll terminate.' I take it that that's just another embodiment of what we were talking about earlier, which is if he resigned or was terminated, they might not get that

17

next interview. . . . A. Correct, yes."); Apr. 18, 2023 Hr'g. Tr. 54:6-18 (Gingras) ("Q. And it says, "Schwartz: On Garden leave." What does that mean? A. I think that just means on paid leave. Q. Then it says, "Trying to get as much as we can." Do you see that? A. Yes. Q. These are your notes. What did you mean by that? A. I think I'm noting here what DLA is telling me and Oz and the team that Cognizant is doing and is doing with certain personnel, including Mr. Schwartz.").

65.     Cognizant subsequently shared with the Government other planned employment actions regarding key witnesses, including Mani and Sridhar Thiruvengadam ("Sridhar"), and explicitly sought the Government's reaction before taking those planned actions. Ex. A[1] (DOJ-EH-00000000122) (DOJ Paralegal Notes from Nov. 16, 2017 Call with DLA) ("list of employees the company wants to take disciplinary action against in related to findings; individual from earlier action who have already been suspended (Sridar, Mani); would like reaction on Sridar and Mani"); DX-16 (DOJ-EH-00000000135) (DOJ Paralegal Notes from December 6, 2017 DLA Presentation) ("want to terminate a number of people . . . mani, sridar (can discuss next year . . . SEC: can you just give us a list of the people being terminated and another of the people. DLA: Sure. The only people I think are important to you are Mani and Sridar.  Sambhaji is the only one on this list who relates to Pune. He was the project manager involved in that approval. AB [Bruck, DOJ]: And you guys are proposing separation? Let me get back to you on that one. At the end of the day, it's your decision.").

66.     "By holding off on terminating Mr. Schwartz, that was something that was helpful to the government."  Apr. 18, 2023 Hr'g Tr. 64:23-24 (Gingras); Apr. 18, 2023 Hr'g Tr. 66:5-15

---

[1] The materials contained in Exhibit A, provided herewith, consist of DOJ paralegal notes produced by the Government during pre-hearing discovery.  Excerpts from these notes were referenced during the hearing; they are included here in full.  All other exhibit references herein are to materials that were previously filed with the Court and/or pre-marked as exhibits in connection with the evidentiary hearing conducted in this matter on April 18-19, 2023.

(Gingras) ("Q. So by submitting to that interview, he generated evidence that you said a little while ago was important evidence for the government, right? A. Yes. Q. And, therefore, evidence that would not have been available if he had not been interviewed and had been fired, right? A. Presumably, yes. Q. And that would not have been available if he had been fired as was intended -- assume that -- before that interview. A. If that's true, then yes.").

67.     Cognizant's decision to hold off on terminating Schwartz, as well as others like Mani and Sridhar, who are now Government witnesses, was encouraged by the operative DOJ policies then in effect: "certainly, if a company is trying to get cooperation credit, I think one of the things that they do, and did in this case perhaps and certainly do in a lot of other cases, is put people on leave to make them available to the government."   Apr. 18, 2023 Hr'g Tr. 60:9-25 (Gingras) ("Q. Let me make sure I understand. It's the business's decision what to do. But in terms of how much credit the business is going to get for cooperating with the authorities, one of the things that's measured is their having given access to the government to certain people, right? A. I think that's correct. I think those are in the policies."); Apr. 18, 2023 Hr'g Tr. 59:13-18 (Gingras) ("You know, in these international investigations and these big white collar investigations, it's not unusual that, when a company is remediating and deciding what to do with a number of its employees, they will try to make witnesses available to [the Government]."); Apr. 18, 2023 Hr'g Tr. 63:3-9 (Gingras) ("A. . . . in weighing that calculus of trying to remediate and mitigate and -- which includes terminating people perhaps and also trying to seek cooperation credit with the government by ensuring that they're available if the government is trying to seek access to them. Q. Right. In order to receive cooperation credit? A. I can't think of another reason why a company would do that other than trying to get cooperation credit.").

68.     Cognizant's counsel later touted to the Government: "We've all seen cases w[h]ere people are terminated right away and that can impede an investigation."  Apr. 18, 2023 Hr'g Tr. 63:17-23 (Gingras); DX-17 (DOJ-EH-0000000206) (DOJ Paralegal Notes from DLA's Filip Factors Presentation) ("KB [Karl Buch]:  Also consistent with the DOJ de-confliction policy, we made sure those people were available to us and you.  KG [Kevin Gingras]:  We appreciate that and it is the company's decision.  KR [Kathy Ruemmler]:  In cooperation, that is a key distinguishing factor.  Doug Greenburg:  We've all seen cases w[h]ere people are terminated right away and that can impede an investigation.  KB:  [underlines making sure Mani was available for interview].  KR:  All the others have separated or been resigned."); Apr. 18, 2023 Hr'g Tr. 64:5-10 (Gingras) ("Q. So what the lawyers for Cognizant . . . are saying to you here is they did not terminate people so that the government would have access to them and they should be given cooperation credit for that, correct?  A. I believe that's correct.").

69.     Had Cognizant terminated Schwartz, it would have "made it very difficult, if not impossible, to speak to" Schwartz.  Apr. 18, 2023 Hr'g Tr. 63:22-64:4 (Gingras) ("Q. Do you agree with that? [referring to statement that company terminating employees can impede an investigation] A. Yes. I think I had seen other internal investigations in my own experience, and I know many of my colleagues, where people we would have liked to have talked to had already been terminated, and it made it very difficult, if not impossible, to speak to them, especially if they were overseas in jurisdictions where it would be impossible or difficult to talk to them."); Apr. 18, 2023 Hr'g Tr. 58:3-6 (Gingras) ("Q. This email, would you agree that it essentially confirms what you have said before, that people are more likely to talk if they haven't been fired? A. Sure. Yes."); Apr. 18, 2023 Hr'g Tr. 55:1-9 (Gingras) ("Q. Right. And if he had been terminated, it would be much harder to get that information, wouldn't it? A. Most likely. . . . Q. That's based on your

experience that if you terminate somebody, it's much harder to get an interview with them. Isn't that true? A. I think that's usually true."); *see also* Apr. 19, 2023 Hr'g Tr. 292:24-293:2 (Buch) ("Q. Would you agree or you won't agree that it's more difficult to get somebody to do an interview after they've been terminated? A. No, I would agree with you.").

F.     **Schwartz's Second Interview.**

70.     On the morning of Schwartz's second interview on September 23, 2016, DLA sent an email to the Government requesting a call for shortly after the interview concluded that afternoon.  ECF No. 377-1, Ex. 16 (CTS_R17_0000278) (Sept. 23, 2016 email from DLA to DOJ and SEC) ("Are you available for a short call this afternoon for a quick update.").

71.     In advance of Schwartz's second interview, DLA again required Schwartz's lawyer, Joshua Rievman, Esq., to adhere to certain "parameters" for the interview, including by prohibiting the presence of more than a single lawyer for Schwartz and requiring "that the lawyer will not take notes, ask questions, or otherwise disrupt the interview."  DX-8 (CTS-0103589); *see also* Apr. 19, 2023 Hr'g Tr. 301:17-24 (Buch) ("A. So I think I said that the lawyer will not take notes, ask questions, or otherwise disrupt the interview. Q. So the lawyer could not take notes, there could only be one, and could not ask questions, right? A. Correct.").

72.     Understanding that if Schwartz did not agree to these terms and attend the interview, he would be fired (and without knowing that Cognizant had already made the decision to fire him), Rievman acquiesced.  DX-8 (CTS-0103589).

73.     Schwartz's September 23, 2016 interview was, as set forth below, designed to elicit statements for use in the Government's prosecution of Schwartz.

74.     As reflected in the interview summary that DLA prepared and then shared with the Government, Buch's questioning of Schwartz extended beyond gathering the facts that would be germane to the internal investigation and instead went to issues specifically tailored to a criminal

prosecution.  DX-57 (CTS_R17_0004363-4382) (DLA Interview Memorandum of September 23, 2016 Interview of Steven Schwartz).

75.     Buch probed Schwartz, for example, regarding "willful blindness" and "facilitation payments"—terms that have special significance in FCPA criminal prosecutions but little, if anything, to do with the actions that Cognizant should or should not take following an internal investigation.  *Id.*; Apr. 19, 2023 Hr'g Tr. 305:25-306:4 (Buch) ("Q. Do you recall, during the course of your second interview with Mr. Schwartz on September 23rd, asking him about whether the particular payment that was being discussed was a, quote/unquote, facilitation payment? A. I do."); Apr. 19, 2023 Hr'g Tr. 307:11-17 (Buch) ("Q. During your interview of Mr. Schwartz, do you remember asking him this question? If you are aware during this week – that is, the week of his conversation – would you agree that this would be willful blindness? Do you remember asking that question? A. I do.").

76.     Buch understood that Schwartz's answers to his questions regarding "willful blindness" might be pertinent to what DLA would then report to the Government, particularly given that it is a term relevant in criminal cases to a defendant's state of mind.  Apr. 19, 2023 Hr'g Tr. 308:14-18 (Buch) ("Q. . . . But you understood that his answer to that question might be pertinent to what you would report to the government, right, because they were doing a criminal investigation, correct? A. Yes."); *id.* at 309:11-310:4 ("And 'willful blindness' is a term that's relevant in criminal law, which you're very familiar with, right? A. Sure. Q. Right. And so you were asking him [Schwartz] about whether his state of mind was one of willful blindness with all of the ramifications for a criminal case that that encompassed, right? … A. So as a general matter, willful blindness is certainly relevant to a defendant's state of mind. So… Q. In a criminal case? A. Sure.").

77.     Buch thus sought to elicit admissions that might bear on Schwartz's potential criminal culpability, including by asking a series of questions focused on the April 22, 2014 notes that DLA had shared and discussed with the Government—but not Schwartz—the week before:

> Q: Are the references to $2 million and $670,000 in the notes facilitation payments?
>
> A: They are not.
>
> Q: Were you aware that Cognizant's receipt of favorable license and permit results could be an improper benefit?
>
> A: Yes.
>
> Q: Had you been competent that week, would the call have put you on notice that an improper payment was substantially likely to occur?
>
> A: Yes.
>
> Q: Did you understand that someone who fails to pursue a red flag could be found to have violated the FCPA?
>
> A: Yes.
>
> Q: If you were aware during this week, would you agree that this would be willful blindness?
>
> A: Absolutely.
>
> Q: After the surgery, did you know you were out of it? And if so, did you do anything to go back and look at what you were working on to see if there were any issues that needed following up?
>
> A: Yes, I knew I was out of it. No, I did not go back to look for open issues. The week was a blur.
>
> Q: Are you aware that this is a potential criminal violation?
>
> A: Yes, I am aware.

DX-57 (CTS_R17_0004380-4381).

78.     As reflected above, DLA included in its memorandum of Schwartz's September 23, 2016 interview, which was conveyed orally to the Government, what purport to be verbatim transcripts of various of Buch's questions and Schwartz's answers on these subjects—a practice

that DLA did not use when preparing any other interview memoranda. DX-57 (CTS_R17_0004373-4377; CTS_R17_0004380-4382).

79.     DLA also noted at the beginning of its memorandum of Schwartz's September 23, 2016 interview that "certain of Schwartz's phrasing and word choices have been retained to enhance the clarity of the discussion reflected in this memorandum"—again deviating, with respect to Schwartz, a putative criminal defendant, from DLA's practice of summarizing, rather than purporting to transcribe, testimony when preparing other interview memoranda.   DX-57 (CTS_R17_0004363).

80.     Meanwhile, Schwartz, whose counsel was not allowed to take notes of the interview, was effectively deprived of the ability to challenge Cognizant's version of the interview, which he disputes.  As set forth above, this was intentional.  Apr. 19, 2023 Hr'g Tr. 303:18-22 (Buch) ("Q. But obviously there's advantages to contemporaneous notes. And that's why you have somebody there taking contemporaneous notes as opposed to just going back to your office and doing an interview, right? A. Correct.").

81.     On the same day as Schwartz's second interview, DLA had a call with the Government to provide an update.  ECF No. 377-1, Ex. 16 (CTS_R17_0000278).  DLA "likely" briefed the Government of Schwartz's interview during that September 23, 2016 call, particularly "given the importance of that interview," "including to the government's case."  Apr. 18, 2023 Hr'g Tr. 51:17-52:18 (Gingras).

82.     The Government made clear the importance of Schwartz's September 23, 2016 interview to its ultimate decision to bring charges and then prosecute this case.  Apr. 18, 2023 Hr'g. Tr. 52:9-11 (Gingras) ("I'm certainly aware that that interview was important for a number of reasons, including to the government's case, yes."); Apr. 18, 2023 Hr'g. Tr. 66:5-8 (Gingras)

("Q. So by submitting to that interview, he generated evidence that you said a little while ago was important evidence for the government, right?  A. Yes."); Apr. 18, 2023 Hr'g. Tr. 76:18-21 (Gingras) ("Q. And that too would have been of enormous assistance to the government, right? A. Assuming we got that information, then that would certainly be relevant to the government's investigation.").

83.     The Government and DLA also discussed on multiple occasions the prospect of the Government calling a DLA attorney to testify as a witness to Schwartz's second interview at the trial of this matter, given the importance of Schwartz's statements to the Government's prosecution.

84.     Specifically, the Government asked Buch on a March 19, 2018 call who "the best witness is" to testify regarding Schwartz's September 23, 2016 interview, emphasizing to Buch that "the consciousness of guilt aspect here" is "crucial for us" and will likely be "an area of the trial that is heavily litigated."  DX-7 (DOJ-EH-0000000151-52) ("Kevin: Do you think you'll have a better sense of who the best witness is once you walk through this stuff in the next few weeks? Karl: As to the Steve Schwartz interview?  This does raise a lot of issues for the firm.  I didn't know if you would want to tee this up now or wait for trial.  Kevin: Before we indict someone we want to have an idea of what we are getting ourselves into.  Oz: I'm sure Karl, you realize the consciousness of guilt aspect here so we want to make sure we know what we have before making charging decisions.  This will be an area of the trial that is heavily litigated so we want to be sure we know what the substance is.  Kevin: . . . for Schwartz it's going to be crucial for us.  Without the statements he makes, I think we're—you've seen the evidence and it makes a difference. . . . . if there were so much evidence we didn't have to go down that road.").

85.     On a June 6, 2018 call between the Government and DLA, Buch advised the Government that a DLA witness, whether Buch or Grayson Stratton, would be made available to testify for the Government regarding Schwartz's and Coburn's interviews, that everything discussed during those interviews is "fair game," but that there may be limits "as to info . . . not provided based on priv[ilege]."  DX-58 (DOJ-EH-0000000304) (David Last Notes from June 6, 2018 Call with DLA).

### G.     Cognizant's Coordination with the Government Continues, Coburn Resigns, and Schwartz Resigns After Facing a Demand for a Third Interview and the Threat of Termination.

86.     Cognizant continued to provide information to, and field questions and requests from, the Government in the immediate aftermath of Schwartz's second interview.

87.     On September 27, 2016, the day before his scheduled second interview, Coburn resigned.

88.     The next day, September 28, 2016, DLA shared that "significant development" with the Government.  ECF No. 377-1, Ex. 28 (CTS_R17_0000267) (September 28, 2016 email from DLA to DOJ and SEC) ("Can I please ask you for your availability today for a call to discuss a significant development that we would like to share with you?"); DX-11 (DOJ-EH-0000000007) (September 28, 2016 Email from Kevin Gingras to Leo Tsao) ("The Company told us today that the President resigned rather than be interviewed further by company counsel (DLA)").

89.     Later that same day, DOJ requested an additional call with DLA and the SEC to discuss follow-up questions.  DX-9 (CTS_R17_0000245) ("Karl: Do you have time to pop back on a call with Paul, Oz and I for some follow up?").

90.     Subsequently, from September 29 to 30, 2016, DLA and the Government exchanged numerous emails and had several calls at the Government's request, in response to the Government's "questions" and "follow up."   ECF No. 377-1, Ex. 30 (CTS_R17_0000268)

(Sept. 29, 2016 email from DOJ to DLA) ("Karl – Do you have a few minutes tomorrow for some quick questions?"); *id.*, Ex. 28 (CTS_R17_0000266) (Sept. 29 and 30, 2016 emails from DLA to DOJ and SEC) (attaching "an updated (inclusive) list of personal email addresses that we have identified to date" and noting "[a]s we identify additional accounts, we will pass them to you."); *id.*, Ex. 18 (CTS_R17_00000499) (Sept. 29, 2016 email from DLA to DOJ) ("Here is the email that we discussed earlier today."); DX-12 (CTS_R17_0000262) (Sept. 30, 2016 email from DLA to DOJ) ("Hi Kevin – Are you available for a quick call with me?").

91.     On October 6, 2016, DLA participated in an in-person meeting with the DOJ and SEC, hosted by the DOJ in Washington, D.C.  ECF No. 377-1, Ex. 31 (CTS_R17_0000297).

92.     One of the topics discussed was "Individual Remediation (Employment) Issues." DX-18 (CTS_R17_0005174).

93.     DLA highlighted that "Gordon Coburn has resigned"; that "Steven Schwartz's duties have been substantially circumscribed"; and that "[t]he Company wants to begin taking employment decisions *subject to any concerns you may have about that*"—specifically identifying Schwartz and Coburn as among the "specific employees" to be discussed with the Government. *Id.* (emphasis added); Apr. 19, 2023 Hr'g Tr. 315:20-316:6 (Buch).

94.     During the October 6, 2016 meeting, DLA also "advised the Government that counsel planned to do an additional (third) interview of Steven Schwartz . . . and had requested medical records from Schwartz related to his purported alibi concerning the basal cell procedure that he had performed in April 2014."  DX-20 (June 15, 2022 Letter from Government at 1-2); Apr. 18, 2023 Hr'g Tr. 76:12-17 (Gingras) ("Q. Then it says, 'We do want an additional interview with him [Schwartz] and have asked for medical records for this alibi.' What did you understand DLA was doing there? A. I'm going to take this to mean that DLA was trying to interview him

again and trying to get medical records to either corroborate or not his alibi."); Apr. 19, 2023 Hr'g Tr. 322:24-323:3 (Buch) (Q. . . . At the top of the next page it says, 'DLA: We do want an additional interview with him and have asked for medical records for this alibi.' Do you remember discussion of that? A. I do.").

95.     The Government, in response, "asked DLA if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about during his initial interview, and whether Schwartz was in the office the week of those events."  DX-20 (June 15, 2022 Letter from Government at 2); DX-19 (DOJ-EH-0000000022) (DOJ Paralegal Notes from Oct. 6, 2016 Meeting) ("GOV: Have we exhausted everything around him not remembering?"); Apr. 18, 2023 Hr'g Tr. 76:25-77:4 (Gingras) ("Q. – which says, 'Gov: Have we exhausted everything around him not remembering?' Any idea who Gov is there? A. Again, it was either Oz or me or, if the SEC was there, someone from the SEC.").

96.     At the time, the Government was still not conducting any interviews of its own or itself investigating Schwartz's state of mind in April 2014; Cognizant and its counsel were "the only ones who were doing this work."  Apr. 18, 2023 Hr'g. Tr. 77:13-78:2 (Gingras) ("at this point the only ones who were doing this work, as they've just said, is Cognizant, right? A. Correct. Q. This is well before there were any interviews conducted by the DOJ, right?  A. Correct.  Q. And it's well before, even further before, DOJ issues any subpoenas, right? A. Correct. Q. Right. So when you say -- when the government says "we" and they're talking about exhausting everything around him not remembering, what they're talking about is that the efforts that Cognizant is going to make to exhaust everything around him not remembering, right? A. I mean, it could be.").

97.     According to Kevin Gingras, DOJ's lead prosecutor on the case at the time, if the Government's contemporaneous notes of the October 6, 2016 meeting are accurate they reflect an

"unfortunate misstep." Apr. 18, 2023 Hr'g Tr. 79:20-80:4 (Gingras); Apr. 18, 2023 Hr'g. Tr. 77:5-8 (Gingras) ("It says 'have we exhausted.' That sounds like you're talking about 'we' as in the government and counsel for Cognizant, right? A. That's certainly an interpretation of it.").

98.     Cognizant and the Government also used the term "we" when referring to investigative activities undertaken by DLA in the months that immediately followed.  For example, on December 16, 2016, DLA reported to the Government, with respect to interviews it had recently conducted, that it "[t]hought we could do better."  DX-15 (DOJ-EH-0000000267) (Kevin Gingras Notes from Dec. 20, 2016); Apr. 18, 2023 Hr'g. Tr. 56:17-21 (Gingras) ("Q. So my question is, taking a look at those, any idea what you meant when you wrote "thought we could do better"? A. Yeah, I think I'm quoting what -- this appears to be a conversation with Mr. Buch. I believe I'm summarizing what Mr. Buch told me.").

99.     Following the in-person meeting on October 6, 2016, the Government emailed Buch the same day asking "do you all have time for a follow up call with us tomorrow?  We have some requests we'd like to make."  DX-21 (CTS_R17_0000311).  Buch responded that he had "some additional information that I learned today that I would like to provide to you" and proposed a time for a call.  DX-22 (CTS_R17_0000427).  The DOJ replied "we have a short list of requests and it shouldn't take long on our end, but we'd be interested to hear about the additional information as well."  *Id.*

100.    On October 13, 2016, Cognizant scheduled the call with the Government for the following Monday (October 17) "to discuss documents and other items."  ECF No. 377-1, Ex. 35 (CTS_R17_0000319).  DLA's talking points for the October 17 call began with a list of five then-"Pending DOJ Requests": (1) "Additional emails/hot docs relating to the $2.5M payment"; (2) "Bank record information relating to potentially improper payments (CKC . . .)"—as to which

DLA said it could "work on a production format that will make them understandable and useable for the DOJ"; (3) "Custodial files for identified custodians"; (4) "Check on Litigation hold coverage over all 12 facilities worked on by L&T"; and (5) "Coordinate Mani interview in mid-November."  DX-23 (CTS_R17_0005177); Apr. 18, 2023 Hr'g Tr. 83:1-86:6 (Gingras).

101.    With respect to the first "Pending DOJ Request," the Government's request for "hot docs" was a "request for Cognizant to select the most relevant documents" regarding the alleged $2.5 million bribe payment.  Apr. 18, 2023 Hr'g Tr. 84:15-85:7 (Gingras); Apr. 19, 2023 Hr'g Tr. 340:7-9 (Buch).  As set forth below, Cognizant continued to provide self-selected "hot docs" to the Government and to determine what was relevant.

102.    With respect to the fifth "Pending DOJ Request" ("Coordinate Mani interview in mid-November."), DLA referenced its "last call" with the Government, during which it was discussed that DLA "will work with Mani and his lawyer should he wish to retain counsel" and remarked that "once he [Mani] is lawyered up, we hope he will continue to cooperate with the company and with the DOJ. We will ask that he cooperate."  DX-23 (CTS_R17_0005178); Apr. 18, 2023 Hr'g Tr. 85:22-86:6 ("Q. And the fifth point here says, 'Coordinate Mani interview in mid-November.' Do you recall any conversation about coordinating with DLA with respect to an interview of Mani in mid-November? A. So I'm sorry to keep saying I don't recall, because this was quite a bit ago, but I certainly remember having conversations about trying to get access to Mani to interview him. I don't remember – I mean, I think we would have tried to interview him very quickly, but I don't remember this specifically.").

103.    During Cognizant's scheduled call with the Government on October 17, 2016, Cognizant, through DLA, also gave detailed oral accounts of Schwartz's and Coburn's interviews to the Government.  ECF No. 169 at 11, 17.

104.    Throughout this period—following Schwartz's September 23, 2016 interview and throughout October—Cognizant, through DLA and Brackett Denniston—an attorney at Goodwin Proctor whom Cognizant retained in August 2016 to assist with the investigation—"doggedly" pressured Schwartz to sit for a third interview.  DX-29 (CTS_R17_0005306).

105.    Schwartz's then-counsel informed Schwartz that during a meeting on October 24, 2016, Buch and Denniston emphasized Schwartz's obligation to cooperate, expressly stating that Schwartz would not keep his job if he did not continue his interview.  ECF No. 377-2, Schwartz Cert. ¶ 4.

106.    On November 3, 2016, facing a demand for a third interview and the explicit threat of termination, Schwartz resigned from Cognizant. ECF No. 377-2, Schwartz Cert. ¶ 7.

107.    Cognizant would later tout this outcome to the Government, along with Coburn's resignation, as the result of its significant cooperative efforts, in furtherance of the Government's stated priorities:

> Cognizant has done everything within its power to investigate and root out misconduct at the Company, including … [d]oggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already).

DX-29 (CTS_R17_0005305, -5306); *see also* DX-20 (June 15, 2022 Letter from Government at 2) ("In the course of describing the company's proactive cooperation, company counsel highlighted that DLA had persisted in securing additional interviews with the president (Coburn) and general counsel (Schwartz) of Cognizant, which [company counsel] described as a distinguishing factor in the Company's cooperation."); DX-17 (DOJ-EH-0000000208) (DOJ Paralegal Notes from DLA's Filip Factors Presentation) (Kathy Ruemmler of Latham: "Karl and his team persisted in securing additional interviews with the president and the GC.  That, too, doesn't always happen and it's a distinguishing factor."); DX-29 (CTS_R17_0005317)

(highlighting the "speed with which the Company moved forward against these senior executives (including sidelining them, pressuring them to cooperate, and ultimately separating with them)"); DX-29 (CTS_R17_0005311) ("The Company insisted on cooperation (including interviews) from both Schwartz and Coburn. Both resigned after DLA confronted Schwartz with his notes of the April 2014 telephone call, and before completing additional follow-up interviews.") (emphasis in original).

## II.   COGNIZANT PROVIDES THE GOVERNMENT WITH A ROADMAP FOR ITS INVESTIGATION BEFORE THE GOVERNMENT CONDUCTS A SINGLE INTERVIEW.

108.   During the course of its investigation, Cognizant (through DLA) provided the Government with oral downloads conveying summaries of certain of the interviews it conducted (the "DLA Downloads").

109.   In total, DLA provided oral downloads to the Government of at least 45 interviews of 18 different Cognizant employees.  Apr. 19, 2023 Hr'g Tr. 340:20-23 (Buch); ECF No. 377-1, Exs. 26, 39, 40, 41.  Thirty (30) of those 45 interviews (including Schwartz's second interview) were conducted after Cognizant self-disclosed to the Government.  *Id.*  The Government "may have asked specifically" for certain of those downloads.  Apr. 18, 2023 Hr'g Tr. 102:17-22 (Gingras).

110.   The first Government interview of Cognizant personnel did not occur until February 7, 2017.  Apr. 18, 2023 Hr'g Tr. 115:6-12 (Gingras).  This was three weeks after DLA had completed 44 of the 45 interviews it downloaded to the Government.[2]  Apr. 19, 2023 Hr'g Tr. 339:1-5 (Buch) ("Q. Do you know whether the government did any interviews of any Cognizant

---

[2] While DLA completed 44 of 45 interviews by January 12, 2017, it conducted one additional interview of Cognizant's Chief Security Officer, Henry Shiembob, nearly 15 months later on April 5, 2018.  *See* ECF No. 377-1, Ex. 39.

employees before you provided your downloads of interviews of those people to the government, of the ones that you knew about? A. I don't think so.").

111.    All of the witnesses the Government interviewed (except one, a ministerial witness who provided information regarding Cognizant's IT systems rather than on any substantive matter) had already been interviewed by DLA, and the substance of all but one of those interviews had been conveyed to the Government, before the Government conducted its own interviews of the same witnesses.[3]  Apr. 19, 2023 Hr'g. Tr. 337:22-25 (Buch) (Q. . . . "After you had done your investigation, the government began to do its own interviews of the witnesses, right? . . . A. Correct.").  The Government "probably" referred back to DLA's interview summaries when preparing to interview the same witnesses later.  Apr. 18, 2023 Hr'g Tr. 136:8-21 (Gingras) ("I don't recall referring back to interview downloads in order to frame questions. It seems to reason that I would have referred -- at least looked at them to understand what they said before. So I guess I apologize. I'm thinking out loud here, but I'm trying to remember back then.  I probably did refer back to them. Q. As you sit here now, do you recall referencing statements made in a Cognizant interview to a witness whom you were directly interviewing? . . . [A.] It's possible. I don't recall. I don't know that -- unless there was a good reason to do that, that I would be inclined to do that.").

112.    DLA conducted approximately 450 interviews in total during the course of the investigation.  Apr. 19, 2023 Hr'g Tr. 340:17-19 (Buch); DX-29 (CTS_R17_0005306).  DLA thus

---

[3] The Government interviewed eleven Cognizant employees, all of whom except Ramesh Lakshminarayanan—the ministerial witness referenced above—had already been interviewed by DLA.  And before the Government interviewed those eleven Cognizant employees, DLA had provided downloads of their prior interviews of all but one, Deepa Baburaaj, though even for Baburaaj, Cognizant had discussed her prior statements during presentations to the Government in March and April 2017, before the Government interviewed her on August 7, 2017.  Ex. A (DOJ-EH-0000000049) (DOJ Paralegal Notes from March 10, 2017 DLA Presentation); *id.* (DOJ-EH-0000000060, -67) (DOJ Paralegal Notes from Apr. 13, 2017 DLA Presentation).

did not provide to the Government oral downloads of over 400 of the interviews DLA conducted, and instead provided downloads of approximately 10% of them.  Apr. 19, 2023 Hr'g Tr. 340:24-341:1 (Buch).

113.    DLA provided to the Government a complete list of the witnesses it had interviewed, Apr. 19, 2023 Hr'g Tr. 340:7-13 (Buch), but the Government does not recall whether it ever asked for downloads of any of the interviews of witnesses that Cognizant had not already provided.  Apr. 18, 2023 Hr'g Tr. 103:14-20 (Gingras).

114.    The Government knew it had "gotten a version of events from the company" and that Cognizant and its counsel "have an agenda. They want cooperation credit, and they want a certain result at the end of the day."  Apr. 18, 2023 Hr'g Tr. 112:13-17 (Gingras); Apr. 18, 2023 Hr'g Tr. 113:8-14 (Gingras) ("Q. And that's true in part because Cognizant and the government don't have the same interests, right? A. Correct. Q. And Cognizant's interests are -- leaving aside getting cooperation credit, they may have a particular version of events that they wish to, you know, advance, right? A. Sure, yes.").  Cognizant was "like a cooperating witness" in that sense, as they were "trying to curry favor with the government by providing information to the government that the government would deem useful and helpful."  Apr. 18, 2023 Hr'g Tr. 142:14-22 (Gingras).

115.    Despite being aware that Cognizant had an "agenda" and was providing a self-serving "version of events," there is little record of any independent investigative activities by the Government during the course of Cognizant's investigation.  Prior to February 7, 2017, when the Government conducted its first interview of a Cognizant employee, the only independent investigative activities the Government identified were the following: preparing "chronologies of documents" Cognizant had produced; issuing preservation notices to "various internet service

providers" and L&T; and issuing grand jury subpoenas to JPMorgan and Verizon.  Apr. 18, 2023 Hr'g Tr. 219:17-221:7 (Last).  According to Gingras, the Government was "trying to be thoughtful and cognizant of trying not to interfere in whatever the company was doing in its own investigation."  Apr. 18, 2023 Hr'g Tr. 93:20-23 (Gingras).

## III.   COGNIZANT CONTINUES TO COOPERATE CLOSELY WITH THE GOVERNMENT, FOCUSING ON THE DEFENDANTS AND PERFORMING DISTINCTLY PROSECUTORIAL FUNCTIONS.

116.    Cognizant's coordination with the Government continued throughout the over two-year investigation and went far beyond the provision of documents and interview summaries. Cognizant investigated potential defenses on behalf of the Government; identified potential Government witnesses; provided to the Government its credibility assessments of witnesses it interviewed; facilitated and sequenced witness interviews with the Government; and made relevance and other evidence-related determinations (discussed below) throughout when reviewing and producing documents to the Government.

117.    By May 10, 2018, Cognizant had provided to the Government: "(1) 10 in-person subject matter briefings; (2) More than 40 telephonic investigation updates; (3) 8-10 subject matter / hot doc binders; [and] (4) More than 20 interview readouts."  DX-29 (CTS_R17_0005307).  In its Filip Factors Presentation to the Government that same day—prepared, as set forth above, for the express purpose of arguing for a declination—Cognizant detailed the "extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives [Schwartz and Coburn]."  *Id.* (CTS_R17_0005317).

### A.    Cognizant Investigated Potential Criminal Defenses and Conducted Forensic Analyses For the Government.

118.    Cognizant's cooperative efforts included doing "everything it can responsibly do to provide key evidence involving its former General Counsel" and providing "further cooperation

specific to Steven Schwartz," including long after Schwartz had resigned from Cognizant on November 3, 2016. *Id.* (CTS_R17_0005308) (emphasis in original).

119.    This included investigating, with at least the encouragement and certainly the knowledge of the Government, Schwartz's purported "amnesia defense . . . Collecting a number of Apple 2014 notes and producing those documents to assist the government's efforts to authenticate his April 2014 notes; and Conducting a forensic deletion analysis on Schwartz's laptop." *Id.* (CTS_R17_0005308); DX-17 (DOJ-EH-0000000209) (DOJ Paralegal Notes from DLA's Filip Factors Presentation) ("Subsidiary relating to Schwartz that the company did: investigated amnesia defense (by collecting medical records and providing to department, SEC, looked at whole line). That falls squarely into proactive cooperation. We also collected his Apple notes and engaged in an effort to help you all authenticate those and the hand written analysis. Forensic deletion on his laptop.").[4]

120.    In response to repeated Government requests, DLA compiled information, conducted forensic analyses and sought to address evidentiary and related concerns expressed by the Government—including related to such evidentiary concerns as authentication and chain of custody—that the Government identified as necessary for the investigation and planned prosecution of Schwartz and Coburn.

121.    DLA compiled information related to Schwartz and Coburn at the specific request of the Government, and for the Government's benefit.   ECF No. 377-1, Ex. 48

---

[4] The Government claimed that it took "investigative steps to investigate Mr. Schwartz's claim that he was concerned about his eye surgery," including interviewing doctors, obtaining video footage of a Mets game that Schwartz attended, and verifying his purchase of the tickets for that game.  Apr. 18, 2023 Hr'g Tr. 223:6-23 (Last).  But each of these investigative steps occurred only after the Government asked Cognizant if "we exhausted everything around him not remembering" in response to Cognizant notifying the Government that it was seeking Schwartz's medical records. DX-19 (DOJ-EH-0000000022) (DOJ Paralegal Notes from Oct. 6, 2016 Meeting).

(CTS_R17_0005192) (June 22, 2017 DLA memo titled "Responses to Government Questions") ("Government Questions" included "Phone records relating to Dana/Frank conversations with Schwartz?"; "What were the date ranges for the Coburn and Schwartz page turns?"; "Download of interviews covering Schwartz's state of mind around April 21-22, 2014."); DX-44 (DOJ-EH-0000000222, -228) (DOJ Paralegal Notes From July 12, 2018 DLA Device Analysis) ("DOJ requested production of 96 emails deleted from Schwartz Macbook" that DLA advised had been identified but did not "seem[] relevant").

122.    DLA conducted multiple forensic analyses of Schwartz's and Coburn's devices at the Government's request, and addressed the Government's questions and follow-up requests regarding those analyses.  DX-43 (CTS_R17_0005224, -5225) (July 9, 2018 "Talking Points re Deletion Analysis") ("Questions asked" by the Government included: "Determine whether it was possible to see if four specific email attachments sent to Coburn appeared on either Coburn's or Schwartz's devices and if the files were ever opened."; "Any evidence of mass deletion"; "Any unusual user activity or data hidden from collection"; "Any business-related chats between Coburn and Schwartz regarding the email attachments"; "All apple notes on Schwartz's MacBook Air"); DX-100 (CTS_R17_0005207, -5211, -5212) (DLA Talking Points for "July 13, 2018 DOJ Meeting") (identifying among "Open Requests" the creation of "Revised Tandberg Logs" and describing "detailed findings" in connection with "Schwartz Deletion Analysis", including that DLA reviewed "all apple notes on Schwartz's MacBook Air . . . but did not find anything directly relevant to the investigation."); *see also* Apr. 18, 2023 Hr'g Tr. 92:3-6 (Gingras).

123.    DLA also addressed the Government's evidentiary concerns, including those related to chain of custody and authentication.  DX-44 (DOJ-EH-0000000228) (DOJ Paralegal Notes From July 12, 2018 DLA Device Analysis) ("Follow up" included "chain of custody letters

on devices collected from Schwartz and Coburn, including who did analysis"; "DLA also to confirm device analysis chronology and what was deleted in august 2016 time frame, USB's accessed during this time period, confirm that emails not deleted on 20th-22nd of August"; "Schwartz's notes . . . show chain of custody"); DX-17 (DOJ-EH-0000000209) (DOJ Paralegal Notes from DLA's Filip Factors Presentation) ("We also collected his Apple notes and engaged in an effort to help you all authenticate those").

### B.  Cognizant Sequenced Witness Interviews, Heeded the Government's Directions When Conducting Interviews, and Facilitated Subsequent Government Interviews.

124.    Cognizant also sought favorable treatment based upon its: "facilitating government interviews of key witnesses," including "[c]oordinating the retention of individual counsel" for them,[5] DX-29 (CTS_R17_0005307); "Providing witness interview readouts and custodial files to DOJ to facilitate productive discussions with key witnesses" (*id.*); and "Providing travel information to the DOJ for its now-former director [executive] – which facilitated DOJ's service of a grand jury subpoena."  (*Id.*)*;* DX-17 (DOJ-EH-0000000208) (DOJ Paralegal Notes From DLA's Filip Factors Presentation) ("We provided travel information to the DOJ for Lakshmi Naryan[sic] which facilitated your investigation [and others]. Facilitating your ability to interview certain people.").

125.    DLA and the Government also worked together to sequence witness interviews during the investigation.  DX-20 (June 15, 2022 Letter from Government at 2) ("The Government also noted that it wanted to interview Thiruvengadam first"); Apr. 19, 2023 Hr'g. Tr. 332:12-22 (Buch) ("I'm going to refer you to -- so Exhibit 26, please, page 11. If you look at the bottom of

---

[5] Buch recommended as individual counsel for certain of these key witnesses other former prosecutors from the U.S. Attorney's Office for the District of New Jersey, including John Carney (for Sridhar); Carlos Ortiz (for Deepa Baburaaj); and Jeff Chiesa (whose partner, Matthew Beck, ultimately came to represent Mani).  Apr. 18, 2023 Hr'g Tr. 236:15-237:21 (Buch).

that page, it says, "Still interviewing people. Performing an India look-back. McLoughlin, Dana, Casari." And after Casari it says, "After DOJ speaks to him." Do you see that? A. I see that. Q. That tells you that DOJ wanted to speak to him first before you interviewed him, right? A. That's what these notes suggest."); DX-26 (DOJ-EH-0000000121) (DOJ Paralegal Notes from Nov. 7, 2017 DLA Presentation – "Download of Steve Casari").

126.     The Government provided feedback and direction to DLA regarding the manner in which it was conducting interviews.  DX-20 (June 15, 2022 Letter from Government at 2) ("The Government advised that it would be helpful if DLA kept track of documents shown to the witness for the first time. . . . The Government thereafter asked DLA whether, for any future witness interviews DLA conducted, DLA could first speak with the Government before showing a witness a document that he/she might not have received. DLA said yes."); (*id.* at 3) ("DOJ advised DLA that it (DOJ) would get back to them on whether to proceed" with requests from witnesses' counsel following interviews); Apr. 18, 2023 Hr'g. Tr. 96:8-15 (Gingras) ("I recall asking -- we -- the team asking for documents that were shown to witnesses that were interviewed, yes.").

127.     For example, DLA sought and received input from the Government as to whether documents should be shown to counsel for the witnesses that it (DLA) was interviewing.  Apr. 19, 2023 Hr'g. Tr. at 334:3-10 (Buch) ("They made requests about identifying the documents that they were reviewing with witnesses so that the government would know what documents you had reviewed with witnesses. Do you remember them doing that? A. Yeah. We would provide them with . . . what documents we did after the fact. But, obviously, we chose which documents we were going to show the witnesses."); DX-41 (DOJ-EH-0000000069) (DOJ Paralegal Notes from May 3, 2017 Call with DLA) (Sridhar's and Raj Ghosh's lawyers "received relevant documents from DLA and asked for a debrief on their client's statements to DLA prior to them obtaining

counsel ← DLA thinks this is reasonable, Kevin will get back to them on whether to proceed"); Apr. 19, 2023 Hr'g Tr. 336:12-20 (Buch) ("'received documents from DLA and asked for a debrief on their client's statements to DLA prior to them obtaining counsel.' A. Yeah. Q. You thought this was reasonable, but Kevin Gingras decided -- said he would get back to you on whether to proceed that way. A. Yeah."); DX-27 (DOJ-EH-0000000041) (DOJ Paralegal Notes From Feb. 14, 2017 Call with DLA) ("Os [Oz Benvenuto, DNJ]: We want John [Carney] to have access to docs that Sridhar would have access to. If you could provide us with a set of whatever you provide him and same thing for Mani. At some point you gave documents available to Matt, we are interested in that set. . . . KG [Kevin Gingras]: It would be helpful to keep track of what is being shown to him for the first time."); DX-28 (DOJ-EH-0000000044) ("KG: Can we talk about it first if you are going to show documents that people may not have received? DLA: Yes.").

### C. Cognizant Identified "Hot Docs" for the Government and Made Relevance Determinations Throughout the Two-Plus Year Investigation.

128.    Cognizant touted to the Government that it had produced "over 100,000 pages to the DOJ" and "made every effort not to just 'data dump' these documents on the DOJ, but has presented them in a way that makes clear the key findings and important documents[.]"  DX-29 (CTS_R17_0005307).

129.    In at least some instances, Cognizant did so in coordination with, and at the express request of, the Government.  For example, in March 2018 the Government requested that DLA create and populate a chart with data that DLA expressed concern the Government would "get lost in" were it not "organize[d] in a way that makes it easier for [the Government]."  DX-7 (DOJ-EH-00000000149) (DOJ Paralegal Notes from March 19, 2018 Call with DLA).  The Government even offered to send to DLA "a blank version of the chart with what would be most helpful for column headings" and provided those specific headings the following day to DLA, who agreed to

undertake the work on behalf of the Government.  DX-33 (DOJ-EH-00000000161) (DOJ Paralegal Notes from March 21, 2018 Call with DLA); Ex. A (DOJ-EH-00000000164) (DOJ Paralegal Notes from March 22, 2018 Call with DLA) ("Courtney: First, the chart I was talking about yesterday. What makes sense is columns: statutory approvals details (type of permit), name of issuing authority, payment amount, date of payment, payment made by (to extent that you know, L&T, CTS directly etc.), senior-most employee who approved payment, date cognizant reimbursed anybody with supporting document bates number, method of payment, supporting documentation bates number. To the extent that you haven't found it, that's fine, but if not note that.  [agree that that sounds doable] Kevin: KITS is the priority first, then we can go Pune second. [agree]").

130.    Cognizant then collected, reviewed and selectively produced to the Government custodial files, including those of Schwartz, making "relevance" (as opposed to merely "responsiveness")[6] determinations on behalf of the Government throughout the investigation, right up to the day of the Indictment.  DX-37 (CTS_R17_0005198) (June 20, 2018 "Talking Points re Collection and Review of Key Custodians") (detailing the collection and review of Schwartz-specific devices and materials and noting that "[a]pplication of these searches resulted in 21,021 documents to be reviewed from Schwartz's custodial files, 362 of which were tagged as *relevant*" (*i.e.*, 1.7%) (emphasis added)); DX-38 (CTS_R17_0005204) (Dec. 19, 2018 email from Gray Stratton (DLA) to Karl Buch re: "DOJ TPs (Schwartz Data)") ("We have completed that review

---

[6] As noted below, the Government did not serve a subpoena on Cognizant until November 8, 2018. Thus, Cognizant was voluntarily producing documents to the Government based on *relevance* determinations for the prior two-plus years, and not based on determinations that the documents were *responsive* to specific requests in a subpoena from the Government.  Apr. 18, 2023 Hr'g Tr. 117:5-9 (Gingras) ("one of the advantages of issuing a subpoena is that a recipient of a subpoena knows what they have to produce, that is, what's responsive to the subpoena, right? A. Correct."); Apr. 18, 2023 Hr'g Tr. 201:5-10 (Last) (the Government issued a subpoena in November 2018 so that "the company would be compelled to produce material and that then they would produce what's responsive, not what they deemed relevant").

[proposed to the Government by DLA] of Schwartz's documents from Aug. to Nov. 2016 and found no additional *relevant* documents.") (emphasis added); DX-39 (CTS_R17_0005203) (Jan. 4, 2019 email from Stratton to Buch re: "DOJ TPs") ("We have completed our review of Schwartz data. We found no new *relevant* content in that data") (emphasis added); DX-40 (CTS_R17_0005202) (Feb. 14, 2019 email from Stratton to Buch re: "DOJ TPs Regarding Schwartz Production") ("We asked Schwartz to produce to us all company documents. We then reviewed those documents for *relevancy* and produced the *relevant*, non-priv materials to DOJ. The gaps in this bates range are company documents produced by Schwartz that were not *relevant* to the investigation.") (emphasis added).

      **D.**    **Cognizant Repeatedly Shared Credibility Assessments of Witnesses, Touting Those Who Fit Cognizant's Desired Narrative.**

131.    DLA shared with the Government not only detailed summaries of the various interviews that it (DLA) conducted, but also credibility assessments of key witnesses that the Government had not yet interviewed itself.  Apr. 19, 2023 Hr'g Tr. 380:18-383:13 (Buch); DX-32 (DOJ-EH-0000000031) (DOJ Paralegal Notes From Dec. 17, 2017 Call with DLA) ("DLA: He said he [Sridhar] didn't know, he was very cagey, he was not telling the truth."); DX-61 (CTS_R17_0005261) (DLA talking points for May 1, 2018 meeting with DOJ and SEC) ("We have reason to doubt Deepa's credibility"); DX-20 (June 15, 2022 Letter from Government at 2) ("During the [February 14, 2017 call with the Government], DLA stated that [Sridhar] Thiruvengadam's testimony has evolved and his memory has gotten better.").

132.    In some cases, DLA opined to the Government that certain witnesses should be believed over others.  For example, DLA told the Government that it had briefed the Cognizant Board that Karen McLoughlin, Cognizant's CFO, "has a solid history" and that there was "no evidence that she was in the circle" or "knew there was a demand until she was first interviewed,"

while Raj Ghosh—who told DLA he had made McLoughlin aware years prior of the alleged bribe demand—was "hedging everything."  DX-34 ( DOJ-EH-0000000268-270) (Kevin Gingras Notes from February 3, 2016 "Cognizant factual download"); DX-35 (CTS_R17_0005246) (DLA memo dated Feb. 3, 2017 re: "Government Meeting Talking Points") ; Ex. A (DOJ-EH-0000000036) (DOJ Paralegal Notes from Feb. 2, 2017 DLA Call) ("Raj was difficult witness. His memory was imprecise. Karen has solid history and reputation with company. . . She had no reason to believe that Gordon or Stephen would do something inappropriate.").

133.    McLoughlin, however, was the recipient of at least three of the emails specifically cited in the Indictment in this case, and the Government's key witness, Mani, had (like Raj Ghosh) testified in an interview conducted by DLA that he told McLoughlin about the alleged bribe demands in 2014.  Apr. 19, 2023 Hr'g Tr. 349:14-20 (Buch) ("Q. What was it that you told them? A. We didn't find any evidence -- documents or testimony -- that showed that Ms. McLoughlin knew that the payment had been authorized by your client and Mr. Coburn. Q. And the government, from your perspective, accepted that? A. They listened. Ultimately, they didn't charge her, but you'll have to ask them about, you know, their views."); Apr. 19, 2023 Hr'g Tr. 348:13-349:2 (Buch); Apr. 19, 2023 Hr'g Tr. 377:20-378:4 (Buch) ("Q. Do you recall that Ms. McLoughlin is on a number of key documents regarding the approvals of this payment?  A. I remember she's on some emails around the approval of the -- of the permit for that facility, yes. Q. Do you recall that Mani said in an interview that in 2014 he told Ms. McLoughlin about corruption in India, that she asked Mani if these were legitimate fees or bribe demands and Mani said they were bribe demands? Do you recall that? A. I don't.").

### E.    DLA Identified Potential Witnesses for the Government, At Its Request.

134.    DLA identified for the Government, in response to its requests, potential witnesses, including experts, on specific subject matters.

43

135.    The Government asked DLA to find for it "an expert in the Byzantine process of permitting in Tamil Nadu in India."  Apr. 18, 2023 Hr'g Tr. 88:22-89:3 (Gingras) ("Q: . . . you requested that Cognizant assist you in terms of finding experts on some Indian contracting processes, right? A. Yeah. I remember asking the company to help us find an expert in the Byzantine process of permitting in Tamil Nadu in India."); Apr. 18, 2023 Hr'g 89:4-12 (Gingras) ("we asked the company who had – who's experience in real estate dealings over there or asked DLA to see if they could find people that would be suitable for us to consider as expert witnesses."); DX-7 (DOJ-EH-0000000145) (DOJ Paralegal Notes from March 19, 2018 call with DLA).

136.    The purpose of DLA identifying this expert for the Government was to assist the Government in its investigation and to provide an individual who could potentially testify for the Government at trial.  Apr. 18, 2023 Hr'g Tr. 89:16-21 (Gingras) ("Q. The purpose of finding that expert was to assist you in your investigation, right? A. Correct. Q. And potentially to even testify at trial if it came to that, right? A. Conceivably.").  The Government told DLA that the expert witness was a "crucial" piece that was needed before the Government could "move to taking action."  DX-7 (DOJ-EH-0000000145-46) (DOJ Paralegal Notes from March 19, 2018 call with DLA) ("Kevin [Gingras]: When I had asked them to look, I asked for a lawyer with experience in the real estate industry and Bruck and I thought DLA might have a better angle . . . For us, this piece is going to be crucial and be a question we get asked by all of our supervisors before we can move on to taking action, so it's high on our priority list.").  In his thirteen (13) years as a DOJ prosecutor, Gingras did not recall another case in which the Government asked a company to assist it in identifying an expert witness.  Apr. 18, 2023 Hr'g Tr. 89:22-25 ("Q. So my question is, is it

common in your experience to ask a company that comes forward to assist in those ways? A. I

don't know whether it's common or unusual. I don't recall doing it in another case.").

137.    The Government also asked Cognizant to identify a potential expert with regard to

particular IT issues, including the Tandberg communications platform that Cognizant used.  Apr.

18, 2023 Hr'g. Tr. 90:1-14 (Gingras) ("Q. Looks like you may have also asked one of them to

assist you in finding an expert with regard to certain IT issues, for example, with regard to the

Tandberg communications platform that Cognizant used. Do you recall asking them for assistance

in that regard as well? A. Yeah. I think we were trying to understand how their IT infrastructure

worked, including the Tandberg, which is, I think, the phone system that they were using that some

of the calls in question took place on. So we had asked the company for assistance in helping us

identify someone who could explain that to us."); DX-7 (DOJ-EH-0000000146) (DOJ Paralegal

Notes from March 19, 2018 Call with DLA); DX-100 (CTS_R17_0005207) (DLA talking points

for "July 13, 2018 DOJ Meeting") ("Open Requests" from the Government included "Backup

Tapes"; "Tandberg Logs"; and identifying potential "Tandberg Record Custodian/Witness" and

"Finance Witness(es).").

### F.    Cognizant Used Its Commercial Leverage to Assist the Government.

138.    Cognizant also touted to the Government having used "the full weight of the

Company's commercial leverage to try to gain information from L&T and other third parties."

DX-29 (CTS_R17_0005306); DX-17 (DOJ-EH-0000000208) (DOJ Paralegal Notes from DLA's

Filip Factors Presentation) ("In addition, the company used all of its commercial leverage to extract

information from LT, including executing audit rights. Not that they were cooperative. Karls' team

had multiple meetings with LT. LT refused to be interviewed but there was an effort to get

information. Then finally withholding payments to LT that lacked supporting documentation,

which exposed Cognizant to litigation.").

IV.   **COGNIZANT'S PRIVILEGE ASSERTIONS GO UNPOLICED AT THE SAME TIME THE COMPANY UNDERTAKES A *BRADY* REVIEW ON BEHALF OF THE GOVERNMENT.**

A.   **The Government Does Not Challenge Cognizant's Dubious Privilege Assertions and Is Rebuffed When It Inquires Over Two Years Into the Investigation Regarding the Privilege Lines Cognizant Was Drawing.**

139.   In January 2018, Cognizant produced to the Government for the first time a privilege log.  DX-42 (DOJ-CTS-LTR-00000054-215); Apr. 18, 2023 Hr'g Tr. 117:24-119:7 (Gingras). The privilege log spanned 162 pages.  DX-42.

140.   Cognizant's privilege log included entries for a number of documents that, on their face, appear not to be privileged.  *Id.*; Apr. 19, 2023 Hr'g Tr. 353:13-358:8 (Buch).  These included, for example, communications with third parties like L&T.  DX-42 at 60 (Dec. 18, 2013 email from Lakshmi Narayanan (Cognizant) to Yogi.Siram@larsentoubro.com, with the subject line "RE: Connecting," withheld as "Attorney-Client Communication soliciting or providing legal advice/analysis regarding FCPA compliance issue"); DX-42 at 117 (July 8, 2017 email from nakkiran@lntecc.com to Venkatesan (Cognizant), copying, among other others, vramesh@lntecc.com and vasa_naga@yahoo.co.in, of L&T, with the subject line "KITS – Academy Block – Additional Construction – Request for Undertakings," withheld as "Attorney-Client Communication soliciting or providing legal advice/analysis regarding permit/license issue").  They also included communications involving only non-lawyers.  DX-42 at 111 (Apr. 29, 2016 email from Mani to Coburn, copying Sridhar, with the subject line "Fwd: Text message which i received in my personal mobile," withheld as "Attorney-Client Communication soliciting or providing legal advice/analysis regarding permit/license issue").

141.   The Government did not question these privilege assertions by Cognizant.  Apr. 18, 2023 Hr'g Tr. 118:12-17 (Gingras); Apr. 19, 2023 Hr'g Tr. 356:2-358:14 (Buch).

142.    Rather, the first time the Government discussed Cognizant's privilege log with DLA was on a November 5, 2018 call—days after Schwartz's counsel raised with the Government concerns the defense had regarding Cognizant's assertions of privilege, including concerns that Cognizant was withholding exculpatory information under the guise of privilege.[7]  Apr. 18, 2023 Hr'g Tr. 198:17-21 (Last) ("Q. . . . The first time you discuss privilege logs with DLA and Cognizant is in this call? A. I believe that's right. Q. And that's after we raised it? A. Yes."); Apr. 18, 2023 Hr'g Tr. 197:25-198:6 (Last) ("Q. And as a result of us raising an issue with respect to privilege and how privilege lines had been drawn, you had a conversation with Mr. Buch and Mr. Stratton? A. That was one of the reasons. We typically go through privilege logs during the course of an investigation anyway, but, yes, you raising it certainly was part of what factored in."); DX-82 (DOJ-EH-0000000320-322) (David Last Notes of Nov. 5, 2018 Call).

143.    During the November 5, 2018 call, the Government sought to inquire with DLA regarding the "lines" that Cognizant was drawing when invoking privilege.  Apr. 18, 2023 Hr'g Tr. 198:25-203:16 (Last); DX-82.  Specifically, the Government expressed that it wanted to "ensure that all documents responsive and nonprivileged or that otherwise fall into a category of what was produced (crime fraud or otherwise)" were being provided, as the Government's "obligations require that [the Government] make [de]terminations re: exculpatory/favorable material."  Apr. 18, 2023 Hr'g Tr. 198:25-203:16 (Last); DX-82.

---

[7] On November 2, 2018, in advance of a meeting with Schwartz's counsel later that same day, the Government advised by letter that it had "become aware" that Schwartz may have "improperly taken and maintained possession of property and information belonging to" Cognizant, "including information that may be protected by Cognizant's attorney-client privilege," and warned Schwartz's counsel not to share "privileged materials" or "potentially privileged information" with the Government during the meeting.  DX-138 (Nov. 2, 2018 Letter from Government to Defense Counsel); Apr. 18, 2023 Hr'g Tr. 229:17-231:11 (Last).

144.     DLA declined to identify those lines or explain to the Government how it was making privilege determinations.  Instead, DLA, on behalf of Cognizant, "asserted privilege over how they determined what was privileged and not and where the lines were drawn."  Apr. 18, 2023 Hr'g Tr. 207:3-8 (Last) ("Q. And now we've established we don't know where those lines are drawn? A. They didn't respond --  Q. Because they asserted privilege over how they determined what was privileged and not and where the lines were drawn? A. Correct."); Apr. 18, 2023 Hr'g Tr. 196:18-21 (Last) ("I was trying to get them to identify those lines. They ultimately did not. I believe the -- I believe Mr. Buch said that they viewed that as work product."); Apr. 18, 2023 Hr'g Tr. 204:18-23 (Last) ("Q. So the company would not tell you on what basis they determined whether a document was privileged or not privileged?  A. Correct. As I was saying earlier, I was trying to figure out the lines with respect to certain of these issues. Q. And you never got that answer? A. Correct."); Apr. 19, 2023 Hr'g Tr. 355:17-356:1 (Buch) ("Q. What do you remember about their questioning assertions of privilege? This is important. A. I remember the -- the government questioning some privilege calls, and I don't remember what specifically they were in relation to, and asking for an explanation for those calls that was beyond what was either in this log or the log that we produced in response to the grand jury subpoena and me, on behalf of the company, telling them that we would not provide them with further information beyond the log, effectively would not get into attorney work product.").

145.     The Government served its first grand jury subpoena on Cognizant on November 8, 2018—over two years into the investigation, but within three days of its November 5, 2018 call with DLA.  Apr. 18, 2023 Hr'g Tr. 200:14-18 (Last).  This was "not coincidence:" following the allegations raised by Schwartz's counsel regarding Cognizant's selective assertions of privilege, the Government "wanted to compel [Cognizant] to provide materials" not only that Cognizant

"deemed relevant" or "deemed interesting," but also "anything exculpatory and anything inculpatory" that was responsive.  Apr. 18, 2023 Hr'g Tr. 200:21-201:10 (Last).

146.    But according to David Last, Chief of the FCPA Unit at the DOJ, a prosecutor involved in the investigation and prosecution of this case since April 2018, and a participant on the November 5, 2018 call with DLA, the Government "had no reason to believe that there was anything that was privileged that [Cognizant] were withholding that was exculpatory."  Apr. 18, 2023 Hr'g Tr. 201:11-14 (Last); Apr. 18, 2023 Hr'g. Tr. at 204:24-205:12 (Last) ("Q. You said you had no reason to believe that there was anything exculpatory in the material that was being withheld as privileged, correct? A. Correct. Q. But you asked Cognizant to go look for it anyway? . . . To go look for whether there was exculpatory material in what they withheld as privileged. A. No. We issued them a subpoena that would require them to produce anything that was exculpatory or inculpatory. I was very clear with Mr. [Buch] that it was our job as the prosecutor to determine what would be exculpatory or inculpatory or otherwise.").

147.    Last testified that if he had reason to believe that DLA or Cognizant possessed exculpatory material that had not been produced to the Government, he "would have not sought charges in this case."  Apr. 18, 2023 Hr'g Tr. 217:9-12 (Last) ("Q. If you had believed that DLA Piper or Cognizant possessed exculpatory material that it had not produced to you, how would that have impacted the investigation?  A. I would have not sought charges in this case.").

**B.    Cognizant Undertakes a *Brady* Review for the Government.**

148.    Following DLA's call with the Government on November 5, 2018, DLA re-reviewed all previously withheld and redacted Schwartz materials for exculpatory information. Apr. 19, 2023 Hr'g Tr. 362:2-12 (Buch) ("Q. So let me just show you Exhibit 46. If you look at the bottom, it says "Optional TP" -- which I take it is a talking point – "regarding nonsubpoena requests." And it says, "We are rereviewing all previously withheld and redacted Schwartz

49

materials. We've seen nothing exculpatory, but we are still going through these." So at this point you would agree, looking at this, that you were looking to see whether there was anything exculpatory in your -- in the files -- in the Schwartz materials that had been withheld or redacted, right? A. Correct."); *see also* Apr. 19, 2023 Hr'g Tr. 284:23-285:3 (Buch) ("Q. Did you review the laptop to see whether there's anything exculpatory of Mr. Schwartz at any time? A. Yes. Q. You have done that? A. Yes.").

149.     According to DLA's talking points for a call with the Government on November 21, 2018, this re-review of Schwartz materials for exculpatory information was pursuant to a "non-subpoena request" from the Government.  DX-46 (CTS_R17_0005206) (Nov. 21, 2018 Email from Grayson Stratton to Karl Buch re: "DOJ TPS") ("We still have a few open non-subpoena requests. We are working through these. Notably – We are re-reviewing all previously withheld and redacted Schwartz materials. We've seen nothing exculpatory but we are still going through these. We anticipate having further discussion with you once we're through these."); *id.* ("The final numbers are lower than our preliminary numbers . . . none exculpatory for Schwartz").

150.     During DLA's call with the Government on November 21, 2018, Buch told the Government that DLA had found "nothing new" and "nothing exculpatory" in its re-review of withheld and redacted Schwartz materials.  DX-83 (DOJ-EH-0000000326) (David Last Notes of November 21, 2018 Call With DLA); Apr. 19, 2023 Hr'g. Tr. 366:10-25 (Buch) ("Did the government know that you were looking to see whether there was exculpatory material? A. It could be. We may have said that. I don't really remember, but it's possible. Q. Take a look at Exhibit 83, the next exhibit, again, Mr. Last's notes. Part way down first page it says, "Nothing []new, nothing exculpatory that found to date." And that's under a piece that says KB, which I'm thinking is you. Do you remember on November 21st, 2018, reporting to the government that you had found

nothing exculpatory? A. I don't remember it, but the notes sort of suggest that's what I said. Q. And so you at least revealed to the government that you had been searching your files for exculpatory information, correct? A. Apparently so."); Apr. 18, 2023 Hr'g. Tr. 209:6-21 (Last) ("Q. So we're talking about privilege here. He says, "Nothing new." Then he says, "Nothing exculpatory found to date." A. That's what he said. Q. If he hadn't been asked to review the documents withheld as privileged, why is he reporting to you that there's been nothing exculpatory found in them? A. All I can think is that, in the last conversation that you just noted, I made very clear to him that determining what is exculpatory is our jobs as the prosecutor. I'd also referenced what Paul, Weiss's allegations were with regard to exculpatory material. So my guess on this -- because I don't recall this call specifically -- is that Karl was just saying to us that they hadn't found anything exculpatory. But I was very clear to him that's not his job; that's our job as the prosecutors. And why he's telling me that, I don't know.").

151.     DLA was, however, aware of obviously exculpatory evidence regarding steps that Schwartz took to assist in, rather than in any way hinder, the internal investigation conducted by DLA.  Apr. 19, 2023 Hr'g Tr. 369:15-18.  But DLA "took the position that, to the extent that Mr. Schwartz was participating in the internal investigation as a member of the investigative team, that his activities were privileged.  And so [DLA] did not report the steps that Mr. Schwartz took to ask witnesses to cooperate with the investigation to the government."  Apr. 19, 2023 Hr'g. Tr. 369:6-18 (Buch) ("Q. Did you ever provide to the government exculpatory evidence regarding steps that Mr. Schwartz took to assist in the internal investigation that was going on? A. I think we took the position that, to the extent that Mr. Schwartz was participating in the internal investigation as a member of the investigative team, that his activities were privileged. And so we did not report

the steps that Mr. Schwartz took to ask witnesses to cooperate with the investigation to the government. Q. Okay, but you are aware of those steps? A. I am. Q. Yes? A. Correct.").

152.    It is the Government's obligation to identify and review materials for exculpatory information.  Apr. 18, 2023 Hr'g Tr. 93:1 (Gingras) ("that's my job as the prosecutor"); Apr. 18, 2023 Hr'g Tr. 232:4-7 (Last) ("Q. Whose obligation is it? A. To do what? Q. To find exculpatory material. Mine or yours? A. The government identifies exculpatory information.").  But the Government has not been able to fulfill that obligation in this case, as Cognizant withheld, on the basis of privilege, exculpatory information.

## V.    COGNIZANT IS REWARDED WITH A DECLINATION—THE BEST POSSIBLE OUTCOME, AND THE ONE COGNIZANT SOUGHT FROM THE OUTSET.

153.    Ultimately, "the extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives [Schwartz and Coburn]" was rewarded. DX-29 (CTS_R17_0005317).

154.    On February 13, 2019, the day before Schwartz and Coburn were indicted, Cognizant entered into a declination agreement with the DOJ.  DX-67.  In that agreement, DOJ specifically cited "Cognizant's thorough and comprehensive investigation [and] Cognizant's full and proactive cooperation in this matter (including its provision of all known relevant facts about the misconduct) and its agreement to continue to cooperate in the Department's ongoing investigations and any prosecutions that might result."  *Id.*

155.    As this Court has described it:

Cognizant signed a declination agreement with DOJ that cited Cognizant's voluntary disclosure, its "thorough and comprehensive investigation," and its "full and proactive cooperation" with the government. Cognizant agreed that it would continue to cooperate fully and provide the government with "any information" requested. It could not have anticipated, at least vis-à-vis the government, that it could shield anything. It is not surprising that Cognizant waived its privilege; by doing so, it dodged a bullet.

ECF No. 339 at 4.

156.    Cognizant made clear to the Government long ago "that the Company wants to see the perpetrators held accountable."  DX-29 (CTS_R17_0005308) (Talking Points for May 10, 2018 Presentation to the Government) ("Cognizant's exemplary cooperation – particularly with respect to the bad actors involved – makes clear that the Company wants to see the perpetrators held accountable.  If the Department has any questions about whether the Company would continue to cooperate if the DOJ were to issue a declination – we can tell you right now that the Company is committed to continued cooperation."); DX-17 (DOJ-EH-0000000209) (DOJ Paralegal Notes of DLA's Filip Factors Presentation) ("If there were any concerns about how a declination with respect to the company would affect cooperation going forward—I can assure you that is not going to be an issue. The company is committed to cooperating into the future with any actions you see fit to take. [Matt Friedrich[8] endorses and agrees] KG: That is a question we had. KR: And we would get support from the audit committee and the board in that respect too.").

---

[8] Matthew Friedrich, who served as Cognizant's Executive Vice President, General Counsel, Chief Corporate Affairs Officer and Secretary from May 2017 through January 2021, was paid a $1 million bonus for his role in successfully resolving the FCPA matter.  Apr. 19, 2023 Hr'g Tr. 411:1-412:19 (D'Souza).  As set forth in a proxy statement that Cognizant filed with the SEC on April 21, 2021: "in recognition of his contributions to successfully resolving the company's Foreign Corrupt Practices Act matter in 2019, the committee provided a further additional equity award in 2020 consisting of $1,000,000 of RSUs [Restricted Stock Units]" to Friedrich.  DX-97 at 65.

<u>CONCLUSIONS OF LAW</u>

I.   **SCHWARTZ'S AND COBURN'S STATEMENTS WERE COMPELLED FOR PURPOSES OF *GARRITY* AND COGNIZANT'S ACTIONS IN OBTAINING THEM ARE FAIRLY ATTRIBUTABLE TO THE GOVERNMENT.**

   A.   **Schwartz's and Coburn's Statements During Their Interviews Were Compelled Under Threat of Termination.**

      1.   **The Coercion Standard.**

1.      The Fifth Amendment to the Constitution of the United States provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.

2.      "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'"  *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  In such proceedings:

> "[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. … Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution."

*Id.* (quoting *Lefkowitz*, 414 U.S. at 78) (alteration in original).

3.      In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that statements obtained from police officer defendants were "compelled" for Fifth Amendment purposes, and therefore inadmissible at their subsequent criminal trial, where the officers were questioned during an internal investigation in which they were subject to termination if they refused to answer.  The Court concluded that the choice given the officers—either to "forfeit their jobs or to incriminate themselves"—was "a choice between the rock and the whirlpool" and, thus,

54

the statements were products of "coercion" under the Fifth Amendment.  *Id.* at 496-97; *see also id.* at 497 ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent.").

4.      As this Court has previously summarized it, "The Supreme Court in *Garrity* held that where a[n] … employee is given a choice 'between self-incrimination or job forfeiture,' incriminatory statements by that employee are the result of coercion and therefore inadmissible in a criminal trial."  ECF No. 263 at 14 n.7 (quoting *Garrity*, 385 U.S. at 495-96).

5.      Courts have extended *Garrity*'s constitutional protections to employee statements coerced through private employers' threats of termination where there is a "sufficiently close nexus" between the Government and the private employer's actions such that the employer's actions are "fairly attributable to the government."  *Id.* (quoting *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019)); *United States v. Stein*, 541 F.3d 130, 146–151 (2d Cir. 2008) ("*Stein II*"); *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974).

6.      In sum, a private sector employee "claiming a violation of the privilege against self-incrimination must prove that the statements at issue were both [(1)] the product of coercion and [(2)] attributable to the government."  *Connolly*, 2019 WL 2120523, at *10.

7.      Under *Garrity* and its progeny, the threat of termination need not be explicit for the statements to have been the product of coercion.  *See* ECF No. 96 at 10 ("Interviews by an employer under the implicit compulsion of 'cooperate or be fired' may be suppressed as involuntary under *Garrity*"); *see also Murphy*, 465 U.S. at 435 (concluding that statements may be "compelled and inadmissible" when a threat is made either "expressly or by implication"); *Garrity*, 385 U.S. at 496 ("Subtle pressures may be as telling as coarse and vulgar ones.").

8.     Whether statements were the product of coercion for *Garrity* purposes is governed by a two-pronged test: (1) whether the defendant "'subjectively believed that he would lose his job if he refused to answer questions'"; and (2) whether "'his belief was objectively reasonable.'" *United States v. Smith*, 821 F.3d 1293, 1303 (11th Cir. 2016) (quoting *United States v. Waldon,* 363 F.3d 1103, 1112 (11th Cir. 2004)); *United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988) ("Under the *Garrity-Lefkowitz-Murphy* line of authority, [defendant] must have in fact believed his … statements to be compelled on threat of loss of job and this belief must have been objectively reasonable."); *United States v. Stein*, 440 F. Supp. 2d 315, 328 (S.D.N.Y. 2006) ("*Stein I*") (the appropriate standard for an "employee['s] claim[] that a statement was coerced by a threat of employment termination" is whether "the belief that termination would follow a refusal to speak was both objectively reasonable and subjectively held.").

9.     To make this determination, courts consider the "totality of the facts and circumstances surrounding the statements made."  *United States v. Camacho*, 739 F. Supp. 1504, 1515 (S.D. Fla. 1990); *see also United States v. Trevino*, 215 F. App'x 319, 322 (5th Cir. 2007) ("[T]o determine whether [the interviewee's] *Garrity* rights were violated, we must look at the surrounding circumstances, specifically focusing on whether the questioning was coercive.").

**2.     Schwartz's and Coburn's Statements Were Compelled.**

10.     In this case, there is no dispute that Schwartz's and Coburn's statements during their three interviews were compelled for purposes of *Garrity.*

11.     Specifically, the Government has not contested, and has thus conceded, that Schwartz's statements during his August 28, 2016 and September 23, 2016 interviews, and Coburn's statements during his September 29, 2016 interview, were compelled under threat of termination.  In the only sentence addressed to the issue in the Government's opposition to the Defendants' motions, the Government assumed that the Defendants' statements were compelled.

*See* ECF No. 399 at 20 ("assuming that the defendants' statements during their three Cognizant interviews were 'compelled' within the meaning of *Garrity* because Cognizant threatened them with termination if they did not cooperate . . . ."). Any argument that the Defendants' interview statements were not compelled for purposes of *Garrity* has thus been waived. *See, e.g.*, *Sportscare of Am., P.C. v. Multiplan, Inc.*, Civ. No. 10-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue"); *Duran v. Equifirst Corp.*, No. 2:09-cv-03856, 2010 WL 918444, at *3 (D.N.J. March 12, 2010) ("The absence of argument on this and other issues constitutes waiver."); *Peters v. Ryan*, 2017 WL 1393692, at *2 (D. Del. Apr. 13, 2017) ("When a party files an opposition brief and fails to contest an issue raised in the opening brief, the issue is considered waived or abandoned by the non-movant.").

12.     Cognizant also admitted to the Government during the investigation that Schwartz's and Coburn's interviews were compelled. Cognizant touted that "[t]he Company insisted on cooperation (including interviews) from both Schwartz and Coburn" as part of the investigation and that its efforts in "[d]oggedly persisting in securing additional interviews with" Schwartz and Coburn and "pressuring them to cooperate" led to their resignations. Proposed Findings of Fact ¶¶ 18, 24, 107 (emphasis in original).

13.     Beyond the Government's and Cognizant's concessions, Schwartz and Coburn subjectively believed that they had no choice but to sit for their interviews or else be fired. *See* Proposed Findings of Fact ¶¶ 18-24, 105; ECF No. 377-2, Schwartz Cert. ¶ 4 ("I absolutely believed that I would be terminated if I did not sit for the interviews Cognizant requested.").

14.     Schwartz's and Coburn's beliefs in this regard were objectively reasonable. Both Cognizant's employee policies and Schwartz's and Coburn's employment agreements specifically

mandated their cooperation with the investigation in order for them to maintain their employment with Cognizant or otherwise to avoid discipline. *See* Proposed Findings of Fact ¶¶ 19-23. Such language is sufficient to support a finding that Schwartz's and Coburn's statements were coerced. *See, e.g., Connolly*, 2019 WL 2120523, at *3 (finding that defendant "did not have discretion to refuse to talk to the investigative team" where his company's employee policy, titled "Global Compliance Core Principles," imposed an obligation to cooperate with investigations and provided that employees who violated company policies "may be subject to disciplinary action up to and including termination of employment[ ]"); *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (granting motion to suppress where defendant was subject to policies that required cooperation in investigations and "provided for 'appropriate disciplinary measures' should he not cooperate"); *Camacho*, 739 F. Supp. at 1518 (evidence that defendants "who refused to answer questions would be subject to disciplinary measures including termination" under operative policies "provide[d] a further basis for these Defendants to have reasonably believed that they were compelled to waive their Fifth Amendment rights during their interviews").

15.     Cognizant and its counsel also made clear during the investigation that, as Schwartz and Coburn already knew, the obligation to cooperate imposed by the Company's policies and employment agreements extended to interviews and would be enforced. *See* Proposed Findings of Fact ¶¶ 104-105; ECF No. 377-2, Schwartz Cert. ¶ 3 (the requirement that employees sit for interviews was "well-known at Cognizant, and … employees complied with demands for investigation interviews because they knew that they otherwise faced the threat of termination under Cognizant's policies.").

16.     The circumstances surrounding Schwartz's interviews make even clearer that his statements during those interviews were compelled. *See Camacho*, 739 F. Supp. at 1515; *Trevino*,

215 F. App'x at 322. These circumstances included both the draconian "parameters" that Cognizant imposed for Schwartz's interviews—prohibiting the presence of more than one lawyer and requiring that Schwartz's lawyer not "take notes, ask questions, or otherwise disrupt the interview," Proposed Findings of Fact ¶¶ 26-32, 71-72—and the coercive questioning that ensued, which was not only hostile in tone, but specifically (and deliberately) tailored to building a criminal case.[9] *Id.* ¶¶ 73-80.

17.     In sum, the record is clear: Schwartz's August 28, 2016 and September 23, 2016 interviews, and Coburn's August 29, 2016 interview, "were coerced in the *Garrity* sense of 'submit or be fired.'" ECF No. 96 at 11; *see also id.* at 10 ("Interviews by an employer under the implicit compulsion of 'cooperate or be fired' may be suppressed as involuntary under *Garrity*").

**B.     Cognizant's Actions In Obtaining Schwartz's and Coburn's Coerced Statements Are "Fairly Attributable to the Government."**

**1.     The "Fairly Attributable" Standard.**

18.     "Where, as here, a private employer conducted the interview, there is another step to the analysis": the "statements obtained in a coerced interview may be suppressed only if the interview is 'fairly attributable' to the government." ECF No. 96 at 11 (quoting *Connolly*, 2019 WL 2120523, at **10-11).

19.     As this Court has described it, the *Garrity* exclusionary rule "'applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are fairly

---

[9] That Schwartz's September 23, 2016 interview was designed not to investigate facts but to elicit statements for use in the Government's prosecution of Schwartz becomes all the more apparent upon the revelation that Cognizant and DLA had already decided in the days immediately leading up to Schwartz's September 23 interview that he and Coburn would be terminated. *Id.* ¶¶ 57-69. But Cognizant and its counsel did not alert Schwartz to his impending termination and instead compelled him to continue cooperating under false pretenses, including by sitting for a second interview that was distinctly prosecutorial in nature. *Id.*

attributable to the government, *i.e.*, when there is a sufficiently close nexus between the state and the challenged action.'"  ECF No. 263 at 14 n.7 (quoting *Connolly*, 2019 WL 2120523, at \*10); *see also Stein II*, 541 F.3d at 146, 152 n.11 ("'state action' includes both conduct by the government and conduct by [a private employer] that is fairly attributable to the government," and the "[a]ctions of a private entity are attributable to the State if 'there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself.'") (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *Stein I*, 440 F. Supp. 2d at 326 ("It no longer may be doubted that economic coercion to secure a waiver of the privilege against self-incrimination, where it is attributable to the government, violates the Fifth Amendment if the pressure is sufficient to 'deprive[ ] [the accused] of his free choice to admit, to deny, or to refuse to answer.'") (quoting *Garrity*, 385 U.S. at 496).

20.     This kind of "close nexus" between the Government and a private employer is not limited to circumstances in which "the State 'has exercised coercive power.'" *Stein II*, 541 F.3d at 147 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  It may also arise, for example, when the Government "has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Id.*  As the Supreme Court made clear long ago, "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."  *Evans v. Newton*, 382 U.S. 296, 299 (1966).[10]

---

[10] Nor are these principles limited to the Fifth and Sixth Amendments; rather, they have long been applied to all fundamental rights that are implicated when a private party stands in the shoes of the Government including, among others, rights under the Fourth Amendment, *see, e.g.*, *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989) (concluding that there was state action for Fourth Amendment purposes where "the Government did more than adopt a passive position toward the underlying private conduct" and where it "made plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions"), and—as discussed

21.     As summarized in *Connolly*, the fact-based "fairly attributable" standard can thus be met in a variety of ways, articulated in the disjunctive:

> [A] close nexus of state action exists between a private entity and the state when a governmental actor (*i*) exercises coercive power; (*ii*) is entwined in the management or control of the private actor; (*iii*) provides the private act[or] with significant encouragement, either over[t] or covert; (*iv*) engages in a joint activity in which the private actor is a willful participant; (*v*) delegates a public function to the private actor; ***or*** (*vi*) entwines the private actor in governmental policies.

*Connolly*, 2019 WL 2120523, at *10 (citing *Stein II*, 541 F.3d at 147) (emphasis added).

22.     In this analysis, "[t]he 'controlling factor' is not whether the state actually directed the constitutionally prohibited conduct, but rather whether the state 'involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'" *Connolly*, 2019 WL 2120523, at *11 (quoting *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974)).   "The state's involvement is no less real for having been indirect and no less impermissible for having been concealed.   The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect." *Montanye*, 500 F.2d at 415; *see also Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 491 (1st Cir. 1996) ("Ultimately, a finding of either direct or indirect state action would suffice to sustain Plaintiffs' [claim of constitutional violation].").

---

further below—those under the Due Process Clause, including the rights embodied in *Brady* and its progeny.  *E.g., United States v. Risha*, 445 F.3d 298, 304-05 (3d Cir. 2006) (in determining whether *Brady* obligations extend beyond federal prosecutors, courts assess, among other things, "whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control.'"); *United States v. Duronio*, No. CRIM.A.02-933(JAG), 2006 WL 1457936, at *3 (D.N.J. May 23, 2006) ("To determine whether an entity is acting on the government's behalf, courts have looked to factors such as whether the entity assists the prosecution before and during trial, and whether the entity conducts interrelated or independent investigations from the government.").

> **2.      Relevant Factors When Evaluating Whether a Company's Actions Are Fairly Attributable to the Government.**

23.      Courts, including Chief Judge McMahon in *Connolly*, have identified numerous factors that bear upon whether a private employer's actions in compelling interview statements should, consistent with the standard set forth above, be deemed "fairly attributable" to the Government for *Garrity* purposes.  These factors include not only the circumstances surrounding the interviews themselves, but also the company's and the Government's motives and conduct both before and after the interviews.  *See* Proposed Conclusions of Law ¶¶ 24-27, 29-30, 43, 61-63.  Those factors include the following:

24.      **Pressure to Cooperate and Alignment of Priorities**:  The "massive amount of pressure" that a company faces to cooperate "is highly relevant to any assessment of the sufficiency of the nexus between the Government and [the company's] 'internal' investigation," particularly insofar as the company's private interests are "aligned with the Government's interest" and stated priorities.  *Connolly*, 2019 WL 2120523, at \*13; *see also id.* at \*2, \*8 (emphasizing, in finding that Deutsche Banks's investigation was fairly attributable to the Government the "substantial pressure . . . to cooperate in every conceivable way with the Government" the Bank faced and its resulting decision to "go all-in with cooperation" in light of the "draconian consequences that would likely ensue if it did not"); *Stein II*, 541 F.3d at 151 ("The threat of [ruinous indictment] brings significant pressure to bear on corporations, and that threat provides a sufficient nexus between a private entity's employment decision at the government's behest and the government itself."); *id.* at 147 (a nexus of state action exists where, among other things, the Government "provides the private actor with significant encouragement" or the private actor's conduct "is entwined with governmental policies.").

25. **Circumstances Surrounding Interviews**:   The particular circumstances surrounding the interviews conducted by the company bear directly on the analysis, including whether the Government in some way influenced the interviews of the defendants and others during the investigation.  This influence may include suggestions, requests, *or* direction[11] from the Government as to the timing, subject matter, or tone of interviews; it also includes evidence of coordination between the company and the Government in connection with Government interviews.  *See Connolly*, 2019 WL 2120523, at *7 (the Bank's counsel "provided the Government with real time updates about facts gleaned from employee interviews" and "did 'everything in its power to facilitate the [Government's own] interviews of relevant current and former [company] employees,' which included 'actively encourag[ing] its employees (current and former) to participate in interviews with regulators.'") (citation omitted); *id.* at *12 ("[T]he Government told [the company] whom to interview and when"); *Gilman v. Marsh & McLennan Companies, Inc.*, 826 F.3d 69, 76 (2d Cir. 2016) (noting that whether the Government "'forced' [the private employer] to demand interviews, 'intervened' in [its] decisionmaking, 'steered' [it] to request interviews, or 'supervised' the interview requests" is relevant to assessing whether the private employer's actions are fairly attributable to the Government).

26. **Providing an Investigative Roadmap for the Government**:  The extent to which the company's investigative activities shaped the Government's investigation and "investigatory strategy" is another relevant factor when evaluating whether the company's actions are fairly

---

[11] As the Court made clear in *Connolly*, the Government need not expressly "direct" or overtly "engineer" the interviews for the private employer's conduct to be fairly attributable to the Government.  *Connolly*, 2019 WL 2120523, at **11-12 ("The 'controlling factor' is not whether the state actually directed the constitutionally prohibited conduct, but rather whether the state 'involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'") (quoting *Montanye*, 500 F.2d at 415 ("The state's involvement is no less real for having been indirect and no less impermissible for having been concealed.").

attributable to the Government, including whether the company provided a "road map" or "blueprint" for the Government to follow.  *Id*. at *12 (the Bank "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect should they finally" conduct interviews on their own); *id*. at *7 (the "[company] did not simply respond to Government document requests by producing responsive documents for the Government's review" but instead "flagged notable . . . evidence or information that [it] believed would be of particular interest to the Government" and "complemented [document] productions with facts learned from [the company's] own interviews of relevant employees.").  *See also id.* at **9, 13 ("It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that" the company's counsel provided, "illuminating just how the Government should 'investigate' the case against certain [company] employees, including [the defendant]").

27.    **The Extent of the Government's Independent Investigative Activities**:    A "critically important issue" in the analysis is "just what the Government was doing" during the period between the commencement of the company's investigation and the company's resolution of the matter with the Government.  *Connolly*, 2019 WL 2120523, at *9 ("One critically important issue is just what the Government was doing during the [period between the commencement of the company's investigation] and [the] Bank's eventual entry into a DPA with DOJ .... Did the Government conduct a substantive parallel investigation to the "internal" investigation at [the] Bank, or did it simply give direction to [the Bank and its counsel], take the results of their labor (which appears to have been fully disclosed to Government lawyers), and save itself the trouble of doing its own work?"); *id*. at *12 (company counsel "did everything that the Government could, should, and would have done had the Government been doing its own work. The fact that the

record contains very little evidence about the Government's own independent investigative efforts during the first three years of [the company's] 'voluntary' investigation renders the inference [that the company's actions were fairly attributable to the Government] all the more compelling"); *id.* at *13 (the company's "investigation pretty much *was* the Government's investigation," as "[t]he Government's investigatory strategy . . . was to let the [company] carry its water for it").

> **3.** **Cognizant's Actions In Compelling Schwartz's and Coburn's Statements Are Fairly Attributable to the Government.**
>
> **a.** **Cognizant Faced Substantial Pressure to Cooperate With the Government and Tailored Its Self-Disclosure and Cooperative Efforts, Including Schwartz's and Coburn's Interviews, to the DOJ Policies Then in Effect.**

28. Cognizant, a publicly-traded company confronted with the specter of significant FCPA charges, faced tremendous pressure to self-disclose to and cooperate with the Government. *See* Proposed Findings of Fact ¶¶ 36-37.

29. The enormous financial and reputational consequences of a potential indictment causes a "massive amount of pressure"—precisely as intended by the DOJ policies—and is, as set forth above, "highly relevant to any assessment of the sufficiency of the nexus between the Government and [the company's] 'internal' investigation." *Connolly*, 2019 WL 2120523, at *13. Indeed, "[t]he threat of [ruinous indictment] brings significant pressure to bear on corporations, and that threat provides a sufficient nexus between a private entity's employment decision at the government's behest and the government itself." *Stein II*, 541 F.3d at 151 ("KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it. The government's threat of indictment was easily sufficient to convert its adversary [KPMG] into its agent.").

30. When Cognizant, through DLA, self-disclosed to the Government on September 1, 2016, DLA was explicit that the Company's self-disclosure and investigative activities were and

would continue to be motivated by the policies, expectations and stated priorities set forth in the Yates Memo and FCPA Pilot Program.  *See* Proposed Findings of Fact ¶ 35.  Cognizant's interests in self-disclosing to and cooperating with the Government were thus "aligned with the Government's interest" and stated priorities.  *Connolly*, 2019 WL 2120523, at *13.

31.     Throughout the Company's two-plus year investigation, Cognizant and its counsel tailored their cooperative efforts, including Schwartz's and Coburn's interviews, to conform to the policies, expectations and stated priorities of the then-operative DOJ policies—all in pursuit of a declination.  Proposed Findings of Fact ¶¶ 38-44.  Given the "obvious incentives to shift blame" that these DOJ policies provided, ECF No. 263 at 23, this included focusing the investigation, from its early days, through indictment (and beyond), on specific individuals—Schwartz and Coburn— all consistent with the express directives of the Yates Memo, the FCPA Pilot Program, and the FCPA Corporate Enforcement Policy.  Proposed Findings of Fact ¶¶ 2-7, 35, 41-45.[12]

32.     Accordingly, in this regard alone, the record establishes that Cognizant's investigative activities, including its interviews of Schwartz and Coburn, were at the very least "significantly encourage[d]" by and "entwined with governmental policies" in a manner that makes them fairly attributable to the Government.  *Stein II*, 541 F.3d at 147 ("A nexus of state action exists between a private entity and the state when the state . . . provides the private actor

---

[12] *See also* Joshua L. Ray, The Continuing Façade of FCPA Enforcement: A Critical Look at the Telia DPA, 17 N.Y.U. J. L. & Bus. 547, 556 (2021) ("The overall purpose of the Yates Memo was to strengthen the DOJ's pursuit of individual corporate wrongdoing, by, in part, denying companies any cooperation credit unless they 'completely disclose to the [DOJ] all relevant facts about individual misconduct.'  The predictable effect of this policy shift has been to further ratchet up the pressure on corporate defendants to not only decline to challenge law enforcement's allegations, but to gear internal investigations towards identifying evidence of their employees' personal guilt, even where it may not be clear that such guilt exists. And since a company's fate turns on finding evidence its employees did something wrong, it is unsurprising that investigations—usually led by outside counsel with duties to the company—generally find just that.").

with *significant encouragement*, either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is *entwined with governmental policies*.") (emphasis in original); *see also Evans*, 382 U.S. at 299 ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."); *Connolly*, 2019 WL 2120523, at \*\*7-9 (in finding private employer's investigation fairly attributable to the Government for *Garrity* purposes, highlighting that "[the company's] interest in cooperating was perfectly aligned with the Government's interest" and that the company "would not have been eligible for cooperation credit had it not" cooperated in the manner that it did, in accordance with operative DOJ policies).

### b. Cognizant's Interviews of Schwartz and Coburn Were Significantly Influenced by the Government and Conducted for Its Benefit.

33.     Cognizant's interviews of Schwartz and Coburn, in particular, were an important aspect of its efforts to be awarded the benefits of the Government's policies.  Thus, in describing Cognizant's cooperation with the Government, the Company and its counsel placed particular emphasis on their handling of Schwartz's and Coburn's interviews.  Specifically, Cognizant pointed out to the prosecutors that DLA's persistence in securing Schwartz's and Coburn's interviews was "a distinguishing factor in the Company's cooperation" and demonstrated Cognizant's efforts to comply with the Government's stated priorities.  Proposed Findings of Fact ¶¶ 68, 107.

34.     These statements themselves reflect how Cognizant's actions in coercing Schwartz's and Coburn's statements were "significantly encouraged" by, and thus fairly attributable to, the Government through its policies.  *See, e.g.*, *Stein I*, 440 F. Supp. 2d at 337

("This Court finds that the government, both through the Thompson Memorandum and the actions of the USAO, quite deliberately coerced, and in any case significantly encouraged, KPMG to pressure its employees to surrender their Fifth Amendment rights. . . .  KPMG's actions in this regard are 'fairly attributable' to the United States."); *see also Stein II*, 541 F.3d at 147; *Connolly*, 2019 WL 2120523, at *10.

35.     But the influence of the Government on Cognizant's interviews was not limited to the promulgation and application of its policies.  Immediately following Cognizant's self-disclosure on September 1, 2016, Cognizant and the Government began coordinating closely and extensively, in particular but not solely, with regard to Cognizant's interviews of Company employees, including Schwartz and Coburn.  This close coordination led up to, occurred on the day of, and followed Schwartz's second interview on September 23, 2016, and embodied the influence and encouragement that the Government policies and actions brought to bear throughout, compelling the conclusion that the Government "involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'"  *Connolly*, 2019 WL 2120523, at *11 (quoting *Montanye*, 500 F.2d at 415).

36.     During the three weeks leading up to Schwartz's second interview on September 23, 2016, Cognizant and the Government communicated on at least eight separate days, often more than once per day, for a total of no fewer than 19 phone calls and email exchanges.  Proposed Findings of Fact ¶ 46.  Throughout this period, the Government—which was not at that time carrying out independent investigative activities of its own—asked Cognizant questions and made specific requests, including that Cognizant advise the Government of upcoming interviews.  *Id.* ¶¶ 47-49, 55-56.  Cognizant complied with the Government's requests then and thereafter, and solicited and received the Government's input regarding its planned interviews.  *Id.* ¶¶ 50, 52, 54.

37.     In particular, on September 14, 2016, Cognizant advised the Government that it planned to interview Schwartz and Coburn for a second time the following week.  *Id.* ¶ 52. Cognizant told the Government on this call that it had just discovered notes on Schwartz's laptop that would become a focus of DLA's questioning at Schwartz's second interview on September 23, 2016, and specifically told the Government that DLA planned to ask Schwartz questions about the notes.  *Id.* ¶¶ 51, 53.

38.     Significantly, by no later than September 20, 2016, three days *before* its second interview of Schwartz, Cognizant had evidently decided to terminate Schwartz and Coburn, memorializing its decision in draft press releases reviewed and edited by Cognizant, its public relations firm, and shared with several of Schwartz's and Coburn's direct reports.  *Id.* ¶¶ 57-61. But Cognizant did not alert Schwartz of his impending termination and instead required him, on pain of termination, to continue cooperating, including by sitting for a second interview on September 23, 2016.  *Id.* ¶ 62.

39.     This decision was made with the very deliberate intention of assisting the Government.  Indeed, Cognizant and its counsel revealed to the Government that they held off on terminating Schwartz because they were attempting to elicit additional information from him to then provide to the Government, in furtherance of Cognizant's cooperative efforts, particularly with regard to specifically designed Governmental incentives to hold individuals—here, Mr. Schwartz—accountable.  *Id.* ¶¶ 64, 66, 68; *see also id.* ¶ 156 ("Cognizant's exemplary cooperation – particularly with respect to the bad actors involved – makes clear that the Company wants to see the perpetrators held accountable.") (citing DX-29) (CTS_R17_0005308) (Talking Points for May 10, 2018 Presentation to the Government).

40.     The operative DOJ policies specifically encouraged this course of action.  *Id.* ¶ 67.

As Chief Judge McMahon noted in *Connolly*, such a course is one that decidedly (and

intentionally) inures to the Government's benefit; as the Government well knows—and certainly

knew here—the Company is in an advantageous position to coerce statements and then turn them

over to the Government in order to curry favor with prosecuting authorities:

> [T]he government often will defer its interviews of the witnesses until after the
> corporate internal investigators can conduct their own interviews.  Given the
> employees' fear of termination by their employer, the government knows that the
> corporation can be more effective in persuading its employees to speak than it could
> be, and the government knows all too well that it can then use its leverage over the
> company to compel the company to tell it what the employees say, even if that
> requires the waiver of the attorney-client privilege or work product doctrine.

*Connolly*, 2019 WL 2120523, at *12 (citing Abbe David Lowell & Christopher D. Man,

*Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment*

*Rights*, 40 Geo. L. J. Ann, Rev. Crim. Proc. iii (2011)); *see* Proposed Findings of Fact ¶¶ 68-69.

Indeed, as Cognizant later touted to the Government: "We've all seen cases w[h]ere people are

terminated right away and that can impede an investigation."  Proposed Findings of Fact ¶ 68

(citing DOJ-EH-0000000206) (DOJ Paralegal Notes from Filip Factors Presentation).  After all,

had Cognizant terminated Schwartz, it would have "made it very difficult, if not impossible, to

speak to" Schwartz again.  *Id.* ¶ 69 (citing Apr. 18, 2023 Hr'g Tr. 63:22-64:4 (Gingras)).

41.     And, Schwartz's second interview was designed to elicit statements for use in the

Government's prosecution of Schwartz that the Government could thus not have obtained.  Having

insisted in advance on the same draconian "parameters" that DLA imposed for Schwartz's August

28, 2016 interview—restrictions which the Government agrees it could never impose, and which

Cognizant selectively imposed on Schwartz and Coburn but not others, *see* Proposed Findings of

Fact ¶¶ 28-32—Buch's questioning of Schwartz then extended far beyond the fact-finding that is

germane to the Company's internal investigation and instead went to issues specifically tailored to

a criminal prosecution.  *Id.* ¶ 74.  Buch asked Schwartz a series of leading questions touching on, for example, "facilitation payments" and especially "willful blindness," terms that have specific significance in FCPA criminal prosecutions; DLA understood that Schwartz's answers to his questions would be pertinent to what DLA would then report to the Government.  *Id.* ¶¶ 75-76 (citing Apr. 19, 2023 Hr'g Tr. 308:14-18 (Buch) ("you understood that his answer to that question [regarding willful blindness] might be pertinent to what you would report to the government, right, because they were doing a criminal investigation, correct?  A. Yes.").[13]

42.     Indeed they were.  On the same day as Schwartz's second interview, DLA had a call with the Government during which it "likely" briefed the Government on the interview it had just conducted, particularly "given the importance of that interview"—"including to the government's case."  *Id.* ¶ 81.  Indeed, the Government was clear in its interactions with DLA throughout about the importance of Schwartz's interview, including that the Government discussed on multiple occasions the prospect of calling a DLA attorney to testify about it as a witness at the trial of this matter, emphasizing that the "the consciousness of guilt aspect here" is "crucial for us" and will likely be "an area of the trial that is heavily litigated."  *Id.* ¶¶ 82-85.

43.     The close coordination between the Government and Cognizant did not end with Schwartz's second interview on September 23, 2023: Cognizant continued to provide information to, and field questions from, the Government in its immediate aftermath.  *Id.* ¶¶ 86, 88-90.  Their aligned focus remained on Schwartz and Coburn and, in particular, on Schwartz's employment

---

[13] For this reason, DLA, having prohibited Schwartz's counsel from taking contemporaneous notes, purported to include a verbatim transcript of Buch's questions and Schwartz's answers in its interview memorandum and noted that "certain of Schwartz's phrasing and word choices have been retained to enhance the clarity of the discussion reflected in this memorandum"—both deviations from DLA's practice when preparing other interview memoranda.  Proposed Findings of Fact ¶¶ 78-79.

status at the Company and their efforts to continue "trying to get as much as we can" before Schwartz resigned or was terminated, *id.* ¶ 64 (citing DX-14) (DOJ-EH-000000015-017) (Kevin Gingras Notes from Oct. 6, 2016 Meeting), powerful evidence of the nexus between the Government and Cognizant for purposes of the "fair attribution" inquiry. *See Connolly*, 2019 WL 2120523, at *4 (as the investigation progressed, the "Bank representatives and counsel continued to update the Government about their findings and coordinate next steps, as to [the defendant] and others"); *id.* at *11 (after the defendant's interviews with company counsel, and "as [the] Bank's investigation progressed, the Government continued to discuss [the defendant] by name in meetings with Bank investigators"); Proposed Conclusion of Law ¶ 18.

44.    On October 6, 2016, less than two weeks after Schwartz's second interview, Cognizant, through its counsel, had an in-person meeting with the Government during which Cognizant and the Government discussed "Individual Remediation (Employment) Issues" and Cognizant specifically solicited the Government's input regarding its planned employment actions, as it would continue to do throughout the investigation. Proposed Findings of Fact ¶¶ 65, 91-93.

45.    During the October 6, 2016 meeting, Cognizant also "advised the Government that counsel planned to do an additional (third) interview of Steven Schwartz . . . and had requested medical records from Schwartz related to his purported alibi concerning the basal cell procedure that he had performed in April 2014." *Id.* ¶ 94 (citing DX-20) (June 15, 2022 Letter from Government at 1-2). In response, the Government—in a prototypical example of the type of "joint activity" and "significant encouragement" that creates a sufficiently close nexus with state action, *Connolly*, 2019 WL 2120523, at *10 (citing *Stein II*, 541 F.3d at 147)—"asked DLA if '*we*' had exhausted everything around Schwartz's claim of not remembering the events he was asked about

during his initial interview, and whether Schwartz was in the office the week of those events." *Id.* ¶ 95 (emphasis added).  At the time, the Government was still not conducting any interviews of its own or itself investigating Schwartz's state of mind in April 2014; Cognizant and its counsel were "the only ones who were doing this work." *Id.* ¶ 96.

46.     This extraordinarily close coordination between Cognizant and the Government in connection with witness interviews continued, and in additional ways that, under the applicable case law, further demonstrate that Cognizant's actions in compelling Schwartz's and Coburn's statements are fairly attributable to the Government.

47.     For example, in addition to mandating cooperation with the Company's in-house attorneys and DLA, Cognizant actively encouraged its employees to cooperate with the Government; "coordinate[d]" interviews and the "retention of individual counsel" for certain employees; and "facilitat[ed] government interviews of key witnesses."  Proposed Findings of Fact ¶¶ 102, 116, 124; s*ee Connolly*, 2019 WL 2120523, at *7 (in finding private employer's actions "fairly attributable" to the Government, noting that the Bank did "everything in its power to facilitate the [Government's own] interviews of relevant current and former … Bank employees[,] which included actively encourag[ing] its employees (current and former) to participate in interviews with regulators").

48.     Similarly, Cognizant and the Government worked together to sequence witness interviews.  Proposed Finding of Fact ¶ 125; *see Connolly*, 2019 WL 2120523, at *6 ("On September 9, 2014, as the Bank's internal investigation was drawing to a close, [the] Bank's counsel sought the Government's "permission" to interview [defendant], who still worked at the Bank, for a fourth time."); *id.* at *12 (emphasizing that "the Government [that] told [the] Bank whom to interview and when.").

49.     The Government also provided feedback and clear direction to DLA regarding certain aspects of the manner in which DLA was conducting interviews of Cognizant employees. Proposed Findings of Fact ¶¶ 126-127; *Connolly*, 2019 WL 2120523, at *12 (the Government "directed" company counsel "on the precise manner" of questioning).

50.     Indeed, the Government requested to be apprised of Cognizant's interviews of its employees, and Cognizant complied with that request throughout the investigation.  Proposed Findings of Fact ¶¶ 50, 52, 54, 94; *see Gilman*, 826 F.3d 69 at 76 (whether the Government "'supervised' the interview requests" is relevant to assessing whether the private employer's actions are fairly attributable to the Government).

51.     And for its part, Cognizant "provided the Government with real time updates about facts gleaned from employee interviews." *Connolly*, 2019 WL 2120523, at *7; *see* Proposed Findings of Fact ¶¶ 51, 55.

52.     In sum, as in *Connolly*, Cognizant's actions, and those of its counsel, went well beyond their role as an employer and internal investigator, respectively; instead, they very specifically intended to and did function as the Government's agent.  For example, as in *Connolly*, Cognizant "did not respond to the Government's subpoenas by turning over documents without comment, and its employees were not subjected to government or regulatory depositions on notice, at which they were defended by company counsel.  Indeed, [Cognizant] did the opposite—it effectively deposed [its] employees by company counsel and then turned over the resulting questions and answers to the investigating agencies." *See Connolly*, 2019 WL 2120523, at *12. Its actions with regard to these interviews are, therefore, "fairly attributable" to the Government.

c.   **Cognizant Provided the Government with a Clear Investigative Roadmap, and the Government Accepted the Results of Cognizant's Investigation in Lieu of Conducting Its Own Independent Investigation.**

53.     For over two years, and even after it had self-reported to the Government, Cognizant was the primary, if not the only, investigator of this matter.  And having received the fruits of Cognizant's investigation—from witness interview summaries and "hot docs" to credibility determinations, the selection of experts, and *Brady* assessments—the Government used that investigation as the basis for this prosecution.   At the very least, the Government's investigation, including interviews of the very same interviewees with whom Cognizant's counsel had spoken, followed what the *Connolly* court described as a "road map" that had already been provided by Cognizant in seeking the corporate declination that it, in fact, achieved.  *See Connolly*, 2019 WL 2120523, at *9 ("It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that" the company's counsel provided, "illuminating just how the Government should 'investigate' the case against certain [company] employees, including [the defendant].").

54.     The specific evidence set forth in the findings of fact above amply supports this conclusion.  In total, DLA provided oral downloads to the Government of at least 45 interviews of 18 different Cognizant employees.  Proposed Findings of Fact ¶ 109.  By the time the Government conducted its first interview of Cognizant personnel on February 7, 2017, DLA had already completed 44 of those interviews and had downloaded the substance of them to the Government.  *Id.* ¶¶ 110-111.  In other words, the Government did not interview Cognizant witnesses until after DLA had already done so and had provided detailed, oral summaries to the Government.  And every one of the Cognizant employee witnesses whom the Government would later interview (except one, a ministerial witness who provided information regarding Cognizant's IT systems

75

rather than on any substantive matter) had already been interviewed by DLA—in many cases on multiple occasions—and those interviews (with one exception) had been downloaded to the Government, which in turn used DLA's downloads to prepare for its own, subsequent interviews of the same witnesses. *Id.* ¶ 111.

55.     This sequence of events—including the Government's failure to conduct a single interview until after DLA had completed all but one of its interviews and provided summaries to the Government—establishes that, as in *Connolly*, the Government did not conduct a "parallel investigation" to that being conducted by Cognizant at the same time.  *Connolly*, 2019 WL 2120523, at *9.  Indeed, even though the Government knew that Cognizant had an "agenda" and was providing a self-serving "version of events" in pursuit of the significant incentives that operative DOJ policies provided, Proposed Findings of Fact ¶¶ 114-115, "the record contains very little evidence about the Government's own independent investigative efforts" during Cognizant's investigation—a "critically important" consideration in evaluating the sufficiency of the nexus between the Government and Cognizant.  *Connolly*, 2019 WL 2120523, at *9 ("One critically important issue is just what the Government was doing during the [period between the commencement of the company's investigation] and [the] Bank's eventual entry into a DPA with DOJ").

56.     Following extensive briefing and a two-day evidentiary hearing in this matter, the only evidence the Government has marshalled of independent investigative activities prior to February 7, 2017 is its preparation of "chronologies of documents" Cognizant had produced; issuance of preservation notices to "various internet service providers" and L&T; and service of grand jury subpoenas on JPMorgan and Verizon.  Proposed Findings of Fact ¶ 115.  This description mirrors what occurred in *Connolly*, where the court recognized the significance of the

Government's failure to develop a meaningful record of a parallel investigation despite having "every opportunity" to do so and knowing that "the Court was interested in the issue." *Connolly*, 2019 WL 2120523, at *12. Judge McMahon thus concluded that this failure "means that the Government did not do enough (indeed, has not done much of anything at all) to rebut [the defendant's] contention that the actions of [the company and its counsel] were fairly attributable to the Government within the meaning of *Garrity*." *Id.* And in a statement that applies to the facts of this case, Judge McMahon continued:

> The only conclusion one can draw from this evidence is that, rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to [the company]—the original target of that investigation—and then built its own "investigation" into specific employees, such as [the defendant], on a very firm foundation constructed for it by the [company] and its lawyers.

*Id.*

57.     This same conclusion is here supported by more than the documents and interview summaries that Cognizant provided to the Government as a road map for its subsequent investigation. Far beyond that, Cognizant effectively acted as the Defendants' prosecutor-by-proxy throughout its over two-year investigation: the Company and its counsel specifically—and at the Government's request—investigated potential defenses on behalf of the Government; identified potential Government witnesses, including India-based experts; provided credibility assessments of the witnesses DLA interviewed to the Government, which appear to have been accepted; made relevance and other evidence-related determinations when reviewing and selectively producing documents to the Government; and even, as set forth below, undertook a *Brady* review for the Government after defense counsel called into question whether it was concealing known exculpatory information from the Government. And the Government allowed Cognizant to assert privilege even in circumstances in which it was clearly improper, including

77

because, as this Court has found, Cognizant had waived the right to assert privilege with respect to subject matters as to which it had selectively disclosed to the Government.  Proposed Findings of Fact ¶¶ 116-138.  In all of these senses, in the words of *Connolly*, the company's "investigation pretty much was the Government's investigation," as "[t]he Government's investigatory strategy . . . was to let the [company] carry its water for it" for years.  *Id.* at **12-13.

      *58.*     These efforts were in particular aimed at the Defendants here.  For example, Cognizant touted among its most notable cooperative efforts having done "everything it can responsibly do to provide key evidence involving its former General Counsel" and providing "further cooperation <u>specific to Steven Schwartz.</u>"  Proposed Findings of Fact ¶ 118 (citing DX-29) (CTS_R17_0005299).  This included investigating, with at least the encouragement and certainly the knowledge of the Government—which expressly asked DLA on October 6, 2016 "if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about during his initial interview," *id.* ¶ 95—Schwartz's purported "amnesia defense … Collecting a number of Apple 2014 notes and producing those documents to assist the government's efforts to authenticate his April 2014 notes; and Conducting a forensic deletion analysis on Schwartz's laptop."  *Id.* ¶ 119 (citing DX-29) (CTS_R17_0005308).  Cognizant also touted having conducted "a 'page turn' review through Gordon Coburn and Steven Schwartz's data during key periods of time" after it "swiftly seiz[ed] recoverable media and business records" from both early in the investigation, *id.* (CTS_R17_0005305-5306), unhampered by the procedural and legal hurdles that the Government would have had to overcome, including under the Fourth Amendment, had it done so itself.  *See United States v. Fallon*, 61 F.4th 95, 107 (3d Cir. 2023) ("The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' It also requires warrants to be

supported by probable cause and to 'particularly describ[e] the place to be searched, and the persons or things to be seized.'") (quoting U.S. Const. amend. IV); *United States v. Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013) ("Our Founders were indeed prescient in specifically incorporating 'papers' within the Fourth Amendment's guarantee of '[t]he right of the people to be secure in their persons, houses, papers, and effects.' U.S. Const. amend. IV. The papers we create and maintain not only in physical but also in digital form reflect our most private thoughts and activities.").

59.     As noted above, in response to repeated Government requests, DLA compiled information, conducted forensic analyses, and sought to address evidentiary and related concerns expressed by the Government—including related to such evidentiary concerns as authentication and chain of custody—that the Government identified as necessary for the investigation and planned prosecution of Coburn and Schwartz.  Proposed Findings of Fact ¶¶ 120-123; *see Connolly*, 2019 WL 2120523, at *8 (emphasizing that company "*collected, analyzed, and organized voluminous evidence, data, and information, and did so in a way that saved the Department significant resources* by identifying certain documents and segments of audio files and providing translations for certain documents where applicable.") (emphasis in original).

60.     DLA also identified for the Government, in response to its requests, potential witnesses, including experts, on specific subject matters.  Proposed Findings of Fact ¶¶ 134-137; *see Connolly*, 2019 WL 2120523, at * 14 (the company "was told by the Government to . . . carry out governmental investigative demands that were generated by [the company's] earlier efforts").

61.     When providing oral summaries to the Government of certain of the interviews that DLA conducted, DLA not only conveyed the substance of the interviews but repeatedly shared credibility assessments of key witnesses whom the Government had not yet interviewed itself.

Proposed Findings of Fact ¶¶ 131-133.  In some cases, DLA went so far as to opine that one witness (*e.g.*, Karen McLoughlin, Cognizant's CFO) should be believed over another (*e.g.*, Raj Ghosh, who directly implicated McLoughlin in the alleged bribe demand).  *Id.* ¶¶ 132-133.  The Government ultimately accepted these credibility assessments, including in that it did not charge McLoughlin although she was the recipient of at least three of the emails specifically cited in the Indictment in this case and, according to the Government's key witness, Mani, was made aware of the alleged bribe demand in 2014.  *Id.* ¶ 133; *see Connolly*, 2019 WL 2120523, at *12 ("rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation . . . and then built its own 'investigation' into specific employees, such as [the Defendants], on a very firm foundation constructed for it by the [company] and its lawyers.").

62.    Throughout the investigation, Cognizant collected, reviewed, and selectively produced documents to the Government based on "relevance" determinations, rather than on the kind of "responsiveness" determinations that are required in order to respond to subpoenas.  *Id.* ¶¶ 128-130.  This is because the Government did not serve a subpoena on Cognizant until November 8, 2018, over two years into the investigation and only after Schwartz's counsel raised concerns just days before regarding Cognizant's selective assertions of  privilege.  *Id.* ¶ 145.  And, in collecting, reviewing, and producing documents based on "relevance" determinations, Cognizant emphasized certain materials, choosing "hot docs" that Cognizant believed would satisfy the Government's investigative priorities.  *Id.* ¶¶ 101, 128-130.  Cognizant's "effort not to just 'data dump' these documents on the DOJ, but . . . present[] them in a way that makes clear the key findings and important documents," *id.* ¶ 128, is precisely what occurred in *Connolly*, where the court explained:

> The Bank's efforts to cooperate [were] not . . . limited to the raw transmission of documents and data.  In other words, [the] Bank did not simply respond to

Government document requests by producing responsive documents for the Government's review. Instead, [the] Bank flagged notable ... evidence or information that [it] believed would be of particular interest to the Government. It also complement[ed] [document] productions with facts learned from [the] Bank's own interviews of relevant employees.

2019 WL 2120523, at *7 (internal quotation marks and citations omitted).

63.     Finally, as discussed further in Section II below, DLA, in response to a "non-subpoena request" from the Government, purported to re-review previously withheld and redacted Schwartz materials for exculpatory information. Proposed Findings of Fact ¶¶ 148-152. This re-review was prompted by Schwartz's counsel raising with the Government in November 2018 allegations regarding Cognizant's selective privilege assertions, including concerns that Cognizant was withholding exculpatory information under the guise of privilege. *Id.* ¶¶ 142, 145. Prior to Schwartz's counsel raising these concerns, the Government had never discussed Cognizant's privilege log with DLA, notwithstanding that the log included a number of entries for documents that, on their face, were clearly not privileged. *Id.* ¶¶ 140-142. And when the Government finally sought to inquire into the privilege "lines" that Cognizant was drawing, DLA declined to describe its rationale or explain to the Government how it was making privilege determinations. *Id.* ¶¶ 143-144. Instead, DLA, on behalf of Cognizant, asserted privilege over both "where the lines were drawn" and how DLA and Cognizant "determined what was privileged." *Id.* That the Government simply accepted these limitations on its investigation is, perhaps, the most powerful evidence that it was not conducting a "substantive parallel investigation to the 'internal' investigation" conducted by Cognizant, *Connolly*, 2019 WL 2120523, at *9, but rather was simply following the lead of Cognizant, its partner in this process.

64.     In sum, the evidence before this Court illustrates "coordination" between the Government and Cognizant from self-disclosure through indictment,[14] as well as the Government's "significant encouragement" at every stage, and Cognizant's successful effort to become deeply "entwined with" the Government and thus to avoid its own prosecution, in line with the then-effective governmental policies, including the Yates Memo, the FCPA Pilot Program, and the FCPA Corporate Enforcement Policy. *Stein II*, 541 F.3d at 147 ("A nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement,* either overt or covert, or when the private actor operates as a *willful participant in joint activity* . . . or is *entwined with governmental policies.*") (emphasis in original); *see also Evans*, 382 U.S. at 299 ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."); *Connolly*, 2019 WL 2120523, at *10.   Because a "sufficiently close nexus" thus exists between Cognizant and the Government, Cognizant's actions in compelling Schwartz's and Coburn's statements are "fairly attributable" to the Government, and are accordingly subject to the constitutional constraints of *Garrity*. *Stein II*, 541 F.3d at 146-51.  Their statements should be suppressed and the Court should

---

[14] The coordination between the Government and Cognizant has continued throughout the litigation of this case. *See, e.g.*, ECF Nos. 76 (Government motion to quash Rule 17 subpoenas that were directed to Cognizant), 99 (Government request to narrow Rule 17 subpoenas that were directed to Cognizant), 161 (Cognizant seeking leave to oppose Schwartz motion related to intrusion into the defense camp, despite recognizing that the motion was directed at the Government); 173 (Government opposing Schwartz motion for discovery from Cognizant related to intrusion into the defense camp by Cognizant); 410-411 (Government consenting to Cognizant's request to amend protective order); *see also* ECF Nos. 388 (Government making an informal motion to preclude Schwartz from challenging trial evidence or seeking discovery based on allegations of taint resulting from Cognizant's counsel's prior meeting with Schwartz); 392 (counsel for Cognizant filing in support of Government's informal motion regarding taint).

consider any such further relief as is appropriate pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), and its progeny.  *See* ECF No. 377-1 at 74-82; ECF No. 376-4 at 39-40.

## II.   THE CONSTITUTION AFFORDS SCHWARTZ AND COBURN THE DUE PROCESS PROTECTIONS SET FORTH IN *BRADY* AND ITS PROGENY: ACCESS TO EXCULPATORY MATERIAL IN THE POSSESSION OF THE GOVERNMENT AND THOSE THAT ENGAGE IN A JOINT EFFORT WITH THE GOVERNMENT.

65.    Sixty years ago, the Supreme Court held that Due Process requires that the Government provide exculpatory evidence to the defense.  *Brady v. Maryland*, 373 U.S. 82, 87 (1963).  This, held the Court, was essential to proceedings that would be fair to the accused and in which the public can have confidence:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.  An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain:  "The United States wins its point whenever justice is done its citizens in the court."  A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.  That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile[.]"

*Id.* at 87-88 (footnote omitted).

66.    The right to "*Brady* material" is "not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial."  *United States v. Bashir*, 731 F. App'x 743, 748-49 (3d Cir. 2018) (quoting *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983)).

67.    In the years since *Brady*, case law has made clear that a defendant's right to exculpatory material "reaches beyond evidence in the prosecutor's actual possession" to evidence about which "the prosecutor knew or should have known."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (quoting *United States v. Joseph*, 996 F.2d 36, 29 (3d Cir. 1993)).

68.     In order to comply with *Brady*, courts have required prosecutors to "learn of any favorable evidence [to the defense] known to the others acting on the government's behalf[.]" *Dennis v. Sec'y Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (internal quotation marks omitted).  This recognition of a defendant's right to exculpatory evidence located outside the prosecutor's actual possession begins with information known to law enforcement.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (granting new trial for *Brady* violation where police failed to bring favorable evidence to prosecutor's attention and holding that prosecutors "have a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case").

69.     In *Kyles*, the State of Louisiana argued that "police investigators sometimes fail to inform a prosecutor of all they know," and that the State prosecutors should not be held accountable for evidence not known to them.  *Id.* at 438.  The Court accepted the State's factual premise but rejected the argument, noting that prosecutors had the means to comply with *Brady* even in such circumstances:  "[there is no] serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'"  *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  "Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."[15]  *Id.*

---

[15] *Kyles* also addressed the materiality standard for *Brady*, which the State sought to lessen to allow prosecutors a certain degree of "leeway" based upon prosecutors' inability to know what is important until the case progresses.  *Id.* at 438-39.  The Court declined to do so, stating that

70.     This obligation remains in full force today.  *See, e.g.*, *Dennis*, 834 F.3d at 284, 275 (affirming grant of habeas relief where, during interview of witness, police gained possession of receipt showing time stamp that corroborated defendant's alibi); *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013) (remanding for analysis of materiality of various police investigations and reports containing impeachment evidence); *Lazar v. Att'y Gen. of Pennsylvania*, No. 14-cv-6907, 2023 WL 2382812, at *10 (E.D. Pa. Mar. 6, 2023) (granting habeas relief where prosecutors did not disclose evidence known only to investigators, the police).

71.     The *Brady* requirement has not, however, been limited to law enforcement.  It has been expanded, first, to circumstances in which the government conducts a joint investigation or shares labor or resources with another agency.  *See, e.g.*, *United States v. Antone*, 603 F.2d 566,

---

"[u]nless, indeed, the adversarial system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result." *Id.* at 439.  Again evidencing the Court's overriding concern in the *Brady* context that criminal trials be, and be perceived as, fair, the Court explained:

> This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.  *See Agurs*, 427 U.S. at 108 ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure.").  This is as it should be.  Such disclosure will serve to justify trust in the prosecutor as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the trust about criminal accusations."  *See Rose v. Clark*, 478 U.S. 570, 577-78 (1986); *Estes v. Texas*, 381 U.S. 532, 540 (1965); *United States v. Leon*, 468 U.S. 897, 900-901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth'") (quoting *Alderman v. United States*, 394 U.S. 165, 175 (1969)).  The prudence of the careful prosecutor should not therefore be discouraged.

*Id.* at 439-40.

570 (5th Cir. 1979) (imputing possession of information to federal prosecutorial team because they had "pooled their investigative energies to a considerable extent" with state prosecutorial team and the effort overall was "marked by [the] spirit of cooperation."); *Commonwealth v. Medina*, No. CP-51-CR-1210801-199, 2011 WL 3420487 (Pa. Com. Pl. Aug 2, 2011) (in reversing murder conviction where prosecution failed to disclose favorable evidence within the knowledge of others acting on the Government's behalf, stating that "[p]rosecutors have an affirmative obligation to learn of any favorable evidence known to the others acting on the government's behalf in the case when agencies conduct a joint investigation or share labor or resources." (internal quotation marks omitted); *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (prosecution must search files of other branches of government if they are "closely aligned with the prosecution" or have a "close working relationship").

72.     Moreover, and critically for this case, prosecutors have also been held to have possession for *Brady* purposes over materials held by third parties unaffiliated with the Government.  *See, e.g.*, *United States v. Holovacko*, 781 F. App'x 100, 105 (3d Cir. 2019) (applying the *Risha* factors to assess whether the documents of a cooperating private party were in the Government's constructive possession).  Thus, under the constructive possession analysis set forth in *United States v. Risha*, courts consider (i) whether a third party is acting on behalf of or under the control of the Government; (ii) whether it is engaged in a joint effort with the Government; and (iii) the ease by which the government can access the information.  445 F. 3d at 304.

73.     The *Risha* inquiry focuses on whether the individual, agency or company with actual possession of the information was involved in the investigation or prosecution of a defendant.  *See McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016) (nurse practitioner,

who testified on behalf of the Government after having examined the sexual assault victim at the request of law enforcement as part of the pre-indictment investigation into the defendant, was part of prosecution team for *Brady* purposes); *United States v. Rosenschein*, No. 16-cr-4571(JCH), 2019 WL 2298810 (D.N.M. May 30, 2019), *reconsideration den.*, 2020 WL 2750247, *6 (D.N.M. May 27, 2020) (finding National Center for Missing and Exploited Children (NCMEC) to be part of the prosecution team in that it provided information to the Government "with the specific purpose of aiding the prosecution," and accordingly compelling the Government to produce certain information in the possession of NCMEC in accordance with Rule 16 and *Brady*).

74.     Here, Cognizant was involved in the investigation, and has become closely involved in the prosecution, of the Defendants.  As is set forth above, Proposed Findings of Fact ¶¶ 33-138, 148-150, Cognizant's role in the investigation of this matter, and its coordination with the Government, evidence precisely the kind of joint effort directed at the prosecution of Schwartz and Coburn that is discussed in *Risha*, 445 F.3d at 304 (describing how third party engaged in a joint effort with the Government as factor showing constructive possession).  As discussed above, Cognizant coordinated closely and extensively with the Government throughout the over two-year investigation, including in the period leading up to and immediately following Schwartz's second interview on September 23, 2016, and continued to provide extensive information to, answer questions from, and comply with requests of the Government throughout.  That included, among many other things, numerous voluntary document productions, in which Cognizant emphasized "hot docs" tailored to the Government's investigative priorities.  Proposed Conclusions of Law ¶ 62.  It also took the form of investigating, at the Government's request, at least one of Schwartz's potential defenses, for which Cognizant sought medical records during the relevant time period; the Government accepted this information and took steps to assure that Cognizant fully exhausted

this subject matter.  *Id.* ¶ 45 (citing DX-20) (June 15, 2022 Letter from Government at 1-2) ("asked DLA if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about during his interview, and whether Schwartz was in the office the week of those events.").  As Cognizant's investigative efforts on behalf of the Government continued, the Government asked to be kept apprised of employee interviews and provided feedback and direction regarding certain aspects of the manner in which DLA was conducting those interviews. Proposed Conclusions of Law ¶¶ 43-52.  And the Company, for example, by conducting and then downloading interviews of all but one ministerial witnesses that the Government interviewed, certainly created the "road map" for this case, which the Government followed, permitting Cognizant to effectively serve as the Government's initial investigative arm.  *See, e.g.*, Proposed Conclusions of Law ¶¶ 53-62; Proposed Findings of Fact ¶¶ 109, 111, 114-115 (DLA provided oral downloads to the Government of at least 45 interviews of 18 different Cognizant employees, nearly all of which were downloaded to the Government before the Government conducted any interviews).

75.     But beyond its involvement in the investigation and prosecution of the defendants, the Government—even as it acknowledges that it is obligated to identify and produce exculpatory evidence, *see* Proposed Findings of Fact ¶¶ 146, 152, has failed to fulfill that obligation with regard to information in Cognizant's possession.  Indeed, notwithstanding Cognizant's incentive to shift blame away from itself and onto others in order to obtain the declination that it was ultimately afforded, rather than to do justice in the way that the Government is obligated to do, *see supra* ¶ 31, the Government has accepted Cognizant's representations that the company conducted *Brady* searches, including of documents withheld as privileged, and had located nothing exculpatory. Proposed Findings of Fact ¶¶ 148-150.

76.   Specifically, there has been no suggestion that the Government has itself conducted any searches of Cognizant's files for *Brady* information.  Proposed Findings of Fact ¶¶ 148-152.

77.   Moreover, and most critically, the Government has accepted Cognizant's assertions of privilege, including baseless assertions of privilege, *id.* ¶¶ 140-42, 144, even though it is now clear that those assertions of privilege were made with regard to exculpatory evidence.  Although the defense cannot know what that evidence was, the evidentiary hearing in this matter revealed that it included obviously exculpatory evidence regarding steps that Schwartz took to assist in, rather than in any way hinder, the internal investigation conducted by DLA.  *Id.* ¶ 151 (citing Apr. 19, 2023 Hr'g. Tr. 369:6-18 (Buch) ("Q. Did you ever provide to the government exculpatory evidence regarding steps that Mr. Schwartz took to assist in the internal investigation that was going on? A. I think we took the position that, to the extent that Mr. Schwartz was participating in the internal investigation as a member of the investigative team, that his activities were privileged.  And so we did not report the steps that Mr. Schwartz took to ask witnesses to cooperate with the investigation to the government. Q. Okay, but you are aware of those steps? A. I am. Q. Yes? A. Correct.")).

78.   Ultimately, this substitutes Cognizant "for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."  *Kyles*, 514 U.S. at 438.  Nor is it an excuse that, as the Government claims, "we were trying to be thoughtful and cognizant [by] trying not to interfere in whatever the company was doing in its own investigation."  Apr. 18, 2023 Hr'g Tr. 93:20-23 (Gingras).  But it is the Government that has the obligation to assure that the fundamental fairness and due process obligations called for by *Brady* and its progeny, and the Constitution, are met, and that any exculpatory information is provided in advance of trial.  *See Fallon*, 61 F.4th at 123 (citing *United States v. Johnson*, 816 F.2d 918, 924

(3d Cir. 1987)) (no *Brady* violation where exculpatory material made available to the defense for use at trial).

79.     Moreover, even today, the Government has at least some control over Cognizant by virtue of the declination agreement between the two.  *See* Proposed Findings of Fact ¶¶ 7, 38-39; ECF No. 339 at 4 (declination agreement provides that Cognizant will "continue to cooperate fully and provide the government with 'any information' requested," and as such, Cognizant "could not have anticipated, at least vis-à-vis the government, that it could shield anything."); Cert. Ex. 83 at 2 (Decl. Agmt.).  The Government certainly could require Cognizant to provide its files to the Government for its review—the very essence of constructive possession.  *See Risha*, 445 F.3d at 304 (citing control as factor weighing in favor of constructive possession).

80.     The only seeming impediment to the Government's review of Cognizant's files are Cognizant's assertions of privilege.  But this may be easily overcome, thus satisfying the final *Risha* factor,  445 F.3d at 304 (ease by which the government can access the information), through the implementation of a "taint" or "filter" team, the usual Government process when handling potentially privileged documents.  *See* U.S. Dep't of Justice, *Justice Manual* § 9-13.420 – Searches of Premises of Subject Attorneys (2021) ("investigators should use protocols designed to minimize intrusion into potentially protected materials or newsgathering activities unrelated to the investigation, including but not limited to keyword searches (for electronic searches) and filter teams" and any "privilege team[s] should . . . consist[] of agents and lawyers not involved in the underlying investigation");, *United States v. Scarfo*, 41 F. 4th 136, 162, n.10, 170-72 (3d Cir. 2022) (Government properly used "filter team" to review recorded conversations and compile potentially privileged discussions for District Court *in camera* review prior to transmission to prosecutors;

additional filter teams reviewed documentary evidence prior to turning materials over to the team handling the prosecution of the defendants).

81.     As well, any such invocations of privilege must be analyzed in light of this Court's prior waiver rulings, which concluded that Cognizant had effected a "significant" subject matter waiver over the information disclosed to the Government during the course of its cooperation.  *See* ECF No. 268, at 5.

82.     And even if there are, among the documents in Cognizant's possession, some over which privilege would otherwise be properly asserted, as Defendants have argued previously, that privilege cannot be used to deny the Defendants' their right to a fair trial.  The Court has not yet been required to address that argument, but it presents itself again in light of the revelation at the evidentiary hearing of this matter that exculpatory evidence is, in fact, being withheld on grounds of privilege.

83.     Indeed, evidentiary privileges are disfavored where they obstruct the production of evidence in criminal trials.  *See United States v. Criden*, 633 F.2d 346, 357–58 (3d Cir. 1980) (compiling cases and noting that "[c]ourts must tread carefully on the hallowed ground where . . . the free flow of information and the fair administration of criminal justice[] conflict") (citing *Herbert v. Lando*, 441 U.S. 153, 175 (1979) ("Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances.")).  This is because "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," whether through the Sixth Amendment's Compulsory Process or Confrontation Clauses or through the Fourteenth Amendment Due Process Clause.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations and citations omitted); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).

84.     Courts therefore engage in a balancing test when addressing the conflict between an assertion of privilege by third parties on the one hand and the vindication of criminal defendants' constitutional rights on the other.  The result has been a series of significant holdings that make clear that the nondisclosure of evidence on account of privilege is unconstitutional where it "significantly undermine[s] fundamental elements" of the defense.  *E.g., United States v. Scheffer*, 523 U.S. 303, 315 (1998); *see also Criden*, 633 F.2d at 358 (upholding criminal defendant's Fifth and Sixth Amendment rights to disclosure of evidence over journalists' "conflicting interests" in privilege).

85.     As discussed above, *see* Proposed Findings of Fact ¶ 151; Proposed Conclusions of Law ¶ 77, Cognizant admitted at the evidentiary hearing that evidence favorable to Schwartz with regard to his participation in and support of the internal investigation, among other exculpatory facts, has been withheld under a claim of privilege.  But this failure means that the emails in fact produced to the Government are taken out of context and thus provide a distinctly one-sided picture of what occurred.  For this reason alone, Cognizant's assertions of attorney-client and work product privilege must yield to Defendants' Sixth Amendment right to present a complete defense. *See United States v. Gupta*, 848 F. Supp. 2d 491, 496 (S.D.N.Y. 2012) (defendant's "substantial need" for SEC interview memoranda potentially containing *Brady* material overcame work product assertion despite the fact that summaries thereof had already been produced, and memoranda were "classic work product" which may reveal mental processes); *Lisle v. McDaniel*, No. 203-cv-1005-JCM-LRL, 2006 WL 3253488, at *3–4 (D. Nev. Nov. 8, 2006) (work product protection does not preclude production of potential *Brady* material); *United States v. Anderson*, No. CR02-0423C, 2004 WL 7339793, at *2 (W.D. Wash. July 23, 2004) (work product protection "has no effect on the government's duty under *Brady*, which is rooted in constitutional due

process"); *United States v. Peitz*, No. 01-CR 852, 2002 WL 31101681, at *8 (N.D. Ill. Sept. 20, 2002) (despite valid claim of attorney-client privilege, the prosecution is "obliged to disclose evidence that would be useful and favorable" within that privileged document).

86.     In sum, in order for the Defendants to receive a fair trial—the very purpose of the *Brady* doctrine—and consistent with the law, including the application of the *Risha* factors, which demonstrate that Cognizant has engaged in a joint effort with the Government to investigate and prosecute Schwartz and Coburn and remains subject to the Government's control by virtue of the declination agreement, Cognizant's files are deemed to be, and are in fact in the Government's constructive possession for constitutional purposes.  Accordingly, the Government should be obligated to search those files for *Brady* and *Giglio* material*,* and turn any exculpatory evidence over to the defense, in order to satisfy its constitutional obligations.


Dated:  May 19, 2023                                            Respectfully submitted,

                                                               s/ Lawrence S. Lustberg
                                                               Lawrence S. Lustberg
                                                               John D. Haggerty
                                                               Anne M. Collart
                                                               **GIBBONS P.C.**
                                                               One Gateway Center
                                                               Newark, New Jersey 07102
                                                               (973) 596-4500
                                                               llustberg@gibbonslaw.com

                                                               **PAUL, WEISS, RIFKIND, WHARTON &**
                                                               **GARRISON LLP**
                                                               Theodore V. Wells, Jr.
                                                               Roberto Finzi
                                                               Justin D. Lerer
                                                               Kyle T. Sieber
                                                               1285 Avenue of the Americas
                                                               New York, New York 10119
                                                               (212) 373-3000

**KRIEGER KIM & LEWIN LLP**
Nicholas J. Lewin
Oleg M. Shik
500 Fifth Avenue
New York, New York 11215
(212) 390-9559

*Attorneys for Defendant*
*Gordon J. Coburn*

**BOHRER PLLC**
Jeremy I. Bohrer
Jonathan E. Jason
10 Grand Central, Suite 2101
New York, New York 10017
(212) 303-3314

*Attorneys for Defendant*
*Steven Schwartz*