# Exhibit A

**Case: Cognizant**
**Company Presentation – 10/6/2016**

- Introductions
- Bracket: CEO of Cognizant is GE director
- DLA: Cognizant is a company based in Teaneck NJ that specializes in information systems technology consulting. Let me walk you through some of the steps that we've taken and information we've developed. Case originally came to company through a complaint from a vendor in India at MEPZ that one employee was extorting this food vendor. The vendor raised it to global security team, who talked to the employee in question that admitted to shaking this vendor down and also claimed that were payments being made to gov officials to obtain licenses and a number of other allegations. In response, the matter was elevated to compliance division, who brought it to legal, who brought it to DLA. Compliant was made originally sometime in April and DLA got it in late April/beginning of May. We collected information and retained ENY to help with that and began the investigation and found information that supported these allegations. We scheduled to go to do interviews in middle of late August. EDNY was gathering docs in July, with the idea for interviews in August. In or around early August, one of the employees raised a concern about a permit that the company needed to receive in connection with the CKC facility (brought by "Money", aka Srimanikandan Ramamoorthy – head of real estate at Cognizant in India). He raised the concern that in order to bring electricity to the CKC site (it was running on diesel generators at the time and continues to run on it presently) they needed to through a contractor called LNT and make a 300,000 USD payment to a gov. official. We spoke to Money on August 8th and 22nd. In the middle of August, we received the EDNY report.
- GOV.: He [Money] told you about the payment or that he made it?
- DLA: He told us that LNT made the payment.

*Pause to go get Paul from SEC*

- DLA: So we received that information from Money on Aug 8th over the phone. [During that call] He was seeking permission to authorize paying LNT and DLA said no and froze all payments to the vendor. On the 22nd, we met with him in person for another interview and went over everything with him. Over the course of that day and the following Monday, he generally confirmed that there may have been payments made for the operating licenses and told us mid-way through the first day that there was a 2.5 million dollar payment made for the CKC site in 2014. Then he also told us about another instance at the Tunai Campus - a payment of approx. 560,000 USD - in order to obtain an environmental clearance during middle-to-late 2013. In respect to 2.5 million allegation, he stated that the company's president and general counsel were aware of or authorized the payments. The payments were not made directly though company, but through LNT.
- DOJ: What did he [Money] say?
- DLA: They [company president and general counsel] were aware and authorized these payments.
- DLA: We immediately contacted the chief compliance officer on the August 20th and the audit chair and CEO who all agreed that the matter should be immediately taken from the general counsel and that DLA would lead the investigation on behalf of the company. So that happened over the course of those days. We met with Money further and he specifically mentioned a call

from 2014 he remembered, where the Chief Operating Officer, Sridhar Thiruvengadan, told the President (Gordon Cobern) and the Executive Vice President (Steven Schwartz) that LNT had informed them that a government official had demanded a 2.5 million payment. What he [Money] testified in August, is that Cobern was surprised by the amount and said that LNT needed to be responsible for this – "this" meaning for making the payment for the government official.

- DLA: Wait some context you should have - the contracts Cognizant had with LNT placed responsibility for getting the licenses in LNT's hands, so that explains Coburn's comment about LNT being responsible for the corrupt payments.
- DLA: To continue, Money alleged Schwartz said [on this call] "as long as it's not showing as a separate line item in the cost of the project we should be okay" and "don't quote me on this". Now, according to Money everyone on the call understood that they would not get the permit without LNT making the [2.5 million]] payment. Money claimed that LNT resisted the idea of making this payment and that he was ultimately directed by Cobern to tell LNT that future business would be at risk if they didn't take care of this permit. With respect to Cognizant's Vice Chairman, Lakshmi Narayanan, he was aware of the improper payment initially and then Money subsequently said later that he was unsure if Lakshmi was aware. As I indicated, the audit committee took control of over investigation and…
- GOV: Was the Vice Chairman on any of these calls?
- DLA: Yes …..
- DLA: Bracket was subsequently hired to help us with the investigation and the role Steven Schwartz previously occupied.
- Bracket: Got call to come help because CEO of Cognizant used to be the director of GE …
- DLA: To continue, we've spoken to and conducted a number of interviews. Probably 30+ additional interviews [aside from the one with Money] and we have been diligent about keeping the data in good condition… We've reported to you and timing wise I think I left for the US on the 25th or 26th, we briefed the board on the 30th and they directed us to call you on Sept 1st. We've notified you of all significant developments and will continue to do that. Then what we've done, what I'd like to do, is go back to my narrative about what we've factually found.
- GOV: Okay.
- DLA: Just to be clear, the investigation around 2.5 million is still ongoing. There's additional work that needs to be done. Particularly in regards to people on emails, but today we're going to talk about the core – Cobern, Schwartz, Shrigan, and Money. With respect to the 570,000 allegation, we're still in the early stages and we haven't been as focused on it. We know the most about the 2.5 million allegation. Money said it was either 2 or 2.5 million and evidence/documents we have collected suggest this as well.
- GOV: To what extent have you determined what facilities LNT has had contact with?
- DLA: We have a list, but I have to come back to you with that data.
- GOV: To what extent are you taking a look at what happened there?
- DLA: Not yet, but we know we have to do that. It's been six weeks.
- GOV: Have you thought about doing some of the same steps like preserving documents from that list?
- DLA: Yes.
- Bracket: To be clear, Money described 3 significant bribes involving 2 facilities….
- GOV: Does Cognizant and LNT have a relationship in any other countries aside from India?
- DLA: Not that I'm aware of.

- DLA: So again, focusing on the 2.5 million, we believe that there was a demand in or about March 2014. That the demand was from government officials, likely government officials in Tamil Nadu, where the facility is located. And that it was for a permit at CKC. We believe that the company started construction at CKC prior to obtaining all the necessarily permits. We have emails from the March time period where clearly there's communications between LNT and the company about the company's expectation that the facility would open in April 2014 and concern that this planning permit would prevent that from happening and that there's more work to do around that period. We do know that there were two calls (April 21st and 22nd). The 21st was between Cobern, Sridhar, Money, and Schwartz. Two calls occurred on April 22nd. We think the 1st call was at 7am between Sridhar, Srimanikandan, Coburn, and Schwartz. The 2nd call was between Lakshmi, Coburn, and Schwartz at 8am eastern immediately.
- DLA: If you turn to Tab 1, you can see that there was an ordinary Monday call and it looks like Coburn was late for the call and you can see that during the call, Cobern sent an email to Schwartz saying, "can you join" and then tab 2-3 is a continuation of that email conversation.
- GOV: This was the first call right?
- DLA: Yes. Following the first call Tab 4 occurs and then you can see on the next tab what we think is an invitation for that call. If you look at Tab 6, Cognizant has a video conferencing system called Tandberg and we have Tandberg records for that April 21st call. We see Menon (an HR guy) on the call, but we don't think he was actually on it. In our opinion, this record is consistent with the emails we found. What's interesting about this is that it's timed to where the person is located and Tandberg equipment reflects that the calls occurred in Connecticut for Schwartz and Coburn. If you go to Tab 7, you can see Coburn sends out an email for what we think is April 22nd asking for a meeting with Lakshmi, Schwartz, and Coburn. And then you can see this is set up as an Intercall, not Tandberg. We don't have the Intercall records, which we've looked for. Tab 8 is an invitation. Tab 9 is the Tandberg record around the 2nd call and again, we have more work to do there but we think it's consistent with the emails. Again, significantly Coburn and Schwartz call in from home in CT. As we described to you, I left India and came to US after talking to Money and we interviewed Schwartz and Coburn on Aug 28, 29 - Sept 1. They strongly denied all of Money's allegations.
- Bracket: Coburn says that a payment was raised in the call, for north of a million dollars for a government official, but then denied it had been authorized. Steven said he wasn't on that call – he only had a call with Coburn at some point who asked 2 hypothetical questions about if Cognizant could pay bribes and he told Coburn no.
- GOV: Did they have counsel at the time [of the interviews]?
- DLA: Steven did. Coburn did not.
- GOV: Were either showed these records?
- DLA: Not sure. We may of shown Schwartz some of these records at the 2nd interviews. And know that we did show him some of the emails referencing the calls…
- GOV: Does he remember the call?
- DLA: Yes. Coburn remembers that there was a call in 2014, but couldn't confirm the date. Schwartz denied that there was a call.
- GOV: What about Schwartz and the two hypothetical questions Coburn asked?
- DLA: Schwartz ties that to a meeting in person with Coburn.
- GOV: Did you guys do formal interview memos of these interviews?
- DLA: Yes. But we obviously assert privilege over them.
- DLA: So, as indicated we interviewed them shortly after coming to USA and called you Sept 1st. I told you at that time that there was strong denials. We continued collecting and reviewing, and

sometime in Sept (9th?) we found the notes... The notes were created on April 22nd [by Schwartz] according to metadata and looks like it was written during the call. The notes appear to be broken into two sections: first call and the second call. *DLA starts reading off the notes aloud* We think the 670,000 is what Money alleged, although Money alleged it was 560,000. IAS stands for "India administrative servants". We think government officials is related to political officials.

- Bracket: The Tamil Nadu politics – chief minister [female] has a history of corruption and has been charged multiple times.
- GOV: What were the convictions for?
- Bracket: they were for bribes according to what I remember.
- DLA: She was convinced for having assets that exceed what she should have had, from which bribery was inferred.
- DLA: Line 12 and 13 [in the Schwartz notes] are significant – we think it relates to LNT. Line 14 was eerily reflective of what Money said about this call.... 121 was amount paid to LNT up to that point.
- GOV: Has Money seen these notes?
- DLA: No.
- GOV: Is this [the notes] an email?
- DLA: No, this is just the format that appears. If you look at native file it's a sticky note and he [Schwartz] had hundreds of sticky notes. An electronic note – metadata explains this.
- GOV: 6.4 million bill - is that outstanding?
- DLA: We don't know what that is.
- DLA: We think these notes reflect that first call on the 22nd and that Lines 1-4 references the second call and notes he took during it.
- GOV: this is 1 file?
- DLA: yes.
- DLA: I read line 3 as it's LNT's responsibility to get the permits and line 4 can have two interpretations: 1) real estate variations 2) we only pay bribes for real estate.
- GOV: Did you have these notes when you spoke to Schwartz?
- DLA: Yes, the second time. We spoke to him a second time with the notes last Friday I think. We did with counsel.
- GOV: Before the president resigned?
- DLA: Yes. So we spoke to Swartz – we again asked him about his recollection of this meeting and he said he had no memory. We showed him the notes and he effectively said they could be his notes and if you found them on my machine I won't dispute that, but I have no recollection of the notes or meeting, and in fact on April 24th 2014 I had surgery on my eye, which caused me great stress that week and thus have no recollection of that week.
- Bracket: We asked if he went to look back at what he done after that week and he said he never did.
- GOV: was he out any days after the surgery?
- DLA: there's emails that show he was doing normal business on the 24th.
- GOV: His counsel?
- DLA: At the time it was a lawyer named Josh Reefman in NYC, but you should talk to Winegarden.
- GOV: what's his current status?
- DLA: he's on home leave, on paid leave. His access to things have been terminated.
- Bracket: Our preferred course is for him to resign or we'll terminate.

DOJ-EH-0000000021

- DLA: We do want an additional interview with him and have asked for medical records for this alibi.
- GOV: Have we exhausted everything around him not remembering?
- DLA: …..
- GOV: Was he in the office at all that week?
- DLA: so the thing is we mostly works from home. It's a company where it's not uncommon for people to work from home. We have been asking people who worked with him that week if they noticed anything unusual that week.
- GOV: and the surgery is an outpatient procedure?
- DLA: We think so – his lawyer said he doesn't think there was general anesthetic involved
- DLA: With respect to Coburn – as I told you on Friday, he wanted to obtain counsel which he did over the weekend. And the day after he resigned, we [were supposed to] interview him. Tuesday afternoon we received an email from his lawyer saying he would not appear for the interview because he had resigned. There are emails from the May time period where it appears that LNT did hire a new liaison appointment. Cobern directed that 17 million dollars owned to LNT was frozen, as a way of pressuring LNT to take care of the payment – this is according to Money's testimony. We found emails that support this. On June 27th, there is a communication from LNT to team members indicating that a government order had been issued which would facilitate them obtaining this planning permit. Additional funds were released to LNT at that time.
- GOV: So funds were released when?
- DLA: End of June and July.
- DLA: I believe the planning permit was released by CNDA in early November.
- GOV: Initial funds in May are released?
- DLA: I think May 20th.
- GOV: when does LNT obtain contract with this new consultant?
- DLA: we don't know. We only have circumstantial evidence.
- GOV: has anyone at Cognizant spoken to L&T about this issue?
- DLA: not yet.
- GOV: Why were more funds released in end of July?
- DLA: Because government released that the permit would go through
- GOV: How much was released in July?
- DLA: Government released 5 million on July 1st….
- DLA: Flip to tab 11. We believe that this document is what referenced in line 12 and 13. *starts going over the document in the tab*
  - Money has told us line 3 on page 27 is the reference to the 2.5 million payment.
  - Page 64: things that were included in the original contract
- DLA: Flip to 12. Email appears to relate to lines 12 and 13 from Steven's notes.
- Bracket: for clarity's sake, this doc is an example of how there isn't a lot of line items. Down the road, more line items appear because "statutory approval" stands out too much.
- DLA: importantly the breakdown on page 27, this page is not sent to Colburn. This is an important fact that his lawyer will realize.
- GOV: what does that mean?
- DLA: this page is not sent to Coburn. But if you do look there are a number of attachments in the document are sent to Colburn…. What's important in this doc (on tab 12), there's details of money not approved and if you look, you see the line items from page 65. There's an email

shortly after this Jan 13th email (which we have not given to you yet) where Gordon says "approved".

- DLA: So we know that there were questions raised internally by people on the India team and at some point, people on Money and Gunesh's team there was a direction to remove the line item that related to statutory approvals and replace it with some of the variations that had previously been rejected. And then those were added into the bill – roughly ~3 million. If you look at tab 13, look at CTS 5 and 6 * reads off spreadsheet* and you can on CTS 90-14 see language in the doc that they are backing out of the statutory approval language. Tab 14: this document goes to Coburn and if you look at the attachment that the 11 items have now been accepted.

12/7/16
**Case:** Cognizant
**Company Presentation** – 12/7/16

Update from DLA

- Working on Schwartz
- Medical records by this week
- Schwartz produced by next week
- Sridhar obtaining lawyer, John Carney who is at Bicker Costello

**<u>Moni</u>**

**Interview 1: Call with Moni on August 8th, 2016**
**DLA:**
- People on call: Christine Liu (Hong Kong), Karl Buch, Robert Molina (senior director in security at Cognizant), Schwartz, Dana Gilbert
- Call about CKC power issue
- Raised issue himself
- Said CTS hired LNT as general contractor, 37 million dollar facility built
- Electricity involved laying of cables and securing connection from electric board (TNEB)
- Total cost of connecting to TNEB grid would be 1.9 million USD
- May 2016 – Moni had phone conference with Vetivelu and Genash Nakkiran during with Vetivelu told BG, Ganesh and him that L&T official paid 300,000 to gov official and that L&T wanted to be reimbursed
- Vetivelu said payment made to individual gov official and payment was captured in email that LT sent to cognizant which included section in proposal called incidental expenses which is approximately 310,000 USD (gov official not identified)
- Moni claimed that L&T told him that incidentals amounted to payment to gov official
- TNED corrupt according to Moni and obtaining connection typically requires making "facilitation payment"
- Moni claimed that cognizant never authorized L&T to make the payment and cognizant did not reimburse
- Moni stated at time that he was not aware of other instances where L&T made payments to gov officials
- Vetivelu may be project manager
- Cognizant hired L&T to obtain approvals and cognizant wanted L&T to deal with it, Moni stated that Cobern unaware that payment had been made to L&T at time and raised it to Cobern in early August 2016 and Cobern refused to talk about it referencing ongoing investigation
- Chief Compliance Officer – Dana Gilbert → Moni told to talk to her

**Interview 2: August 20th, 2016**
**DLA:**
- People at interview: Karl Buch, Christine Liu, Robert Molina
- Moni joined company in July 1994
- Became head of Corporate Workplace Services in 2009 – (Admin dept)

- Promoted to be head of admin and corporate real estate in 2014 in India
- At time of interview reported to Sridhar and Carn McGluffin
- He said he knew about FCPA corruption policies
- Company pays liaison in charges to get renewed licenses (%75-2,200)
- Alleged that L&T made 300,000 payment to TNED official sometime before 2016 in order to permit them to install electric cable at CNC facility
- Emails from March 1st and 2nd where Vetivelu wrote that L&T had obtained "load sanction" for electrical cable (permit)
- Ramesh provided estimate that the cost would be $2 million, with 300,000 for incidental expenses (payment to gov officials)
- March 3rd email where they held call with L&T to discuss work status and cost estimate – during call BG asked for reference to incidental expenses to be removed from emails, quotes, or invoices
- Email from March 23rd
- March 10th, Mikeran sent itemized quote to Gamesh for approval and quote contained 24 construction line items for about 2 million and no incidental expenses mentioned
- May 6th email contained final itemized bill containing 1.96 million with no incidental expenses
- L&T removed reference to incidental expenses and agreed to hide figure in the invoice by inflating work related expenses
- Moni claims that he reached out to Cobern in early august and Cobern refused to discuss it and said to speak with Dana and Schwartz
- CKC – Moni raised issues about CKC before asked any questions about it by lawyer (?)
- Alleged that L&T paid 2.5 million to obtain building permit for CKC facility, payment purportedly made in 2014 and global leadership including Cobern, Schwartz and Sridhar approved the payment
- Karl Buch: Moni is a "truth-teller", but make your own judgement
- Schwartz was on August 8th call when Moni said he wasn't aware of anything else which may explain why he said that
- L&T began construction at site before obtaining all necessary permits including the CMDA planning permit
- Claimed not aware of issue until early 2014 during site visit with L&T when L&T employee told him that CKC would not open on schedule because planning permit not been issued
- Moni claimed that sometime in middle of 2014, Vetivelu informed him that gov official demanded payment in connection with planning permit for CKC facility
- Moni recalled that there had been conference call with Cobern, Sridhar, Schwartz and himself in middle of 2014 (later established that call was in April 2014)
- Claimed that on call he relayed update to them that L&T informed him of demand for payment from gov official and requested amount was 2.5 million. According to Moni Cobern was shocked stating that "L&T needs to be responsible for this"
- Moni understood Cobern's statement to be that it was L&T responsibility to hand payment to gov official – and everyone understood that Cognizant could not obtain permit without payment
- Moni assumed payment was "political request
- Cobern tried to put pressure on LT by freezing payments to L&T
- Moni also recalled that Subrahmanyan (SNS) who is vice chairman of L&T, thought to be next CEO, contacted him sometime later after call insisting that L&T would not make payment and Moni relayed message to Cobern who instructed him to revert with message that L&T's business

(with Cognizant) would be at risk if they did not obtain building permit for Cognizant → Moni delivered message to SNS

- Moni said Cognizant reimbursed L&T for 2.5 million by improving LNT's construction variation request
- Moni said that there was document in November 12th 2014 which was PowerPoint that Vetivelu sent to Moni listing the variations and one line item in variations with planning permit for 2.5 million which was improper payment. Does not know whether other 6 line items were improper payments as well.
- **FBI:** Did Moni use the word "bribe"?
  **DLA:** Notes reflect that he said they were bribe payments
- On Feb 3rd 2015 Cobern approved 8 million total in variations including 3.7 million in statutory approvals
- Buch showed him March 11 2015 email (doc showed 3.7 million that had been previously approved was now categorized as claim not accepted and Buch asked about that), and Moni said that these items were now accepted
- Moni recalled that Latchmey Narinan, Ganesh BG and Rosh Golsh were also aware of 3.7 million in improper payments
- Alleged that Schwartz participated in two conference calls in which payment was discussed, and did not protest, Schwartz said that he was "not to be quoted" for approving the payment
- Schwartz and Cobern then removed
- DA: What was Moni's demeanor like?
  DLA: very soft spoken, very religious, thinks very highly of Gordon, clearly uncomfortable and upset
- DLA met with him again on Monday August 22nd, it was Karl Buch, Christine, Robert in hotel in Chennai

**Interview 3: August 22nd, 2016**
**DLA:**
- Stated by asking questions about Pune
- Moni said in India it is common to start building before gov officials, felt pressure from Cognizant business leaders to open facilities based on original schedule, raised issue with respect to this pressure
- Pune was built in 2014 but since they had not obtained environmental clearance not able to open on schedule
- Gov brought lawsuit against Cognizant for not obtaining proper clearance and lawsuit still ongoing
- Toward end of project, L&T made payment to gov official to obtain environmental clearance
- Moni believed that he told Cobern that CTS had to authorize payment to gov official to obtain clearance
- Buch showed email from April 19th 2013 that attached a variation spreadsheet relating to Pune facility from L&T and it contained line item for expenses toward various statutory approvals for 560,000 USD and Moni thought that was line item for payment to gov official
- CKC planning permit: Moni submitted application to CMDA in Feb 2013 almost a year later still not obtained permit
- Moni shown email from Jan 2014 where L&T requested that Cekaran, CTS executive vice chairman, meet with chief minister of Tamil Nadu (just died) (state in India where Chennai is

located) in order to try to persuade her that this would be worthwhile to help with planning permit (business friendly reach out ) but everyone told L&T that CTS would not allow meeting because afraid chief minister would ask for payment and "we'd all be stuck"

- Moni said everyone including Cobern and Schwartz thought meeting with minister would be bad idea
- Moni repeated that when it became apparent that they would not be able to open on time, there was a lot of pressure from leadership
- Some time prior to April 21st, 2014 Vetivelu informed him that there had been demand for payment from gov official and Moni said he informed Sridhar when he was told that (2.5 million dollar demand and probably a political demand)
- April 21st Cobern requested teleconference with Shridar and Moni, said that he remembered receiving call from Shridar asking him to join call with Cobern, after joining conference, Shridar told him Cobern wanted to speak about CKC planning permits
- Moni claimed that he told them that CTS had not obtained permit and there was payment demand
- Cobern was surprised to learn payment was 2.5 million and that "it's a lot of money now I understand why &LT was having trouble"
- Clear to Moni that everyone understood payment to be illegal and not normal gov fee
- Recalled that Schwartz stated "as long as it's not showing as separate line item in the cost of the project, we should be okay".
- Schwartz said "don't quote me on this
- Everyone agreed that Chandra should not meet with Chief minister during this call
- Moni stated that on April 22nd, Cobern organized follow up call with Moni and Schridar during which Moni told Cobern that LT unwilling to make payment and did not want to be involved. Cobern said Moni should freeze payments and threaten with loss of CTS business
- Moni explained pressure intended to motivate L&T to do whatever was necessary to obtain payment – also recalled meeting with SNS after meeting where he relayed Cobern's message
- 17 million frozen
- Vetivelu told Moni that they had obtained new consultant for approval process but did not explain how consultant would obtain payment but believed that he would likely make payment to gov official
- Cobern said hold 10 million and give L&T 7 million until payment (
- Moni said LT did not want to get involved in obtaining statutory approvals for CTS
- Moni not sure if he told Latchmey about the payment
- Moni told Latchmey that LT was handling approval process, not sure if he told Chandra about the payment
- Moni did not discuss with McGlocklin and did not know if he knew about the payment
- Feb 3rd: email where Cobern approved 3.7 million in statutory fees, Moni alleged that Cobern understood that this money included 2.5 million payment to gov official for obtaining planning permit
- Email in March where Cobern approves variations but line item for 3.7 million approves to not approved category – moved approval language to protect Cognizant – Moni informed Cobern of the replacement and Cobern understood
- Turnkey contract model: Moni said usually line item for statutory approvals in this model, stated CTS would not question amount LT paid for stator approvals or how they obtained payments because that it part of turnkey contract. CTS would not determine whether or not payments were

reasonable. LT only did this kind of model with Cognizant, not as a business practice.

**Interview 4: September 20th, 2016**

- People at interview: Jessica Masella, Kevin Huska (Cognizant Global Security),
- Who from LT told him about the demand? Moni said likely Vetivelu
- Moni not sure where the demand came but impression that it was a political demand (probably chief minister, recently deceased)
- April 21st call – Schwartz dialed in after Moni, Sridhar wanted to speak about gov approval, Moni told them about demand and did not have permit for CKC facility, Moni stated that while Schwartz was on call, Cobern asked Moni how much money had been demanded, Moni said he believed it was 2 million (changed from 2.5 million which he said earlier)
- Moni said Cobern said it was a lot of money and understood the gravity of the situation and said "now I understand why L&T is having trouble getting the permit"
- Moni could not recall discussion of Pune project
- Moni said Schwartz talked about how to handle CKC payment demand and that he said not to put tin line items or quote him
- Moni believed that they discussed that money would be billed to CTS as change order and understood that at end of project L&T would submit this change order and there would be line for statutory approvals
- Schwartz said that this "should not set a precedent" and Moni understood this to mean that they should not be taking this route in the future
- FBI: Did not set precedent refer more to amount?
  DLA: Didn't ask
- FBI: could be precedent with regard to a number of things
  Bracket: I don't know how to interpret it
- Moni confirmed purpose of April 22nd call was to figure out how to put pressure on LT
- Moni provided statistically details on how much CTS had paid to LT
- Moni stated that Cobern told him to tell LT that if they did not get permit they would lose CTS business and they would suspend payment
- CTS's position was that it was LT's contractual obligation to obtain permit and those on call thought this was best way to "protect Cognizant", from exposure in gov according to Moni
- CTS's position that they "do not want to know what they do"
- Moni reported that first time he realized LT made payment was in November 2014
- Moni not sure whether Gosh was aware, he wanted to participate on the call but believes that he told Gosh know
- Does not think Latchmey was aware that they were having trouble getting the permit
- Did not recall whether he would have generally mentioned the payment and does not think Chandra was aware
- FBI: Latchmey he does not quite recall but is clearer about Chandra?
  DLA: Yes
- Moni changed costs associated with statutory approvals so it would appear they were not paying them even though they were, line item on the books would look bad
- FBI: Was it Moni saying to LT to make that change?
  DLA: It was done internally, no negotiations with LT, just internal decision with CTS (Moni, Ganesh, Vetivelu)

- Moni only kind of remembered hearing about Pune payment – focus was on CKC. Denied knowing amount paid for Pune although he previously said it was 560,000
- FBI: was he saying that he was not sure of the amount but knew there was a payment? DLA: Knew about payment but not sure of amount

**BG**

**Interview 1: August 24th**
- People at interview: Christine, Robert, Karl Buch
- Joined company in 2009 as head of procurement for India, reported to Raj Gosh
- BG: Associate VP Procurement
- Said L&T largest player in construction market in India
- L&T usually hired consultants to handle statutory approvals under turnkey model
- CTS did not question this, costs built into contract according to Karl Buch
- Given ecosystem in India might be making improper payments
- Said L&T ethical company and operated under stringent norms in comparison to other Indian companies
- Retaining or renewing operating licenses could be problematic area
- Project in Hyderabad: not relevant
- DLA discussed electrical cables with him, BG assumed L&T made improper payment to gov official to install this cable
- Karl Buch: this was a more challenging interview
- Said incidental expenses line item probably references payment but was not sure how much out of the approx. 300,000 went to him
- Said 300,000 incidental expense raised red flag and they believe portion was used by L&T consultant to "take care of" gov official and if "you don't think that way you're fooling yourself"
- Call in March to discuss this line item for incidental expenses that everyone on call understood amount was to "take care of gov officials"
- BG said it was "stupid mistake" that they included this language of incidental in contract and everyone (from L&T) was upset
- BG: "All of us know what these fees are for but we don't talk about it" – told L&T to remove incidental expenses from contract on that March phone call
- Karl Buch: I showed him revised invoice that no longer included reference to incidentals. Were incidental expenses removed to hide payment? BG said L&T had already completed work at time quote was provided. They put great pressure on L&T to provide power and L&T was in rush to get this done.
- BG said he did not know specific amount paid to gov official because under no circumstance would L&T tell him that
- BG alleged that LT paid 2.5 million to political figure to obtain planning permit for CKC – SNS told him, Moni, and Ganesh that there was request, suspected that figure was Chief Minister Tamil Nadu. Unable to recall when SNS told him about request. BG stated that Coburn froze payments, thus LT hired consultant and eventually obtained permit.
- BG said after learning about payment – discussion with Moni, Ganesh, Sridhar, not sure if he reached out to Latchmey, regarding putting pressure on LT to obtain the planning permit.
- BG alleged that Coburn approved 2.5 million payment
- 2.5 million "came out of the blue" and was not in original LT contract

- BG said Coburn was detail oriented and "on the ground " person and that he had to know but according to Buch, had no specific knowledge
- Karl Buch asked him about government order, and BG said that gov order was usual and had never seen letter from Principal Secretary demanding (?)
- L&T kept it a secret because they were trying to protect their reputation in the payment, and did not want other people to know that they were involved
- L&T had many construction projects in Tamil Nadu and did not want chief minister to know in case they demanded more payments
- Karl Buch shows November doc (2014) with line item: BG said 2.5 million was likely the political payment figure because CTS had already paid the statutory fees and charges directly to the government agency and received the payment  (DLA has these receipts)
- Kevin Gringas: what is the timeline?
  DLA: Start construction in 2012 or 2013 → apply for permit in Feb 2013 → demand from gov official around March 2014 → Real payments June-November 2014 → payment suggests around November 2014 → received gov order directing permit in March 30 2014
- BG: no one discussed with him why payment was approved and then later rejected

**Interview 2: September 21st**
- People at interview: Karl Buch, Kevin Huska, Jessica Messala, Robert Molina
- BG stated that first learned of planning permit issue in last quarter of 2013
- Moni and Chandra knew about the demand
- Assumed for political figure – before state elections and usually when they demand these payments in exchange for approval on construction projects
- Managing Director called BG to explain that L&T under pressure because of payment
- CTS pushed back because they did not want to be involved, but L&T also did not want to be involved, BG said essentially a stalemate for period of time and eventually CTS stopped paying L&T until they finally agreed to obtain the approval
- BG claimed no specific knowledge of how payment was made or logistics
- BG began to walk back what he said earlier according to Karl Buch. BG started to realize what was happening (Karl Buch: BG's instincts are that he wants to cooperate but is a little squirrely)
- DLA showed him email December 19th, 2014 – part of chain where BG forwarded variation document to Raj Gosh where they say the terminology needs to be modified
- Because Raj is BG reporting manager, told him not to circulate the doc
- FBI: he sent it to his boss to prevent it from being circulated?
  DLA: BG did not want Raj Gosh to circulate the email further internally
- BG wants to distance himself from statutory approvals and says he only was copied because he's in procurement
- Denied knowing about improper payment with regards to Pune
- KG: What was going to be at CKC?
  DLA: Would house CTS employees providing services, essentially office space
- DA: BG have a lawyer?
  DLA: No, we are interviewing Raj Gosh tomorrow and he lives in U.S.
  DA: BG is still cooperative?
  DLA: Yes
  DA: Will you recommend that he obtain counsel?
  DLA: We do not do that but will tell him

- Coburn resignation escalated things – had impact on BG and others
- KG: are preservation orders running now?
  DLA: Should be on server but let me confirm

**Sridhar**

**Interview 1: August 23rd**
**DLA:**
- People at interview: Karl Buch, Christine, Robert
- Joined in 1994, promoted to Chief operating officer reporting to Cobern in 2014
- Currently in transition to Strategy dept. as executive VP
- Said ecosystem in India difficult for business
- Said its contractors job to obtain statutory approvals and CTS would not be involved
- If LT made payment, he would not be aware
- Claimed that CTS faced issues from time to time to obtain statutory approvals, but said he put his foot down and said he would not allow starting projects until they obtained approvals (Buch thinks it was after the CKC permit)
- DLA asked about planning permit: Said request by LT to have Chandra meet with Chief Minister and he said not good idea
- Claimed that SNS never mentioned any gov official demand in order to obtain permit
- Sridhar acknowledged that he had regular Monday morning conference call with Coburn
- Recalled conversation about delay of planning permit for CKC, stated that they decided not to occupy building until company obtained permit
- Remembered someone saying that we could do whatever is legally required, thinks that's what was discussed during call
- Does not remember Feb 22nd call, does not recall any discussion of demand for payment
- DLA: he was talking in hypotheticals, saying Steven would have insisted that there zero tolerance on anything outside scope to get approval, stressed that Coburn, Schwartz, or himself would be surprised if someone mentioned a 2.5 million payment. Said they only paid for additional construction work by LT.
- Bracket: Testimony changes over course of interviews, he has softened with respect to what was and wasn't said
- Sridhar said that as a result of April 21st call, said Coburn told Moni to put pressure on LT to do whatever they could do "legitimately (according to Buch)" → Buch: not uncommon to freeze money to vendor not living up to contract, not about demand for payment
- DLA: we asked about May 20th email where Moni says they have new liaison consultant
- Sridhar denied knowledge of LT consultant or his work
- FBI: Why would Moni be sending an email talking about new LT consultant?
  DLA: He said he didn't know, he was very cagey, he was not telling the truth
- Stated that he had no knowledge of 3.7 million replacement with 11 line items

**Interview 2: September 21st**
DLA:
- People at interview: Jessica Messala, Huska
- Sridhar worked for 24 years, joined as 40th employee, now 250 employees, no direct reporting relationship between corporate real estate and himself, and Moni reported directly to Cobern

- Some time in early 2014 became aware that LT did not want to get involved in approvals, but CTS said they were not going to get involved, said he was concerned because meeting with gov was risky and they start asking for money, and said LT was trying to shirk contractual obligation
- Sridhar said it would expose company, let LT off the hook, and make Sridhar, Karen, Chandra, and Coburn participate in conversations that they do not want to have
- Said did not believe LT involved in corrupt practices but that they had lobbying group, some discussion about whether LT could do this lawfully using lobbying group
- April 21st call: he would raise issues with Coburn, who may loop in Moni or Steven Schwartz. Sridhar said that on this call he said that they could not get the permit and that they "were getting into bad territory".
- Further stated that he believed he Moni Coburn and Schwartz said LT should handle payment including what may be made to gov officials.
- Sridhar said he did not question reimbursement of LT costs because infrastructure not under his jurisdiction
- April 22nd: Remembered Schwartz saying that LT needs to do the work, Moni provided background on the facility
- Schwartz said he would meet with LT if CTS needs to  pushback about terms of LT contract
- Remembered that thrust of conversation was that they were against CTS making payment directly and that it was LT's responsibility
- Sridhar said he understood that LT faced decision about bribe but that it's their decision whether to pay it from their contract, in his view, likely that LT would need to make payment and was their cost to make business
- Said its common to hire another company to buffer risk which is purpose of turnkey model
- Insulated CTS from gov so they wouldn't receive bribe request
- January → first email to Gordon about 3.7 million, Sridhar said this was not formal approval and that it would come from Narci,
- Wasn't sure why statutory approvals line later removed
- CKC was only payment he had doubts about
- Schridar said he understood that there was demand for money

#### Coburn

**Interview 1: August 29th**
- People at interview: Karl Buch, Greg, Natasha, Bracket
- Coburn offered CFO position at CTS to take it public
- Remained CFO until 2006-7
- In 2012, became President of the company
- DA: Does he know about FCPA?
  Coburn: Said it prohibits paying bribes directly or indirectly
- KC was head of corporate workplace services in India, he appointed Moni
- Coburn: highlighted that if we paid something to gov we could get permits faster but we said no and expected LT to get permits legally. Said Moni or Sridhar had brought this to his attention but could not remember if CTS approached the gov or vice versa
- Coburn said his response to approval request was no and that LT needed to pursue all legal avenues

- Coburn said payment amount was "north of a million" and could be 2.5. Coburn said Schwartz was aware that payment was over 1 million
- Showed email from April 21st about follow up: Coburn said he did not remember either email or the call
- Reiterated that he did not know whether Moni or Sridhar brought up the payment initially but said they discussed legal options
- Discussed "public relations department" at LT and wanted them to use this to put pressure on the gov. Coburn did recall that the team did not like this strategy which he said meant that they were "on the take" AKA using bribery instead of doing it lawfully
- Denied knowing anything about LT consultant
- August 29th: Said that he spoke with Schwartz in last week or 2 about proposal request for payment, Schwartz brought up the topic, told Moni or Sridhar that it could not be done and developed plan to squeeze LT (Schwartz references a similar conversation)

DOJ-EH-0000000033

2/2/2017 Cognizant Company Presentation

SEC: Michael, Paul
DLA
Brackett
DOJ
Kelly, Kourtney


Karl Buch (DLA):
Phase 1: Allegations around 3 big payments. What we did to close that out was interview individuals who were involved, Mani, Schridar Ganesh, BG. Interviewed 2.5 weeks ago. Spoke with Karen McLoghlin and Raj Gaush. We also began reviewing other construction projects in India within last 5 years. Big development is one property called Siruseri where there may have been improper payments.
We also received word from a whistleblower, Shiv Kumar, who sent us an email that you had sent him (DOJ) indicating that he had reached out to you.

With respect to investigation date, reviewed over million docs, conducting nearly 250 interviews. With respect to big 3, we interviewed the individuals. CKC: planning permit allegations, substantial evidence of improper payments. With respect to 300K for power payments, evidence that L & T made that payment but no evidence that CTS reimbursed. Evidence of improper payment for Punay with respect to environmental clearance.

Karen McLoughlin: Interviewed 3 times now. She is CFO of company. Also interviewed Raj Ghosh who is global head of procurement. Interviewed him twice (Sept 27, December 8th, second time had counsel (Eric Ruse). Karen interviewed w/o counsel in August and October, and last time with counsel named Dan Small. Raj Ghosh, reviewed over 100,000 docs on his machine and docs between Nov 2014-March 2015. With Karen, reviewed 80K docs over same periods, all docs between Jan-May 31st 2014, and from Nov 1st 2014 – March 1st 2015 (same period for Raj).
KG: Period between may and nov was keyword search?
DLA: Yes. We made judgement that those were the periods where there was most traffic over permits.

DLA: Walk through most relevant emails.
KG: During this period where is Raj?
DLA: Texas and also in 2014.
KG: Where is Karen?
DLA: New Jersey.


**CTS-0000255-60**:
This is first document that places number on the demand payment that had come in. This is first document which is an email from BG to Raj where he sends email summary of projects. Section 5 (256): "Approval mechanism…You can pay LT through a contractor to protect on FCPA". Raj forwards email to himself, and he enters light blue text after having a call with BG. It says "2 million dollar ask from JLL" which should have said L & T. First email evidence of request for a bribe. Earliest placement in March.
KB: BG walked back some admissions in second interview when he had counsel.

KB: Raj is relatively new to job and asked BG to put together pending matters. On March 7th, there was

Global Capacity planning meeting (5893) where company discusses ongoing construction and real estate needs. There was call on March 7th and participants included: Karen, Sridhar, BG, Mani, Gordon

DLA: **CTS-0005899**: Slide about Chennai. Projections on number of seats. Says: "Planning permit delayed". We asked whether there was any talk about the demand that delayed the permit. There was no explicit discussion during this call about the demand for payment.
Tab 4:
**CTS-0000332**: Timing of chat between BG and Sridhar started texting each other at tail end of Capacity Planning call. This chat lays out a lot of what was happening at time.
SNS: Initials of LT Vice Chair.
DLA: We believe "KITS issue" is reference to the demand. LT was worried that if they got involved in this payment, they would get shaken down for other projects.
The Lady: Former chief minister of Tamil Nadu
DLA: LT's pushback is pretty equivocal.
Bill in Pune: Testimony for Schridar says this was reference to bribe paid in Pune.  "Contract says that they get the approvals".. Mani said that Gordon told them that if they don't step up it will endanger their future business with the company.

**CTS-0005892**: KB: Also March 7th (same day as call). We believe this relates to CKC planning permit.
**CTS-0000247**: Document found in Raj Ghosh's email. It is just a draft. We don't believe he sent this to Karen.
**CTS-0005891**: Email from Raj to Karen.
KG: What is JLL?
DLA: Joes Lang Lasale, big property management company. Shows that his involvement is on the periphery. I don't think focus of his concern was about payment itself, he was more focused on the discussions that were excluding him. He said should've said LT. We think this "call" is the one that occurred on the 22nd.

Tab 3 (**CTS-0000248**): KB: He is inviting himself to Regulatory Planning Call. He did not have a seat at the table.

**CTS-0005912**: KB: Again he gets it wrong, he thinks it shows that he is on periphery.
SEC: JLL manages other properties? Could they be talking about one of those other properties?
DLA: He admitted that he made that mistake.

AUSA: Do we have a date on the metadata? Going back to tab 6? Because he gets it right on tab 6.
FBI: Have you seen any indication where someone has corrected him?
DLA: No

**CTS-0003574**: LT is asking for release of some of the funds that have been frozen

**CTS-0004942**: One of the most critical documents. Document that contains the variation requests. BG forwards doc to Raj Ghosh on December 19th. He cryptically says not to circulate because there is some terminology that needs to be modified. BG said that it was a reference to the variations that are in the doc.

Karen said not aware of payment to gov official for KITS. We spent time asking her about email in tab 5 (which suggests issue would be difficult). She said she didn't remember the email. She also said she was

not aware that colleagues had discussed payment or that payment would be made. She has no recollection of discussing it with Raj Ghosh. She did recall that there was a delay and recalled participating in Mar 7th call. Memory was that it was LT's responsibility to obtain the approval.

In Oct interview, she said she thought she would have remembered if Raj had raised this request for payment to her. Recently she denied that Raj had told her that there would be this demand.

Raj Ghosh doesn't speak affirmatively. He specifically denied telling her that it was a 2 million dollar demand. He said he would have told Karen that LT's inability to obtain planning permit and that if they did not get permit CTS would be unable to occupy the facility. Raj believed that Karen understood that it was a large demand. He said fact that LT brought demand to infrastructure's attention meant they were not willing to pay without being reimbursed. Raj said he told Karen they should abandon the turnkey model and instead lease. In first interview, Raj said he believed that Karen understood that LT would not be able to obtain permit without payment to gov official. In second interview, however Raj said all convos with Karen considered that CTS would not pay LT and possibly LT would have another way of resolving the issue. Raj said in his first interview that in his view LT would have to make the payment. Discussion in his mind was whether CTS would reimburse, not whether LT would make the payment or not. .

We asked him if he did anything to prevent the payment. He said he thought Coburn was responsible to was deciding the issue.

**CTS-0005891**: He is corroborated on this point because from this email, Gordon and Stephen were considering the issue.

BG said he never had direct convos with Karen and didn't know if she was aware.

AUSA: Tab 5 (**CTS-0005892**): Email between Raj and Karen. Did Raj say what his understanding was of Gordon's understanding of the KITS issue.

DLA: My guess would be that he would've learned that from BG. We know that on Mar 5th BG tells Raj that there was demand for 2 million. And we know from chat on Mar 7th that BG and Sridar are talking about Gordon in this chat.

**BG:**

BG said he never had direct convos with Karen and didn't know if she was aware of bribery

BG confirmed that he told Ghosh about demand for payment from political figure and that LT did not want to get involved. He said he probably told Raj it was 2 million. Raj told BG that he would follow up wiwtrh Karen to discuss demand for payment. He did not have specific knowledge of whether Raj actually discussed it with Karen.

We briefed Cognizant board on this, about 2 weeks ago. They have continuing confidence in Karen. There is no evidence that suggests Karen knew improper payment was considered or made.

Raj was difficult witness. His memory was imprecise. Karen has solid history and reputation with company.  Never involved in any allegations of misconduct. During time, Gordon Coburn were responsible for real estate. She had no reason to believe that Gordon or Stephen would do something inappropriate. JLL confusion further muddies the record as it relates to her. Board still considering what remediation would be appropriate with respect to Raj and Karen. Raj is a bit different because he received the document which shows the 2 million dollar amount (4943).

AUSA: What was Raj's purpose in his own mind in involving Karen?
DLA: I think Raj was concerned that he wasn't being included.
AUSA: Karen is ultimately copied when Cognizant obtains the planning permit?
DLA: Yes in June.

AUSA: She just didn't put two and two together?

DLA: She had no memory of the email in March. When we asked her about the consultant who is being hired and then you get the permit. She says she wasn't involved in real estate and wasn't making decisions, it was Gordon and Coburn. People didn't second guess Gordon's decisions. No evidence that Karen had knowledge of payment. Raj received variation document. When we asked him about 2 million dollar line he says he doesn't remember.

DLA:

**Phase 2:** We looked at all of the transactions, all of the new construction the company conducted over the past 5 years. We viewed that as the biggest risk. Reviewed over 130,000 docs related to the facilities. Most of the construction except one project was LT, one was managed by Cee Dee Yes. Conducted 150 interviews in December and January. Looked at CKC Punai, no evidence of additional improper payments. Calcutta, Hyderabad, Kochi, Coimbatore no evidence of improper payments.

4954: References to Siruseri in line items 3-6. First of all these payments weren't booked property. We have witness testimony and docs that the issues carried high risks of demands for improper payments. We know amounts in 3-6 have great deal of back and forth between CTS employees talking about difficulty in obtaining permits. Based on sequence of events it's suspicious and we are drawing inferences based on what people were telling us. What we know is in 2010, 5 years after building was constructed they still don't have permit and they hire LT to help them obtain the permits. LT submits variation request that is rejected in 2012 and revived in 2014 and approved and we know that was in relation to a bribe. Obtaining approval 5 years later is suspicious. The fact that it was rejected and then approved later on is very suspicious. Witnesses said amounts were very high and no way to back it up.

SEC: Do we know the dollar amount for new location?

DLA: Close to a million in potential improper payments. We also know it was not booked properly.

DLA: We investigated allegation that respect to Chennai Regional Provident Fund Commission (Social Security Commission), there was commissioner who solicited bribe from Cognizant in exchange for favorable treatment resolving tax issue.

FBI: where did allegation come from?

DLA: Stephen Schwartz reported it to the Board.

DLA: Commissioner named Derga Presad who was arrested on Jan 18th, 2016 recently for taking bribes. 2 days later the commission clarified tax issue.

DLA: we conducted 9 interviews in Chennai and 3 in London, did record and media searches, analyzed invoices from vendors including attorneys and consultants.

AUSA: When did Schwartz report this to the Board?

DLA: I will get back to you. I think 2013.

DLA: We believe regional commissioner solicited a bribe. No evidence that Cognizant made bribe to Presod. One of the things we looked at was whether company hired consultant or law firm that had been recommended by Presad. No evidence of this. We found some evidence that some of the employees of CTS provided gifts to Provident Fund officials such as cab services, access to CTS conference space, travel to religious pilgrimage. One request from official that someone be hired by Cognizant India.

DLA: We are very comfortable of any payment.

**Sons & Daughters**

DLA: We found instances where public officials asked for placement of relatives. Audit committee asked us to take a look at whether this was an issue. There was a referral from gov official where someone was

hired. Hundred instances where there are referrals from gov officials. We found that those referrals would help them get to the interview stage, but found very limited evidence of actual hiring. We haven't uncovered evidence that CTS received any benefit.

2016: CTS received 1.4 million resumes, interviewed 300K applicants, hired 75K employees. Witnesses confirmed that it is always struggle to meet hiring demands. Referrals constitute 30-50% of resumes they get. We found 376 candidates where employment request came from gov official from 2003-2016. Majority of requests were for full time employment, some were for internships or existing employees who wanted to be transferred. 70% of requests were largely ignored (20% were unanswered). 18 hires at this point, 3 seem problematic in the sense that they failed a test but were still hired, or were not qualified. But not problematic in sense of evidence of problematic action.

FBI: What type of positions were the hires?

DLA: Relatively low level, most salaries at bottom end of the range. 15 in India, 2 in US, 1 in Canada. 3 problematic ones in India.

DLA: 2 issues to raise:

1. Company is running on Diesel generators. This is the facility were the 300K bribe was paid for electricity. With respect to that, we know CTS did not reimburse LT for that payment or work that LT was doing to bring electricity. The facility is still running on generators. We would like to bring in different contractor. We have spoken to Indian counsel and once the app is filled out correctly, you would pass the inspection when the work is done.

KG: Will this trigger any payments to LT?

DLA: We will not pay LT for the work.

FBI: Is there a specific contractor?

DLA: Putting out a bid.

2. New facility at Hyderabad where LT is principal contractor. At our direction, we told company not to make payments to LT. We have not made payments since August, LT worked until November but has effectively stopped working. Excavation is done, beginning to put in foundation but work is essentially stopped. We asked LT at end of Nov for documents relating to Hyderabad but also all facilities. To date we haven't received any docs. LT wanted info on this investigation. We said we need docs for Hyderabad. We would like to get documents that focus on a line item and their running account bills (9 million). There is line item that allocates certain amount of money for statutory approvals. We want to pay them for the amounts not related to statutory approvals and bring in someone else to help with any additional statutory approvals.

KB: Outstanding 9 million dollars for Hyderabad. There is a small amount that relates to statutory approvals (amount not to pay). We would like to get the documents but if Debavoy takes position that they don't want to provide docs until they finish their internal review, our compromise is to pay them for the legitimate work that is being done.

KG: This is a business decision for the company.

KG: What is the evidence that there was improper payment in Hyderabad?

KB: No evidence, but we still didn't want to permit any payments.


DLA: Next steps:

Re operating licenses: We have evidence that for one facility (MEPZ), payments made for operating licenses. Biggest payment was $4000. We will look at other facilities that company owns.

There is issue on whether we paid consultant for electricity tariff refunds

Issue re customs, small payments made to move business equipment out of economic zones

Payments for notarized birth certificates for visa applications

Siva Kumar: Former CTS employee, terminated in Dec 2015, suspended with pay in August 2013, ultimately let go for lack of leadership qualities and team building abilities. Associate Director in Enterprise Information. Joined in 2010. Alleged wrongful termination and made number of complaints to other Indian gov agencies. Raised allegations of Oct 2016 which were referred to DLA. Alleged bribe to official at Registrar of Companies. Also malpractice including falsifying emails and other reports. At this point looks like he is a disgruntled employee.

Forwarded email from DOJ to DLA:

Call with L&T                                                              2/13/2017

Debevoise

Paul Berger
Dave O'Neil
Oz

Update on work and next steps"

Getting started with internal review – have identified 13 projects that LT worked on for Cognizants' Indian subsidiaries since 2006

- 26 custodians, loaded into database and have search terms
- Working with Seral Emershaun Vegalas (sp?), taking lead in first level review. Lawyers have trained team there.

Conducting review in 2 parts:
1. Facts surrounding LT construction work for Cognizant's Indian subsidiary

2. Assessment of LT anti-bribery compliance program

- Have done scoping interviews with respect to work to make sure we are focusing on right areas. Additional interviews will be focused on compliance program.

- Projects that LT has undertaken are some ongoing projects in Hyderabad and Pune. Planning to prioritize projects in these areas so that they can get underway again. Have not reached any conclusions that have led us to focus on these areas.

Oz: Who are the 26 custodians that you imaged materials from?
Debevoise: We will take it back to our client.
KG: Also if you could share how you landed at the 26 custodians?

KG: U.S. nexus with L & T?
Oz: Cognizant uses Indian JP Morgan to make payments. Not sure if it's in USD.

To Do List for next talk with Karl:
- Payments to LT in USD?
- Request list (spreadsheet – when requested, date due, date of response, etc.)
- Want to talk about interviewing Raj Ghosh – call Eric Bruse (counsel)

**2/14/17 Call with DLA**


Os: We spoke to John Carney yesterday and mentioned that we were interested in speaking with Sridhar

DLA- Gray: He called me and asked about documents. I wanted to talk to you guys before I said anything to him about it

Os: We want John to have access to docs that Sridhar would have access to. If you could provide us with a set of whatever you provide him and same thing for Mani.

At some point you gave documents available to Matt, we are interested in that set.

DLA: We made available documents that were available to you that he would have seen in his business function. We can send a copy.

We also want to summarize interviews that we conducted for Mani and Sridhar. We read out interviews up until January.

Sridhar's testimony has evolved and his memory has gotten better.

KG: Is there a reason you are making docs available instead of producing?

DLA: My preferred way. John asked for access to his emails and his computer and I said I wouldn't do that but I would consider making the relevant documents available to him.

KG: It would be helpful to keep track of what is being shown to him for the first time

DLA: We can burn a copy of what we produced to John.

DLA: Did you have dates with John at this time?

KG: We wanted to talk to Sridhar first.


Feb 28th: Summary of Sridhar, Mani, and BG


Os: BG is no longer employed by the company?

DLA: He is and so is Sridhar. BG is represented by an Indian lawyer. I can try to help facilitate him hiring a U.S. lawyer.

Os: It would be useful if Karl could start facilitating to see if BG can hire a U.S. lawyer. We are interested in setting something up with Raj Ghosh. We wanted to talk to you before reaching out to Eric Bruce.

DLA: I think he is willing to talk to you. He is a very difficult witness. No definitiveness. Since he hired Eric, his position has changed. In the first interview his testimony was this demand came in, we knew we wouldn't get permit unless someone made payment. The debate was whether we should reimburse LT not whether they should do it. When we spoke to him a second time, testimony had changed and said there was no discussion about making the payment. I think we should add Raj Ghosh to people we read out to you on the 28th.

Os: Is Raj an American?

DLA: Yes, he is a U.S. citizen. I think he was born and raised here.


DLA: Company is considering a small transaction (~$40 MM). We want some time with you and SEC to talk about pre-transaction due diligence and their ability to go forward with the transaction.

DLA (Gray): I'm looking through notes on meeting with Raj and I don't see a discussion of his

citizenship.
DLA (Karl): Molina has it

**2/24/17 Cognizant Company Presentation**

DLA:

You were looking for date of draft email to Karen McLoughlin. The time was March 7th 2014, will give time stamp metadata in next production
Question about positions filled in Sons & Daughters. The positions were entry level software engineers, project analysts, specialist, manager – projects, graduate trainee, administrator and project analyst trainees
Question about Hyderabad facility. Value of statutory approvals that they want to be reimbursed for is outstanding is $318,000.
When did we sign a contract – on October 7th, 2015. March 7th, 2016 is when construction begin.
Is Raj Ghosh a U.S. citizen? Yes.

**Sridhar:**

DLA: We interviewed him 5 times. August 23rd, September 21st, September 28th, October 19th, January 11th, 2017.
Oz: We previously have gone over August 23rd and September 21st?

Sridhar is COO, was appointed in 2014.

**August 23rd, 2016 Interview** – conducted by Karl Buch and Christine Lu

- January 2014, he recalled that there was an issue with the Planning permit for CKC. There was a question about whether CTS senior management should meet with gov officials at LT's request. Everyone was strongly against it.
- He said that SNS said that planning permit should be a joint responsibility. SNS never mentioned any demand from a gov official to obtain the CDMA planning permit.
- Sridhar said he had regular Monday call with Coburn, one call discussed planning permit delay. Sridhar stated that they decided not to occupy building until company obtained the permit. He said Coburn said to do whatever is legally required.
- He was unable to recall whether he participated in telephone conference on April 22nd, and didn't remember demand for payment but that Mani may have brought up the issue. He said that if there was a demand, Coburn would have been against it.
- He stressed that Coburn, Schwartz and himself would be surprised if someone mentioned $2.5 MM payment
- Was not aware that CTS made any other payment to LT except for construction payments
- He said that as a result of this discussion Coburn told Mani to put pressure on LT by freezing payments CTS owed to LT and threatening them with loss of business.
- DLA showed variation requests, said he was not familiar with them.

- DLA showed line item that showed Statutory Approvals (Nov 2014) and he said he had no idea about it and that he had no knowledge that the $3.7 MM had been rejected and replaced with other line items
  KG: You guys have interviews planned in the future?
  DLA: Yes
  KG: Can we talk about it first if you are going to show documents that people may not have received?
  DLA: Yes

**September 21st Interview**
- Sridhar explained that sometime in early 2014 he learned that LT did not want to be responsible for getting the statutory approvals and instead wanted CTS to interface with the government
- He said this request made him concerned because meeting with the government was risky (they start asking for money)
- Sridhar said that obtaining permits for CKC was within scope of LT's contract and that he felt they were trying to shirk contractual obligations
- Sridhar said at the time he thought LT was getting into trouble trying to obtain the approvals [DLA: LT was constructing a port at the time and they were having difficulty obtaining permits. There was a text chat between BG and Sridhar in March 2014 which refers to LT's issue obtaining permits for port]
- He emphasized that he did not want CTS to accept responsibility of obtaining the permits because it would let LT out of its contractual obligations
- He said that if gov demanded payment, CTS would have to reply and there would have been a conversation with Sridhar, Chandra, Coburn, Karen and that they didn't want to have this conversation
- Sridhar said he did not believe LT involved in corrupt or fraudulent practices but that they had a lobbying group
- He recalled that sometime after he learned LT didn't want to obtain approvals, there was a meeting and the issue was escalated to Coburn
- Sridhar said he didn't know if LT ever engaged in corrupt practices, but his sense from the conversation was that it was leading that way and that CTS had to put a stop to it
- He thought the sentence in Mani's email in January 20, 2014 "Real estate matters can be messier" referred to corruption, specifically demands from gov official. But he didn't get into it because the email was addressed to Chandra, suggesting that they didn't want to have a conversation about corruption with Chandra
- DLA showed him April 21st, 2014 email from Coburn asking for follow up call. He said he remembered the email and that he had a standing one on one call with Coburn every Monday. He remembered saying on a call that LT was having delay with planning permit and they didn't think CTS should get involved.
- He noted that Coburn would often loop in Mani or Schwartz. He said on this particular call he was getting nervous that they were getting into "bad territory"

- During conversation, he, Mani, Coburn and Schwartz said they agreed that LT should handle obtaining the permit including any demand made by the government. He was surprised that LT later sought reimbursement as a change order which was contrary to the terms of LT's contract
- He said that he was told by Coburn that his authority did not extend to infrastructure so he didn't question it
- He also said Mani recommended the amounts and Coburn approved so he could not question the reimbursements
- DLA showed him invite for follow up discussion on April 22nd: Sridhar said he specifically remembered Schwartz saying that LT needs to do the work and they have nothing to do with it. He thinks all of the invites were on the call
- He speculated that Schwartz was also on the call because it could eventually lead to a legal issue because LT not abiding by its contract
- Sridhar said Schwartz said he would meet with LT if CTS needed to push back on terms of the contract
- He could not remember further details including if a demand had been made or if there was a specific amount discussed. He said he just remembered that there was zero tolerance for CTS making a direct payment to a gov official and that it was a contractual obligation to LT
- Sridhar later claimed that it was LT's decision whether to make the payment
- He said if LT chose to make payment, this was already built into turnkey contract
- He said that bribes are so common in India that they are always built into contracts and that paying bribe was part of LT's cost of doing business
- He confirmed that LT did not put bribes on their books and instead used liaison, common in India to hire a sub-contractor as a buffer against risk
- We then talked about the turnkey model which made LT responsible for everything and provided insulation to company against statutory approvals
- Said CTS received a change order and there was discussion about whether they would approve that
- Did not remember receiving advice on how to change an invoice received by CTS
- Sridhar said Schwartz said "LT should be responsible."
- Remembered that CTS stopped payments to LT
- We showed May 20th email that discusses new liaison consultant. He said the liaison consultant dealt with getting things pushed through and possibly making payments.
- He said after the CKC experience they agreed not to start further construction without approvals in play
- DLA showed the variation document from Nov 2014 which he said he'd never seen. He did remember receiving a change order request from LT and then raising it with Coburn. It would have been usual for the company to pay for the planning permit but reimbursement in form of change request would be unusual. He admitted that 152 MM Rs was a large amount but there could be a lot of interpretations and not necessarily out of the ordinary.

- He disclaimed any responsibility over knowing what the line items referred to so he did not get involved in the infrastructures finances.
- Sridhar did not recall any issue with respect to EIA for Pune. He said issue came when they were starting construction without the approvals. Coburn said LT does this at his own risk.
- Sridhar claimed to have no knowledge of other payments made without permits, he said CKC was only facility he had doubts about. (See Pune chat and Schwartz notes)

**September 28th, 2016**
- At this point we had the March 7th, 2014 chat between Sridhar and BG
- He said the chat related to fact that LT didn't want to go through permit approval process and wanted CTS to meet with gov officials to obtain approvals
- DLA asked about language in chat re FCPA, saying LT signed FCPA. "we are caught" he said at time of conversation he didn't understand what FCPA was, but at time of interview he did. He denied that chat meant that LT needed to make a payment to gov official on CTS' behalf and then acknowledged later that there was a demand.
- He essentially said that ordinarily when LT had to make a payment to gov official it was built into cost of contract and LT would not usually ask CTS to cover such a payment. He didn't have evidence that they were required to make payments to gov officials in the past but that they probably had done so.
- He explained that a change order was issued for the Pune project but he learned about it after the fact and didn't know exact details
- He agreed that as general matter, he expected LT would have to make payments to gov officials to get projects done in India and that these would violate CTS' company policy
- DLA asked again about the April call. He said he didn't recall that there was a demand and denied issue was brought to Coburn and Schwartz.
- He claimed that he did not remember discussing gov official payment issue
- DLA: shown Schwartz's notes
  KG: Was he told that they were Schwartz notes?
  DLA: Don't think so
- Sridhar agreed that notes represented what had been discussed during call, and that it was common to build before planning permit
- Sridhar reviewed point 6 from notes and said that he still didn't remember discussing it or that payment request was larger than normal but acknowledged that he had a hunch about this because LT had not come back to them about this kind of issue in the past which is why they escalated it to Coburn
- DLA showed point about Pune. Remembered talking about Pune issue on the call. Agreed that it was a similar issue to KITS and that LT would have to take care of it.
- Sridhar reviewed point 8, saying that this was one of the highest demands that we had ever seen, consistent with his recollection but didn't remember specifically discussing 2 MM

- Asked about the change order, said they would usually buffer bribe payments into their cost.
- Chief Minister of Tamil Nadu – explained that LT needed her approval to go forward with the port project. Said that high level projects go to her and she makes them wait until she gets paid. Sridhar did not want to get involved with her as a result
- Asked about "bill in Pune" chat. Said it was before his time but that he heard that there was a bribe paid for the Pune facility.
- Sridhar heard LT submitted that has a change order for reimbursement
- He acknowledged LT had FCPA in their contract and acknowledged that they could not pay a bribe without violating it. He claimed that he didn't realize at the time that it would be a violation if LT made a payment on behalf of CTS.
- Sridhar said he had a terrible lung condition in April and his sister had a malignant colon issue
- He said no one at CTS told LT not to make the payment
- Sridhar clarified that CTS had zero tolerance for making direct payments. Sridhar said that Schwartz said that having LT make all payments would be best route legally. Sridhar said Schwartz understood meaning of the conversation and didn't recall whether they discussed the bill in form of change order. Sridhar said Schwartz did not have any health problems at the time.
- Said prior to case, understanding of FCPA was that CTS should not pay bribes directly but wouldn't violate law if someone did it on its behalf
- Talked about TNEB: said he remembered speaking to Mani about permit issue and remembers discussion of whether to hire LT to lay cable or pay TNEB to do the work through a public tender

**Interview: January 11th, 2017** – first interview with counsel
- Remembers Capacity Planning Call on March 7th to discuss CKC planning permit delay – denied discussion of bribe during that call. Discussion of contingencies for dealing with the delay.
- DLA returned to chat which began during second half of Capacity Planning Call: Said that he was aware at the time of the chat that CTS would have to pay something but wasn't aware of a specific demand
- Sridhar said he assumed the participants of March 7th call knew of demand because LT had requested CTS to meet with government
- Sridhar confirmed that he told LT that it was their responsibility to handle it and it was his belief that a payment would have to be made
- Chat began during latter half of the call – he knew that Cognizant couldn't make payment, confirmed that when he told LT that it was their responsibility, it was his belief that a payment would have to be made
- Line in chat about bill in Pune: he admitted that it related to payment of a bribe, BG or Mani told him that a bribe would have to be paid to obtain environmental clearance

- Said there was a meeting in late Nov 2014 with Sridhar, Mani, and SNS (after Nov 2014 variation request) and that LT's variation was discussed at the meeting but only in general terms – says he told SNS that the statutory approvals were within the scope of LT's contract
- Sridhar had no personal knowledge about whether anyone briefed McLoughlin and that if anyone briefed her it would've been Mani
- Mani said that he did not brief McLoughlin in his interview
- DLA showed April 23, 24th email related to JLL Siruseri debrief.
- Sridhar stated that there was only one other instance where Coburn asked him not to discuss something via email so it was not a common practice (billing clients for hours worked by associates)
- Sridhar said that size was a reference to the bribe demand

3/10/17 Company Presentation Notes

DLA: Bonus season. Deepa Baburaj failed to take action on Cognizant issue and it was communicated that she would not receive her bonus/stock grant in the usual procedure. She recognized that it was better for her to leave the company (will leave on April 30th). Coburn received request from Mani to approve $3.7 MM in statutory fees. This email was forwarded to Deepa and she had concerns about it when it crossed her desk. There is a question about whether her email will fall under Crime Fraud exception.

KG: Coburn received request from Mani for what?

DLA: LT sends variation powerpoint which included 3.7 MM. There was internal discussion and in January, Mani sent an email to Gordon discussing the variations. Deepa raised concerns about the $3.7 MM

SEC: When did Deepa become general counsel?

DLA: Spring 2016?

DLA: Raj Ghosh – in November we recommended that he be placed in modified duty. We did not want him in charge of procurement in India. We gave him rules of engagement but he has not engaged at all and it not really doing any work. Company wants to place him on leave and bring someone else to fill that role.

DLA: CTS has held back bonuses and stock grants including for Sridhar and Mani. I talked to their lawyers about it.

Oz: Does Carney now have the documents that his client would have had access to?

DLA: Docs going out today and we will produce a witness binder of documents he is on only.


**BG**


**Interview 1: August 24th, 2016**

First interviewed him on August 24th. Joined company in 2009 as India Head of Procurement and began reporting to Raj Ghosh, VP of Global Procurement in 2013. Current title is Associate VP Procurement.

- LT largest player in India construction market. He said they had turnkey contract.
- Stated that LT typically handled statutory approvals and hired consultants to help them with that work
- CTS did not scrutinize LT's charges for statutory approvals and usually considered part of LT's business costs.
- Given ecosystem in India, LT might be making improper payments to gov officials but he thought they were an ethical company compared to other players in market
- KB asked him about operating licenses and he said that would also be a problematic area
- In 2013 he raised a concern about Hyderabad because there was a line item in April 1st email from LT that contained a 5 MM rupee line item for statutory approvals including local planning permit and No Objection Certificates
- Email from July 8th 2013 where LT provided a description of what 5 MM line item related to and BG was told by Ramesh from LT that it related to consultancy fees for architectural drawing, draftsmen and verification works
- KB talked to him about CKC TNEB: BG assumed LT made improper payment to gov official in order to obtain order for TNEB to install electrical cable at KITS
- BG said he was uncertain about the specific amount but part of the quote "incidental expenses" which amounted to $310K was payment to gov official
- March 2nd 2016 email that related to load sanction. Ramesh provided estimate of $2 MM to do the work including 300,000 in incidental expenses.

- He recalled that incidental expenses part raised a red flag
- BG said "If you don't think that way, you're fooling yourself".
- We showed him email dated March 3rd, 2016 which showed Ganesh, BG, Mani had conference call with LT to discuss work status and estimated cost
- BG stated that during the call, LT informed them that 21 MM rupees or 300K USD was for consultant fees. He said everyone on call was actually a payment to take care of gov officials and it was a stupid mistake that LT included reference to incidental expenses on contract and everyone on the call was upset with LT and BG blew up on them and deleted the email because he was so angry. "All of us know what these expenses are for but we don't want to talk about it." He asked them to remove the reference from the contract
- We showed him an email chain from March 10th where Nakkiran R, LT employee, sent an itemized quote to Ganesh, BG, Venugopal, Mani which contained quantity and price of 24 constructed-related line items for 20 MM USD (same amount as before) with incidental expenses no longer referenced
- KB asked if he instructed LT to inflate other items to hide it. BG denied that they directed LT to hide the amount but claimed LT had already completed the work including paying the gov official at time quote was provided. After having secured it they came back to negotiate the contract price. But he said LT would never give them the exact amount.
- Generally KB asked what he knew about planning permit. He said in 2014 LT paid 2.5MM USD to a gov official to obtain the planning permit. BG stated that SNS told him, Mani, Ganesh that there was a demand for payment from unnamed political figure in Tamil Nadu. BG suspected that this was Chief Minister.
- He said CTS obtained the planning permit shortly after Tamil Nadu election in 2014.
- BG stated LT was unwilling to handle payment because they didn't want to fall into a trap. LT recommended Chandra, Executive Vice Chairman of CTS meet with Chief Minister but senior leadership did not agree with the recommendation
- BG stated that Coburn later put pressure on LT by freezing payments owed to LT, thus LT hired a consultant at some point and eventually obtained permit
- BG said he had a discussion with Mani, Ganesh, and Sridhar re putting pressure on LT to obtain permit
- BG said he could not recall whether he reached out to Latchmey about this issue
- BG alleged Coburn approved 2.5 MM payment, stated only a small group of people discussed the payment with Coburn and that he was not part of this group
- BG described Coburn as a "detail oriented, on the ground person"
- BG claimed that Coburn had to know what 2.5 MM line item was about before approved. BG initially approved 2.5 MM among other costs and then he approved a revised quote with this included as well.
- June 27, 2014 gov order from principal secretary to government to issue the planning permit. BG thought this was unusual. There is a reference in related email from June 30th from Vadivelu "no one should know that LT got this government order, confidentiality". LT wanted to keep it secret because they were trying to protect their reputation by hiring a consultant.
- KB asked about email chain from August 25th re a demand notice from CMDA for 260 MM rupees which he said was a legitimate charge from CMDA for the planning permit
- There were legitimate payments made in 2014 by demand order for ~$3MM
- Showed him Nov 12, 2014 powerpoint from Ramesh which contains variation document. BG said statutory approvals line item was payment to the political figure and said "Everyone knows this

amount was bribery" because CTS had already paid legitimate costs to CMDA and obtained receipt for this payment

- KB showed Jan 13th, 2015 email from Mani to Gordon where Mani is seeking approval for ~8 MM USD in variations including 3.7 MM in statutory approvals. BG claimed Coburn understood the nature of 2.5MM cost was contained in 3.7 MM for statutory approvals
- BG said he had explained it to Coburn before seeking his approval otherwise he would have been surprised. Did not know what the other 1.2 MM in statutory approvals were for.
- March 11th, 2015 email → From Narsi where 3.7 MM in campus regularization was put in not approved category and BG did not know how the changes were made. Everyone (Venkat and Krishna) understood that payment needed to be made and they needed to replace it with something else.
- Talked to BG a bit about Pune. Showed email chain from March 31 – June 14, 2013 re LT's running account bills. He said they were following up for payment and said he had no knowledge of any improper payments re Pune. Said Gordon would have been aware and no one would have him sign off on a bribe payment that he was unaware of.

**Interview 2: September 21st, 2016**

- CKC planning permit – BG said he first learned about this issue during last quarter of 2014. Recalled demand being for 100-150 MM rupees. Said Mani, Ganesh, Chandra knew about the demand. BG said he believes Mani generally disseminated info re approvals and gov demands. Said he assumed it was for a political figure because elections were upcoming and that this time many gov officials demanded donations.
- Said he was aware of demand because contracts go through him and said gov fees were outside the contract and generally paid outside the contract and are paid directly by CTS directly to gov (legitimate gov fees)
- BG said SNS called him and explained LT was under pressure because payment had been demanded in exchange for planning permit. BG explained CTS pushed back because they did not want to be involved and neither did LT which posed political problem because they did not want to be seen as buckling under pressure. BG said stalemate continued and only when CTS stopped paying LT did they finally agree to obtain the approval. When approval was finally granted, BG said logically conclusion was they got the payment done. He claimed however, that he had no specific knowledge of how it was made
- We asked him why LT asked him to keep government order secret, and he said LT was afraid it would put them at risk for gov demands on all of their projects. He said he does not know if the payment was actually made but that he would assume that LT paid and that it could be deduced from variation documents
- BG said he did not speak to Mani about the payment and he assumed someone above Mani had knowledge and every decision is "taken to the U.S." and everything goes to Coburn for approval. Said he did not participate in calls with Coburn on the topic and is not aware of discussions between Coburn and Mani
- June 30th 2014 email, Schwartz was copied. BG said Schwartz did not usually get involved in discussions re planning permits but he had never seen anything like this before.
- DLA showed him variation document in Nov 2014 and BG wasn't sure who created the document. We went back to reference to amount for planning permit. He denied any recollection of whether he discussed contents of slide or whether he forwarded it to anyone

DOJ-EH-0000000051

- Dec 19th, 2014 email in which BG forwards variation doc to Raj Ghosh and in that email BG said not to circulate due to terminology needing modifications because of amounts related to statutory approvals. He said he would have spoken to Raj about the payment but he was not definitive.
- BG thought email made it clear to Raj what the issue with the document was but they were not involved in decision making process
- Showed Jan 13th, 2015 email from Mani to Coburn where Mani seeks approval from Gordon for 8 MM in variations. He said the discussions about approval amounts would have been negotiations between Ganesh and others and he was not involved in the statutory approval process and only was copied because he was in procurement. He said he wished he wasn't copied.
- He said he never spoke with any gov official directly about a demand for payment and that he would put himself at risk by doing that
- Talked about Hyderabad, Pune. He said they started construction without proper EC and denied knowing anything about an improper payment

**Interview 3: October 21st, 2016**
- Talked about Capacity Planning Group Calls. Participants included BG, Coburn, Raj, Mani, Ganesh, Chandra, Karen, and people from FP & A group. (Financial Planning and Analysis)
- Calls occurred every 3 months in order to access capacity and business growth and make decisions about new office capacity.
- Calls run predominantly by Coburn and Karen provided direction. Sometimes there were minutes but that was a more recent procedure. Coburn asked majority of questions during the call. BG described him as very involved and high attention to detail during the call.
- Series of emails from March 4th, 2014 – shows that BG learned about it in first quarter of 2014. Emails between BG and Raj Ghosh where Ghosh makes notes to himself about demand at CKC. First email that showed demand came in March. "Global Infra Procurement Update" Email Subject. Line item in chart that related to Chennai KITS approval update. Says permits are pending. BG said he made the chart for Raj in advance of Capacity Planning Group Call. BG thought it would be good for him to have a comprehensive overview of projects because Raj was new to the group. Language in email talks about approval mechanism which BG said did not refer to gov demand for payment. BG said he recommended letting Mani deal with issue of obtaining approvals. BG said he and Raj must have discussed Raj's convo with SNS re payment demand before writing this email to Raj. Assumes Raj would have advised BG to let Mani deal with issue of demand
- Asked about language of "approval challenges and on the ground realities". Said he thought it may have related to buying vs. leasing and on the ground reality referred to company not being able to operate building despite being finished due to lack of permits
- BG did not recall anyone discussing the payment demand during the March Capacity Planning Call
- Showed March 5th, 2014 email that Raj sent to himself with subject line "Global Infra Procurement Update" appears that Raj took notes of call he had with BG. This email had language of "2.5 MM ask from JLL, protect through FCPA…". BG acknowledged that he may have been the source for Raj's additional notes in the chart. Said he did not recall JLL being involved with CKC and Raj probably meant to put LT.
- "You pay LT through a contractor to protect on FCPA". BG did not remember FCPA discussion with Raj but would have said that they should not do payments to gov officials because of FCPA concerns

- Showed March 7th, 2014 chat between BG and Sridhar. After reviewing the chat, BG said he did not know what Sridhar meant about Pune payment and remembered that there was a delay but not payment
- BG "grey area" said that FCPA restrictions included in LT's contract so they could not force them to pay a bribe
- At time BG said he believed CTS should wait out the government but he did not discuss this view because he did not want to get involved in potential bribery payments as it would put his job at risk
- Not involved in discussions about which variation requests should be approved
- March 10th, 2014 email – Deepa email. Said he had no recollection of it and that he would have forwarded it to Raj to keep him informed.
- Showed email chain from May 17th, 2014 that Ramesh had written. BG forwarded to Raj Ghosh
- Showed email chain from May 31 – June 14th 2013 re Pune variations. He said LT did submit variation claims re Pune but was still unaware of any gov demand related to it
- Showed October 18th, 2013 email

**Interview 4: January 12, 2017**
With counsel present, Suren Uppal
- Covered March 7th, Capacity Planning Call. Showed him call slide deck and chat between BG and RG
- Asked when SNS first informed him of payment demand. Remembered SNS reaching out in Sept or Oct in 2013 but it was not until several months later when he had conversation with Sridhar and issue became more serious. In Jan 2014 when SNS asks to see if Chandra would meet with Chief Minister.
- BG thought issue would have been discussed at call but he does not remember
- Said Mani must've discussed it with Gordon before Call. He said Karen must've been updated because no way that senior folks would not have asked why planning permit was delayed given company's $150 MM investment in building
- BG said he did not have actual knowledge that Karen was updated about the demand but assumed. Described her as passive during the call and it was mostly Gordon's discussion
- Calendar invite dated April 24th 2014 from Ghosh to Mani, BG, and Sridhar requesting conference call on April 28th. Call never was held but there was language in there that says Ghosh was uncomfortable that BG was to be front ended conversations with the vendor without getting clear direction from senior leadership "JLL Siruseri Debrief Call". BG confirmed that this subject line was an error and it was actually referencing CKC Planning Permit. DLA thinks this email relates to CKC because this was a few days after the call with senior management and Raj Ghosh was not invited to participate.
- BG stated one SNS informed him of payment, he relayed that to Raj Ghosh. BG indicated that he told Raj that CTS received demand from political party and amount was approx. $2MM. Said he told Raj that LT stated emphatically that they would not make the payment
- BG stated that he relayed substance of his convo with SNS to Raj and Raj stated that CTS should not get involved and to let Mani handle the convo with LT
- BG stated that he did not have specific knowledge of whether Raj had discussed the demand with Karen but remembered that Raj once told him that he would follow up with Karen to talk about it.
- BG said Raj once elevated a red flag re Hyderabad to Karen and that he would have done the same here as it was a red flag

- BG believed that Raj maintained a good relationship with Mani but at certain times Raj was not comfortable with their relationship because Mani was very close with Coburn. BG believes that Raj was insecure because of Mani's relationship with Coburn.
- Asked about Siruseri. Showed him an August 2012 list of additional work items submitted by LT in connection with Siruseri facility. Spreadsheet includes 2 statutory line items for STPI approval and Phase II land costs. The 2 line items were rejected by CTS in 2012 but resurfaced in Nov 2014. BG said he did not know what the line items referred to and that they were all charges handled by Infrastructure.
- Email chain from July 27th – Dec 5th 2012 re TNEB payment notice for Siruseri facility. Language says that LT managed to get power permit for us when state is experiences acute power crisis. BG said he did not know how they obtained power for Siruseri facility.
- Line item in Nov 12, 2014 for facility for power – Siruseri. Asked him what line item related to and he said he didn't know.
- LT tried to book it as a variation in 2012 and it was rejected and then it resurfaces in 2014 variation request.

**Raj Ghosh**

**Interview 1: September 27th, 2016**
Without counsel
Director of Knowledge from 2001 – 2005 at McKinsey & Co. Then moved to company called Authenidate where he was Head of Financial Planning and Analysis and COO for 2 years. In 2007 joined AIG as Global Head of Finance Operations. Joined CTS in 2009. Took over head of Global Procurement in 2013. Joined CTS to lead Corporate Transformation Program. Reported to Karen and indirectly to Gordon Coburn.

- Said he participated in quarterly Capacity Planning Calls that included Mani, Sridhar, BG, Ganesh, Narci, Karen, Coburn
- Purpose of call was to discuss items in pipeline. Key decisions were sometimes made on these calls always by Coburn and Mani.
- Ghosh recalled that he was vocal about his opinions during first calls before being told by Coburn to back down and let Mani handle it.
- Re infrastructure matters reported to Coburn
- Karen's role in infrastructure very limited prior to August 2016. According to Ghosh, if she was unavailable at a time, call would take place without her. Ghosh recalled having numerous one on one calls with Coburn re Real Estate and Infra.
- Ghosh also discussed delays getting permits with Coburn, such as Pune, Siruseri, and CKC
- Ghosh readily acknowledged doing business in India required improper payments and every Real Estate transaction in India has "black money" tied to it.
- Explained black money referred to improper payments
- Gave example of transaction he was involved with McKinsey involving improper payments
- He said that with respect to CTS involvement in Real Estate – uncomfortable because a lot of risk in these transactions. He said they had poor process around construction and wouldn't be surprised to learn that company began construction without obtaining proper permits
- Said that in 2014, 2015 he tried to promote better practices because he knew bribery was involved in certain transactions particularly in Real Estate

- He said despite fact that CTS had FCPA language in their contract, at same time CTS would tell vendors that they had to provide services contracted for and bribery attempts were their issue to resolve
  Q: Is that the nature of a turnkey contract?
  A: Yes.
  Q: We tell the vendor that we need to act in compliance with the FCPA so if you need to make a payment it's their responsibility not ours
  A: Yes
  Q: This notion, that we place the burden on the vendor with the expectation that if they have to do the something inappropriate it falls on them?
  A: Yes.
  Q: Who has this understanding?
  A: Everyone involved.
  Q: Mani, Sridhar, BG, Karen, Coburn, Narci?
  A: Yes.
- Ghosh advocated shifting from a "build model" to "lease model" to avoid potential bribery
  Specific awareness of improper payment at CKC:
- Ghosh said he believed that it was well understood by his colleagues that LT may need to make improper payments to obtain payments. He said that there were direct conversations reflecting this understanding. Cited demand related to CKC. Without being shown docs, Ghosh recalled that CKC was unable to occupy because of permits, he said vendor, LT, told CTS that in order to occupy a payment would have to be made. Ghosh remembered conversations with Mani and BG where they agreed that they would "hold the line" even if it resulted in further delays. Ghosh said they agreed that they could not make a payment directly or in kind by doing a project of equal value.
- *Walks back the following testimony in next interview* Ghosh said he never received specific confirmation that payment was made but assumes so because they obtained permit.
- Further stated that he could not recall amount requested or who communicated demand to CTS but assumes it was Ramesh, Vadivelu, or SNS. Said he would have had discussion with Karen but could not recall specific conversation
- Then showed March 5th, 2014 email: Chart that gives breakdown of different facilities and says "2 million ask from JLL". Raj confirms this ask referred to demand by gov official. He first learned about this from BG through direct report. BG told him that someone from LT said there was demand from gov official. Said "risk" referenced was that CTS would not be able to occupy. He said LT said that they won't be able to get approvals unless they pay $2MM and it was not within their planned budget so they were "looking to us to make them whole on this"
- Ghosh confirmed that JLL referred to Jones Lang Lasale.
- Asked about language in email that says "Pay LT through contract to protect on FCPA" and he said this was suggested by JLL
- They also suggested coming up with additional work for LT and building the costs into that project
- Also suggested paying LT through a contractor
- Raj repeatedly stated that internal discussion within CTS was not about whether LT should make a payment to gov official which was accepted as necessary. Focus was on whether CTS should reimburse.
- Ghosh said it was company's position that they would not make payment directly and they would not reimburse LT if they made a payment.
- He agreed that this position did not prohibit LT from making a payment and CTS never told LT that it could not make a payment

- Raj said this was the company's "loose logic"
- How LT was going to obtain the permit was never explicitly discussed.
- Ghosh later described CTS' approach a simplistic view in which they "turned a blind eye"
- Company's perspective was "As long as we are not making the payment directly and it's LT's responsibility to give us the facility free and clear, then we are okay"
- He said while this approach was an attempt to protect on FCPA, he agreed that this was not a correct understanding of the FCPA
- Said he did not have direct conversations with Coburn about it but knew that he was aware based on direct conversations with Coburn and BG about it.
- May 17th, 2014 email in which Ramesh Vadivelu told Mani, Ganesh, and BG that LT is going ahead with the approval part. Ghosh said BG would have told him that CTS was withholding payment to LT.
- Showed email May 20th, 2014 re consultant. Had no recollection.
- Showed March 7th 2014 email in which Ghosh wrote to Karen that KITS issue would be more difficult than Coburn stated because LT put foot down. Said LT told them that a 2MM payment would be required and said he didn't know if Coburn or Sridhar did not know if they had spoken to Karen about this issue. Ghosh recalled informing Karen about LT's inability to obtain permit and if they did not get permit, CTS would be unable to occupy. Ghosh further indicated that he was certain that he had communicated to Karen that he had told her about demand for payment. But his recollections of what he told her were "inconsistent" (According to DLA). Some points said he told her about a demand from LT and then told her about payment to gov official. Did not explicitly say it was illegal but thinks she would have understood. Raised this issue with her because of his concern that company should switch from building to leasing model. He said McLoughlin did not ask any follow up questions and as far as he knew did not take any steps to prevent the payment because "this was the culture" in his view so he was not surprised by her reaction.
- He elaborated that it was Coburn not Karen's responsibility to handle this situation. Ghosh also said he did not recall telling her the specific amount that was demanded. She would have known that is was a large amount because it was built into the cost of doing business but because they raised the issue to be reimbursed.
- Showed Dec 19th, 2014 email that he received from BG in which he forwarded variation doc.
- Showed March 11th email where Narci asks Coburn for approval. Denied knowing whether Coburn approved it.
- Asked if he raised the issue to anyone in compliance and he says he didn't.
- Said he had no recollection of any gov ask in connection with Pune. Remembered permit delay.
- Internal audit report from Sep 2013: He remembers having conversations with Coburn and Karen about risks involved in construction. His view was to move to a lease model. Thought Karen supported the view but Mani and Coburn wanted to build their own facilities because it allowed them to have greater control.

**4/13 Cognizant Company Presentation**

Objective: 2nd interview of Raj Ghosh and 2 interviews of Steven Schwartz.

**Raj Ghosh: Interview 2, Dec 8th, 2016, had counsel (Eric Bruce of Cober and Kim) CKC**

- In 2012-13 time period, Raj was trying to get more involved in the infrastructure project and Raj told us that Coburn had instructed him to let Mani run infrastructure, even though BG supported Mani, Coburn told BG to keep Raj up to date
- Raj said he was interested in increasing accountability but generally found it difficult to get things done
- DLA talked with him about CKC planning permit, he said he first learned of a delay in obtaining the permit from BG. He couldn't recall a specific conversation with BG but remembered learning about it from him based off email review
- Emails from March 2014, where one includes a chart of different ongoing projects. DLA showed that document to Raj and we focused in on entry related to CKC. There is some blue text in that document and we asked him some questions about that. "2 MM dollar ask from JLL. Since the local government has requested from JLL…pay through a contractor".
  Kelly: Do you have the CTS number for that?
  DLA: CTS - 255
- Raj indicated that that text was reflective of what BG told him during a phone call that he had with BG on this issue. He said he was merely writing down what BG was saying. He likely filled it out during the call with BG or after
- Raj said reference to JLL was a mistake because the right vendor was L & T. He said he was generally unfamiliar with the projects and vendors in 2014. He wasn't sure if this was the first time that he had heard about the issue surrounding the planning permit for CKC.
- Raj acknowledged that 2 MM dollar payment demand reflected in his notes was an inappropriate request because it came from local gov official
- Raj believes LT had communicated this request for demand to either Mani or BG in connection with LT's request to be reimbursed
- We asked him about language of paying through a contractor to protect on FCPA, he said this language did not reflect his views, merely recording what BG had said
- Raj clarified that in his earlier interview, he was speculating when he said that protecting meant to prevent the payment from being discovered. In first interview, he indicated that protecting on FCPA meant that payment through vendor meant payment wouldn't be discovered.
- Raj explained that he understood that LTt was demanding reimbursement because project budget was tight and LT could not absorb that amount. DLA asked how paying through a vendor would protect on FCPA and he said that he could not explain

- Discussion about his preference toward moving toward a leasing model which he thought would be more compliant
- KB asked him a series of questions about what he did when he heard about the demand, said he didn't do anything specific to prevent the demand from being made but viewed this as something Coburn was aware of and would address. He did not view it as something that was going to happen. He claimed that all of the conversations were to the effect that CTS would not make an improper payment and would not reimburse LT, and that perhaps LT had another mechanism for resolving the issue. Raj said the permit was viewed as being LT's responsibility. (Change from first interview)
- Remembered call with Mani, BG, and Ganesh while he was in a conference in Florida and that everyone on the call agreed that CTS should not reimburse LT for any payment.
- He thought that Mani would've discussed this with Coburn
- Then DLA asked him about his conversations with Karen McLoughlin. He said to the best of his recollection, he told Karen about the governments demand, that LT make a large payment to a gov official for obtaining the permit. But he does not believe that he provided any specifics including the amount. He did not recall her reaction. He explained that he "would have" told her because she was his boss. He hoped that she could influence Coburn. He believed that Karen did not have much influence over Coburn. He claimed that Karen might not have acted because she believed Coburn was deciding the issue. Raj made clear that Coburn did not have a reputation for dishonesty or cutting corners, although Raj thought Coburn failed to recognize that if LT was unable to obtain permit, CTS may not be able to operate the facility. In Raj's dealings with Karen, he was largely motivated on this issue to protect BG from having to interact directly with LT without having the benefit of participating in meetings with Coburn and Mani. He wanted a seat at the table, and didn't want BG interacting with LT without him knowing what was going on.
- DLA showed him a March 7th email from Raj to Karen, "KITS issue more difficult…not likely that they will bend". According to Ghosh, this email refers to a phone call, where Coburn dismissively indicated that payment was LT's problem. He says that the focus of discussion was that LT was demanding more money and that CTS may not obtain the permit, not that LT was being solicited to obtain a bribe. He says the issue was ultimately resolved but he does not know how.
  Pune:
- Showed him on email on Pune, from October 18th, 2013. Email from BG to Ghosh and the email talks about LT's unwillingness to be responsible for EIA for the Pune project. There is a reference in the email where LT said they will "unofficially they will do all that is necessary to obtain the approval". Ghosh recalled that the reference to "unofficially" meant that LT did not want the requirement in the contract although they would agree to help get the approval.

**Steven Schwartz, August 28th, 2016: Counsel was Joshuah Rievaman, Law firm: Hoguet Newman Regal, & Kenney**

- Schwartz is a corporate lawyer, he worked at Cooper and Librent (now PwC) and then Simpson Thatcher in M & A securities group from 95-99, then he worked in house for two companies, Haggle zone, Soul Spark. He joined CTS in October 2001. He was first corporate attorney hired by CTS. He advanced quickly and could not remember when he became general counsel. At the time of interview, he was Executive Vice President Chief Legal and Corporate Affairs Officer, also Corporate Secretary.
- He said government affairs was a big part of his responsibility.
- Joel Quilla, Dana Gilbert (responsible for India Legal and Chief Compliance officer), Henry Shienbob (chief security officer) were all his employees
- As corporate secretary he would take minutes at board meetings
- A LOT is privileged request of Coburn
- Spoke to Mani on August 3rd re power issue at CKC, (TNEB)
- Schwartz reached out to DLA Piper to set up follow up call with Mani on this issue around August 8th 2016. There was a call on August 8th involving DLA, Schwartz, Mani, and Dana Gilbert. The call is privileged.
- DLA asked him about Coburn. He said everything was reported to Coburn except for infrastructure which recently began reporting to McLoughlin. Coburn was very detail oriented but tried to be more hands off. He was "in the weeds" with respect to budget management. He reviewed every budget even though he was not CFO, him and McLoughlin would go through everything.
- He said budget holders would present a deck spreadsheet and Coburn would scrutinize. Schwartz described challenges in getting approval from Coburn re compliance budgets. Schwartz said he thought compliance was underfunded but legal was adequately funded and Schwartz had been fighting for more money for compliance.
- Schwartz said that he and Gilbert built a world class India legal team.
  Questions about compliance budget
- Coburn rejected Scwartz request for additional funding for compliance in budget in 2015. Coburn told Schwartz with margin pressures, he could only increase it by a certain amount. Schwartz said he took the budget that he was given and tried to help compliance.
- At time of interview, compliance budget was 1.8 MM dollars.
- In 2016, Gilbert sought to hire 7 more compliance employees. Schwartz told Gilbert that if Coburn did not approve of additional hires, he would give her part of his budget, but Coburn approved in 2016. There were 35 compliance personnel globally before additional hires.
- Then talked about compliance training, Schwartz and Gilbert tried to build an internal compliance training team, so Schwartz proposed to introduce training software (Conversant) in 2016 with budget of 500K.
- Coburn wanted to negotiate a better deal, ultimately Coburn approved the software in August 2016. Schwartz discussed his impression that compliance is underfunded and KB asked why there was resistance to increasing the budget, and Schwartz said Coburn set the budget and he fought for and received what he could.

- Asked about Mani. Schwartz said his interactions with infrastructure were limited and he wasn't familiar with Coburn's interactions with Mani
- DLA did not have his interview notes at this time
- DLA asked generally about India and way he ran the legal division in India. He said litigation particularly use of property commonly brought to his attention, responsible for obtaining counsel for real estate matters. The two lawyers responsible for India were Deepa Baburaaj (her lawyer will reach out about next steps).
  SEC: Can we receive some guidance as to what areas are privileged and not privileged?
  DLA: we are putting together a binder of documents that are not privileged.
  The other lawyer was Anand Bhushan who was the former general counsel of Cognizant India (he was let go in first quarter of 2016)
  These lawyers reported to Dana Gilbert who reports to Schwartz
  SEC: Why was he removed?
  DLA: More personalities than anything else I believe
- Schwartz said lawyers could reach out to him with issues but he was not involved with him on a day to day basis
- It was common practice for Schwartz to be copied on emails sent from India legal team to Coburn
- DLA asked generally about pre-permit construction practices in India. He said there was a time when CTS was proceeding without the proper permits but he had thought the practice had stopped. These were legal issues where the government would approach. Bhushan was involved in these issues directly and Coburn was involved in the expense side.
- DLA asked about the internal audit report from 2013 re practice of starting construction without permits. Schwartz said he was aware that there was an internal audit report but he was not familiar with it. Thought audit raised the issue and it was resolved.
- DLA showed him Dec 3rd, 2013 audit committee presentation. He recalled that document, DLA pointed to reference of "significant delays" and what steps he took to fix them. Schwartz said delays in obtaining permits was a Real Estate admin issue. He said he doesn't see a legal issue because they aren't doing anything illicit so he and legal did not take steps to fix it. Said that in this circumstance, construction should not have started.
- He said he took notes at the meeting, doesn't remember of committee members were asked about compliance risk of starting without permits. Said it would have been Gilbert's responsibility to follow up. He was told steps had been taken and it wasn't an issue anymore. He did not remember hearing after this meeting that the company had started construction prior to obtaining permits. He thought all of the issues pre-dated the meeting.
- 2014 conversations with Gordon: only familiar with KITS because of the power issue and that he might have talked about the failure to obtain permits at KITS. Schwartz said he may have had, but did not recall a conversation with Coburn, Sridhar, and Mani about failure to get permits pre-construction. When asked if he remembered a conversation with them about a bribe, Schwartz responded that he remembered only one conversation with Coburn, he believed in 2014, and he did not remember word bribe being used. Coburn

said he was having a challenge getting approvals on a real estate transaction. Coburn asked Schwartz 2 questions:

1) I can't make a payment to help with these approvals?

2) I can't go through a third party?

To which Schwartz answered correct, to both questions. He did not remember to which facility these questions related. Schwartz said conversation was short and only involved Schwartz and Coburn. He was walking by Coburn's office and he called him in. Did not indicate what payment addressed or to whom it would be paid. Did not mention LT or the amount. When asked if he thought Coburn was telling him about something he was doing or an actual demand, Schwartz said he took it as a rhetorical question, people do this to him and other lawyers all the time. Coburn never considered doing it before and was not considering doing it then, according to Schwartz. Schwartz said his 2014 conversation with Coburn was his only involvement in admin. Schwartz asked if he knew LT was proposing to pay a bribe. Schwartz said "I'm walking by headed to a meeting. He asked the questions. I thought they were rhetorical. I left". Schwartz did not report it to anybody or ask if a demand was made. Said he did not consider a conversation about a potential payment. Said Coburn did not ask anything about paying, I didn't think I needed to report it. Schwartz speculated that maybe someone asked Coburn and Schwartz said Coburn knows that he cannot pay a bribe directly or indirectly. Schwartz analogized that people ask him questions that they already know the answers to. When pressed on why he did not ask question why he was asking these questions, he said Coburn told him he was having trouble obtaining an approval. Schwartz did not ask who from admin might have brought the request to Coburn. Schwartz admitted that him asking him about the possibility of a payment was brazen considering what he knows now, but at the time he didn't reflect on it.

- DLA asked about company policy re facilitation payments: was policy that permitted these payments under certain circumstances.
- DLA asked if he had recent conversations with colleagues about his removal from the investigation, Schwartz is removed on August 20th.
- Gilbert called Schwartz on Saturday August 20th and told him he was off the investigation. Gilbert declined to explain why Schwartz was off the investigation. Dana told him to speak with Desuza (CEO). Schwartz said he racked his brain for his involvement in Real Estate admin and remembered 2014 conversation with Coburn.
- DLA asked him about conversations with Frank Desuza. He was not able to get a hold of him on 20th, so they spoke on 21st for 20 mins. Schwartz said Desuza told him he was being removed and Schwartz did not remember the specifics but he assured Desuza that he had done nothing wrong. He remembered speculating that it was probably Mani who made an accusation against him because Mani was under investigation. He knew Mani was nervous about 300K from TNEB for CKC. Schwartz denied telling Desuza that he had a call with Coburn, Mani, and Sridhar concerning payment. He told Desuza same version of events that he told us. He said only thing he could think was the two questions Coburn asked him.

KB: Do you remember mentioned to Desuza that issue related to KITS

SS: Only reason he knew it was KITS because he had a recent conversation with Coburn about substance of his investigation. He said he didn't tell Desuza but if he had told Frank it would have been something that Gordon had reminded him about.

DLA: Did you tell Desuza that he advised Coburn that he couldn't make the payment but you can use the government affairs group.

Frank said that Schwartz knew this involved KITS and told him that.

Didn't say when in 2014 he had the conversation with Coburn.

DLA: Since you were removed from case did you talk to Coburn

SS: Spoke by phone on Sat August 20th and that they met in Coburns office between 20th and 28th. Said it was about this 2014 conversation.

DLA: Why did you call Coburn

SS: First Gilbert reached out to Coburn, and he was not calling her back. Schwartz said he called Coburn to tell him to call her. Said he wanted to discuss 2014 discussion. He thought it was a conversation in 2013, not 2014. Schwartz asked Coburn if he asked those two questions. Schwartz said "If I said anything different or wrong I will resign now" and Coburn confirmed his recollection. Schwartz asked Coburn about it again a few days later because he wanted to "look into his eyes". Coburn confirmed his recollection again. Said Coburn's demeanor was calm, cool, and collected. Schwartz said he was not sure the exact date of original 2014 conversation. Coburn reminded him that the conversation involved KITS. In August 2016 conversation, Schwartz told Coburn that a payment had been withheld but it was an appropriate withholding under the turnkey. Schwartz asked Coburn "how did it get done" and understood that direct procedures were followed and nothing was paid directly or indirectly to get the payment. Schwartz said he did not know how CTS obtained the permit, only knew because Coburn told him on August 20th, 2016. Schwartz said Coburn said he did not do anything inappropriate.

- Schwartz had no indication that any amounts were paid that should have not have been paid because he "would never authorize that. I follow the book".

- DLA asked whether he had more recent conversations with Gilbert about 2014 conversation with Coburn. He told Gilbert he was called into Coburns office and Coburn asked two questions. He probably would've told Gilbert about his frustration of admin for being removed without being accused of anything.

- DLA: Have you ever talked to Mani about these issues
  SS: Never talked to him about 2014 conversation with Coburn but didn't know if anything was on the phone. He was concerned that Mani had made an accusation because he was in a lot of trouble. He was concerned that Mani may have been trying to throw him under the bus.

- Went back to 2014 conversation.
  DLA: Should he have been concerned?
  SS: I did not say I was concerned. It is all I remember. Said Coburn did not tell him in 2014 conversation that LT was involved in potential payment. Only later assumed LT was involved because LT did most of the work. Did not recall LT coming up but it could have, LT would not have necessarily stuck in his mind.
  DLA: Remember telling Gilbert that he was pulled into meeting with Coburn in 2014 re

trouble with KITS where he said LT could not do anything illegal

SS: I said that we put FCPA language into our contract and they couldn't do anything that was illegal

DLA: Conversation with Karen?

SS: He did but it was a short conversation.

DLA: Remember meeting with Coburn, Mani, Sridhar

SS: No

DLA: Showed him two emails from April 21st,

SS: Said he didn't remember the topic

DLA: Showed him document dated June 30th, 2014 from Mani, Sridhar, Coburn, Schwartz regarding the approval

SS: Didn't remember the email

DLA: Asked about DLA's internal investigation. We are taking the position that it is privileged for now.

Interview 2: September 23rd, 2016, same lawyer

- Asked him about corruption risks in India
- He said that he had never been involved in Real estate but after 2013 admin reported to compliance which reported to audit committee (inaccurate)
- He didn't know if Chennai was more corrupt than other states in India, said CM of Chennai was arrested for corruption but probably similar problems throughout
- Internal audit reports in 2014-2015 about strengthening controls but no mention of improper payment
- DLA: did any CTS ever tell him about a payment
  SS: Not to my knowledge
  (DLA had his notes at this point)
- Asked about August 8th call with Mani: Mani first reached out to Coburn who told Mani to speak to Schwartz and Gilbert. Call is privileged.
- Asked him about other payments, he had stuff to say about them but privileged
  SEC: Why privileged?
  DLA: DLA was involved as part as internal investigation
- DLA: Sequence around August 8th call. In late July, Mani called Coburn and said payment for TNEB. They got DLA involved and then there was a call.
- Then DLA discussed with him compliance function generally, performance reviews, document retention. DLA wanted to make sure they had his electronic data.
- DLA asked about Pune environmental clearance. Asked about that because reference to Pune in the notes.
  Showed email from July 24th, 2015: relating to starting projects without permits and clearances. Slide about Siruseri. He was aware of EIA in Pune, doesn't know how they ultimately obtain the clearance. DLA showed him email related to consultant and said he didn't know anything about it. Also didn't know if Pune investigation was still ongoing. DLA showed Audit committee deck from Dec 2013. Reference to "significant delays" in

obtaining permits. Said he learned about Siruseri in Feb 2014 and Pune in April 2013. Said he would receive updates on Pune from litigation team.
DLA: any red flags in Pune?
SS: Denied being aware of payments related to Pune. Said he never had an indication but didn't think it was something CTS did.

- Nov 6, 2013 email for Pune, shown to Schwartz: He said there was a compliance board created in India in May or June of 2013 to ensure that starting construction without permits did not continue
- There was internal discussion and decks on reforming process of obtaining permits, Schwartz thought this was in Dec 2013 audit report
  CKC – Planning permit
- KB: Asked about conversation with Coburn in 2014. Schwartz was given the opportunity to change those answers but repeated his prior responses. Asked if he had conversation with Sridhar, Mani, Coburn about KITS. Said no. Repeated prior statements. Schwartz said he told Coburn "no" you cant make a payment. Said it was a 30 sec conversation.
- DLA asked him about other executives. Did he have concerns about anyone else?
  SS: Talked about Frank Desuza. Conversation he had with him when equipment got stuck at a dock, Frank said he went there every day and said he wouldn't pay a bribe and didn't. Schwartz said he brought this story up to Dana and she denied that.
- DLA asked is he has concerns about Sridhar, Lakshmi. Schwartz said no.
- Asked about conversation with Frank after August 20th. Schwartz said he was shocked by Mani's allegation
- DLA asked about statements
  Q: Did you tell Frank that Gordon invited you to a conversation about a bribe
  No
  Did you tell Frank that the conversation involved LT
  Don't recall
  Did you tell Frank that LT could help
  No
  Did you say Coburn is un-policeable
  No, I might have said he may be challenging
  Do you remember being asked previously by DLA about call with Sridhar, Mani, Coburn about KITS
  Schwartz began alluding to eye surgery before he was shown the notes (first DLA had ever heard of it): Schwartz said he did not remember a call. Said remembered conversation about a call when he was having surgery. Said entire week of April 21st he was having eye surgery. He was heading into city when this call happened. Schwartz did not recall having a call on April 22nd with Sridhar or with Coburn. Said the entire week of April 21st he was dealing with eye surgery and said he was not on many calls this week.
  DLA: asked about these calls. Was there a discussion of payment to make a demand north of 1 MM.
  SS: I don't remember that at all.
  DLA: Do you remember Coburn saying on that call that there was no freaking way they

would make that payment.

SS: Do you remember Coburn saying they should exert pressure, gov affairs group

DLA: Asked if he remembered calls with Gilbert after audit committee took over the case

SS: Remembered telling Gilbert on August 20th that he suspected Mani made accusation against him, said someone along the way told him Mani had made an accusation about him. Said Dana and Joel told him Mani made an allegation.

Do you remember asking Dana if accusation related to enviro issues at KITS

No.

DLA showed him emails indicating that there were phone calls on April 21st and 22nd.

One email said Coburn wanted to talk about gov issue in India

Said he did not remember that reference, missed many calls that week.

Could you have been at home?

Yes

Do you remember hearing that there was a payment for Pune

No

Anyone tell you about 2 MM payment

No

Line item in change request for 2 MM?

No

KB showed him April 22nd notes. Asked if they are his

If they are on my machine then I took them. Not denying they're mine but I don't remember. Does not remember the week. Said notes appeared to reflect other people talking. "That's what they must've been saying"

Line 5: LT is making small payments, what does it mean?

I don't remember

"This one is 2 MM"

I don't remember, I don't know to whom the payment is made

USD 670K, what does this mean

Don't recall

Do notes refer to payment to gov official?

Don't remember

Did you understand the speakers to tell you that there was a payment to gov official?

I do not recall

LT spent more than usual

Don't recall

"Highest demand we've seen"

Don't remember, just taking notes of people talking

"Money going where, we do not know"

There are lots of red flags here that I do not remember. I'm not going to make stuff up.

Do you remember asking questions during this conversations?

Don't remember

How can you not remember a call about 2 MM?

I do not recall. Im not going to make something up. Based off what was going on in my life that week, I don't remember anything.
How do you interpret the document?
I don't know what it's for
"REAS and CUST"
I do not recall.
Change request for a lot of line items
I don't know.
Are we setting precedent
I don't know.

- Schwartz claimed that he was not aware of any change requests. Never saw a bill and never discussed a bill with Coburn. Schwartz said he did not like the way the notes looked now.
  KB: When asked what he meant, and what they looked like
  SS: "It could be a payment to a government official" Said he did not know or remember

- KB: Did you report it to anyone?
  SS: Doesn't think he reported it to anyone at CTS. Did not know what he did with the information. Doesn't recall asking questions or providing advice. Was going into surgery and was "focused on me". Said he did not see the notes before the interview so did not prepare in advance.

- Asked about notes that referenced Lakshmi "taking the right approach", meaning they will not pay a bribe. Not alternative approach with Lakshmi involved.

- Showed him Tandberg records (internal video system) showed that he dialed into the calls.

- Asked if he did anything about bribery related red flags
  DLA: What should you have done?
  SS: Should have reported it up because it was serious. Said he maybe should've reported even a conversation about a bribe.

- Said he might lose his eye.
  DLA: you seemed to be of sound mind to participate in these calls
  SS: I appreciate your viewpoint

- Said he had reported smaller amounts in the past.
  DLA: Asked if notes referred to hiding payment in change order request
  SS: "One could interpret it that way", "It is a red flag"

- Brackket: Asked if he went back when he realized that he was not lucid
  SS: No
  DLA: No one indicated that he appeared to be out of it
  Kelly: Did you go into any detail about the smaller amounts that he's reported?
  DLA: Not at this point. Used the provident example as principal example of his vigilance

- KB: Asked about anti-corruption policy
  SS: Admitted that if he had been lucid, it would be appropriate to conclude that he turned a blind eye. Said had he taken steps to prevent the payment, it wouldn't have happened and said company could say that he was "willfully blind".

- KB: Asked about reference to Pune
  SS: acknowledged challenges in obtaining EIA. Said he did not remember April call, and therefore did not know whether there was a payment. Said he would have investigated if he had been in his right mind.
- Email in late 2013- early 2014 about Pune delays. In late 2013, he was aware of environmental permit. Four months later you were involved in discussions about Pune bribe. Said he doesn't like the answers of what I did that week. "I don't like the way it looks", "I don't love the notes", "I would've gone to internal audit, Frank". If he had memory of it, his lawyer would know about it. If he had been with it, he would have reported it.
  DLA: All you had to do was forward the notes to the audit committee
  SS: He was "just listening", should have taken the week off, I apologize with what was going on that week
  Josh: Said notes had never come up in any of their conversations
  SEC: How were notes found? Were they deleted?
  Kelly: They were on a post it note
  SEC: Deleted?
  DLA: No evidence to suggest notes were deleted. Approximately 200-250 different notes. We asked if he had doubt about authenticity of notes and Schwartz said he did not.
- KB showed him anti-corruption policy. In policy, discussion of red flags.
  Is India a market high risk? Yes
  Are references to 2 MM and 670K facilitation payments in legal definition. No
  Were you aware that CTS receipt of favorable license and permit results could be improper benefit. Yes.
  Had you been competent, would this call put you on notice that improper payment likely to occur? Yes
  Someone who fails to report red flag could violate FCPA? Yes
  Had you been competent would this be willful blindness. Absolutely
  Did you know you were out of it? Did you go back to look for potential holes. Yes I knew and did not go back
  Did you sign a certification to agree to code of conduct? Yes
  SS: I would have reported it in my right mind. I would have resigned if I remembered the call.
  Bracket: Schwartz's lawyer requested a break. Then they said they would not answer any more questions.

Last talk with DLA.

Witness Updates
- Deepa has retained Carlos Ortiz (former AUSA) – willing to come talk to everyone
- DLA has had contact with BG's Indian lawyer, made demands for information and indicated that BG may need to get U.S. counsel

- Putting together witness binder for Deepa.

    Schwartz docs relevant to this presentation
    123
    120
    116
    5917
    297
    117
    310
    4055
    11169

DOJ-EH-0000000068

**5/3/17 Call with DLA re Raj Ghosh Docs**


Objective: Update on conversations with counsel for Raj Ghosh, BG, Deepa, development with Debevoise on behalf of L & T


- Outreach from John Carney (Sridhar's counsel), and Eric Bruce (Raj Ghosh's counsel)
- BG has a new Indian lawyer who is open to discussion
- Bruce and Carney received relevant documents from DLA and asked for a debrief on their client's statements to DLA prior to them obtaining counsel ← DLA thinks this is reasonable, Kevin will get back to them on whether to proceed
- DLA planning to provide BG's layer with retainer and company cooperation agreement, after this, will share BG related documents with him
- Suren Upbol, BG's old lawyer, made many demands, his new lawyer seems more experienced in this area
- DLA received an inquiry from the India IRS requesting high level payment information, which DLA will have to provide. These payments partly involve L & T, DLA asked them for information. India IRS is interested in the vendors involved
- Cognizant has current $100 million project with LT in Hyderabad. Cognizant stopped them from working because L & T wasn't providing enough information on the project, and now L &T has agreed to provide documents for Hyderabad. Cognizant wants to restart project under enhanced controls. L & T has yet to give DLA any documents, CTS gave them an ultimatum, either give the documents or Cognizant will pursue work with different vendors for Hyderabad. Now L & T is willing to cooperate
- Does CTS have line in contract requiring vendors to provide this kind of documentation? KB: Depends on the project, not sure for CKC. No sure if there is an audit right.
- Deepa's lawyer has been meeting with her, inclined to come in and talk
- Lakshmi is off the Cognizant U.S. board but travelling to U.S. in connection to an upcoming board meeting. Lakshmi no longer has any formal connection to the company and has not retained counsel as far as DLA knows.

DOJ-EH-0000000069

**6/1/17 Factual Download**

Agenda: Review of Schwartz, Dana Gilbert, Desuza, Questions about CKC Electricity, Pune Environmental Clearance, Siruseri permits, ongoing review of operating licenses at MEPZ and Siruseri.

Up until August 20th, 2016, Schwartz was leading the investigation that DLA had been hired to conduct. Mani made the allegations of Schwartz and Coburn's involvement, at which point DLA contacted chairs of audit committee and board, as well as Desuza and investigation moved to audit committee. Schwartz had conversations with Gilbert and Schwartz when he was removed:

- Schwartz said he spoke with Gilbert, Coburn, and DeSuza
- Gilbert called him on August 20th, Saturday who told him he was off of the investigation
- Said he probably sent her some texts or emails indicating that he wanted to speak with her. Gilbert declined to speak with him about why he was off the investigation and said he should speak with DeSuza. Then he recalled 2014 conversation with Coburn.
- Schwartz unable to speak to DeSuza on Saturday August 20th because Desuza was in Brazil
- Spoke with Desuza, assured him that he had done nothing wrong. Speculated that Mani had made the accusation against him. Knew Mani was nervous about $300K payment for CKC electricity.
- Schwartz denied having call with Coburn, Mani, or Sridhar concerning the bribe payment. Said he could not imagine what was being alleged because he had little involvement in admin function.
- Remembered asking Desuza if issue related to KITS. Only knew issue could relate to KITS because he had spoken to Coburn recently about 2014 conversation.
- Schwarz was asked if he told Desuza that he had advised Coburn that they could use LT to make the payment
- Said he subsequent conversations with Gilbert where he discussed 2014 conversation with Coburn. Told Gilbert he was called into Coburns office where Coburn asked him two questions, etc.
- Schwartz said he might have expressed his frustration to Gilbert about admin. He said he was frustrated with his call with Mani about the $300K, he spent years protecting the company. Said he never discussed with Mani subject of conversation he had with Coburn.
- Concerned that Mani may have made an accusation against him because Mani was in trouble re 300K payment.
- Said Mani may have been trying to throw him under bus because he knows the FCPA policy. Only other thing he can think of is that Gordon told Mani about 2014 conversation
- Karl asked him why the conversation would have stood out as something he should be concerned about. Said he wasn't concerned but that's what he remembered.
- Schwartz said he put FCPA language into contract and LT could not do anything that was illegal.

**September 23rd, 2016 Interview:**
- Covered conversation with Frank.
- Said he told Frank exactly what he had previously said about his conversation with Coburn
- Said he did not tell Desuza that Coburn had invited him into a conversation about a bribe
- Did you tell Frank that LT could help if there was trouble? No. I never said LT could get things done. Might have talked about LT in connection with internal audit report.
- Asked him about conversations with Gilbert. Do you recall telling Gilbert that you suspected Mani made an accusation against you? Yes.
- Schwartz said Dana gave him a "tell" that Mani made the accusation against him.
- Do you remember asking Dana if conversation related to environmental issues at KITS? No.

**Dana Gilbert**
**Interview 1: August 21, 2016**
- Chief Compliance officer at CTS
- Remembered several conversations with Steven. Said she told him that there were certain developments in the case and she would need to collect his comp. Couldn't provide any details but Frank would speak with him on Monday
- Said she would call Coburn when Schwartz asked
- Tried to call Coburn but went to voicemail
- Schwartz called her at 12:07 on August 20th and said he had just spoken with Coburn and Coburn would take her call if she called him back, but when she called again it went straight to voicemail.
- Called her a couple more times before 2 pm. Schwartz understood that Dana couldn't get details but he suspected someone had accused him and he believed it was Mani. Said he would review his emails and forward anything important to CTS lawyers, but Gilbert said no just give your laptop over.
- Schwartz asked if he would be fired and Dana said there was no imminent plan
- Schwartz said he racked his brain and only thing he could remember was being called into meeting with Coburn in his office for call about problems with CTS KITS campus involving LT. She claimed Schwartz said he advised Coburn that they could use LT so long as there was nothing illegal. Schwartz said you should wait and tell that to the investigation team
- Asked Gilbert to speak to her off the record but then said nothing is off the record is it? And Gilbert said no.
- Gilbert said Schwartz called her again later and declared he could no longer work for Gordon and would be looking for a new job.
- Gilbert said she just let Schwartz vent. After they hung up, Gilbert spoke to Coburn and didn't hear from Schwartz again until later. Said Schwartz called again in the evening. Schwartz said Coburn asked if LT could pay a bribe and he told Coburn no.
- She claimed he continued to complain about Coburn, describing him as "unpoliceable". Schwartz continued to say he was going to resign and had done nothing wrong and was being thrown under the bus.

- Schwartz said turnkey model was in place when he joined the call
- Final call at 10:45, Schwartz asked her if issue related to environmental issue at KITS.
- Schwartz said he thought Mani was claiming that Mani was unaware that bribes could be paid through a third party.

**Interview 2: August 28th, 2016**
- DLA asked her whether Schwartz ever made statements to her about KITS building permit issue
- Said he did not refer specifically to CKC, but expressed concern to Gilbert about Mani after Mani raised the power line issue, which he raised at end of July 2016 which is before audit committee took over the investigation.
- In first conversation, Schwartz said he was worried that Mani would get them in trouble and they are like rats on a sinking ship. Afraid Mani would throw him under the bus. Schwartz asked Gilbert if she remembered when Mani raised that a bribe needed to be paid. Gilbert replied that she did not and Schwartz said, Oh you weren't part of that.
- Gilbert told Schwartz she remembered 2013 issue re requesting reps and warranties for LT. Schwartz said Oh that must have been what I was thinking about.
- Gilbert stated Schwartz raised the issue again in second conversation. He was worried what Mani would say to the investigators. Schwartz said there had been a discussion regarding LT paying bribes and Schwartz told others that LT could use whatever influence they had as long as it was legal. Gilbert said she did remember this when Schwartz asked her and Schwartz said he must have been thinking about LT line item issue

Desuza – about his conversations with Schwartz
Interview 1: August 21, 2016
- Said he had spoken to Schwartz on the phone about an hour earlier
- DLA gave Desuza talking points telling Schwartz he was taken off and needed to cooperate, and then Desuiza reported to the team about the conversation
- Schwartz said he understood and was perplexed as to why this was happening and that he wasn't really involved in RE program
- Schwartz described 2014 issue when Coburn called Schwartz into conversation about payment of a bribe relating to facility Schwartz believed to be CTS KITS campus. Claimed that during conversation ohe advised that CTS could not pay a bribe.
- Said Schwartz claimed his advice was to use LT's government affairs group if CTS had trouble
- Schwartz told Desuza that he had recounted this conversation to Gilbert two weeks earlier. Schwartz told Desicuza that his reputation was at stake, looked at his emails and said he did nothing wrong. Desuza said to trust in the process. Said he would but he was concerned people were fibbing, and was concerned about one person in particular but didn't say who.

Interview 2: August 22

- Schwartz said he had a lot of mental anguish and wanted to be interviewed sooner rather than later.
- Discussion about trusting the process, Schwartz expressed concern that his reputation would be tarnished.

Interview 3: August 29th
- Clarification of points from first two interviews
- He recounted that Schwartz tried to reach out him on August 20th, Desuza was not able to talk to him.
- Delivered the talking points, at which point Schwartz began raising a number of different issues.
- During course of investigation, Schwartz assumed there were allegations. Schwartz was perplexed. Specific instance where Gordon asked Schwartz to join a conference call during which there was discussion of demand for a bribe. Schwartz said he replied that CTS could not pay a bribe and it was LT's responsibility to fulfill the contractual obligations.
- Desuza confirmed that conversation specifically involved LT.
  AB: What was Desuza's knowledge at point of interviews? Had he heard information about the bribe when he is hearing this info from Schwartz?
  KB: No evidence that Frank was aware of this info prior to conversation with Schwartz.
  KG: Did he know what projects were?
  KB: He knew that there was a facility at CKC

- Schwartz's notes were found on September 9th
  Paul: Did he have knowledge of the delay?
  KB: All of operations around CKC permit, core group of people involved.
  Paul: So no knowledge of a delay?
  KB: Will confirm, but no evidence that he was aware of any of the delays. Gordon ran the RE program.
  Paul: Did they have workforce ready to occupy?
  KB: Yes they were in leased facility.
  Bracket: Or as growth occurred employees would be added to the facility.
  KB: Document called "Capacity Planning Call" which gives you all of the plans

CKC Electrical
- Electricity issue raised by Mani at end of July 2016
- Company submitted application with TNEB around Jan 2nd, 2015 – rejected Jan 14th, 2015 – internal discussion follows about potentially hiring LT to obtain the electricity at CKC
- CTS-9701 – discussion about whether to bring LT in to do the work or to go through the public tender process. No suggestion in testimony that this proposal was in any way improper
- CTS-3096 – lays out timeline for getting the permit – Ganesh, discussion about whether to hire LT on turnkey basis. Discussion with Sridhar and Lakshmi. No indication of anything

improper. Ganesh said he was not comfortable with LT because they weren't transparent about their cost structure. Preferred to go to TNEB directly so you could get a receipt.

- CTS-4056 – From Vadivelu, LT project manager, to Ganesh 2.1 Cr is roughly 300K USD – incidental expenses line. Mani and BG identified this line as potential improper payment. 13.93 Cr total. BG said when he saw this line item he went through roof because everyone knew that this reflected an improper payment.
- CTS-11645 – scheduling telephone call with Ramesh. Mani claims that during call LT informed them that incidental expenses reflected payment by LT to gov official and that there was discussion about removing the incidental expenses line and building that into other legitimate work referenced in the email. BG said that when he saw incidental expenses it raised a red flag and he e believed at least a portion used to take care of gov official
- CTS-2156 – no reference to incidental expenses on attachment but total is same amount of 13.93 Cr. Mani said they inflated cost of work to hide incidental expenses line item. BG confirmed that he had instructed LT to remove the reference to incidental expenses but denied telling them to hide the line item by inflating other line items. BG said this was a "stupid mistake"
- CTS-2140 – reflects a discount that they negotiated.
- CTS-2104 – draft email created to send to Gordon asking for approval, don't believe it was ever sent to Gordon. Around this time that Mani became aware of DLA's investigation. Mani raises this issue up to Gordon in end of July, Gordon directs Mani to speak to Schwartz and Dana. And DLA interviewed Mani on August 8th about this particular issue.

Pune
- Potential improper payment in 2013. DLA trying to get info from LT about the consultants that they hired. Potentially consultant is ultratech.
- Payment involved an environmental clearance
- If payment was made, would have been made through Dec 2013 variation
- CTS-4786: Email lays out some of the timeline involving environmental consent. April 7th 2011, CTS filed application for environmental consent but it languished. DLA was told that the authorities for the EIA was dissolved. Decision made to start construction without having environmental consent in place. Pollution Control Board issued notice because company had begun construction without the EC in August 2012. Last paragraph discusses discussion with LT and says that they are working closely with consultants to get the EIA approval. No evidence that links it back to the U.S. in terms of management involvement.
- CTS-9721 – Bhor (associate director of Infrastructure, project manager for Pune) – very involved in this issue. There was meeting in March 2013 with senior official in environmental department which included Bhor, Jain, and ultratech consultants. Official assured them that there was a way forward for them to obtain environmental consent. Bhor said there was no discussion of improper payment during meeting.
- CTS-9721 – variation document from SNS – reference in line item 9 toward "statutory approvals and scaled model of CDC (Pune campus)" About 560K. Mani identified this line item as potential improper payment.

DOJ-EH-0000000074

- CTS-9860 – breakdown of statutory approvals
- CTS-11656 – Line 24 for 50 M Rp, next page has additional line item for approvals for 8 M. Line item relating to work stations is approved and this is used to hide statutory approvals line items which later drop off.
- CTS-4882: Discussion between BG, Bhor about who is responsible for obtaining environmental clearance. Debate about whether it is LT's or CTS'. They have effectively withheld payment for this. Later workstations ultimately approved and statutory approvals were denied. No indication that Gordon sees the original reference to statutory approvals.
- DLA talked with Ganesh, Bhor, and Ganesh, all denied knowledge despite being on emails.
- Also have Schwartz's notes.

  Siruseri
- Two building in Siruseri, one started in 2003 and completed in 2005 and SEZ started in 2009 and completed in 2011.
- Tab 25: CKC Slide desk – CTS-137 – 3 line items – this is why the facility was investigated. These line items were ultimately approved and built into CKC bill
- CTS-11652 – From 2011. Discusses having obtaining planning permit approval wich had been pending since 2005. Go into how they obtained the approval. Involves LT.
- In 2014 variation, revived request for Siruseri liasoning and ultimately got paid despite being rejected for this request initially. DLA does not know why this occurred. Mani and Ganesh were only one who would have memory. Mani said he was not responsible at the time, but when iti came to him in 2014 it was suspicious. When he ultimately approved it he was relying on Ganesh. When DLA asked Ganesh, Ganesh said he does not remember and that Mani was the one who approved it so he's responsible for it.

  **Operating Licenses**
- Initially hired to look into allegations surrounding operating licenses
- DLA will be going back in July to look into MEPZ as well as other facilities
- CTS-9817 – Document found on two contractors computers. "Necessary liassoning fees" testimony that these fees are payments to gov officials. "We have paid an unofficial amount of 10K to one official" – "Authority's expectation is 1.5 Lakhs" – all references to improper payments. Appears to be regular smaller payments to obtain operating licenses
- CTS-11648 – Appear to be relatively small amounts

  **Hyderabad**
- Included copies of running account bills – these are outstanding invoices where LT has not been paid at this site. Site effectively shut down at this point and at impasse with LT. Said will not pay until LT gives the backup for charges in running account bills. Particular line items reference statutory approvals. Still discussing that with them.
- CTS has audit rights for Hyderabad. Did not have it on KITS project. May not be contract for CKC Electric.

DOJ-EH-0000000075

**L & T**

- DLA has made numerous requests for back-up for Hyderabad as well as for CKC, Siruseri.
- Recently, CTS received an inquiry from India IRS over press reports around company's investigation. They are looking for company to settle amount of payment that was made in connection with CKC project. Indian government wants CTS to pay that taxes on 2 M payment.
- DLA said they will turn over information on LT to India IRS which motivated LT to share some information. Natasha went to look at documents – invoices – only 15, not for relevant time periods

AB: Have all of CTS' business with LT been LT construction?

DLA: Will get back to you

KG: Search term review for Coburn?

KB: Page turn review, then comprehensive searches of time periods, then search term

KG: Same question for Schwartz

KB: Will get back to you

AB: Conversations with people about Schwartz's state of mind during week

KB: Will give download.

**Call with Counsel for L & T Construction**

Colby Smith, Jill Steinman

As you know, in early part of May we were in India doing additional work with our client gathering information. As a result of that work, we can begin rolling productions to you all. The work is ongoing. There will be some gaps in the info which we will try to fill in as we go along. Starting next week, can start sending documents. Flow will be smaller at first but hopefully grow.

- Will start with underlying contracts for the projects LT was involved in. Not long after, will provide running account bills and related documentation. Docs related to consultants who were involved in statutory approvals process including contracts with consultants, invoices, payments.
- LT is doing this on a voluntary basis as part of its efforts to cooperate in your review.

   KG: Starting next week, you will roll out documents, when you talk about documents related to consultants involved in approvals, will that be included in first tranche? What is the volume of documents at beginning
   Colby: Number of consultants involved varies by project. Not a huge number of documents. Contracts tend to be not very long or detailed. Invoices from them are key to milestones in the contracts. Invoices aren't thick either. We will give you whatever we have for consultants we pulled together. We prioritized certain projects. Earlier docs will be from priority projects and lower priority will take longer. In terms of when we will start producing consultant info, next week may be a little ambitious, possibly the following week. It won't be everything, just stuff we've pulled together so far. Hyderabad, Pune, KITS on top of list.

   KG: We talked about preserving custodial information. Have you all started reviewing some of the email traffic, those kinds of things related to these projects? Do you know when or if you will be willing to produce this material?
   Colby: Emails talk a bit longer. Won't be in first tranches. Are engaged in process of reviewing emails, will come a time when those are available for production. Too early, can't definitely say when we can provide. Maybe in a couple of weeks we will have a better handle on that.
   KG: I'm not looking for definitive date. Just looking for a general timeframe for this?
   Colby: Hard to say. I hope in the next couple of months.

## Call with Counsel for L & T Construction

Colby Smith, Saqib Alam
Andrew Bruck, Kevin Gingras, Jasmine Robinson

Colby: Another production on Tuesday of next week. This one will consist of running account bills for several of the projects. The KITS project, Pune, Hyderabad projects included among them. We are still receiving running account bills from other projects from India so there could be some additional ones as well. Bills can be quite large and will include some backup information about the bills themselves.

Email review:

- The way LT's IT infrastructure works, the mailbox size has a pretty small limitation on it, as a result people do a lot of maintenance on their email box quite frequently, limited to 1 GB per person. While we've captured the live email and have imaged computers, in order to try to get a more complete picture, we have to go back to back-up and restore a number of those to get a more complete picture of the events because the emails don't go back very far in time.
- Most optimistic scenario will be some time in August to start providing emails to you.

- Would like to come in and talk to you on an interim basis about what we are learning.
- Planning another trip to Chennai in third week of July, after that, could come in last week of July or early August and make a presentation.

- I think there will be one other production in early part of July, spin off from accounting work.

   AB: When were you guys initially retained?
   CS: Late last year or early part of this year
   AB: This seems slow for a company that is cooperating. This timeframe has not been working for us so far.
   CS: I will take that back to the client.
   AB: How far back do the backup tapes go?
   CS: Going back until 2012
   AB: Do they capture every email from that time?
   CS: Capture the emails that are resident on the servers on the first day of each month.
   CS: The preservation request covers everything yes.
   AB: When you guys come into speak with us, what is that covering?
   CS: Our plan is to make a presentation that includes highlighting documents and information that we have learned from witnesses. Would not be reading interview memos at this stage. Idea would be to give you an overview of what we are finding and where we are in the process.

AB: Do you anticipate making company employees available for interviews by the government?
CS: We are happy to raise that subject with our client.

DOJ-EH-0000000079

Call with Debevoise & Plimpton (Counsel for L & T Construction)


Debevoise: Saqib Alam, Colby Smith, Paul Berger, Dave O'Neil


KB: Objective is to reiterate what we said last time. The pace at which information is forthcoming and the timeline is really going to fall short of the pace at which we would expect cooperating companies to move. Could you tell us how exactly it is working with the litigation control team? Are you reporting to one person? A committee? Given the pace and challenges you're facing, we would give you a bit of a taste of evidence we've already collected which would explain to you why we are hoping to move with more speed.

CS: It would be helpful for us to learn more. We've read the public reports but we don't know the details of what they've provided. We've also seen the press release on the $40 million we think was spent on this. Are client is expending a lot of money but I don't think $40 million is the amount our client can spend.

KB: They did not have that much of a head start, a matter of a few months. I thought we would describe generally what we saw from a high level. We saw a pretty clear cut set of bribe schemes between Cognizant and L & T. One project in particular is the KITS project. Early 2014, individuals at LT relay to people at Cognizant that there is a bribe demand for roughly $2 MM for a planning permit. Back and forth about whether this is in the scope of the contract with LT, whether CTS needs to get involved. Individuals at CTS decide to freeze 10 MM in payments to LT for force LT's hand to make them handle it which is what LT does. In June 2014, LT is able to get the permit for KITS and conveys that back to CTS and the change requests start getting doctored to hold the bribe money in the change request orders for CTS can reimburse LT for that bribe. The clarity we have is making us want to move more quickly.

CS: We are poking around in the same transactions that you're talking about. We will take that back to our client. In October you sent a request for us to preserve documents. You asked us to start providing documents in April, up until that point everything we had done was without request from you. We never received a document request from you all, if there are things that you'd like us to emphasize we will. They're not an issuer or domestic concern so we have a lot of conversations with them about what the basis is for your jurisdiction. But I think the level of cooperation you've seen thus far is pretty extraordinary.

PB: It's not just that CTS has had a head start, it's that they are an American company whereas we are dealing with a company that operates in an entirely different environment. There are technical issues that are attended to that, such as the email accounts which are very different than the U.S. Going to backup tapes can take an extraordinary amount of time. In my experience this is very fast. We laid out a timetable and we've met it. It is a little disconcerting to hear that the level of cooperation isn't what it should be. You haven't identified the documents we are giving what we think is appropriate.

?Debevoise: Might also be helpful if you gave us a sense of what you think the U.S. jurisdiction is here?

KB: We hear you as far as the challenges. One of the reasons that we didn't come out with specific document requests is because we were hoping that in your review, you would see what we were seeing. At the same time LT is a huge company that has done business all over the place. It may not be a U.S. company but from what we can tell it's fairly sophisticated.

CS: What do you think is the next step after our trip to Chennai?

KB: That's fine. I thought we talked about a presentation.

CS: We are back after late July.

2017.07.27

DOJ: Kevin Gingras, Andrew Bruck

FBI: Kelly Blanchfield

Debevoise: Colby Smith, Philip Rohlik, Saqib Alam, Alice Barrett

Cyril Amarchand: Lakshminarayanan Viswanathan

[Will provide PDF of PowerPoint]

Interim Update from Internal Review of CTS Projects

CS: Still in the midst of review. This is earlier in the process than we would prefer to talk to you. Wish we had more in the way of findings. But want to cooperate with requests to share information. Storeis we have to share are not complete, work is ongoing. Appreciate guidance you provided on our last call. There were missing pieces you brought to our attn we are looking to fill in.

Agenda

-L&T Background

-Scope and Methodology of Review

-Update on Status of Review of Priority Projects

        -KITS, Sholinganallur

        -Pune Phases 1, 1a, 2, 2a and co-developer

        -Hyderabad Incubation and ISC

Next Steps, Ongoing Cooperation

**Background [provided on slides]**

L&T group started 75 years ago, Danish engineers who went to begin cement company, developed to be multi-purpose.

Grown to 43K employees; 14 dif bus units in engineering/construction

LNTECC (Engineering, Construction Company)

LNTECC and CTC Relationship

-3 projects on hold due to investigation

-Help with statutory approvals not a normal part of LNTECC business, unusual

-normally owner's responsibility to obtain necessary permits

KG: You showed the % of business that is cognizant, what percent of LNTCC's business is doing turnkey contracts, that they build at a set price?

CS: I don't know but we'll figure that out. One of the units is buildings and industries. We can figure it out. The norm for EPC contractors is that you do the design and the build.

KG: Also interested in what percentage cognizant is of buildings and factories in LNTCC

CS: Okay. There is a sub group within LNTCC that deals with Cog, IT and Office Space.


LNTCC Relationship Cont'd

-Payments not always a 1:1 basis

    -Weightage process assigned to each task


## Scope and Methodology of Review


KG: Are we going to get the list of custodians?

CS: Sure. We've provided a list of hard drives that were imaged.


Back-up tapes are an ongoing process to restore materials

Filtering

    -Took place before files loaded on Xerox database


KG: I don't know if our last phone call was helpful in filling in what the document review you were conducting, CTS-related issues.

CS: It was helpful. You hinted some more specific things that we should have been looking for and you will see in a moment what we were and weren't able to find.


Have not gotten far in Kochi review process, but it has been prioritized


KG: What sample size did you use for [raw review]?

CS: It wasn't sampling size. It was for particular custodians that we wanted to look at.

Work to Date

Challenges/Limitations

KG: Is the company taken any employment actions ?

CS: Current employees have been very cooperateive. Former employees have more leeway to decide if they should com ein or not. Some have and some have not.

**Update on Status of Review of Priority Projects**

KITS

Statutory Approvals

    -No FCPA clauses in some of the documents

ENSYS Technologies

    -One identified consultants

    -Cognizant advises government that consultants are representing them

    -Payments made later than contract required them to be paid

        -Price differences raise q's

KG: What is the difference with Lachs?

CS: differents of 8 lachs, approx. 1500 per lach.

T National Polution control board (TNPCB)

-Would expect Ensys payments to decrease due to a contract change, howerver a Liasoning Fee was paid in cash for 5 Lachs (substituted this payment for redicued amount of the contract)

-Reached out to Ensys for interview; did not respond

Internally Handled Approvals – Nagasubramanian

-AKA "Naga"

-His arrangement was "normal" for India

DOJ-EH-0000000084

-Spoke with him; now former employee

     -Answers consistent with how his work was described to Counsel

-Got approvals from many gov departments, he helped facilitate


KG: When did he leave the company?

CS: February of this year.

KG: How long had he been with the company?

CS: 2008


**Planning Permit KITS**

-"Scrutiny fee" Raises questions

     -Referred to in regulations and letter from gov agencies; appears to be application fee


: Is it your view the planning permit is a discretionary permit? That the gov entity has discretion to grant or deny the application as opposed to everyone who submits it gets it?

CS: Yeah I think they have some discretion of not only whether to grant, but also with conditions that may require tyou to remediate or make changes to the work.


37 Another fee that relies on the scope of the project


: Where something appears in quotations, that's from an email?

CS: It is. And we plan to provide you with all docs and emails that underlie the presentation.

: It would be helpful if when you do, point us to bates numbers of the quotes provided.

CS: Sure. Some have not bates yet but we'll get that to you.


KG: The minister is the chief minister of Tamil Nadu?

CS: So far, we don't know which minister they're talking about. That's coming up.


39: reference to something Cog needs to do

KG: Who's the draft letter addressed to?

CS: Mr. Chandra Shaker (SP). The idea behind the letter is that Cog would have more pull with the industry than they would have, so Cog should take care of it.


PG 41. Sign of payments being withheld

: Do you know how much that was?

CS: A few million dollars. We can check back on that, it increased over time to 16.5 million.


OC stands for "Occupancy Certificate" on page 42.


KG: What is that supposed to mean?

CS: He did not have a specific recollection of this but it seems to us to be a suggestion that there is resistence to doing something here. There has been a back and forth about who bears the responsibility to take the next stepe with the ministry. There is resistance on the LNTECC side.


Pg. 43 – Draft letter. No evidence it was sent.

Pg. 44 (continuation of above)

-The contract underlined the need to liase and assist. We think this harkens back to that part of the contract.


Pg. 45

Pg. 46 Discussion shifts after meeting in March; no longer back and forth about who will take the next step

    -Discussion of doing something with respect to the Academy building; unclear what it was, as it was never built

    -There was a 20 crore allowance in the budget for a 2-story academy building; discussion of increasing to 7 stories; maybe "add on value" of allowance to allow for this

    -If we understand correctly, looked to us that it could be a way to move 12 crores into the hands of YYY without YYY having incurred the expense for that; no evidence implemented, would have been difficult to implement; could have morphed into something else; still looking into this area

KG: Some of the email addresses are L&T mail.com? Lyntecc? IS there any significance to those?

CS: We noticed that as well, but I don't know. They were taken from the same server. We don't have the answer to that yet.

Pg. 46 – Unclear why the 12 crore number keeps recurring; looking into it

Pg. 47 – Even in May, bills not being paid; over 16 mil owed

Pg. 48 –

Asked about statement "nobody should know"

-Week before, there was a massive building collapse. Friday, permit was signed. Saturday, building collapsed. Monday, order issued to LNTEC. Effort to keep it quiet was due to controversy of making more high rise buildings after the collapse of the other.

:There's a big jump between 5/17 when LT has payments withheld, don't' want to do this, then on June 30th they're able to get the permit. Is there an explanation on how that was procured, what caused the change in the approach?

CS: Thee record that we have doesn't provide a lot of insight of what happened in that period of time. Cog is still saying, we need the permit, we're anxious to get theh permit. There is haranguing, is how I would put it, of them pinging LNTEC about the planning permit. At least 2/3 of the time, LNTC doesn't respond.

: But LNTC takes the position that this isn't our responsibility but then they respond "we got it"

CS: Well it had been applied for a long time before, so you would assume it would be issued at some point in time. Whther lntc did something? There was a back and forth. Some time in March, maybe early april, we don't see a continuation of that back and forth or what steps were takedn around that period of time.

: And in interviews, no one has any recollection of how this approach was changed?

CS: We've heard that this was issued in the ordinary court. I'm telling you what we've got. Hopefully there will be more down the road.

**Variation claims**

-We understand that there was a demand made, based on what you've told us, but we have not seen evidence of that.

-Do you see money flowing back? That's why we looked at variation claims to see if there were add-ons that raise questions in our minds.

Pg. 53 Evidence of LNTECC's view of claims

-Won't get what you expect, so put 3x number of what you expect to get

Pg. 55

'PP" Planning permit

-When asked why applying for Siruseri, they answered they didn't think they sould have been denied in their process so they were trying to get the money there.

-We are told that what you see listed on expenses is less important than the bottomlinle amount

Slide 56

ACE is expected margin

JCR Mar '13

9.4 in variation claims that they are confident in getting.

-Enhanced Sales an additional client requqirement

So if they get the enhanced sales amount, that would raise them back up to the margin they hoped for at the beginning


::If you look, the enhanced sales they are hoping to get is 1/3 of the total submitted variation claim at the time


Pg. 57

Claim stayed at 22.6 throughout discussion process of variation claims


Pg. 58

Description of where separately listed claims went; there are 15 on slide 59, adding up to 32.7 CR

-Response to reduce item 11, does so, sents to Vinketessin(?)


KG: The earlier slide, what is this (pg 56)

CS: This is a mid term review of how the project is going.

KG: When was this?

CS: September 2014

CS: So 2-3 months before this email exchange (page 58). There are references to prior reviews. The reviews sare done periodically.

KG: And the original margin

CS: ACE, accepted cost estimate (by cog and lentecc), Cog doesn't know the anticipated margin, internally that is what they would expect.

::so at the beginning of the project, they were doing better than expected. They saved money in structural works. Then it goes back down.

KG: And then this dramatic jump from 17 to 13.67, what time is that?

:: That's between… that would have been in the summer, August/September.

KG: And the budget would have been in the beginning of the year?

:: Probably. I'd like to check. And there is an explanation on the other side of the document. Indirect costs, we're told was preliminary and (IDC) staffing costs; then below is what they want to get to bring it back up. The variations considered, which gets you to the number that is still 13, are tings that are extra claims that they expect to get. CTS claims –central service tax. EDRC Prism is interior design and procurement costs.

KG: What falls under procurement costs? Just materials?

:: That is our assumption but I'll need to confirm that to you.


Page 63

-Document exists in 2 iterations; there is a list of line items and for those with numbers, there is a tab in the spreadsheet with a calculation of a certain amount; so these amounts are drawn from another tab.

    -But for a number of these, many are blank and there are no tabs.

    -In the second iteration, there are a lot of round dollar figures that have no backup or explanation


Page 64

-In response to 15 line items, they sent back 26 and many were different.


:How many line items had been sent over?

CS: I don't know on this breakdown. It gets more curious as we go. Now we're at 26. There's more back and forth but we do see a document we believe was emailed to one of our people. This is an internal document from Cog (page 65).

Not sure why there is a distinction with architectural enrichment, as you would think that would be on-sight.

Page 67 – Amendment to Contract, dated in August.

     Only list 6 categories as compared to 46; decreased by 20 crore, as the academy building was not built.

Pg. 68


## PUNE PHASES


Letter of acceptance Date discrepancy-contract signed after project already 2/3 completed


Pg 72 Back and forth on whether Enviro impact assessment was cog or Intec's responsibility

Page 73 Excluded from this contract as well

Pg. 74

Pg 77 – More consultants retained in connection with the project

Pg 79 – Actual payments higher than allotted for

Pg 89 – Agencies that give environmental clearance

     -Authority gives appeals;

Pg 90

     -

: Is the guy on the line there the same Subramanian?

CS: No, this is S Subramaniam as opposed to SNS.


Page 91

The key agency for getting the enviro clearance is dissolved and wasn't reconstituted until 9/2011.

-Then Cog got lease, which required to start construction in a year in the face of this issue with getting the enviro permits

Pg. 92

Interpretation was that the agency had 105 days to decide yes/no; if hadn't done anything, that they were deemed to have approved; email is to notify that they had begun

Pg 93

Qualifications: Required enviro clearance; however, construction began.

SEAC reconstituted in 9/28/2012, ask why construction was started.

Pg. 94

Pollution control boards and SEAC now treating this as a violation case

3/24/2013 - SEAC Want to be sure that a suit has begun so that this is treated as a violation

:: There is communication before the hearing b etween cog, lntecc, and ultra tech consultant about having meetings with the undersecretary; includes unofficial meetings. There are discussions about trying to meet the member secretary of the committee before the meeting occurs. The member secretary i

AND: Those are between March?

:: March 2012. Those comm's exist, but we wanted to flag it for you.


Pg. 95

There is a request from CTS to expedite the case

:: He names two people there. Neither is the member secretary I Was just talking about. Again, this is cog who met with these people and he's email the L&T people.


Pg. 97

Request passed up the chain; Kanaan is more senior; sent on to Badabaloo who then says to go ahead

Even a relatively small payment like this is passed through proper approval channels


Pg. 98

7 lakhs, about $10k


Pg. 99

Particularly worrying

Asked to speak with Patil, has not come in

Have been told this email is Patil complaining about not being paid and agitating to get a payment. We are still looking into this to understand. The amounts mentioned earlier might b ereferred to.

DOJ-EH-0000000091

: How many projects did Patil do?

CS: I think that this was the only one.

Pg. 100

Statutory approvals never included in weighting in the beginning

Pg. 101

: How much is 5 crores at this time?

ALAM: 760k

:3.9?

Alam: 250k

75 is about 120k

The ones from august to not get carried over, even the ones that they describe.

Pg. 104

Contract day was 7 days before this, December 15.

:: This is 5 crore for statute approvals that is rejected. You again see the total amount in claims keeps changing.

Pg. 105

Final agreement that reflects what they received.

Pg. 106

Never saw follow through on this or whether it was obtained.

**HYDERABAD**

Pg. 108

Total value less than $85 million

Pg. 109

FCPA Clauses begin to come into the contracts. Require LNTECC to assure the company that all subs are approved

-No evidence that this compliance and approval process did occur

110

111

Incubation Project: In the weightage, 50 lakhs included for statutory approvals

ISC: Haven't found an itemized breakdown for the statutory approval costs, but there are a number that have been attained for the project.

    -New "single window" procedure in this state; Go to TSI IC and apply for all permits at a single agency; can also be done electronically


Consultants obtained for the projects (information provided)


121

Asked why the vice chairment needed a payment, esp as it was one of the largest payment there. We were told it is not the vice chairman who gets the payment, it's the agency. But we are still looking into that.


Pg. 123

Divided into pre and post construction

-All but one permits were obtained

-Total amount for permits was just over 1 crore billed

    -L&T Have not been paid for them


:As you said, we understand this is an ongoing project. I think the intial reaction is that to the extent that there are explanations of questionable payments, those that have been provided to you so far don't sound plausible. WE will follow up with specific additional questions we have. Given that you are furthest along in KITS, we assume that will be a priority. Our interest is in March 2013 until at least June 30th 2013/(14?). We would think that something happened there and that it is odd there would be no recollection of what happened. We are also aware that it is clear that cog was pressuring l&t to get this approval, so we understand the difficult position that l&t were in when this happened. So that is something we are keeping in mind and are open to considering that as a factor. One additional thing to

keep in mind on the KITS project is communications between high level officials at L&T and cog, S&S. One question that pops out is whether S&S is considered part of the litigation control group for the company and whether that in any way affects the way that the investigation is handleded. Whether there were high level officials in the company incolved, that raises questions of who has influence over the investigation.

CS: Sure. You reaised that before so that was the point of including what we have been doing with the company and its employees. Hopefully that addresses some of those. Out liason was in the lentecc business.

: One thing that would be helpful would be an org chart of the relevant players employed at the time that these decisions were being made.

CS: We haver some charts so we'll see if we can get you something from that time period or do a call.

: Sure. And we'll look through this and follow up with questions.

CS: Of course and the company is prepared to take next steps in cooperating with you.  If there is more you can do to help us look in the right places, we're happy to do that.

**2017.10.05 – L&T – Debevoise & Plimpton Review Status**

D&P: Colby Smith, David O'Neill

DOJ: Kevin Gingras, Andrew Bruck, Rachelle Linsenmayer

**Colby**: I'll give an update of what we've been doing since we had our meeting. We have made two additional productions since our meeting. The first were docs that lay beneath the presentation that we made and we made another production, the next installment of our forensic accounting review. We have more of that accounting work to come. At least 1 more, possibly 2. Our intention is to communicate to you the outcome of that work stream.

We also sent the letter that responded to some of the questions that you all posed during the course of the meeting. IN light of Andrew's comments encouraging us to continue looking at the KITS project, March-June 2014, we tried taking additional steps to uncover additional materials from that project. In order to do more to dig into those areas, we've done: 1. Conducted a review of data from 6 custodians from the KITS project. 12/1/2013-6/30/2014. The only search terms we used were Cognizant and CTS to capture all communications with Cognizant and to look at all of those with human eyes and not relying on key words. The custodians are: Satish, Vadivelu, Nagarajan, Kannan, Lakshmanan, Nanda Kumar.

In addition to the cognizant review, we also looked at the other data for those custodians and ran a broad group of search terms to ID information that could be related to the KITS project and searched through those records for those 6 in the same time frame.

For 5 of the 6 custodians, except Vadivelu, we restored backup data for 1/2014-6/2014. This was to find anything related to Cognizant and anything that didn't specifically refer to Cognizant but could be relevant.

For Vadivelu, instead of that time period, we restored 24 months of backup tapes 1/2013-12/2014. We used the same broad set of search terms for anything related to Cognizant.

For Subra Manan (sms senior official at L&T construction) we restored 24 months, 1/2013-12/2014 and applied broad search terms. Unfortunately, his email inbox included a range of information that was not related to cognizant, so we limited it to items related to cognizant.

As a result, we added 385K additional records to our review in addition to the 105K already reviewed prior to the July meeting. We enlarged staff. Number of reviewer increased to 18 reviewers. They are 1/3 of the way through those new materials. For the remaining documents, we are prioritizing 12/2014-6/2014 although our plan is to work through all of the documents.

We also do quality control checks along the way with random document samples.

Based on the work we've done so far, we have not yet found any new documents that add much to the chronology that we told you about in July, but the work is ongoing and we will keep you informed of any new information that we find.

In addition to that work, we came across a list of shell companies listed in a local Indian newspaper, associated with the former minister. We ran those names through our electronic records and identified 600 documents as a result. Review did not reveal a relationship with those companies.

We also took the names of those companies about put them through the accounting work stream to look for payments. We also did not find any payments made to those companies.

Finally, we also focused on the Cuney project and the environmental clearance. We ran targeted searches focused on the governmental agencies and enviro. Focused on communications from L&T construction to Mr. Zumbazi, focusing on 5/2013-8/31/2013, which was the period for the environmental clearance. These have not yielded additional results.

**Dave**: We hope you guys appreciate we are using every tool that we can think of to find additional information. Obviously we'll let you know if we find anything more and we appreciate you guys have been forthcoming with us in finding additional areas to look at and if there is anything more you can tell us to help us focus our search, that would help us be more effective.

**Kevin**: This is pretty comprehensive and we get that and appreciate it. Your point is taken and we'll see if there is any further that we can go to help you guys out because we understand that's quite a bit of work.

**Andrew**: I think that we expressed out concern earlier on that we thought this was moving slowly. Clearly you're taking a comprehensive look at this and from the description, we are happy to see the progress you're making. We're interested in what comes of the review of the 285k documents and will be interested in additional documents that come up. Until that is done, I don't have any additional questions.

**Kevin**: I don't have anything else. That's helpful to know.

**Colby**: Okay, as we said, we'll keep you posted but it will take us a little while.

**Kevin**: Do you have a rough estimate of when you think you'll be done?

**Colby**: Based on the number of documents each reviewer can get through in a day, we're thinking it's going to be at least 6 weeks. Probably about 2 months.

**Andrew**: And the first line reviewers, those are attorneys?

**Colby**: Attorneys with the law firm in India and also temp reviewers we have hired in our London office. They are temp attorneys doing the first level of review and we have used them on multiple projects and are doing QC to make sure things aren't slipping through.

**Andrew**: Okay, thank you. Let's plan for another update call. If you guys come across things that are of interest, we're happy to jump on a call. Otherwise, it makes sense to plan for a call two months out when you guys will be done with the review. We will reach out to you if we can share additional information.

**Colby**: Okay. If there's anything you can give us, that may greatly accelerate our progress and we will let you know if something particularly interesting and we'll report regardless once the review is complete.

2017.10.10 – CTS Presentation – Cognizant/India

**DOJ**: Kevin Gingras, Andrew Bruck, Rachelle Linsenmayer

**FBI:** Kelly Blanchfield

**SEC**: Paul Sharratt, Michael Catoe

**DLA Piper:** Karl Buch, Natasha Kanerva, Gray Stratton

**Karl Buch**: Give additional information about the planning process as we understand it. Then we were going to cover in detail the CKC variation, because you were interested in learning more about the middle-management level—below Gordon, Steven. The on-the-ground India team to show how they changed the documents. There's a very long history of that. There is also testimony taken.

If we have time, I can show additional class of documents that we uncovered, which I wasn't going to go through today but there is relevant information in here that we've produced to you. There's a discussion about the planning process and the permit. L&T put together slide decks that shows CKC project. The status of statutory approvals was shared as a line item. There is one for every month, starting in 3/2010-11/2014.

Two aspects of permitting

1. Planning Permit process in Chennai
2. Environmental consent or clearance in Maha Rastra (Pune location)

This should give background information to use.

CMDA (Chennai metropolitan development authority) – Local planning authority constituted under the Tamalnadu town and country planning act.

- States that anyone wanting to develop a plant applies to the member secretary of CMDA for a planning permit.
- Other local bodies CMDA delegated authority to (industrial, commercial, etc.)
- Issues permits for major development projects (multi-story buildings)
- Cognizant would have sought permission from CMDA for a plant permit (visible in docs produced to us)
  - CTS00051961 – Management review meetings (MRM's)
    - Gives a sense of the on-the-ground
  - This was in the last production
  - Will follow up after the meeting with bates
- Application required:
  - **Website cmdachennai.gov.in/planningpermission.html**
  - Plans from engineer and architect, title documents, no objections certificate, deed, no objections certificates from various agencies, enforcement by CMDA (if any; not clear that happened here), scrutiny fee (application fee: 250k lakhs paid by Cognizant)

- o Scrutiny fee is paid up front
- o After
  - ▪ Panel at CMDA scrutinizes
    - • CMDA Secretary, director of fire and rescue, water and sewage engineer, chief engineer, electricity board engineer, CMDA engineer, traffic commissioner from police, engineer from local body and planning department
  - ▪ Inspection of site by CMDA
  - ▪ Panel considers and issues recommendations
  - ▪ If successful, CMDA grants written permission
- o Approval
  - ▪ Development charge and rate calculated
  - ▪ Application for completion certificate
    - • "No person shall use or permit to use a building without a completion certificate"
- o Time takes
  - ▪ 6-9 months (for application)
  - ▪ Valid for 3 years
- o Then submit completion certificate
  - ▪ **Unclear how long it takes to get completion certificate on average**
  - ▪ **Presumed that completing the application includes getting the completion certificate**

**Karl:** Chronology based on management review meeting. How much detail do you want here on that or should we go to the Pune process?

**Kevin Gingras**: My thought is that given the limited time, it makes sense to go more general and follow up if we need to.

**Kelly Blanchfield**: I agree.

**Andrew Bruck**: There's the scrutiny fee paid upfront with the application at a set number of Lakhs. Is there another payment?

**Karl**: Yes, once the application is granted, you pay for the planning permit.

**Andrew**: How do they determine that?

**Karl**: It depends on the type of building, the square footing and the usage.

**Andrew**: do they have a specific schedule for how they determine it? Do you know if 2.5 million is what would be expected?

**Karl**: You'll see if you look for the September – there's a separate charge made in Fall 2014 after the CMDA issued its permit. I'm looking for a reference. There is, at a 9/2014 management review meeting. Bates CTS0050806, then 822 there is a payment advice and knowledge received. This is the first reference to the payment due to get the planning permit.

**Natasha Kanerva**: There's an email August 25 regarding 5 demand drafts for CMDA then WSSB. What is unique is corresponding demand drafts from the government, which shows that it is a legitimate charge.

**Karl**: So we know there was a legitimate charge in this time period. We have the demand drafts and we should get the bates numbers to show the payments and wire information.

**Natasha**: The payment goes directly from Cognizant to the government, not L&T paying on Cognizant's behalf.

**Karl**: And that's important because the 2.5 million referenced later in the variation documents is not the legitimate fee charged by the government, in our view.


**Pune – Environmental clearance process**

- Environmental Protection Act 1986 – Act regulating potential harm to humans related to development
    - Requires developer to obtain an Environmental Clearance from the MOEF or the SEIAA before beginning a project.
        - Ministry of environment and forest
        - State Environmental Impact Assessment Authority
    - Depending on the project,
        - Category A is MOEF
        - Category B SEIAA
            - Cognizant applied to this one

**Natasha**: Line of demarcation between categories A and B relates to if it were federal or a state agency.

- Submit forms, then
    - State Expert Appraisal Committee determines if project requires studies
        - Depends on environmental impact report
- Public notice hearing and opportunity to respond
- Typically, SEAC Issues an appraisal report after the enviro impact assessment (within 60 days)
    - Recommendation to the SEIAA
    - May also be an inspection by the SEAC
- Specified time that SEIAA is supposed to render a decision
    - If a decision not agreed to within that time, "deemed approved" if not heard from
    - Not supposed to start a project without having an Environmental Clearance in hand

**Michael Catoe**: What's the specified time?

**Natasha**: There are many different combinations, but there is a schedule.

**Karl**: Is it online?

**Natasha**: I can circulate a summary document from the website.

**Karl**: So that's what we understand generally. Timeline on Pune, we can come back to that depending on what we get through.

**[Binders passed out; Andrew and Kelly received electronic copies]**

Overview of the binder

- These are the key documents relating to the CKC variation
- Cover Q4 2014, Q1 2015
- Starts with requests from L&T to Cognizant
  - Series of internal cog documents, verifying costs and preparing response for variation request
- Q4 2014
  - Reference to a meeting with Cognizant and L&T, Cognizant agreed with L&T to pay statutory approval amount
  - Shortly after, Statutory approval amount (although agreed to be paid between cognizant and L&T) the line item is listed as rejected in internal Cognizant documentation
- Approvals from Gordon Coburn
  - Statutory approvals listed; Gordon approves the reimbursement
  - 2nd approval in 3/2015, statutory approvals listed as rejected, 11 offsetting line items approved
- Last document is the final variation spreadsheet sent from Cognizant to L&T
- I will point out the highlights, but you'll have the full set of all communications relating to the variation request

Tab 1

- First of communications relating to variation request
- 10/29/2014
- From Balaji to Venkatesan
  - V reported to Sinha, Sinha reported to Ganesh P., Ganesh reported to Mani
- Attachment
  - Excel that varies in form throughout binder
  - Line 32, they've requested reimbursement for approvals in 22.6 crores (226mil INR)
  - 11 offsetting line items are throughout the documents at lines 4, 8, 10, 11, 12, 14, 21, 25, 26, 30, 36

**Michael**: What are these line items?

**Karl**: This whole list is items L&T wanted to be reimbursed for. In early November, getting close to completion of the project, so L&T was telling Cognizant what they think they are owed because they did more than the original contract.

**Gray Stratton**: These are the 11 included in the variation request.

**Karl**: But the history is that these initially are rejected by cognizant because it was within the four corners of the contract.

**Michael**: They were initially rejected in 2013?

**Karl**: 2014 and it ends in 2015 when martin approves the changes we'll walk you through. This is early November 2014 – March 2015


Tab 2 – CTS32892

- Taking variation request from L&T and populating with comments to verify the cost
- Venkatesan sends to Sinha
- Attachment
  - Right-hand column shows basis for rejection or acceptance
    - Most rejected for being in scope of contract (line 14, 26)
  - Red high-lighted, comment shows basis to reject request
  - 11 items: 4, 10, 11, 12, 14, 24, 26, 30, 36
  - Request for statutory approvals is in line 32
    - Item "under discussion"
- Penultimate page (6 of 7) red high-lighting broken by two yellow lines
  - "Items in yellow to be discussed with PG"
  - Line 46

Tab 3 –  CTS319

- Infrastructure team – Venkatesan emailing excel to himself
  - Internal working to verify variation request
  - "PG Comments"
- 11 Items throughout sheet (highlighted in red)
- Request for statutory approvals at 25
  - Only item not highlighted by a color
  - Project statement after commitment of job
- Appears at this stage, statutory approvals still under discussion; all 11 line items marked red, to be rejected
  - This is similar to the basis provided in the prior excel


**Kevin**: Kelly, we'll Fedex one of these binders to you tomorrow.

Tab 4 – CTS125

- PowerPoint sent from Vadivelu to Mani and others
- Infrastructure and procurement (12 pages in, CTS137)
  - Breaks out variation in request for approvals of campus regularization
  - Prepared by L&T
    - Photographs that provide justification for charges; figures for enrichment charges
    - Most are described as "enrichment to the property"
    - 2 line items in addition to enrichment are variations for statutory approvals, variation for Forex losses

Tab 5 – CTS3897

- November 2014
- Venkatesan sending to Sinha
- Internal discussion related to L&T request for extension of time
  - "EOT" for KITs due to delays of permits; L&T requesting extensions
- Page 21 of PowerPoint, CTS32919
  - Line item for statutory approvals for campus listed as accepted
  - **First time listed as accepted**

**Kevin**: Accepted based on what? Is this still internal?

**Gray**: Yes, those comments are in "PG comments" so you can assume that it is internal deliberation.

**Karl**: We're suggesting at the mid manager level, there is back and forth and then they bring it up to Gordon. So this is how it gets to him.


Tab 6 – CTS13066

- November 2014
- Page 2 of the excel sheet shows statutory approvals/regularization accepted
- 11 items all in category below yellow row, "no accepted cost" associated
  - Lines 24, 28, 30, 31, 33, 36, 37, 39, 43, 44, 45

Tab 7 – CTS33899

- Still Venkatesan and Sinha
- Excel sheet similar, but on page 2 line 15 (previously said yes to statutory approvals) now says "to be decided by management"
  - We asked Venkatesan about this
    - The first should not have been accepted, which is why he included this note
- All 11 line items highlighted in red on page 3 of 6

Tab 8 – CTS12066

- Cost breakout provided by L&T, similar to PowerPoint on tab 4

- Nehru – Engineer in infrastructure department
  - According to him and Venkatesan, he verified associated costs but not at review of statutory approvals and campus regularization charges
- Significance
  - Page 18 of 53 shows breakouts and support provided for 11 items substituted for the statutory approvals
    - According to associates, those line items were real costs, were just rejected for various reasons
    - Shows that those costs were supported by documentation

Tab 9 – CTS4847

- Email from 12/24/14 – Venkatesan to Sinha, referencing meeting with L&T on Nov 30th
  - "All of the items in the variation list has been reviewed along with L&T" "We proposed RS plus 403 million INR)
  - If you look at page 3 of 6, this same line is on the net total 403 million INR of spreadsheet
    - (Excel sheet created prior to meeting to list what they would reimburse)
  - Email bullets show:
    - Outcome of meeting, what they agreed to pay on top of that amount
      - "Based on request from CTS, STPI campus regularized" "we accept it for the same"
      - STPI is the Sinuseri campus; related to Tab 4, this was the document that broke out the statutory approvals at CTS137
        - Amount covered planning permit, items related to Sinuseri
  - Bullet 1: Didn't agree at meeting to pay all 22.6 crores; amount in right-hand column tab 9 pg 2/6
    - "-70" amount is what is referred to in the email as the amount requested for the campus regularization
    - In Tab 4, if you add lines 3-6, that is 70 million INR
    - So initially, Cognizant agreed to pay statutory approvals and alc layout and rejected the Sinuseri amount
    - BUT at the meeting L&T asked that they pay the 70 million INR, and they agreed (about 1 million USD) to regularize Sinuseri campus
  - Bullet 2: Quarry problem
    - Line item, line 28 the Delta of cost (44 million INR) for granite increase (2nd item that Cognizant agreed to pay above the initial amount (planned to by 403 INR, then agreed to the 70, then a portion of the granite cost due to a closed quarry)
  - L&T wanted FOREX losses to be paid
    - Cognizant did not accept that variation
    - "In total we confirmed to L&T we will consider around 50 crores as variation for the KITS project " (includes 403 + 70 for Sinuseri + portion of granite cost)
  - Concludes saying they will consider 50 crores

Tab 10 – CTS33901

- Excel now reflects 50 crores, and this continues through the rest of the binder
- Most interestingly, for the first time (page 2/7 CTS33906) we see the 11 line items now above the line and listed as "proposed to be paid"
  - Lines 16-26
- Discussion about reasons for the delay and milestones on obtaining planning permit
- On line item 34, campus regularization moves from being approved to not approved for the first time
- To sum up 16-26: 3.7 million USE (roughly the same as campus approvals)

**Andrew**: On 34 it drops, then they put it back in?

**Gray**: That's right, The email at tab 9 says they provided additional information and the 70 million for the Sinuseri was added back to the overall amount that would be approved by Mani. Tab 9 and 10 you have to look at together because it's later the same day that they've offset the statutory amount with the 11 line items. Then later they prepare an excel sheet that reflects the approval will be rejected and the 11 line items offset will be accepted.

This is all midlevel managers at this stage.


Tab 11 – CTS3579

- Infra prepared a draft of variation response and proposals
- Goes up to Mani, BG at procurement—all more senior—Narasimhan (Narsi, Finanice), Krishna (also an analysis agent)
- More formalization of the structure; including finance personnel to preplan for approvals
- Excel sheet
  - Same as the last, 11 offsetting items at 16-26, designated for acceptance
  - Statutory approvals and campus regulatory is at 24, designated for rejection
  - Total proposed to approve is 50 crores (page 3/6 of excel sheet, CTS3584)

**Michael**: Who were the finance people again?

**Gray**: Narsi and Krishna.

**Karl**: Krishna is no longer with the company. Narsi is.

**Gray**: We can talk about their interviews.


Tab 12 – CTS3608

- Mani approves, related back to discussion with L&T
  - Requests help from Narsi on approval from Gordon
  - Narsi sends capital allocation request later

Tab 13 – CTS321

- All 11 line items with no other text in the email
- 1/13/2015 Venkatesan sent to L&T with no other text
  - Venkatesan was reluctant on going into specifics about these particular documents and line items

**Paul**: So this appears to be Cognizant letting L&T know how it's going to pay the 3.7 million?

**Gray**: That's fair to infer.

**Karl**: But we don't have that. We was not cooperative, is how we'll put it. He ultimately left the company on his own. We had him suspended.

**Gray**: In the end he said that these line items were ID'd by Mani to offset the statutory approvals.


Tab 14 – CTS322

- Different Narsi than previous (under Venkatesan, not in finance)
- 1/13/2015 is an important day—leads to Mani sending a version to Gordon and asking for informal approval
  - Many different versions done on the same day, Mani takes one and sends (Tab 19 – CTS177)

**Michael**: What's the summary of the internal discussions that resulted in the variation of the internal documents on that day?

**Gray**: The documents tell as good of a story as we have. The people involved spent their interviews denying knowing about offsetting entries. The testimony are not helpful for 1/13. Ultimately, Venkatesan, Ganesh, Mani, BG all said these 11 items were ID'd as offsetting entries.

The summary is what you see is lots of different versions.

**Kevin**: You don't know the rhyme or reason to the different versions?

**Gray**: Schedules reflect a 26 crore variation amount—the amount for enrichment, what L&T did to make the property prettier. That is the stripped down version of what was pre-approved. Tab 18 is the table Mani will send to Gordon in the text of his email. The amount for enrichment is there, then the other amounts are on top of that. A lot of the machinations and variations of the documents are designed to, they're trying to present the clean document relating to just enrichment, then another with just statutory approvals. That's what it looks like but testimony doesn't say that.

**Andrew**: Where is tab 17 from?

**Gray**: Ganesh to Mani.

[Andrew is missing initial email with attachment]

**Gray**: Tab 18 was s standalone on Mani's laptop.

**Andrew**: Does the metadata say where that came from?

**Natasha**: the best we have is that it was created on his computer, not that it was sent.

**Gray**: We don't have another document similar that we've identified.

**Andrew**: It seems like it's similar to the numbers in your 17billion at the top, except that comes from Ganesh.

**Gray**: Yeah it looks like Venkatesan was preparing the various iterations from Ganesh to send to Mani, from which Mani emailed Gordon.

**Andrew**: One other bigger picture question is, statutory approval payments that went through L&T are for 2.5 million, which would have been between 12-15 crores but here it's 3.7 million. What's the reason for the discrepancy?

**Karl**: Go to tab 4, 137. If you look, this is the early document that is the PP from L&T to cognizant. The enrichment items plus this page where they are seeking variations for approval of campus reg. The umber there is 239 mil Rupees, then goes down to 226 million. You get this if you back out the neps approvals. We believe line item 2 is the 2.5 million for CKC. Then other line items which we thought were suspicious, and we conducted a review to find various levels of suspicion around the other items. [Can go into these at another time – no evidence Gordon was aware of the other line items and how they got to the 3.7 million—he never got the PowerPoint]

Mani's testimony shows he spoke to Gordon about Tab 19. We read out further that we went through the other line items with Mani and he mainly said, "I don't know because it predated my role." There's a long history of what the others relate to.

**Andrew**: Generally the stat permit is 2.5 then other payments are bundled in as statutory?

[General Agreement]


Tab 16 – CTS35366

- Page 11 of 19, first time we see schedules
- 11 items plus two others
- Specifically refers to adding additional claims instead of statutory approval
- Other documents, you see similar language

Tab 19 – CTS177

- Part of what is sent to Gordon
- Informal notice from Mani to Gordon to get approval; Mani says he sent it for statutory approvals in addition to variation request related to enrichment (26 crores)
- Gordon sees the 3.7 million amount
- Attached Excel CTS178
    - Approval requested for statutory approvals (22.6); 11 line items ID'd as rejected

- So ended up unwinding the line items when they gave it back to Gordon, despite the work done to do otherwise
  - In March, that changes and is sent to him in a spreadsheet
    - Schwartz told in 2014 that "a lot of line items" would come in an exchange order
  - Original Gordon Doc: 3.7 million claimed, Gordon told the 11 line items rejected
    - In March, the request approval for the opposite
    - This ties in to Mani's statement that he wants statutory approvals
      - Wasn't formal financial approval, just internal
      - Official includes all finance people
    - January was the actual deal; the later approval was more "clean"

**Kevin**: Doesn't Gordon reply instantly that this was approved?

**Gray**: No, three weeks later.

**Kevin**: That's the email without the finance people on it?

**Gray**: Yeah you see that at tab 3.

**Natasha**: Yeah and Mani wasn't expecting the approval there. The finance people were preparing for the request.

**Catoe**: In tab 19, where are the line items?

**Gray**: Lines 3,5,6,7,8,9,10,12,13,15,18. On page 2.


Tab 20 – CTS3198

- Draft email to Gordon for capital request KITS variation
- Because statutory now in formal, listed as rejected, line items approved

Tab 21 – CTS4849

- Venkatesan Saying statutory costs are included in the 500 INR, 50 crores amount

Tab 22 – CTS33996

- Language with amounts on page 305; seen in original comments Venkatesan had

Tab 23 –

- Gordon's informal approval to Mani in response to 1/13/2015 email

**Andrew**: On that email, did anything trigger Koburn sending that 3 weeks later?

**Karl**: I don't know that we have any answer on that.

Tab 24 – CTS0000264

- Related to variation discussion

- When Mani asked about if Deepa asking about variation amounts prompted them to change the presentation, Mani said that it didn't change it. They were always going to do the line amounts.

Tab 25 – CTS0000199

- Page 6 of 18 of excel, statutory claim language given

Tab 26 – CTS0000326

- Similar to 25, sharing internal versions, ID'ing 11 line items as accepted

Tab 27 – CTS0000328

- Broader participants, all infrastructure people
    - David reports to Ganesh; all report up through Ganesh
        - David says in preparation of formal request; two options in excel sheet
    - Excel sehests, 11 line items accepted

Tab 28 – CTS0003076

- Original draft to be sent to Gordon; Background says "18 million" "for changes at the site" for enrichment. "Note sent by Mani"
    - Likely a reference to January
    - Thi sis the original language. There is a response in Tab 29 – ganesh to Krishnah that there are changes in bullets below

Tab 30 – CTS0000201

- Ultimate email to Gordon from narsi, for formal approval of capital allocation request
- Under background, highlighted amount; no reference to changes and approval on sire that were included in tab 28

**Karl**: This is missing a document. We have a spreadsheet.

**Gray**: When you go back, tab 30 there should be another excel sheet that Gordon would have received.

**Karl**: in that spreadsheet are the variation items that would show the stat approvals went from accepted in January to accepted in March. Gordon said in an interview that he hadn't looked at them. But if he had, that's what he would have seen.

Tab 32

- Final doc sent to L&T

---

**Testimony**

**Mani**

-He prepared initial approval request to Gordon in January because he wanted it for the stat approvals in addition to the 11 line items. Language on stat approvals removed to protect Cognizant because he didn't want it on their books that CTS made such a large payment for stat approvals. He Informed Koburn of the replacement, Koburn understood.

Cognizant told L&T they wouldn't pay for 11 line items. Presented to Gordon in this way. Changed to offset statutory approvals so it would appear they weren't paying the approvals even though they were.

**Venkatesan**

-Rejected initial request for STA approvals because no supporting docs. Amount was 20 crores was high to him for stat approvals.

11 line items: those were items Mani said could be reconsidered for payment. Initially denied attempting to match line item value to stat approval value. Ultimately, he said Goal was to compensate for shortfall from rejected stat approvals and language "accepted for stat approvals" in his document was an accurate rep of his scheme. This was after shown document from his laptop.

ID's 11 line items to make up shortfall after discussion with Mani. Rep'd work performed by L&T, not fabricated expenses. Didn't recall circumstances around his writing, "accepted for stat approvals". Someone may have instructed him to write it. Didn't know the goal for the money. Denied involvement of Government officials.

<u>**Follow up**</u>

-Dana Gilbert privilege follow-up items?

**Kevin**: It raises the issue of how we're going to deal with this going forward. We don't want the first time we hear about something to be in cross. So are we going—it's just an issue.

**Karl**: We're working with the client because there are some things that fall under privilege. We've done our best to navigate around crime fraud and the company has directed us to share with you. There are additional things that we are talking about. The collateral consequences of waiving.

**Kevin**: Other companies worry about the same issue. We're not asking you to waive but it looks like this is heading in a direction of a theoretical issue.

**Karl**: There are some additional documents we will be producing to you from different custodians. There is some additional relevant stuff, but not a lot.

Do you have a sense of timing? I need to judge resources.

**Kevin**: On our side, we're trying to move quickly. Andrew, correct me if I'm wrong, we're probably near the end of interviews. That is a marker that suggests we're getting to a point of making decisions within the next couple months. Part of that hinges on a resolution of this issue or a way forward.

[Kevin will send selective waiver letter}

This one is different because it is not broad, but directed at particular items.

We got through and I know you're looking at crime fraud and it's backwards looking, mainly looks at attempts to cover up the crime.

**Gray**: Are there particular areas from your conversation with Dana that you have in mind?

**Andrew**: I flagged a couple of things but we can set up a call to go through that stuff.

Have you guys done an interview of Steve Kasari in audit?

**Karl**: Yes, two.

**Andrew**: Did that include a discussion of the 2013 internal audit review, Ernst and Young audit of Sinuseri and KITs? Could we have that on a call? Is he represented by counsel?

**Karl**: He is not. So I will want to get that process started now.

Okay, let's schedule a time for a download on that. Our investigation is still going on. We did interviews in August, there are some additional ones we want to do. Particularly around a number of issues, including compliance: Dana Gilbert, Steve Karari (pot.), Karen McLouglin (pot.) within the next few weeks.

**Kevin**: Do you have a set time?

**Karl**: No.

**Kevin**: If you can let us know when you get a sense of the time frame.

**2017.11.07 – DLA Piper Presentation – Download of Steve Casari**

DLA Piper: Karl Buch, Gray Stratton

DOJ: Kevin Gingras, Andrew Bruck (phone), Rachelle Linsenmayer

SEC: Paul Sharrett, John, Mike

FBI: Kelly Blanchfield (phone)

**Agenda and Follow-Up Items**

- Tolling agreement to be discussed with client
- E&Y Point
    - DOJ awaiting contact from E&Y to speak to directly
- Casari currently getting counsel
    - Won't meet with him until week before thanksgiving or after
- Casari—interview exhibits not produced (custodian wasn't asked for, outside of scope of Sinuseri story)
    - Happy to produce if needed
- Document production of other custodians already interviewed by DOJ
    - Gilbert, D'Souza, Casari, Dana, McLouglin, Shekar (interviewed, do have documents—list sent 7/6/2017 of interviews, then 9/6/2017 custodian collections)
    - DOJ will follow up with additional individuals, if wanted
- Chandra Shekarian interviewed—DOJ requests download
- Will give download of Shekar Subramanian
- Privilege log
    - Held up by CKC specific log—narrowing down
    - DOJ Req: Broad log first, then will ask follow up questions
        - Will send in next week or two
- Counsel will produce exhibits referenced in download (drafting history important)
    - When produce documents, will include key to match up

**Casari interview – 9/30/2016**

<u>Background</u>

- Accountant, bachelors from Pace in 1998
- Kone Holdings; position as Controller then CFO (7 years)
- Became consultant, worked for UK company Remore (later became Swets Blackwell)
- Rejoined PWC for 3 years after the merger in 1998
- Joined OmniComm (advertising); head of external reporting, head of investor relations (7 years)

<u>Cognizant</u>

- 9/2008: hired by Rob Telesmanic (corporate controller, now chief accounting officer) and Gordon Coburn (then CFO)
- 9/2008—7/2012: held Assistant Controller position
  - Helped with 10k's 10q's stock compensation, m&a—not involved in real estate (aware of disclosure of sg ft of leases)
- 2-3 years ago, more involved in real estate management
- 7/2012: McLoughlin asked him to run internal audit and ERM (Risk management system)
  - prompted by dissatisfaction from audit committee with existing audit reports; about 15 people worldwide worked for internal audit; previous internal audit led by Prekash Rejan
  - Focus at the time by Rejan was SOX compliance
  - interviewed with Tom Wendell (chairman of the board and audit committee when he took the role)
- Casari identified main issues with internal audit: increase capacity; change leadership
  - Casari replaced leaders in India (Sheker Subramanian, Senior Director of Internal Audit; K.S. Dinesh (Senior Executive and Head of ERM)
  - Looked at work defined by SOX, advocated for 20% department increases per year instead of 7-8%
    - A lot of work was in house instead of outsourcing to E&Y
  - Increased staff to 40 from 15 (2012-current)
- Casari reported to Mcloughlin; dotted line to Maureen Brinkiron-Evans (chairman of audit comm)
  - frequent calls with Brinkiron-Evans but Mcloughlin controlled his career and compensation
  - Raj Ghosh his peer (VP of procurement)


Internal audit compliance

- Every corporate function under-funded (internal audit, legal, finance)
  - Compliance had no budget increases, Casari didn't know how could run compliance with 2-3 people
  - Funding and buy-in from business colleagues were issues
- Formal review for anti-corruption in 2015
- Geographic reviews with compliance elements
  - immigration and local pay roll policies
- Information from internal audit to audit committee via quarterly reports
  - content improved over the years; reports provided concise summary to audit committee
- Mcloughlin, Coburn, D'Souza all reviewed reports before release (provided minor comments)
  - did not recall substantive change to ERM reporting regarding top 10 risks (sanitized a bit)
- Year-end report
  - deep dive into 1 or 2 risks, business leader of risk would present to committee
  - audit committee received in advance; at meeting went through pages 1 by 1
  - Brinkiron in charge of presentation
  - consistently expressed concerns of underfunding to audit committee in 1 on 1 sessions: Leo McKay, Tom Wendell, Brinkiron

- o Casari was aware of issues because he saw presentation slide decks prepared by Dana Gilbert (she would show and ask for feedback)
- o committee asked gilbert for benchmarking for requested funding from compliance
    - ▪ gilbert asked for info from industry experts
- o Slide decks sometimes had comparable market data, ie Cognizantcompared with competitors
- o Knew problematic but market info removed from gilbert's slide deck before presentation to audit committee
    - ▪ didn't know who removed content—but probably D'Souza, Coburn, Mcloughlin or Schwartz (removed benchmarking data)
    - ▪ Excuse for removal was that not enough time to vet info; Casari uncomfortable with this explanation because info was from experts
- o Casari encouraged Gilbert in private sessions
    - ▪ politics made it seem Gilbert might only do so privately
- o Audit committee had private meetings with PWC
    - ▪ seems never had private meeting with gilbert [this is incorrect]
- o Casari felt audit committee listened to him but did not address his concerns
    - ▪ believed resistance from Coburn due to his control of the budget
    - ▪ at a very recent point, comparative data on compliance was presented to the audit committee

Business side

- • Casari believes doesn't care about compliance; many budget discussions included Rajiv Mata (president of IT)—felt Mata didn't value corporate functions, didn't understand why he would weigh in
    - o Mata focus didn't include compliance
- • Discussed scorecards which now include compliance; but felt at the time that compliance not seen as important
    - o Issues with technology and language
    - o Tone at the top—disconnect between words and actions (based on view that compliance underfunded)
    - o Ongoing compliance issues with travel and T&E
        - ▪ Potential inappropriate client entertainment
            - • [information privileged; does not indicate at what level of management]
    - o Seemed to have improved in the past 8 months

Relationship with Mcloughlin

- • Working relationship tough over past couple years
- • Casari thought he was adding value to internal audit but sometimes things difficult, "hit a nerve"
- • Content
    - o KM would push back, saying he hadn't talked to the right person
    - o red yellow and green color designations led to debates
        - ▪ system subjective; discussions with Mcloughlin about it
        - ▪ seemed odd to him; Mcloughlin seemed to require internal audit to justify position
        - ▪ He felt all risks should be red

- - KM concerned if all risks rated red, audit committee would want to invest money into issue even if not a priority
      - to Casari, regardless of designation audit should follow up
  - o Example of back and forth: Immigration practices
    - Discussion about h1b1 visas and scope for what holder can do; review revealed potential violations; long discussions on rating of report with Mcloughlin and Schwartz; ultimately no change in wording of his report
    - change in risk rating red to yellow
      - didn't think Mcloughlin and schwarts unreasonable about it, just sensitive
    - Visa compliance in japan—discussion of risk level (all agreed it should be red; Mcloughlin disagreed because the market was so small it was immaterial to her)


**India (including 2013 audit)**

- Risk of corruption in India high
  - o hasn't seen corruption, himself
  - o always bribe to get things done; always concerned from a governance perspective on how Cognizant operated
    - company slow to react to operational problems
- E&Y said focus on governance, don't go further
- facilitation issue raised in an invoice, which gave him a good education on the issue
  - o recalled escalating to compliance; external counsel brought in; issue run through; does not know what outcome was

<u>E&Y Investigation and proposal (2013)</u>

- Prompted by Tom Wendell (board member at the time)
- Board meeting in Chennai; Tom Wendell asked for internal audit review of procurement proves around real estate business
  - o Wendell noticed every project went to L&T, internal discussed his concerns
    - wanted to understand internal bidding process
    - Cognizant did not have resources for review, went to E&Y
- Phase 1 investigation for projects in Chennai; 2&3 in Bangalore and China
  - o Second phase of project done internally to save money
- *Email 4/4/2013 -- Mani to McLoughlin, Casari CC Shekar Subramanian*
  - o Remembered that email related to getting 3rd party to conduct audit; discussion about this; believed sent during drafting of phase 1 report
  - o Mani advocated using Kusman, CBRE or JLL over E&Y due to companies' familiarity w/ property consulting in India
  - o Didn't appear to Casari that Mani avoiding the audit; Mani just thought E&Y didn't have expertise
  - o Casari decided to go with E&Y
- E&Y audit first, shadowed by Cognizant; Cognizant then used first shadowing to do their second review

- *E&Y Power Point ("Revised Final Report" 6/3/2013 – "Internal audit report internal structure review—Sinuseri projects – KITS")*
    - Remembered E&Y concluded vendor prequalification calculations potentially biased towards L&T because of scorecard structure
        - vendor scorecard ranks vendors on different aspects, highest score selected
        - bias because card awarded points for balance sheet –bigger companies get more points—experience company has (L&T has worked on larger projects historically)
        - easy for L&T to outweigh smaller companies; bias didn't seem deliberate to Casari
        - although there were open bids and competitors offered better prices, may have been excluded anyways

<u>Construction w/out permits</u>

- Recalled E&Y found Cognizant doing work before permits issued
- Widely accepted practice to do this and get permit later; Mani, BG, Ganesh all agreed on working first and getting permit later—"just what people did" in India
- Practice persisted despite that; not involved in calls for approval but thinks Shekar was
- Told they would eventually get permit but doesn't recall seeing it; once it took a year to get a permit for a parking garage
- Sometimes needed to do process to get a stamp; E&Y found permissible

Lead E&Y partner on Project Terry Thomas (with E&Y India), along with Banerjee Avishek, Vidhathrae, Krishnamorthy, Rohi Nayak

- Avisheck and Rohid were real estate experts
- Vid was senior management; more program management experience

*Overview slide ("Project in scope") – addressed turnkey model, requirements, etc.*

- Cognizant put out list of requirements, vendors respond with proposal to fit needs
- Casari said difficult to compare different concepts because CTS didn't require many specifics; offerings were sq foot and feet
- alternative was hire engineer builder, compare costs
- Instead, Cognizant relied on turnkey vendor for everything—seemed sensible because Cognizant not a building company
    - question to him was if they would lose control by hiring this vendor
- Narsimhan Sinhara (Narsi) – name that was on the document
- Audit of L&T never occurred (by internal audit)
- Cognizant had never audited a 3rd party—did negotiate audit rights with L&T

*46th slide – "8 - Statutory licenses and approvals"*

- External consultant referenced; did not know who that was
- Did not recall details of Sinuseri, KITS campuses issues, only what was in slide deck
- Licenses approvals part of L&T scope; internal audit only looked at process and governance
- recalled that hampered by delays, so common to move forward without permits
- if waited, wouldn't be able to meet building objectives

- "just in time" approach met Cognizant requirements of having facility at or near end of project—common practice that eliminated risk of having government shut down the work
  - having a turnkey vendor was common practice
  - recalls conversations about this with Mani, not Mcloughlin
- Once in 2015, recalls a permit did not arrive in time for a project
  - BG told him Cognizant occupied building w/out permit, government shut it down, then Cognizant had to wait for permit to use building
  - L&T working on project, was nearly completed
    - doesn't recall how they ended up getting the permit

*47ᵗʰ slide ("Risk")*

- penal provision
  - recalled discussing with Shekar and Mcloughlin at large meeting fall 2013 with Mcloughlin, Coburn, checker, Casari, and ghosh
    - Casari, Mcloughlin, Ghosh attended; Mcloughlin by phone; Shekar from India
  - risk was downplayed about permits because normal to go forward without permits

**SEC**: This criminal liability is liability for building without permits in advance?

**Karl**: Correct.

**Andrew**: Do you guys have additional information on when that conversation happened—like calendar entry of the participants, other email traffic that would help us pin that down?

**Karl**: We'll do some work on that.

**Kevin**: So around building a building without a permit?

**Karl**: Yes my suspicion is they were looking at the reports. Fall 2013 (repeats above information)

*47ᵗʰ slide ("Risk")*

- Downplayed risk, but Mcloughlin was pretty quiet at meeting, consistent with her personality
- believes consulted with Anan Bushon (although not at that meeting or on that call)
- Takeaways from call:
  - group agreed issues needed to be resolved; Mcloughlin advocated Ghosh address them since he could drive management responses from procurement perspective
- Casari felt that Coburn recognized issues with company process and was willing to make decisions contrary to policy even if board would not approve them
  - Coburn cited cost efficiencies and said if he were fired over his decisions then "so be it"
  - attitude consistent throughout award/bid process
  - no discussion about risk of project being stalled/shut down

**SEC**: So Coburn felt things should keep going the way they were going?

**Karl**: You'd have to ask Casari.

48th slide – States finding that 12-18 months required for approvals prior to construction but that timeline not suitable to Cognizant

- "approval from local planning authority takes 8-9 months… due to socio political factors"
- Casari interpreted this to mean that these times were common practice in industry
  - doesn't remember if actually were common practice

**SEC**: Says that this is not conducive to…

**Karl**: It just would take too long to wait is what he was trying to say. [the formal 12-18 month process]

*48th slide*

- Instance where Mani was building 5 floors above parking garage; expected permit; Casari didn't know if received
- Slide is management's response
  - In conclusion, but way ahead to keep going with Cognizant approach
- Casari didn't recall how approvals attained at Sinuseri and KITS; didn't know what liaison consultant [listed on slide] was
- Was asked if there was a challenge from board on criminal risk—did not think board was challenged, but discussion possible; board may have missed the risk of this due to L&T use of consultants

E&Y Report – Management response

- 2 reports
- struggled to get responses regarding mitigation activities
  - interpreted board suggestion as justification for previous process; meeting with Mcloughlin, Shekar, Coburn (regarding that they could rep cognizant the best and put FCPA language in contracts)

**SEC**: One of the responses was why couldn't they continue with vendors' submissions?

**Karl**: Yes just the previous practice of using vendors to vet bids.

E&Y Report – Management response

- Thought L&T capable of process w/out bribes; global and would avoid "getting hands dirty"
- L&T was biggest player, had reputation for conducting clean business
  - Casari amenable to argument but wanted a business plan for preferred vendor agreement
    - Coburn refused to spend money on study, stated "I'll take responsibility. If they don't like it they can fire me"
  - Coburn responsible for real estate decisions; week prior (9/2016) people were still referring to Coburn when discussing real estate

**SEC**: And Coburn said that in the context of..

**Karl**: Of management's perspective of using L&T to continue to build the buildings

**Andrew**: Is this part of the same phone call we were discussing before?

**Karl**: I don't know. We'll see what we can do to get you dates and calendar entries.


E&Y Report – Management response

- Casari felt he was trying to help solve the problem; Ghosh proposed conducting market study himself, not hiring someone; did the study and concluded L&T was the largest provider in India
- Internal audit concerned no protection language in contract; that's why they added FCPA language; executives responded positively
- This was one of the results of a 2013 internal audit meeting
- Did not recall asking L&T for audit rights at that time
- Handbook created following review
- included directive not to start construction without permit; unclear if implemented (referring to Raj Ghosh)
  - Will follow up on if have handbook


Internal Audit Report – Phase 2

*4/22/2013 email chain: Draft internal audit report*

- *Slide 27: "7 – Statutory Approvals"*
  - recalled issue with water remediation at Pune, didn't know details besides that litigation occurred; specifics in Delai project, Sinuseri, Kits, Pune, Chi—all not presented to audit committee, just said excessive delays
- *Slide 28 – continuation of statutory approvals*
  - acknowledged inconsistent contract clauses for statutory approvals across L&T
- Kochi and Climpatior, Hyderabad
  - L&T requested reimbursement for stat fees at Hyderabad
    - raised this as compliance concern to Gilbert
  - internal audit put FCPA language into contracts as warning to vendors
    - conceded language couldn't shield Cognizant if they compensated vendors for inappropriate payments
- Ghosh told him BG and Mani looking into corruption in 2013
  - India was a complicated market; BG thought using L&T was a safeguard because they would pay proper facilitation payments but not bribes
  - didn't recall conversations discussing having L&T engage liaisons
- *Slide 29* - Bullet point "Non-Compliance with FCPA provisions could subject cognizant to investigations and penalties"
  - This conclusion was in the internal audit report, not the E&Y report; doesn't recall why this was
  - observed slide 29's recommendation that Cognizant add an audit clause to contracts; doesn't recall why a difference on FCPA point

DOJ-EH-0000000118

**Andrew**: Do you have a bates on the internal audit report?

**Stratton**: I'll get it to you. This is identified as a draft of the report, which we might not have produced. We'll come back to you.

**Karl**: But we produced the final report so we can get that.


<u>1/6/2014 final audit report</u>

- o   Did not include audit rights or FCPA clause; Casari didn't recall seeing presentation before but Shekar Subramanian (no longer with company, left before investigation) Venkata Anish Leburu (now in global security function at cognizant) might know about draft

**Kevin**: Where is Shekar now?

**Karl**: He has since moved to the UK. Shekar Subramanian.


*Email 8/26/2013 from Mcloughlin to Casari (for 9/2013 meeting of audit committee)*

- o   Email says that Mcloughlin modified working on slide, asking Casari if okay
- o   Casari generally got comments from her via email or internal video system; also generally received clarifications from D'Souza
- o   Slide 3 references bribery of transport staff; favoritism with vendors paying cognizant staff kickbacks to get deals

*Email 10/24/2013 (Anush PS, Abraham Agazi, Anish, Casari) – attached draft of audit committee slide deck with India update*

- o   remembers internal audit took a lot of work and time, in part due to writing of internal audit; also due to management responses delayed
- o   2013 track internal auditing and reports, draft of escalation matrix
- o   response from pollution control board in Pune – Maharaja Pollution Board
- o   Not included in final report to audit committee; normal to exclude details like this
- o   Process was to have detailed report then review as a team before presenting to Mcloughlin

*11/13/2013 chain, contains 11/8 email from Ghosh asking Casari and Shekar, Sivaramakrishnan (IT manager) for comments on infra and procurement landscape assessment*

- o   forwarded to Mcloughlin, Anjan Sur (finance); helped to coordinate audit committee slide decks; final report called out Pune and MP (Maharaja pollution board) project; felt that could address penal issue due to construction starting before permit
- o   met with Mcloughlin about Pune issue; Mcloughlin didn't want to be the one to possibly go to jail because she was director of India board

**SEC**: And they both recognized the risk?

**Karl**: Yes.

- o May have discussed with Mcloughlin that this may have been bending of process, but not discussion of violating local law; Mcloughlin wanted to resolve the issues; discussion of audit report

*Email from Casari and Mcloughlin, Anjan Sur - Other version of audit committee presentation*

- o further discussion about MP; slide deck mentions risk of fines, prosecution, pollution standards in Pune
- o includes recommendations for FCPA wording; asking for audit rights v. FCPA compliance
- o no reference to criminal violations
- o when asked about why differences: Casari believes Ghosh made the change; internal audit worked with Ghosh to make sure observations not diluted; Shekar ran meetings with Ghosh but Casari on some calls; wanted to make sure internal audit concerns addressed; this deck was to go to audit committee

*12/2013 presentation to audit committee (final version, slide 25, language about criminal liability removed)*

- o Expectation was that language would have been included; didn't recall being at meeting and noticing info missing; struggle for closure on the issue; had meetings with Brinkiron-Evans about it; didn't know why info not there; didn't know why no internal audit rating (previously had a high-risk rating)
- o Sensitive, request from Wendell—there was a process but wasn't followed; follow up, but wasn't sure
- o Discussion about findings at committee meeting? Didn't get very far in presentation; didn't have notes, didn't think there were minute meetings
- o Management thought favorable judgment with Pune probable; approval recommendation by government ministry
- o *when showed 1/6/2014 audit report, pg 26*
  - o Environmental issue for Pune listed as high—stated this was not circulated to audit committee, only would have received presentation deck; doesn't know why approval rating not included.

*Ata Batla Construction 6-7/2013 (mostly privileged discussion)*

- o Hyderabad

*7/1/2013 – BG, Casari, Mcloughlin, Mani email chain*

- o not sure if he raised the issue (approval for Ata Batla campus on 6/21); might be confusing timeline; believed looped in Gilbert who took it to Mcloughlin

**SEC**: What is the issue with approval?

**Karl**: Was there an inappropriate payment for attaining approvals at Hyderabad [this is counsel summarizing previous events]. This was escalated, we looked at it with review and we don't believe a payment was made.

- o internal audit escalated issue again; company got additional info from L&T for line item; knew Shekar or Ginesh would have been involved and following up with BG; no notes with interview of BG

**Kevin**: Did you interview Shekar?

**Karl**: No. [seems he left in 2014]

Global anti-corruption review (2015)

- o audit conducted w/in regular audit plan; interviews with senior management; global risk assessment of high risk; key area was FCPA; first time focused solely on anti-corruption and FCPA alone
- o audit plan looking at risk; emailed stakeholders, executive leadership to solicit concerns; interviews and documents collected, including compliance, procurement docs; executive summary on corporate governance; concluded compliance needed strengthening—compared general program compliance with other companies; Cognizant missing formal policies, inadequate training, compliance level within training, incident reporting and response
- o in his opinion, deficiencies due to lack of execution; difference between tone and execution; went to audit committee in private session when discussing issue
- o audit committee asked Gilbert and Casari for clarification; had always been hot topic for audit committee, particulary McKay and Wendell; Schwartz said would allocate portion of budget to compliance; Coburn said company would invest more in compliance
- o investment had been made since report issued, some of which needed due to new business; dedicated compliance officer; more money to gilbert to address training programs and hire more people
- o finding procurement function; due diligence; adding FCPA language; didn't believe more done than add language (FCPA and anti-corruption) for procurement policy; target date 2016; [reference to people soft enhancements]

T&E issues in the past, didn't agree with how they were handled.

No other compliance issues

**Action items**

- o working on his lawyer (process for company to cover fees)
    - o will meet with him, give documents (as done with everyone)
- o still interviewing people; performing an India look-back
    - o Mcloughlin, Dana, Casari (after DOJ speaks to him), pot. Others will be interviewed December or later
- o Note: not everything stated in Casari interview can be corroborated by other work done by Counsel

DOJ-EH-0000000121

**2017.11.16 – DLA Piper Call**

DOJ: Kevin Gingras, Andrew Bruck, Rachelle Linsenmayer

DLA Piper: Grey Stratton, Karl Buch

---

Planning meeting early December for update on internal investigation

- additional findings around operating licenses (inappropriate payments), customs, tax allegations (electricity tariffs)
    - some have been sustained, some inappropriate payments
- list of employees the company wants to take disciplinary action against in relation to findings; individuals from earlier action who have already been suspended (Sridar, Mani)
    - would like reaction on Sridar and Mani; 11-12 employees likely to be terminated, others who will get warnings, bonus claw backs, coaching, etc.

Proposed meeting during first two weeks of December; tentatively plan for the 6th; meeting should be 4 hours

- Morning preferable; 12/6/17 from 9AM-1PM


Andrew asks

- Follow up on read out of Chandra Seguran—schedule that read-out; Shaker Subramanian read out, as well
    - 2 or 3 interviews for Chandra;
- Had previously put a pin in chart sent in Oct or Nov that added up to 3.7 million
    - questions about some of those; would like dla to go back through those
        - DLA will provide additional findings from Sinuseri, other line items; will add that to next meeting

Grey

- Bates numbers for audit reports mentioned during kasari interview (also EY, procurement reports)
    - Will email with subject "CTS"

Kevin

- You will reach out to SEC about proposed date and time
- We'll check with Kelly to make sure her availability
- One item to raise:
    - Request list of personal email addresses that DLA sent in 2016
        - originally sent to Leo Tsao on 9/8/2017; DLA will also send to Kevin
        - 2nd list sent later with Schwartz

2017.12.06 – DLA Piper presentation

SEC: Michael Catoe, Paul Sharratt

FBI: Kelly Blanchfield

DOJ: Andrew Bruck (USANJ)

FBI: Kelly Blanchfield

DLA Piper: Gray Stratton, Karl Buch, Natasha Kanerva

---

**Interviews Downloads:**

Chandra

- Interviewed twice in December, September 2016

<u>Sept 21 interview</u>

Joined Cognizant in 1994

- take care of dmv division
- executive vice chairman for india last 2 years
  - guidance and direction, face of company in India—spoke at conferences; reports to Frank D'souza

On turnkey model

- model was one where all the responsibilities for a project given to a vendor; end-to-end responsibility;
- Cognizant preferred because they did not have bandwidth to manage large scale products
- There were competing bids from companies, in part L&T was chosen because largest in industry
- vendor responsible for stat approvals; cog never dealt directly w/ gov, didn't know approx costs; resp of vendor to get licenses in compliance w. law;
- unaware of construction w/out approvals; builders would sometimes start foundation before approvals received

CKC

- unaware of problems during construction or delays of planning permits; wasn't operational so wouldn't be brought to his attn.

1/20/2014 email btwn gamesh and Ramesh regarding l&t req for cog to meet w/ minister;

- recalls l&t wanted him to attend the meeting but mani and ganesh opposed because meetings could be messier
- reviewed doc but didn't remember it referring to stat approvals;

- l&t had challenges w/ gov and wanted him to attend the meeting; didn't mind accompanying them because cog one of largest employers in state and he thought he could communicate to minister that delays were not advised
- reference to messi (by mani) meant dealing w/ gov not straight-forward, was a matter of bandwidth and cog didn't want to be involved in getting stat approvals or transportation for employees—those were contracted out
- discussion regarding meeting chief minister was internal, never spoke to l&t about it, meeting never took place. Minister inaccessible. No one discussed details of delay with him, remembered company got necessary approvals in 2015

6/30/2014 Email – KITS planning permit cleared

- didn't remember it; delays were normal
- delays for getting PUNE pollution clearances
- Steven Schwartz, not typically included, may have been involved because he was responsible for gov affairs in India

**AB**: Have you seen anything else suggesting that's the case?

**DLA**: In general he was responsible for government affairs.

**AB**: Have you seen any other examples in India in particular?

**DLA**: Not specifically, but we can search some emails. We found him on very few email correspondence.


11/26/2012 – Chron of events on issues with PUNE enviro clearances

- was still involved in operations at the time; obtaining pollution certificates, the proper procedure was impractical so they would start before granted
- no recollection about Madras Export Processing Zone facility emails (MEPZ)
    - MEPZ was the original facility raised to DLA piper before CKC

Improper payments

- not aware of specific improper payments for CKC or Pune; l&t had a good reputation because they were large

Impression of Gordon Coburn

- very involved with decisions; had final say, people didn't act w/out his approval; everything that happened went back to him, as he was kept in the loop by Mani and Sridar


2nd interview - 12/16/2016

Background

Sinuseri land deals

- recalled acquiring land for facility in two lots; all leased through gov
- believed some of ckc competitors got land earlier at a throw-away price; price went up by multiple of 10 by the time cog got the land;
  - gov controlled the price [unclear over what time period the price increased]

Potential issue, allegation that the company had leased land for Sinuseri and when the lease expired, leased back at a higher price—potential for payment

- could not recall transaction involving lease of land back to gov—would have remembered such a transaction
- Gordon Coburn and KC (Chandrashekaran Krishnaswamy—Mani's predecessor, left company in 2013, involved in inappropriate payments prior to Mani)


**SEC**: And with the land acquisition, you didn't come across any improper payments?

**DLA**: No, we weren't able to get to the bottom of that.

**SEC**: Were you able to contact him?

**DLA**: Yes.

**SEC**: Could we get that contact information?

**DLA**: Sure. We may have had one of the people on the local team try to reach out to him. He wouldn't talk.


Potential issue, allegation that the company had leased land for Sinuseri and when the lease expired, leased back at a higher price—potential for payment

- difference between software technology in STPI and SEV program; STPI preceded SEV;
- Sinuseri was STPI program at first to promote technology parks; before, no efforts to provide tax incentives around implication of goods—just a place for manufacturing industry
- SEV program began in 2010 after STPI scrapped
- SEV was a 25 acre threshold for inclusion in program; original size of 28 acres caused problems because facility built on 8 acres; obtaining permits and meetings with gov entities
  - gov entities electronics corporation of tamelmadu (ELCOT); state industries promotion corporation (SIPCOT)
    - these are both part of gov IT department.

Email 3/9/2010 – Sinuseri land issues; discussion of parcel of land for power substation (40.1mil rupees per acre)

- that rate not reflective of other acres purchased; unsure what referred to

Email 3/9/2011 – Chandra to KC and Coburn

- Possibility of purchasing land by company called Change Pond; change pond had lease, determined they would not pursue the lease, stopped

KOCHI facility discussed

- Buy-back (stock 2016)

Personal knowledge of demands of bribers from gov officials

- only aware in past 6 months from investigation


**AB**: What's his current status?

**DLA**: I think he's still there. I haven't heard he's left.


## Shakar Subramanian - August 19, 2016 Interview

Background

- Senior direct of internal audit; joined in 2/2013 as senior director in Chennai; internal audit for India and APAC region; transferred to London in 2015, did internal audits for UK in India

2013 infrastructure audit

- company audited 6 projects from 2008-2012 done by L&T
- concern that a number of major projects awarded to l&t; wanted to assess if improper acquisition process
- EY conducted phase 1 of audit—KITS and Sinuseri
- Internal audit did phase 2—PUNE, Bantala, Kochi, and Coimbator
- audits revealed improper vendor selection process because not properly documented, local management didn't provide satisfactory answers, didn't select vendors other than L&T
- audit showed cog started construction w/out permits; continued operating facilities w/out permits
- local management aggressive during audit process; mani and ganesh questioned EY's capability and right to undertake project; audit team did not receive satisfactory answers from local management on q's
- local management did not dispute that construction began w/out approvals—responded that that's how it is in India, you can't wait
- did not know if they gave documents they requested, but probably
- during phase 2, discovered PUNE constructed w/out pollution consent; Deepa was aware


**AB**: At the time of the audit or when the permits came out?

**DLA**: It's ambiguous but the legal team would have been aware in 2012.

**SEC**: He said it started without local pollution permit?

**DLA**: Correct.


2013 infrastructure audit

- local management said l&t would continue w/out further details.
- 1/2013 audit done, other approvals had then been attained for Pune
- end of 2013, raj created new procedures and communicated them to management team; included not proceeding with construction w/out approval

Conversation with BG in 2013

- infrastructure review focused on documentation and process
- BG informed audit team l&t only provider because of gov connection sand financial capabilities to do CTS project

L&T hiding payments to gov officials

- did not recall BG mentioning them

---


**UPDATE ON NEXT PHASE OF REVIEW**

Background

- first phase was potential embezzlement, MEPS operating licenses; after meeting with Mani in 8/2016, changed to CKC, PUNE
- went back to understand operating licenses at MEPS and other factoriess : CKC, TCO, PUNE, Calcutta, MEPS, Sinuseri, Kochi, Coimbator
- then whether issues raise during review relating to improper payments w/ customs, tax, electric tariffs, whistleblower who contacted DOJ (10/2016) claiming company bribed gov officials in connection w/ labor case, concerns in China (kickbacks, gift giving typical in China)
- more work is ongoing, but giving update because in admin group, we've given recommendations to terminate more people

Stats

- 1.5 mil documents; 375 interviews
- Phase 3: additional 50 custodians; 160k docs; 95 witness interviews including corporate workplace, finance, enviro health service; EY fin analysis pulling supporting info

Operating Licenses

- Company used 3rd party vendors to make small, pot inappropriate payments to gov officials to obtain op licenses

- o $30-2500 dollars; $34k total in payments over 5 years
- people in workplace services aware that vendors made these payments; sometimes aware of specific instances
  - o company has Integrated Facilities Managers (IFM) who make payments to gov officials directly or indirectly for things that company entitled to
    - ▪ these are not cog employees—a CBRE or other large, multi-national responsible for property management;
    - ▪ JLL another example used to operate property
  - o JLL or CBRE would make a payment—although usually done through a sub vendor to make payment

Sub-Vendor invoices

- Typical charges: liaising, misc, coordination, taxes, management fees – code words for improper payments [documents provided—first 15 documents]

[BINDER TAB DESCRIPTIONS]

1. "coordination charges"; 6k—but there is no charge for a fire license

2. 1k rupees; 5k management fees

3. petty case of 4400 rupees ($80); person from CBRE says "we can't do this"

4. Shows VJ spoke to vaskar, fire officer, agreed amount would be $300; cash handed over

No objection certificate—60K rupees

7. 15k rupees; Eco Chem; uqatoe for 17k rupees for kitchen license renewal; vendor service fee

9. liason charges


**SEC**: Was there separate billing for actual professional service?

**DLA**: Typically there is a small amount in addition to the liaison charge. They'll do the liaison charge, then separate small amounts.

**SEC**: It's not a straight—there's no hourly or any way they could justify it.

**DLA**: No, there's no way they can justify them. We've talked to people who confirm that.

**SEC**: And these payments have stopped?

**DLA**: Yes.

**SEC**: What has been the result?

**DLA**: Delays. All we can do is continue to say that we've applied, where's our license?

**SEC**: Are there fines?

**DLA**: Long delays but no real action. So it leaves the company in a bit of a pickle because the company wants to be compliant so we just advise to apply and follow the process.

**AB**: The new, looking at 9, Ghershran N Row, he was in a couple of the documents—do you remember who that is?

**DLA**: I think it's a different Row. We can go through this if you want. The people on these emails—doc 7, these are all mid-level to low level employees and a lot of contractors. The person here, DA Shankar, one of the earliest people who was straight with us. K Anan above him was the person who was shaking down a vendor at MEPS for kickbacks and who was the subject of the internal corporate security review when they interviewed him, then that was raised up through compliance. So he was the initial person who relayed the issues of lower level payments. DA Shankar has been very cooperative about the payments. He is probably the most senior person on this list.

Shankar is one person who, because of his cooperation, we are likely to recommend something less than termination.

**AB**: These are all folks in the facility offices?

**DLA**: Yes, those responsible for facilities and maintenance and who operate the buildings once constructed.

**AB**: Would Shankar have reported up through Mani?

**DLA**: Eventually but not right away. We can get it for you. Some of these issues around op licenses did ultimately make their way to Mani. Mani acknowledged in connection with Eco Kemp that that was one of the companies they were using to get licenses.

**SEC**: You talked about the practice now having delays, have they changed vendors?

**DLA**: It's a good question. There are strict instruction that there are no facilitation payments unless approved by legal. There have been instructions that no vendors are to interface with the gov—the company wants to do that directly now. Much of the renewals are done online so that mitigates the risk. There is a restricted vendors list. With the CBRE and JLL's of the world—they are international and have compliance programs in place and they didn't want to do this but there was pressure applied by mani and others to get them to do that.

What the company wants to do at this point is put all property management in JLL or CBRE's hands. India is a risky environment but we are putting controls in place and getting rid of sub vendors—but there is no perfect system.

**DLA**: Shankar reported to BJ Uberjee who reported to Senkora who reported to Mani.

10. Professional fees

11. Liaison charges

12. An example of where mani was on phone with dhs to get l&t to help with an approval process. There's a long email about different renewals and issues. We have a very good record at MEPS of payments made and that mani and others were aware of it

13. Discussion about engaging a consultant to do a renewal; consulting charge high

14. Different charges set forth; some are real fees (fire renewal); then consultancy and miscellaneous charges; vendor built in some for them and then fees that we think go with facilitation payments

16. We've showed you before—an attachment talks about a license renewal needed

15b. page 2 licenses—incidental expenses are the facilitation fee; incidental payments also facilitation

**SEC**: The IFM used, did you say that the improper payments were made through the IFM?

**DLA**: Indirectly because the IFM would hire a sub-contractor—we rarely saw n IFM make a payment directly.

**SEC**: So the sub vendors are independent?

**DLA**: They are small Indian companies making payments then charging back.

**SEC**: But the charges on the invoices are directed by the IFM?

**DLA**: Yes, I suppose so. We don't have the disc between the IFM and the sub-contractors. Typically the cog employees deal with the IFM. We can get more detail on who they are. It's a mixed response for them to say what was really going on.

**SEC**: Do you have an understanding that the IFM knew what was going on?

**DLA**: Yeah. There was also a response that that was going on in 2014-2015 and that they don't do it anymore. The pressure was coming from Mani to the IFM's to obtain a renewal

This chart is from compass. If you turn to page—on 3 and 4 is has liaison fees explanation.

15b. Page 4—air and water consent form; indicated a payment through Eco Kemp; Mani pressured Compass, a large, multi-national IFM who said their policy didn't allow them to do it

**DLA**: We never found anyone in the US aware of these types of payments. The highest level was mani and people below him were doing it.

**SEC**: A question on 14—the top email is that saying the charges should already be covered in the contract?

**DLA**: Yes, that's what it looks like.

**SEC**: So this could be an example of padding.

**DLA**: Yes and if you look at the second email chain—I think this is an example of a sub vendor trying to pad it for their own uses.

In most instances you could make a good argument that these were facilitation payments. There are a couple of examples where we found there may have been violations and payments around that.

## MEPS

Background

- construction started in 2007, 2006

tab 1

- enviro clearance issued that allowed construction of 162k sq meters w/ 12k works
- waste water—an STP (sewage treatment plant) that would be developed
  - important because company did not meet obligations; constructed 20k sq meters beyond what they could have and had more than 12k people onsite

tab 2

- requirement issued at time of consent to operate was that company would create stp of 500 kld (Kiloliters daily) to be installed before commencement
- units shall not commission activity before 500kld stp; once constructed, would be handed over to MEPS
- cog has a facility w/in meps, operated by meps; gov management team that works within meps
- requirement was that meps handle the sewage treatment plants

tab 3

- air and water consent received in 2009; renewed every 2 years

tab 4

- confirms 3/2009 that received air and water permit; Shankar underlines importance of renewal
- Pure Enviro quote for 100k rupees for consulting charges for renewal of air and water permit
- Shankar would say this is probably a facilitation payment

Tab 5

- consultant fee services, 1 lakh

Tab 6

- email with renewal of permit
- sewage is being treated at the common STP during this period while cog constructs the other STP;

Tab 8

- early 2011, letter from cognizant saying to inform that sewage treatment plant fully operational and handed over to MEPs for operation (2 years after began)
- believe that after handed over, another renewal payment likely made in 2011

Tab 9

- there is a consent renewal for 150k rupees; discussion about business case for consultancy charges; likely facilitation payment

Tab 10

- copy of work order for consultancy charges—ECO Kemp
- Shankar writes that renewal needed; includes quote for vendor for approval

**AB**: So they use Enviro Camp in 2009 then Eco kemp in 2011—any idea why it switched?

**DLA**: I don't know.

90k/100k

Tab 11

- example of fees for renewal

Tab 7

- head count data; company exceeded head count
- today, headcount is below 12k

Tab 12

- apparent in 10/2014 that STP treatment water not received due to breakdown; MEPS operated it into the ground, stopped functioning
- Now, sewage treated by common plant; in 2015 some sewage sent to common plant was over flowing and being converted to a storm water drain
  - 2/2015 renewal up—Eco Kemp was doing renewal; liaison work references included (sub vendor)

Tab 13

- TNPCB issued notice in 2/2015 around time of renewal saying unit has not provided flow meters for the outflow of STR and that there were more than 12k onsite;
- 2015 renewal, no evidence of payment; likely because incident where sewage treatment plant failed and CNTCB charged for death of a person, so didn't accept a bribe

Tab 15

- emails, 7/15/2015—meeting with Pari (gov liaison, still w/ cog, suspended since 11/2016) and engineers; discusses enviro issues of overflow of STP

- notice in 2012: EIA obtained; overbuild of 20k sq meters; too many people; excess may have led to STP malfunction; requested cog confirm that they reduce head count
- no evidence a bribe paid for this

Tab 17

- letter saying that overbilled; too many people; diesel generator not permitted

Tab 18

- letter from mani that they will request permission for overbuild and additional people

Tab 19

- conditional consent issued in 2016
- efforts made to regularize head count
- when DLA involved in May 2016, cog had made some progress and hired ERM (enviro consulting) to take leadership on renewal efforts; reduced headcount to 12k; spent millions on fixing STP; ERM also did a review of all company practices

**SINUSERI Docs**

- overall: evidence company making payments every few years for air and water consent; MEPS more problematic because of discharge; at Sinuseri, discharge of water with High Salinity (Reject Water) being dumped into storm drain
  - evidence certain corporate people knew

Tab 1

- consultant charges for renewal – ECO Kemp

Tab 3

- acknowledged EPCOT letter in Tab 2

Tab 4

- email discussing overflow; inspection

Tab 6

- letter denying that water was being dumped; stopped discharge after letter sent

Tab 8

- Renewal in 2016; example of additional liaison charge; name of inspector who payment made to (Prekash)

ERM has been hired to work at Sinuseri and to look at all facilities to ensure compliance

At MEPS, the company does not currently have air and water consent because of the work that they are doing to renew the consent; will try to renew once completed

**Customs and Tax**

- Allegation by Anan Krishnan about pot improper payments to declare goods in and out of zones in India
- Pari Sriramulu (government liaison with government regulators on small issues) Alleged cog associates made pot improper payments to India revenue, customs excises, and tax payer units—later retracted these
- however, DLA looked into it; interviewed Pari in 5/2016
  - made claims then later retracted many
  - company would like to separate from him


**SEC**: We asked if we could get a list of the people interviewed—did we get those?

**DLA**: Yes, but we can get you an updated list. We also gave the machines collected and the search terms.


- A couple of people admitted a risk with clearing goods through customs but had no specific knowledge of payment
- appears to be risk, but we could not give specific instances of payments; we could not conclude the allegations were false
- with respect to some clearing agents, there have been held back payments and there is a pending lawsuit on a couple of them; if we are ordered to pay them, we will do that but we are trying to get information from the customs clearing agents before we do so
- all are registered with the government

**Electricity Tariffs**

- Pari alleged $5300 paid to electricity board to convert cog category from commercial to industrial to get reduced rate; no evidence this is true
- there is a process that allows for a reduced tariff by the way you are characterized—company sought to convert categorization from commercial to industrial but does not appear improper
- TNEB in connection with payment at CKC and potentially Sinuseri—but nothing found in this instance

**Whistleblower**

- claims to DOJ that Siv Kumar Krishnamurthy (senior manager at enterprise senior management)
- India had a history of raising complaints w.in company and to India authorities; included that company made improper payments to influence his employment litigation
- no evidence found to support his claims; appears to be disgruntled former employee

**China**

- 1/12/2016 – global tax team received request from china finance manager to approve gifts for Chinese new year
- according to finance manager, Xiaoyi Qu, was interviewed and said it was customary to give gifts to officials—twice a year
  - found that gifts were made: food vouchers, coupons, shopping cards (44-$160 per person; provided at various times of the year including Chinese new year)
- 2010-2016 19k worth of gifts provided; provided by most senior person, Sean Zhang
  - these kinds of gifts incredibly common but will not occur in the future

**SEC**: Do you know how many people received gifts?

**DLA**: We have a list that we can get to you. There was an allegation that this finance director had been taking kickbacks. We interviewed her [] she's no longer with the company, anyway.

**SEC**: This came up through the new procedures?

**DLA**: Yes, they wanted an approval for this and it got routed to us. Approval was sought from the GMU.


**Work at TCO for Operating Licenses**

- will interview Mcloughlin, kasari, and gilbert once DOJ interviews
- review around potentially improper payments to obtain birth certificate and marriage licenses to support outbound visas for India's working abroad
- 2 new issues that have come up in event management (payments to obtain even permits—small amounts, currently being reviewed) and waste management (waste disposal permission—conducted email review—does not appear to be huge issue)
- expect to be done with internal investigation by q1 next year


**Individual remediation**

- want to terminate a number of people because they authorized or directed payments; didn't meet company standards when managing enviro issues
  - mani, sridar (can discuss next year
  - assoc director admi, admin Hyderabad meps, admin in Calcutta, aso dir in Calcutta, senior manager at meps, enviro health and safety person, anam Krishnan (took kickbacks), engineering and maintenance person, manager in admin
    - about 12 people—none relevant to main issue
    - others will receive warning letters or coaching; may be transferred to an integrated facilities managers
    - company trying to reduce people in corporate services—will be transferred to other facilities

**SEC**: Can you just give us a list of the people being terminated and another of the people..

**DLA**: Sure. The only people I think are important to you are Mani and Sridar.

Sambhaji is the only one on this list who relates to Pune. He was the project manager involved in that approval.

**AB**: And you guys are proposing separation? Let me get back to you on that one. At the end of the day, it's your decision.

**DLA**: Sambhaji Bhor is that individual.

Most of these people are lower level and in admin. There are a number of contractors who we are going to ask the companies not to employ.

We'll have a more in-depth conversation about remediation in terms of the compliance program, but to give a sense of some immediate things:

**Remediation**

- high risk vendors ID'd
- additional controls in place
- 3rd parties paying permits handled internally
  - special procedure to be put in place if a 3rd party is needed; EY involved in process
- permits and licenses must be obtained prior to construction, paid to gov online or in other non-cash form
  - if cash payment necessary, protocol to be put in place (no instances that currently know of)
- supporting documentation for high risk facilities being helped by EY

**CKC Payment file**

*Changes with electronic binder; Andrew has physical binder*

All payment files DLA have been produced to government; most complete record relate to LT variation from CKC and Pune (at back of binder); front of binder is official payments from cognizant for planning permits

Binder is subset of what has been recently produced

First section

- payments relating to CKC planning permit

CTS53880

- planning section from gov of Chennai; building license fee, scrutiny fee

**AB**: The building permit is a separate permit? The CMDA issues planning permit then corp of Chennai issues a building permit are those the same?

**DLA**: There is a fee for each. It's hard to say with some of this stuff. We're just interpreting the documents.


Tab 2 – internal comm of initiating fees

- 53872 – email from Mani to Sridar, Gordon, Stevens, others
    - gov order to be issued shortly
    - internal correspondence picking up on financing
    - pg 3 shows official charges and breakdown; EY confirms these were paid

Tab 3

- email disc of paying direct demand, draft payments
- pg 4 payment


**AB**: On tab 3—cmw ssp, I don't have it with me but I remember seeing that it looks like l&t might have made that payment on behalf of cog?

**DLA**: In connection with the academy block, they may have made some payments which was atypical, but here we saw them direct from cognizant.

**AB**: So the general pattern was that cog would make payments direct—why would there be an exception with academy block?

**DLA**: Unclear. They couldn't get the permits for the academy block. The timing was such that it was after the company had been shaken down for the larger payments and they were unwilling to go forward until they had the permit in hand. Ultimately it was not built because they never got the permit for it.


The next section is CKC, tabs 1,2,3 are called variation invoice #1

- Tab 2 variation rule #2
- Tab 3 variation bill – final bill

Binder includes official invoices


**AB**: So does 2 build on what 1 had and 3 builds on 2?

**DLA**: Yes. Bill 2 reflects, in Chennai tab 2 you see the first running bill, that's the amount in tab 1, then they add to it the new amount for the second bill. Ultimately in tab 3 with the final bill, the total cost is 559 mil rupees.

**AB**: And are the payments over time or at the end?

**DLA**: There are close to 10 separate payments all-in to L&T. Tab 3, the final variation bill, is the cumulative bill for ckc. One section is the progress bill then the deduction section includes payments made directly to tax authorities. The first section is what cts will pay to l&t

**SEC**: So these variation amounts, we believe these are all the improper payments that were made?

**DLA**: These would relate closely to the binder we gave you with variations.

**SEC**: Are there any legitimate payments in here?

**DLA**: Yes. All of these are legitimate payments and work. Some of it, the company took the position that they were not included in the contract and L&t wouldn't get paid for them. Ultimately the statutory approvals came out then the line items came back in and were approved.

**AB**: When cog is paying l&t for the outstanding amount, they make 4 payments over time, will they say payment 1 is for claims 1-10, then 10-20 and so on?

**DLA**: They specify it's for payment claim 1

**AB**: It seems 1 and 2 have the same payments in them. Is there a particular wire transfer that correlates with the claims or is any payment cog makes to l&t includes paying a part of those?

**DLA**: Yes.

**AB**: Okay but spaced out over time.

**DLA**: Yes there are installment payments for the whole thing.


PUNE Tab

- Invoices sent to project manager (Sambhaji)
- CTS361
- full invoice and variation discussed; bates 363 is the change

Tab 2

- work complete and ready to be paid

Tab 3

- Ganesh approval
- To summarize, payments by cog to LT to pay for CKC are behind tabs 1-10; payments to LT for Pune are 11-15(?) – each tab is a separate installment

Tab 1 – 3 all relate to cog paying l&t for account bill 1, variation bill 1

- cts337 payment voucher—300 mil INR; payment ref #3620000044
    - the model is a payment voucher, bank statement, then accounting entry

Tab 2 – next portion of the payment to l&t

- 338 is another payment from JPMC-payment ref 600002, 60 mil INR
- now almost to full amount of the variation bill 1
- 351 is bank statement of matching amount; 60 mil INR
- 3rd page is the accounting voucher

Tab 3 – completion of the payment to L&T

**AB**: How did they determine the 368 mil?

**DLA**: In the variation bill there is a percentage in the annexure of work completed in the right hand column.

**AB**: And if a work is completed, will they be paying for that?

**DLA**: That's right.

**AB**: So looking at tab 1, I remember one substitute was modular furniture—claim 23,--it was work completed. SO if the work is completed, they would have paid for all of the mod furniture claims for all of this bill, it would not have been paid in a later bill?

**DLA**: That's correct. Some of this is our interpretation.

CKC running account bill 2 is paid out in tabs 4-6

- The bill was for 104 mil INR
  - Tab 4 shows 100 paid; Tab 5 is 2 mil paid; Tab 6 is the completion with 2 mil INR
  - 2 payments to LT, one to tax commissioner

**AB**: And it looks like the payment is going from the Cog JPMC account to an account of L&T.

**DLA**: Yes and the Bank of India account was generally used for the tax commissioner.

**AB**: Right and that account is not being fed with funds from the US, correct?

**DLA**: That's correct.

**AB**: Who handles the wiring of the money?

**DLA**: My guess is they're likely in India, but we can find out.

**AB**: You guys were going to let us know who Kasari's attorney was?

**DLA**: He's with King & Spalding.

**AB**: We were waiting to talk to him for you all to iron out details—are those done?

**DLA**: Yes, you can reach out to him.

**AB**: Okay and through the next few weeks, we're going through the documents. As we have questions, we'll make a list of them and then go through a call to run through it.

**DLA**: Okay. We have privilege logs and other things we can talk to you guys about.  There are a couple of other things we want to run by myand sridar's lawyers to check on privilege.

**AB**: A month ago, you mentioned a chat between Deepa and ganesh

**DLA**: That has not been produced yet.

**AB**: Okay.

2017.12.07 – Call with EY RE: Cognizant

EY: Wendy

DOJ: Andrew Bruck, Kevin Gingras, Rachelle Linsenmayer

---

Wendy: This was not a US engagement, no copy of report from US person

This was done through EY India

We will assist and aid in the informal request, reached out to general counsel in India to begin the process

No objections to EY US assisting

There would be a different process to get documents

EY India is getting an outside counsel who Wendy will coordinate with and make an introduction to DOJ

This is currently pending

AB: Do you have a sense of time frame?

W: I am hopeful it will be before our holiday week in the U.S. In December.

AB: It seems it makes sense for us to keep coordinating through you. We'll wait for you to reach back out once you have material or a relevant update.

 [Will likely be able to get the initial documents, at least]

KG: Can you also let us know to the extent that your time frame crystalizes more if you can reach out to us? That will help us adjust on our end.

W: Absolutely.

**2017.12.07 – Call with L&T Counsel**

DOJ: Kevin Gingras, Andrew Bruck, Rachelle Linsenmayer

Debevoise & Plimpton: Saqib Alam, Colby Smith, Dave O'Neil

**Colby**: There are two things to update you on. Our brute force review of documents restored and then second an update on the forensic work stream which has occupied the last couple of productions we've given to you.

You'll remember from the last call we're trying to look harder at March to June 2014, looking for a possible payment on the KITS project. We also focused on earlier 2014 and late 2013 months to find a demand for a payment from an official.

We made limited use of search terms and more of an eyes on review. Mr. Subramanian's emails were treated separately from the other custodian. There's were 6 others we looked at. S was 120k emails restored from backup tapes covering 1/2013-1/31/2014. We looked at everything he had and didn't cover any search terms, we looked at everything. We made 2 exclusions from things restored from backup.

First were emails outside of the 2013-2014 time period. We were looking at the kits project and that was the most relevant period. To the extent that there may have been captured earlier emails we didn't look at those. That was 108k emails.

The second exclusion was emails with yahoo groups—this was a common email address Mr. Subramanian and school classmate friends of his used as a group to communicate. There were 21-22k of those emails in the time period. We looked at 13k of those before deciding they were entirely irrelevant.

All told, we restored 250k emails from the backup tapes for Mr. Subramanian and reviewed 120k of those—every non yahoo groups email between 2013-2014.

For the remainder, we used search terms designed to exclude emails with nothing to do with cognizant. We were sure to capture every document that referred to cognizant and also looked for key cts employees on the kits project. For Mr. Vadivelu these emails were drawn from backup tapes covering all of 2013-2014. For 5 other custodians the backups covered 12/31/2013-June 2014 which we thought was the most relevant period and this was a large total. The other 5 custodians include Satish, naturan, kanan, lakhshmanan, nanda kumar.

For Vadivelu we also recovered emails found in several pst files. Several had been dated October 2016 so we restored them. We did not use search terms but looked at all of the emails. I don't have a count but it was a couple of bytes, all added together.

Quality control review looked at 32k records, senior lawyers reviewed, to make sure—some reviewers were in our office in London and then in India doing the review—we had the senior lawyers review work of India and have the Indian team do a quality check for those documents in London that our team was looking at.

The review did not yield new findings. No correspondence from late 2013 or early 2014 regarding payments. Nothing from 3-6/2014 relating to payments or the claim process we discussed when we

met. Based on the hints given for what to look for we thought it would be possible we would find more documents but we didn't.

L&T devoted 18 reviewers to the project. We've reviewed now close to 350k emails over the KITS, PUNE, and Hyderabad project. This was a large effort and they continue to have questions to us over the DOJ's jurisdiction on the issue.

We can't think of any other backups to turn to or other custodians. So we're preparing to move on in our internal review and look at the Sinuseri and Kochi projects.

The forensic work stream—I don't know if you've started looking at those productions—but that is to identify money flows and suspicious transactions in the construction accounting records. We've provided everything that reflects the work done to the date of the production.

As I mentioned, Subraamashan (?) has in house forensic capability. They ID'd more than 1000 transactions with cognizant to be reviewed and have examined the line items submitted by L&T for the KITS project.

We have made two productions so far and have another production in the work. Some of the documents in the forensics are more interesting than others and we thought it might make sense for us to come in and talk to you about our findings. We do still have at least one more production to make but once we've done that we would be in a position to talk to you. Perhaps early to mid January.

Those are the two things I had to report on.

**KG**: This is very helpful. We appreciate the scope and nature of what you've accomplished. Andrew may have a different take but I find the fact that there's nothing that got turned up somewhat surprising so maybe we're at a point where we need to evaluate on our side a way to perhaps steer you in certain directions in a bit more targeted fashion because I am surprised given the effort and scope.

**AB**: I think that we can come back to you guys with some more targeted information. Going off of the Debevoise presentation to us a couple months ago, you flagged the change order request for 22.6crores for statutory approvals that gets substituted out for other requests. You guys flagged that as suspicious and it kept coming up—have you guys come to any conclusions about what that initial request for 22.6 crores statutory approvals was? Why would L&T have requested reimbursement for those funds and have you found a statutory approval that that was linked to?

**Colby**: We've asked people we've spoken to about this and there's not a lot of documentation that backs up those numbers. **We were told this was an effort to claim additional money because of delays to the project. They chose the statutory approvals as the section because they knew cog would not pay a delay claim.**

**We haven't found documentation that backs up these claims and have not found consultants hired for the statutory approval process who were paid anything like that sum of money for this work. We haven't seen any connection between consultants and some of those large, round number dollars. We've reported to you everything we were able to uncover.**

**We saw something similar in the PUNE project—505 crore for statutory approvals and we were given a similar explanation.**

**AB**: Why would L&T seek payment from cognizant for that delay? As a business matter why would they be reimbursed for that. I thought cognizant would be the ones who would be out of money and I thought L&T had to get an extension of time.

**Colby**: As you know there are different kinds of delays**. The explanation we were provided was that there were certain delays at the outset of one of the projects and that those were viewed as caused by cog's failure to obtain the right to start work on the project. But they said they had to rent equipment and brought it to the job sight and lined up workers but were unable to start. The idea for those claims is to recover those costs.**

**They were also trying to recover costs for delays after the project began. They incurred cost even though they were not making progress. Again, without looking back at my notes, that is how I recall it**.

**AB**: Okay we'll huddle and get back to you. It would be helpful to know, do you anticipate a) producing emails to the government from this review that are responsive to statutory approvals and planning permits and do you anticipate making these 6 custodians available for interview by government authorities.

**Colby**: My understanding is that there is not a lot to produce to you. You can interpret that in that we've missed something in this process—we tried to describe to you how we have been thorough—but what I hope it means is that the first round of work we did, we found what was there to be found. We knew this brute force review was reaching beyond the obvious places. It is a little surprising nothing more was found.

Making employees available, in principle L&T is prepared to do that. We have to work our way through the issues that would present from an employment perspective. They have indicated to the extent employees can be persuaded to make themselves available, it would be preferable if we could do that in a neutral location like London. I will raise that with them, now that you've asked. We'll raise those employees in particular.

One thing you should be aware of is that Mr. Subramanian has personal counsel at this point, Jeff Knox. We have not determined if we would be in a position to represent him if he were interviewed. If you wanted to work out talking with him it would be better to talk to Jeff about that.

**AB**: Okay I think we'll come back with more specifics but it will be good to raise with L&T that we anticipate speaking with employees.

**KG**: To address the neutral location, our preference it always the U.S. but we understand there are reasons to deviate so we're open to that idea if that makes the most sense for everybody.

**Colby**: And I'm sure you can appreciate maybe none of these people travel to the U.S. regularly or maybe ever. So there, it would just might be easier to persuade them that way [by meeting in London].

We'll address it with them for those specific people and if you have a list you'd like to send, please do.

**KG**: Thank you. We will try to figure out where we might be able to help you—we'll get back to you.

**2018.03.19 – DLA Piper Call**

DLA: Karl Buch, Gray Stratton

DOJ: Kevin Gingras, Courtney Howard (AUSA), Osmar Benvenuto (AUSA), Rachelle Linsenmayer

Kevin: We appreciate you getting on the phone. We had a number of items we wanted to catch up on. Karl, we had mentioned since my trial is done we are back on and trying to make headway on this in the next 6 weeks. I also talked to Kathy Rundler to let her know we understand the company wants any resolution we have to be wrapped up around the same time so I let her know our timeline. She said she understood and you guys are going to get back to us on dates for a filip factors presentation in April.

We're speaking with Matt Beck. We're going to try to get Mani in here the first week of April. We're working on the visa issue with the FBI.

Karl: He looped me in. I said, given the government's timing, maybe you could make it happen faster. For us to do it would be the middle of April.

Kevin: With that, there were a few things. A lot stem from the letter that Bruck and I sent mid-December and you guys have been producing some of the items we asked for, then. Before that, we wanted to follow up on the expert witness that you guys were helping us find regarding the permitting process in the real estate world in India or Chennai.

Gray: We have a name but I think we need another one. Sowmya Holenarasipur.

I haven't been in contact with her, but getting a cold call from you might be off-putting. I can call her and make an introduction to see if this is something she would want to do or not.

This is the one I wasn't so sure on and we will circle back with our outside counsel to see if there is another name that would work but I'm happy to call and give her your name and number.

Courtney: Why do you think she would not be a good fit?

Karl: She's not one of the top firms in the country.

Gray: She seemed okay but not someone you would look at as a top person. She seems to have an expertise in Bangalore. Permitting varies state to state so it might not be the best fit but she might be a good stepping stone.

Kevin: If you're still looking for a Tamil Nadu connection, I would much prefer someone with a working knowledge of Tamil Nadu.

Courtney: I agree. What are her qualifications? Is she a lawyer?

Karl: A real estate lawyer.

Kevin: When I had asked them to look, I asked for a lawyer with experience in the real estate industry and Bruck and I thought DLA might have a better angle.

Karl: The name of the firm is her name, associates. It's a leading real estate firm based in southern India. A corporate lawyer 20 years of experience. Represent leading builders.

Kevin: Let us talk. She might be work talking to then we will reach back out to you to contact her.

Courtney: Are there additional steps, Karl, you can take—I agree with Kevin that it doesn't make sense for us to talk to her if she's' not familiar with the state. Are you planning on taking steps to find someone from a top firm?

Karl: We are going to get back on the phone with our company lawyer to see if he can find someone in Tamil Nadu. I can call her and find out whether she represents L&T at all because that's a non-starter, then gauge her willingness to entertain representing you guys.

Kevin: Or at least talking to us and being a witness. And maybe she has practiced in Tamil Nadu.

Karl: Okay, we'll do that Wednesday morning.

Kevin: We appreciate that. For us, this piece is going to be crucial and be a question we get asked by all of our supervisors before we can move on to taking action, so it's high on our priority list.

[Karl reiterates contacting her Wednesday morning]

Kevin: Then a tech witness, you were looking for one.

Karl: We have one. We are prepared to bring him in. He's here in the states. One of the supervisors in the IT department who can answer a lot of the questions I think you will have.

We talked about one witness who we are not going to get separate lawyers for. We will represent him and we don't see a divergence.

Kevin: We'll confirm that, but that seems right to me.  So he'll be able to explain the Tamborg records and that guys' name.

Karl: The story is that Tamborg was previously assigned, we think.

Gray: Yeah, it was somebody else's' machine that was reassigned. It was Sridar's machine, I think. We have the notes. That's effectively what happened. When we ran the report, it gave the name for the current custodian whereas previously it was a participant who we knew was on the call.

Karl: Do you want to take this person's name? Ramesh Lakshminarayanan. [FALSE HIT THAT MAY APPEAR]

Kevin: We'll let you know if there are any issues.

Karl: Sambaji Bhor.

Kevin: We did a quick search and it looks like he is on emails regarding projects we were interested in, although he gets dropped off of some of the conversations. Have you interviewed him? Can we get a download?

Karl: Sure.

Kevin: Then I think we should be able to answer whether we want to talk to him.

Karl: The lawyer who I gave you his name. He is moving from one firm to the next. There is a conference coming up and the company is worried he's not going to reach out to you beforehand but going to the conference and then we'll. His name is Steve Schortgen.

He's going to Sheppard Mullin. He was at KL Gates before.

Kevin: When is the conference?

Karl: March 27th at 2:15

Kevin: Remind me the posture, for Oz and Courtney. What's your current posture?

Karl: The posture is, they've filed the derogatory's and document requests. We've objected. Now there's a discovery conference on March 27th where we expect discussion about this. Schortgen was not willing to make a commitment about not pursing, although we let him know you had an interested. The concern is them going to the conference and having a discussion without you being able to weigh in.

Kevin: With regard to the letter we sent in December, I know you had asked—I think with regard to item 1—for more clarification and I hit pause.

Karl: Gray and I thought about this before we got on the phone and we have a proposal. If you want to click on the Webex, we are going to show a document that you have but that we wanted to show.

Gray: It's a PowerPoint presentation called management review meeting 2012.

[follow along with document as Gray shows it]

Gray: Request number one called for a list of statutory approvals. These documents are what we believe are the best source material to prepare that list. We aren't 100% that that would be a complete list. These decks were prepared by L&T with senior infrastructure personnel at cognizant throughout the duration of the project. [shows slides that show the lists, which change, that list—slide names Statutory Approval Status]

There is an associated deck that goes with each of these and there is a decent list of required permits for each facility. We checked with Mani to see if this was a good source and he confirmed. L&T was the one gathering a submitting applications so the material prepared by L&T is our best source. That's how we prepared the first list.

Then we've made an effort to gather the payment files that correspond with these.

Gray: We are dependent on the categorization of payments when they were entered, then they are sorted by facility. The challenge is that when we looked at the descriptions—they don't neatly correspond with the permits we identified. If you go to CKC [referring to list shown on desktop] you can see charges and who it was paid to but a lot of entries "KITS land development charges" likely related to a permit but it's unclear which permit. [lists other such examples that are difficult to link]

Payments, particularly in demand draft notice, to cognizant there were different fees [makes it difficult to determine which permit they relate to]. The permitting process being as lengthy as it is, it is difficult to determine a time period in which a permit should have been received. We have had some success of gathering the supporting documentation. We do have all of the supporting documents. It's generally a bank statement, accounting voucher, and a payment. We sometimes see email correspondence. We

have had some success linking those to payment files but we are not there yet so we wanted to have a conversation with you about prioritizing payments for permits you want to see first.

Karl: The concern is that there is a lot of data here and we are concerned you will get lost in it. We could give it all to you or we could organize it in a way that makes it easier for you. So we could figure out how to organize in a way that most makes sense to you. We assume maybe start with CKC.

Courtney: I think we would want to prioritize CKC. Do you have information as to what the amount is?

Karl: Yes [shows on chart—which will not be turned over, attorney work product]

Courtney: What about—you're saying this chart is work product

Gray: We put it together, so it's our chart.

Courtney: To the extent that you know—you pulled this information from

Karl: Information provided to us by the company. This is just a listing of what was in the ledger. We have the information that was in the payment files and we can send that to you.

Courtney: Based on what you gathered, is there indication that this includes payments made by L&T and later reimbursed or only direct payments?

Karl: These are direct. IT will be hard for us to be able to know what they paid and didn't pay. We tried our best with L&T to get them to produce records but they wouldn't really.

Oz: But there would at least be some record of the variation process where L&T would have told you about payments made that needed reimbursed.

Karl: You know that generally when there was an invoice for a stat approval, the company would generally make the payment directly. But there were, like in CKC, we got the invoice and documents and we can show you the payments made to LT to cover the agreed upon amounts. But we don't have the invoices from L&T that reflect the charges that they allegedly incurred around the 2.5 million payments.

Oz: There are limited instances where Cognizant did not pay the government office directly. There was some sort of legit payment that had to be paid by cognizant to the government.

Courtney: Yes, we're aware of two examples in the KITS project.

Oz: Right so we're--

Karl: I haven't thought about this aspect in a bit. If you could give us the details around those transactions, we can look.

Courtney: Ideally what we would have is a chart of some sort with the necessary statutory approvals, authorities, amount, paid and how it was paid, and these are the documents that show that.

Karl: I think we can give you a great deal of information about that. But I don't think we can give you every example. We don't want to represent that this is the whole universe when we don't know for certain.

Courtney: Other than L&T making those payments, why would there be payments you're not aware of?

Karl: It's a big company and we did a good faith effort to ID everything in the general ledger. I think we have everything but I'm not sure I can represent to you that it's everything. [reiterates they have taken aggressive steps to find everything]

Courtney: Your source for this was the general ledger and you used that to find the documents?

Karl: Our source was the record produced by LT that set forth the stat approval process. [document first shown}. [Referencing presentation--#6]. We took these then went through the general ledger.

We don't have a lot of witnesses left from the time period. Mani pointed us back to this document.

Courtney: Kevin, if you agree, it makes sense for us to talk internally and give you more clarity. I think we're in the right realm, it's just a matter of how to present it.

Karl: Right and we will give everything you need. There will be a lot of work to get it to you in the format you are looking for which is why we want to prioritize.

Kevin: Right and I think we would want to start with KITS. If we discuss, we can get back to you about prioritizing.

Karl: Right and what would be helpful is for Gray to get the bates numbers to you.

Gray: Yeah, I'll have lit support pull those bates numbers and get those to you. We can probably do [the rest of the letter] in a quick way.

Karl: Number 2 is complete.

Courtney: Your cover letters—I'm trying to identify, for example, the January 12 cover letter is related to Steven Kasari and then one relating to various witnesses. Is that responsive to this? A related question is that you say you were producing documents—in the 2/6/2018 letter you say you got two disks, additional documents responsive to request number 2 and you say many documents were already produced—did you produce duplicates?

Gray: No. We have tried to keep that consistent. We only ever produce new documents. At times, we produce something again. In that case, we produce it in pdf.

Courtney: So if I were trying to identify where you were filing in the gaps on request number 2, is that something you could point me to?

Gray: Pointing to the previously produced stuff?

Courtney: You don't have to do it right this minute.

Gray: Request 2 we produced on set 6, 58546-73145

Courtney: Okay so those are the new documents and everything else, we already had. Okay so that is complete as of 2/6/2018 production.

Gray: Another note on the range 31038-52286 is the R&M requests.

Courtney: The PowerPoints?

Gray: Correct. They will be in chronological order, mixed in with minutes of meetings.

Courtney: Okay. So request 3.

Karl: Number 3 we've completed.

Gray: It is complete. CTS 47.

Karl: Then there's additional information. What we found is in addition to the report you mentioned here, there is a report from 2008 that EY produced for the company on infrastructure process review. Your request is for a different document but I imagine this would be of interest to you as well. This is MIPS, Coin Victor, Hyderabad and Calcutta. But there may be language that is interesting to you and we think we can trace this back to Gordon Coburn.

This is outside of the range of what you asked for, but I imagine you would want a copy of it.

Kevin: Yes, we would.

[will send to DOJ]

Kevin: You will be able to trace how you think it goes back to Coburn?

Karl: We have an email saying it was sent to Coburn but not the one that actually went to Coburn.

Gray: Number 4. We've done the legwork and have a list of dates drafted. We have been intending to give one letter—there's about 7 dates and I have bates numbers for the documents that reflect relevant meetings. I can give those now or send them.

[agree to put in an email and send]

Karl: Number 5 we have produced all of this.

Courtney: With February 16?

Gray: I believe so. CTS 046. A: 83480-83819. For 5 B: 83661-62, 83745-50, 83480-81, 83482-87, 83488-93

Then the privilege log—I think in January we gave a big privilege log covering 97% of what we will produce. We will true that up once we complete productions. I don't think there will be an incremental difference.

With respect to individual interview privilege log—we are finalizing that. We should be able to get that out this week.

Karl: We did talk with Dana Gilbert. We have an interview with Karen Mcloughlin coming up, as well as some of the employees in the legal division. There are some documents that we are trying to determine privilege on and whether we can determine not privileged due to an exception or if the company would waive privilege.

Kevin: What do you think is the timeline for those decisions?

Karl: I would say we will try to be done with those in the next two to three weeks.

Kevin: I know there was the Deepa chat from 2014

Karl: There's better stuff than that.

Kevin: Are you able to describe the categories?

Karl: Just be patient.

Oz: Does it include the notes Dana Gilbert made during her interview?

Karl: No. We are going to maintain that those are work product. You'll get all the information that was in those notes. This is conduct that occurred during the course of the investigation. It's separate from the underlying facts but we are trying to work through it.

Oz: We just have to think through how that would play out at a trail.

Kevin: So, when do you think we should interview Gray?

Karl: We just need to figure out who your best witness is. I wasn't leading the interview, gray did, so he is probably an important witness. But if they challenge his notes, that makes me a witness. His lawyer was present but his instruction was that he not take nots during the interview.

Kevin; Do you think you'll have a better sense of who the best witness is once you walk through this stuff in the next few weeks?

Karl: As to the Steve Schwartz interview? This does raise a lot of issues for the firm. I didn't know if you would want to tee this up now or wait for trial.

Kevin: Before we indict someone we want to have an idea of what we are getting ourselves into.

Oz: I'm sure Karl, you realize the consciousness of guilt aspect here so we want to make sure we know what we have before making charging decisions.

This will be an area of the trial that is heavily litigated so we want to be sure we know what the substance is.

Karl: What would an interview or Gray or me look like that would be different from—at least for Gray, they're his notes—

Kevin: Let us think about this. It is something on our mind. Given what is at stake, our supervisors want to know specifically who the witness in the room will be.

Karl: Let us think and you think as well what the best way to tee that up is.

Kevin: Maybe we just need another conversations to lead up to this. If it were Gray, that opens up stickier problems than someone who didn't take notes. We haven't thought through all that as well. But for Schwartz it's going to be crucial for us. Without the statements he makes, I think we're—you've seen the evidence and it makes a difference.

Gray: Why is it stickier for the note taker?

Kevin: I'm just thinking about how I treat my witnesses if they have contemporaneous notes.

Karl: I would march into court and say that the only notes are DLA notes and we would be entitled to those so I think there is a big risk that those notes are turned over anyway.

Oz: There is also the issue of prior consistent statements

Karl: And the company has provided a lot of information regarding consciousness of guilt. This is a unique situation where we have learned a lot of relevant information to you and there is more than you know of conduct that occurred during the investigation. We're going to have to spend some time on this and figure out our obligations to the client. So you may want to start with gray because there is an argument that this would disqualify me from representing the company. So maybe it is Gray and Bracket.

Kevin: We are sensitive to that and we know we have the information because the company is cooperating and we know the issues that can create. If there were a way for there—if there were so much evidence we didn't have to go down that road. We appreciate it but it is something we will probably have to sort out relatively soon.

Karl: I wasn't expecting you to ask this now because you know what was in gray's notes and you know what he will testify as Schwartz saying.

Courtney: I think we need to talk through what that will really look like in terms of discovery.

Kevin: The larger point is not so much that we want to interview Gray right now. The issues you are talking about that are going to be ugly—we want to think through them now as opposed to pretrial mode where we are struggling with the company and have crossed a line. There were different understandings on each side of what we were getting ourselves into. These are the issues we want to understand before we go into trial.

Karl: I can't see a judge not issuing a complex case order.

Kevin: Sure, but Oz's point is who knows what reed will pull? So to the extent that we have different understandings or expectations, we need to sort those our sooner rather than later.

Karl: Are you worried the company won't make us available?

Kevin: No I think just with these discovery issues, we want our arms around it. We're imagining the worst [need to think through; company pushing back on turning over certain documents]

Karl: That's why I've only been producing documents that we don't think are privileged. Who's going to be deciding the company's privilege at that point? IT's an interesting questions. I'm just asking you what you want me to get clarity from the company on.

Oz: This is just, we haven't thought about it deeply but the crime fraud exception regarding privilege and work product is going to come up.

Karl: And we have produced documents we think are subject.

Oz; Sure but it might come up with gilbert and gray so to the extent we can resolve them before trial, before we indict, that is our preference.

Karl: I suggest to get a list of documents you are concerned about, a list of the witnesses you are concerned about, and then the subject areas that you are thinking about and let's get very specific. Then let's try—that's what you're saying with respect to Gray. He will have his own lawyer. We'll have to think about it but there will be clear lines on privilege. He knows a lot more than just about Steve Schwartz.

So tell us the topics you want gray to testify on and we will come back to you on what the boundaries are.

Kevin: This is helpful. We haven't thought deeply about it. But you guys have been. That makes sense. We will come back to you with more specific questions and concerns we may have to tee it up in a more crystalized way.

Karl: I've had lots of conversations with Matt Friedman about these issues and he is very much wanting to help you guys. Consistent with his obligations to the company, he wants to share as much as he can.

Kevin: Okay, so we will come back to you with that. Then I just had a couple more things. Do we have a complete KITS contract somewhere?

Karl: I don't know. Gray can you follow up on that?

Gray: We certainly have one.

Kevin: We have been looking for it and we can't. if you could point us to is. Then, the 2/13 production—can you remind me who is Shakar Subramanian?

Gray: He's in internal audit and reports to Steve Kasari. I don't remember the genesis of that. You may have seen him on some other communication, but you asked us to produce his custodial file.

Courtney: The only thing is—maybe we talk about this when we follow up on request 1—another thing we think would be useful is to get a list or group of documents that show any variation request for statutory approvals for projects with LT other than the KITS project. Given how much that stand out in the presentation—we were wondering if there are other examples of those variation requests other than that PowerPoint.

Oz: Also variation request spreadsheets that don't have statutory approval which make clear why this one is unique.

Courtney: Right, I don't know if maybe the initial request and then the final one. That would be useful.

Karl: We don't have a collection of that but we can certainly look for it.

Courtney: We could put that in a letter for you so you have it.

Oz: Have you guys produced Coburn's resignation?

Gray: We can send that to you.

Oz: Then have you given a download—

Karl: He resigned two days before we interviewed him.

Oz: Have you given a download on Chandrashekaran?

Karl: I think we did. Gray can check.

Gray: I feel like we talked about it and you might have taken a pass on it.

DOJ-EH-0000000153

Oz: This potential meeting with the chief minister and that certain people thought there were risks associated with meeting the minister is an issue—if we haven't done a read out we'd be interested.

Gray: Sure.

Kevin: Then for a download of Sambaji?

Karl: How about Wednesday?

[agree to have download in the afternoon; 2-4:00 for Chandra and Sambaji]

Kevin: Gray, can you include Rachelle on the calendar invitation?

Karl: Should we include the SEC?

Kevin: If you want to reach out to them separately and let them know they're welcome to join that would be fine. To keep it separate from us.

Gray: The email from me [that I am sending now] will be bates ranges of the meetings with Schwartz and Coburn about the 2004 audit.

- CTS-0056682

- CTS-0056757

- CTS-0007504-CTS-0007507

- CTS-0056395

- CTS-0056438

- CTS-0056515

- CTS-0056518

- CTS-0085791

- CTS-0056593

- CTS-0057439

DOJ-EH-0000000154

**2018.03.21 – Call with Willkie Farr & Gallagher regarding proffer preparation**

DOJ: Kevin Gingras, Courtney Howard (AUSA), Rachelle Linsenmayer

Willkie: William Stellmach

Will: We now have the documents from LT. One thing I wanted to raise is the possibility of getting more color on the documents. I don't know if it would be helpful for you, but it would be helpful for me if I could come in and get a sense of specific documents and topics you want to cover. Last time you mentioned KITS. If we could get more of a road map on that, that would help us get back to our clients and then start scheduling logistics.

Kevin: Okay. When would you like to do that?

Will: Whenever suits you guys. [Suggests week of 4/2 or this Friday 3/23/2018]

Kevin: Our preference would be sooner rather than later. We would prefer Friday.

[Courtney agrees; Friday proposed]

Kevin: We'll go through the topics we're interested in. KITS is primary. And sort of where we are drilling down and the issues we're interested in. I know often it's a matter of us drilling down into the documents before the interview.

To the extent that—if we are able to meet Friday—contingent on you being able to speak to your clients and get them comfortable—but what time frame are we looking at to talk to them? Do you have a sense as to when we would be looking at?

Will: I think it would be after we talk to you and you can give us color on documents. My hope would be to talk to them over the weekend or next week. Next week is probably more likely. That would be the plan then we can get back to you and talk about more specific practical issues about meeting and times. I would love to meet the expectation of 4/9 but I just don't know whether that's likely. I'll have a better sense next week based on progress we've made in doc review.

Kevin: Okay that's fine. What would work on Friday?

[Schedule afternoon; Courtney to join on phone; 3PM scheduled]

Kevin: We appreciate the update. We'll see you Friday at 3.

**2018.03.21 – Call with DLA Piper – Download for Sambaji Bhor (SB)**

DOJ: Kevin Gingras, Courtney Howard (AUSA), Osmar Benvenuto (AUSA), Rachelle Linsenmayer

DLA Piper: Gray Stratton, Karl Buch

---

Karl: We gave you the name of the person in Bangalore and we were on the phone with our regular Indian lawyer and asked for a Tamil Nadu recommendation. We should have that next week.

Kevin: That's fair. We'll figure out how to tread lightly. Do you have the contact information for the woman you mentioned on Monday?

Gray: You have the name. [Sowmya Holenarasipur] +9 1984 521 8448. Email: hrs@sowmyaandassociates.com

If you google her name, you'll see her bio and the firm bio and that email address.

Kevin: We'll talk to our OIA. We may have to go through some formal channels but we'll figure out what that is and do that.

Karl: We interviewed SB 3 times. 11/11/2016, 12/13/2016, and 1/11/2017

FIRST INTERVIEW 11/11/2016

He is most relevant to the Pune, not to the others. He's involved in variation requests but claims he didn't pick up on the switch or think anything untoward happened. We didn't think he was being entirely truthful given his involvement.

Worked since 5/2011 as electrical engineer. Project manager for Pune CKC campus. Construction had begun at Pune before he joined the company. Manager was—he said L&T was the partner who was responsible for constructing Pune's turnkey contract which made L&T responsible for everything. He thought the value of the contract was 58 million. He reported to Ganesh and Venugopal, based in Chennai. They would come to Pune every two months. Remembers Chandra and Krishnaswarmi were involved in the Site.

He said the company obtained the land for Pune 2007, construction began 2011, and was completed 2014. That was the only project he worked on during that period. He said BG is located in Chennai and was the person in procurement responsible for issues involving finance. Payment approvals were electronic.

Phase 2 of Pune construction was planned to commence at same time Phase 1 ended. Phase 2 at time of interview was about to begin [11/2016]. He would be the project manager for this new phase. Construction contract was given to L&T but had not yet begun. Delayed because Cognizant needed to obtain statutory approvals. This was a change from phase 1 where company began without approvals. He doesn't know who drafted the construction contracts for phases 1 and 2. Satadru Sinha would have been involved with that.

More generally, talked about licenses. Cognizant had to obtain approvals from electricity board, fire officials, Maharashtra Development Corporation, environmental from pollution control board, public

works, water permit. Approvals not required from sanitation or safety offices. There would be a requirement to obtain operating permits from construction official.

Turnkey contract with L&T made them responsible for obtaining permits. Company's responsibility for approvals.

Environmental clearance issue for phase 1.

He was aware the company started construction without the permit. The company applied in March 2011 and expected it in 6 months. When delayed, construction continued without the approval. Was the practice everywhere in India to do so. The body responsible for the issue was the State-level Expert Approval Committee (SEAC). All applications within Maharashtra had been delayed. Company began construction without the permit because they had submitted application. There was a clause in the application that said the government had 60 days to act and if did not, the company could begin construction within 150 days thereafter.

There was a presentation to the SEAC a year and a half after Cognizant submitted their application. During that, the SEAC asked if they had started construction without the environmental clearance. They said they had. In Chennai, environmental clearance was handled by BG, Venugopal, and legal team.

A Show Cause notice was issued. The company replied to the Show Cause notice and presented their case to SEAC. Committee asked questions about the building plan and gave recommendations. Permit was eventually granted after 3 years. Issued in 2013.

SB stated L&T was responsible for getting the Permit and obtained consultant Ultra Tech to assist in preparing the company's response to the Show Cause request. He didn't know how much L&T had paid to obtain the permit nor how much it generally cost.

He remembers L&T asking for additional money for the environmental clearance (EC) through a variation request. L&T contract said that they would obtain all statutory approvals except for the EC. Cognizant interpreted that differently and pushed back on the variation request for additional funds. Rejected request. Chennai handled variation requests. He knew it was rejected but he wasn't involved because it would have been handled in Chennai. Mani, Ganesh, Venugopal were decision makers.

Unaware of L&T paying government officials to obtain the EC. Difficult to get things done in Maharashtra. Stringent process. Not something that could simply be obtained by paying a bribe. Never heard of government officials being bribed for statutory approvals. Not aware of policies and procedures surrounding paying government officials but didn't believe L&T would ask for money from Cognizant to pay a government official. L&T seemed to be asking for money because L&T didn't think contract covered the EC.

Inspection reports. I don't think those are interesting so we can skip it. There was discussion about handing over copies of all licenses and permits, including invoices from L&T.

Additional remarks—other than EC issue, not aware of violations of Pune. Pune had stringent statutory approvals. Thought they were compliant.

Courtney: At the beginning you mentioned a lack of candor and that you felt he wasn't being totally honest.

Karl: I wasn't there during the interview. What I based that on is—I don't want to characterize his testimony—but given his position and the documents in front of him, we would have expected him to know more about the variation and why that switched.

SECOND INTERVIEW 12/13/2016

[Karl notes he did not sit with this interviewee]

This is after Gordon and Steven resigned. He was asked about awareness of disclosures of company on the investigation. He was aware of 12/30 market disclosure and Coburn resignation. Also heard Sridar had resigned. Only knew of alleged payments in Chennai facility.

First heard of FCPA from a newspaper story. Believed anti bribery laws applied to the company. Thought mandatory FCPA training was related to the payments.

Pune environmental clearance. Construction started March 2011. He began working 3 months later. As L&T was the turnkey vendor, they designed the building and obtained approvals. Dispute on whether they were to pay for environmental clearance (EC).

SB recalled L&T commenced construction pursuant to an LOI. Delay in finalizing the contract—disagreements over EC obtainment approval. Typically turnkey vendor's responsibility.

EC obtaining. Application early 2011. Before that was ruled on, company started construction. Common practice. Requirement of technical commission to state committee. Applicant had to attend meeting with experts, describe project to committee. Committee might comment and require changes before approval. He recalled company appeared before committee 9/2012. Was asked if they started construction prior to having the EC. Company said yes. SB said typically construction occurs before committee issues a decision and committee refers to secretary of environment, who issues Show Cause notice. Applicant responds to notice and appears in person before the secretary. Applicant apologizes. Secretary may issue fine, criminal case, and or establish remediation plan. Then the applicant must comply.

Showed email from 4/24/2013 between him and colleagues – "PUNE MIDC Environmental Clearance no way forward"

3/15/2015 email chain where he wrote that on 3/14 he sent Kumar (legal manager), sent RK Jain (L&T consultant) an environmental consultant, Savant Amogh (Ultra tech environmental consultant)—at meeting with secretary of environment. Said meeting was held in a large space. Assistant secretary had not issued an approval but provided L&T and Cognizant with a road map of what they would need to do for the EC.

Typically LT would only be present but Cognizant was present because of show cause notice. Secretary did not ask for anything for approval. Doesn't recall conversations with L&T or Ultra Tech about giving government officials anything. Doesn't know if they could have discussed that amongst themselves.

Supervisor Ganesh instructed him not to get involved in conversations about payments to government officials. SB explained the secretary needed to file a criminal case because it would allow Cognizant to obtain the approval process.

3/15/2013 email where he wrote to Kumar about the EC. Kumar was a lawyer in addition to.. may be privileged information in that email. The email was asking the legal department to get involved in approval. Resulted in email 4/24/2018 involving Ganesh, Senthil Kumar (former Cognizant lawyer), Venugopal, Deepa Baburaaj, alswin unnikrishnan

There was a hearing, he remembers attending it. It was he and RK Jain (L&T consultant) Krishna Subramanian, Senthil, and Mr. Savant. That was a meeting with the secretary in Mumbai. There may have been other admin staff.

Prior to meeting, the consultants said they would have to admit that Cognizant started construction, then meeting would be over quickly. He was comfortable with that advice because consultant had worked with the government a lot. Company admitted to beginning construction prior to EC. Secretary said would file criminal action against Cognizant, as it was required to receive EC approval. Secretary didn't ask for anything improper. Unaware of anyone at L&T or Cognizant asking for improper payment.

Speculated if improper payment had been made that the consultant would have made the payment to the individual separately not at the hearing. Doubted they would have violated FCPA. Improper payment wouldn't have passed through company controls.

We then went through the variation documents with him.

Said generally, on construction projects, Cognizant will ask L&T to make changes to aspects of contract beyond scope of LOI. These are variations. L&T would seek reimbursement for variations through variation requests to Cognizant.

L&T sent various variation requests during construction. SB responsible for confirming with supervisors including Mani or Ganesh on whether L&T should be paid for requested variation amount. Mani and Ganesh would then decide on reimbursement amount. Common on turnkey contracts to seek reimbursement for as many items as possible even if not entitled.

4/19/2013 – LT executive summary of variation requests relating to this project.

SB noted line item 9 on sheet was request for statutory approvals. Did not recall version of variation report as many were sent. LT was required to submit doc for all requests. Admitted didn't see documentation for stat approvals.

8/30/2013 – Project analysis

Sheet called civil and architect tab. 4 columns relating to L&T. line item at 23—idle charges 74 days of delay 39 mil rupees. Not familiar with that. Probably discussed between L&T and Ganesh.

7/18/2013 – spreadsheet

Line item for idle charge was 18 mil 187 rupees. Why had that request jumped in one month? Change consistent with L&T trying to shift charges to company. Issue cleared by L&T. Nothing improper that took place. Increase from 9-50 mil variation requests. Didn't know why changed dramatically. Was consistent with L&T.

9/5 – summary analysis non intended items

Line item for 50.5 mil rupees liaising charge. Variation request 20—change in work station. L&T claimed 58.1 mil rupees owed to them.

He indicated request 20 included complicated charges

11/14/2013 – Cognizant campus variation claims summary

Line item 13 for workspace variation. 13 million. Line 16 for liaising charge 58.5 mil. Both items were rejected. He said work station variation should not be considered, here. Liaising was part of scope.

12/5 spreadsheet – final variation claim summary. Workspace decreased and approved. Liaising and consulting charges increased from 50.5 mil to 50.8 and denied. So they were just switched. Why? SB conceded looked to be final variation. Couldn't explain why swapped. Likely decided between Ganesh, Mani, L&T in Chennai. "everyone knows liaising costs could not cost over 50 mil. Would be wrong for cog to charge those" Rejected possibility LT made improper payments or did so through improper variation requests. Reiterated things were done the right way.

FINAL INTERVIEW

1/11/2017

Pune variation claims. Negotiated in an in person meeting in 12/2013 between Mani, Ganesh, Venugopal, Saravana Kumar, and senior officials from L&T.

Courtney: Was he at that meeting?

Karl: He previously said he wasn't there. In this interview he was suggesting he wasn't but it's not entirely clear.

He says then, he did not participate in the final meeting but prior to final meeting, L&T had emailed 4-5 variation requests. He did not have authority to approve but he reviewed and discussed with superiors, Venugopal and Subramanian who discussed with their superiors Ganesh and Mani.

11/14/2013 spreadsheet – later interim variation requests from L&T

Line item 13 for work stations-58.1-liasoning and consulting 58.5. Both rejected.

12/5 spreadsheet- final variation. He confirmed this was final spreadsheet. Result of final negotiation between L&T and Cognizant. Saravana agreed to items in the spreadsheet.

He says the line item relating to work stations for 50.5 mil, he believes approved variation was for something other than change in work station. Maybe to reimburse L&T for idling charges.

[Karl mentions: we had heard this theory about idling charges from LT lawyers]

Kevin: The idea they would give one cost while they were being delayed

Karl: Effectively conceding line items for statutory charges were inaccurate and actually for idling charges. That's what you may hear from them.

Cognizant rejected request for 58.1 for consulting and liaising. In final spreadsheet they're switched.

Aware Cognizant didn't want to approve consulting for stat approvals. Mani made final approval decision. He noticed a swap in values. Ignored it. Couldn't challenge it. Didn't think it was important for project completion.

Emails from March and April discussing enviro consent meetings.

Email about back-dated letter on EC application. Repeated he didn't do anything improper. Procedure to expedite EC approval process. Local government wanted to help the local economy. Didn't think backdated letter related to improper payment. Repeated didn't believe L&T or other consultants had made improper payments to government officials for EC. Not aware of behavior by government official suggesting that a payment be made.

That was it.

Kevin: That's helpful. We'll talk on our side and get back to you quickly.

Karl: Good. He's been sitting. We're eager to close that. So let us know if he's someone you want to interview or not.

Kevin: I think while we have 5 min left, we were supposed to get back to you on request 1 for the letter.

Courtney: I think what would be most helpful is to respond to #1 in a chart format. Not necessarily the chart you guys showed us but a chart with columns corresponding to the requests Andrew listed. Then in addition to provide bates stamped documentation to the extent that you haven't provided it, where you have refer to bates stamp.

Gray: New documents will be payment files we collected with assistance from compliance and corporate audit. Is there something we should focus on first?

Courtney: First on KITS. If it would be helpful I can send you a blank version of the chart with what would be most helpful for column headings.

Karl: Why don't we schedule time and you orally tell us what you would want in that chart?

Courtney: Sure. I don't know if you have any time tomorrow morning?

[schedule call for 11:30 3/21/2018 tentatively; Gray to send invitation]

Gray: I had a piece of information to pass on. I was going to get back to you with the bates number for the CKC contract. CTS-0030909 – 937

Kevin: Great, then, I found the notes for Chandra. Was there a supplement for that from the last time you gave a readout?

Karl: No, we only interviewed him those two times. Ramesh. You were thinking about Ramesh, the IT guy?

Kevin: We don't think there is any conflict. It's ultimately your call. But nothing jumped out at us that seemed problematic with you guys working with him. He's here in the US right?

Karl: He is.  I would suggest we get a date for you to meet with him.

Kevin: Why don't we propose—he's not on any of those calls, right?

Karl: No, he's just an IT guy who gathered information. He'll be able to tell you how the Tamborg process works. How people at Tamborg gather information from the service provider. He had no relation to any of this.

Courtney: To confirm, there is a guy who is listed as being on the call but he isn't. Have we talked to him to confirm?

Karl: The Ramesh we are going to connect you with will explain that he thinks the Tamborg where the other Ramesh showed up was previously assigned to Sridar.

Courtney: Has anyone asked him if he was on the call?

Gray: We didn't, but we sked the known participants of the call who said he was not on the call. Then we tracked down the historical custodial data for those Tamborgs and that's how we determined at the time he wasn't the custodian of the machine.

Karl: We will find out if he is still with the company and speak to him if he is.

Kevin: We will potentially have a call tomorrow, so let's do the date for the interview then.

DOJ-EH-0000000162

**2018.03.22 – DLA Piper – Discussion of Spreadsheet**

DLA Piper: Gray Stratton, Karl Buch, Natasha

DOJ: Kevin Gingras, Courtney Howard (AUSA), Rachelle Linsenmayer

Courtney: First, the chart I was talking about yesterday. What makes sense is columns: statutory approvals details (type of permit), name of issuing authority, payment amount, date of payment, payment made by (to extent that you know, L&T, CTS directly etc.), senior-most employee who approved payment, date cognizant reimbursed anybody with supporting document bates number, method of payment, supporting documentation bates number.

To the extent that you haven't found it, that's fine, but if not note that.

[agree that that sounds doable]

Kevin: KITS is the priority first, then we can go Pune second.

[agree]

Kevin: The readout yesterday was helpful. We do not feel that we need to talk to him. Again, sorry that took so long.

As far as interviewing the tech person, I think we have a lot of balls in the air as far as interviews we're going to be conducting. We're trying to get Mani in but there are issues. Beck may be calling you to ask to apply for a visa for a later date.

Karl: We have, last I heard, a two week waiting list to get an interview at the American Embassy in India. They had applied for that, sometime in the middle of April.

It is potentially 2-3 weeks for an interview, then a couple of weeks after that to get the interview.

Kevin: Okay, well we want to keep that moving forward.

Karl: If you don't think you're going to be able to get that done just let us know so we can get a refund on the ticket.

Kevin: Of course. One of the things required for the parole application are the flight times and arrivals. We've had it go where it wasn't approved until two or one day before, so we'll figure it out.

But with regard to the tech person, we were hoping to do it soon but what—is a couple weeks lead time too short? Obviously we have to work out schedules. If we tried April 9th?

Karl: I will be in Dubai that week in connection with a different investigation. The week of April 16th or 23rd would be more realistic.

Courtney: Is he in New Jersey?

Karl: Yes, he is.

Kevin: Can we say then April 17th and put that on the calendar for now? I can't imagine it would take more than half a day.

Karl: I agree. This may be one where I may still be in Dubai, so you could just do it with Gray and Natasha.

Kevin: It's pretty straightforward. We just want someone to explain the Tamborg system and how it works.

[Agree that 17th works]

Karl: We'll get back to you on if that works for the client.

Kevin: Would the week of the 9th still be a possibility then?

Gray: I can be available the second half of that week.

Courtney: As a reminder from yesterday if you guys could track down the person listed on the call and get an answer from him.

[Gray and Natasha to follow up; Karl agrees doesn't need to be at the interview]

Karl: You mentioned talking to Cathy Rundler about a presentation on compliance. The fact portion of the presentation, I'll be taking the lead on.

[Propose first week of May for presentation; DOJ to get back to DLA on date; Karl says third week of April may work]

Kevin: If things let up on our side, we will of course be happy to extend the dates if we can.

So we'll wait to hear from you guys on the 17th or the end of the week on the 9th. Then we'll have a better sense later.

**2018.03.07 – Call with KR**

DOJ: Kevin Gingras, Courtney Howard (AUSA), Rachelle Linsenmayer

Latham & Watkins: Kathy Ruemmler

Given schedules, looking at the end of April.

Concern about SEC timing. To touch base with SEC.

KG: No problem with that. We assumed you may have already done that.

KR: Do you think they would be at the compliance presentation?

KG: Let us talk to our supervisors about that. We will get back to you.

KR: We will probably reach out to them tomorrow then I will wait to hear back from you [regarding presentation on compliance program].

KG: Will you get back to us with some dates?

KR: Yes, by tomorrow at the latest. Matt Friedrich just got back from India.

DOJ-EH-0000000165

**4/3/2018 – Call regarding LT clients**

Willkie: William Stellmach, John Joy

DOJ: Kevin Gingras, Courtney Howard (AUSA)

---

Bill: The issue about the documents comes as a surprised. Will get the documents from the company after produced to you.

Questions about the metrics—volume, how many relate to our clients. The schedule we were planning on was meeting with you guys the week after next isn't going to be feasible [in order to review them].

Kevin: We don't know any more about the documents than you do.

Courtney: I believe the number was in the 100's.

Kevin: It's fair and not unreasonable. We understand. Realistically, when do you think would be the next window where we could do something? We are probably looking at the week of the 14th of May.

The second question is—were we talking about talking to all three? With the caveat that you need to look at the documents.

Bill: Yeah. And I don't know whether the documents impact the decision making of my clients going forward. But we don't want to go in without knowing what is in there. I think all 3. [one client may be less willing to come in]

About timing, when we had spoken I had offered the week of the 7th or 14th but I can't do that now because I need time in person. I think the week of the 20th would work for us to meet with you. The plan would be to have all three meet with you the week of the 21st.

Kevin: Even later in that week [17th or 18th] wouldn't work? That would be my preference to at least start later in that week.

Bill: I have something on the 14th of May, so I can't leave until the 14th. [would restrict time that he could meet with his clients before the week of the 21st]

Kevin: I will check with the agent on whether that works for us or not. The week of the 14th was already pushing it. We will get back to you on that but hold that for now.

Courtney: Given that it was represented to us that the documents will be less than 1000, would the week of april 23rd be a possibility?

Bill: I can't.

[Discussion of schedules and potential alternatives; Will does not think it would be possible to meet earlier]

[DOJ will get back to Will on whether 5/21/2018 will work]

Bill: We could give you a robust attorney proffer on what they have to say.

Courtney: One question is—when would you have to get the documents to keep the original plan of the week of the 9th and the 16th?

Bill: I mean maybe we could [if we got the documents tomorrow] but the travel arrangements have to be remade.

**2018.04.16 DLA Piper Call – 12:00PM**

DLA Piper: Karl, Gray Stratton

DOJ: Kevin Gingras

AUSA: Courtney Howard

Karl: Ramesh, the IT guy.

Kevin: We have been diverted from that issue. Let us look at our calendars.

[Ramesh is in New Jersey; could be talked to as a background witness]

Kevin: Are there times over the next month that we need to know you wouldn't be available at all?

Gray: We will meet with you guys on the 7th and 10th of May. Would the 8th or the 9th make sense to have him come down?

Kevin: [may be difficult; will circle back to DLA]

Courtney: Did you have a chance to confirm with the employee who appears on Tandberg as being on the April call?

Gray: I will get that done this week.

[Rajeev Menav]

Courtney: If you could give us a download on that that would be great.

Karl: Conduit. The latest is that the plaintiff's lawyer said he would consider not pursuing discovery if the government asked. He was going to pursue them the first week of May.

The plaintiff's name is Steve Schortgen. He is at Sheppard Mullen.

[Kevin confirms he received the email with this person]

The lawyer who is representing Cognizant is Jason Wilcox. Kirkland and Ellis. 202-879-5810.

Karl: We will be producing a bunch of stuff this week in response to the letter.

Gray: We finally have request 1. You'll get all of the payment files.

Kevin: We'll get back to you on dates for Ramesh.

2018.04.16 – DLA Piper Call

DLA Piper: Gray Stratton,

DOJ: Kevin Gingras, Rachelle Linsenmayer

AUSA: Courtney Howard

Gray: We have an expert for you that I can give you now. He is a partner at Fox Mandal.  Jaya Prakash Padmanaban. Number is +9 197 909 76191. Email address is p.jayaprakash@foxmandal.in

Gingras: Let us know about a follow up call and if he frees up before 1.

**2018.04.16 – Document Follow-Up Call with Debevoise RE: LT documents**

Debevoise: Saqib Alam, Colby Smith, Philip Rohlik, Kunal Gupta

DOJ: Kevin Gingras, Rachelle Linsenmayer

AUSA: Courtney Howard

___

Kevin Gingras: Questions about the most recent production. In the new documents you produced—900—were there any new documents that you found of note or that we should be zeroing in on?

Colby: I think the answer is nothing in particular jumped out at us. We reported to you that on the first tranche we made in January, the search request was just from specific people. We didn't find anything worth highlighting.

We discovered additional backup tapes from early 2015 that we had not looked at in our most recent production. So we didn't filter them for relevance, just within the date range and who received them.

Gingras: You may have provided this already—did you all produce or explain which backup tapes you were not able to recover? For what periods of time?

Colby: I think what we told you [may need to check with India] is that we learned there was a backup tape taken the last day of each month and the systems were backed up. Now I think we've restored those from.. thru March 2015 but it started somewhere around September

Saqib: 12/2013 to June 2014.

Colby: Those are for the nine custodians and the government's request.

Saqib: For SNS and Vadivelu, 1/2013 to March 2015, inclusive. So two full years.

Colby: My understanding is that we did find a complete set. If something got deleted during the course of the month, it wouldn't show up on the backup tape. Such deletions are a real possibility because these guys had restricted mailbox sizes.

Gingras: One request. We are trying to churn through these. Would you consider providing us with the search terms that you all used to do your review? It would help us prepare for interviews in the next few weeks. The scheduling has been pushed back into May.

Colby: We will run it by our client, but I suspect we will be able to give you something. Let us check with them and we will get back to you.

Gingras: Thank you. One thing I would add is that we are working on a time sensitive schedule so to the extent that you can come back to us quickly, we would appreciate it.

Colby: Sure, we will try to get you an answer in the next couple of days.

DOJ-EH-0000000170

**2018.04.25 – Attorney Proffer Regarding Vadivelu, Nakkiran, Balaji**

**DOJ**: Kevin Gingras, Courtney Howard (AUSA), David Last, Rachelle Linsenmayer

**Willkie Farr and Gallagher**:  Bill Stellmach, Zachary Cobb, John Joy

---

*Disclaimer: All provided on a hypothetical basis.*

Housekeeping: Safe passage and proffer agreements to be sent to clients

- **DOJ to send agreement**


Tendering Process

Bill: Vadivelu recalls 2-3 other companies bidding. Rounds of negotiations on contract price with Cognizant. Vadivelu was Tendering Manager for community buildings and airports unit. Once won, he handed it off to design and construction teams. Kannan and NV Satish were more involved in negotiation with Cognizant on LT side [for the tender, final pricing of bids]

Vadivelu was watching the negotiation take place. His role changes in 2014—eventually business head of community buildings and airports—substantive.

Nakkiran and Balaji played no role in tendering process. Given contract and price after completion.

Contract was for a lump sum contract. Total price received by LT was negotiated at outset. "Preliminaries" startup costs of project. Payments under KITS were milestones established during negotiations [documents lay those out]. Payments prearranged % of overall contract. Running account bills.

Initial payment made for "preliminaries'. Then, on a monthly basis, there were account bills for the completion of certain benchmarks. Amounts were tied to given milestones, not cost of achieving the milestone—didn't necessarily cost .5% to complete that step, it was just a point in negotiations agreed would pay that amount at that time. LT met milestones to continue cash flow. Wanted money up front.

Payment issue at this point: even though contract negotiated as a lump sum, expectation of delays and changes were anticipated. A provision was included that allowed LT to be compensated for delays.

On CTS side—internally reserved 3% price to cover costs they might incur. Extra claims or variations process. This was 3%--in page 6 of presentation. Agreed on variation prices.

It wasn't a surprise to clients that there were changes—a number of the delays were due to conduct and activities undertaken by Cognizant due to changes.

Recurring debate points between LT and Cog concerned responsibility for statutory approvals and permits. Unique to Cognizant as a client. Typically, contractors are not responsible for ongoing approvals. LT took responsibility here. Seemed contrary to industry practice but CTS dictated to LT as a valued customer. Unique to LT that they did this for Cog. Role that LT played in process was flashpoint later in relationship. CTS believed LT had complete responsibility for the approvals and was accountable

for delays. CTS pressures LT and is frustrated –DOJ_RN 000012. On the other hand, LT had a different interpretation of the contract. LT thought the contract was limited to LT producing drawings and designs that would be sufficient for the regulations. Preparing the documents requires too much bureaucracy. Thought they were just to expeditiously create the underlying documentation—that was the extent. Incorporated changes from client, obtained signatures and incorporated edits. LT view seen in correspondence.

Vadivelu would say LT saw to eliminate responsibility for statutory approvals at tendering stage. Legal departments met to discuss issue. Remains—despite being flagged at outset—a recurring issue throughout relationship. Not resolved. Both sides believed itself correct.

Courtney: You said there was a discussion of the issue of who would be in charge of approvals at the outset? Vadivelu recalls a call with legal on both sides at that point?

Bill: Yes. When they were tendering and LT was explaining scope, Cognizant came back and said it wanted them to be responsible for statutory approvals. CTS pushed back against dropping it. Ultimate result is in the contract—language can be ambiguous. Both parties never agreed on final responsibility.

In 2014, suggestion that given importance of project to Tamil Nadu and jobs, CTS should meet with a local politician to avoid delays. Clients (Vadivelu, Nakkiran, Balaji) had no knowledge on whether the meeting took place and did not attempt to organize the meeting.

The Chief Minister of Tamil Nadu, Jayalalithaa. Cognizant would have had difficulty getting approvals from the minister. Clients didn't think Cognizant would have luck meeting with Jayalalithaa. No luck going through normal channels. Vadivelu thought the meeting was just a suggestion—didn't think Cognizant would have been able to get a meeting. Nakkiran was aware that a meeting was suggested. Balaji knew nothing of suggested meeting.

In correspondence, SNS emails that it is not LT's responsibility, onus should be on Cognizant.

Clients were not shown emails not on.


KITS Project Delays

From what we have learned, there were a number of permits to be obtained.

Three key steps: 1 obtain ELCOT master plan approval, 2 enviro clearance, 3 planning permit

1: [page 13 of slideshow shows steps] Starts master plan approval—building plans submitted to CMDA in Chennai. This first step caused the most significant delay in the process with a cascading effect on the approvals. Land deed received incorrectly laid out plan for KITS project—parceling mistake. Deed had to be reissued and drawn. Supposed to be done by 2/2012—doesn't happen until 1/2013. Pushed everything back because nothing else could be launched.

2: Planning permit for environmental clearance from statutory environmental impact assessment authority (SEIA). Hired ENSYS to attain that approval. Ultimately obtained 9/2013 (should have been 2/2013)

David: Why did they obtain a consultant if they were not responsible for permits?

Bill: [LT suggested] We were going above and beyond. This piece was so intricate and technical. One off task.

David: Was there someone in particular?

Bill: There are names. But our clients just knew it as ENSYS. They had no role in choosing the consultant or interacting with them. They just knew they were obtaining a permit and it was delayed. Balaji may have had limited interaction with someone from ENSYS—but only for handing off documents.


3: Application for planning permit. Once done, in position to occupy campus.

According to the Clients, there was nothing LT could have done to speed up approvals. Vadivelu was aware of delays because the issue was raised to senior management. Doesn't know what the source of delays was. Would refer to Balaji who was on site and responsible for day to day. Recalls issue with land title and that changes in designs were delayed. CTS seems complicit for changing plans. After the project was complete, learned CTS purposefully delayed the project apart from statutory approvals. An internal document from CTS was inadvertently shared with LT that suggested CTS wanted this delay for tax reasons.

Nakkiran didn't see a responsibility to address issues. Attended meetings regarding delays. Didn't take action on delays. Role as relationship manager was to make sure nothing fell between cracks and to facilitate communication between Cognizant and LT. Triages. Not focused on communication unless directly going to him—copied on a lot of emails.

Balaji worked at site level. Best insight on delays. Kept chart of KITS progress. Not all delays lack of approvals. Balaji thought CTS team was responsible for delays due to revisions of design plans.

CTS made payments to LT on a monthly basis through running account bills. Payments requested monthly. In 2014, CTS falls behind. Issue raised with senior management and LT. Counsel for LT advised that payments be made on some bills and not others. Clients don't have insight into this issue. They knew some payments had been delayed. They were not involved in discussions between CTS and LT on that issue. Vadivelu didn't recall why there were delays but speculated they were due to delays on the KITS project. All 3 didn't think LT could have obtained the approvals quicker.


Variations and extra claims process.

By the time KITS was closed—over schedule by more than a year—CTS had made many changes. Final cost was negotiated through the variations process. Parties had to agree on a significant amount to compensate LT. In theory, the variation process was to address additional charges, but viewed by LT as a chance to renegotiate the contract price due to losses through delays and changes. Wanted 15% margin—due to delays, their profit margin shrank completely. Variations attempted to capture margins back. 5% captured back.

Vadivelu had the most involvement in the process. Project had overrun due to delays—LT required 60 crores to make a project profitable. KITS would be less profitable than expected. Vadivelu requested cost figures from Balaji—"Rule is variation claims should be 3 times the amount [needed]". Vadivelu knew this would be negotiated down. He included any cost he could, including costs from other projects. Rule of thumb to multiply by three. Process LT engages in inversely with its own vendors. Cultural practice in India around this.

Cost of statutory approvals.

Perceived cost of delays. 11/2014 Balaji estimated 15.2 crore cost. Vadivelu took the number and added costs not covered through Siruseri. Balaji collected in spreadsheets to justify variations [dojbs0007— shows how came to 22.6 crores]. Siruseri amount was still owed at the time. You wouldn't be able to find supporting documentation for the chart. This was roughly the amount.

Line items in documents calculating variations, according to Vadivelu, are meaningless. The amount required by LT would be used for purposes of negotiation. As seen in the documents, after 60 crores was agreed on, Thiyagarajan at LT agreed to negotiate the prices. Vadivelu was aware that CTS only cared about final figure. How it was presented in the line items didn't matter. It just needed to be enough to cover LT.

Courtney: Costs were inflated?

Bill: Vadivelu told people at the time to inflate the numbers. So the 22.6 was the number they actually needed—so they inflated it to cover the margins.

Vadivelu has the most involvement [of the clients] in the variations process. He relied on Bajaji to obtain the figures to use in negotiating with Cognizant. Nakkiran was not significantly involved in variations. He was forwarded correspondence from Vadivelu so he could print the emails. Balaji was trying to catch cost overruns and spread them across different line items. Assuming LT would submit a number to CTS and CTS would refuse, this would spread costs among as many line items as possible.

The variations process was unique in this industry. We are unfamiliar with it, ourselves. We could ask [our clients] questions to follow up on any issues.

Meetings with government officials

Clients unaware.

Variations

Tension point between clients. Vadivele views numbers as fudgeable—just wants total amount. Balaji is on site putting together spreadsheets—says there is a basis for each of the numbers. May be difference

in their levels at the company. Vadivelu just viewed the spreadsheets created by Balaji as a negotiating device to recover the crores.

**Scheduling Interviews**

Vadivelu May 18, Nakkiran May 20, Subramanian May 22

Vadivelu needs interpreter—doesn't fully understand English.

Balaji may need interpreter; Nakkiran does not

Willkie will provide interpreters.

[After discussion of scheduling, Willkie suggests still doing Vadivelu interview on Friday, the other two on Sunday, will check with clients on scheduling]

**Any follow up items?**

Kevin: Let us talk and come back to you.

Could you remind me of structure? Balaji is below Vadivelu...

Bill: They are all in the airports construction unit—when the projects started, V was in charge and reporting to Kannan. Nakkiran was a dotted line to Kannan, below Vadivelu. He was the relationship guy with Cognizant—the key account relations manager. Balaji was lowest. He is an onsite engineer trying to ensure everything is built as it should be. He is in charge of day to day operations and is an actual engineer. 2014—Vadivelu gets Kannan's job—head of business unit. Oversees Nakkiran and Balaji.

Venkatesan is Vadivelu's equivalent [after Venkatesan moves into Kannan's position]. Ganesh is project head on CTS KITS. Those are the two recurring people on Cognizant's side with whom they interact.

**2018.05.01 – Presentation by DLA Piper**

SEC: Mike Catoe, Paul Sharrat, Robert Dodge, John Bowers (on phone)

DOJ: Kevin Gingras, Courtney Howard, David Last, Rachelle Linsenmayer

Latham: Kathy Ruemmler, Doug Greenburg, Erin Brown Jones

DLA Piper: Gray Stratton, Karl Buch, Natasha Kanerva

FBI: Kelly Blanchfield (on phone)

*Three binders handed out at beginning. Referenced throughout.*

<u>Investigation Overview</u>

- **Investigation conducted and different phases**
  - Initially received call about allegations of improper payments around a food vendor (license renewals, food handling, etc.)
    - through hiring counsel, DLA hired EY to help accounting testing—there was suggestion of small improper payments
    - June/July 2016, DLA gathered information and conducted interviews;
      - August interview of Mani
        - improper payment related to electricity permit on 8/9
        - 8/20 interview, mentioned management may have been involved in CKC/KITS facility, Coburn and Schwartz allegedly authorized 2.5 mil through LT)
        - Pune facility (Environmental Permit – 560K permit mentioned)
  - Changes in investigation
    - allegations raised to compliance officer, compliance chair (Maureen Brinkiron-Evans), and chairman of board told
      - They decided to remove Schwartz and Coburn from overseeing investigation (8/20/2016)
      - DLA collected their hard drives and machines
      - Schwartz interview 8/28/2016; Coburn on 8/29/2016
- **Basic Timeline of Investigation**
  - 8/31/2016 update to board
  - 9/1/2016 company self-disclosed
  - 9/2/2016 doc review began
    - then Schwartz's notes concerning the 4/2014 meeting were found
      - produced notes to gov on 9/14/2016 after board approval
  - 9/19/2016 – 9/22/2016 additional interviews
    - Schwartz interviewed 9/23/2016
  - Coburn resigned 4 days later rather than come to another interview;
  - 11/3/2016 Schwartz resigned

**Phase 1 of Investigation**

- 3 big payments Mani raised
  - smaller payments put aside (those that had opened the investigation initially)
- 95 interviews conducted in India and US
- company may have authorized payment for planning permit on CKC permit
  - 2.5 mil payment made by LT on company behalf

*Binder 1*

- TAB 1 - 3/4/2014- Raj Ghosh (US head of procurement); both employees in tab 1 have been terminated
  - Pg 2, 5th column approval update
  - 2014—company began construction w/out having all approvals; earliest written document suggesting this allegation. 2 different types of print—lighter blue reflect Raj Ghosh notes of conversation w/ BG
    - should be 2 million dollar ask from LT
      - LT received demand from local LT official, then passed request on to company
    - Email indicates that they think they will be protected from FCPA
- TAB 2 – At the time, BG was head of procurement in India
  - planning quarterly capacity planning meeting
  - 9:31 "sns reached out to me"
    - SNS is current CEO of LT
  - [mentions political party—reference to LT unwillingness to make demand payment on Cognizant's behalf; "the lady" is Jayalalitha; "not buying that story" mentions "Pune", may be reference to payment made there]
  - 9:39 chat about losing jobs
  - 9:56 Sridhar "I'm not sure what they are trying to get from us on this approval" context suggests discussion between LT and cog about responsibility for payment, contractual obligations
  - 10:01 BG's view LT can take a stand – "they can say whatever they needed to do legally" mention of FCPA—who has legal obligation to get permit, whether cog can force them to get the permit

**Karl**: After this meeting on March 10, Biswajit Ghosh and Raj Ghosh receive email behind tab 3

TAB 3

- Reaching out to India General Counsel Kannan; Ganesh to be meeting with Deputy Secretary of Government
  - curious timing (a few days after Tab 2)
  - potential reference to request by Ganesh to get advice on how to meet with Deputy Secretary regarding statutory approvals
    - additional documents to show meeting between LT and Cog in the same week (subsequent to March 10th to discuss contract obligations about payment

**Courtney**: It is true, correct, that there was not a signed [contract with] FCPA [language]?

**Karl**: I think he thought that there was. But this contract did not have that language.


TAB 4

- copy of Schwartz' notes; shows call between Gordon and Sridhar; Schwartz did not dispute they were his notes; you can see line 6 suggests discussion about $2 mil demand; there is an ask is on the Pune Project from officials; discussion about a change request w/ a lot of line items—important later on, this request was manipulated by people at Cognizant to conceal the payment;
- "are we setting precedent here"
  - During his interview, Mani mentioned Steven said this TAB 5
- Direction by Coburn to withhold funds to LT as part of negotiation going on to force them to get the permit

**Paul Sharrat**: With respect to Schwartz's notes, those were on a server or a machine?

**Karl**: On his laptop and on his iPad.

**Natasha**: I'm not sure on the number of places but I can check how many times it was repeated. It was in the "notes" on his iPad and was backed up on his computer.

**Paul Sharrat**: I'm assuming you have forensic images and the metadata?

[DLA notes that this was produced to us]

**Karl**: He did not deny in the interview that these were his notes. There was also a series of other notes that makes it clear this is how he took notes. We produced other non-privileged notes similar to this.


TAB 5

- Following the April 20 call, direction by Coburn to freeze outstanding payments to LT until able to obtain KITS building permit
- Pg 2—Vadivelu is the site lead for LT on project, sends this along to Mani, Ganesh, and BG—payment request for 100 crores.
- Significant line at the bottom—"as committed we are going ahead with the approval part (not to inform your site team and others)"
- middle email references new liaison consultant to process approval;


**Mike Catoe**: Who is the new liaison consultant?

**Karl**: No one is able to answer that for us.

**Gray**: We asked LT, too.


TAB 6

- June 30, Vadivelu comes back to Mani, Ganesh, BG saying he had obtained Government Order from KITS; order attached

   ○ Worth noting that the company had been trying to get this permit for roughly 16 months; within 1 month of new liaison consultant appointment, the order was received from the Government

TAB 7 – permit issued in November

TAB 8 – Vadivelu sent variation document to Mani, BG, Ganesh

- PowerPoint presentation w/ variation proposal [we have seen these variation requests that generally come at the end of construction on LT projects; includes increases in price not initially included for additional work]
- page 135 – overview of items—"Approvals, campus registration" most crucial
- page 137 "approvals, campus regularization" #2 statutory approvals corresponds with 2 mil payment to government official
  - ○ indication other items could have been inappropriate payments
- LT requests reimbursement which corresponds with 2.5 million dollars
- Page 174 shows "points not agreed by cognizant"; "flab barriers" rejected, others rejected
  - ○ important because in subsequent docs sent to Coburn, items initially rejected are then switched and amounts relating to statutory approvals recommended to be denied, similar amount for rejected items approved; improper payment switched out, likely to try to conceal payments

TAB 9 – Jan 13, 2015

- Team on the ground had different spreadsheets indicating ways to substitute items in to add up to stat approval cost
  - ○ 7th page – line item 34 "approval regularization" for 3.7 million. This corresponds with Tab 8
  - ○ CKC Sholinganullar – on 2nd excel tab, line items 16-26 "additional claims accepted instead of statutory approvals"
- This is a loose spreadsheet found on Venkatesan's machine; these can be found in binder produced by DLA earlier, to the extent found in email correspondence

TAB 10

- Shows Venkatesan forwards to Balaji items previously rejected that will be accepted

TAB 11

- Mani transmits recommendation on variation request from LT to Coburn
  - ○ "as discussed"
  - ○ left-hand yellow box includes LT claimed amount; $3.7 mil corresponds with November deck LT had sent
  - ○ Approved amount Mani requesting is $3.7 mil

- the attachments show amount sought for approval is amount relating to statutory approvals and lists out the "switched items"; recommends not to be accepted
  - line item in excel in 2nd attachment includes recommendation to approve statutory approvals, but not for line items that will [eventually] be approved

TAB 12 – February 2, 2015

- Venkatesan created this document
- Page 2 – subtotal accepted for statutory approvals; trying to calculate which items to include in the final version to cover the improper payment

TAB 13

- As team continues work on line items, Coburn writes "approved" on 2/3/2015; further discussion about construction project
- Deepa, Associate General Counsel, raises question to clarify statutory approvals
  - She is concerned that this may be an FCPA red flag; has call with Ganesh afterward

TAB 14 - March 11 email

- Seeking Gordon's final approval for variations
- Spreadsheet shows on last page additional items not accepted for claim
  - 16,18,19,20,22,23,26,27—these variations were previously rejected, now accepted

TAB 15

- Coburn approval of revised document

**Mike**: Those numbers of the rows were previously accepted but now rejected?
**Natasha**: It's everything listed at page 10.


**SECTION B – RELATES TO TNEB Electricity application**

- LT paid 300k to TNEB –electricity board—to hook CKC to the electricity grid; company still is not hooked up to electricity grid; to the extent that a payment was made, no benefit received

Tab 16

- shows Vadivelu sending invoice for services; load sanction approval refers to electricity approval
- line item 3 relates to potential improper payment; 2.1 crores listed "incidental" expenses
- next page [Tab 17] shows detailed bills

TAB 17

- Concerns raised by BG; revised invoice submitted and attached to this email
- BG deleted email in Tab 16 as soon as he got it; amount was too large
- Revised bill sent for 13.93; same amount but 'incidental expenses' removed and all other line items increased to total same amount (2.1)
  - appears to be to conceal amount

**Courtney**: I hear what you are saying and I see the total. What I am missing is, couldn't LT simply say: "No incidental expenses hadn't' been broken out yet. We broke it out in what we sent to include the expenses."

**Karl**: There were additional emails around this and a dialogue. In witness testimony, Ganesh said that they told him to remove the incidental expenses. There are other emails that provide color. We were told that incidentals were removed and other line items were increased to cover that amount.

**Courtney**: But, in theory, you could argue they were broken out. There's nothing you've seen on the document that would counter that?

**Karl**: It speaks for itself.


## SECTION C

- Pune, first large payment ID'd in phase 1

TAB 18 – SNS (ssmanian) unclear if actually SNS

- attachment shows line item 9 "expenses toward various statutory approvals"
    - 380 lakhs (560k US)

TAB 19

- Page 3, line items at 13 and 16—"work stations" , "liaisoning and consulting charge"
    - 50 mil 500k rupees—$770k USD

TAB 20

- The previous amount listed [in Tab 19] is important because in this tab, line 6 shows the decision to change work station to approved, taking the amount originally relating to liaisoning charges (50 million) and plugging it into the work station line item
    - Together with the reference in Schwartz's notes and the text chat between Ganesh and Sridhar regarding the Pune payment, this appears to be evidence of an improper payment

**Mike**: [asking for clarification on switching of charges]

**Natasha**: Tab 20, line 16 shows the environmental clearance as rejected, but now for the amount initially charged for the change in the work stations. Line 6 shows the 50 million approval now listed as a work station.


## SECTION D

**Karl**: At tab 8, we talked about the focus on the statutory approval line item (2.5 million), but other [line items] appears suspicious –"relay out approval", "land approval" –there were other approvals adding up to 1.2, so we began to investigate those.

This evidence is not as strong. Some is from 2011—most of the relevant people involved are no longer at the company.

Tab 21

- The first email relates to land acquisition—11/2014
- Land approval, Siruseri – relates to 1.2 mil amount; this suggests LT was involved in helping, notwithstanding government red tape to get permits

Tab 22 - Statement of Work

- Third page shows references to request by LT for variations
- At the end, line 54 says "land cost"; 56 is "STPI approvals"; line 58 "5 MVA temporary power" [hooking up to grid]
- If you take these amounts and link back to presentation submitted earlier, Tab 8—137 –you see "land approval" is listed as 2x the initial request; the amount on line 6 is 2x what they were originally seeking;
- For STPI campus regularization on line 5 in Tab 22, there is an identical amount requested [lines 3, 5, 6]; in line 7, CTS asked not to move forward
  - All items were rejected when requested in 2011
  - However, when LT obtained a building permit for CKC, they brought these statutory approvals back and sought approval for them through the CKC project—these were then concealed on the company's books
    - do not have the same level of detail around them [as for other payments]

TAB 23

- Page 2 references a call on STPI approvals and lack of required approvals
  - references work LT did

TAB 24

- Document references electricity approvals paid
  - note from Ganesh for TNEB registration, references that LT has been able to obtain the registration; "we need to make the payment"; LT able to get approvals during a power crisis

Tab 25

- Page 2: Language from Ganesh to reduce scope; "unplanned expenditure" during power crisis
  - Similar to later application to TNEB for 300k permission

TAB 26 [copy of TAB 8]


**SECTION E**

Refers to Phase 3 of the investigation—operating licenses; suggests inappropriate payments made through 3rd party contractors

Tab 27 – Air and Water consent to operate
- processing/consulting charge likely paid to government officials to facilitate permits

TAB 28

- lower level employees on the chain

- spreadsheet, page 3: 1st column, "license name", #2 air and water consent for MEPZ
  - "present status" refers to consent needed: "possible solution to obtain license…3rd party…what support required…1.5 lakhs unofficial"
- Witnesses stated that this references 300k payment made to government official
- Line 1, far right column: references another "unofficial" payment to government official to facilitate permits

TAB 29

- email relating to air and water renewal for Siruseri
  - Assistant Environmental Engineer (AEE) to get a payment; 1.5 lakhs requested for liaisoning; A to Z services (3rd party); names of officials next to license renewals

[Karl gives summary of investigation efforts]

**Interview numbers**

- 400 custodial collections (half laptops; all in, 450 interviews);
- 10 TB of data collected and reviewed by terms; key time periods for key executives

**Company's historical compliance program**

- 2011-2016
  - program included FCPA policies procedures and training
  - risk assessments, internal audits, investigative function
  - program has been evolving with growth
    - company has been rapidly growing over past 10-15 years
  - company does not generally do business with foreign governments—no substantial contracts doing work for foreign governments
    - because of this, company viewed risk profile in this area as low
- 2015 – company internal audit review of global anti-corruption program
  - observed program evolving
- DLA observed that company had hallmarks of program with some exceptions, but needed improvements (to be discussed soon)
  - found that conduct (decisions by management to approve payments) were a result of misconduct by Schwartz, Coburn, and others in real estate in India
    - controls were overridden, decisions made to conceal the payments
- Company investments to improve existing controls
  - Notwithstanding program challenges, it worked here—conduct uncovered because of the compliance function
    - complaint>counsel hired>investigation>management involved found to be involved, so audit committee removed them>further investigation
- Program findings
  - had policies and procedures throughout period;
  - 2013 chief compliance officer; global ethics and compliance committee created
  - periodic internal audits—2014, 2015
  - 3rd party DD not originally focused on
  - training occurred electronically and in person

- web-based ethics and compliance
- reporting hotline existed
- compliance program needed more resources (in deck regarding audit)
  - o Coburn had been involved with and was in control of compliance and legal budget
    - active role in [potentially] constraining compliance budget
  - o Empowerment
    - Compliance personnel was empowered, which led to this investigation
      - called out the general counsel and president of the company

### *BINDER 2*

TAB 1 –

- Bates 11328: initially adopted in 2011 (not many changes made to this version)
- Bates 11336: discussion about corruption, FCPA
- Last 2 pages –11366 has certification

TAB 2 – 2011 FCPA Policy – 11369

- copy that still exists today

TAB 3 – email from 2011

- middle email –Misty is a compliance officer, Jim Lennox is "chief people person"
  - o mention that they were aware Gordon would be cutting back on compliance, including 3rd party risk
  - o subsequent 3rd party risk assessments were done but not for specific issues until 2016

TAB 4

- reference to competing for business without bribes

TAB 5

- In 2013, committee with management created. Met informally as issues arose.

TAB 6

- risk assessment done by internal audit in 2013; solicits feedback from clients, business

TAB 7

- Slide deck used by CTS for client-facing discussions to explain the company's compliance program
- page 5 shows global compliance committee; 6 shows function/staff; 7 shows compliance monitoring flow chart; page 9 shows training schedule

TAB 8

- Internal audit update to the audit committee; part of doing operational reviews; internal investigations being done by internal audit and corporate security

- page 10 shows observations about testing controls, 3rd party due diligence and recommendations
- page 29 shows legal and regulatory compliance as a risk move from 5 to 2 (moves up in risk)

TAB 9

- training slide deck for new employees
- page 12 shows gift and entertainment policy; slide 22 gift thresholds

TAB 10

- Company sustainability report--# hours people were trained; page 55 shows 332,000 trainings through Elearning, others

TAB 11

- 2/2015 training goes through FCPA, anti-bribery

Tab 12

- Shows who compliance was—backgrounds, titles [2015; most individuals no longer with Cognizant]
- Now this is a series of documents relating to an audit committee meeting in early 2015—Dana Gilbert created a slide deck to update the audit committee on the status of the compliance program
  - Dana obtained information on benchmarking from a 3rd party

Tab 13

- Slides 9-11 show company's benchmarking for compliance
  - information looks at risk profile of company, employees relative to risk profile
- calculations relating to compliance function and where companies should fall
- Slide 14 – overall maturity score for company, broken down and aggregated
  - Cognizant's maturity was 2.08 (slightly below average)
- Slide 15 regards resources
  - Score is 1 out of 4—bullet points 2 and 3 discuss new funding plan (benchmarking scores set forth)
  - we found suggestions that this particular slide deck was edited prior to going to the audit committee

TAB 14

- Dana sends to Karen Mcloughlin, who sends to Coburn
  - points out slides 9-11

TAB 15

- Coburn responds "this needs work" – "no way we can show slide 9"
  - The slide references compliance funding

TAB 16

- Continuation of above, forwarded, Schwartz now on it
- Schwartz is frustrated Coburn won't make compliance changes needed; Coburn diluting message to audit committee

TAB 17

- Schwartz and Dana; Dana believes presentation will be misleading

TAB 18

- Points 2&3 to remove resourcing and scoring boxes (slide 15 –when compared to tab 13)
- Wanted bullets 2&3 and purple scoring boxes removed
- slides 9-11 also removed

TAB 19

- Dana agrees to changes

TAB 20

- While the above is occurring, Gordon is approving earlier payments mentioned

TAB 21

- shows Coburn's control over budget
- Q2 audit committee meeting
  - Schwartz mentions that Maureen asked if they had enough resources

TAB 22 – FCPA training and certification deck

TAB 23 – india specific FCPA training deck

TAB 24 – 2014 review of audit

- page 2 suggests that program needs strengthening, potential 3rd party Due Diligence (to be done June 2016)
- page 9 risk assessment was not being followed;


[NOTE: SEC not present for 3rd part of presentation]

*Download of Schwartz*

- Schwarts only remembered one conversation with Coburn in 2013—not that a bribe was paid, but that Coburn was having trouble getting a payment.
- Schwartz remembered Coburn had asked him if he could make a payment and not through a third party—Schwartz said no.
- When we interviewed him, we asked Schwartz whether (on 8/28/2016 subsequent to Mani's allegations about Schwartz and Coburn on the 22) he had had a conversation with Coburn regarding 2014 issue just mentioned

- o Schwartz recalls it was over the phone because he wanted Coburn to call Dana Gilbert back, which he wasn't doing
- Discussed the 2014 conversation –Schwartz thought it was 2013, not 2014. Quick telephone call.

8/20/2016 telephone conversation

- Asked Coburn if Schwartz's recollection of 2013 conversation about if Coburn could make a payment was correct. Schwartz said to Coburn that's what I remember. If I did anything wrong I'll resign now.
- Schwartz subsequently asked Coburn about the conversation in Coburn's office a few days later "to look him in the eyes". Coburn confirmed Scwhartz's recollection of the conversation in 2013/2014
- Schwartz [unclear if in office meeting] was not sure of exact date of 2013 conversation. Coburn reminded Schwartz that the conversation had involved the KITS project.
- During the August 2016 conversation, Coburn told Schwartz that having the payment withheld [from LT] was appropriate under turnkey project. Project had been delayed for months and months.
- Schwartz asked how it had been done. Coburn said appropriate procedures had been followed. There was no payment to get the permit.

From 9/23 interview

- Schwartz told about a call he had with Dana Gilbert and Mani regarding the $300 thousand payment for electricity permit.
- Schwartz said Mani was speaking quickly, so he thought Mani had said a $300 dollar payment. When Mani said $300 *thousand* payment, Schwartz's heart sank.
- Schwartz said Mani claimed $300 thousand payment was a facilitation payment. Schwartz knew this could not be the case.
- Mani told Schwartz that the payment was given from LT to the government official to get power to CKC. Schwartz's heart sank because he didn't know if the payment had been made—if it had been, it would have violated the FCPA.
- When asked how the FCPA would have been violated, Schwartz said that it sounded like a bribe to get power more quickly.
- Karl reminded Schwartz that he had referred to the $300 thousand payment in last interview as 'huge'. Schwartz said yes, it was a large payment. It was the largest payment to a government official he had ever heard of.

**Courtney**: Did he say the date of the conversation?
**Karl**: We can get you that.
**Courtney**: But he didn't say that.
**Karl**: Right.
**Kevin**: The largest payment he had ever heard of—that's a quote from the 2nd interview?
**Karl**: Yes [reiterates above]. He had not yet been shown his notes.

***BINDER 3***

TAB A.1

- Henry Shiembob Global head of security; Email to Steven and Dana (Robert Molina was his direct report)

TAB 2

- Schwartz reacting to Tab 1
- Dana suggests pushing EY to finish review within the week.

**Gingras**: Have you spoken to Shiembob?
**Karl**: Yes.
**Gingras**: He's not a lawyer?
**Karl**: Correct. We can share the notes from his interview with you. He said at the time he didn't think it was anything nefarious but in hindsight it is suspicious.

**Karl**: [referring to tab 2] There are additional emails surrounding this, but they are privileged [on privilege log].

TAB B.3

- Email regarding March 2014 conversations relating to Ganesh's Conversations with local government official (previously held back and redacted)

TAB 4

**Karl**: Some of these documents you would have seen. Shows meeting scheduled between LT and Cognizant personnel. This is around the time period that the bribe demand first surfaced. You would have seen all of these except for tab 8.

TAB 8

- conversation with Deepa, BG
- We believe this exchange was occurring in real time during conference call between LT and Cognizant
  - Prior document, TAB 7, shows dial in for that call
  - Jagannathan is LT lawyer
- BG and Deepa texting each other. "the fpa will impact us" we believe to be reference to FCPA.

[Deepa has not been asked about this document, was found later through additional review]

- Reference to "issues with authorities" to be discussed with Gordon.

TAB 9

- Email sent after phone call

**Other Potential Compliance Issues**

- Visas

- Thomas cook and TTK—concerns raised that line items on the buildings weren't supported. EY has been auditing that work. Company has decided not to move forward with those vendors. There is no evidence of improper payment but we have taken it as far as we can with the audit.
- We had previously discussed the stock buy-back. The provident fund—the social security fund through which there was a bribe ask. Nothing was found through investigation. No evidence found through electricity tariffs. Waste and events allegations of bribes to police for traffic—there was one document that suggested an event management company paid 75$ to get an event license but cog didn't know.
- Leased facilities. No evidence of improper payments.

**Courtney**: Following up on the binder 3—we had had a conversation where you mentioned globally there may be evidence that people were trying to shut down the investigation and this was the email. There was an indication you would talk to Mani about it.

**Karl**: We never did.

**Courtney**: Did you have anything that suggests he was aware of it?

**Karl**: Just the mention of anxiety of the India team.

**Gingras**: When did you interview shiembob?

**Karl**: Earlier in april. We are happy to give a download. He didn't know who the document referred to.

**Gingras**: Did he have a good recollection of the conversation with Gordon?

**Karl**: [will refer to notes—may remember conversation at a conference]

**Gingras**: Does Molina have any information on this?

**Karl**: He may have information but it is likely subject to privilege.

**Courtney**: A couple of things you may be able to answer—I have seen indication after KITS that Cognizant changed its practice of starting without approvals. Is that true?

**Karl**: Yes, with caveats. There hasn't been a lot of new construction recently. I do not know definitively. We had heard that the change had occurred but we would need to come back to you to confirm. There is at least one facility where that may have been the case.

**Courtney**: Both BG and Ganesh are gone, correct?

**Karl**: They both resigned before being fired.

**Gingras**: When did Raj leave?

**Karl**: I think it was right after you [DOJ] talked to him.

**Courtney**: Did you interview Ganesh?

**Karl**: Several times.

**Courtney**: Who is David Mithra? I see him [listed as] associate director.

**Gray**: He's in infrastructure. He was involved in several projects, including Siruseri.

[DLA may have met with him a few times, has not shared the notes, may not be helpful]

**Gray**: He is a one or two levels lower than Ganesh.

**Karl**: He is no longer with the company.

**Natasha**: Venkatesan was just below Mithra.

**Courtney**: On the Casari interview read out in November—there was a note that not everything stated in interview can be corroborated by counsel.

**Natasha**: I recall that some of what he had said didn't correspond with the documents.

---

**Other important information**

- Metadata for Schwartz notes is at CTS 123
- Courtney: We have been on the weeds on some of the documents and it is not always clear on the time zone. Let's raise that.
  - Karl: That will depend on where the person is, where the server is.
  - [Will circle back on specific documents with DLA]
- **Mike**: you mentioned there was compliance and training. Did the individuals involved receive compliance training prior to the matters?
  - Karl: It depends. The company had training, but one that was provided to employees lower than assistance VP's. If you were higher, annually you had to certify you had reviewed and were compliant with policies and procedures. No evidence Schwartz and Coburn would have gone to training, but signed that they were in compliance. Acknowledged he was aware of company's code of business ethics, compliance, had knowledge of FCPA that were relevant to him.
  - In India, we would have to check if they had training or not. My expectation is that they should have but if you give me the names we can give certs.
- **Kevin**: What's the footprint in the Philippines?
  - **Karl**: It's probably after India one of the larger markets. We'll come back to you.
  - **Gray**: I can get you a more precise number on the Philippines, but binder 2 tab 10 shows on pg 53 regions [Cognizant operates in] by order of magnitude. Philippines is the only space I know of in APAC occupied. 7k employees in 2014.
  - **Gingras**: What are they doing over there?
  - **Gray**: Should be the same.
  - **Gingras**: You haven't seen issues there?
  - **Karl**: We did see potential issues in China. Evidence that the employees were providing 50-100 dollar gift cards which may have been in violation of the company gift policy. That was the only other country we looked at.
    I went through the operating licenses –over a 6 year period the gift total was $19k. No quid pro quo. Through customs and tax EY did work around that. In short, we didn't find evidence to support concern of inappropriate payments.

- Regarding Filip Factors, with respect to benefit analysis of payments, Latham and DLA are currently working with EY to provide a "cost avoided" framework; still going through calculations; payment by payment
  - **Kevin**: When you say cost avoided, what are you referring to?
  - **Doug**: [Give example] If we had succeeded in getting attached to the electricity grid, it would have avoided costs associated with generators. It's more complicated on some analyses—what would cost to lease have been, etc. [then temporally calculate revenue that would/would not have been generated]. We hope to have this ready by next week. If not, it will be soon thereafter.
- Big Reveal—Documents to be produced through 502(d) order

**2018.05.07 Compliance Presentation**

DOJ: Kevin Gingras, Dan Kahn, David Last, Andrew Gentin, Courtney Howard, Rachelle Linsenmayer

SEC: Michael Catoe, Paul Sharrat, Robert Dodge, John Bowers

DLA: Karl Buch

Latham: Doug Greenburg, Natalie Rao

Cognizant: Matt Friedrich, Amy Schuh

---

*Presentation deck will be produced to DOJ*

Introduction of Matt Friedrich—former DOJ AUSA for 15 years.

- Came to Cognizant in May 2017 to take leadership of legal function
- He built a compliance program

Matt Friedrich comments on compliance program

- Hired Amy Schuh (SP?), Chief Compliance Officer
    - Worked in compliance in various contexts; working on investigations; Deputy Gen Counsel of HP; experience building teams

Amy

- Been with Cognizant for 7 months (October 2017)
- 10 years ago, created Kilpacker's Compliance program following a board scandal
    - HP did not have a compliance program beforehand—built a program that is ongoing
- CEO, CFO, audit committee chair cooperated with making a compliance program that was interactive
    - Work on the program had already begun to identify risks—informed by DLA, senior management
- Focuses on creating a foundation, then consistently working to improve
    - There was a compliance program prior to the conduct, identifying risks, but she has continued this work

SLIDE 3

*Background on Cognizant*

Majority of the employees are in India doing back-office tasks, second is the Philippines, then the US.

SLIDE 4

Not many government clients

SLIDE 5

Support operations across various industries


SLIDE 6

Timeline showing program enhancements post voluntary disclosure

- Shows addition of compliance personnel prior to Amy's arrival
  - Head of litigation, head of anti-corruption, global and ethics investigations hired since

SLIDE 9

Shows profiles of compliance team

- Wan Kim – will run global litigation portfolio and immigration law function

Budget was increased substantially, hired team as a result


SLIDE 10

Focus on independent reporting authority


SLIDE 11

Focus on escalating issues that need to be investigated

- Previously, a criteria did not exist; reported on a quarterly basis


SLIDE 12

Investigation stats


SLIDE 13

Global Ethics and Compliance Committee (includes list of members)

- Meets quarterly; CEO encourages participation
  - Highly attended

SLIDE 14

Regional compliance committee

- First program in India, works with leadership team
- Focuses on accountability and united senior leaders with staff in charge of control functions

DOJ-EH-0000000193

- Will be having VU compliance committees, soon (vertically address)

SLIDE 15

VU "Compliance" Champions

- Use to address tone at the middle; cascade messages; recognize those who are doing well

SLIDE 16

Organizational chart for Compliance team

- This has lead to easier recognition of power structures; increases in budget to bolster staff around the world

SLIDE 17

New role to be headed by Anti-Corruption

- On-the-ground team to support ethics training and issues
  - Oversee 3rd party DD, support regional M&A DD efforts
  - Counsel and provide guidance
    - Lead to an increase in people asking questions


**Andrew Gentin**: How many people are in India now?

**Amy Schuh**: Right now 1, I plan to have, well—I have 3 others supporting the hotline. I will add 3 more regional ethics and compliance folks and will be adding one more person as a program manager.

**AG**: How many in your unit?

**AS**: At this point, about 55. With a goal to add another 20-27.

**AG**: Do you feel like you have enough people in India?

**AS**: I do and we have alignment of what they are doing. We are also seeing how we will staff up. We just spent a week in India going through the control functions. We are buttressing support and making sure there is clarity on roles. I'm not the only one to add resources.

**Paul Sharrat**: The new people in responsible for India will they be located there?

**AS**: Yes. We hired two people in the last year who are the first boots on the ground people. We also just added a new person to be there for Mexico.


SLIDE 19

Standard of business conduct has always been there, but adding a new code of ethics

- CEO involved in shaping this
- Translated into 24 languages (for the first time), including Indian languages

SLIDE 20

Re-issues various policies

Disciplinary Guidepost

- Goal to consistently enforce rules for HR staff; show levels of misconduct and range of discipline

Hiring Guidance

- Addresses hiring individuals related to hiring officials
- Published on internal and external website

**Matt Friedrich**: To address resources in India, a couple of other non-compliance hires. One was a new general counsel for India. I went through a lengthy process for that, looking for someone with a strong background with a Western company. We ended up getting a top litigator Narinan who has [over ten years of experience]—he came from a large company. Amy and I met with him in India about a month ago. Even though he isn't in the compliance headcount, he will help what we are trying to do.

In real estate and finance we've been upgrading personnel. The people now in charge of real estate—Steve Smith (experienced, formerly at a large accounting firm, works with CFO) Amy and others have real-time control over decisions being made.

**Doug Greenburg**: A lot of the employees in India are back office and supplying IT support and Data entry. It's not like you have a massive amount of people selling product. There are major risk factors, but the numbers are skewed by the back office function.

**AS**: Currently searching for new CFO. Narinan's credentials … coupled with Steve Smith, they are making positive change.


SLIDE 21

Face-to face, live training being done in languages native to the countries that the trainings are conducted in

- Designed for senior management and high risk associates to discuss goals going forward; designed as a seminar 20-25 people at a time, encourages conversation
  - Spike in "question manager" following the initiative; allows individuals to follow up privately

SLIDE 22

Code of ethics training

- Cover anti-corruption, gifts, conflicts of interest

Adding new training program

- Mandatory for all employees—new hires get assigned

**AG**: Who do you view as highest risk employees?

**AS**: Since our business is a lot of people obtaining licenses and permits on the real estate side. Also the global mobility side where people are getting visas. We are over-training. We are making sure we get this into the business side.

**AG**: No risk based training?

**AS**: We do—we do an approach to everyone for code of ethics. Anti-corruption we eliminated for those that we didn't think would be necessary (back office). Also video training to individuals who may have contact with government officials going forward. I think we have tried to ID different risks. Also we have focused on India population (next slide)

SLIDE 23

Integrity minutes series that you can license from Lockheed—2 minute videos showing cliff hangers

Other trainings were present in India, but no other India-centric training

- 4 videos to be pushed out this summer to India population to enforce India-specific issues and responses
- Will not be mandatory—goal is to drive leadership and management to utilize these in town halls
- Goal is to build and continue to use what we see in India and reinforce how we expect people to act

**Kevin Gingras**: So India—we talked about real estate is the core of the conduct. Are you going to talk about addressing that specifically?

**AS**: Yes.

SLILDE 24

Company to launch new intranet to include links to codes, policies, and corporate hotline

SLIDE 25

Focus on allowing people to speak up safely

SLIDE 26

Convercant – user-friendly tool for Compliance portal

- Users can report incidents—email and phone

- o   Focus on anonymity
- Conflict of interest and gift and entertainment disclosure
- Issues raised in question manager can be send above to the hotline


SLIDE 27

Number of issues reported—steep increase in 2017

- Helpline - hotline
- Proxy – allegation received from someone else (CEO, legal, HR, compliance, etc.) and then put into the system
- Question manager – generally more on policy

Changes attributable to live trainings, better use of one tool (previously had Navex tool)

- Reinforcing logging issues in one place to identify clarity on policies and need for training


AG: What are the numbers for corruption related inquiries?

AS: The number is very small. Any allegation we have had we have pulled into our FCPA investigation.

[a handful]

MC: When did you migrate to Convercant? Like a year ago?

AS: A little over a year ago. Sometime in 2016.


SLIDE 28

Ensuring consistency across all programs.

After something is reported to hotline, assigned to appropriate person

- Higher risk issues are ID'd and escalated to management
  - o   Matt's experience shows combination of HR and compliance functions, lead to this program to immediately mitigate and report on high risks

**MF**: This is one way that triggers issues and we also don't wait. Immigration was potential risk. We just brought in a niche law firm to do an audit of the immigration program that will be reported to the next audit committee meeting.


SLIDE 29

Guidepost of consistency

- Still being worked on – 636 serious disciplinary actions taken in the last year (variety of termination, written reports, etc)
- Walked through individuals who engaged in misconduct
    - 22 resigned/terminated in connection with investigation
    - Still negotiating with one person; sued by another person as a result of a termination
- 23 written warnings issues
    - Half of individuals received 50 percent hit to bonus
- 18 received coaching/training
- 5 contractors were removed and blacklisted from working with CTS going forward

[we can provide more information about this]

**KG**: The contractors—what type are you talking about?

**AS**: Facilities.

**KG**: Vendors?

**AS**: Compass, JLL, CBRE. Facilities managers, people potentially involved at the time in getting licenses.


SLIDE 30

In addition to informal recognition, company-wide awards introduced

- New platform intranet will assist

Frank D'Souza expects 100% completion for trainings


SLIDE 31

New lawyer coming in with an M&A background

- Ensure DD is done. This attorney will bring SME's whether regional or for countries to ensure M&A matters handled correctly

Integration template

- Sent to new hires including ethics and policies links
- Assigned training curriculum

Company is considering IP and software acquisitions at this point—small but growing—process to be put in place now

- Integration process begins prior to negotiations and continues until after acquired

3rd party vendors used by target are rationalized then put through CTS due diligence

SLID 32

3rd party Due Diligence

- Began when Amy hired
- DLA and Latham counsel assisted in Due Diligence program
- Partnered with Navigant for a risk-based 3rd party DD platform
  - Reach out to 3rd parties, answer DD questionnaire (use this to take next steps if further DD required)
    - Annual certifications, audit rights, etc. may be assigned

Process was started on new vendors, then went on to existing vendors in India (began with highest risk)

- Close to completion of phase 1—entering all high risk India vendors into program
- Then will move to APAC and Europe, then LATAM, Canada, then medium0based

**Mike Catoe**: That number earlier about the 5 contractors—was that India specifically?

AS: Yes.

MC: Do you know approx. how many vendors used in India?

AS: No.

MC: Has there been a change in philosophy surrounding vendors in India?

AS: Yes, the real estate team has re-looked at how they are supporting the business. Decided to outsource basic facilities management—cleaning, etc. Primarily to JLL and CBRE. We also check if they bring in anyone.

MC: Is that new?

AS: Yes. We also make it clear JLL and CBRE are not to have any contact with government officials. We have then in-sourced internal resources to manage tracking licenses and interactions with government officials. That way we can manage high risk touch points.

MC: So no third party contractors would be interacting with government officials?

AS: In the real estate function no.

Karl Buch: We discontinues using L&T many months ago.

MC: I remember some projects were in limbo.

KB: Correct. Discussions on how to extra L&T are continuing but they have stopped active work.

SLIDE 33

Risk assessments

- Annual global risk assessment—enhanced compliance program initiatives

- Each quarter, top 15 enterprise risks shares with audit committee. At least once per year, owners present risks to audit committee and show what risks are.

Enterprise risk assessment

- Addressing how risks considered, focus on the future
- Top 15 risks seems correct, but would like to have a closer conversation with the risk holders to take back to the company and focus attention

SLIDE 34

Travel and entertainment audit – been running for 10 years—looks for outliers and red flags for individuals

- Sometimes risk sent back to the individual to provide supporting documentation; otherwise sent to audit team
- More than half last year went through prepay audit

Travel and Entertainment

- Through analytics, reach out to associates or assign to investigators

Top-Spend analysis

- Amy and CFO see this and ask questions and address disciplinary action

Accounts Payable

- All invoices in India going through an analytics review
  - Key-word searches; partnership with compliance and investigation team

SLIDE 36

Remediation

- Weakness in tone at the top remediated (mentioned in 10k)


SLIDE 37

Corporate workplace services

- 2/2017 Steve Smith—Global Lead of Global Real estate hired
  - Power shifted from India to US
- In process of hiring new India and APAC real estate lead
  - All have been westerners with global experience
- Independent compliance function in India to track licenses and permits
  - Monitoring applications, ensuring CTS meeting the conditions
  - Tracker is periodically reported to the audit committee
  - Also overseeing 3rd party audits

- - ▪ Received budget increase to hired two large global 3rd party firms focused on environmental and real estate risk
  - Prioritizing paying via electronic payment newly in use in India

Reporting 2x per year on status of remediation in India

- Focus on maintaining greater control over high risk areas

MC: Do you know if there's been any new real estate projects the company has agreed to take on since they implemented the new policy not to build?

Karl: The policy has been in place. I've spoken with Steve Smith and others—last week I had told you there may have been some construction in 2016 without a permit in place—but for all new construction, this policy in place.


SLIDE 38

AP team has been paying a significant amount at EY to review invoices for issues

- 2.5 – 3 mil annual cost; ongoing, but with goal to end after learning
  - 10k invoices reviewed; 35% initially rejected (none related to corruption or compliance)
  - Overall, getting good support
  - **Anything infrastructure or real estate related in India**

SLIDE 40 - 41

GAPS presentation – Meeting with leadership

*Video of Frank D'Souza – focus on integrity – has shown day-to-day support to focus on issues and make compliance part of CTS culture*


**KG:** As far as the India real estate infrastructure enhancements, how is this—not asking about business—some of the problems happened due to growth in India. Is the company envisioning continued growth in India or has it leveled? Is this something that is going to be—that is designed to address potential growth if you hit another periods like that?

MF: From the business side the explosive growth is a continuing problem. 8-10% growth per year will continue. For all fortune 500 companies, they need a company like us or one of our competitors so the need will only continue. We are interested in looking in India and beyond—to Philippines—but for foreseeable future we will train large numbers of people in these spaces. The risks won't go away. But in addition to compliance enhancements there is another level of monitoring and control on the financial side. For discipline, the teams doing tis and paying for contracts, [many people have been terminated] which shows the tone going forward.

Between new oversight at the top, getting a new CFO lead for India, EY looking at the invoices are a lot of layers.

AS: I have seen—all of the large hires have been people from the outside, not just people who have been with the company for a long time. There is momentum for change on the ground as a result of bringing in external knowledge.

SEC: You spoke about the determinations as to discipline the day you met, today or some other time, could you give us more insight into that process and the different levels of discipline and if there were people who were not disciplines but were interviewed in the investigation and maybe were involved. We'd like to know whether there were people with no discipline.

MF: I think the process like this is never perfect. From my chair, the way we approach this is I want action immediately. The process was that Karl gave a list of implicated individuals—30-40 people divided into 3-4 buckets based on severity of conduct. I believe in a higher standard for managers, a lower bar for lower level people depending on evidence against them.

We went through the list (Amy, I, audit committee) to determine who needed terminated, those who could stay but would have a hit to their bonus, people who would get a warning, contractors that needed to go. I don't know of anyone who didn't' fall into one of those categories.

Some people with a lack of clarity, beyond the investigation you have to stop at some point.

KB: We were in addition guided by whether someone was senior, how cooperative they were during interviews. [Uncooperativeness was a count against them]. Also focused on whether someone could be rehabilitated.

We had 3 tiers from termination to discipline with financial penalty. Then warning. With contractors, if they were involved around wrongdoing they were separated.

[we can send further details on that]

PS: Has that list of employees been given to us?

KB: Through oral downloads.

[Karl will provide orally]

[Matt leaves door open for follow up questions]

**Cognizant Filip Factors Presentation**

DLA Piper: Karl Buch, Gray Stratton

Latham: Kathy Reummler, Natalie Rao, Doug Greenburg

CTS: Matt Friedrich

DOJ: David Last, Kevin Gingras, Courtney Howard, David Last, Leila Babaeva, Paul Murphy, Dan Kahn

FBI: Kelly Blanchfield (on phone)

---

**Kathy Reummler**: We are going to put forth our view that the appropriate resolution is a declination. Not just that it would be appropriate [in this case], but that it would be the appropriate resolution under current DOJ policy. The company's response to the misconduct hits those metrics [of a declination] in every respect and exceeded those.

At a high level, the most important factors to consider is that after learning of Mani's allegations, the audit committee made remarkably quick decisions about what to do. To include separating the bad actors immediately, initiating a full scale investigation, and to proactively report to DOJ and SEC.

The first two were immediate—to proactively report in less than two weeks is remarkably fast, particularly considering seniority of those involved. [Audit committee did not delay, is significant and what the DOJ expects companies to do and ought to be recognized]

After initial disclosure, cooperation has been exemplary. I've had the privilege of seeing the cooperation after the fact and what Karl, Grey, and team has done with the company's direction. Sometimes we as external counsel have to convince companies that they should cooperate and have faith in the department and policies. This was not that situation. I think the company was very much on board with—we're going to get rid of the bad actors.

**Karl Buch**: One thing I would emphasize is not only immediate, audit committee decided even before we found Steven's notes. They decided to remove these people from the investigation [all based on Mani's allegations before had other documents]

KR: In my experience working with companies, that is a tough decision and it's as you know there are internal politics involved. The speed here, to us given what we do, that is extraordinary in the corporate world.

KB: And that was a decision the board—we started to make the presentation and the board immediately [agreed that the investigation should go forward]

KR: In terms of the response—high level—the company's remediation has been extensive. We've done significant enhancements to the compliance program including—in terms of quantity and quality of senior personnel. You know matt's background is very different from Steven Schwartz. You talked on Monday about who matt has brought in. It's an impressive group of people [emphasizes commitment on behalf of the company]

We think that a declination is consistent with the DOJ's codified USAM policy on corporate resolutions but also we think it is the paradigmatic example of when a declination is appropriate. We understand the presumption can be outweighed by aggravating factors, but we think together this is the paradigmatic case for a declination if the DOJ made a decision to prosecute individuals, which we will talk about in more detail.

[*To walk through Filip factors*]

1.   Nature and seriousness of offense

KR: We're not going to diminish the seriousness of the offense. That would be inconsistent with the ongoing conversations you have had and the seriousness with which the company responded.

Context to consider [factor comes in company's favor]. [The facts of this case] are fundamentally different from other FCPA cases. [In most other cases, a company is paying bribes for competitive advantage]. Certainly that is a major one—leveling the playing field. Here, you had corrupt government officials in a high risk country who said—had their hand out and that if the company wanted the permits, they had to pay.

That is not to diminish seriousness but qualitatively it is fundamentally different than paying to win a tender offer. Examples—Vimplecomm (paying 114 mil to gain market access). This is not a revenue generation scheme here. This is what they needed to do to have a space to put our people. It is also not like the Louis Berger case.

Here, the facts are such that Cognizant's business is not government facing. Bribes were ancillary to the core business—that is why I am drawing a distinction with these cases. The reason we raise this is because effectively the function here was almost like a back office function [underlines ancillary nature].

After Karl's investigation, there wasn't anything that would suggest at the core of Cognizant's business, there was a culture of greed.

KB: We have taken a look at the back office real estate and other aspects of the business. We just didn't see the same level of activity outside of that area. This was the area they were having problems. 1 the company tried to do the right thing by applying to permits (years before bribery began). They got stuck in the bureaucracy of India permitting. [not diminishing bribes]

We didn't find evidence in Pune or CKC that they were trying to undermine standards or a building that wasn't up to code. There was one instance in the Siruseri site (environmental) where that was the case. The applications were submitted. We feel comfortable saying this was isolated to real estate.

Matt Friedrich: If you guys are familiar with the Kay case on obtaining business. Does the conduct of any business activity you pay for fall under bribes? 5tth circuit said even taxes count. But if you think of it as a continuum to things that are core to the business [utilities, taxes, etc]. This conduct is on the lighter end of that scale on the continuum.

KR: We usually talk about the seriousness of the offense. On the nature—nature of the harm. Here, consistent with what we said, there is no impact on Cog competitors. Conduct didn't involve confidential competitor info or pricing.

Kevin Gingras: Do you mean there is no direct impact? Arguably it does put them at a competitive advantage. They just aren't beating them on a contract.

KR: Yes. We won't back away from the benefit gained is that they avoided costs that they didn't want to pay. In the meta sense, that is a competitive advantage. I agree with you on that. But just in terms of direct.

On those same lines, the payments didn't generate sales or revenue but allowed them to avoid other costs they would have had to incur.

That is everything on seriousness.

    2.  Pervasiveness

KR: That prong focuses on pervasiveness within the corporation and condonement. What we would submit here is that the conduct was not pervasive across the company. You may say during remediation, listing the people sanctioned and separated, how could it not be pervasive?

This is a sizable company. The conduct occurred in an ancillary support part of the business, not the core. When you have a decision being made at the level of seniority as it was here, the decision makers [are separate]. When you think of the context in bribery cases, what you see is a multi-national doing business in multiple countries, people are paying bribes in multiple countries in multiple contexts. Here, it is isolated to real estate where people at the top decide to do it, then a bunch of people know about it through the implementation.

I would argue that is not the kind of pervasiveness argued in the Filip factors here. It is a scheme authorized by a couple of bad actors.

KB: Within real estate there were a lot of people involved. In that perspective it's isolated to that function and to a couple of individuals. It's not pervasive in that sense.

KR: To get into granularity. The issues implicated 4 out of 57 facilities [including leased facilities] in India—even just in country.

KG: But 4 of how many owned by the company?

KB: Around 30.

KG: That LT built?

KB: No—it would have been other contractors.

KG: How many were LT?

KB: Probably nearly 30. We can get you that number.

KG: The distinction I would make is ones that were built for them vs what they bought.

KR: There are 174 locations globally. If you break that down further, in India there are 11 sales regions. Misconduct occurred only in 2.

I think that is helpful context.

Karl's team didn't find evidence of similar conduct in the rest of India or elsewhere.

KB: The Philippines is the next biggest market and there are no allegations there. India was the only market—also [the market with the] largest footprint.

KR: Improper payments were through building licenses and then operating permits.

Building licenses—few associates involved in light of the overall size of company. Coburn, Schwartz, Sridhar, Mani, BG, and Ganesh were the key people involved. Those decisions were implemented by others who the company has taken action against. With exception of Mani, Cognizant was quick to remove those individuals in the wake of Mani's allegations. That shows quick decision making on the company's part.

KB: Also consistent with the DOJ de-confliction policy, we made sure those people were available to us and you.

KG: We appreciate that and it is the company's decision.

KR: In cooperation, that is a key distinguishing factor.

Doug Greenburg: We've all seen cases were people are terminated right away and that can impede an investigation.

KB: [underlines making sure Mani was available for interview]

KR: All the others have separated or been resigned.

KG:  Sridhar?

KB: He is negotiating a separation. By next week he will be separated.

KR: Operating permits personnel—larger number—principally personnel in the corporate real estate group in India. I would argue that is the definition of lack of pervasiveness. Ancillary to business mission. Excluding the two cooperators, the company separated all people from middle management to line employees and contractors where they knowingly participated in the conduct.

Company otherwise disciplined with warning letters, training, etc. over 50 additional employees and some contractors who were implicated in some way but not so much so that they knowingly participated.

MF: With remediation, Amy mentioned this the other day. As a matter of local Indian law, there is required notice where you provide evidence and have a hearing. We made the decision not to wait or hide behind that so we are anticipating litigation risk in India for that decision.

KR: And we are really talking about one contractor here—LT. CTS has stopped business and payments to them. In other cases you see a cultural problem and multiple third parties over multiple jurisdictions.

KG: Pervasiveness is the chief factor—pervasiveness or involvement and complicity. Employees in a particular role or it was condoned by upper management. Your point that it is discreet and the function was ancillary—but the idea that it goes up to the president and the GC has the idea it isn't widespread, but if you look at the commentary in USAM. Where the wrongdoing was done by a large # of employees.

That's not here. But the role and conduct of management is most important. So I take that to mean we should look at how management was behaving. Management is responsible for corporate culture where criminal conduct is encouraged or discouraged. Within real estate group it does go up straight to the top.

KR: I don't disagree. They were senior and the GC was involved and he had extra fiduciary obligations. Absent the conduct by those two, I don't believe they payments would have been made. The problem is you have these two who decided to break the law and they were senior people. The question is, what does the company do when the company learns about that? The company did the right thing and they proactively said by action that we know these guys engaged in the conduct and we will provide the DOJ with what they need to make decisions.

The cost to the company reputation is huge. There was a very significant material weakness finding that the auditors imposed based on tone at the top issues. All of these things that the company suffered— not withstanding that, is this a good or bad company? [when considering appropriate resolution, this is important to see that the company will do the right thing]

We aren't going to minimize that these two were in a senior position, but when they are taken out, the company didn't just eradicate them but they had a holistic response by cooperating. As a policy matter that is what you guys want, to me. Prosecuting companies and the way that that has evolved—what you know deters conduct is by bringing individuals to account. We own that they engaged in egregious conduct but that fact is mitigated by everything else.

Matt Friedrich: I would add that involvement of senior folks has to be viewed through the prism of how extensive it was. It is not uncommon for bad managers to perpetrate an entire scheme in multiple countries over multiple years. This was a bad choice by 2 senior people in one area for 2-3 transactions.

KB: Stephen was really involved in one bad transaction. Then Gordon was no more that 3—even for him it wasn't pervasive. [wasn't through CTS business model, relatively isolated, no evidence of pervasive pattern]

KR: And that is really important. [No evidence of others engaging in the conduct; example of other case involving seniors who directed widespread fraud; here, this appears to be outlier behavior]. How the conduct relates to the company is significant.

KB: [makes example of another fraud issue raised to Stephen and Gordon to litigate another case where an official submitted a bribe] There was a solicitation and these individuals made the right decision, which was important for the people around them. For them, they didn't do business by acceding to bribe demands.

3. Corporation history of similar misconduct

KR: Company has a completely clean record. This one is unambiguous.

4. Cooperation – in particular, willingness to cooperate in investigation of personnel

KR: Company has done everything in its power to investigate aggressively. Including removing the president and the GC on the same day that Mani made the allegations. Then immediately seizing all electronic and business records from custodians within 5 weeks of the allegation.

With respect to the internal investigation there were over 400 custodians whose electronic evidence was collected and reviewed. 450 witness interviews. [Large scale, particularly in the speed it was done]. They reviewed over 1.5 million documents in addition to a page-turn review of Coburn and Schwartz data over the key periods of time. In addition to those two, also reviewed the CFO, Corporate Head of Real Estate, Global Head of Procurement, former COO, and the former GC through a page-turn review.

Some companies get a lot of allegations, so how to you balance self-reporting when there is a substantive finding? Here the company took some risk in self-reporting so quickly before having done a thorough investigation. Because the self-reporting was a significant issue it was possible with further investigation that the seriousness of the concern would be mitigated. I think that points to the company's [initiative].

MF: When something like this comes up in terms of what the CEO is going through at the time, [having his GC and others implicated, deciding what to do—Brackett, a former GE lawyer and former Boston AUSA—made a quick choice to move forward]. That says a lot.

KB: [Brackett is a] high integrity individual and an incredible resource at every turn. [DLA investigation received support from him; had access to interviews with key individuals immediately based on little information]. [Underlines the audit committee's integrity—tight set of events for them to do that]

KR: This one is in the category of proactive cooperation. Karl and his team persisted in securing additional interviews with the president and the GC. That, too, doesn't always happen and it's a distinguishing factor.

In addition, the company used all of its commercial leverage to extract information from LT, including executing audit rights. Not that they were cooperative. Karls' team had multiple meetings with LT. LT refused to be interviewed but there was an effort to get information. Then finally withholding payments to LT that lacked supporting documentation, which exposed Cognizant to litigation.

Turned over GC notes. To distinguish Cognizant's conduct from other good companies, turning over a GC's notes are a big deal. There are significant implications to that. [Underlines tough decision to make, particularly so early in an investigation, decision swift to turn them over]. It is difficult in today's post KPMG [world] to get companies to produce privileged documents so that warrants consideration.

KB: Within 5 days of getting the notes they were turned over.

KG: Obviously we don't ask companies to waive privilege. I would like to think in regards to the notes, they are clearly evidence that would put them in an exception bucket but your point is well taken.

[KB notes that the speed with which the company provided the information is most notable]

KR: In addition we recently produced documents that were arguable privileged pursuant to the 503(d) order. We provided travel information to the DOJ for Lakshmi Naryan which facilitated your investigation [and others]. Facilitating your ability to interview certain people. I don't think you all have any complaints in that respect.

Extensive interview readouts. In addition, there have been 10 in person subject matter briefings. More than 40 telephone updates. 8-10 subject matter hot doc binders and more than 20 interview readouts.

Over 100K pages were produced to the Justice Department voluntarily. With an eye towards providing most relevant and pertinent documents, not just anything that was relevant.

We are also confident we have done everything we can to provide key evidence regarding the former officials who are the key wrongdoers. That was complicated by the fact that one was a GC, so that required an enormous amount of effort. 100s of pages of documents were produced as a result of the Schwartz review.

Subsidiary relating to Schwartz that the company did: investigated amnesia defense (by collecting medical records and providing to department, SEC, looked at whole line). That falls squarely into proactive cooperation. We also collected his Apple notes and engaged in an effort to help you all authenticate those and the hand written analysis. Forensic deletion on his laptop.

The conduct of the company around Coburn and Schwartz, the company acted like a company who was pissed off that these guys had behaved this way and wanted to make sure they were held accountable. They have a will continue to facilitate your ability to continue at your discretion.

[KR quotes Rod Rosenstein that if you want real cooperation and credit, you should act like a victim who wants to hold perps accountable]

If there were any concerns about how a declination with respect to the company would affect cooperation going forward—I can assure you that is not going to be an issue. The company is committed to cooperating into the future with any actions you see fit to take.

[Matt Friedrich endorses and agrees]

KG: That is a question we had.

KR: And we would get support from the audit committee and the board in that respect too.

That's it on cooperation.

**Existence and effectiveness of preexisting compliance program**

Are there any open questions since Monday? Our bottom line is that we think the compliance program was adequate given the nature of the company's business. It was an override of the program by senior people. But it was certainly an opportunity for the company to take a look and see if we do have everything that we need. [notes that there is always room for improvement, will change as company evolves]

KB: To talk about the historical program, the program actually worked and it worked well. [He was hired because of food vendor allegation by a CTS employee; that employee raised allegations about the operating licenses when confronted with the evidence against him]. It was a direct result of the compliance program [that led to the following investigation]. It was empowered enough to do what it did.

KG: What do you say about the fact that Coburn was at times starving the compliance program?

KB: It wasn't perfect. More money should have been spent on it. Even Steven was conceding it should have had more money. More money for training or third party due diligence might not have prevented

this since it was management that overrode the controls. But the program was good enough to investigate the president of company.

MF: There are probably other fact patters of a senior manager starving a compliance program to hide other conduct but I don't think that was the case here.

DG: [also not the case that people in the field weren't aware of compliance issues; people understood what they were doing]. To your resources point, you can see what the company is putting in now.

KB: And you saw in the BG and Sridhar chats where they knew they were violating the FCPA. There are other examples of that in chats and emails. It's not like they weren't trained or aware. It was that management overrode the training and controls.

KR: Timely disclosure – we have already talked about.

The specific timeline—

- Mani allegations 8/20-22/2016
- Self reporting on 9/1/2016
- Coburn out 9/27/2016
- Schwarts out 11/3/2016

That is lightning speed.

**Remediation**

KR: I think we've talked about this quite a bit. Some detail—Kevin you asked how many employees and what degree of remediation they received. We have more detail on that. We would prefer not to leave it with you due to FOIA.

We've talked about Schwartz and Coburn. With respect to garden leave: Sridhar (immediate), Ganesh Paramisvan, BG Ghosh, Pari Sriramulu, Venkatesan Nadarajan, Raj Ghosh.

Deepa Baburaj resigned (former India counsel)

17 associates separated; 10 resigned

In total, company imposed discipline on 70 cog associates and contractors. Most involved in operating license issues. Remaining (70 less 27) were given warnings and other discipline short of separation.

KB: Warning with financial penalty. A warning or coaching.

Summary of employment actions:

21 separated/resigned

10 warning with financial penalty

12 warning

18 coaching

6 contractors

**Forward-looking remediation – most was covered on Monday**

KR: A large amount of money and human resources were employed to make sure other problems were not out there. Reviewing invoices for all construction vendors. The company engaged EY and DLA in that process. Moving permits and licensing in house to mitigate risk. Implemented a project authorization policy. Licenses and permits in place. Created independent compliance team.

Doug and Erin have been working with the company on its commitment to bring this aspect of the compliance program into the world class level. This is substantial.

DG: The commitment is evident in the personnel. [Kari Chandler had been chief of corruption before; importance of managing program with resources in place that is effective; underlines Amy's knowledge of the company and issues]

KR: The next is collateral consequences.

We didn't think this was a large factor to you. It would not be good for the company if the company were prosecuted. Most of the customers are fortune 500 companies and reputational damage would be substantial and likely cause significant customer flight and impact innocent employees and shareholders. We want to note in terms of whether the company has paid a price for the misconduct— we can say that in terms of direct cost, the company spent over 60 million in terms of legal fees, remediation, EY. That is not to say –we will discuss disgorgement later—but to give a sense of the magnitude of the cost to the company. [we think that is important context that the company has responded with commitment of resources]

MF: If you were on our earnings call a few days ago, employee retention is an issue for us in India. We have had a lot of folks leaving and the weight of this case is part of that. It's a weight on us with the market. Declination compared to a DPA matters in that context. [want to send message of declination]

KG: Legal fees, public filings—what else was a cost?

KR: EY, legal fees, other professionals brought in to assess and help with messaging, individual counsel fees, audit,

MF: 60+ I think is conservative.

Leila Babaeva: Over what period of time?

KB: 2 years.

KR: Adequacy of enforcement action.

We don't think that this would be a stand-alone declination but accompanied by an SEC resolution and disgorgement of any ill-gotten gains. We think—as what I see as the right outcome, a declination seems appropriate. We aren't suggesting the company gets a pass.

Adequacy of prosecution of individuals responsible.

As we've talked about, we believe—informed by Karls' investigation—that the conduct is not a reflection of the company, but of bad actors. What really is a reflection of the company is the conduct subsequent to the misconduct being revealed. In the Yates memo, I am in agreement that the most effective deterrent. Companies only engage in conduct through its employees so if you change to deter individuals—this is an argument that would be more to your front office even. [Argument on policy; opportunity to express policy coming from front office]. For FCPA, would bring accountability to a former GC and President of a company. [would send a message to incentivize other companies to report]  There is a lack of conduct on defense that self-reporting pays off.

Here, too, the reality is that under corporate liability, an individual's actions leads to corporate liability for the company. But few companies are prosecuted. [compares DPA, NPA, declination]. I would suggest here that this is a company that did everything right and could show a demarcation between a declination and a DPA.

[End of presentation]

MF: To come back to involvement of senior folks, in this case it's hard to imagine other cases with these mitigating factors on seriousness and pervasiveness. The other factors just weigh so strongly in the other direction. [Incentivizes companies to report]

**2018.06.20 – DLA Piper Download of Henry Shiembob and P. Ganesh**

DLA Piper: Gray Stratton, Karl Buch

DOJ: Courtney Howard, Nick Grippo, Rachelle Linsenmayer (phone)

SEC: Michael Catoe, Paul Sharratt

[Karl Buch presented the below information unless otherwise noted]

**Interview of Henry Shiembob – April 5, 2018**

*Background*

Henry joined Cognizant in September 2013 as Chief Executive Officer. Before, worked at Verizon as an Assistant Officer for fraud and security risk.

Reported to Schwartz until he left the company. Now reports to D'Souza.

Shiembob is still with the company.

*Function – Corporate Security*

Views on compliance program and staffing were discussed.

*Investigation*

We asked about Coburn and Schwartz's treatment of the investigation. Shiembob said that besides his conversation with Coburn in June 2016, he didn't think anything that occurred was unusual for an investigation. He had a positive view of both Coburn and Schwartz. Described them as: "Stand up guys".

*Discussion of compliance programs and how they were lagging.*

According to Shiembob, Coburn and D'Souza generally tried to do the right thing. Coburn gave the budget he requested so it didn't interfere.

*Discussion of Raquel Klien and other compliance personnel*

Deepa Baburaj—didn't have much interaction with her.

*2016 Investigation*

Shiembob had a limited role. Was copied on some emails and participated on some calls but didn't recall specifics.

Recalled Coburn in June 2016 expressing concern about investigation. Otherwise did not have noteworthy conversation with him about the investigation. Suspected that organizational issues had contributed to the need for investigation, as well as cultural issues in India.

**Nick Grippo**: The last statement was that Shiembob?

**Karl Buch**: That's Shiembob speculating.

He was asked whether it seemed off that Coburn or Schwartz would try to shut down the investigation. Shiembob didn't get the sense that they wanted to shut it down, just that it was taking a long time to complete the investigation.

**Courtney Howard**: We have two emails to Shiembob with Coburn saying he wanted him to wrap it up-- Was Schwarts [also asking that]?

**Karl**: Schwartz didn't say that to him.

Some emails that we discussed were privileged and involved DLA, Dana Gilbert, or Schwartz. But we cannot share those with you.

He generally discussed the fact that the people in India are a tight-knit community, so rumors spread quickly and morale was being affected. Shiembob felt they needed to "calm down" people in India.

*Interaction with Mani*

Shiembob had limited interaction with him. He may have been cc'd on emails where Mani complained about being mistreated by Cognizant. Shiembob contributed this to cultural differences and that US investigators were being too aggressive.

*June 7, 2016 Email - Exchange between Schwartz and Shiembob;*

[SEC taken off of call for below]

*June 7, 2016 Email - Exchange between Schwartz and Shiembob; Copying gilbert and Molina.*

CTS-0100457 - Shiembob email to Schwartz

This email is in reference to the conversation between Coburn and Shiembob preceding this email.

[SEC rejoins call}

Shiembob recalled a 6/7/2016 conversation with Coburn in Austin, Texas. They were attending a leadership training. Recalls Coburn saying to him "What the hell is taking so long on this investigation? It's been going on for a while. It's affecting morale. Let's try to get this thing shut down." Shiembob responded to Coburn that there was a lot to do. Shiembob assumed Coburn was not trying to shut down the investigation, he was just not familiar with how long they took, especially with outside counsel. Shiembob remembers relaying to the team that Coburn was unhappy with time that it was taking and pushed team to close it. At the time, Shiembob was unaware of any nefarious reasons for Coburn's comments but thought he should be educated on it. Coburn was concerned about morale, anxiety in the staff. Shiembob didn't think Coburn was nervous, just frustrated.

[SEC is taken off call for below]

Looking at the emails in the present, Shiembob realizes that these "look bad", but he didn't have any reason to question Coburn's motives at the time.

[SEC rejoins call]

When asked about his impression of Coburn and Schwartz's relationship, Shiembob had no impression. Shiembob doesn't know whether Coburn and Schwartz have spoken about concerns of the length of investigation. Coburn was permitted, as president, to ask for the investigation to be wrapped up quickly. Shiembob said he would see Coburn occasionally at meetings, but didn't have much interaction with him. The only memorable conversation was the one just relayed to you.

Shiembob could not recall face-to-face meetings with Schwartz regarding the length of the investigation. Shiembob didn't interact much with Schwartz, although their offices were on same floor in Teaneck.

There are some additional emails not produced to you on the investigation subject because they relate to DLA advice.

Paul: The emails and other documents you can't talk about, are those listed on a privilege log?

Karl: Yes. June 2016 time period.

We asked, generally, if in hindsight looking at correspondence whether he perceives a different motive for Coburn's statements. He said he did now that he "knows what he knows". At the time, he took the comments as ignorance about the investigative process. He takes a different view of the conversation with Coburn after learning more information. But he didn't have a reason to question Coburn's motives at the time.

*Frank D'Souza*

Shiembob says D'Souza "Was always focused on doing the right thing." He never had reason to believe D'Souza had bad intentions. Shiembob still thought Coburn and Schwartz were "stand up guys" even after knowing about the conduct. Did not believe they were involved in conduct or personally benefited from it.

*Regarding what would happen if permits didn't come through*

Company would have found a way to move people to other offices.

Shiembob was also asked about Incentive structure (personal incentives) based on metrics.

---

**P. Ganesh Interviews (9 Total)**

**Interview 1 – August 23, 2016**

*Background*

Joined Cognizant in 2008 – Senior Manager in infrastructure

Promoted to director in 2010, then to senior director in 2012, then to Associate VP in 2015

Worked on MEPZ, Coimbatore, Calcutta, Pune, CKC facilities.

*Turnkey model*

The company outsourced construction through this model.

Ganesh stated that pressure from business leaders pushed Cognizant to do "just in time" model. They would apply for approval and begin construction simultaneously. Sometimes, interior fit-out would start before construction was completed. Company decided to change to receive all approvals before beginning construction because it was inappropriate for campuses to go unused after spending millions on construction.

*Examples of facilities on which construction did not start until after permits had been obtained*

Hyderabad and CKC academy block. Sridhar said shouldn't operate academy block until got approvals.

*Pune*

Ganesh said Cognizant started construction without obtaining the environmental clearance for Pune. As a result, the pollution control board sued Cognizant. There was an additional delay due to the dissolution of the committee in charge of environmental approvals. The issue moved forward once the committee was reformed.

*CKC and electricity connection*

Cognizant operated CKC on diesel generators since April 2015. They engaged LT to install electricity. Under the turnkey model, the campus would get electricity sooner. Powering through diesel was twice the cost of being powered through the electric grid.

Discussed issue with Lakshmi Naranyan, procurement person who advised Cognizant adopt LT turnkey model. LT was brought in to do electric cabling work. LT submitted work proposals to TNEB (Tamil Nadu Electricity Board) who in turn conducted the site inspection before LT ran cabling. Ganesh was unsure if it was LT's responsibility under the contract to connect to the power grid. Ganesh didn't know if Cognizant was aware of the cost of diesel before connecting to the power grid.

$310k incidental expenses—Ganesh was asked whether any payment had been made to government officials to obtain work. Ganesh didn't have any knowledge of any such payment.

*Email chain from 9/4/2015 – 10/24/2015*

 Includes email from 9/7/2015 [CTS-0003683]. Ganesh was not comfortable with the way LT was taking the project forward. Suggested Lakshmi push for a direct job to be done by TNEB. Ganesh was not comfortable with LT because they were not transparent with cost structures and wouldn't disclose costs paid to TNEB. He thought it would have been better for Cognizant to pay TNEB directly and obtain a receipt.

*Concerns about improper payment*

Unresponsive.

*Email 10/6/2015* [CTS-0003683]*– Mani advised Ganesh to add compliance/FCPA language to LT contract.*

Ganesh said Mani suggested the turnkey model after discussing it with Sridhar and Lakshmi (board member).

Ganesh did not answer whether Mani showed concern about FCPA compliance language because of potential payments to government officials. He stated, "We should not let it happen they should not be doing anything like that."

*March 2016 email [CTS-0030732, CTS-0021334, CTS-0042711]*

Email to Ganesh and Venugopal. LT had obtained approval and was expecting turnkey approval any moment. Vadivelu approximated costs for work, including 1.4 mil TNEB costs and 700k for switch yard equipment. 300k is listed for incidental expenses. 200k listed for overhead and margins.

Ganesh, when asked what incidental expenses covered, said we had lots of meetings and calls with Mani and BG. Expenses covered was always decided by the procurement team. Ultimately, Ganesh admitted that the 300k amount related to LT bringing on an unnamed consultant, but he didn't know what the consultant was going to do with money.

*Mani, BG, Venugopal, and LT on March 3—telephone conversation. [CTS-0010052]*

Ganesh remembers that LT informed Cognizant that $300k was an incidental expense for consulting charges. Ganesh said they didn't ask questions about this. "We don't need to know how the consultant will do the work." Cognizant later told LT they would not pay a consulting charge because it was LT's responsibility to obtain approvals. Ganesh was an engineer and did not deal with that. Procurement and commercial (BG) would have been involved in that.

*Did Ganesh instruct LT to remove incidental expenses language?*

We didn't know the cost and the breakdown for the bill. Ganesh repeats he was just an engineer.

*March 10, 2016 email from Nakkiran (LT) – quote contained 24 construction line items. No incidental expenses included in quotes. [CTS-0002208]*

Ganesh had no knowledge of whether the 2.1 crores cost was incorporated into each line item. He was not responsible for the number, he could only address technical stuff. The fact that the total amount in the quote matched the costs from the 3/1/2016 email [CTS-0042711] including 2.1 crores was a coincidence. Ganesh insisted the itemized bill only contained technical charges. He said to discuss this matter with the procurement team, as he was only responsible for technical matters.

*4/29/2016, 4/22/2016 - Emails discussing line items and negotiations. [CTS-0042297, CTS-0021334]*

Ganesh only dealt with the technical aspect. When asked if he thought LT overcharged Cognizant, he was evasive.

*CKC Planning permit*

Cognizant started development without obtaining the CMDA planning permit. It was illegal to start without this permit. It took a long time to obtain permits. Ganesh was unaware of illegal payments made to obtain the permit.

*January 20, 2014 email in which LT requested Chandra Ramakrishnan meet with chief minister of Tamil Nadu [CTS-0000317]*

Mani email expressing concern about having the above meeting.

Ganesh said he was not concerned that minister would ask for a bribe. He did not believe the CM had been convicted of corruption. Ganesh didn't know what Mani meant about "messy"

*March 12, 2014 Email [CTS-0000302]*

When asked what the "parallel effort" with SNS/MVS/KKN/Ramesh was, Ganesh said it was LT's responsibility to get the permit and LT said they were following up with CMDA.

June 27th, 2014 – Housing and Urban Development secretary awarded G.O.

"No one should know LT got the G.O." – Ganesh suggested parallel efforts mentioned above may have been to obtain an order from the secretary. Did not know why they would be necessary or why LT would want to keep it separate. Didn't know about LT retaining a consultant to obtain this.

*11/4/2014 CMDA planning permit*

Ganesh didn't know about the relationship between the government order issued by the HUD secretary and its impact.

*11/12/2014 email – Ramesh Vadivelu sent PowerPoint "Cognizant KITS Sholinganullar" [CTS-0000125-6]*

Ganesh was asked about variations listed on page "Approvals – Campus regularization"—includes 7 line items for approval. Line item 2—Ganesh didn't know what 2.5 mil related to. Claimed LT had incurred the cost—"it was not our job" to question what the cost is for in the turnkey model.

*1/13/2015 email –Ganesh sent Mani KITS variations, including stat approval claims for 3.7 mil; included breakdown of approved/not approved*

In reference to the 3.7 mil figure, Ganesh said it's possible LT could have hired a consultant to acquire the approvals. Possibly. Processes and approvals could mean anything, such as filing applications. In this country [India], "it's possible that the engaged consultant possibly made a payment to a government official." But he had no idea what the consultant would have done.

When asked how he asked for approval without knowing what the expense was for, Ganesh didn't have answer.

*CTS-0003074 - Ganesh asks Deepa to have a call to discuss statutory approvals*

Ganesh didn't recall a discussion.

*3/11/2015 – Narasi sought Coburn's approval for revised variations. 3.7 mil for approvals "not accepted"; 11 line items had been moved from rejected to accepted [CTS-0000201]*

Ganesh recalled a discussion with Coburn and Sridhar where it was decided LT should not get statutory approvals. Ganesh claimed that Coburn, Sridhar, and Mani discussed replacing 3.7M with 11 line items. Cognizant couldn't pay consulting fees because they didn't know what the consulting was. Ganesh claimed SNS had discussed statutory approvals with BG.

**Interview 2 – 9/20/2016**

*Showed 11/12/2014 email – Ramesh copying BG, Ganesh [CTS-0000125-6]*

Ganesh identified document as variation list submitted by LT for CKC campus. Typically under the turnkey model, the vendor would ask for additional expenses to be covered. Ganesh only would have dealt with technical aspects of such requests. Raj Ghosh would have handled the commercial aspect. Statutory approvals shouldn't have been included in the variation request, Ganesh assumed LT included them hoping to get more money.

*11/25/2014 – Excel with LT variation request*

Once he got it, he would have discussed it with procurement, infra, and admin. Mani, BG, sometimes Sridhar would discuss variations. Combined recommendations would then sent to Coburn. Didn't know what statutory line items were for or why the clarification field was left blank. Ganesh was only concerned with the technical line items. Mani and BG might have more information—especially for statutory approvals.

Ganesh admitted he was aware that LT had incurred costs related to statutory approvals, including costs related to the consultant that LT engaged to help with obtainment. The consultant charged LT, he assumed, and LT sought reimbursement. Probably they hired the consultant to protect themselves from dealing with government authorities. Mani and BG pushed back on variations, which escalated the matter to conversations with Sridhar and SNS, then Sridhar and Coburn.

*1/13/2015 – Email [CTS-0000177]*

According to Ganesh, there was no process for statutory approval requests. It made sense for the email to come from Mani. Ganesh acknowledged finance should have been CC'd, but having the communication include Coburn and Mani was fine. Mani would generally call Coburn before a request for approval to explain the request. However, Ganesh was not part of that conversation and didn't know if he had included the statutory approval line item. It was probably for hiring a consultant, although 3.6 seemed exorbitant to Ganesh. In response to the line item, Ganesh repeated that Cognizant was "stuck" because they had started construction without approval.

*Variations sent after January 13, 2015*

Ganesh did not know why the line items changed and shifted from unapproved to approved, nor what was included in the 11 line items. Said he always believed it was possible LT had made inappropriate payment to a government official in order to obtain approvals. He did not ask any questions because it was their responsibility [to obtain the approvals]. Cognizant could not control LT or who they paid.

*4/17/2015 – Deepa asking follow up questions*

This was typical. They would then have a telephone conversation. LT was seeking reimbursement for costs related to statutory approvals.

*3/11/2015 document Narasi submitted variation to Coburn for approval [CTS-0000201]*


Ganesh denied that the 3.7 had been rejected but now 3.4 had been added for other items to cover it. Other line items were a product of negotiations that Ganesh had had with Ramesh. Ganesh stated that

he had documentation to substantiate that Cognizant had asked for additional work to be done, which was included in the line items, and that that work had been completed. Ganesh repeated that he was responsible only for technical aspects. Says he brought documentation of line items to Mani. Mani, BG, Santhosh Debarajan, and Venkatesan Natarajan had a meeting to discuss the line items. There had been a dispute of whether or not to approve. Mani had discussed the issue with Sridhar and Coburn. Ganesh was unaware of line items relating to statutory approvals.

There had been many meetings about statutory approvals that he wasn't involved in. He didn't know the decision-making process. As far as he knew, Ghosh, Schwartz, Lakshmi Naranyan, and Mcloughlin had not been involved in discussions. He didn't know for certain whether an illegal payment had been made but he "had a feeling" it had occurred. He assumed others had the same feeling because Cognizant was "stuck". There had been no open conversation at Cognizant regarding a payment to a government official, but it was assumed.


**Interview 3 – 10/20/2016**

Ganesh indicated he'd seen public announcements about Cognizant and that Gordon Coburn had resigned. He thought it was unfortunate that he resigned because he had had good feelings about him. Ganesh had never heard of Cognizant making bribe payments in past.

*Interactions with LT*

Ganesh worked on Cognizant projects with contractors, including LT. Ganesh had project managers for each facility. The Cognizant managers reported to Ganesh. He had talked to LT about technical requirements and what was needed for facilities on the front end. He would verify with LT that buildings met requirements.

*CKC/KITS*

Ganesh met with Vadivelu, mainly, regarding CKC. Also SNS on a few occasions.

If LT encountered problems, they contacted Ganesh and worked to resolve the issue.

*Turnkey Model*

Expenses were agreed upon before beginning a project. For additional expenses, LT submitted variation claims. Ganesh was on the technical side and checked technical variations. LT did not track requests as technical/non-technical. Ganesh estimated 90% of variation requests were technical.

*Approvals*

Cognizant pushed LT for approvals because it took a long time. Having a finished, non-operable building was a financial problem. Ganesh learned of delays from Ramesh and Mani. Ganesh was aware of large request for statutory approvals—he only knew that the request was a large amount of money. He never knew why the amount was needed, but thinks Venkatesan, Mani, and BG must have known. Mani, Coburn, and Sridhar had meetings about variations. Mani told them they should approve the statutory approval request. Coburn said the company couldn't pay for those, it could only pay for what was

DOJ-EH-0000000220

executed. Mani said it was LT's responsibility and that Cognizant shouldn't pay for approvals. However, Ganesh had not been part of any discussions surrounding obtaining approvals.

LT and Cognizant had ongoing conversations about variations.

*CKC variations*

Ganesh was not involved in or aware of the concealment of a payment for statutory approvals in the line items. He understood from Mani that Cognizant was not going to pay for statutory approvals, but for work performed. Payments to LT were for technical work done, not statutory approvals.

Nick Grippo: Did he say why the statutory approvals were in there to begin with if the money was for construction?

Karl: He said there was no relationship between the two. He was suspicious of the statutory approvals, but there was no relation with the 11 line items.

Ganesh initially refused to answer whether he thought the statutory fees had been paid to LT. He said he assumed the variation request for statutory approvals was for a payment to a government official. He made the assumption that the money was for a government payment based on his knowledge of Indian real estate. He assumed Venkatesan had shared this. Later, Ganesh said it was not Cognizant's responsibility to know what the payments were for. Then later, Ganesh said that LT could have been using the money for an additional consultant.

*Technical vs. Non-Technical Variations*

Ganesh only covered technical issues with LT. but when shown the discussion he had had with LT regarding payment issues, he conceded that he had talked about more than just technical issues with LT.

*1/20/2014 – Email from Mani to Chandra about LT request to have Chandra meet with CM [CTS-0000317]*

Ganesh acknowledged that this was not a technical issue. He had to have a broad understanding of real estate projects. LT had reached out to him about planning permits because they wanted a Cognizant senior official to meet with a government official. LT had wanted Cognizant to meet with the Chief Minister about KITS. Ganesh didn't know the Chief Minister personally, but knew she had been convicted of corruption.

Mani's position was that it was LT's responsibility to pay approvals. Mani said it could get messy. Ganesh said that the meeting with the Chief Minister may not have been worth it [because it wouldn't necessarily result in an approval].

*Capacity planning call*

Mcloughlin, Coburn, Sridhar, BG, Raj Ghosh, Ganesh, Mani, and a representative from global workforce management were on the call

There were also discussions about capacity planning

*3/7/2014 invitation for one such meeting shown to Ganesh – Raj asks Mani if it is ok to join [CTS-0000248]*

Ganesh didn't know why Raj Ghosh asked that question.

*3/7/2014 email to participants including PP with capacity planning India 2014-2018 [CTS-0000223]*

Slide 6 references KITS planning; planning permit delayed; approval for additional spend to be obtained.

Ganesh says that this refers to the statutory approval request, but doesn't recall a discussion of it on call.

*Email from Ganesh to Anand Bhushan, Mani and BG copied – "KITS Statutory approvals to be obtained by LT" [CTS-0012262]*

Ganesh mentions that had call with the Deputy Secretary of the Government of Tamil Nadu and "spoke to Deepa on Saturday" regarding advice on speaking to government officials.

Ganesh said someone must have asked him to take the call. Didn't know why he would want legal input. Didn't know what he meant when he said context couldn't' be explained, although it looked bad. Coburn didn't talk to him directly about approvals. Legal would have told him statutory approvals were LT's responsibility. Ganesh didn't recall a conversation with a government official, but he would have told them that statutory approvals were LT's responsibility.

*Self-Dealing*

Ganesh was then asked about a potential conflict of interest; he had been accused of having an interest in a furniture company that Cognizant was dealing with.

**2018.07.12 – DLA Piper Device Analysis and Walk-Through of Pune, Siruseri, and CKC**

DLA Piper: Gray Stratton, Karl Buch

DOJ: David Last, Courtney Howard, Nick Grippo (Phone), Gary Owens, Rachelle Linsenmayer

SEC: Maria Gallo, Michael Catoe, Paul Sharratt (phone)

---

**Back-up Logs**

- 2014,15, 16 back up tapes exist
    - company in process of restoring (will take 4-6 weeks per tape)
    - restoration happening in tandem, not necessarily by year
- do not have weekly/monthly tapes
- Deduplication
    - Theoretically, possible. Will explore and also DOJ may request custodian list

**Voicemails**

- No System to record

**Tandberg Records**

- Another witness in India has been Identified.
    - Phanindra K (can send full name); member of video conference team
    - DLA planning to interview
    - Appears he has knowledge regarding video conferencing, not conduct
    - Will set up VTC in roughly 2 weeks
- Logs
    - Working with video conference team on more clear reports, but not possible to do by machine number
        - Searchable by name
        - Report generated by machine has been sent to DOJ
            - Recently CTS-101452 produced (slightly different—2nd page. Each tab would be by person—diary log shows name changes)
    - Issues
        - Some reports have been updated to new person, whereas others haven't
            - This is due to when info originally taken in 2016, users had not been updated yet.
        - Most recent logs produced to DOJ should best reflect names
            - Separate allocation showing changes in names by machine kept manually and user is replaced each time—wouldn't necessarily show who had it before.
            - Does not appear to be a chain of custody log

DOJ-EH-0000000223

- o Phanindra may be able to address this issue, however some information where data is pulled is managed by a third party; however, he accesses the information on a regular basis
- o Potential witnesses on this:
  - ▪ Ragu Raman
  - ▪ Krishna Subramanian

**Deletion Analysis**

- EY analyzed Schwartz and Coburn machines in October and December 2016
- Vestigant then looked at EY's analysis in January 2017.

<u>Schwartz</u>

- Macbook Air (imaged August 22, 2016), Lenovo Thinkpad (August 24th, 2016), western digital external hard drive (August 24th, 2016)
  - o imaged on days that devices handed over
  - o attempted to image phone, Schwartz refused

<u>Coburn</u>

- Lenovo thinkpad x250 (imaged august 22 2016), Lenovo thinkpad x201 (imaged October 7th 2016), cms external drive imaged October 5th 2016)
  - o gap in time due to thinkpadx201 and cms external hard drive being older, unused; collected after Coburn resigned
- samsung phone (imaged 9/19/2016), apple ipad tablet (9/19/2016)

<u>Review</u>

- searched for specific email attachments
  - o 202, 220, 178, 198 (variation requests received 1/13 and 3/11
  - o EY unable to ID activity relating to emails on these devices
- no evidence of mass deletion

<u>Unusual user activity</u>

- schwartz used other removable devices not accessible by EY;
  - o western digital hard drive used on august 22nd;
  - o external hard drive was plugged in date it was imaged;
- Deletion programs were on the machine, but unclear on which date they were used
  - o Unclear because dates on programs may correspond with every day that it runs in background; inconclusive
  - o program "secure erase" on macbook air used 3 times, but not later than November 28, 2015; trash it, super duper, data rescue all installed in 2013 time period, some in 2015;
  - o Mostly shown to have been used in August 2016, which EY credited to normal scripting as each machine was turned on on August 22, 2016 (the last time he used his computer)

- different USB's 2016 2 on 8/22, 1 on 8/20, 1 on 8/16, 1 on 8/12 all used on MacBook—time on 22nd : 00:51 timestamp, 09:49
- Coburn iPad had some deleted files, but were not relevant

Business related chats (office program)

- none between Coburn and Schwartz

Schwartz Macbook Air apple notes extracted and reviewed; nothing relevant

*That was the initial review done in October.*

- No indication deletion programs were used; no abnormal deletion for both Coburn and Schwartz

Additional Analysis done in December 2016

- Schwartz: Macbook Air and thinkpad x230
  - Cloud-based accounts on mac laptop
  - Documents in trash on Schwartz mac, not relevant
  - Applications that could be used to force delete not shown to have been used
  - Devices connected by USB (mentioned above)

Vestigant investigation January 2017

- Schwartz, Macbook air
  - 4 executions of secure erase, 2013 and 2015 Macbook air
    - Potential data may have been destroyed due to reformatting; last reformat was December 2014
    - Many (96 emails) deleted emails on august 22nd
      - Reviewed to/from date fields, nothing seemed relevant
      - Time stamp when deleted
        - One from jgalt3942@mac.com deleted at 00:31
  - Cloud accounts may hold additional data
  - USB activity Identified
    - Unable to determine what files were copied over
  - Deletion analysis on 20th and 21st
    - No evidence of deletion in reports; DLA will double check
- Schwartz was notified by Gilbert and D'Souza that he was removed from the investigation on the 20th, devices collected the 22nd

---

***Excerpt of binder 1 walkthrough of Pune, Siruseri, CKC; Core Documents***

**Pune**

- Cts 9721
- Pune came to awareness in Mani interview august 2016

- April 19, 2013 – email 9721 identified by Mani; email from SNS (LT) to Ganesh including construction variations
    - CTS-9722 line 9 – first variation request relating to Pune where stat approvals referenced
        - Mani identified this line as a payment made by LT to a gov official and requested for reimbursement through variation process
            - 380 lakhs varied through variation requests ; many variations unrelated to switch that happened eventually: line item 9 broken into pieces—1 being line item for liaising
            - 9822 (from sambaji bhor computer) page 3 line item 3 rejected and line item 16 environmental clearance; line item 13 featherlight work stations was
            - identified as amount for liaising for environmental clearance
    - no emails surrounding these excel sheets; mani did not know which line item had been switched; sambaji bhor did not acknowledge this line item was improper; 2014 Schwartz notes mentioned specific amount relating to this in Pune—670 (close to 780); work stations likely carried charge for payment to government official
    - Coburn's knowledge of this mentioned by mani
        - no contemporaneous communications at the time that this was related to an improper payment; nothing that revealed Gordon or Steven knew about this until April 2014; no record that sambaji emailed these to anyone—documented 11/4/2013 (tab 19 9822) tab 20 is 12/5/2013 3888)
    - there is an approval from Gordon on the variation amount, but he was not given line items before he approved; email stating "approved" from Gordon regarding construction related line items (would have been for more than just 780k)
    - communications in 2013 show Gordon was aware of an environmental consent delay; Schwartz and Coburn aware of show cause notice issued; communications with Schwartz further showing awareness regarding legal proceeding (DOJ has some of these emails)

Iterations of variation requests and gordon's approvals already produced

**Siruseri**

- Tab D – tab 26 125 – November 12 2014 PP presentation sent by Mani (cts 137 variation for stat approvals, planning permit)
    - items including payments to government officials
- Tab 21 (8767)– principally Ganesh and Mani knew of these September 2010 thru September 2011
    - krishnaswamy chandrashekaran was mani's boss, mani took over his role; also known as KC; has not been interviewed by DLA
    - relates to land acquisition
- cts 8768 narsi sends request for 1.7 acres of land purchase next to STI campus; Gordon approves

- o Ganesh emails a year later—allotment letter received from SIPCOT, includes payment details
  - o KC credits LT for making "this happen"
  - o relates to "land approval" line item in tab 26
- Tab 22 – first variation from 2012; 9820—page 3 51, 54, 56,58 (standalone; DLA will check where from, date)
  - o 51 line item for power rejected in 2012; witnesses said was never built
  - o 54 land cost; rejected in 2012; payment to government for land acquisition
  - o 56 STPI approvals; marked approved, but not paid in 2012;
  - o 58 line item for power rejected in 2012
- Tab 23 – 9828 SRI approvals
  - o Ganesh attaches document with additional "extra works"; discuss variation; plan call on SRI STPI approvals; issues with not having approvals—SCZ facility being built in 2012 overlapped with STPI land allotment, requested approvals 8 years before and still hadn't been approved for STPI; STPI facility was still being used.
  - o BG notes at top he had a call with SNS to discuss variations related to Siruseri
  - o LT got approvals for old facility— STPI —in 4 months (had been pending for 8 years)
- Tab 24 – electrical connection facility for power CTS 4789
  - o Ganesh emails with payment advice for TNEB registration; LT got it for them amid power crisis
  - o witnesses said about connected Siruseri to the grid—LT managed to do so more quickly than other entities that had been waiting for longer
- Improper payments – Tab 26 125 – shows payments, all Siruseri-related charges relate to those
- Tab 25 9825 – mentions large, unplanned expense to connect to power
  - o witnesses unable to describe what the unplanned expenditure was
  - o although this issues had happened in 2012, booked in 2014
- November 2014 variation list
  - o 2 KITS, 7 Is MIPZ (ultimately not agreed to),
  - o ELCOTT re-layout approval related to kits—unclear what this payment was


**CKC Electrical**

- o Tab B – March 2016– 4056
  - o in first interview, mani believed LT made a payment and was seeking reimbursement; payment was frozen, discussion followed and LT was ultimately fired, so never continued work and was not paid
  - o SOW that Ramesh at LT sent to Ganesh relating to connection
    - ▪ approval for connection was accorded; line item 3 "incidental expenses" is 2crores (300 usd), 13.93 works for all additional work
    - ▪ Mani and BG noted, BG in particular that when he saw it he believed related to potentially improper payment; Ganesh's response mentions cannot discuss over email—BG thinks related to improper payment, was upset that Ganesh emailed this

- ○ Phone call then, after email—CTS-2208, Nakkiran sends detailed scope which removed "incidental line item" for 2 crores; however, the total amount is the same
  - ○ BG was on the call—can confirm who else was on the call.
  - ○ LT claimed that they had paid this and were seeking to be reimbursed; issue of whether they paid without prior approval; were never actually reimbursed for it

**Disclosure**

- ○ Mani in late july 2016 mentions that there is an issue in the bill to Coburn; Coburn tells mani to go to Schwartz, who then called mani and dana gilbert—they then suggested he speak to DLA.
- ○ Mani first interview included Schwartz on the phone.

---

Follow up

- chain of custody letters on devices collected from Schwartz and Coburn, including who did analysis
  - ○ existing documentation
- DLA also to confirm device analysis chronology and what was deleted in august 2016 time frame, USB's accessed during this time period, confirm that emails not deleted on 20th-22nd of August
- DOJ should have Cloud-based accounts
- DOJ requested production of 96 emails deleted from Schwartz Macbook
- Krishna Subramanian – potential finance person to interview
- Document requests
  - ○ Supporting payment made to LT for change order in addition to finance witnesses (other than Gordon approval email) for CKC [already produced—will send bates ranges]
  - ○ Schwartz's notes
    - ▪ Notes were in "notes" folder of outlook; approximately 100 files; initially found in notes feature on mac (synced to outlook), found during collection of original device—showed up as an email would
    - ▪ DLA to check if also located on Outlook server; show chain of custody
  - ○ Other notes
    - ▪ Some have been produced to DOJ; DLA will check what sample of notes had been produced and send bates
    - ▪ DOJ wants business-related notes and privilege log for privileged notes
  - ○ All of Schwartz emails, documents, calendars, etc. from april 14, 2014 – april 28, 2014 inclusive of 28th
    - ▪ All non priv, then a priv log

**2018.07.13 – Downloads Lakshmi**

DLA Piper: Gray Stratton, Karl Buch

DOJ: David Last, Courtney Howard, Rachelle Linsenmayer

SEC: Michael Catoe, Maria Gallo (phone), Paul Sharratt (phone)

**Lakshmi (3 interviews)**

<u>9/14/2016 Interview</u>

*Background*

Recruited in 1994 for Dunn and Bradstreet India; chief tech officer

Cognizant was an offshoot of Dunn & Bradstreet, no employees in US, company grew and hired employees all over

Lakshmi became president before company public offering; reported to kumar mahadeva

Cognizant grew in early 2000's due to .com boom; became CEO in 2003

2006 India law established mandatory 55 retirement age, so had to retire; D'souza took over, Lakshmi became board member

Remained involved in industry-related activities; one of Cognizant's key repretentatives on the ground in India;

Board often hears about India corruption problems and takes comfort Lakshmi is there

*Corruption concerns*

Board concern because corruption is a general problem in India; people outside think it's rampant; Lakshmi thinks exaggerated, particularly for IT industry; other IT firms have good reputations which helps industry as a whole; views more corruption outside of IT industry in India

*Highest risks of corruption in IT*

Pollution control, income tax, labor and employment, and real estate all bigger risks for corruption than IT

*Real estate corruption in Chennai*

Main entity Is CMDA—which could refuse approvals for any reason; couldn't remember specific time this occurred; remembered when people asked him to speak to CMDA officials when Cognizant was having problems

Cognizant set standard for using reputable agents; smaller travel agencies offered better deals but Cognizant used AMEX because more reputable

When Cognizant first engaged LT, they told them would be held to Cognizant standards; [speaking generally]

*CMDA "tough agency to deal with"*

LT on multiple occasions experienced delays in getting permits from CMDA; learned from visits to company facilities; delays at TCO facility; hadn't heard about issues around ckc/kits

*Pollution control board (PCB)*

Lakshmi believed pcb was "one of the most difficult or corrupt organizations". Remembered issue re storage of diesel fuel and that the pcb told cognizant to reduce diesel levels—this was a typical type of dispute.

No knowledge of company making facilitation payments to get permits; generally company left alone by pcb officials

*Awareness of company difficulty on air/water consents for MEPZ*

Not aware that pcb raised issues about cognizant having too many associates at the facility; not aware of facilitation payments to gas bank (diesel storage); only remembered diesel storage issue during monsoon season (often floods)

Referrals from government officials for potential employment opportunities [part of "friends and families" review conducted by DLA; generally for family members of government officials—generally no evidence of company receiving benefits for this]

There was an issue with CKC—flood damage to generators at facility; cts contacted Lakshmi to see if he could help. Reached out to Jaya Kumar from TNEB (exec engineer in charge of electric; knew him because he helped with power problems where Lakshmi lived; a relative was a female doctor who wanted a job at cognizant, she was eventually hired; didn't know why she was hired but assumed it was because of respect for him sending referral

Normal for government to recommend candidates to cognizant; didn't know about ultimate decisions unless HR told him

*1/12/2012 job request, jaya kuma saranya –email to Lakshmi 10/12/2011 [will send bates number]*

sriram iyer was forwarded email (HR employee), Lakshmi noted that this came from a tneb senior official while discussing tariff issues; elevated up; Lakshmi recalled saranya accepted a coordinator role in workplace services team

Individual, kabilen, representative from tamil nadu electrical regulatory commission reviewing tariffs had wanted Cognizant to participate in review; had met him socially, then Lakshmi introduced him to jaya raman

*Was tneb involved in tariff decision?*

Didn't know.

*Why did he tell hr came through tneb?*

Just being transparent.

Confirmed tneb senior official referenced was jaya kumar; any engineer in tneb considered senior; 3 levels of seniority (1 lowest, 4 highest):

- 1st is AE (assistant eng)
- 2nd DE (divisional)
- 3rd EE (executive)
- 4th CE (chief). Could be one more above.  Unsure.

Consultant hired to optimize within firm, but couldn't recall details.

*Email 10/13/2011 – related to phone interview with sarayna*

describe her in negative terms, but email suggests invited for face to face screening since came from government recommendation

Lakshmi said company wanted to meet with her because she was related to an important person.

*Email 10/25/2011*

Lakshmi responds to sriram, saying Jaya Raman, her dad, visited him (EE);

Lakshmi says it was not normal for government officials to visit his home, but sometimes that happens in India; not out of ordinary, in this case, because he knew Jaya Raman

*11/11/2011 email regarding jaya raman visiting Lakshmi, requesting op for interview for saranya; also references visit "intense" from DE and EE*

Lakshmi says stopped by 3-4 times in this period to see how he was doing

Lakshmi said was being pressured; officials waiting for him when he got home from work; wore him out; wanted to give position to avoid upsetting engineer; eventually given job 160k rupees per year, admin coordinator—the job she had wanted was 350k rupees per year, so he assumed she wouldn't want this.


*Pari Sriramulu [was a similar to a gov affairs employee at cog, interviewed multiple times, suspended from cog—hasn't worked for comp since nov 2016]*

Lakshmi says handles pub relations for cognizant.

When asked if pari would have fixed a dispute between company and tneb, Lakshmi said he might have been able to bring to attention of right people but had no authority to fix it.

Lakshmi probably spoke with TNREC because they had been following up with Lakshmi often. If saranya hadn't been good for job, wouldn't have been hired. Wouldn't have caused probs with TNREC or TNEB since other couldn't offer permits; just gave job to get saranya's father off his back


*Deepak Roger Noble [relative of tneb official]*

- remembered hiring him; son of Mitra Noble (tneb official); wasn't sure if actually hired. Remembers tneb officials trying to pressure him to hire him, including visiting his home; concerned about nuisances, not negative action to cognizant as authorities lacked ability to make tariff changes


*10/7/2013 email re Deepak*

hired by cog because qualified


*3/18/2014 – Depasis Basu reached out to Lakshmi because Deepak's father, Mitra reached out to Lakshmi*

not unusual that a senior employee would come direct because came through his channel


*5/1/2014 – email sent on update on performance*

his response typical to people seeking help; likes to encourage people


*CKC power supply*

ckc didn't have power; remembered talking to mani in November 2015 around Chennai floods and asking what delay about; remembered mani said LT was the vendor; did not hear about cognizant

DOJ-EH-0000000232

making payment to a government official for ckc approval; recalled government wanted to give contract to lay cable to a particular company but cognizant wanted LT to handle it

Couldn't recall conversations about someone making inappropriate payment to electrify site, but remembered recent conversation with Schwartz about CKC power supply issue; recalled call from John Kline (board chairman) and saying Lakshmi should recuse himself because of pending investigation; Lakshmi wanted to find out what was going on, so he called Schwartz; conversation lasted about 2 min—around august 2016-sept 2016

Spoke briefly to mani 10 days prior to interview (around sept 4th) about investigation; mani said he was going through a difficult time (spoke on the phone and in person) and couldn't reveal details but that he was being interviewed, that there was data collection, and that it had to do with corruption and approvals; mani was nervous and disturbed, talked about all he had done for cognizant during his tenure; Lakshmi did not record the conversation.

At this point, Lakshmi had not been told why he was asked to recuse himself and did not attend board meetings.


*Document read aloud to Lakshmi: "We are not comfortable with the way LT is taking this forward…follow route turnkey model" to drastically reduce time; email that he wasn't on*

Did not recall whether electricity conductivity was received faster under turnkey; recalled if that if they had a contract, they couldn't force the contract


*11/12/2015, 11/13/2015 -- lakshmi, mani, Sridhar, pari "meeting with the secretary it"; in email, refers to Jaya Kumar asks about pending items from tneb*

Said must have been relating to tower issues

In regards to hiring, not involved in hiring Deepak; didn't recall issues beyond ckc power; suggested using jaya kumar office to help because other IT issues were discussed with him; recalled children employed by cognizant because he was being transparent; trivial since the company had 20k employees; can't get influence by giving job; probably raised issue with jaya but couldn't remember if jaya helped cognizant; he had had various conversations with government officials to sort it out


*11/13/2015 – conversation, decision to proceed with LT—demand note for 1.69  billion inr for admin approvals; paying through demand draft*

Lakshmi said this demand draft was going through LT


*CKC planning permit*

Recollection of speaking to cognizant employee about ckc permit issues in 2014.

Any conversations with Coburn or Schwartz would have been unusual. Didn't recall talking to them about other India government issues.

Sometimes took handwritten notes during phone calls, kept in drawer. No recollection about conversations with Schwartz or Coburn about planning permit.


*Conversations with SNS  re: CKC regarding demand payment?*

Knew sns but didn't recall conversation about ckc; not involved with ckc; recalled vaguely there had been delays; didn't hear of any demand of more than 1 mil to acquire permit because he would have remembered such a large amount.

Didn't remember discussing obtaining ckc permit through brier but may have generally discussed with Coburn and Schwartz; knew tamil nadu was making larger demands for permits; knew jaya lalithra was later convicted for corruption

Could not recall details about possible general conversation with Coburn and Schwartz about a planning permit

LT on behalf of cts sometimes began construction before they had permits; used practice because didn't want to lose time by waiting


*6/30/2014 – mani to Lakshmi 'kits planning permit cleared'; GO shortly*

Lakshmi recalled every time there was a policy change, government issued a GO; remembers permit came in document form; didn't know government process for issuing permits; denies recalling conversation regarding permit; this was an "FYI" email; he was only included on email due to his reputation in company.


*10/11/2014 email – mani told coburn, sridahr, others that CM arrested and LT trying to get next set of approvals*

Denied recollection; getting approvals was routine, so he didn't pay attention to the details; he was not associated with ckc

Didn't attend audit committee meetings;


*India procurement process update 12/3/2013*

Didn't recall seeing slide show; didn't recall site visit to ckc visit with Coburn, although calendar showed he went

**2nd Lakshmi interview – 12/15/2016**

Stated he had no additional concerns to share; disappointment corruption occurred; visited cts campuses to improve morale; challenging time for cts

*Gen background discussed*


***Ckc planning permit***

*Shown email 4/21/2014 - Coburn copying Schwartz; requesting call with Lakshmi for perspective on government issue*

Lakshmi had no recollection of email or call; didn't recall other conversations in april 2014 regarding this or conversations that LT was facing payment demands from the government in connection to ckc


*When asked about points in Schwartz's call notes ((he was not shown notes); asked if recalled any of these points),*

Said cognizant was taking the right approach; government wants more money, so it was right that LT handle; cognizant shouldn't pay anything other than real estate

Didn't recall discussing this regarding ckc; agreed it was right that statutory approvals were LT's problem because of their contract responsibility and cognizant advised employees to avoid meetings with government officials;


*Example of government official asking for cognizant employee referral one potential issue*

If a cts employee was facing an improper request for payment, Lakshmi told the employee that cognizant was large and should not feel the need to cave, given their role in India's economy

No recollection of $2 mil or $670k demands; would remember conversation because would have been highly unusual and it was such a large amount of money; would be surprising if there were notes suggesting he participated in such a conversation; wouldn't have reason to think someone had such notes


*CKC power electric connection*

Recalled siruseri power discussion with mani or ganesh


*10/23/2015 – ckc tneb power (ganesh, mani, venugopal) was discussed, not shown to him; mani says had disc with Lakshmi in email about tneb issues*

Lakshmi denied hearing LT had been asked to pay a tneb official for a work order for ckc; recalled discussion with mani about using a vendor to get electrical wire for siruseri instead of going through the government; [in previous interview, recalled this as being about ckc]

*Tax benefits*

Recalled ckc was in a tax benefit zone, didn't know specific details

*Referrals from government officials*

*Email 2/7/2014 indicating resume received from telecom sec of india—neice mahvish farooqui wanted job*

Forwarded to pari and bhooma raghavan (HR); lakshmi didn't keep track of the referral and was unaware of what happened to candidate; farooqui was well-respected and cognizant used him to test software systems, or they had wanted to use farooqui but were unable to do so due to a telecom scandal in 2010 or 2011 where the government was accused of proving broadband to some companies and not others; farooqui retired in 2014; at some point cognizant obtained spectrum but he didn't know how; didn't know of other business with telecom board

*Stock buyback program [company, based on Indian law bought back a tranche of its own stock to avoid tax increases] discussed during interview*

## 3rd interview 1/11/2017 – regarding sons and daughters issue

Employment referrals were important because cognizant hired so many people; lakshmi welcomes referrals; interacts less with elected officials than bureaucrats; often a government official forwards a resume, although they are not invested in the outcome—they just want to say they got the candidate the interview; these are evaluated as all other candidates are

These go through the normal referral process, background is given to interviewer—interviewer tells candidate they are aware of referral service (allows referrer to say that they gave them an opportunity); unlikely to apply pressure to company to hire candidate, as they likely applied to and could go to another company; if someone couldn't get a job elsewhere, an official might pressure cognizant; cognizant was more likely to help the official if they were nice; might process application faster, but no preference given

If a government official pressured a lot, cognizant might make more effort to hire candidate—such as giving more interviews or lowering the offer (knowing it would be refused); even if they do take the job, cts assumes the company will handle it (in IT, candidates are selected from "bench" for a project, if not chosen they are eventually dismissed; so performance would weed them out)

Cognizant might offer a referred candidate to a non-IT position if the candidate were suitable; would never accept or propose quid pro quo; this is due to treating them properly and wanting respect as a firm; when a referral is received, resume is scanned and may not forward if not good; if candidate appears okay, Lakshmi forwards to appropriate business unit;

Quality of relationship with the government official matters—if it is a son/daughter, Lakshmi will tell the cognizant employee that it is important and will ask to be updated on the appliation status; if Lakshmi knows that the government official is just trying to get a candidate off his back, he is less persistent; either he or his secretary would ask HR if the government official had circled back; HR used to be more willing to accept government official referrals but is not anymore, perhaps due to volume

*2/10/2011 – Email 7/18/2010 lakshmi to Satish balasubramanian and sriram rajagopal; resume of shipra godhwani, daughter of sudhir Chandra (income tax commissioner of chennia, nieice of naresh chandra, former indian amnass to US); discussion of preference of candidate;*

Lakshmi recalled candidate and noted commissioner would be important to cognizant if he worked in the Large Accounts Division (LPR); email indicated a "pass on" situation, but should not be taken too seriously; if candidate did not work out, cognizant shouldn't try unreasonably to accommodate, believed the candidate ultimately found job elsewhere

*4/23/2013 – lakshmi to pradip chilije (senior vp of enterprise application services); referral from DE of TNEB's son;  "jittery, has been on the bench for awhile";*

The email refers to the official divisional engineer, "a pest who haunts influential people in the area"; muthu reports to pradip; Lakshmi just meant that they should be nice to the guy but not do anything out of the way to give him an opportunity

*Jaya Sankar – 1/6/2014 email to Sridhar and HR head ; mentions jaya met on personal basis to evaluate daughter for job; shantha kumar gunasekaran*

Lakshmi surprised email contains wording "private and confidential"; suspects he asked for the application to have more attention due to the official following up; admitted there could be another reason he was asking for more attention; no reason to think the tech team made a hiring decision due to his reference

*Morari – India admin service, former secretary to president of India*

8/16/2016 – email to president of global delivery re: relative of Morari—lakshmi knows him well; relative of a current employee looking to transfer to Mumbai; discuss facilitating, however the employee had had poor performance

Did not want to see a good employee leave the ranks, he was not telling HR to give special treatment due to government connection; Morari was over 75 years old; invited Morari to speak about the subject;

the employee had had multiple releases from cdp so no one would touch him—it was a helpless situation

*Srivatsa Krishna – secretary at Indian admin services*

*12/23/2011 – email from Krishna, forwarded to associate VP admin Gorsharan handled; Lakshmi suggested SK meet with him; suggested making job offer; government official mentioned*

Srivada was a secretary in services; Lakshmi admitted he would not normally give such detailed instructions as he did with this candidate, but had written a little more because the official was pressuring him, demonstrated he would do something; reference to a reasonable offer likely referred to offering something more than reasonable

*10/21/2015 – IT minister of telan gana called with request for transfer*

Lakshmi stated the IT minister was influential because he controlled government spending for IT in the state, didn't control licensing; Lakshmi had been reminded to write to the newly appointed minister due to this email, it didn't refer to an administer referral; these referrals were of such low importance didn't matter; didn't see as a quid pro quo arrangement

**Finance witnesses**

Krishna Subramanian (KVS) (knows about valuation of ckc) more senior

Ragu (knows payables process at ckc) reports to KVS; would have processed LT payments

**Krishna Subramanian (KVS) – 1st Interview 9/21/2016**

*Worked for cognizant for 7 years*

At time of interview, associate vp of finance, accounting and controllership, reported to rob telismanick, who reported to Mcloughlin

Occasionally worked with Mcloughlin; rarely with raj ghosh

General responsibilities included finances, auditing, focused on tax and revenue, ensured audits completed for 10 entities

He was a certified accountant; accounting for asset management and capitalization; processes centralized in India

*Obtaining fin approvals*

Board resolutions sign offs; he and colleagues could approve payments through "people-soft", which manages controls of each person; now Cognizant uses Areba, which was instituted by raj; employee

submits a claim, manager can approve if appropriate; payment requested, including receipt or process order

Described new streamlined process—vendor name auto populated, purchase order filling out, etc.

Cognizant has close to 40 units and each unit had its own reporting requirements; net amount requested was paid after adjustments; change requests referred to the central way for vendors to submit invoices—they plan to have them all in Areba; non-approved vendors and those lacking documents are not accepted;

KVS discussed purchase orders with srimanikandan; mani visited Chennai; the two spoke bi weekly on telephone; now spoke more recently due to insurance claim

KVS spoke with ganesh less frequently

KVS was generally aware of improper payments due to the investigation; would be surprised about cognizant making improper payments

Employees had been trained within the last 2-3 years on this issue; would be surprised if project team had made payments;

KVS hesitant to answer questions about Coburn because he was not privy to conversations; Coburn was hands on and approved things; KVS would be surprised and sad to learn that the government had demanded a payment


*CKC*

Denied knowledge of obtaining planning permits; KVS was only involved surrounding floods; recalled opening celebration in first quarter of 2015—the opening would have been tied to the financial year and admin would have been notified when financials had finished the work; LT was the vendor; CTS received an ongoing bill from them; didn't recall delay in opening the facility; saw some delays because a building collapsed; there was always a waiting period before moving in to a new facility


*Discussion surrounding withheld payments*

*4/2013 email*

Standard with some vendors for Cognizant to withhold if vendors were not following tax authorities.

*7/23/2014 email – pwc asking to reconcile LT statement*

Recalled statement in email that cts was withholding $5 mil; KVS explained they withheld payment until work was completed

*7/24/2014 email*

Work completion review; cts paid some amount in advance and other later

*Walk through of invoice payment*

Santosh devarajan would scan invoice into Areba; project team alerted approval needed; work confirmed and approved; venkata and treasury team would then issue payment; payment made when treasury receives approval

If a payment was more than 10 mil inr, treasury team was given a heads up to make sure funds were available; Coburn approval was required for any payment around $1-2 mil

*Emails from may to august 2014 relating to amounts withheld by cognizant from LT*

Wasn't sure why this was done; remembers potential conversations with rob talismenick; approvals came from mani who regularly talked to Coburn;

*Process*

*8/25/2014 email about demand notice from LT; uploaded and put in vault by mani, management team told how much*

KVS said it was common to overestimate amount to treasury so there was enough in the account; to his knowledge, payments to government officials were always paid in demand draft, not cash

*Slide deck 11/12/2014 – variation list*

KVS never received such a list; mani was responsible for signing off; running bill usually included broad categories of work, not technical breakdown; statutory approvals would have been split among buildings and described as "buildings"; KVS never saw a more detailed invoice

Didn't think cost of statutory approvals seemed large in light of the building size; team never questioned invoice. If infra approved the invoice, it went forward;

*Anything suspicious?*

The project was large; variation requests came at the last minute; requests included many technical items he knew nothing about; stated maybe should have asked more questions

**2nd KVS Interview 10/18/2016**

Vault system and that it moved to Areba

In vault, everyone could upload their invoices, then the first level accounting was done, then it went to department review approval; the payment coordinator confirmed the technical aspects; then the

invoice was approved and entered into oracle's "people soft"; through this system, everything manual—nothing could be scanned in. vendor name and invoice amount typed. No limits on invoice—$10 or $100k payment could be approved

Areba is more user friendly; accounts payable was changed to make the approval process more automated and put limits on what individuals could approve; vendor name and other details auto populated now

Corporate real estate invoices are usually high value payments; generally the treasury team is notified about these due to size; Areba had certain approvers to review opening on process

If KVS was listed as an approver, he would check if the withholding had been made; never checked all technical aspects or confirmed that the job was done—not part of his function; he ensured the contract was correct and that the payment was going to right unit; emphasized accounts payable could only look for correct documentation and ledger code to double check, then accounting was done.


*CKC planning*

A few invoices from LT were initially approved but he was directed not to pay because the work was not approved

*4/23/2014 email*

Mani would have approved payment; not many instances payment withheld; sometimes tax department would tell him to withhold because taxes had not been paid by the vendor

*4/23/2014 email, pwc wanted documentation for LT payments*

Every now, documentation was asked for; not related to $5 mil withholding in prior email; didn't specifically recall withholding money—guessed this was because they didn't complete work; would have followed orders to withhold but couldn't remember if given a reason; payments to LT were always large so this one didn't stick out. Cts typically gave LT unsecured credit

*7/31/2014 – email, mani to Coburn*

Denied recollection of whether payments were withheld due to kits approval process; not alarmed at the time that LT had hired a new consultant; began looking at the email differently after cognizant went public with corruption investigation; at the time he just would have been looking at whether or not it was approved

Before his interview, hadn't heard of a liaison consultant; wouldn't have considered the mention of a liaison consultant to be odd because he trusted the system and approval of Karen and Gordon; whenever payment was required, mani would have called; couldn't specifically remember in this instance; would hear about additional work to be done by vendor which resulted in change order later.

2-3% approval limit on requests; KVS would see IT limitation there when it came in; almost every contract was amended when scope of work changed; couldn't recall when ckc was more than 2-3%

*Ckc power*

Often took time to acquire permits; unaware of improper payments or that they were running on generators

*Pune*

Unaware of delays or construction before permits

---

**Raguhu Raman 9/22/2016**

First worked at cognizant 2003-2008 (asset management accounts payable, spent time in UK)

2013 rejoined in asset management

2014 restructured, moved from controller (KVS) to source to pay function 2014-2016 (Ghosh)

Then reporting line shifted to Vinod Ramakrishnan Eshwaran

*CKC*

Role to pay vendors, namely LT; turnkey vendor for ckc; understood to mean they were responsible for everything relating to construction of building

Typical payment process: for projects like this, usually advanced payments were made based on letter of content secured through ine guarantee; ckc project was approximately a 134mil and an advance of 40 mil was paid to LT; work commenced after advance; 2-3 year project, so LT provided a running bill

More than 20 bills for ckc; invoices were submitted, uploaded for corporate real estate team (ganesh) to approve (mani if amounts larger); when approved, would release payment

Sometimes infrastructure instructed ragu to withhold payment; only information he received was a summary of charges; infra received a workbook of associate charges

System changed in middle of ckc; changed from vault to Areba; Areba limited individuals on approval levels; guessed Ganesh could approve up to 500k, Mani 1 mil, anything higher was approved by Gordon

Buffer of 10% in contracts—variation bills automatically accepted if below buffer, Gordon was asked if not.

*Statutory approvals*

Required before construction; typically, demand draft payment sent by government re: approval; once approved, would issue demand draft; payment would go to government directly, not through a vendor

Recalled no instance where vendor sought reimbursement for statutory approvals—that would be outside of scope; not privy to what the number would have represented, but to his knowledge it would be construction

Annexure usually included referring to milestone for work completed; once completed, would release funds

There had been delays on one facility due to a missing permit but couldn't remember which

Recalled discussion between cognizant and LT about who was responsible for getting a building permit; recalled LT hadn't gotten approval but had begun construction; no recollection of improper payment made to obtain permit; unable to obtain permits likely because ckc was on marshland—made it more difficult to receive permits

Only generally aware of a delay and debate regarding payment of statutory approvals because mani or ganesh forwarded him emails when payments were due


*Emails re freeing payments*

*4/23/2014 – withholding payments for kits*

Typical; bascar was an employee on the general review team;

*7/31/2014 – includes request to release payments to LT*

Remembers receiving instruction from KVS to execute payment; unremarkable that a payment was withheld; appeared to him that the correspondence pertained to statutory approvals and he assumed approval was obtained between may and july


*Change in reporting from kvs to ghosh*

Would talk to ganesh and venkatesan


*4/25/2014 – email re requirement to pay 26 crores*

Confirmed looked normal; cost of permit, 3.9 mil, reasonable as it was tied to overall cost of the project; after payment made, the government would issue a receipt


*Pune*

No knowledge of delays

*LT*

Rarely interacted with them directly because they were 'protected' in infra team; went to ckc facility in 2014 while it was being constructed but project manager didn't let him in or let him speak to ckc

Ragu asked about why LT got so many projects and was told it was because they were big and reliable. However, this seemed strange to him

---

**Dana Gilbert – 2nd interview - Confirmation**

Schwartz statements made to her about KITS permits issue ever?

Statements made between when mani raised ckc power line issues and before audit committee assumed responsibility of the issue (late july-august 20th, 2016);

In first conversation, Schwartz indicates he is worried mani is getting us in trouble, "we are like rats on a sinking ship"; afraid mani was going to "throw me under the bus"

2nd conversation—Schwartz said to gilbert that he was worried what mani would say to the investigators

[clarified further in notes from gilbert download]

---

**Follow up**

- Bates for whole set of documents referenced in downloads
- Further information surrounding hiring issue
- Send timing of lakshmi recusal—timing company directed this.
- Approvals required to authorize construction of ckc (look at time period before); DLA looking for this, will provide to DOJ.
- Dana Gilbert download.

**2018.07.13 – Latham & Watkins Disgorgement Analysis**


Latham & Watkins: Erin Jones, Doug Greenburg

DLA: Karl Buch, Gray Stratton

DOJ: David Last, Courtney Howard, Rachelle Linsenmayer

---

Meeting regarding EY analysis. Preliminary presentation, not inclusive of all granular information.

- Payments included in analysis
- Methodology
- Proposed: benefit of approx. $12 mil
    - Based on contemporaneous comp data about lease costs


**Disgorgement Analysis**

Benefit derived from 4 payments:

- 2.5 (LT 2014 planning permit CKC);
- 770k (LT enviro clearance Pune);
- 840k (building permits for SCZ facility, reimbursed in 2014);
- various payments less than 30k between 2013-2016 for approvals of operation licenses at various facilities

Didn't include

- $300k cost of connecting CKC to electric grid in 2016, as never reimbursed by Cognizant
    - benefit would have been expedition of approval, but company didn't use the approval; only recently in 2018 were they connected

Small payments for operating licenses predating 2013. Only included those after 2013.

- calculus for excluding is timing; 2013 was outside of 5 years; excluded anything outside of scope
- related to a small portion of 30k. will get it back to doj


**Methodoloygy**

Analyze benefit to company

- through cost avoided analysis; cost avoided by making payments; costs avoided were:
    - leasing expenses, statutory penalties, deferred environmental remediation costs

- didn't focus on profits or revenue because payments not related to sales, contracts, customer relationships; company business provides services with people—if couldn't have operated the affected facilities, could have moved those people elsewhere

Cost avoided approach used often in fcpa regulatory context (relating to judicial, regulatory relief)

- appears consistent with fcpa past and case law;
- distinguished from vimpelcomm and telia where large bribes occurred to enter the market in general
    - cognizant was not relying on opening a building to do business in India, solely related to physical location of staff
        - question of costs regarding operating facilities

Evidence clear with pune, ckc, siruseri that if facilities hadn't opened, could have leased a facility (this is why calculated based on leasing costs)

- at the time, the company was leasing 12 facilities in pune; Chennai 2015 had 29 leases and owned 5 facilities (leasing always has been part of model)
- there is contemporaneous evidence supporting this; document referring to lease model [raj ghosh; cts 0052624]
- lease space was available for each of the payments

Length of time would have used lease

- used 1 year model for analysis; in some cases would have taken less time, in some could have taken more time
    - how long you assume the facility is not open would determine how long leasing was

Size of leases required

- decided to look at open seats in other facilities, so looked at cities where project located to see if people could have been placed there
- analyzed whether would use "buffer seats" dedicated to clients (ex. Seats for other companies to use to foster relationship)
    - buffer seats are counted as filled in cog analysis; in this analysis, also counted these as filled, as they were planned and reserved to grow business
    - seats reserved for trainees also disregarded
- company internal head count projections relied upon
    - better indicator than actual number of people who showed up (which was lower than projected)
    - by using projections, accounted for how cts was planning at the time; based on contemporaneous planning docs used at the time

EX: ckc planning permit 11/5/2014—focused on cost avoided for leasing cost in Chennai in 2015

- based on contemporaneous documents prepared by corporate real estate group, headcount projection was 17500 employees

- In 2015, Cognizant had 8919 unused seats in Chennai (excluding buffers) in other facilities leased or owned
  - without ckc, would have had to house 8581 employees for year in addition to empty seats
- broker reports used to calculate costs to lease in Chennai
  - compared against 29 active leases;
  - 1 year per employee $807
    - estimated cost for 8581 employees is 6.9 million [exact number given in document—cts-ecp-00000443]
- Pune and siruseri went through the same exercise, focusing on each relevant year
  - calculations in documentation already provided to sec that will also be given to doj


Leasing space

- focused on employee head count, didn't try to replicate square footage of facility, since had common spaces; common space used by the company as a lobby, etc.


Sheet (CTS-ECP-00000443)

- driver is delta between projected need and available seats for that year; not trying to reduce number by including buffers as empty


Operating license (slightly over 27k over 5 years); multiple facilities (listed on sheet as operating licenses)

- 26 ranging from $30-3,000
- generally (besides environmental remediation) it is not suggested payments were made to avoid compliance to approvals, but to expedite the process of attaining approvals
  - regard elevator, fire alarms, dining facility, etc.
  - do not believe these would have threatened ability of building to operate, so benefit received was just to avoid stat fines that could have been imposed for not having licenses
  - no evidence that money was saved by operating buildings improperly
- Worked with India counsel to figure the fines and what they would have been for a year; list of fines
  - largest related to dining facility

Environmental remediation (specific to siruseri)

- allowed them to operate facility outside of compliance by discharging too much waste water in siruseri
- cts would have had to upgrade enviro plant to accommodate number of people

- o Disgorgement: benefit was cost of not doing the remediation; estimate to do it to bring up to code was approx. 500k.
  - o estimate from 3rd party provider
  - o remediation still has not been done—people instead were moved to a different facility to bring it within compliance

*All of this is high level analysis;*

**3 primary costs [chart provided]**

- o additional leasing costs is largest
- o avoiding statutory penalties
- o deferred environmental remediation

**Follow up:**

Produce financials materials already provided to SEC. Documentation shows backup of the proposed 12 mil benefit. DOJ also requests any productions regarding the issue going forward.

- o spreadsheets showing math; generalizations of statutory fines corresponding to 27k payments; extracts from corresponding documents showing where payments come from

Amount of payments excluded due to being out of 5 year scope

Confirm whether or not cts did subleasing

August 20-24, 2016 Collection/communication timeline

(Call with Gray and Karl – 8/23/18 – DL, NG, CH)

August 20

- 1:30 am ET – Mani's interview began
- 11:54 am – Dana called Schwartz, Dana asked Schwartz to bring in laptop on Monday
- 12:02 pm – Gilbert called Coburn – voicemail
- 12:07 pm – SS to DG
- 12:07 pm – DG voicemail to GC
- 12:40 pm – SS to DG
- 1:12 pm – SS to DG
- 1:43 pm – DG to SS - substantive
- 2:27 pm – SS to DG
- 2:46 pm – DG to SS
- 2:57 pm – SS to DG
- 4:07 pm – DG to SS – substantive
- 5:16 pm – SS to DG
- 6:36 pm – DG to GC – asked him to bring in laptop
- 7:23 pm – DG to SS
- 8:11 pm – DG to SS – substantive
- 10:40 pm – SS to DG – substantive

August 21

- 9:53 am – SS to FD – substantive
- 12:42 pm – DG to SS – substantive
- 5:12 pm – SS to FD – substantive
- 7:23 pm – DG to SS – substantive
- 11:00 pm – Mani's third interview began

August 22

- 6:30 am – Mani interview break
- 9:58 am – Schwartz macbook air collected and imaged

August 24

- 10:24 am – Schwartz thinkpad and western digital HD were collected and imaged

**2018.10.17 Call with DLA – Coburn Download**

DLA: Gray Stratton, Karl Buch

DOJ: Courtney Howard, David Last, Nick Grippo, Gary Owens, Rachelle Linsenmayer

---

Summary of August 29th Coburn Interview with DLA

Background

- Coburn began working at CTS in 1990 as part of program with Dunn and Bradstreet (Company that owned CTS)
    - At end of program, worked for Dunn and Bradstreet until 1996 as venture capitalist; this VC spun into Cognizant
- Cognizant CFO and participated in taking company public in 1998; remained in position until 2006 or 2007; became COO until 2012 when he became president


Knowledge of FCPA

- understood that prohibits paying of bribes directly/indirect
    - In cog code of conduct
- Had had recent conversation with Dana Gilbert about facilitation payments; she explained it could be more than $5-10, which was news to him


Infrastructure department in India

- in early days of company, there was an individual who was finance director and in charge of infrastructure in India—nickname was "RR"
- after RR left, Coburn appointed Chandrashekaran Krishnaswany (went by "KC")
- KC was set to retire in 2009
- Coburn thought about putting Mani in that position to take over admin then put P Ganesh would take over infrastructure
- But then Coburn didn't like idea of putting Ganesh there because he didn't think he was that good, as far as leading infrastructure
    - Coburn also thought Ganesh might be receiving kickbacks
- KC postponed retirement and appointed Mani as head of admin with KC as head of infra for 2 more years; then retired around 2012 and Mani took over admin and infra
- Appointed Mani because he had been a financial advisor in US and he trusted Mani
    - Coburn didn't have "FCPA concerns" with Mani, per se, but wanted to make sure team wasn't motivated by self-enrichment in general
    - in general, Coburn expressed concerns about colleagues taking kickbacks from vendors

<u>Turn-Key model</u>

- "model in which developer hired to handle entire process of constructing the building"
- Cognizant would contract with a vendor who would handle everything from design to construction, then give a facility to occupy at the end
  - turnkey vendors would be responsible for making sure certificates were in place
- thought model was a way to mitigate risk that colleagues would demand kickbacks because it gave Cog discretion with respect to the vendor only and there weren't a lot of vendor choices


<u>Admin and infra interaction</u>

- Quarterly calls with capacity discussions; based on calls, the company would develop a strategy/model around buildings; mindful of policies, tax law, etc.
- Around this time, they were interested in building to get the cash building in India; took advantage of ability to repatriate money


<u>Building permits for CKC</u>

- When asked if there were any regulatory challenges with undertaking construction projects in India, Coburn said he was generally aware of 2013 internal audit report which highlighted that company was starting construction without obtaining building permits; he was unhappy with the finding that the company was doing this

Shown internal audit report, which he didn't recognize

- Coburn did recognize a May 2013 update, he recognized (shown page 10 which referenced that company started building without permits)
- Didn't know that company had started construction without permits before; this was the first time he heard of it (when viewing report)

Site visit in February 2013 to KITS (note in management review meeting note)

- Hadn't seen note and didn't remember visiting the site then; did remember visiting site at one point
- When pointed out CMDA permit application had been submitted February 7 2013, he said that construction was underway at the time of his visit; he didn't know if company had received permit at the time he visited

Permit process for CKC

- received more emails from Mani at that time than any other project because there were more delays with CKC
- attributed delays to fact ruling party in turmoil; chief minister went to jail for what he assumed was corruption
  - he said he probably learned this from Mani or Sridhar because they were concerned that that fact may have delayed permits
  - time frame of conversation not mentioned

Whether remembered if LT asked for a Cognizant Exec to meet with CM to obtain permit for CKC

- didn't remember that; just remembered that the Chief Minister did not like Cognizant or the IT sector
- company developed strategy to tell LT that contract was for delivery of completed building and cog would withhold payment for work already completed until LT fulfilled their end of contract
- couldn't' remember if he had been concerned LT would do something illegal; it was highlighted if they paid something to the government, they would get payments faster; he told them no, they expected LT to get the permits from the government
  - believed Mani or Sridhar brought this proposal to his attention; didn't remember if government approached LT or vice versa or if it was a suggestion by Cog or LT
  - believes conversation took place in 2014
  - his response to proposal of request was 'no freaking way' and to stick to original strategy and legal avenues and, until they did, to withhold payment from LT
  - amount was north of 1 million dollars; could have been around 2.5 million (when asked)
    - amount proposed in context of if there was a discussion of an amount issued by government "it was very big. North of 1 million"
  - Schwartz was aware amount was over 1 million

Email dated April 21, 2014 – requested follow up call with Mani, Sridhar, Schwartz

- when asked if that was call with Mani/Sridhar about making payment; he said he didn't remember call or email
- remembers having long discussion with Mani/Sridhar about other options that existed because they couldn't make a payment to speed up permit process
  - remembers LT having a public relations department they could use to pressure the government lawfully; remembers Schwartz involved and couldn't remember if idea of PR was Coburn or Schwartz but remembers team didn't like strategy, which made him suspicious they were on the take
  - thought by withholding amounts, would make it difficult for LT to pay sub contract which would incite protest from workers and would push LT to call in legal favors from government
- doesn't remember telling LT that relationship would be in question if it didn't get permits

Email 5/20/2014

- Mani writes of 'positive traction'; "a new liaison consultant" being appointed
  - Coburn didn't know anything about a consultant; when he looked at language where he told Mani to withhold payments; didn't remember specifically doing this, but said he must have and that this was consistent with strategy

Email 6/30/2014 – August

- 6/30 Mani confirms building permit cleared
- Coburn didn't know what was done to obtain order

Conversation with Mani, Sridhar, Schwartz regarding proposal request to pay over 1 million to government official for permit

- certainly spoke to Schwartz but didn't remember if he raised it with audit committee or Dana Gilbert; didn't know if it was a proposal or request but felt satisfied that he had raised it to Schwartz and had then told Mani it wasn't an option and to withhold payment to LT


Variation requests from LT

- Aware of them because looked back through notes to prep for interview
- recalled in late 2014 Mani or Sridhar told him they were in discussion with LT regarding an additional change order for $25-30 million in variation requests; he told them there was a clear contract in place and shouldn't be work orders for some of the claims; shouldn't be having this conversation with them
- some of the items sounded legitimate or credible versus other items that LT made on their own; told LT to go back and get the number down; this raised red flags for him because of concerns that the team was taking kickbacks
    - Coburn was concerned about kickbacks because of the amount
- When asked if this raised FCPA related red flags, Coburn said no, because he didn't pay attention to the breakouts; for example when "statutory approvals" was pointed out to him on a separate line item but he didn't focus on the details


1/13/2015 Email

- remembered the email and request for $25 million in variations from LT; told team $25 mil was a nonstarter and wanted variations request down to single digits
- pointed out line item of $3.7 mil, he said he didn't know what that was "because he did not probe it"
    - he said, when questioned further, "for Cognizant, 3 million dollars was a rounding error"
- he didn't get into weeds with purchasing orders; typically just with capacity planning and budgets
- remembered ultimately approving a number that was under 10 million, which was the target he had set

3/11/2015 email

- didn't open attachments or speak to Mani about content of variation request; assumes had a phone call with Mani about additional requests

3/13 email with Mani asking to speak about variation

- couldn't recall if spoke and didn't remember approving 9 minutes after Mani requested phone call


Asked if had reviewed email in advance of interview

- mentioned that he had reviewed his emails and that his computer had been taken; was concerned about "what was going on"; had reviewed internal audit material
- asked if had spoken to Schwartz about the call with Mani/Sridhar
  - had In last week or two; not a detailed conversation but brought up recollection of being told of proposal and required for payments; had in person meeting with Schwartz; not detailed but Schwartz brought up topic and both remembered it happened and remembered telling Mani and Sridhar that it couldn't happen [they couldn't make payments] and developed strategy to withhold payments from LT

Power at CKC

- Coburn thought the company had always had electricity at CKC; he was surprised when Mani told him a bribe was paid to get power to the site; in a call with Mani, he remembered barely being able to understand Mani and that when he realized what Mani was talking about, he told him to speak to Gilbert or Schwartz immediately

Other topics

- Wasn't aware company had potentially exceeded capacity at MEPZ, that it overbuilt, or that the company had started building Pune without the necessary permits; did recall issue with MEPZ not treating waste water but not in further detail

Coburn was not represented by counsel during interview

**2018.12.19 – DLA Piper Download – Schwartz device update, Schwartz partial download, McLouglin partial download, Telesmanic download**

DLA Piper: Gray Stratton, Karl Buch

DOJ: David Last, Courtney Howard, Rachelle Linsenmayer

---

**Update on Schwartz Devices**

Regarding EY

Karl: We told you previously we had collected from Goodwin, then from Stefco, a copy of the hard drive and a laptop that was imaged. EY told us the hard drive image and laptop images were corrupted. However they were able to determine the HD contained backup images of laptop which were identical to those we produced in august except the backup contained backups from August and November. So we told you we would process and review the laptop we collected in November 2016. So we are trying to see if anything is there from august and November that would be relevant to the search terms you gave us.

That data was processed and there were no new additional relevant documents.

In processing Schwartz's November laptop image, EY ran a full deduplication of that data against the data set we had previously run. The various forms of data from both his backup and the image that we collected in August 2016. For a number of technical reasons the deduplication process was not able to dedupe all of the documents. Part of the reason is that the tool EY used in August 2016, the software, was different than what EY is currently using to analyze the 2016 data.

Courtney: One question—EY was trying to figure out if there was anything from August to November, but instead of looking at the backups on the hard drive given to you went back to the original laptop?

Karl: We ran the laptop against the image we took in August and reviewed the difference between those. So [we looked at] whatever was new from when we collected in November.

As part of that, we took the whole collection [over 100k emails] and deduped across the database we already had. The program used by EY in August 2016 when they initially processed the image that they took created a marker, or serial number, which didn't match the software they used—so they weren't able to dedupe the serial numbers. So they created an algorithm where they looked at subject matter, sender, date, time—deduping by the header data—and reduced it to about 55k documents.

Then, what we did was sampled the documents. About 85% of the documents we were able to manually dedupe. We ran search terms—CKC KITS, Sholinganullar, Larson and Tubro, L&T [others] and Coburn, Mani, Sridhar, Naranyan names—to narrow potentially new documents down to 6k documents. We are reviewing and will let you know what is new, being as conservative as possible.

We will produce to you whatever might be new.

[Courtney confirms timeline—DLA looked at August—Nov laptop and found nothing responsive to search terms; then EY process]

Karl: We wanted to look at all of the August 2016 data and dedupe it against the old data to make sure there was nothing new. Theoretically there would be nothing new.

David: Were there any notes on the additional data that you have that you hadn't already identified?

Karl: We will check. Will make a production by the end of the week if anything is new.

---

**Steven Schwartz Interview Memos – Summary**

August 28, 2016 interview

**Relating to Aug 20, 2016 conversation he had relayed to DLA; Dana Gilbert; first interview with him**

Gilbert called him August 20, relayed to him he was off investigation. They spoke once more that day but maybe more because Schwartz perplexed. Probably sent text or email indicating he needed to speak with her.

He then had a conversation with Gilbert about a conversation he had had with Coburn in 2014.

Schwartz said he didn't speak to D'Souza on August 20 because he was in Brazil. Spoke on August 21 for 20 minutes. Remembers D'Souza telling him he was removed from investing. D'Souza assured him he'd done nothing wrong. He remembers speculating it was probably Mani who made an allegation against him because Mani was under investigation. Couldn't think of anything else. He knew Mani was nervous about the 300k payment.

Denied telling Dsouza he was on a call with Coburn, Mani, Sridhar. Couldn't imagine what was being alleged because little involvement in admin. Could only think of a conversation he had with Coburn in his office.

That conversation was [mostly withheld for priv]

Remembers mentioning to Dsouza whether related to KITS. Knew that because had spoken to Coburn recently about contents of conversation in 2014. Schwartz asked Coburn if his recollection of that conversation was correct.

When asked about payment issue in 2014 involving LT, Schwartz said didn't think he'd told D'Souza but if he did it would have been something Coburn reminded him about. Asked if made statement to D'Souza that he "couldn't do it" regarding payment." .Schwartz said he didn't make that statement.

Schwartz only learned company received permit for KITS when Coburn told him on Aug 20, 2016. Coburn said they'd withheld payments as entitled to do and then many months later, they received permit. Coburn said there are ways to do the right thing without paying someone. Schwartz said he was not aware of payment made. Schwartz said "I would not authorize that I go by the book".

**Conversation with Gilbert**

Wanted to discuss a conversation he had with her with Coburn in Coburns office in 2014. Company exerting privilege over this.

Schwartz might have expressed frustration about admin. Company was in situation they were in because of them. A reference to internal memo that the company exerted work product over.

Schwartz was frustrated about phone call with Mani about the 300k. He had spent 15 years protecting the company.

He said there was an additional exchange relating to the 2014 conversation with Coburn that the company is asserting privilege over.

**Mcloughlin conversation**

He relayed the conversation he had with Karen Mcloughlin about the fact that the computers had been taken. She commented how long it had taken when her computer was imaged and she was surprised U.S. people were being looked into and thought no one would have been involved in this.


**9/23/2016 interview summary**

**Conversation with Frank after 8/20/2016**

Schwartz shocked and taken aback by Mani's allegations because Schwartz had so little involvement.

Schwartz was asked about inconsistencies in statements he had made in exchange below.

EXCHANGE WITH SCHWARTZ

DLA: Did you tell frank that Gordon invited you to a conversation about a bribe?

SS: No.

DLA: Did you say you replied that cognizant had a contract with LT and it was LT's responsibility to fulfill that contract?

SS: Not in those terms. If I mentioned LT at all I would have said there were FCPA provisions in their contract.

DLA: Did you tell Frank the situation involved LT?

SS: Don't recall.

DLA: Did you tell Frank LT could help if they had trouble?

SS: No. In another conversation I might have said something about LT. I never said LT could get things done. Might have mentioned LT in reference to internal audit report and that in that context they could get things done.

DLA: Do you remember telling anyone that Coburn was "unpoliceable"?

DD: No,  I might have said he could be challenging.

**Calls with gilbert after audit committee took over, specifically if recalled telling Dana he suspected Mani made the accusation about him?**

Said he didn't remember. Someone along way told him Mani made allegations about him. Dana gave him a "tell" and Jalel told him. Schwartz said based on Mani's position as head of admin, he assumed it was Mani.

Question relating to a conversation he had with Gordon (company asserting priv over)

**Do you remember asking Dana if the accusation was related to environmental issues at kits?**

No I do not.

[Regarding priv components, company taking position that the meetings were relating to legal advice. This was a meeting DLA was told occurred and during which it was asserted there was a seeking of a provision of legal advice for which DLA is not otherwise able to say that the crime fraud exception exists.

DLA will get back to DOJ on how would convey that in a privilege log.]

---

**Mcloughlin**

Interview on October 3, 2016

Said she had only one conversation with Schwartz, several weeks ago, where they were catching up by Tandberg one night around time where DLA asked to collect laptops. Schwartz made comment saying essentially "I can't believe we are doing this. We've never done anything wrong. Any time we thought that we were being asked been asked for money we have done the right thing." Didn't discuss any particular facility, project, or people involved.

---

Rob Telesmanic

Interview on October 15, 2016

Is currently Corporate Controller (CC) at CTS. Joined May 2003. At the time, Ross Williams was controller and Rob was assistant CC.

Late 2004, promoted to CC.

Reports to Mcloughlin, CFO; Telesmanic has 9-10 direct reports; 4 controllers under him—Europe, APAC (except India), India, Americas

    -Each country controller is responsible for filings of revenue

Total group under him is 250-300 people

Recalled when he was promoted to CC, Williams transitioned to a more compliance focused role and Telesmanic focused on controllership. He worked closely with Williams, recalled Williams promoted to chief compliance officer but didn't know when. Williams maintained that role until he left in '11 or '12.

Compliance function at time strictly about SOX and the team was small. Started setting up internal audit department.

When he joined company, there was no internal audit. When SOX was passed, was generally outsourced to EY. Williams mostly talked to EY. Cognizant was small at the time and SOX was complex.

Prakash Rajan was hired at one point to be assistant vice president of internal audit.

Recalled at some point hired Van Ellipson was also hired to internal audit. He focused on management testing at that time; later on started working on special projects.

**Interactions with Mclouglin**

Around consolidated results, external reporting, projects (internal revenue standard); Mcloughlin works with Anjan Sur closely; sometimes business optics discussed.

**Control function**

Scaling up business; updating systems; labor arbitrage originally, but then later investing in other areas—business consulting as related to marketing

**Real estate in India**

No real involvement. Coburn handled real estate. There was an India team that reported to Coburn.

At most would record transactions, but wasn't involved operationally.

No involvement with LT or CTS withholding payments from LT; recalled CTS withholding payments from vendors generally but that it happened less than 10 times over 10 years.

Doesn't recalls issue with LT.

Recalls conversation of whether cognizant was getting a good deal with LT; Casari did an internal audit on that topic.

No recollection of issues regarding permits or obtaining them before construction; no knowledge of issues at MEPZ or whether CMDA had withheld refunds from them.

**Discussion about cmda refund**

Emails around discussion

Deposit with CMDA related to other pending stat approvals, but was accounting not operational issue

**Turn key model**

Telesmanic knew this involved a vendor delivering CTS a totally finished building; didn't know whether this included obligation to obtain stat approvals.

Discussed accounting of turnkey; capitalize cost of the asset.

Email re: Dec 2013 audit committee meeting. Slide deck "India infrastructure and India real estate procurement update" with language relating to significant delays on environmental clearances and planning permits was shown to him.

He had no recollection of this being raised in that meeting or any other time.

**Pune enviro clearance**

March 28 email in which KVS asked Ganesh to provide formal LT 1 million rupee charge to maharaja pollution control boards because construction began before obtaining clearance

He was copied but didn't remember email; didn't know what enviro clearance was.

Sept 11 email from KVS reL Pune and an EIA licence

He didn't know what EIA stood for or about the lawsuit around it.

Oct 1 email relating to VAT reimbursement

Didn't remember enviro issue

Dec 25 email 2013 relating to enviro clearance, stating a criminal complaint was initiated by MPCB

Didn't remember conversations with anyone about it

**Tax holiday at pune/ckc**

Remembered construction delays don't impact him until facility actually opens; issue was operational.

**4/16/2014 email about commencement of production at Pune after enviro clearance**

Recalled new facilities always had a debate on when to depreciate assets.

**Email relating to Adi Batla—facility at Hyderabad**

Acquired by UBS. Issue of whether there was an impairment on asset

**Stock buyback (increase in tax rates)**

Remembered there was a law firm hired in India to consult on that.

**Compliance concerns**

Had no particular concerns. The company was small and grew rapidly and lacked robust back office functions; didn't have a program like GE but thought they were compliant in trying to do the right thing. Chief compliance role was not robust, funding could be part of it but didn't know of a reason besides business being a driving topic.

Thought corporate functions were stretched from time to time.

Didn't comment on tone at the top from Coburn.

**DLA Pending items**

-remainder of documents to dedupe (about 6k documents to review); review will be complete by end of the week

-response on where sox sub cert process was stored

      -Woltham Massachusetts; a third party administrator runs that; automated questionnaire circulated to people from 3rd party administrator

      -there may be emails reflecting Casari asking people to complete those; Casari was based in Teaneck

DOJ-EH-0000000261