UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

GORDON J. COBURN and
STEVEN SCHWARTZ

Hon. Kevin McNulty

Crim. No. 19-120 (KM)

---

## POST-HEARING BRIEF OF THE UNITED STATES

---

GLENN S. LEON
Chief
1400 New York Ave. NW
Washington, DC 20530
(202) 514-2000

PHILIP R. SELLINGER
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:
SONALI D. PATEL
GERALD M. MOODY, JR.
Fraud Section, Criminal Division
Department of Justice

JONATHAN FAYER
Assistant U.S. Attorney

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................1

ARGUMENT..........................................................................................2

I.    **The Government Did Not Engineer Cognizant's Interviews of the Defendants.**.................................................................2

II.   **Cognizant Was Not a Member of the Prosecution Team.**.....................12

    A.   No Court Has Ever Held That a Private Company is a Member of the Prosecution Team.................................................12

    B.   Cognizant Was Not Acting on the Government's Behalf or Under Its Control...................................................................13

    C.   The Government Conducted an Independent Investigation. .................16

    D.   The Government Has Never Had Ready Access to Cognizant's Files.......................................................................20

**CONCLUSION** ..................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland,*
  373 U.S. 83 (1963) ................................................................ 12, 13, 22

*Garrity v. New Jersey,*
  385 U.S. 493 (1967) ...................................................................... 2, 11

*Gilman v. Marsh & McLennan Companies, Inc.,*
  826 F.3d 69 (2d Cir. 2016) ................................................................. 6

*Roberts v. United States,*
  445 U.S. 552 (1980) ......................................................................... 5

*United States v. Connolly,*
  No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ................. 2, 11

*United States v. Garcia,*
  509 F. App'x 40 (2d Cir. 2013) ............................................................ 13

*United States v. Graham,*
  484 F.3d 413 (6th Cir. 2007) ................................................... 13, 15, 21

*United States v. Holovacko,*
  781 F. App'x 100 (3d Cir. 2019) .......................................................... 13

*United States v. Josleyn,*
  206 F.3d 144 (1st Cir. 2000) ............................................................. 13

*United States v. Ng Chong Hwa,*
  No. 18 Cr. 538 (MKB), Dkt. No. 84 (E.D.N.Y. Sept. 3, 2021) .............................. 11

*United States v. Norris,*
  753 F. Supp. 2d 492 (E.D. Pa. 2010) ..................................................... 16

*United States v. Pelullo,*
  399 F.3d 197 (3d Cir. 2005) ............................................................. 12

*United States v. Reyeros,*
  537 F.3d 270 (3d Cir. 2008) ..................................................... 15, 16, 21

*United States v. Risha,*
  445 F.3d 298 (3d Cir. 2006) ........................................................ passim

*United States v. Tadros,*
  310 F.3d 999 (7th Cir. 2002) ............................................................ 13

**Treatises**

Moore's Federal Practice - Criminal Procedure § 616.06 (2020) ............................... 13

**Constitution, Statutes, and Rules**

U.S.S.G. § 8C2.5(g) ........................................................................................ 5

## PRELIMINARY STATEMENT

For years, the defendants have baselessly claimed that the Government engineered their interviews by Cognizant Technology Solutions Corp. ("Cognizant") and that Cognizant was a member of the prosecution team because the Government "outsourced" its criminal investigation. From the start, the defendants have said they needed to collect the supposed evidence that would somehow prove this was so. Now, after years of litigation, hundreds of pages of defense submissions, and two days of testimony from four witnesses, including two Government prosecutors, the record is finally closed, and it remains much the same as it was on day one. There is no evidence that the Government engineered Cognizant's interviews of the defendants. And the defendants have not established that the Government "outsourced" its investigation to Cognizant. There is no "smoke tokening fire" here for the simple reason that neither of these things happened. Jan. 11, 2023 Hr'g Tr. 8:25 (KM) (DE 438).

The defendants' 93-page post-hearing submission confirms this by what it deliberately omits. It fails to acknowledge, much less address, the consistent testimony that the Government did not direct, influence, or engineer Cognizant's interviews of the defendants, two of which occurred before the Government even became aware of Cognizant's months-long internal investigation of potential Foreign Corrupt Practices Act violations. And it ignores the overwhelming evidence that the Government did not, at any point, control Cognizant, conduct a joint investigation with Cognizant, or have ready access to Cognizant's documents.

For the reasons below and those in the Government's prior submission (DE 399), the Court should deny the defendants' motions.

## ARGUMENT

### I.   The Government Did Not Engineer Cognizant's Interviews of the Defendants.

The defendants have not met their burden under *Garrity v. New Jersey* to show that Cognizant's interviews of the defendants were Government-"engineered," and thus fairly attributable to the Government. 385 U.S. 493 (1967); *see United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *12 (S.D.N.Y. May 2, 2019) ("Of course, it is not enough under *Garrity* that [the company]'s investigation was *generally* fairly attributable to the Government. The [company]'s interviews of [the defendant] must have been Government-*engineered* interviews." (second emphasis added)); DE 96 at 11. No evidence at the April 18-19, 2023, hearing (the "Hearing") even suggests, much less establishes, that the Government directed, influenced, or otherwise engineered those interviews.[1] Instead, the Hearing confirmed what the Government has represented for years: When Cognizant first interviewed Schwartz and conducted its only interview of Coburn, the Government did not know about Cognizant's internal investigation, including the interviews themselves, and the Government did nothing to direct, influence, or engineer the second interview of Schwartz.

---

[1] The defendants' post-hearing submission proposes 156 findings of fact and 86 conclusions of law. *See* DE 482. The Government disputes the relevance and accuracy of many of those proposed findings of fact and conclusions of law. But, for brevity's sake, this brief addresses only those factual and legal issues necessary to show why the defendants' motions should be denied.

Cognizant conducted its first interview of Schwartz on August 28, 2016, and its first and only interview of Coburn on August 29, 2016.[2] *See* DX-61 at CTS_R17_0005258; Defs.' Proposed Findings of Fact ¶ 25 (DE 482); Defs.' Proposed Conclusions of Law ¶ 17 (DE 482). Then, on September 1, 2016, Cognizant disclosed to the Government information about the misconduct underlying the Indictment. *See* DX-54 (CTS_R17_0000246); Apr. 18, 2023 Hr'g Tr. 271:15-18 (Buch); Defs.' Proposed Findings of Fact ¶ 34 (DE 482). In other words, Cognizant's first two interviews of the defendants happened before the Government even entered the picture.

Recognizing the challenge, to put it mildly, of establishing that the Government engineered interviews of which it was not even aware, the defendants promised to "explore" at the Hearing whether there were any "informal" communications between Cognizant and the Government prior to the disclosure. Coburn Br. in Supp. Mot. to Suppress (DE 376-4) at 8 n.7 ("Whether Cognizant engaged in any informal communications with the government prior to [the disclosure on September 1, 2016] requires additional factual development, which we will elicit at the Hearing."); Schwartz Br. in Supp. Mot. to Suppress (DE 377-5) at 8 n.7 (stating that "among the issues that should be addressed at the forthcoming hearing" are whether the Government communicated with Cognizant before the

---

[2] The defendants mistakenly suggest that Coburn's interview occurred on September 29, 2016. *See* Defs.' Proposed Conclusions of Law ¶ 11 (DE 482). Elsewhere, though, they correctly state that interview occurred on August 29, 2016. *See id.* ¶ 17.

September 1, 2016 disclosure). At the Hearing, the witnesses confirmed that no pre-disclosure communication had occurred. Karl Buch, Cognizant's outside counsel from DLA Piper, testified that he first contacted the government to make the disclosure on either August 31 or September 1, 2016, and had no contact with anyone from the Government prior to the disclosure. Apr. 18, 2023 Hr'g Tr. 259:10-14 (Buch); 271:15-272:2 (Buch) ("Q. But up until then, you had had no contact with anybody at the DOJ; is that right? A. That's correct. Q. And nobody at the U.S. Attorney's Office for the District of New Jersey; is that right? A. Correct. Q. And notwithstanding that you had relationships with that office, you never gave them a heads-up that this might be coming in, right? A. Correct."). Kevin Gingras, the Government's lead prosecutor at the time, testified that he had "never even heard of Cognizant" before its disclosure. Apr. 18, 2023 Hr'g Tr. 153:18-154:1 (Gingras). As the Government has long represented, and the testimony confirmed, it had no idea Cognizant's investigation even existed at the time the first two interviews were conducted.

Thus, the only way that the Government could possibly have engineered the first two interviews of the defendants (and the only interview of Coburn) would have been through generally applicable DOJ policies. Schwartz has already correctly conceded that "'DOJ policies, standing alone, cannot create state action.'" Schwartz Reply Br. in Supp. Mot. to Suppress (DE 431) at 17 (quoting Gov. Br. in Opp. to Mots. to Suppress (ECF 399-1) at 31) ("Schwartz agrees, and has never

argued to the contrary.").[3] But Coburn—whose only interview occurred before Cognizant's disclosure—insists that DOJ policies coerced Cognizant to interview him and then disclose the results to the Government. *See, e.g.*, Coburn Reply Br. in Supp. Mot. to Suppress (DE 416-2) at 14. That argument, however, has no factual or legal support.

There was no testimony at the Hearing that a DOJ policy pressured Cognizant to interview the defendants.[4] Rather, Buch testified that Cognizant

---

[3] The U.S. Sentencing Guidelines encourage cooperation with authorities and reporting of crime. *See, e.g.*, U.S.S.G. § 8C2.5(g) (providing credit against culpability score based on factors including whether organization "reported the offense" and "fully cooperated"); *Roberts v. United States*, 445 U.S. 552, 557 (1980) (emphasizing appropriateness of considering failure to cooperate at sentencing, as "[c]oncealment of crime has been condemned throughout our history").

[4] There also was no evidence that DOJ policies compelled Cognizant to self-disclose to the Government. Buch testified that, despite the existence of DOJ policies, such as the Yates Memo, "it's a pretty rare event for a company to self-disclose." Apr. 18, Hr'g Tr. 253:15-16 (Buch); 254:4-8 (Buch). This contradicts the core premise of Coburn's argument—namely, that DOJ policies effectively coerce companies to conduct interviews of their employees and then disclose them to the Government. Were that the case, then most, if not all, companies would disclose to the Government potential criminal conduct they uncover in internal investigations, including employee interviews. Buch, an experienced defense attorney who represented Cognizant, testified to the opposite. Tellingly, none of the defendants' 156 proposed findings of fact includes Buch's testimony about the infrequency of self-disclosure. The defendants nonetheless insist that Cognizant "faced substantial pressure to self-disclose." Defs.' Proposed Findings of Fact ¶ 36 (DE 482). To support this assertion, the defendants cite only (i) statements of Cognizant's attorneys, who advocated, on May 10, 2018 (a year-and-a-half after the company's self-disclosure and over two years after Cognizant initiated its internal investigation), that the Government should not prosecute Cognizant because the company would face negative collateral consequences and (ii) the testimony of Francisco D'Souza, the former Chief Executive Officer of Cognizant, who stated that he was concerned about "reputational damage" to Cognizant if it were convicted of a crime. *Id.* ¶¶ 36-37. These generic concerns would apply to any company facing potential criminal liability. They do not show that Cognizant was "pressured" to self-disclose. Nor do

conducted the interviews of Coburn and Schwartz "for a variety of reasons" that had

nothing to do with the Government, "including potential securities litigation,

employment litigation . . .[and] shareholder derivative lawsuits." Apr. 19, 2023 Hr'g

Tr. 310:9-13 (Buch); 294:21-295:2 (Buch); *see also Gilman v. Marsh & McLennan*

*Companies, Inc.*, 826 F.3d 69, 77 (2d Cir. 2016) (noting that a company "typically

has supremely reasonable, independent interests for conducting an internal

investigation and for cooperating with a governmental investigation, even when

employees suspected of crime end up jettisoned" and finding that "[a] rule that

deems all such companies to be government actors would be incompatible with

corporate governance and modern regulation").

Buch also made clear that the Government did not provide input or direction

regarding any of Cognizant's interviews of Coburn and Schwartz, including

Schwartz's second interview, which occurred on September 23, 2016, about three

weeks after Cognizant disclosed to the Government. *See* Apr. 19, 2023 Hr'g Tr.

277:25-278:6 (Buch) ("[I]t was our investigation, and [the DOJ] never asked us to

ask anyone any specific question . . . [o]r any question at all."); 384:6-9 (Buch)

("Q. Did the government provide any input or direction with regard to any of the

interviews of Mr. Schwartz or Mr. Coburn that the company conducted? A. No.");

---

they suggest that Cognizant was under some unique influence from DOJ policies
that would distinguish it from other companies that "do[] an internal investigation
and decide[] not to disclose" potential criminal conduct, after making a calculated
business decision. Apr. 18, 2023, Hr'g Tr. 254:4-8 (Buch); 252:6-7 (Buch).

DX-131.[5] Buch explained that Cognizant decided "to conduct the second interview of Mr. Schwartz to further its own investigation and ultimately tried to uncover what, if anything, happened in relation to this alleged bribe that occurred in 2014, including trying to investigate whether there were other people who were—in senior management who were involved in that." Apr. 19, 2023 Hr'g Tr. 297:9-14 (Buch).[6]

Likewise, Gingras testified that, sometime after Cognizant's disclosure to the Government on September 1, 2016, he learned of the company's plan to interview

---

[5] The Government also provided no direction or input regarding the rules that Cognizant placed on the process for Schwartz's second interview, including that his attorney could not take notes or make statements. *See* Apr. 19, 2023 Hr'g Tr. 383:24-384:5 (Buch) ("Q. Mr. Buch, two questions. You were asked about the rules that were set with regard to Mr. Schwartz's interview by the company, right? A. Correct. Q. Did the government provide any input or direction with regard to those rules? A. No."); Apr. 18, 2023 Hr'g Tr. 47:4-48:1 (Gingras).

[6] Although Buch questioned Schwartz in his second interview about "willful blindness" and "facilitation payments," Defs.' Proposed Findings of Fact ¶¶ 73-78 (DE 482), that was not done at the Government's direction. Apr. 18, 2023 Hr'g Tr. 154:2-155:14 (Gingras); Apr. 19, 2023 Hr'g Tr. 308:7-13 (Buch). Buch testified that he asked Schwartz about "facilitation payments" because Schwartz had raised the issue of facilitation payments with respect to a different potential bribe and the company had a policy about such payments. Apr. 19, 2023 Hr'g Tr. 305:23-307:9 (Buch). Buch also testified that he asked Schwartz about "willful blindness" because Schwartz had "claimed that he had amnesia and was in a fugue state" after being confronted with the notes he took memorializing the bribery scheme, and Buch "asked a series of questions that were designed to understand his state of mind." Apr. 19, 2023 Hr'g Tr. 309:2-10 (Buch); 310:14-16 (Buch) ("And so certainly trying to understand the chief legal officer's state of mind when he was involved in a conversation involving a $2 million bribe payment was relevant."). Although Buch testified that Schwartz's answers about his mental state might have been pertinent to what Cognizant would ultimately report to the Government, he also made clear those answers would plainly be relevant "for a variety of reasons, . . . including potential securities litigation, employment litigation, . . . [and] shareholder derivative lawsuits." Apr. 19, 2023 Hr'g Tr. 308:14-18 (Buch); 310:9-16 (Buch).

Schwartz a second time, but did nothing to direct, influence, or engineer that interview, which occurred about three weeks later, on September 23, 2016:

> Q. And at some point you learned that the company intended to interview Mr. Schwartz in September of 2016; is that right?
>
> A. Correct.
>
> Q. And did you ask the company to conduct that interview?
>
> A. No.
>
> Q. Did you tell the company that they should not conduct that interview?
>
> A. No.
>
> Q. Did you tell the company how they should conduct that interview?
>
> A. No.
>
> Q. Did you give the company questions that they should ask Mr. Schwartz?
>
> A. Definitely not.
>
> Q. Did you give the company any instruction about the tone that it should take during the interview in asking questions?
>
> A. No.
>
> Q. Did the company tell you how they planned to interview Mr. Schwartz and ask for your input on their plan for the interview?
>
> A. No.
>
> Q. Did they ask for input on their style of questioning?
>
> A. No.
>
> Q. Did they ask for input on the topics that they intended to cover?
>
> A. No.

Q. So you received information about the interview that they
   conducted, but you did not provide any instruction or direction on
   how that interview should be conducted?

A. No. And I will say I think they may have told me that they were
   going to ask him about the notes I think which they recently
   discovered. So I just want to make sure I'm clear about that. But
   that seems like a logical thing they would have told me about, but I
   would not have opined or given them direction, both because I knew
   not to do that and it was so early in the case, I don't know how I
   possibly could have felt empowered to tell them what to say or how
   to ask things, not knowing anything about the case.

Apr. 18, 2023 Hr'g Tr. 154:2-155:15 (Gingras).

Ignoring Buch's and Gingras's consistent testimony that the Government did

not direct (or even have an opinion about) Schwartz's second interview, the

defendants emphasize a series of calls and emails (largely about scheduling)

between the Government and Cognizant that occurred after the disclosure on

September 1, 2016, and before the company's second interview of Schwartz on

September 23, 2023. Defs.' Proposed Findings of Fact ¶ 46 (DE 482); Defs.' Proposed

Conclusions of Law ¶ 36 (DE 482). Despite extensive questioning by defense

counsel, however, there was no testimony at the Hearing that the Government

provided any direction (either explicit or implicit) to Cognizant concerning

Schwartz's second interview in those calls and emails.

The defendants also attempt to attribute Cognizant's second interview of

Schwartz to the Government by claiming that the company had "already decided" to

terminate Schwartz and thus conducted his second interview for no other reason

than to generate evidence for the Government. Defs.' Proposed Findings of Fact ¶ 57

(DE 482); Defs.' Proposed Conclusions of Law ¶¶ 38-40 (DE 482). In making this argument, they brush aside Buch's and D'Souza's unequivocal testimony that Cognizant had ***not*** decided to terminate Schwartz prior to his second interview, but was instead preparing a "contingency plan" after finding notes on Schwartz's laptop that contradicted his statements in his prior interview denying participation in the bribery scheme. Apr. 19, 2023 Hr'g Tr. 290:6-292:1 (Buch); 400:18-23 (D'Souza); 402:14-24 (D'Souza); 403:18-404:23 (D'Souza). Indeed, Buch made clear that the investigation team was "keeping an open mind" to see whether Schwartz was able to explain the notes in his second interview. Apr. 19, 2023 Hr'g Tr. 291:18-292:1 (Buch) (explaining that Cognizant, a "large publicly traded company," "had to prepare for the possibility that after—that—for the possibility that Mr. Schwartz and Mr. Coburn, if they were interviewed, did not have explanations regarding what the investigation had uncovered"). Moreover, prior to Schwartz's second interview, the Government knew nothing of Cognizant's employment decisions regarding Schwartz.[7] Apr. 18, 2023 Hr'g Tr. 52:19-22 (Gingras); 65:2-5 (Gingras)

---

[7] The Government did learn, on October 6, 2016—after Schwartz's second interview and before his planned third interview—that Cognizant had placed Schwartz on paid leave (also known as "garden leave"). *See, e.g.*, DX-14 (DOJ-EH-0000000015-17) (Kevin Gingras Notes from Oct. 6, 2016 Meeting); Apr. 18, 2023 Hr'g Tr. 54:1-11. But the Government did not direct or suggest that Cognizant place Schwartz on paid leave and the third interview never occurred because Schwartz resigned from Cognizant.

("Q. [Y[ou don't know, as of September 23rd, Cognizant had made the decision whether to terminate Mr. Schwartz or not. A. Yeah, I did not know that.").[8]

 In short, the record here is nothing like the one in *Connolly*, where the government "directed Deutsche Bank to investigate [the defendant] on its behalf," "the Bank's first interview of [the defendant] was conducted at the behest of the Government," and the government directed Deutsche Bank's outside counsel "on the precise manner in which he should ask questions" to aid the government's case. *Connolly*, 2019 WL 2120523, at *11-12. Here, by contrast, the Government did not even know about the first interviews of Coburn and Schwartz, and it did not direct or influence the second interview of Schwartz, which it learned about only days after receiving Cognizant's disclosure and days before the interview itself took place.[9]

 For these reasons, the defendants have not met their "burden of showing that [their] interview statements are subject to *Garrity* protection," *Connolly*, 2019 WL 2120523, at *11, and the Court should deny their motions to suppress.

---

[8] Gingras also testified that he was unaware of Cognizant's employment-related plans for Coburn before his resignation. Apr. 18, 2023 Hr'g Tr. 152:1-22 (Gingras).

[9] *Connolly* is inapposite for many reasons. The facts in *Connolly* were unique—it "was no ordinary 'outside' investigation"—and nothing like the circumstances here. 2019 WL 2120523 at *12. For example, in *Connolly*, there was "very little evidence" that the government undertook its "own independent investigative efforts." *Id.* Here, by contrast, as outlined in more detail below, the Government conducted a thorough, independent investigation. *See United States v. Ng Chong Hwa*, No. 18 Cr. 538 (E.D.N.Y.) (MKB), Dkt. No. 84 at 131 (Sept. 3, 2021) (Redacted Order) (distinguishing *Connolly* where the Government "took significant independent investigative steps beyond seeking information from the [cooperating third party]").

## II.    Cognizant Was Not a Member of the Prosecution Team.

The defendants also failed to establish at the Hearing that Cognizant is a member of the prosecution team because the Government supposedly "outsourced" its criminal investigation to the company.

### A.    No Court Has Ever Held That a Private Company is a Member of the Prosecution Team.

The Government's duty to disclose material exculpatory evidence extends only to materials in the Government's actual or constructive possession. *See United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). To show that Cognizant is a member of the prosecution team—and that the Government therefore constructively possesses Cognizant's documents—the defendants would need to satisfy the three-factor test from *Risha*: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which [the third party] and federal government[] are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *Id.* at 304; *see also United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005) (holding that Pension and Welfare Benefits Administration was "not a member of the prosecution team" for *Brady* purposes).

The Government knows of no case holding that a private company was a member of the prosecution team because it cooperated with the Government. To the contrary, "cooperating private parties . . . have their own set of interests" and "[t]hose private interests . . . are often far from identical to—or even congruent

12

with—the government's interests." *United States v. Josleyn*, 206 F.3d 144, 154 (1st Cir. 2000) (holding that American Honda was not a part of the prosecution team investigating a kickback scheme at the company because "while prosecutors may be held accountable for information known to police investigators, . . . we are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests"); *see United States v. Holovacko*, 781 F. App'x 100, 105 (3d Cir. 2019) (non-precedential) ("It would be particularly unusual to find prosecutors in constructive possession of evidence held by Merrill Lynch, a private party, since private parties' interests in this context 'are often far from identical to—or even congruent with—the government's interests.'" (quoting *Josleyn*, 206 F.3d at 154)); *United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) (non-precedential) ("[T]his Court has never held that the 'prosecution team' includes cooperating witnesses.").[10]

The Hearing confirmed that, here too, Cognizant, a cooperating private company, is not a member of the prosecution team.

B. <u>Cognizant Was Not Acting on the Government's Behalf or Under Its Control.</u>

The evidence and testimony at the Hearing showed that Cognizant did not act on the Government's behalf or under its control, but instead conducted an

---

[10] *See also United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) ("[C]ooperating witnesses . . . stand in a very different position in relation to the prosecution than do police officers and other governmental agents."); *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) (prosecution had no *Brady* obligation with respect to tape recordings of conversations made by insurance company); Moore's Federal Practice – Criminal Procedure § 616.06 (2020) ("If the material is in the possession of . . . a private party, the prosecution does not have constructive possession and has no obligation to obtain the evidence and make disclosure.").

independent investigation. *See* Apr. 19, 2023 Hr'g Tr. 335:11-14 (Buch)

("[Cognizant] had an independent investigation that we were conducting, and . . .

there were multiple reasons why we were conducting the investigation.").

Cognizant began its internal investigation in late April or May 2016, several

months before its disclosure to the Government. *See* DX-56; Apr. 18, 2023 Hr'g Tr.

238:6-10 (Buch). After becoming aware of Cognizant's internal investigation in

September 2016, the Government neither directed nor controlled Cognizant's

investigation. *See* Apr. 18, 2023 Hr'g Tr. 80:11-14 (Gingras) ("I knew that we were

not to direct the company's investigation. My AUSA partner knew that as well. And

that's something that wouldn't have happened. So we weren't directing them."). For

example, at the Hearing:

- Buch testified that the Government did not direct or suggest that Cognizant interview any witness, direct or suggest any questions be posed to a particular witness, or suggest how Cognizant should interview a witness. *See* Apr. 19, 2023 Hr'g Tr. 277:25-278:1 (Buch); 288:13-24 (Buch);

- Gingras and David Last, the prosecutor who replaced Gingras when he left the Department in 2018, both testified that they did not tell Cognizant how to perform interviews, whom to interview, or what questions to ask. *See* Apr. 18, 2023 Hr'g Tr. 42:12-22 (Gingras); Apr. 19, 2023 Hr'g Tr. 226:6-23 (Last);[11]

- Gingras testified that the Government provided no guidance to Cognizant on whether to discipline employees. *See* Apr. 18, 2023 Hr'g Tr. 61:1-10 (Gingras); *see also* DX-16 at DOJ-EH-0000000136 (paralegal notes stating

---

[11] The defendants claim that the "Government provided feedback and direction to DLA regarding the manner in which it was conducting interviews." Defs.' Proposed Findings of Fact ¶ 126 (DE 482). To support this baseless allegation, the defendants point to a Government request that DLA Piper first speak to the Government before showing a document to a witness in an interview that that witness had not previously received. *See id*. But the defendants omit Buch's testimony that he did ***not*** agree to the request. Apr. 19, 2023 Hr'g Tr. 335:8-20 (Buch). DLA Piper's refusal to accede to the Government's request shows that the Government did not control Cognizant.

"[Government prosecutor to defense counsel]: And you guys are proposing separation? Let me get back to you on that one. At the end of the day, it's your decision."); DX-17 at DOJ-EH-0000000206 (paralegal notes stating "[Defense counsel]: Also consistent with the DOJ de-confliction policy, we made sure those people were available to us and you. [Kevin Gingras]: We appreciate that and it is the company's decision.");

- Last testified that the Government issued a grand jury subpoena to Cognizant to compel it to produce documents. *See* Apr. 18, 2023 Hr'g Tr. 200:16-201:10 (Last); *see also Graham*, 484 F.3d at 417 (cooperating witness remained independent actor as evidenced by fact that government "had to serve a subpoena on him to compel the production of documents"); and

- Buch testified that Cognizant withheld documents from the Government on the basis of attorney-client privilege. *See* Apr. 18, 2023 Hr'g Tr. 214:9-14 (Last) (Cognizant withheld documents as privileged); Apr. 19, 2023 Hr'g Tr. 345:6-346:8 (Buch) (Cognizant asserted privilege over its interview memos and refused to produce them to the government); *see also Graham*, 484 F.3d at 417-18 ("Another clear indication of Allen's independence from the Government is the fact that Allen refused to provide the Government with materials that were covered by the attorney-client privilege.").

Unsurprisingly, Cognizant proactively provided information and documents to the Government, made factual presentations, and responded to Government requests for information and documents—as cooperating companies routinely do in white-collar criminal investigations across the country. And as it could with any cooperator, the Government at times requested or subpoenaed documents and information from Cognizant. But that does not mean the Government controlled Cognizant or that Cognizant's actions could bind the Government.[12] *See United*

---

[12] The defendants also falsely claim that the Government and Cognizant "worked together to sequence witness interviews." Defs.' Proposed Findings of Fact ¶ 125 (DE 482). Gingras testified that, in order to de-conflict the Government's criminal investigation and Cognizant's internal corporate investigation, he may have asked Cognizant to tell the Government when it was going to interview its employees. Apr. 18, 2023 Hr'g Tr. 41:18-42:2 (Gingras). De-confliction occurs when the Government requests that a cooperating company, such as Cognizant, not interview an employee until after the Government interviews them. Other than a few references in paralegal notes to the Government expressing a preference to

*States v. Reyeros*, 537 F.3d 270, 284 (3d Cir. 2008) ("The mere fact that documents may be obtainable is insufficient to establish constructive possession."); *United States v. Norris*, 753 F. Supp. 2d 492, 530 (E.D. Pa. 2010) ("While the companies entered into cooperation agreements with the Antitrust Division, they were not—by any means—agents of the Antitrust Division.").

C. <u>The Government Conducted an Independent Investigation.</u>

The Hearing also established that the Government conducted a thorough, independent investigation, and that Cognizant was not a member of the Government's team or otherwise engaged in a joint enterprise with the Government. *See Risha*, 445 F.3d at 305.

Gingras and Last walked through numerous independent investigative steps taken by the Government, including, among others:

- conducting 23 witness interviews, which, other than one interview of a minor technical witness, were done without anyone from Cognizant or DLA Piper present, *see* Apr. 18, 2023 Hr'g Tr. 218:17-219:16 (Last);

- travelling to Singapore to interview four employees of Larsen & Toubro ("L&T"), the construction company that paid the $2 million bribe authorized by the defendants, without the knowledge or involvement of Cognizant, *see* Apr. 18, 2023 Hr'g Tr. 158:12-16 (Gingras), 221:17-222:7 (Last);

- meeting with counsel for L&T to gather documents and information from the company, as well as arrange interviews of its employees, *see* Apr. 18, 2023 Hr'g Tr. 157:25-158:11 (Gingras), 222:8-22 (Last);

- obtaining medical records and interviewing Schwartz's doctors to investigate his claim that he was in a fugue state when participating in calls in which the bribe demand was discussed, *see* Apr. 18, 2023 Hr'g Tr. 223:6-12 (Last);

---

interview a witness before Cognizant—which, as defendants note repeatedly, interviewed all the witnesses before the Government—there is no evidence that the Government ever asked Cognizant to hold off on interviewing any particular witness or that Cognizant complied with any such request.

- issuing more than 25 grand jury subpoenas, from November 2016 to January 2019, for records from various third parties, including credit card companies, phone companies, and financial institutions, *see* Apr. 18, 2023 Hr'g Tr. 224:7-23 (Last);

- obtaining a court order pursuant to 18 U.S.C. § 2703(d) for an email account associated with the case, *see* Apr. 18, 2023 Hr'g Tr. 225:2-8 (Last); and

- setting up a system for the Government's document review, including hiring a vendor, *see* Apr. 18, 2023 Hr'g Tr. 112:9-12 (Gingras); 225:13-226:2 (Last).

Gingras and Last further testified that they did not merely accept the information Cognizant provided, but rather did their own independent assessment in light of all the evidence collected throughout the investigation. *See* Apr. 18, 2023 Hr'g Tr. 112:13-19 (Gingras) ("And we knew we'd gotten a version of events from the company, but that was the company's version. We're not on the same team, and I understand they have an agenda. They want cooperation credit, and they want a certain result at the end of the day. But we're doing our own—we're taking our own steps to understand the case and focus our investigation on where we're trying to go."); Apr. 18, 2023 Hr'g Tr. 227:8-10 (Last) ("A cooperator provides information, you take the information and you use it for follow-on investigation. That's exactly what was done here.").[13]

_____

[13] Contrary to defendants' suggestion, the Government began conducting its own investigation soon after it opened the case in September 2016. Prior to first interviewing Srimanikandan Ramamoorthy in February 2017, the Government was, among other things, reviewing thousands of pages of documents produced by Cognizant, preparing draft chronologies to understand the facts of the case, taking steps to preserve evidence, issuing subpoenas to gather more information, and attempting to schedule interviews with witnesses in foreign countries. *See* Apr. 18, 2023 Hr'g Tr. 132:10-22 (Gingras); 158:5-159:9 (Gingras); 219:17-221:112 (Last). The defendants want to have it both ways: On the one hand, they argue that the Government's review of documents it collected does not amount to investigative

17

The defendants' post-hearing submission effectively ignores this testimony and instead cherry-picks isolated phrases (like the colloquial use of the word "we") out of hundreds of pages of paralegal notes in a failed effort to paint a misleading picture that Cognizant was acting jointly with the Government to investigate this case. For example, the defendants claim that Cognizant gave the Government a "road map" for its investigation by providing oral summaries of 45 interviews that DLA Piper conducted of Cognizant employees, prior to the Government conducting its first interview of Srimanikandan Ramamoorthy on February 7, 2017, in Rome. *See* Defs.' Proposed Findings of Fact ¶¶ 108-115; Defs.' Proposed Conclusions of Law ¶ 74.[14] As an initial matter, the Government neither participated in, nor directed, the interviews conducted by Cognizant. *See supra* at 6-10, 14. Cooperating companies routinely provide summaries of their interviews to the government in white-collar investigations, and no court has held that doing so makes them a member of the Government's prosecution team. Moreover, the Government did not, as the defendants falsely claim, passively receive summaries of witness's prior statements. When interviewing a witness with whom Cognizant had already spoken, the Government did not rely on Cognizant's oral interview summary, but

---

work (Defs.' Proposed Conclusions of Law ¶ 56 (DE 482)) and, on the other, they claim that the Government simply accepted Cognizant's version of events (*id.* ¶ 57).

[14] The defendants note that Cognizant conducted approximately 450 interviews during its internal investigation and only provided summaries of approximately 45 interviews to the Government. *See* Defs.' Proposed Findings of Fact ¶ 112 (DE 482). The defendants fail to mention, however, that only 95 of those interviews related to the bribery scheme in the Indictment. *See* Apr. 18, 2023 Hr'g Tr. 159:10-162:11 (Gingras) (discussing DX-61).

instead conducted its own interview and made its own determination as to that witness's credibility. *See* Apr. 18, 2023 Hr'g Tr. 100:20-101:4 (Gingras) (stating that he made his own "separate, independent assessment" of every witness's credibility); 228:2-16 (Last) (same).

The defendants also claim that the Government delegated key prosecutorial functions to Cognizant, including making determinations about what was relevant to the case and what was exculpatory. *See* Defs.' Proposed Findings of Fact ¶¶ 148-52.[15] That did not happen.

The grand jury subpoena that the Government issued to Cognizant on November 8, 2018, compelled Cognizant to produce documents that were responsive to broad requests related to the facts later alleged in the Indictment, from numerous custodians, including the defendants. *See* DX-80. These requests compelled Cognizant to produce documents regardless of whether they were relevant, exculpatory, or inculpatory. Last testified that he made this clear to Buch during a call on November 5, 2018, a few days before issuing the subpoena:

> We issued them a subpoena that would require them to produce anything that was exculpatory or inculpatory. I was very clear with Mr. [Buch] that it was our job as the prosecutor to determine what would be exculpatory or inculpatory or otherwise.

---

[15] For example, the defendants claim that Cognizant, at the Government's request, investigated Schwartz's medical excuse for being in a fugue state during the week in April 2014 when he authorized the bribe that is the subject of the Indictment. Defs.' Proposed Conclusions of Law ¶ 74 (DE 482). But Buch testified that DLA Piper obtained Schwartz's medical records through Schwartz's attorney, who offered to collect them because he wanted to show the company there was merit to Schwartz's claim. Apr. 19, 2023 Hr'g Tr. 323:5-324:23 (Buch). Buch also testified that DLA Piper took additional steps to investigate Schwartz's medical alibi to further its own investigation, not at the Government's request. *Id.*

Apr. 18, 2023 Hr'g Tr. 205:9-13 (Last). Last's explanation of his contemporaneous

notes of the call provide a similar account:

> So what I said to Mr. Buch was our obligations, meaning DOJ's—our
> obligation as prosecutor, and we're required that we make
> determinations regarding what's exculpatory and favorable
> material . . . . Mr. Buch then responded that he—they—Cognizant,
> DLA—are not the government agent. I then responded I agree, which
> is why I underlined it three times. I said you're not our agent. It's the
> company's obligation to produce all responsive materials.

Apr. 18, 2023 Hr'g Tr. 199:24-200:8 (Last); *see also* DX-82 at DOJ-EH-0000000322.

When shown the same notes, Buch testified, "I don't remember telling Mr. Last that

the company and DLA were not his agent. But that would be true." Apr. 19, 2023

Hr'g Tr. 365:21-23 (Buch).

   While Buch confirmed that DLA Piper undertook a review for exculpatory

material in 2016 and 2018, he made it clear that the Government had never asked

Cognizant to do so. Apr. 19, 2023 Hr'g Tr. 361:24-362:13 (Buch). Buch explained

that, in both instances, DLA Piper had conducted the review "at the company's

direction, not at the government's direction." Apr. 19, 2023 Hr'g Tr. 363:10-364:15

(Buch). DLA Piper produced information identified in the course of that review to

the Government, which then provided it to the defendants in discovery. Apr. 19,

2023 Hr'g Tr. 367:5-368:14 (Buch).

   D. <u>The Government Has Never Had Ready Access to Cognizant's Files.</u>

   The defendants also are unable to satisfy the third *Risha* factor because the

Government has never had ready access to Cognizant's files. *See Risha*, 445 F.3d at

304.[16] Indeed, the Government issued Cognizant a grand jury subpoena to compel it to produce documents in the company's possession. *See* Apr. 18, 2023 Hr'g Tr. 201:5-10 (Last) ("[W]e, collectively as a team, wanted to issue a subpoena so the company would be compelled to produce material and that then they would produce what's responsive, not what they deemed relevant, not what they deemed interesting, but what was responsive.").

Moreover, Cognizant withheld privileged documents from the Government that were arguably responsive to the Government's document requests and its subpoena. *See* Apr. 19, 2023 Hr'g Tr. 353:13-15 (Buch); 215:11-18 (Last). It is clear from Cognizant's assertions of privilege that the Government did not have "ready access" to evidence in Cognizant's possession. *See Graham*, 484 F.3d at 417-18 ("Another clear indication of Allen's independence from the Government is the fact that Allen refused to provide the Government with materials that were covered by the attorney-client privilege.").

The defendants falsely claim that the Government did not push back on Cognizant's privilege assertions. *See* Defs.' Proposed Conclusions of Law ¶¶ 75-86. The record, however, shows that the Government in fact reviewed and questioned Cognizant's privilege logs. *See* Apr. 18, 2023 Hr'g Tr. 215:11-216:25 (Last); 355:8-358:14 (Buch). More fundamentally, as the Court noted at the Hearing, the

---

[16] The defendants also wrongly claim that the third *Risha* factor is satisfied because the Government has the ability to access Cognizant's files through the cooperation provision in the declination agreement. *See* Defs.' Proposed Conclusions of Law ¶ 79 (DE 482). "The mere fact that documents may be obtainable is insufficient to establish constructive possession." *Reyeros*, 537 F.3d at 284.

defendants' argument "jumps several steps ahead," by assuming that Cognizant was "inside the *Brady* tent" to begin with. Apr. 19, 2023 Hr'g Tr. 343:22-344:5. As shown above, that is not the case. Indeed, Cognizant's privilege assertions demonstrate why it is not—and has never been—a member of the prosecution team. The defendants cannot have it both ways by arguing that Cognizant withheld documents from the Government, on the one hand, and that it was acting as a government agent, on the other.

* * * * *

The evidence at the Hearing confirmed that the defendants cannot make the showing required under *Risha.* Cognizant was not under the Government's control or acting on its behalf; Cognizant was not participating in a "joint investigation" or sharing resources with the Government; and the Government did not have ready access to Cognizant's files. Accordingly, the defendants' motion to require the Government to search through Cognizant's files for *Brady* material should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny the defendants' motions.

| | |
|---|---|
| GLENN S. LEON | PHILIP R. SELLINGER |
| Chief | United States Attorney |
| | |
| */s/ Gerald M. Moody, Jr.* | */s/ Jonathan Fayer* |
| _____ | _____ |
| SONALI D. PATEL | JONATHAN FAYER |
| GERALD M. MOODY, JR. | Assistant U.S. Attorney |
| Fraud Section, Criminal Division | District of New Jersey |
| U.S. Department of Justice | |