

Lawrence S. Lustberg
Director

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4731 Fax: 973-639-6285
llustberg@gibbonslaw.com

June 28, 2023

**VIA ECF**

Honorable Kevin McNulty
United States District Judge
Lautenberg U.S. Post Office & Courthouse
Federal Square
Newark, New Jersey 07102

      Re:   *United States v. Coburn & Schwartz*,
               **Criminal No. 19-120**

Dear Judge McNulty:

      Please accept this letter on behalf of defendants Gordon Coburn and Steven Schwartz to briefly address certain aspects of the Government's post-hearing brief, ECF No. 485, filed in response to the Defendants' Proposed Findings of Fact and Conclusions of Law, ECF No. 482. As set forth below, the Government's brief applies the wrong legal standard to both the *Garrity* and *Brady* claims at issue, and in doing so seeks to avoid the facts that the Court has carefully allowed the defense to develop over the last several years—over the Government's and Cognizant's consistent objections—and which are concretely and specifically set forth in the Defendants' Proposed Findings, almost all of which remain unrebutted.

      Although the Government purports, "for brevity's sake," to address "only those factual and legal issues necessary" for resolution of the Defendants' motions to suppress and for other relief pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), and other authorities, Gov't Br. at 2 n.2, its consideration of those issues is necessarily limited by its use of the wrong standard, one which fails to consider the range of factors to which courts have looked in determining whether a private actor's conduct—here, Cognizant's—is "fairly attributable" to the Government. That is the applicable standard: as this Court has put it, the *Garrity* exclusionary rule "'applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are fairly attributable to the government,' *i.e.*, when 'there is a sufficiently close nexus between the state and the challenged action.'" ECF No. 268 at 14 n.7 (quoting *Garrity*, 385 U.S. at 495-96; *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019)). As it was summarized in *Connolly*, this fact-based standard can be met in a variety of ways:

> [A] close nexus of state action exists between a private entity and the state when a governmental actor *(i)* exercises coercive power; *(ii)* is entwined in the management or control of the private actor; *(iii)* provides the private act[or] with significant encouragement, either over[t] or covert; *(iv)* engages in a joint activity in which the private actor is a willful participant; *(v)* delegates a public function to the private actor; or *(vi)* entwines the private actor in governmental policies.

2019 WL 2120523, at *10 (citing *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008)).

GIBBONS P.C.

June 28, 2023
Page 2

Nowhere in its post-hearing brief does the Government even acknowledge, much less apply, this established legal standard or the factors that courts use to govern its interpretation. Instead, the Government repeatedly suggests that the only circumstances in which Cognizant's interviews of the Defendants can be fairly attributable to the Government is if they were "directed" or overtly "engineered."[1] Gov't Br. at 1, 2, 7, 8, 9, 11. But that is not the law. To the contrary, in construing the "fairly attributable" standard, courts have made clear that "[t]he 'controlling factor' is *not* whether the state directed the constitutionally prohibited conduct, but whether the state 'involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'" *Connolly*, 2019 WL 2120523, at *11 (quoting *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) (emphasis added). Indeed, "[t]he state's involvement is no less real for having been indirect and no less impermissible for having been concealed. The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect." *Montanye*, 500 F.2d at 415; *see also Evans v. Newton*, 382 U.S. 296, 299 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."); *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 491 (1st Cir. 1996) ("Ultimately, a finding of either direct or indirect state action would suffice to sustain Plaintiffs' [claim of constitutional violation].").

The Government's focus on a single phrase from *Connolly* that comes two pages after Chief Judge McMahon recounted the applicable legal standard—*i.e.*, the court's statement that the interviews at issue "must have been Government-engineered," *Connolly*, 2019 WL 2120523, at *12—and its interpretation of that phrase without reference to the analysis that both precedes and follows it, distorts what Chief Judge McMahon meant. "[D]eeply troubled" by a growing trend of private employers performing Government functions—and, in particular, the "profound implications" of the Government "routinely outsourcing" its investigatory responsibilities "to the targets of [its] investigations, who are in a uniquely coercive position vis-à-vis potential targets of criminal activity," *id.* at *1[2]—Chief Judge McMahon identified and applied a number of specific,

---

[1] The Government also asserts at various points that it did not "influence" the Defendants' interviews. But that is demonstrably false, including because DOJ policies concededly guided Cognizant's self-disclosure and actions throughout the investigation—specifically in connection with the Defendants' interviews. *See* ECF No. 482, Proposed Conclusions of Law ¶¶ 30-42.

[2] Much has been written about this trend, including the distinct implications that it has on individual employees like Schwartz and Coburn. *See, e.g.*, Joshua L. Ray, The Continuing Façade of FCPA Enforcement: A Critical Look at the Telia DPA, 17 N.Y.U. J. L. & Bus. 547, 556 (2021) ("The overall purpose of the Yates Memo was to strengthen the DOJ's pursuit of individual corporate wrongdoing, by, in part, denying companies any cooperation credit unless they 'completely disclose to the [DOJ] all relevant facts about individual misconduct.' The predictable effect of this policy shift has been to further ratchet up the pressure on corporate defendants to not

GIBBONS P.C.

June 28, 2023
Page 3

objective criteria that would be useful to her, and to future courts, in deciding the legal issue before her:[3] whether the private employer's actions in compelling the interviews at issue should, consistent with the standard articulated at the outset of the court's analysis, be deemed "fairly attributable" to the Government for *Garrity* purposes. These factors, supported by precedent, include not only the circumstances surrounding the interviews themselves, *see* ECF No. 482, Proposed Conclusions of Law ¶¶ 25, 33-52, but also the company's and the Government's conduct both before and after the interviews. *Id.* ¶¶ 24, 28-32 (pressure to cooperate and alignment of

---

only decline to challenge law enforcement's allegations, but to gear internal investigations towards identifying evidence of their employees' personal guilt, even where it may not be clear that such guilt exists."); Aruna Viswanatha & Dave Michaels, Flaws Emerge in Justice Department Strategy for Prosecuting Wall Street, WALL ST. J. (July 5, 2021) ("The system of corporate cooperation creates such strong incentives for companies to assist the government with its investigations that it can lead to corporate counsel acting like deputized members of the Department of Justice rather than private defense lawyers"); Richard F. Albert, Issues Raised by the "Outsourcing" of Government Investigations, City Bar Center for Continuing Legal Education (Sept. 18, 2019) ("Over time, as the government has leveraged its enormous power to decide whether or to what degree to prosecute corporations for the actions of their employees, corporations have gone to greater and greater lengths to seek to impress prosecutors with the thoroughness and vigor of their "investigations for hire." The extent to which an excessively symbiotic relationship between a theoretically internal investigation and the government prosecutors for whom such investigation is being pursued can effectively turn that investigation into a government operation has been the subject of significant recent litigation."); DLA Piper White Collar Alert, *US v. Connolly* and the potential pitfalls of cooperation in internal investigations (May 8, 2019) ("Judge McMahon's opinion is a clear warning shot to government lawyers against delegating core investigative functions to outside counsel for targets or subjects of their investigations. This should drive government agencies to reassess how they interface with outside counsel and promote more active participation by the government in all phases of the investigation.").

[3] Chief Judge McMahon's careful analysis in this regard represents the traditional development of doctrine in a legal system like ours: higher courts set forth broad standards which lower courts develop by identifying relevant factors that allow them to determine those standards have been met. *See, e.g.*, The Tyranny of Choice and the Rulification of Standards, 14 J. Contemp. Legal Issues 803, 804-05 (2005) (describing how subsequent courts interpret and elaborate upon rules set forth by an earlier court); Michael Coenen, Rules Against Rulification, 124 Yale L.J. 646, 656 (2014) (noting how lower courts develop standards to interpret rules set forth by the Supreme Court). The Government's approach seeks to interfere with this development of doctrine by ignoring, rather than interpreting, the factors described in *Connolly*. But the Court should contribute rather than detract from the salutary process begun by Judge McMahon, moving the process forward rather than backward.

GIBBONS P.C.

June 28, 2023
Page 4

priorities); ¶¶ 26, 53-64 (providing an investigative roadmap for the Government); ¶¶ 27, 54-56 (the extent of the Government's independent investigative activities).

In its post-hearing brief, the Government ignores these criteria, along with the proofs specifically set forth in the Defendants' Proposed Findings establishing that all of the pertinent factors were satisfied in this case. *Id.* Instead, the Government focuses entirely upon the "Government-engineered" language from *Connolly*, interpreting it to supply a standalone, governing standard requiring Government "direction" and confining its argument to the facts that it believes are pertinent to that standard—all of which are focused exclusively on the circumstances surrounding the Defendants' interviews alone.[4] But as is evident from Chief Judge McMahon's analysis in *Connolly*, that is not what she meant when she used the phrase "Government-engineered," which instead connotes the multifactorial approach that she in fact undertook before concluding that "the Government violated *Garrity*, because [the company's] interviews of [the defendant], for which he was compelled to sit under threat of termination, are fairly attributable to the Government." *Connolly*, 2019 WL 2120523, at *14.

That said, even if the Government's narrow, invented formulation of the "fairly attributable" standard had support in the law, it would be satisfied by the proofs here. In this regard, although the Government is correct that DOJ policies like the Yates Memo and FCPA Pilot Program, standing alone, do not necessarily create state action, those policies and the "obvious incentives to shift blame" that this Court has recognized they provide, ECF No. 263 at 23, exert enormous pressure on companies to cooperate and are, as the *Connolly* court held, "highly relevant to any assessment of the sufficiency of the nexus between the Government and [the private company]'s 'internal' investigation." *Connolly*, 2019 WL 2120523, at *13. This is far from a hypothetical in this case, where the record makes very specifically clear that those policies were in fact the basis for Cognizant's self-disclosure to the Government and its investigative activities throughout, including in connection with the Defendants' interviews in particular. ECF No. 482, Proposed Findings of Fact ¶¶ 38-45; Proposed Conclusions of Law ¶¶ 28-32. Indeed, Cognizant and its counsel placed particular emphasis on their handling of the Defendants' interviews when touting their cooperative efforts with the Government, highlighting that their persistence in securing Schwartz's and Coburn's interviews was "a distinguishing factor in the Company's

---

[4] It is only by doing so that the Government can contend that the record following "years of litigation," including extensive discovery in response to subpoenas, multiple orders from the Court enforcing those subpoenas, "hundreds of pages of defense submissions," and "two days of testimony from four witnesses, including two Government prosecutors," "remains much the same as it was on day one." Gov't Br. at 1. That, of course, is not a fair or accurate characterization of the record, as is apparent throughout the Defendants' 156-paragraph Proposed Findings of Fact, ECF No. 482, and can only be justified by using the narrow view of the governing legal standard—equating the phrase "Government-engineered" with "Government-directed" and focusing exclusively on the circumstances surrounding the Defendants' interviews—that the Government advocates.

June 28, 2023
Page 5

cooperation" and demonstrated Cognizant's efforts to comply with the Government's stated priorities. ECF No. 482, Proposed Findings of Fact ¶¶ 68, 107.

But the influence of the Government on Cognizant's interviews of Schwartz and Coburn was far from limited to the promulgation and application of its policies. Following three weeks of extensive communication with the Government, *see id.* ¶¶ 46-56, Cognizant conducted a second interview of Schwartz on September 23, 2016 that was deliberately designed to elicit statements for use in the Government's prosecution of Schwartz that the Government could not have obtained itself. *Id.* ¶ 68-69, 74-76; Proposed Conclusions of Law ¶¶ 37-42. That this was Cognizant's intention became all the more apparent with the revelation that it had already decided to terminate Schwartz and Coburn three days prior to Schwartz's second interview, but did not alert them to this fact and instead endeavored to require each, on pain of termination, to continue cooperating, including, in Schwartz's case, by sitting for his September 23, 2016 interview.[5] ECF No. 482, Proposed Findings of Fact ¶¶ 57-69.

In this regard, the Government's argument that the evidence is "unequivocal" that "Cognizant had *not* decided to terminate Schwartz prior to his second interview, but was instead preparing a 'contingency plan'" is inaccurate for at least three reasons. Gov't Br. at 10. First, it ignores that Cognizant and its counsel specifically told the Government that they held off on terminating Schwartz because they were attempting to elicit additional information from him to then provide to the Government. *Id.* ¶ 64. Second, the suggestion that Cognizant merely had a "contingency plan" in place to terminate Schwartz does not square with the fact that the draft press release announcing his termination was shared with, among many others, three of Schwartz's direct reports, subordinates who would not have been apprised of this development were it merely hypothetical, as the Government posits. *Id.* ¶ 59 (Cognizant's CEO, Francisco D'Souza, testified that the company was "working through contingency plans" at the time but does not recall another instance in his career having sent draft press releases announcing supervisors' terminations to their direct reports before a decision to terminate those supervisors had been made). And third, there is not a shred of documentary evidence of contemporaneous discussions at Cognizant regarding this purported "contingency plan," nor for that matter of any other contingencies that were being considered with respect to Schwartz's employment status at Cognizant. *Id.*

As for the Government's contention that "the record here is nothing like the one in *Connolly*," Gov't Br. at 10, that is decidedly not the case, as the Proposed Findings show. Though the Government ignored them, every one of the objective factors that the *Connolly* court identified and applied, and that justified the court's conclusion that the company's interviews of the

---

[5] Coburn and Schwartz were not the only Cognizant employees whom the Company held off on terminating in furtherance of its cooperative efforts. Cognizant also shared with the Government other planned employment actions regarding key witnesses, including Srimanikandan Ramamoorthy ("Mani") and Sridhar Thiruvengadam ("Sridhar")—both of whom are now Government witnesses—and, most importantly, explicitly sought the Government's reaction before taking those planned actions. *Id.* ¶¶ 65-68.

GIBBONS P.C.

June 28, 2023
Page 6

defendant were fairly attributable to the Government, is also present here. *See* ECF No. 482, Proposed Conclusions of Law ¶¶ 24-56. And the specific evidence that Cognizant's investigation was "no ordinary 'outside' investigation" is equally compelling, if not more so, than it was in *Connolly*: throughout Cognizant's over two-year investigation, the Company and its counsel effectively acted as the Defendants' prosecutor-by-proxy, investigating potential defenses on behalf (and in some cases at the specific request) of the Government; making relevance and other evidence-related determinations when reviewing and selectively producing documents to the Government; identifying potential Government witnesses, including experts, at the Government's request; and even undertaking a *Brady* review for the Government after the defense called into question whether Cognizant was concealing known exculpatory information from the Government. *Id.* ¶¶ 53-64. Indeed, the Government's dismissal of *Connolly* as "inapposite" ignores this Court's rulings that led to these proofs. Gov't Br. at 10 n.11. In September 2020, when the Court authorized the issuance of subpoenas addressed to the nature and extent of the relationship between Cognizant and the Government, it determined that, because it had "a less complete record than the one that was before Judge McMahon" in *Connolly*, it would "convene a hearing on the outsourcing itself." ECF No. 96 at 11 n.11. The Court then facilitated the Defendants' "valid attempt to obtain by subpoena evidence relevant to the defense of criminal charges" by enforcing the Court-authorized subpoenas in multiple opinions, *see* ECF Nos. 263, 339, before ultimately convening on April 18-19, 2023 the evidentiary hearing that it said it would, over the Government's objection.

In sum, the Government attempts to elide the appropriate inquiry by employing a standard that is far too narrow, that is unfaithful to Chief Judge McMahon's analysis in *Connolly*, and that ignores the factors that courts have developed to give meaning to the actual standard—whether Cognizant's actions in obtaining the Defendants' statements are "fairly attributable" to the Government. Under the caselaw that the Government does not even attempt to address, satisfaction of that standard is not governed by whether the interviews at issue were directed by the Government, nor is the inquiry confined to the circumstances surrounding the interviews alone. Rather, the Court is required, as it has previously recognized, *see* ECF No. 268 at 14 n.7, to determine whether there was a "sufficiently close nexus" between the Government and Cognizant's conduct during its investigation, including the Defendants' interviews—an inquiry that includes looking to a number of issues that the Government has declined to address, including the "massive amount of pressure" that Cognizant faced to cooperate with the Government; the extent to which Cognizant's investigative activities shaped the Government's investigation and provided a "road map" for it to follow; and the volume of evidence showing the paucity of "the Government's own independent investigative efforts" during Cognizant's investigation. *Connolly*, 2019 WL 2120523, at **9-13. The Defendants have, by contrast, addressed those factors with specific citation to facts and law that show that, in fact, Cognizant's action are fairly attributable to the Government. The Defendants' motions to suppress or for other relief should, accordingly, be granted.

The Government's position with respect to the Defendants' access to *Brady* material is similar to its treatment of the companion constitutional right addressed by *Garrity* and its progeny:

GIBBONS P.C.

June 28, 2023
Page 7

though citing the factors set forth in *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006), the Government's analysis collapses the applicable test into whether the Government "directed" or "controlled" Cognizant's investigation, *see* Gov't Br. at 14-15, and whether the Government took any independent investigative steps, *id.* at 16-20.  The case law under *Brady v. Maryland*, 373 U.S. 82 (1963) and its progeny, however, does not impose anything like this kind of rigid requirement. Instead, cases like *Risha* employ a less unitary and thus far more nuanced, multi-factor analysis, in an effort to ensure, in the context of a constructive possession analysis, that the purpose of *Brady* and its progeny "that criminal trials be, and be perceived as, fair," be realized.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  The analysis utilized by the Government, of course, pays no heed to that constitutional purpose.

*Risha* requires that the Court look to (i) whether a third party is acting on behalf of or under the control of the Government; (ii) whether it is engaged in a joint effort with the Government; and (iii) the ease by which the Government can access the information.  445 F. 3d at 304.  As this Court has held, "*Risha* does not mandate [] a rigid ticking of boxes" and instead "guide[s] a more flexible 'case-by-case analysis.'"  ECF No. 96 at 6.  Thus, the *Risha* inquiry is "a more general inquiry" into how closely the prosecution worked with the third party, *id.*, and focuses primarily on whether Cognizant was involved in the investigation or prosecution of a defendant.  *See id.* at 6-7 (noting that joint fact gathering may be enough to establish constructive possession); ECF No. 482, Proposed Conclusions of Law ¶¶ 71-73 (citing *McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016); *United States v. Rosenschein*, No. 16-cr-4571(JCH), 2019 WL 2298810 (D.N.M. May 30, 2019), *reconsideration den.*, 2020 WL 2750247, *6 (D.N.M. May 27, 2020)).  Here, it clearly was: as the Defendants have shown, Cognizant coordinated closely and extensively with the Government throughout the over two-year investigation, including in the period leading up to and immediately following Schwartz's second interview on September 23, 2016, and continued to provide information to, answer questions from, and comply with requests of the Government thereafter.  That included numerous voluntary document productions, in which Cognizant emphasized "hot docs" tailored to the Government's investigative priorities, Proposed Conclusions of Law ¶ 62; investigating Schwartz's potential defenses, at the Government's request, including to ensure that Cognizant fully exhausted this subject matter; *id.* ¶ 45; and keeping the Government informed not only as to scheduling but also content of employee interviews; *id.* ¶¶ 43-52.

Beyond its effort to avoid the constitutional mandate of *Brady* by failing to apply the appropriate standard, the Government's analysis of the facts regarding whether Cognizant was acting on the Government's behalf within the meaning of *Risha* either ignores or misstates the record support that has been cited extensively by the Defendants.  *See supra* at 4-6; ECF No. 482. For example, in attempting to show that the Government investigated independently of Cognizant, *see* Gov't Br. at 16-20, the Government claims that it "in fact reviewed and questioned Cognizant's privilege logs."  ECF 485, Gov't Br. at 21.  But what the record actually shows is that the Government did not question Cognizant's privilege assertions until November 2018—over two years into the investigation—and that when it did query why a small number of entries were

GIBBONS P.C.

June 28, 2023
Page 8

withheld, it was rebuffed by DLA and never followed up.[6] ECF No. 482, Proposed Findings of Fact ¶¶ 139-147. Most significantly, there can no longer be any question but that Cognizant, which to this day is obligated to cooperate with the Government's prosecution, including providing such materials as the Government demands (unless actually covered by a privilege not held by this Court to have been waived, *see* ECF No. 339 at 4), withheld exculpatory information under the guise of privilege. Indeed, at the hearing of this matter, Cognizant *admitted* that it possessed exculpatory information that it had not provided to the Government, let alone to the defense. ECF No. 482, Proposed Findings of Fact ¶ 151; Proposed Conclusions of Law ¶¶ 77, 85. This extraordinary admission shows that the Government's position—that it need not seek or obtain all exculpatory information from Cognizant—concretely threatens whether the Defendants will receive a fair trial, when the Government is in a position to command Cognizant to produce any non-privileged document it desires to receive. Indeed, taking the Government at its word, it should not have indicted this case against Mr. Schwartz and Mr. Coburn at all. ECF No. 482, Proposed Findings of Fact ¶ 147 (Apr. 18, 2023 Hr'g Tr. 217:9-12 (Last) ("Q. If you had believed that DLA Piper or Cognizant possessed exculpatory material that it had not produced to you, how would that have impacted the investigation? A. I would have not sought charges in this case.").

More generally, the Government goes to great lengths in its response to argue that it took some investigative actions (often having nothing to do with Cognizant) independent of Cognizant's investigation. *See* Gov't Br. at 16-17. But even if the Government took some independent action in addition to the extensive investigative steps undertaken by Cognizant and provided to the Government for use in this prosecution, that does not change the essential reality that Cognizant has been the Government's partner in investigating the Defendants these many years and remains so today, obligated as it still is to cooperate in the Government's prosecution of this case. *See* ECF No. 482, Proposed Findings of Fact ¶¶ 154. Nor may Cognizant's privilege assertions over select documents undermine a finding of constructive possession under *Brady* and *Risha*, neither of which require that Cognizant be "acting as a government agent" as the Government claims, *see* Gov't Br. at 22. Rather, the law looks to the fundamental fairness of denying Defendants access to exculpatory material. This is neither an abstract concept nor a fishing expedition; the hearing revealed that specific *Brady* evidence has not been disclosed. ECF No. 482, Proposed Findings of Fact ¶ 151. In the face of sworn testimony acknowledging this, the Government should not be able to stand idly by and ignore its constitutional mandate to ensure a fair trial. The Government should be obligated to search appropriate Cognizant files for *Brady* material, and turn any exculpatory evidence over to the defense, in order to satisfy its constitutional obligations and ensure the fair process that *Brady* requires.

---

[6] Even now, after having joined in the Defendants' request to refer privilege disputes to the Magistrate Judge for review and resolution, and after hearing testimony establishing that Cognizant deliberately withheld exculpatory material from the Government and the defense under the guise of privilege, the Government did not submit a single challenge to Cognizant's privilege logs.

GIBBONS P.C.

June 28, 2023
Page 9

*   *   *

    Of course, if Your Honor has any questions or concerns, please do not hesitate to contact us. Thank you very much for your kind attention to this matter.

    Respectfully submitted,

    s/Lawrence S. Lustberg
    Lawrence S. Lustberg, Esq.
    **GIBBONS P.C.**
    One Gateway Center
    Newark, NJ 07102-5310
    (973) 596-4500
    llustberg@gibbonslaw.com

cc:    All Counsel (by ECF)