# Exhibit 2



## INTERVIEW MEMORANDUM

TO:      File

FROM:    DLA Piper

DATE:    August 31, 2016

RE:      Cognizant August 29, 2016 Interview Memorandum – Gordon Coburn

---

This memorandum summarizes the telephonic interview with Gordon Coburn, President of Cognizant Technology Solutions Corp. ("CTS" or the "Company"), by Karl Buch, Gray Stratton, and Natasha Kanerva from DLA Piper, and Brackett Denniston, external counsel retained by CTS, on August 29, 2016.

Coburn is the only source of the information reflected herein. This memorandum is not a verbatim recitation or transcription of the interview. It reflects the mental impressions of counsel and is protected by legal privilege. The purpose of this memorandum is to assist in gathering information for counsel to render legal advice to CTS and in anticipation of potential litigation.

At the outset of the interview, Mr. Buch informed Coburn that DLA Piper had been retained by CTS to investigate certain allegations. Mr. Buch then delivered a standard *Upjohn* warning and Coburn acknowledged that the interview was to be kept confidential as it was protected by the attorney-client privilege, a privilege that belonged to CTS and not to him, and that the Company would determine whether to disclose information discussed to any third parties.

### I.   BACKGROUND INFORMATION

#### A.   Professional History

Coburn first worked at CTS in 1990 as part of a two-year rotational training program when CTS was Dun & Bradstreet's ("D&B") in-house technology unit. At the end of the program, he worked for D&B's new venture capital business until 1996, when D&B spun off several subsidiaries, including CTS. Coburn was offered the Chief Financial Officer ("CFO") position at CTS, with the intention that he would help to take the Company public, which he did in 1998. Coburn remained CFO until approximately 2006-07, when he also became Chief Operating Officer. In 2012, he became the President of the company.

#### B.   Knowledge of FCPA

Coburn was asked general questions regarding his knowledge of the Foreign Corrupt Practices Act ("FCPA"). Coburn said that it was his understanding that the FCPA prohibits paying bribes either directly or indirectly. He said he knew this because it was in the CTS Code of Conduct. He elaborated that he recently learned following a conversation with Dana Gilbert, Chief Compliance Officer, that facilitation payments could actually be more than $5-10 USD. He said that "this was news" to him.

EAST\144789195.1



## II. CORPORATE REAL ESTATE

### A. History and Structure

Coburn explained that in the early days of CTS, the finance director for India (nicknamed "RR"), was also in charge of Corporate Real Estate ("Infrastructure" or "Infra"). After RR left the company, Chandrasekaran Krishnaswamy ("KC"), who was the head of Corporate Workplace Services ("Administration" or "Admin"), assumed responsibility for Infrastructure as well.

In 2009, when KC announced his retirement, Coburn said that he contemplated asking Srimanikandan Ramamoorthy ("Mani") to take over Admin and Ganesh Paramasivam to take over Infrastructure. Coburn explained that he was not particularly keen about Ganesh leading Infrastructure because, in Coburn's estimation, he was "not particularly intelligent." Coburn also stated that he had the feeling that Ganesh might be "on the take." Coburn could not remember the reason why, but ultimately, KC decided to postpone his retirement. As a result, Mani became the head of Admin while KC continued as the head of Infrastructure for a few more years. When KC finally retired in approximately 2012, Coburn asked Mani to lead both Infrastructure and Admin.

Mr. Buch asked Coburn why he selected Mani for these positions. Coburn explained that he first met Mani many years ago when Mani was a financial analyst in the United States. Coburn said that he was generally concerned about the conduct of his team in India, but he trusted Mani. When asked what he meant by this, Coburn clarified that he did not have "FCPA concerns" *per se*, but instead wanted to make sure that the members of his team were not motivated by self-enrichment. He said that was not worried about the Admin side, because he was not really involved in that aspect, but when it came to Infrastructure, he was very concerned because there were many opportunities for CTS colleagues to demand kickbacks from vendors or subcontractors. Coburn specifically mentioned having suspicions with respect to RR in this regard. Although unable to point to any specific reasons why Mani had engendered such confidence, Coburn said that he trusted Mani in these important roles.

### B. Turnkey Model

Coburn described the turnkey model as one in which a developer is hired to handle the entire process of constructing a building. Using this model, CTS would contract with a vendor that would handle "everything," including the design and construction of the building, and at the end, hand CTS a facility ready to occupy. When asked if turnkey vendors are responsible for obtaining statutory approvals, Coburn said that he knew they make sure that the permits are in place but that he did not know that level of detail. He said that the main reason he supported using the turnkey model is that he viewed it as a way to mitigate the risk that CTS colleagues would demand kickbacks because the model only gave CTS discretion with respect to one vendor and not to many.

EAST\144789195.1



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### C. Synergies Between Admin and Infra

Coburn explained that there are synergies between Admin and Infrastructure, particularly with respect to capacity planning and this was the component of Infrastructure in which he was most involved. He said that the team had quarterly calls where they would model their assumptions and see where there might be shortfalls in terms of space. Based on these models, they would develop a strategy for what they wanted to do in each city: (1) lease; (2) build to suit; or (3) build their own building. Coburn explained that the preferred approach has changed over time based on government policies and tax law. He said that prior to this year, they preferred to build because they had an issue with cash building up in India. This year, however, they took advantage of a legal ambiguity that enabled them to repatriate approximately USD 2 B. As a result, CTS changed their strategy because they are now cash-poor in India.

## III. CKC PLANNING PERMIT

### A. Awareness that Construction Began Without Necessary Permits

When asked generally if there were any regulatory challenges with undertaking construction projects in India, Coburn immediately recalled a 2013 Internal Audit ("IA") study that highlighted that CTS had been starting construction before obtaining the necessary permits. He further volunteered that after he read results of the study, he expressed his "displeasure" to the team at this particular finding.

Coburn first reviewed ELM_03234842, [Tab 69], an IA Report, which he said he had never seen before. Coburn then reviewed ELE_00378569, [Tab 60], the IA Update from May 2013, which Coburn immediately recognized. Coburn reviewed pg. 10 of the document, which described instances in which construction began without the necessary permits, including at the Cognizant KITS Campus ("CKC" or "KITS"), in Chennai. After reviewing this page, Coburn said that he did not know who made the decision to start construction without the permits and that this document was the first he had heard about this issue at the CKC facility.

Coburn then reviewed ELE_00370084, [Tab 61], notes from a Management Review Meeting that was held in the KITS conference hall on February 19, 2013. Coburn reviewed point 2b, which thanked Coburn for his visit to the project site in February 2013. After reviewing the document, Coburn said that he had not seen it before and he did not remember visiting the project site during that time period. He did recall, however, that he visited the site at some point for a tree planting. Coburn then reviewed point 5a in the document, which stated that the Chennai Metropolitan Development Authority ("CMDA") permit application was submitted on February 7, 2013. After reviewing this page, Coburn confirmed that when he visited the site he did a "hard hat tour" and construction was already well underway. He denied knowing that they had not yet received the planning permit at that time. He said he still did not know when the permit was received.

EAST\144789195.1

Confidential

CTS_R17_0004339



### B.   Awareness of how the CKC Planning Permit was Obtained

Coburn remembered that Mani emailed him more frequently with respect to the status of the CKC permitting process than he did with respect to other facilities, because there had been so many delays with CKC. Coburn attributed these delays to the fact that the ruling party was in turmoil at the time because the Chief Minister ("CM") had gone to jail for what he assumed was corruption. He could not recall who told him this although he thought that it was probably Mani or Sridhar Thiruvengadam, Executive Vice President, Strategic Initiatives, and former Chief Operating Officer, because they were concerned that this fact would further delay getting the permits they needed.

Coburn was asked if he remembered a request from Larsen & Toubro ("L&T")[1] that a CTS executive meet with this same CM in order to help obtain the permits. Coburn denied any recollection of this and commented that the CM hated CTS and the IT sector in general.

Coburn was then asked if, when Mani and Sridhar raised the prospects of further delays in obtaining the permits, they had also proposed any strategies for overcoming this problem. Coburn responded that the strategy that they developed was to tell L&T that the contract was for the delivery of a completed building and that CTS would withhold payment for work already completed until L&T fulfilled their end of the contract.

Coburn was asked if he was ever concerned that L&T would propose to do something illegal. Coburn replied:

> "I can't remember what happened – whether they proposed, we proposed, or the government proposed – but it was highlighted that if we paid something to the government, we could get the permits faster. We said no. We can't do that. L&T, you are connected in government, you can get permits legally and we expect you to do that."

Coburn was asked to provide further details regarding this proposal. Coburn said that he believed it was either Mani or Sridhar who brought it to his attention, but he could not remember if the government had approached L&T or if the government approached CTS colleagues or if it was a suggestion made by L&T or one made by CTS. He further could not remember when this discussion took place, although he was pretty sure it was 2014. Coburn reiterated that his response to the proposal / request was "no freaking way" and that he told the team CTS was going to stick to the original strategy that L&T was to pursue legal avenues and, until they did, CTS would withhold payment.

When asked if Coburn could recall if the amount of the proposed payment was ever discussed, Coburn replied that, "it was very big: north of a million." Coburn was asked if it could have been

---

[1] L&T is an engineering and construction company that is frequently used by CTS.

EAST\144789195.1



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

USD 2.5 M, and Coburn replied "could be." Coburn further confirmed that Steven Schwartz, Executive Vice President, Chief Legal and Corporate Affairs Officer, was aware that the amount involved was over a million dollars.

Coburn then reviewed ELE_00961764, [Tab 112], an email dated April 21, 2014 in which Coburn emailed Mani, Sridhar and Schwartz to request a "follow-up call (to today's discussion) tomorrow." After Coburn reviewed the document, he was asked if this was the call when Mani or Sridhar brought up making a payment to a government official. Coburn said that he did not remember either the email or the call.

Coburn was then asked a series of questions about the details Coburn could remember about this discussion. Coburn reiterated that he could not recall whether Mani or Sridhar brought up the topic initially, but he remembered that they had a "long discussion" about other options because they could not make a payment to speed up the permit process. He remembered discussing the fact that L&T had a public relations department and the fact that L&T should use this group to exert lawful pressure on the government. He confirmed that Schwartz was involved in this discussion but could not remember if this was Schwartz's suggestion or his own. Coburn did recall that his team did not like this strategy, which made him suspicious that they were "on the take." From his perspective however, these were monies that CTS owed L&T for work already completed and withholding it would make it difficult for L&T to pay their subcontractors. Coburn said he wanted there to be protests and perhaps even negative press such that L&T would really feel pressure to call in favors – legal ones - with the government. He could not remember if he told L&T that their relationship would be in question if they did not obtain the permits as promised.

Coburn then reviewed IN_ELE_01101197, [Tab 124], an email that Coburn received on May 20, 2014 in which Mani wrote that they now had some "positive traction" with respect to the CKC campus. Coburn was pointed to a sentence in which Mani wrote that L&T had hired "a new liaison consultant to process the approval." After reviewing the document, Coburn denied knowing anything about a consultant. Coburn then reviewed an email later in the chain where Coburn instructed Mani to withhold payment to L&T. Coburn reviewed this passage and said that he did not specifically remember doing this, although he accepted that it happened and noted that it was consistent with their strategy with L&T at the time.

Coburn also reviewed IN_ELE_01075463, [Tab 140], an email chain dated August 25, 2014, specifically the email dated June 30, 2014, in which Mani confirmed that the planning permit cleared and that they would be getting the government order soon. Coburn was asked if he knew what was done to obtain the order. After Coburn reviewed the email, he said that he did not know the answer.

      C.    **Response to the Proposed Payment**

Coburn was questioned on his reaction and response to the conversation he had with Mani, Sridhar and Schwartz regarding a proposal / request to make a payment of "north of a million dollars" to a government official in exchange for obtaining the planning permit. Coburn said that certainly he spoke to Schwartz, but he could not remember if he also spoke the Audit Committee or Gilbert. He said he did not know if it was a proposal or an actual request was made so he felt

EAST\144789195.1

Confidential

CTS_R17_0004341


PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

satisfied because he (1) raised it to Schwartz; (2) told Mani and Sridhar it was not an option and (3) developed the strategy to withhold payment to L&T.

### D. Approval Of L&T's Variation Requests

Coburn was asked if he remembered that L&T submitted requests for variation for the CKC facility. Coburn admitted that he did because his memory was jogged after he went back through his notes in preparation for this interview. Coburn recalled that in late 2014, Mani or Sridhar communicated to him that they were involved in discussions with L&T regarding an additional USD 25-30 M in variation requests. Coburn said that he told them that there was a clear contract for the building, there were no work orders for some of the claims and that they should not even be having these conversations. Coburn said while some of the items sounded "legitimate" or "credible" in terms of things CTS requested versus other items reflecting decisions L&T had made on their own. He told his team to go back to L&T and "get the number down." Coburn further said that the situation raised more red flags for him regarding whether the team was receiving kickbacks. Mr. Buch asked if Coburn had thought that the situation also raised any FCPA-related red flags. Coburn replied that it did not because he did not pay attention to the breakout. He said, for example, he saw that "statutory approvals" was on a separate line, but he did not really focus on the details.

Coburn reviewed IN_ELE_01118006, [Tab 151], an email chain dated January 13, 2015 and after reviewing it, Coburn confirmed that he remembered it. He pointed to the request for USD 25 M from L&T in variations and repeated that he told his team that USD 25 M was a non-starter and that the variation had to be single digits. Coburn reviewed a line item for "statutory approvals" in the amount of USD 3.7 M. Coburn said that he did not know what it was because he "did not probe it." Coburn was asked a series of follow-up questions in which he pointed out that the amount was significant as a percentage of the total amount claimed. Coburn explained that in the "Cognizant realm," USD 3 M is a rounding error.

Coburn further denied ever opening the attachments to this email and said that he is not really in the weeds when it comes to a purchase order or a variation approval and instead typically engages in the details only with respect to capacity planning and budgets. Coburn was asked if he remembered what happened after he received this request. Coburn said that he approved it and then L&T came back sometime later requesting a few million more, but still under the USD 10 M target that Coburn had set.

Coburn then reviewed IN_ELE_01042509, [Tab 165], an email dated March 11, 2015, and Coburn confirmed that this was the email to which he was referring. He again said that he did not open the attachments or speak to Mani about the content of the variation request, although he assumed he had a phone call with him about the additional monies being requested.

Coburn reviewed IN_ELE_01042229, [Tab 166], an email dated March 13, 2015 from Mani asking to speak with Coburn about the revised variation. Coburn reviewed this document but could not recall if they spoke at that time or what about. He further claimed that he did not remember approving the revised variation nine minutes after Mani requested the telephone call.

EAST\144789195.1

Confidential                                                                                                    CTS_R17_0004342



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### IV.   EVENTS RELATED TO THE CURRENT INVESTIGATION

During the interview Coburn mentioned multiple times that he had reviewed his email in advance of the interview because after his computer was taken on Monday, he was concerned about what was going on and felt like he did not get adequate answers from anyone involved. He said that he primarily reviewed the Internal Audit materials.

Coburn was asked if he had spoken to Schwartz about the conversation they had with Mani and Sridhar regarding the payment to a government official. Coburn confirmed that he had spoken with Schwartz about this in the last week or two. He claimed that they did not speak in detail, but that he brought up his recollection about being told about the proposal/request for payment. Coburn said that this conversation happened in person because their offices are next door to each other. He reiterated that it was not a detailed conversation, but that Schwartz had brought up the topic and they both remembered that it happened, that they had told Mani and/or Sridhar that it could not be done and that they developed the strategy to "squeeze L&T."

### V.   CKC ELECTRICITY CONNECTION

Coburn was asked when he first learned that CTS was having difficulty getting electricity to the CKC facility. Coburn said that he thought they had electricity the whole time, so it was a surprise to him when Mani called him and told him that he paid a bribe or wanted to pay a bribe to get power to the site. Coburn said that he was barely able to understand Mani when he called, but that when he realized the topic Mani wanted to discuss, he stopped the conversation and told Mani to speak with Gilbert or Schwartz immediately.

### VI.   ADDITIONAL REMARKS

In response to questions, Coburn denied having any previous knowledge regarding: (1) exceeding the capacity of the Madras Export Processing Zone ("MEPZ") facility; (2) MEPZ being over-built beyond the permitted levels; or (3) beginning to build the Pune facility without permits. Coburn did remember an issue with respect to MEPZ not treating their waste water, but had no further details.

*   *   *

At the end of the interview, Coburn was instructed to keep the content of the discussion confidential.

EAST\144789195.1