# Exhibit 3



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

## INTERVIEW MEMORANDUM

TO: File

FROM: DLA Piper

DATE: September 8, 2016

RE: Cognizant August 20, 2016 Interview Memorandum - Srimanikandan Ramamoorthy

---

This memorandum summarizes the interview with Srimanikandan Ramamoorthy ("Mani"), Vice President, Corporate Workplace Services ("Administration" or "Admin") and Corporate Real Estate ("Infrastructure" or "Infra"), at Cognizant Technology Solutions Corp. ("CTS" or the "Company") by Karl Buch and Christine Liu from DLA Piper, and Robert Molina from CTS at the ITC Grand Chola Hotel, Chennai on August 20, 2016.

Mani is the only source of the information reflected herein. This memorandum is not a verbatim recitation or transcription of the interview. It reflects the mental impressions of counsel and is protected by legal privilege. The purpose of this memorandum is to assist in gathering information for counsel to render legal advice to CTS and in anticipation of potential litigation.

At the outset of the interview, Mr. Buch informed Mani that DLA Piper had been retained by CTS to investigate certain allegations. Mr. Buch then delivered a standard *Upjohn* warning and Mani acknowledged that the interview was to be kept confidential as it was protected by the attorney-client privilege, a privilege that belonged to CTS and not to him, and that the Company would determine whether to disclose information discussed to any third parties.

## I. INTRODUCTORY REMARKS

Mr. Buch acknowledged the prior interview with Mani conducted on August 8, 2016.

## II. BACKGROUND INFORMATION

Mani joined the Company in July 1994. He became the Head of Admin in 2009 and then the head of Infra in 2014. He is now responsible for both Admin and Infra. Mani currently reports to Sridhar Thiruvengadam, Executive Vice President, Strategic Initiatives, former Chief Operating Officer, and Karen McLoughlin, Chief Financial Officer.

At the beginning of the interview, Mani acknowledged that he read and understood the Company's Foreign Corrupt Practices Act ("FCPA") and anti-corruption policy, and the Company's Core Values and Standards of Business Conduct. Mani stressed that he "would rather be compliant than pay government officials to get things done." However, he also stated that the current business environment in India makes it hard to be compliant and that "you have to pay government [officials] in order to get what is orderly yours."

Confidential                                                                                          CTS_R17_0004416



## II.  COMPASS AND ECOCHEM

Mani reviewed IN_ELE_00455439 [Tab 174], an email chain dated June 18, 2015, including an email dated June 11, 2015 from Mani to Parikshit Roy, Managing Director of Compass, in which Mani invited Parikshit to discuss the renewal of various operating licenses and permits for the Madras Export Processing Zone ("MEPZ") facility. Within the same email chain, Mani forwarded Parikshit an email dated June 10, 2013 that discussed Compass' refusal to provide license renewal services to CTS because Compass had a "stringent" anti-corruption policy and code of ethics and business conduct.[1] Mani claimed, however, that he did not know until sometime in 2015 that Compass had refused to renew licenses for CTS for the past two years and that EcoChem, a third party vendor, had instead been providing licensing services for CTS.

Mani claimed that the reference in the June 10, 2013 email to INR 5 K (USD 75) in "liaison charges" were payments made to government officials in order to renew lift licenses for the MEPZ facility. He further explained that "other liaisoning [sic] costs" referred generally to payments made to government authorities, including individual government officials, in order to renew licenses and permits.

During this discussion with Parikshit in June 2015, Mani told him that if Compass desired to continue serving as the MEPZ facility management partner, it had to agree to the turnkey model and do whatever was required to obtain the licenses for CTS. Mani explained that the "turnkey model" referred to "end to end delivery by a service provider that constructs new buildings and fits out the interior." Mani denied that he encouraged or instructed Compass to pay bribes to government officials in order to obtain licenses and permits. He emphasized that he merely asked Compass to "take care of the licenses if they want to do business with CTS."

Mani reviewed IN_ELE_02774691 [Tab 175], an Excel spreadsheet dated June 19, 2015, which listed the "incidental expenses" and the "unofficial amount" paid or yet to be paid to government officials in order to renew lift license, fire license, kitchen license, gas bank No Objection Certificate ("NOC") and the air and water consent. The spreadsheet was prepared a few days after Mani's conversation with Parikshit and Vasudevalu Perumal, a Compass employee. The spreadsheet indicated that INR 250 K (USD 3,700) in "incidental expenses" had been paid to Tamil Nadu Pollution Control Board ("TNPCB") officials to renew the 2013-2015 air and water consent, and that "the authorities" were expecting approximately INR 150 K (USD 2,200) for the renewal of the 2015-2017 air and water consent. Notably, Mani said he was not surprised when he saw the language in the spreadsheet because it was common practice to bribe government officials in India. Still, he denied ever instructing Compass to make improper payments to government officials.

---

[1] Mani was not copied on this email, and could not recall how he obtained it.

EAST\144789158.1

Confidential

CTS_R17_0004417



### III. MEPZ AIR AND WATER CONSENT AND UNAUTHORIZED CONSTRUCTION

Mani initially stated that he only recently became aware that (1) there had been an unauthorized built-up area of more than 20 K square meters at the MEPZ facility, (2) there were 4 K additional workers, and (3) the facility was using an eleventh diesel generator despite only being authorized to use ten. Mani reviewed IN_ELE_03237535 [Tab 18], an email chain dated July 20, 2011, including an email dated July 13, 2011, wherein he approved a payment of INR 691 K (USD 10,200) to the TNPCB to renew the 2011-2013 air and water consent. The email also referenced a proposal from Pure Enviro Engineering Pvt. Ltd. ("Pure Enviro"), a third party vendor that CTS retained to renew the 2011-2013 air and water consent, and to incorporate the additional built-up area and the eleventh diesel generator in the renewal order. Mani admitted that he had been aware of those issues since 2011.

Mani then explained that Larsen & Toubro ("L&T") advised him not to seek regularization of the unauthorized built-up area, the additional headcount or the unauthorized diesel generator because CTS would lose the security deposit previously paid to the Chennai Metropolitan Development Authority ("CMDA"). According to Mani, he followed L&T's advice and did not apply for the environmental clearance from the Ministry of Environment and Forests ("MOEF"), despite the fact that he knew that the additional built-up area, headcount and the unauthorized diesel generator violated construction and environmental regulations. Mani claimed that he could not recall the amount of the CMDA security deposit, but he believed it was large. Mani remarked that CTS received the CMDA refund for phase one of the MEPZ construction but not for phase two, despite the fact that it was completed in 2011.

### IV. CKC ELECTRICITY CONNECTION

Mani alleged that L&T made an INR 20.1 M (USD 310 K) improper payment to an official from the Tamil Nadu Electricity Board ("TNEB") sometime before May 2016 in order to obtain a government order to install electrical cable at the CKC facility.[2] Mani indicated that he learned this from L&T employees.

Mani reviewed IN_ELE_00380922 [Tab 192], an email chain dated October 23, 2015, including an email dated October 6, 2015, in which Mani instructed Ganesh Paramasivam, Associate Vice President, Infra, to include FCPA compliance language in the contract with L&T. Mani recalled that he was concerned that L&T would bribe TNEB officials. He claimed that the TNEB was the most corrupt government agency in India, and he had to protect the Company.

Mani reviewed IN_ELE_01172913 [Tab 212], an email chain dated March 2, 2016, including an email dated March 1, 2016 from Ramesh Vadivelu, an L&T employee, to Ganesh and Venugopal Girirajan, Director, Infra, in which Ramesh wrote that L&T had obtained "load sanction" for the 10.6 MVA 110 KV electrical cable and was expecting the "turnkey approval for execution in favor of Cognizant any moment." Ramesh also provided an estimated cost of INR

---

[2] The facility is still currently using diesel generators.

Confidential                                                                                                                              CTS_R17_0004418



139.3M (USD 2 M) for the work, including INR 90.8 M (USD 1.4 M) for estimated TNEB costs, INR 12 M (USD 200 K) for switch yard equipment, accessories and related civil works, INR 21 M (USD 0.3M) in incidental expenses, and INR 15.5M (USD 200 K) in overhead and marginal cost. Mani recalled that he had been told by L&T employees that the INR 21 M in incidental expenses was actually a payment that had been made to a government official in order to obtain the work approval.

Mani reviewed IN_ELE_03830792 [Tab 213], an email chain dated March 3, 2016, from Biswajit Ghosh ("BG"), Associate Vice President, Procurement, to Mani, Ganesh and others, in which Mani, Ganesh and BG held a conference call with L&T to discuss the work status and estimated cost. Mani claimed that during this call, BG asked L&T to remove the reference to "incidental expenses" from any future emails, quotes and invoices.

Mani reviewed IN_ELE_00326489 [Tab 217], an email chain dated March 23, 2016, including an email dated March 10, 2016, in which Nakkiran R. Murugesan (L&T) sent an itemized quote to Ganesh and BG for approval. Mani and Venugopal were copied on the email. The quote contained the quantity and unit price for 24 construction line items, totaling INR 139.3M (USD 2M). No incidental expenses were referenced in the quote.

Mani reviewed IN_ELE_01176329 [Tab 228], an email chain dated April 29, 2016, including an email dated April 22, 2016, in which Venugopal informed Ganesh that "as an indicative figure" L&T "provided a 20% overhead cost in each line item." Also included was an email dated April 29, 2016, wherein Ganesh instructed BG to negotiate with L&T and obtain the final price for Mani to approve.

Mani reviewed IN_ELE_00067025 [Tab 231], an email chain dated May 6, 2016, in which L&T provided a final quote of INR 133 M (USD 1.96 M), containing INR 141.1 M (USD 2.08 M) in electrical accessories, energizing, testing and commissioning charges, as well as INR 8.1 M for a discount "offered during the discussion held on May 3, 2016." L&T also provided an itemized list for the INR 141.1 M charges and no incidental expenses were referenced. According to Mani, L&T reduced their price after negotiating with BG. Following these negotiations, L&T removed the reference to incidental expenses and agreed that L&T would hide this figure in the invoice by inflating the work-related expense.

Mani reviewed IN_ELE_00322455 [Tab 233], an email chain dated May 13, 2016, including an email dated May 6, 2016, in which Devarajan Krishnan, Director, Financial Planning and Analysis ("FP&A"), circulated a draft email that he had prepared to send to Gordon Coburn, President, to approve L&T's final quote. The email indicated that Mani had reviewed the proposal and intended to award the contract to L&T. Mani explained that he had not sent the draft email to Coburn because they had hired CBRE to conduct a cost validation on L&T's final quote around that time, which also was around the time the Company launched this investigation. Mani claimed that he reached out to Coburn in early August and informed him that L&T had made a facilitation payment of approximately USD 300 K to a government official in order to obtain electricity for CKC. According to Mani, Coburn refused to discuss the details with him and told him to speak with Dana Gilbert, Senior Vice President, Chief Compliance Officer and

EAST\144789158.1

Confidential



General Counsel, then Chief Compliance Officer, and Steven Schwartz, Executive Vice President, Chief Legal and Corporate Affairs Officer.

## V.   CKC PLANNING PERMIT AND L&T VARIATION REQUEST

Mani made additional allegations regarding the CKC facility, a site that also was built by L&T and completed in the middle of 2014 for a total cost of approximately USD 150M. Specifically, Mani alleged that L&T paid approximately USD 3 M to a government official in order to obtain the building permit for the CKC facility. This payment purportedly was made in 2014. Mani further alleged that CTS's global leadership, including Coburn, Schwartz and Sridhar, approved the payment.

Mani reported that L&T began construction at the CKC site before it obtained the necessary Chennai Metropolitan Development Authority ("CDMA") planning permit. He claimed, however, that he was not aware of the issue until early 2014 during a site visit with L&T. An L&T employee informed him during the visit that CKC would not be able to open on schedule because the planning permit had not been issued.

Mani claimed that sometime in the middle of 2014, Ramesh informed him that a government official demanded a payment in connection with the CMDA planning permit for the CKC facility. According to Mani, L&T recommended that Chandrasekaran Ramakrishnan ("Chandra"), Executive Vice Chairman, schedule a meeting with the Chief Minister of Tamil Nadu to "get the planning permit moving forward." Mani reported that he escalated the issue to Sridhar, who commented that Chandra should not directly deal with the Chief Minister "because she is unscrupulous."

Mani recalled that he had a conference call with Coburn, Sridhar and Schwartz sometime in the middle of 2014. During the call, the four of them collectively agreed that Chandra should not meet with the Chief Minister of Tamil Nadu. Mani claimed that on this same call he relayed an update to Coburn, Schwartz and Sridhar that L&T had informed him about the demand for payment of approximately USD 2.5 M from a government official. According to Mani, Coburn was shocked by the amount, stating that "L&T needs to be responsible for this." Mani understood Coburn's statement to mean that it should be L&T's responsibility to handle the payment to the government official. According to Mani, he believed that everyone on the call understood that CTS would not be able to obtain the planning permit without making the payment. Mani said that he did not know to whom the payment would have been made, but assumed it was a "political request."

He further alleged that Coburn tried to put pressure on L&T by freezing payments to L&T.

Mani recalled that SN Subrahmanyan ("SNS"), Vice Chairman of L&T, contacted him sometime later, insisting that L&T would not make the payment. Mani relayed this message to Coburn, who instructed him to revert back with a message that L&T's business would be at risk if it did not obtain the planning permit for CTS. Mani reported that he delivered the message as

Confidential                                                                                                                                                    CTS_R17_0004420



instructed. As evidenced by the documents identified in connection with this investigation, L&T subsequently obtained a new consultant and eventually obtained the CMDA planning permit.

Mani alleged that CTS reimbursed L&T for the USD 2.5M payment by approving L&T's construction variation requests. Documentary evidence appears to corroborate this allegation.

Mani reviewed IN_ELE_00335471 and IN_ELE_00335472 [Tab 143], an email with attachment dated November 12, 2014, in which Ramesh sent a PowerPoint presentation entitled "Cognizant KITS Sholinganallur - Variation Discussion Document" to Mani, copying Ganesh and BG. According to the document, the total value of the variations was INR 1,573,247,909 (USD 25.8M)[3]. One of the variations was described as "Approvals/Campus Regularization" and it contained seven line items for various statutory approvals concerning the CKC, Siruseri and MEPZ facilities, totaling INR 239.4 M (USD 3.7 M). Mani recalled that Line Item No. 2 "Statutory Approvals - Planning Permit" in the amount of INR 152M (USD 2.5 M) was the improper payment made to obtain the CMDA planning permit for CKC. Mani, however, said he was uncertain whether the remaining six line items, totaling INR 87.4 M (USD 1.4 M), were bribe payments as well.

Mani reviewed IN_ELE_00335553 [Tab 158], an email chain dated February 17, 2015, including an email dated January 13, 2015, in which Mani sent Coburn a high-level summary of the variations. In Mani's summary, he stated that L&T had claimed INR 1,573,247,909 (USD 25.8 M) in variations, but that he wanted Coburn's approval, including for INR 488,038,649 (USD 8 M), as well as for INR 226 M (USD 3.7 M) in statutory approvals. In an email dated February 3, 2015, Coburn approved the USD 8 M variations, including the USD 3.7 M in statutory approvals.

The email chain also included an email dated February 16, 2015, in which Deepa Baburaaj, General Counsel for India, asked Santhosh Devarajan, Manager, Procurement, to explain the variation claim for USD 3.7M in statutory approvals that had been approved by Coburn on February 3, 2015. In the email, Deepa questioned whether L&T would make the payment to the authorities in cash or in demand draft. Ganesh responded shortly thereafter and proposed to schedule a call with Deepa for the next day. According to Mani, he was not sure whether Deepa was aware of the nature of the statutory approvals.

Mani reviewed IN_ELE_01042509 [Tab 165], an email dated March 11, 2015, in which Narasimhan Varadhachari ("Narsi"), Director, Finance, asked for Coburn's approval of a revised variation claim. The itemized list indicated that USD 3.7 M in "Approvals/Campus Regularization," which had been previously approved, was now categorized as "claims not accepted." Moreover, eleven construction-related line items amounting to USD 3.4 M, which had previously been rejected, were included in the "claims accepted" category.

---

[3] The USD and INR exchange rate was 1 to 61 in January 2015.

EAST\144789158.1



In addition to Coburn, Schwartz and Sridhar (who participated on the conference call in the middle of 2014), Mani recalled that Lakshmi Narayanan, Vice Chairman of the Board of Directors, Ganesh, BG and Raj Ghosh, Vice President, Global Procurement, also were aware of the USD 2.5 M payment. He further alleged that Schwartz participated in two conference calls in which the payment was discussed and had voiced no objections to making the payment. Mani specifically recalled that during one of the calls, Schwartz said that he was "not to be quoted" for approving the payment.

*   *   *

At the end of the interview, Mani was instructed to keep the content of the discussion confidential.

Confidential                                                                                                    CTS_R17_0004422