# Exhibit 8



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### INTERVIEW MEMORANDUM

| | |
|---|---|
| TO: | File |
| FROM: | DLA Piper |
| DATE: | September 26, 2016 |
| RE: | Cognizant September 23, 2016 Interview Memorandum – Steven Schwartz |

This memorandum summarizes the second in-person interview of Steven Schwartz, Chief Legal and Corporate Affairs Officer of Cognizant Technology Solutions ("CTS"), by Karl Buch and Gray Stratton from DLA Piper, and Brackett Denniston from Goodwin Procter at DLA Piper's offices in New York City on September 23, 2016. Schwartz was represented by Joshua Rievman from Hoguet Newman Regal & Kenney.

Schwartz is the only source of the information reflected herein. This memorandum is not a verbatim recitation or transcription of the interview though certain of Schwartz's phrasing and word choices have been retained to enhance the clarity of the discussion reflected in this memorandum. It reflects the mental impressions of counsel and is protected by legal privilege. The purpose of this memorandum is to assist in gathering information for counsel to render legal advice to CTS and in anticipation of potential litigation.

At the outset of the interview, Mr. Buch informed Schwartz that DLA Piper had been retained by CTS to investigate certain allegations. Mr. Buch then delivered a standard *Upjohn* warning and Schwartz acknowledged that the interview was to be kept confidential as it was protected by the attorney-client privilege, a privilege that belonged to CTS and not to him, and that the Company would determine whether to disclose information discussed to any third parties.

## I.    INTRODUCTORY REMARKS

Mr. Buch acknowledged the prior interviews with Schwartz conducted on August 28, 2016.

## II.    CORRUPTION RISK IN INDIA

### A.    Schwartz's Perception of Corruption Risk in India

Mr. Buch asked Schwartz about his perception of corruption in India. Schwartz responded that India is a risky country and so you have to focus on controls and training. The risk, in particular, is that "it is common practice [in India] to ask for favors in return for getting things done." Favors include government officials' asking for "money or gifts or other things." Schwartz said CTS is aware of this risk and that these requests can happen in, for example, real estate transactions and litigation.

EAST\133220531.3

Confidential

CTS_R17_0004363



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Schwartz said he gained an understanding of the corruption risk in real estate in India based on his involvement in this investigation, before he was taken off. Schwartz said he had never been involved in Real Estate Administration ("Administration" or "Admin"). After 2013, Admin reported to Compliance, which reported to the Audit Committee. Schwartz gained further understanding of the issues in real estate based on the minutes of those meetings. He noted that Dana Gilbert, Senior Vice President, Legal, reported to the Audit Committee on Compliance. He was aware of a general risk in India based on conversations with Dana and with Anand Bhushan, former General Counsel, India.

Schwartz said that he did not know if Chennai is more corrupt than other states in India. He also claimed that he was aware that the Chief Minister of Tamil Nadu was arrested for corruption but added that there are probably similar issues in other parts of India.

Schwartz further noted that DLA's July 2016 investigative report to CTS discussed the risk associated with obtaining licenses and permits in India. Potential issues included too many people in buildings, not enough water, and the use of a diesel generator, among other things. He understood at the time of the report that DLA was not sure if there was a violation and DLA was retaining a local expert to look into it. Schwartz said that he learned about the risk of improper payments being made to obtain permits from the DLA report. Before that, Schwartz said that he had no information about a risk of government demands relating to permits. Schwartz was asked about the Internal Audit Reviews in 2013 and 2015. He said they did not point out that payments had been made; they said contracts and controls could be strengthened.

Schwartz further recalled that in 2012, Dana raised a USD 500 K payment that was examined with DLA. According to Schwartz, it was concluded that this was a "facilitation payment." It did not, however, relate to permits. There was also an USD 80 K payment which did relate to statutory approvals. In this case, Schwartz said there were "follow up items" that were not done by CTS. Schwartz confirmed that other than these indicia, he had no information about CTS making improper payments, directly or indirectly, to obtain or expedite permits approvals.

In considering whether any CTS employee had ever told Schwartz that a government official demanded a payment (either directly or indirectly) in order for CTS to obtain a permit, Schwartz responded, "Not to my knowledge."

### B.     Risk Management

Schwartz indicated that he relied on Dana to apprise him of the risks in India, but he said that Dana did not tell him much. The interviewer pointed out that it appeared he was "trying to have it both ways,"  and asked what he did to satisfy himself regarding India risk. Schwartz said he was satisfied that Dana and the Compliance team were managing the risk "as long as she did what she said she was doing." He then stated that he was not sure Dana was doing as she said.

Schwartz said that Dana claimed that she was conducting training and Schwartz noted that this included the Admin group. Schwartz said this was important because the 2013 and 2015 Internal

Page 2 of 20

Confidential



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Audit Reports highlighted problems in Admin. Schwartz said "in hindsight" he was concerned that Dana might not have been doing what she said she was doing because the people in India did not seem to know that things they were doing were improper.

## III.   IMPROPER PAYMENTS

### A.      August 8, 2016 Call with Mani

Schwartz discussed the August 8, 2016 call with Dana and Srimanikandan Ramamoorthy ("Mani"), Vice President, Admin and ("Infrastructure" or "Infra"), and the subsequent call with Karl Buch, and Mani. Schwartz explained that Mani first reached out to Gordon Coburn, President. Coburn pushed Mani to Schwartz and Dana. Schwartz and Dana held a Tandberg call with Mani. Schwartz described Mani as nervous. He was speaking very quickly about a payment. Schwartz thought Mani referenced a $300 payment. He said that when Mani said USD 300 K, his "heart sank." He said Mani claimed the USD 300 K was a facilitation payment, but Schwartz knew that it could not be the case.

Schwartz said that Mani explained that the USD 300 K was given from Larsen and Toubro ("L&T") to a government official to get power to Cognizant KITS Campus ("CKC" or "KITS"). Schwartz's "heart sank" because he did not know if the payment had been made, and if it had been made it would be a clear violation of the Foreign Corrupt Practices Act ("FCPA"). When asked how he knew it would violate the FCPA, Schwartz said "It sounded like a bribe. It sounded like a payment to get power more quickly."

Schwartz again considered the potentially improper USD 300 K payment, which he said was concerning because "if paid" it would have violated FCPA. Specifically, Schwartz was asked if an offer would also be a violation and he acknowledged that it would be. He said that is why he got DLA involved immediately. He said he did not want anything in writing from Mani about this issue. Schwartz inferred that it would be a bribe.

Because Schwartz could not understand Mani, it was unclear where the money went or whether it was paid. According to Schwartz, Mani was not answering the questions that Schwartz posed to him, so they concluded the call and contacted DLA. Schwartz underscored that he was the one that wanted to involve DLA immediately. Schwartz was reminded that in his prior interview he referred to the USD 300 K payment as "huge" and to gain it was huge. He said it was a very large potential payment to a government official, "the largest one" he had ever heard of.

Schwartz said that he asked Mani if making payments to government officials was a recurring practice by CTS or its vendors, but that Mani did not answer. Based on DLA's investigation, Schwartz was concerned it might be "a bigger number" than what he had previously considered. Schwartz was asked if he had any reason to believe there was a bigger problem than what was previously identified in the investigation. He said "no, other than the USD 250 K with [Bhushan]."

EAST\133220531.3

Confidential                                                                    CTS_R17_0004365



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### B.    Other Payments

Mr. Buch asked Schwartz if he was aware of any other potentially improper payments. Schwartz said no, none were ever paid. He said there was one "smaller" and one "large" potential payment relating to litigation. He explained that in 2012 and 2013, a potential payment was raised in connection with the local Provident Fund, which was raised to the Board. It related to transferring people from India. He said that when CTS "deputized" people overseas, they were transferred off payroll. In 2013, even though CTS took people off the India payroll, a government official said CTS was still supposed to pay into the Provident Fund for these people. CTS disagreed and so in 2013, CTS engaged the best labor counsel in India. CTS took a two-pronged approach: (i) addressing the legal situation, and (ii) retaining Deloitte to put together letters for deputation in India.

Schwartz got a sense from Bhushan that they were getting squeezed by the government official. In going through the process, the government official made a "crazy demand". He said CTS needed to produce so many records that it would have required a trailer truck. Bhushan thought the official was trying to "squeeze" CTS. At some point in 2014, Bhushan said "if we pay one of two lawyers, and we pay them USD 250 K, this problem goes away." Schwartz said that he replied said "no, we will fight it." This was a minimum USD 250 M issue to clear up the problem prospectively; or over USD 1 B retrospectively. Schwartz recalled that the government official who made the demand, located in Chennai, was ultimately arrested in 2016. He was a minister and thus Schwartz suspected he may have been a political appointee. He further remembered emailing "good news" when the official was arrested. Higher-ups in the government later clarified the law.

Schwartz also said that Dana had previously told Bhushan that CTS could not make this payment. Bhushan said he was just bringing it to them because of the complexity of the Provident Fund situation. Schwartz was not satisfied and said they needed to talk to Bhushan to make sure he understood. In this case, Schwartz thought it was his responsibility to go to Dana, the Audit Committee and the Board. He said if there is a potential problem, it is his responsibility to notify them. When asked to clarify, Schwartz said it is his responsibility if he thinks "there is something there." Here, there was a direct request made by the General Counsel of India, put it in writing, and so Schwartz had to do something.

Upon consideration as to whether it would be any different if Bhushan had made an oral request to authorize payment, after a pause, Schwartz responded, "if it were a serious question," then his response would be the same. "This was more than a rhetorical question." In this situation, "we were really being asked to do this . . . This wasn't just a question asked for [Schwartz] to say no. [Bhushan] was serious about it." And so Schwartz had to act. There was specificity; there was a plan of action. The amount was considerable; USD 250 K was a substantial amount of money for a bribe.

EAST\133220531.3

Confidential



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### C.     Response to Potential Improper Payments

It was pointed out that the General Counsel of India is a control function, a gatekeeper, and Schwartz was asked how he got comfortable leaving Bhushan in that position. Schwartz said he "chatted with Dana" and she got comfortable. He said he asked Dana to watch Bhushan.

Schwartz was asked if he had concerns about Bhushan. He responded with a narrative about Jayant Furniture, which he said was "another matter" in or around 2012, but which began earlier. Jayant Furniture was a vendor for the Infra group that supplied furniture. The Infra team was not happy with Jayant's services. "There was a USD 330 K demand" from a government official but "someone" said "if you pay USD 10 K to someone, it goes away." Schwartz claimed no recollection of whether the demand came up through Bhushan or Dana, but said it was probably Bhushan. Schwartz said that he told Bhushan "no way." CTS ended up paying significant legal fees and they settled for USD 185 K. Schwartz did not know to whom payment would have been made in that instance.

It was pointed out that this was the second instance Schwartz described in which Bhushan suggested inappropriate payments and Schwartz was asked again how he got comfortable with Bhushan. Schwartz said that Dana assured him that Bhushan would never make such an improper payment. Schwartz also indicated to the Board that they would never make improper payments. Schwartz was asked if he brought the second potentially improper payment of USD 10 K to the Board. Schwartz claimed to have no recollection.

It was pointed out to Schwartz that it seemed that when potential payments came up, Schwartz reported them to Dana. Schwartz clarified that if he thought it was a "serious request," meaning "not just someone thinking out loud," then he reported it to Dana. He indicated that Bhushan's questions were not rhetorical because they were put in writing. Schwartz was asked again about the USD 10 K amount and how that fit into Schwartz's definition of a serious request. Schwartz said he was not sure he talked to the Board about that but insisted that any time he thought "there is something wrong in a function," he would try to do something about it. He pointed out again that, here, Bhushan put it in writing.

Schwartz again considered whether he would have done the same thing if Bhushan had mentioned the USD 10 K request to him orally. Schwartz said that in this case, based on how Bhushan said it, he would have responded the same. He said that if Bhushan called and said to him, I think we should do this, then Schwartz would have responded the same.

Schwartz continued that after the Monday, August 8, call with Mani, Dana got on a call with Francis D'Souza ("Frank"), Chief Executive Officer and Karen McLoughlin, Chief Financial Officer, followed by a call with the Audit Committee Chair. Schwartz also spoke to all but one member of the Board. In this case, Schwartz indicated that he "reported up" because of the amount at issue, the specificity, and the ongoing investigation.

EAST\133220531.3

Confidential                                                                CTS_R17_0004367



### D.   Compliance Function

Schwartz also offered that, in 2013, Dana began reporting to the Audit Committee on Compliance. He was asked if, as a result, he regarded himself as having no responsibility for Compliance and he acknowledged that he did bear some responsibility. Schwartz elaborated to say he is responsible for understanding what Dana is doing by supporting and helping her if she has issues. Schwartz oversees her compensation, including bonuses. The Company recommended her compensation and Schwartz either approved or disapproved. Schwartz set goals and objectives to meet the Compliance Committee Charter in May 2013. Otherwise, Dana set the goals and the Audit Committee either agreed or disagreed. Schwartz saw her goals and thought they seemed reasonable. He said that they were supposed to discuss goals more frequently, for example at monthly meetings, but Dana canceled most of them. They would talk about her challenges, but they generally did not discuss goals because they did not have enough meetings.

## IV.   CTS POLICIES AND PRACTICES

### A.   Performance Reviews

Schwartz indicated that senior leaders above the director level at CTS do not receive performance reviews. The existing practice is instead that "they sit down occasionally and talk."

Schwartz offered a narrative about the "Gang of 8" dropping legislation in April 2013 on immigration reform. He indicated that CTS's Head of Government Affairs in Washington, D.C. was not performing. Frank, in particular, had concerns about this employee's performance. In June or July 2013, Frank called Schwartz into his office to discuss the issue. Schwartz said if the legislation passed, CTS would have been over because CTS would not have been able to put employees at client sites, which is key to CTS's business model. Frank asked Schwartz to go to D.C. every day. Schwartz went one or two days a week and served as Head of Government Affairs until 2016. Schwartz said he was traveling to D.C. throughout 2014 on this issue. Schwartz was pressed on this issue and asked whether the bill was effectively dead in "the Fall." Schwartz insisted it was not dead until December 2015.

Mr. Buch asked Schwartz if he was aware of any instances in which incidental expenses were removed from invoices and offset with other line items. Schwartz indicated he was not. Schwartz was further asked if he has ever heard of payments being hidden in a line item in a bill. "No." Schwartz expressed his view that when Internal Audit did a compliance deep dive of the Admin group, they should have caught some of the items that DLA identified in its investigation. Schwartz said he was surprised they did not, and as a result, he had not heard of anything like that before.

Page 6 of 20

Confidential



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

### B.    Document Retention

Schwartz indicated that he has no hard copy documents that are responsive to the litigation hold other than potentially some hard copy Board books at his Teaneck office. He indicated that "everything is on computer." When working from home, he receives signature pages, signs them, and then shreds them. Schwartz said that he typically takes handwritten notes and takes notes on his computer and his iPad, but does not use a stylus. His notes are in Word documents or Apple Notes on his MacBook. Schwartz converts his handwritten notes into Word documents or he discards them. DLA has these. Before his MacBook, Schwartz said that he took notes on an IBM. Prior to his use of an IBM, they would have been in Word documents because Schwartz did not have Apple Notes. Schwartz does not take notes in emails for work purposes. All of his notes are on his MacBook. He started using an iPad for work purposes when he got an iPad Pro in 2015. He also has a smaller iPad that he used to take Board notes. He took Apple Notes on his iPad and MacBook. Schwartz uses iCloud, which links his iPad and MacBook. He uses Apple OS El Capitan and IOS 10. He indicated that he occasionally sent emails from his personal email account when it was sent by automatic function, but these would be on the CTS servers.

Schwartz indicated that all of his devices are password protected. On this point, he specifically identified his Mac Book, iPad, and his "older machine." Schwartz provided his passwords to Ernst & Young ("EY") but otherwise "no one has the password," not even his assistant.

## V.    PUNE ENVIRONMENTAL CLEARANCES

### A.    Environmental Clearances and the Show Cause Notice

Schwartz reviewed IN_ELE_03616412, [Tab 525], an email chain dated April 24, 2013. Schwartz recalled that Admin was starting projects without permits and clearances. This was the same as what he heard from the Internal Audit/Audit Committee deck in 2013. There was a slide relating to CTS' campus at Siruseri, which said CTS was doing this. Schwartz said: "this was eye opening in December 2013." They took a two-pronged approach: (i) they fought the litigation with attorneys, and then (ii) they resolved the problem. Schwartz understood the problem was fixed in 2015.

In considering the language in the document stating that it was "[n]ot entirely clear how they would obtain the EC," Schwartz agreed that if they could obtain the clearance, then they would have presented that to the court, but he would have to go back to look to be sure about this strategy. He did not remember if they ultimately obtained the clearance or how they obtained the clearance. When shown the reference to an environmental consultant, Schwartz indicated he did not remember any consultant or what the consultant was doing. At the time of the interview, Schwartz did not know if the Pune litigation was still ongoing because litigation rolls up to Joelle Quilla, General Counsel, Client & Corporate Securities

Schwartz then reviewed ELE_00377894, [Tab 92], a December 2013 Audit Committee presentation. Schwartz was asked about the significant delays referenced in page 25 relating to

EAST\133220531.3

Confidential

CTS_R17_0004369



obtaining permits. He indicated there was a February 2013 deck that mentioned the problem at Siruseri and KITS. There was a reference to beginning construction without permits. This Internal Audit report initiated the Real Estate review that culminated in the December 2013 Internal Audit/Audit Committee report. So Schwartz thought that he learned about Siruseri in February 2013 and about the same issue in Pune in April, likely from Bhushan or Senthil Kumar, Manager, Legal.

With respect to CTS's litigation strategy for Pune, Schwartz said CTS was doing anything it could to get the permits and to prevent fines. He clarified that this did not include paying a government official; they were only doing what was within the bounds of the law. They hired counsel and worked on getting the appropriate environmental clearance even if after the fact. He said it was hard to fix something that was done, which is why they took the two-pronged approach.

Schwartz reviewed IN_ELE_00304964, [Tab 65], an email chain dated May 17, 2013 and asked why Bhushan looped him in to the Pune discussion reflected in this document. Schwartz claimed that this was just an update. He said he did not interpret Bhushan's comments to reflect a concern about how Mani would obtain the environmental clearance. Bhushan thought Mani was oversimplifying things, including the ease of obtaining the environmental clearance.

Schwartz reviewed IN_ELE_03599576, [Tab 64]. Schwartz recalled that it referenced potential criminal prosecution against CTS. It identified a USD 92 M project that potentially could not be used if they did not receive the appropriate permits and clearances. Schwartz claimed he did not remember reporting this to CTS's Board, only the India Board. He also did not remember reporting it to the auditors. Schwartz indicated that Senthil was always worried and potential criminal sanctions in India were common but that he took it with a grain of salt.

Reading the documents, Schwartz said that it appeared that the reference to "statutory requirements" was a reference to "part of the permit process." Schwartz further acknowledged that he received regular updates on the legal situation in Pune from Bhushan and Senthil. Schwartz said that he had faith in Bhushan to handle the litigation part and update the India Board as needed.

### A.   Pune Red Flags

Schwartz denied any knowledge about the about references in documents to working with outside consultants. He said that at the time, he did not recognize this as an FCPA red flag but he does now. He "had no inkling of any of this back then." When Schwartz received DLA's [July 2016] memorandum, he said he was heartbroken because it did not reflect the CTS culture that he knew. The tone from the top has always been that they do the right thing, they do not cut corners. This was particularly important in a risky market like India.

Schwartz said that he was not aware that CTS might be making payments to get permits quicker for the Pune facility. He said that he never had any indication of this and did not think it was

EAST\133220531.3

CTS_R17_0004370



something CTS did. After he received the Internal Audit report, Schwartz asked Dana if they should look at Real Estate. Dana said "you don't want to do that." "Based on advice from DLA," she said, "once you have done your review you do not have an obligation to do anything further." He said that Dana further claimed that Internal Audit needs to focus on the things they need to focus on. Dana said she received this advice from DLA in 2015. Schwartz said he does not have any emails about this but Dana and Frank remember. Schwartz also went to Henry Shiembob, Chief Security Officer, about it. Schwartz said that he was not worried about CTS working with outside consultants to interface with local authorities. He said he trusts his India legal team to tell him about issues and does not think they keep anything from him. Schwartz understood that the litigation strategy at Pune would include presenting the environmental clearance but insisted this would only be in compliance with the law.

## VI.   REFORM OF PRE-PERMIT CONSTRUCTION PRACTICE

Schwartz reviewed IN_ELE_03529882, [Tab 84], an email dated November 6, 2013 from Deepa, providing an update on the show cause notice received at Pune. He reviewed, in particular, page 2, which indicated a serious review of CTS's building and permitting process was required to ensure compliance. Schwartz said that the India Legal Department knew that Finance was working on solutions with the Corporate Legal Department. Schwartz added that a "compliance board" was created in India in May or June 2013—which he acknowledged he was calling "the wrong thing"—to ensure that starting construction without permits did not continue. Schwartz indicated this was "troubling" not only to him but to the entire executive team.

He said that Bhushan proposed a series of recommendations to Schwartz, and Dana was overseeing the legal process in Admin. Before they knew about these issues, Admin had been "getting ahead of itself" in starting projects. Bhushan put in place a four-step process for up-front review. Legal then began working with Admin to ensure they had a permit before starting the work.

Deepa Baburaaj General Counsel, India worked on reforming the process of obtaining construction permits. There are decks on it. Finance was also working on reforming the permitting process. Karen McLoughlin, Raj Ghosh, Vice President, Global Procurement, and another person gave a presentation in a December 2013 meeting. This is the December 2013 Audit Committee Procurement Process Update. Schwartz said he was happy after this because "Legal had a seat at the table." Furthermore, Bhushan, the Compliance Committee, and the software called "Lexplosion" that they rolled out gave him confidence. Schwartz had confidence in Bhushan. Schwartz explained that Lexplosion lays out the statutory requirements. If you are constructing a building, Lexplosion will tell you what you need. On each trip to India, Schwartz received an update on Lexplosion. CTS used the software for HR, Admin and other contexts.

EAST\133220531.3

Confidential



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

## VII.   CKC PLANNING PERMIT

### A.   Meeting/Telephone Call with Coburn in 2014

In considering his purported conversation with Coburn regarding the CKC planning permit, Schwartz repeated that Coburn requested that Schwartz come to his office. Schwartz was asked if he remembered the questions asked in his last interview and the answers he provided. Schwartz was given an opportunity to change those answers and he instead repeated his prior assertions. He was asked if he remembered when he was questioned about a conversation with Coburn, Sridhar and Mani about getting permits at KITS. He remembered saying no. This format of Q&A was followed and Schwartz reiterated his prior statements that he remembered the conversation with Coburn but he did not remember the word "bribe" being used. Schwartz indicated that Coburn was having a challenging time getting a real estate project going. He did not tell Schwartz the name of the facility but Coburn recently reminded him it was CKC. Coburn said he could not make a payment directly or indirectly. Schwartz said he did not think Coburn was asking a question. Instead he said that Coburn "was thinking out loud" and said, "I can't make any payment to a government official directly?" To which Schwartz said he answered "Ok. No." Coburn then said, "I can't make any payment indirectly to a government official?" Schwartz again responded, "No Gordon." According to Schwartz, that was it. Schwartz said no "just to say no" but he "didn't think they were questions." It was a 30-second conversation and there were no subsequent conversations on the topic. Schwartz explained that it was not uncommon for Coburn to think out loud and ask questions and that Coburn never ignored Schwartz's advice.

In defense of Coburn's character, Schwartz referred back to the Provident Fund issue. He recalled that someone said to Coburn if they used a certain law firm, the problem would go away—Coburn said no immediately. This was huge issue. The same was true for the Jayant furniture issue—Coburn said no. Schwartz said that he thought the culture at CTS was such that they would not do this. Schwartz "would never ever tell someone to do something wrong, particularly in Admin." He pointed out that the Provident Fund issue [making the problem go away] would have helped his career but still he refused because this was simply, "not our culture." Schwartz said that he had no doubts about Coburn's character in this regard. He said it took only a nanosecond for Coburn to reject the notion of an improper payment in connection with Jayant and the Provident Fund. Coburn never wanted to be in the gray area. He thought out loud, but always followed the advice of counsel. Schwartz reiterated that, looking back, he did not think Coburn asked him a question at all in the 2014 meeting.

## VIII.   OTHER EXECUTIVES

In considering whether he had any concerns about other senior executives, Schwartz said that right before he was taken off the investigation, Frank D'Souza told him a story but told someone else a different story. Schwartz was on the phone with Frank soon before Saturday, August 20, the day Schwartz was removed. He recalled that Frank was frustrated and wanted to take immediate action—slash and burn in the investigation. Frank relayed a story of when he set up



D&B India and was trying to get equipment into India. Frank said the equipment got stuck at a dock because the government official wanted a bribe. Frank went every day to the dock and told the official they could do it every day but he would not pay the bribe so he should go pick on someone else.

Schwartz started to tell Dana the story. Dana said she knew the story: Frank was bringing equipment into D&B and he paid bribes to get the equipment. Schwartz said he told Dana, "wait that's not my story" but was taken off the case before he had a chance to discuss it in detail with Dana or Frank. Schwartz says he still has no doubt about Frank.

Mr. Buch asked Schwartz if he had any concerns about Sridhar Thiruvengadam, Executive Vice President, Strategic Initiatives and former Chief Operating Officer. He said no. Schwartz said did not deal with Sridhar often and someone else was also always involved in Schwartz's meetings with him.

Mr. Buch asked Schwartz if he had any concerns about Lakshmi Narayanan, Vice Chairman of the Board. He said he had no concerns that he "could remember." Like Frank, Schwartz said Lakshmi "always played by the rules." He said Lakshmi is connected in the government but "never indicated" that bribery was an issue. Schwartz said he could not remember a conversation with Lakshmi around payments.

Schwartz was asked about a conversation with Frank after August 20, 2016. Schwartz said he told Frank exactly what he stated previously about the chat with Coburn. Schwartz was shocked and taken aback [by Mani's allegation] because Schwartz has so little involvement in Admin. Schwartz was questioned about the inconsistencies between his prior statements to DLA and his purported statements to Frank as follows:

> Q: Did you tell Frank that Gordon invited you to a conversation about a bribe?
>
> A: No.
>
> Q: Did you say you replied that Cognizant had a contract with L&T and it was their responsibility to fulfill the contract?
>
> A: Not in those terms. If I mentioned L&T at all, I would have said there were FCPA provisions in the contract.
>
> Q: Did you tell Frank the situation involved L&T?
>
> A: I don't recall.
>
> Q: Did you tell Frank that L&T could help if they had trouble?

EAST\133220531.3

CTS_R17_0004373



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

A: No. In another conversation, I might have said something about L&T. I never said that L&T could get things done. I might have talked about L&T in connection with the Internal Audit report and, in that context, said that they could get things done. But I didn't say that recently to Frank.

Q: Do you remember telling anyone that Coburn is "unpoliceable"?

A: No. I might have said he could be challenging.

Upon consideration as to whether he remembered being asked previously by DLA about a call with Mani, Sridhar, and Coburn regarding a demand or proposal to make a payment to a government official, Schwartz repeated that he did not remember such a call. Schwartz remembered the prior interview discussion about a call "when I was having surgery on my eye." On April 21, Schwartz said he was "heading into the city." He said he was going in the late morning but would have to look to be certain about the time. Similarly, Schwartz did not recall having calls on April 22 with Mani, Coburn, and Sridhar, or with Coburn and Lakshmi.

Schwartz said his "entire week" of April 21 was "dealing with eye surgery" that took place on April 24. He said that the week leading up to surgery was not good. He canceled many calls and was not on many calls that week.

When asked if he had a memory of specific statements that others said were made on the calls.

Q: Was there a discussion that there was a demand or plan to make a payment of "north of $1 million"?

A: I don't remember that at all. I would remember that because it would be the biggest number I've ever heard of.

Q: Do you remember Gordon [Coburn] saying on the call that that there was "no freakin' way" that CTS would make the payment?

A: No, but I would expect that from Gordon.

Q: Do you remember Gordon saying there was a discussion that if L&T had a government affairs group, they should exert influence?

A: I don't recall that.

Q: Do you remember a discussion on the call about a strategy to withhold payment to pressure L&T to obtain the permit?

A: I don't recall that but I learned of it later from Gordon.

EAST\133220531.3

Confidential

CTS_R17_0004374



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Schwartz was asked if he remembered telephone calls with Dana after the Audit Committee took over the case. Specifically, he was asked if he recalled telling Dana in an August 20 call that he suspected Mani made an accusation about him. Schwartz said he did remember. Someone along the way told him that Mani made an allegation about him. Schwartz said that Dana gave him "a tell" and Joelle told him. Also based on Mani's position as head of Admin, Schwartz said that he assumed it was Mani.

Schwartz was asked a series of questions to test inconsistencies between his statements to Dana and his statements to DLA.

> Q: Do you remember telling Dana that you had a call with Gordon during which he asked if L&T could make a bribe?
>
> A: No, it wasn't a call. L&T was not mentioned. I was walking by and was pulled into Gordon's office.
>
> Q: Do you remember asking Dana if the accusation related to environmental issues at KITS?
>
> A: No, I did not.

## IX.    APRIL 2014 CONFERENCE CALLS

Schwartz reviewed ELE_00961746 [Tab 110], an email chain dated April 21, 2014 wherein Coburn asks to speak to Schwartz; IN_ELE_00961764 [Tab 112], an email dated April 21, 2014 from Coburn about a "follow-up call," ELE_00217277 [Tab 114], an email chain dated April 22, 2014 wherein Coburn requests a call with Lakshmi and Schwartz; and ELE_00961765 [Tab 116], a conference call invite for April 22 between Mani, Sridhar, Coburn and Schwartz. Schwartz claimed that he did not remember the calls referenced in these emails. He did not remember the reference to a "government issue in India." Schwartz reiterated that he missed many calls that week. He was "in and out of calls" and "in and out of cars." He admitted that he missed many things. Schwartz was asked if he could have been home at the time of the call. He said yes, he could have been at home at the time.

Schwartz was asked a series of questions about the items that would later be shown in his notes.

> Q: Do you remember hearing that there was a payment that needed to be made at Pune?
>
> A: No.
>
> Q: Did anyone ever tell you that a $2 million payment needed to be made?
>
> A: No.

Page 13 of 20

Confidential

CTS_R17_0004375



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

> Q: Did anyone tell you about a line item in a change request for $2 million?
>
> A: No.

When asked, Schwartz said he was familiar with a change request and explained what it meant in some detail.

### A.      April 22, 2014 Call Notes

Schwartz reviewed 00901523 – Call Notes [Tab 115], a copy of notes found in his custodial files dated April 22, 2014 and appearing to reflect notes from the call(s) that took place that date. After reviewing the notes, Schwartz said, "if they were on my machine, then I took them." "If I took the notes, I took the notes. I'm not denying these are my notes." He added, "but I don't remember." He said he does not remember the week. He indicated that the notes appeared to reflect other people talking. "That's what they must have been saying." Schwartz was asked a series of questions about the content of the notes.

> Q: Line 5 says L&T is making small payments. What does it mean?
>
> A: I don't know other than the words on the page. I don't remember the conversation.
>
> Q: This one is $2 million. What does it mean?
>
> A: I'm guessing they were asking for $2 million. I don't remember. I don't know to whom the payment was made.
>
> Q: $670,000 normal rate. What does this mean?
>
> A: I don't recall.
>
> Q: To which government officials would payment be made?
>
> A: I don't recall.
>
> Q: Do the notes refer to a payment to a government official?
>
> A: I don't recall.
>
> Q: Isn't that the natural inference from the notes?
>
> A: I don't remember. I just wrote what people said.

EAST\133220531.3

Confidential

CTS_R17_0004376



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Q: Did you understand the speakers to tell you there was a demand from a government official relating to Pune for $670,000?

A: I do not recall.

Q: L&T spent more than usual. What does that mean?

A: I don't recall.

Q: Highest demand we've seen. What did you mean?

A: I was just taking notes of people talking. I don't remember.

Q: Money going where; we do not know. What does that mean?

A: There are lots of red flags here that I do not remember. I'm not going to make stuff up.

Q: You had a conversation about a $2 million payment. Do you remember asking questions?

A: I do not recall.

Q: How can you not remember a call about $2 million?

A: I do not recall. I'm not going to make something up. Based on what was going on in my life that week, I don't remember anything.

Q: How do you interpret the document?

A: I don't know what it's for.

Q: "Reas and cust." What does that mean?

A: I do not recall.

Q: Change request for a lot of line items. What does that mean?

A: I don't know.

Q: Are we setting precedent. What does that mean?

A: I don't know what it means.

EAST\133220531.3

Confidential

CTS_R17_0004377



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Schwartz claimed that he was not aware of any change requests. He said he never saw a bill and never discussed a bill with Coburn. Schwartz said he did not like the way his notes look now. When asked what he meant and what they looked like, he responded, "It could be a payment to a government official." He added that he did not know or remember. Schwartz admitted that he did not report the information seemingly discussed on this call to the CEO, Audit Committee, the Chief Compliance Officer, or outside counsel. He did not think that he reported it to anyone at CTS. He did not know what he did with the information, nor does he remember asking questions or providing advice. He said again that he was going into surgery and was "focused on me." He said he had not seen the document before this interview.

Schwartz was asked about the reference in his notes to Lakshmi. When asked specifically about the reference to "taking the right approach," Schwartz said this would mean that they were not paying a bribe. He said there could be no alternative interpretation with Lakshmi involved. Schwartz was asked if he had any knowledge, memory or ability to interpret the comments under Lakshmi's name in his notes. In response, Schwartz said he could not remember and he did not know what the references meant.

Schwartz was shown Tandberg records for calls on April 21 and 22. He claimed that he still did not remember the calls.

When asked if he did anything about the bribery-related red flags raised on the call, Schwartz said he did not remember taking any actions or going to anyone about them. He was asked what should be done with this kind of information. He responded that he should have reported it up because it was serious. He said it would be a violation of policy if they made an improper payment. When asked if having a discussion to consider making an improper payment was a violation of CTS policy, he did not respond verbally but moved his head and shoulders as if to indicate maybe. Schwartz admitted that the Board and the Audit Committee would want to know about a demand for a USD 2 M payment and under normal circumstances, he would report it up.

At various points of the interview, Schwartz repeated that, at the beginning of the week in which April 21-22 calls occurred, he learned that he might lose his eye. When it was pointed out that he felt of sound enough mind to join and participate in the conference call, Schwartz said, "I appreciate your viewpoint." He was asked, "What should the Company do about this?" "Is it a gross failure?" Schwartz replied that he did not know. Schwartz said he would have told the participants on the call that they could not make an improper payment but he has no notes or memorandum that reflects such advice and nothing to corroborate his story. He indicated, however, that he had said no to smaller amounts in the past and his history at the company supported his position.

Schwartz was asked if the notes referred to hiding the payment in a change order request. He acknowledged that "one could interpret it that way" and "it is a red flag," which he rephrased to: "If it means what you think it means, then it is a red flag." Nevertheless, Schwartz did not go to Internal Audit or anyone else about it.

EAST\133220531.3

Confidential

CTS_R17_0004378



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Schwartz indicated that he has no concerns about CTS's books and records and no one has ever raised any such concerns to him. He said he has no concerns about bribery or corruption at CTS and no concerns about any violations of the anti-bribery policy or code of conduct.

Schwartz reviewed IN_ELE_00377848, [Tab 130]. Schwartz denied any recollection of the document or receiving a copy of the government order for the CKC planning permit.

## X.   COGNIZANT ANTI-CORRUPTION POLICY

Schwartz reviewed ELM_04666396 [Tab 12], the Cognizant Anti-Corruption Policy. Schwartz was directed to the prohibitions in CTS's Anticorruption policy against turning a "blind eye" toward potentially improper payments. Schwartz admitted that if he had been "with it" when he was on the April call then it would be appropriate to conclude that he turned a blind eye. He further admitted that had he taken steps to prevent the payment, then it would not have happened and he "could see" that the company might consider that he was willfully blind. He declared, however, that if he knew he had done something improper, then he would have resigned.

## XI.   PUNE ENVIRONMENTAL CLEARANCES

When asked about the reference in his call notes to a demand or payment in connection with the Pune facility, Schwartz acknowledged his familiarity with the Pune facility and with the Company's challenges in obtaining an environmental clearance. Schwartz was asked if, as a result of the call, he was concerned that the environmental clearance was obtained by improper payment. He said he did not remember the call and therefore did not know. Schwartz indicated that Deepa Baburaaj is more familiar with the Pune show cause proceeding. Schwartz was further asked: if he knew about it and had concerns, what would he do now. He responded that he would "look and investigate."

After further reviewing his call notes, 00901523 – Call Notes [Tab 115], Schwartz acknowledged that, at the end of 2013 and beginning of 2014, he was advised by his India legal team that CTS was experiencing delays in obtaining an environmental clearance for the Pune facility. It was pointed out that four months later, Schwartz was involved in a discussion about a demand for payment in connection with Pune. He acknowledged that this was a red flag and added, "I don't like the answer of what I did that week." He pointed out that there would be no reason for him to cover up an improper payment. "There was no benefit to my not reporting, as I have done many times in my career."

It was pointed out to Schwartz that his notes are clear and lucid. He did not disagree with this point. It was further pointed out that there were a series of items in the notes that would meet his definition of "serious." Schwartz responded, "I don't like the way it looks." "I don't love the note, but if I remembered this, I would have gone to Internal Audit. I would have gone to Frank and asked them to look into Real Estate." He said if he had a memory of it, then Steven's lawyer would know about it. He said if he had been "with it" that week, he would have reported it.

EAST\133220531.3

Confidential



When it was pointed out that all he needed to do was to forward his notes to the Audit Committee, Schwartz said he was "just listening." He said he had "run to the Audit Committee" for far less in the past. He further indicated that he was not looking to protect any of the people reflected in the notes. He said he should have taken the week off. He said, "I apologize with what was going on that week."

After going through the notes with Schwartz, his attorney Joshua Rievman volunteered that Schwartz had spent the better part of the month wracking his brain trying to figure out why CTS was looking at him and "this" had not come up in any of their conversations.

## XII.    MANAGEMENT RESPONSIBILITIES

Schwartz has oversight over the Legal budget out of which the Compliance budget had been segregated in 2015. Prior to that, Dana asked for a budget and Schwartz determined what was ultimately presented to McLoughlin and Coburn.

### A.    CTS Anticorruption Policy (Second Pass)

Schwartz was directed to page 3, bullet 2 of CTS' anticorruption policy and referred back to his call notes, 00901523 – Call Notes [Tab 115]. He was asked if lines 12 and 13 of his notes were red flags. He said yes they would be if he were "with it." Schwartz was then asked another series of questions about the notes.

> Q: Is the India market high risk?
>
> A: Yes
>
> Q: Are the references to $2 million and $670,000 in the notes facilitation payments?
>
> A: They are not.
>
> Q: Were you aware that Cognizant's receipt of favorable license and permit results could be an improper benefit?
>
> A: Yes.
>
> Q: Had you been competent that week, would the call have put you on notice that an improper payment was substantially likely to occur?
>
> A: Yes.
>
> Q: Did you understand that someone who fails to pursue a red flag could be found to have violated the FCPA?

EAST\133220531.3

Confidential

CTS_R17_0004380



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

A: Yes.

Q: If you were aware during this week, would you agree that this would be willful blindness?

A: Absolutely.

Q: After the surgery, did you know you were out of it? And if so, did you do anything to go back and look at what you were working on to see if there were any issues that needed following up?

A: Yes, I knew I was out of it. No, I did not go back to look for open issues. The week was a blur.

Q: Are you aware that this is a potential criminal violation?

A: Yes, I am aware.

Q: Were you aware that Cognizant could not make a payment directly or indirectly to a government official to obtain an improper benefit?

A: Yes.

Q: Did you sign a certification that you agreed to abide by the Code of Conduct?

A: Yes, and I would be subject to it whether I signed it or not.

Q: Did you have an obligation to report this potential improper payment?

A: Yes, in my right mind I would have had an obligation to report and would have reported it.

Q: Do you remember PwC asking you if you were aware of any illegal acts?

A: I was not "aware" because I don't remember the call. I would have resigned if I remembered the call.

Q: You sign a SOX certification every year in which you represent that you have evaluated internal controls and reported deficiencies in internal controls. Would failing to report the call be a violation of that certificate?

EAST\133220531.3

CTS_R17_0004381



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

A: Yes, and I would have reported it if I was in my right mind.

Lastly, Schwartz was asked  if he was aware of any other compliance issues or issues affecting internal controls. He said he was not aware of any other issues.

After a short break, Schwartz's lawyer indicated that given the potential implications of the discussion, Schwartz would not answer any further questions.

\*       \*       \*

At the end of the interview, Schwartz was instructed to keep the content of the discussion confidential.

EAST\133220531.3

Confidential

CTS_R17_0004382