# Exhibit 10



## FEDERAL BUREAU OF INVESTIGATION

Date of entry  10/16/2017

DANA GILBERT, COGNIZANT Chief Compliance Officer (CCO), was interviewed at the Securities and Exchange office, 200 Vesey Street, Suite 400, New York, NY 10281. GILBERT's legal representation, Crowell Moring attended the interview. Participants of Crowell Moring were Daniel L. Zelenko and Danielle Giffuni. Members participating in the interview of GILBERT included, FBI Special Agent (SA) Kelly Blanchfield, Department of Justice Trial Attorney, Kevin Gingras, Assistant United States Attorney (AUSA) Andrew Bruck, United States Attorney's Office, District of New Jersey, SEC investigator Paul W. Sharratt, SEC investigator Mike Cono and John Bowers, SEC trial attorney. After being advised of the identity of the interviewing Agent and the nature of the interview, GILBERT provided the following information:

GILBERT graduated from East Carolina University in 1995 with an undergraduate degree. GILBERT graduated Chapel Hill law school in 1999 and took the BAR exam in New York and New Jersey in the same year. In 2000, GILBERT worked for a small law firm located in Princeton, New Jersey. In 2002, GILBERT assisted COGNIZANT with an acquisition and was introduced to STEVEN SCHWARTZ, general counsel for COGNIZANT. SCHWARTZ was the only in house lawyer for COGNIZANT in 2002.

In September 2002, SCHWARTZ asked GILBERT to join the COGNIZANT team. GILBERT interviewed for a director level position at COGNIZANT that reported to SCHWARTZ. GILBERT's responsibilities included assistance with the SEC filings, contract review, and contract negotiations. GILBERT was the second in house attorney that was hired by COGNIZANT.

In 2002, COGNIZANT had $220 million in revenue with 400 employees. The legal department continued to expand. GILBERT held several positions with COGNIZANT that included: director, AVP, VP, and Senior VP in 2014. GILBERT assisted with the setup of an offshore legal team in India that handled all outsourcing for COGNIZANT. GILBERT also took on compliance responsibilities for the company. In 2012, GILBERT proposed a formal compliance plan that was approved by the board of directors in May 2013.

In 2016, GILBERT became the Chief Compliance Officer and General Counsel for North America. GILBERT's direct reports included: ANAND BHUSHAN

| Investigation on | 10/05/2017 | at | New York, New York, United States (In Person) |
|---|---|---|---|

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Date drafted  10/11/2017

by BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000046

, DOUG JONES, commercial attorney, MISTY PEDERSON, AVP of compliance, ROHAN SUKHDEO, AVP of compliance, and KERAN CHEVALIER, director of compliance. GILBERT reported to SCHWARTZ; however, the Audit Committee gave GILBERT the authority to report any areas of concern directly to the committee. GILBERT reported to the board quarterly.

All investigations for COGNIZANT were handled by the Corporate Security team unless the subject was human resources related. PEDERSON received all of the complaints and distributed the complaints to various individuals on the compliance team to be investigated.

Compliance was broken up into two parts: operational and core. The operational compliance included client work, regulators (health care, banks, etc), and worked with the business teams of COGNIZANT. The core compliance handled all of the corporate compliance. The corporate compliance ensured that COGNIZANT adhered to all laws and regulations. COGNIZANT had 5 employees that worked core compliance.

GILBERT left COGNIZANT in June 2017 and was unemployed at the time of the interview.

## INTERNAL INVESTIGATION

On August 20, 2016, COGNIZANT's outside counsel, DLA Piper, and the company provided GILBERT with an update on the investigation. GILBERT was at her home in Cape Cod, Massachusetts. GILBERT was instructed to call SCHWARTZ and GORDON COBURN, President of COGNIZANT. GILBERT was instructed to obtain COBURN and SCHWARTZ's laptops for imaging and advise SCHWARTZ and COBURN that they were not involved in the investigation moving forward. There was another COGNIZANT attorney that assisted in collecting the laptops to be imaged. There was a list of individuals and devices that needed to be collected.

## COBURN

*{Agent Note: GILBERT was provided a call log of her COGNIZANT mobile telephone number, (201) 759-3094. Refer to the 1A for the call log}*

GILBERT called COBURN twice on August 20, 2017, as displayed in the call log as call #5 and call #6. COBURN did not answer either phone call and GILBERT left a voicemail.

COBURN e-mailed GILBERT later in the afternoon and said that he was available for a call. GILBERT called COBURN, telephone number (970) 455-1050 from her home telephone number (508) 348-1722, Comcast service provider at 6:37PM. GILBERT advised COBURN that there were developments in

the Foreign Corrupt Practices (FCPA) matter and the company needed COBURN's laptop and other electronic devices at COGNIZANT Headquarters, located in Teaneck NJ, on Monday morning. There were several people's devices that were imaged on that Monday morning to include: STEVEN CASARI, GILBERT, LAKSHMI NARAYANAN, KAREN MCLOUGHLIN, and all of their assistants. COBURN agreed to bring his devices and inquired about the eDiscovery process at COGNIZANT. GILBERT advised COBURN that he would not be involved in the investigation anymore.

COBURN had a very nonchalant demeanor and didn't seem surprised about the information that GILBERT relayed. COBURN did not have any questions besides the eDiscovery process. COBURN was aware of the investigation and received updates regularly. COBURN asked GILBERT if he was allowed to continue to work with SCHWARTZ. GILBERT said yes, but not to discuss the investigation. GILBERT advised COBURN that SCHWARTZ was not going to direct the investigation going forward.

On August 20, 2016, COBURN and SCHWARTZ were the only two individuals that were sidelined from the investigation. As the investigation progressed, there were additional management personnel that were walled off from the investigation.

COBURN thanked GILBERT at the end of the telephone call. That conversation was the last time that GILBERT spoke to COBURN.

## *SCHWARTZ*

On August 20, 2016, GILBERT called SCHWARTZ at 11:54AM from GILBERT house number, ending in 1722 to SCHWARTZ's mobile telephone, 203-832-7997. The telephone call lasted approximately 5 minutes. GILBERT relayed the same message as COBURN and instructed SCHWARTZ that he was no longer able to participate in the investigation. SCHWARTZ was asked to wait in the office on Monday after turning over his devices to speak to FRANK D'SOUZA, CEO of COGNIZANT.

SCHWARTZ was stunned and that he would comply with turning over his devices and to not participate in the investigation. SCHWARTZ inquired of who else was sidelined from the investigation. GILBERT responded that COBURN also off of the investigation. GILBERT told SCHWARTZ that there was a set up in the board room for his devices to be imaged and that he was not the only COGNIZANT employee that was bringing devices to be imaged that day. SCHWARTZ understood. GILBERT conveyed that the audit committee would assume control of the investigation.

GILBERT instructed SCHWARTZ and COBURN to not discuss the investigation with anyone unless counsel was present.

DOJ-302-00000048

{Agent Note: The following timeline took place on August 20, 2016.}

At 12:07PM, SCHWARTZ called GILBERT's home telephone. SCHWARTZ asked GILBERT if she spoke to COBURN at that point. GILBERT told SCHWARTZ that she left him a voicemail but COBURN has not returned her telephone calls yet. SCHWARTZ told GILBERT to try COBURN now and that he was available since SCHWARTZ just spoke to him. SCHWARTZ indicated that COBURN would take the call at that moment.

At 12:08PM, GILBERT called COBURN. COBURN did not answer and GILBERT did not leave a voicemail.

At 12:40PM, SCHWARTZ called GILBERT's home telephone. The call lasted approximately 10 minutes. SCHWARTZ said that he went through his e-mails on his device and that he could not think of a single thing that he did wrong. GILBERT told SCHWARTZ that was not a good use of his time and to just turn over his device. SCHWARTZ was worked up on call. GILBERT could tell that SCHWARTZ's wheels were spinning. It was normal for SCHWARTZ to call her all day long if there was an issue.

At 1:12PM, GILBERT missed a call from SCHWARTZ on her home telephone.

At 1:43PM, GILBERT returned SCHWARTZ's call from her house telephone to his mobile number. The call lasted approximately 26 minutes. There was no small talk on the call. SCHWARTZ sounded like he was "starting to lose his mind". SCHWARTZ was more agitated on this call. SCHWARTZ told GILBERT that he understood that she was unable to provide details about what was uncovered but that he suspected that MANI had accused SCHWARTZ of wrongdoing. GILBERT was in listen mode and took notes of the call. SCHWARTZ told GILBERT that he would do a review of his emails and forward any relevant communications to GILBERT and DLA Piper. GILBERT instructed SCHWARTZ to turn over his computer. SCHWARTZ asked if he was going to be fired on Monday. SCHWARTZ asked GILBERT if she knew what D'SOUZA was going to say. GILBERT told SCHWARTZ that she was not aware of any basis for him to get fired at that time. SCHWARTZ replied with "at this time, nice choice of words". GILBERT was aware of MANI's identity at the time of the call.

On the above mentioned call, SCHWARTZ volunteered to GILBERT that he was racking his brain and remembered being pulled into COBURN's office, in Teaneck NJ, to participate in a call that was already taking place. The discussion on the call in COBURN's office was whether the company can use L&T to make a payment related to some trouble at the CKC or KITS campus. SCHWARTZ advised the participants of the call that they can use L&T for help on the project as long as it was nothing illegal. GILBERT told

SCHWARTZ to describe that to the investigators. SCHWARTZ said "off the record" to GILBERT which in turn GILBERT stopped SCHWARTZ and said "nothing is off the record". The call ended.

GILBERT was aware of L&T at the time of the call. GILBERT assumed SCHWARTZ meant bribery but she did not ask for a further explanation. GILBERT was aware that there was an issue at the KITS facility. GILBERT was aware of one issue at the KITS facility that was communicated to her and SCHWARTZ from the internal investigation. GILBERT's knowledge of the issue at KITS came solely from the investigation. GILBERT took notes during the telephone call.

At 2:27PM, GILBERT missed a call on her house telephone from SCHWARTZ

At 2:35PM, SCHWARTZ called GILBERT's mobile telephone.

GILBERT created a list of missed calls on August 21, 2016 in order to fill in the blanks of all communications.

GILBERT started to intentionally ignore SCHWARTZ's telephone calls.

At 2:36PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12253 for the text communication)**

At 2:46PM, GILBERT called SCHWARTZ from her home telephone. The call lasted approximately 4 minutes. SCHWARTZ professed his innocence and that he was still in the process of going through his e-mails. SCHWARTZ was very concerned and couldn't find anything that he did wrong.

At 2:57PM, SCHWARTZ called GILBERT's house telephone. GILBERT did not answer the call.

At 3:59PM, SCHWARTZ called GILBERT's house and mobile telephone. GILBERT did not answer either of the calls.

At 4:00PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12253 for the text communication)**

At 4:07PM, GILBERT called SCHWARTZ mobile telephone from her home telephone. The call lasted approximately 21 minutes. SCHWARTZ was extremely angry and said that he could not work for COBURN anymore. SCHWARTZ stated that he was looking for a new job. SCHWARTZ felt that he was being falsely accused. SCHWARTZ did not understand what he was being accused of but that he would not stand for it. GILBERT told him to relax and wait to talk to D'SOUZA.

At 5:16PM, SCHWARTZ called GILBERT's home telephone. GILBERT did not take the call.

At 7:48PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12253 for the text communication)**

At 8:11PM, GILBERT called SCHWARTZ from her house telephone number. The call was approximately 11 minutes. SCHWARTZ told GILBERT that he needed to vent and was very angry. SCHWARTZ indicated that once COBURN asked SCHWARTZ if L&T can pay a bribe, SCHWARTZ told COBURN no and that L&T could only use their influence if it was legal. SCHWARTZ told GILBERT that he joined a call that was already in progress and that SCHWARTZ agreed on the call that the turnkey model was the right approach. GILBERT was not aware about the turnkey model nor did she inquire of SCHWARTZ about the turnkey model.

GILBERT was in listen mode during the call with SCHWARTZ and took notes of the things that he said. SCHWARTZ claimed that he went through 100,000 e-mails that day and that he made no mistakes. SCHWARTZ said that DEEPA, GILBERT, and CASARI were more involved with the real estate group than he was.

On the call, SCHWARTZ complained that COBURN was "unpolicable" and that SCHWARTZ "could not police everyone in the company". SCHWARTZ said that he was going to resign even though he did nothing wrong. SCHWARTZ was done, tired, and has been thrown under the bus too many times. SCHWARTZ claimed that he was accused by bad people that were looking for a scapegoat. SCHWARTZ said that he did the right thing for 15 years and that he could not find any evidence of anything that he did wrong. SCHWARTZ said "I'm not going to stand for this shit".

Towards the end of the call, SCHWARTZ referred back to L&T and said L&T can use their government influence but cannot pay a bribe. SCHWARTZ was livid and "always told them no bribes". SCHWARTZ told GILBERT "good luck with the company".

GILBERT never heard SCHWARTZ say that COBURN was "unpolicable" in the past. SCHWARTZ and COBURN did not always get along but SCHWARTZ never indicated that COBURN did anything that warranted to be policed. SCHWARTZ and COBURN disagreed on budgets, pay increases, and promotions. COBURN was a bully, a "tough guy", unkind to everyone, and everyone had issues him at times.

SCHWARTZ was very worked up and angry on the call.

At 9:09PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12253 for the text communication)**

At 9:40PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12253 for the text communication)**

At 10:40PM, SCHWARTZ called GILBERT's cell phone, listed as #11 on the call log. The call lasted approximately 37 minutes. SCHWARTZ apologized to GILBERT for venting on the previous call. SCHWARTZ told GILBERT that he reviewed the items in his computer and the only thing that he could think of was a consultation about an environmental issues for the KITS facility. SCHWARTZ said that he had no idea what happened after his consultation for KITS.

SCHWARTZ found an e-mail from MANI that requested training for the Administration team. SCHWARTZ was angry that the Administration team acted like they "didn't understand the rules". GILBERT thought that SCHWARTZ was referring to anti-corruption and bribery training. SCHWARTZ told GILBERT that "reading between the lines", that MANI would claim that he was unaware that it was illegal for bribes to be paid through 3rd parties. SCHWARTZ listed other items as well as a water issues at the PUNE facility that was handled properly by BHUSHAN and outside counsel and an encroachment issue that was handled by outside counsel.

SCHWARTZ was in a better mood and calmer during the call.

*{Agent Note: The following communications took place on August 21, 2016}*

At 12:31PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12254 for the text communication)**

At 12:42PM, GILBERT called SCHWARTZ from her home telephone number. The call lasted approximately 20 minutes. SCHWARTZ started the conversation with making jokes about finding e-mails on his computer related to BHUSHAN and DEEPA's attempted resignation in 2011. COGNIZANT pressed BHUSHAN to stay with COGNIZANT, which he agreed to. Once BHUSHAN agreed to stay, DEEPA agreed to stay as well.

SCHWARTZ told GILBERT that he spoke to D'SOUZA and did not feel better. SCHWARTZ was curious to see BREAK-IVANS' approach to the investigation and said that he hoped that she was "up for the job". GILBERT advised SCHWARTZ to trust the process and that she was confident that the investigation was bring handled properly. That comment made SCHWARTZ angry and he got loud with GILBERT. GILBERT told SCHWARTZ that she turned over all of her

devices. SCHWARTZ said that he was the "sole bread winner" and that her situation was not the same as SCHWARTZ.

SCHWARTZ indicated that he was worried about what MANI would say about SCHWARTZ, even though SCHWARTZ said that he did nothing wrong. SCHWARTZ said that "who knows what desperate people will say". SCHWARTZ confirmed his innocence and said that he always said no to paying bribes. SCHWARTZ expressed that he felt that his 15 year career was over and that he would not be able to look at the board of directors or his boss in the face again.

SCHWARTZ requested MANI's training records from GILBERT once she received them. As part of the investigation, all training records were pulled for high risk employees. SCHWARTZ knew that the request was outstanding. GILBERT did not respond or provide the records to SCHWARTZ.

At 3:26PM, SCHWARTZ sent GILBERT a text message. **(Agent Note:Refer to CTS 12254 for the text communication)**

At 7:23PM, GILBERT called SCHWARTZ from her mobile telephone which was listed as #18 on the call log. The call lasted approximately 5 minutes. SCHWARTZ wanted to ask DLA Piper about the potential to expedite his interview so that he can either be cleared of the allegations or resign. SCHWARTZ needed to be the one to protect the company as the general counsel. SCHWARTZ told GILBERT that he found e-mails from BHUSHAN.

SCHWARTZ talked to GILBERT about his devices. SCHWARTZ said that he was "uncomfortable" giving the company access to all of his personal devices because he had "1,000 passwords" on his I-phones and I-pads. SCHWARTZ personally owned the I-phones and I-pads. SCHWARTZ told GILBERT that he could not live like this and that he was trying to temper his anger but he couldn't. SCHWARTZ was very professional on the phone.

SCHWARTZ expressed concerns that COBURN was going to throw SCHWARTZ "under the bus" to protect himself.

There was a long silence on the telephone and SCHWARTZ told GILBERT that he was going to hang up the phone because GILBERT's "silence was telling".

GILBERT stayed in Cape Cod, Massachusetts until the day before Labor Day. It was likely that GILBERT had contact with SCHWARTZ over the week; however, GILBERT doubted having any contact with COBURN.

SCHWARTZ called GILBERT on either 8/28/2016 or 8/29/2016, the day after SCHWARTZ was interviewed by DLA Piper. SCHWARTZ told GILBERT that there

were things that SCHWARTZ did not say in the interview with DLA Piper. SCHWARTZ was angry with BHUSHAN and blamed BHUSHAN for the entire situation. SCHWARTZ left certain things out of the interview because he did not want to throw anyone under the bus. BHUSHAN was involved with a lot of different aspects of real estate. BHUSHAN was very good at sending well written communications but then getting on the Tamburg system with SCHWARTZ and saying "but this is how it really works in India." GILBERT advised SCHWARTZ that SCHWARTZ should tell the investigators that detail. GILBERT took notes of the telephone call with SCHWARTZ.

There were no other text messages between SCHWARTZ and GILBERT that related to the investigations. All of the following text messages were day to day interactions.

Following the interview, SCHWARTZ had a rules of engagement meeting. SCHWARTZ called GILBERT following the meeting and expressed that SCHWARTZ was uncomfortable dealing with GILBERT about compliance matters. SCHWARTZ did not want to travel with GILBERT. GILBERT saw the rules of engagement that were communicated to SCHWARTZ; however, GILBERT was not present during the meeting.

GILBERT did not have further conversations with SCHWARTZ about the investigation or his resignation.

### *SCHWARTZ's MEDICAL CONDITION*

GILBERT was unaware of any medical issues related to SCHWARTZ. SCHWARTZ did not go to the office often. SCHWARTZ spent a couple of hours a month at the office but worked mostly from his residence. SCHWARTZ was always available whenever GILBERT reached out to him. COGNIZANT employees notified the lack of time that SCHWARTZ spent in the office.

### *SCHWARTZ's RESIGNATION*

DLA Piper informed GILBERT that SCHWARTZ resigned from COGNIZANT. GILBERT did not have any conversations with SCHWARTZ about his resignation. SCHWARTZ did not send GILBERT a goodbye text message or phone call. GILBERT did not have any contact with SCHWARTZ or SCHWARTZ's counsel since SCHWARTZ left COGNIZANT.

### *GILBERT'S RELATIONSHIP WITH SCHWARTZ*

SCHWARTZ was a supportive manager at times. SCHWARTZ was decent to work for; however, SCHWARTZ had anger issues that were bothering to GILBERT. SCHWARTZ was a micro-manager and hardly participated in events with the legal team. GILBERT was under the assumption that COBURN "didn't care for

lawyers in general". COBURN did not want to hire lawyers. There was a time that the legal team got aware and COBURN did not grant the legal team the award. COBURN did not want to be told what to do by lawyers.

### GILBERT'S RELATIONSHIP WITH COBURN

GILBERT was under the assumption that COBURN "didn't care for lawyers in general". COBURN did not want to hire lawyers. There was a time that the legal team got aware and COBURN did not grant the legal team the award. COBURN did not want to be told what to do by lawyers. COBURN's facial expression showed a look of disdain.

### COBURN'S RESIGNATION

GILBERT did not have any conversations with COBURN after the initial conversation about the investigation.

### COBURN AND SCHWARTZ'S RELATIONSHIP

COBURN was difficult to work with and SCHWARTZ had frequent communication with COBURN. SCHWARTZ seemed eager to keep COBURN happy and to please him. SCHWARTZ talked "tough" to his legal team and then was not tough towards COBURN.

### COMPLIANCE

COGNIZANT had a Chief Compliance Officer, ROSS WILLIAMS, who was part of the finance team and reported to COBURN. The position was part time and once WILLIAMS left the company there was not a replaced for a long time.

GILBERT did not think that the compliance department at COGNIZANT was properly staffed. GILBERT was not sure on SCHWARTZ's view of the staffing of the compliance department. There was limited resources in both areas of compliance at COGNIZANT.

GILBERT raised concerns about the limited resources to SCHWARTZ. GILBERT requested support from SCHWARTZ with the formation of a compliance department. GILBERT volunteered to be the head of the department if and when it was approved by COBURN. SCHWARTZ wanted an assessment of the compliance program to be discussed during the budget review. COBURN and GILBERT discussed a formal compliance program in 2012 or early 2013. GILBERT organized and formulated the structure and models for the compliance department.

The assessment was proposed to COBURN and MCLOUGHLIN. SCHWARTZ tended to agree with GILBERT's view on the limited resources in the compliance

department; however, the decision was ultimately COBURN's decision. SCHWARTZ pitched COBURN for the increase in resources for compliance and COBURN's response was that they "weren't discussing compliance".

COBURN was resistant to the idea of a compliance department since the company had an enterprise risk management function and internal auditors. COBURN expressed that a compliance department would have been redundant. COBURN requested that GILBERT and CASARI put together a presentation with the segregation of duties with the proposed compliance department and internal audit. GILBERT had a clear understanding of the differences in the functions. The legal department was responsible for anti-bribery compliance. COBURN viewed the importance of compliance when it added value to the business. GILBERT presented the presentation to COBURN and COBURN agreed to allow GILBERT to present to the board of directors. COBURN approved GILBERT to work on compliance matters part time with no additional resources.

The formal compliance program was approved by the board of directors and GILBERT diligently worked to ensure that all elements were met for an effective compliance program. GILBERT utilized outside counsel and CBE, which was a third party counsel to assist companies with compliance benchmarks. COGNIZANT was below the benchmark average for compliance compared to similar companies in the industry.

The only time that GILBERT saw COBURN value compliance and FCPA training was after the FCPA investigation was initiated. GILBERT spent a lot of time attempting to get ant-bribery training approved prior to the investigation.

GILBERT did not have specific concerns about anti-corruption compliance issues. There was general concerns about corruption when the company entered into new geographical areas or when trainings were not available online. GILBERT was not aware of any activities that were happening that should be stopped.

### *TRAINING*

Subsequent to 2013, the company offered online FCPA and anti-corruption training. PEDERSON expanded trainings for higher risk geographical areas and functions. The code of conduct included FCPA language and employees under the vice president level took the training once a year.