# Exhibit 11



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry  08/13/2018

DANA GILBERT, Former Chief Compliance Officer (CCO) at COGNIZANT, was interviewed at the United States Attorney's Office located at 1 Courthouse Way, Suite 9200, Boston MA. Trial Attorney David Last, Department of Justice, Fraud Section (DOJ), AUSA Courtney Howard, United States Attorney's Office, District of New Jersey, and AUSA Nick Grippo, United States Attorney's Office, District of New Jersey participated in the interview. Also present during portions of the interview was SEC Investigator Michael Catoe via telephone. GILBERT was represented by legal counsel Daniel L. Zelenko and Danielle Giffuni of Crowell Moring.

Prior to the interview commencing, GILBERT was reminded of her on-going obligation to be truthful as to whatever she can remember. After being advised of the identity of the interviewing agent, DOJ, AUSA, and SEC personnel and the nature of the interview, GILBERT provided the following information:

In 2012/2013, COGNIZANT did not have a formalized compliance program. The company had a formalized Code of Ethics, Code of Ethics training and a hotline. COGNIZANT did not have a Chief Compliance Officer (CCO) from approximately 2011 through the formalization of the company's compliance program.

In early 2012, GILBERT participated in a meeting with STEVEN SCHWARTZ, General Counsel, and other senior members of the COGNIZANT Legal Department that discussed the roles and responsibilities of the legal department at COGNIZANT. GILBERT discussed with SCHWARTZ the importance of a formulized compliance program and volunteered her time to create a compliance program. COGNIZANT needed a compliance program that focused on all the important aspects of compliance that started with risk assessment. Data privacy was a growing concern at COGNIZANT.

GORDON COBURN, President of COGNIZANT, did not support a formalized compliance program. COBURN verbalized that a compliance program was "unnecessary" and that the Internal Audit function at COGNIZANT and Risk Management functions had a dual purpose with compliance responsibilities. COBURN made his views on the compliance program known to GILBERT, SCHWARTZ, KAREN MCLOUGHLIN, Chief Financial Officer (CFO), and STEVEN

Investigation on 08/07/2018 at Boston, Massachusetts, United States (In Person)

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Date drafted 08/10/2018

by BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000058

CASARI, Head of Internal Audit. MCLOUGHLIN, SCHWARTZ, GILBERT, and CASARI supported a formulized compliance program.

COBURN requested a presentation from GILBERT on the importance of a compliance department prior to giving the approval to present the idea to the Audit Committee. MCLOUGHLIN, SCHWARTZ, CASARI, and GILBERT presented to COBURN. COBURN did not support the legal functions or seeking outside counsel unless it was extremely necessary because of the added costs. COBURN was very expense conscious.

COBURN approved GILBERT to present the need for a compliance department to the Audit Committee. COBURN had two conditions for GILBERT to report to the Board:
1. GILBERT can work the compliance program part-time and was not allowed to request more resources.
2. GILBERT was not to bother the Business Unit Heads with time consuming tasks.

{Agent Note: GILBERT was shown document CTS-0100349 which was an e-mail correspondence dated September 13, 2013 with the subject "Compliance Charter" and an attachment titled "Global Ethics and Compliance Committee Charter.PDF"}

GILBERT drafted the charter with the assistance from outside counsel for COGNIZANT. The charter was the start of the formularized compliance program.

The CCO presented to the Audit Committee quarterly. GILBERT and her team drafted the presentations to the Audit Committee. MISTY PETERSON was on GILBERT's team and focused on the help line and compliance training for COGNIZANT. GILBERT utilized the legal department for assistance with compliance functions. The quarterly reports to the Audit Committee varied per quarter. The reports included hotline incidents, the size of the compliance team, and tasks that were completed during the quarter by the compliance team.

GILBERT did not have regular scheduled compliance meetings since she worked closely with her direct supervisor, SCHWARTZ, and SCHWARTZ was aware of everything that happened within the compliance department.

{Agent Note: GILBERT was shown document CTS-0100426 which was an e-mail correspondence dated January 27, 2015 with the subject "Compliance Update Board Deck" and an attachment titled "Qtr 1 Compliance Update Audit Deck 2015 (January 2015).pptx"}

GILBERT educated the Audit Committee on the compliance functions during the first quarter of every year. The compliance team utilized CEB, which was a program and tools for benchmarking data of the compliance program. The benchmark data compared COGNIZANT's compliance program with other companies in the industry. The benchmark data showed that COGNIZANT was below the industry standards for compliance. GILBERT wanted the Audit Committee to be aware about the benchmark data and the lack of resources for the COGNIZANT compliance program. MCLOUGHIN reviewed the draft Board Deck (attachment to CTS-0100426). MCLOUGHLIN provided feedback on the Board deck and wanted GILBERT to remove the benchmarking data. MCLOUGHLIN wanted the benchmarking data removed because MCLOUGHLIN, COBURN, and FRANSICO DESOUZA, Chief Executive Officer (CEO) for COGNIZANT, would not have time to validate the data prior to the Audit Committee meeting. MCLOUGHLIN thought that the benchmarking numbers were "ridiculous" and that COGNIZANT's compliance department should not be compared to companies like JP MORGAN CHASE. COBURN did not think that CEB's analysis was "very good" even though COBURN was a Board member for CEB. GILBERT was not pleased about removing the benchmarking data; however, GILBERT planned to verbally discuss the benchmarking data during the Audit Committee presentation.

There was constant pushback from management about the contents of the Audit Committee presentations. Management wanted to address issues prior to informing the Audit Committee. GILBERT and COBURN did not have conversations about the benchmark data.

Subsequent to the Q1 Audit Committee presentation, GILBERT did not get any more resources.

Management rushed GILBERT through the Audit Committee presentations. In May 2015, GILBERT spoke to MAUREEN BREAKIRON-EVANS about having inadequate time to present to the Audit Committee and the benchmark data. BREAKIRON-EVANS advised GILBERT that GILBERT can have one on one sessions with the Audit Committee that was similar to the Internal Audit sessions. The one on one sessions were never scheduled.

{Agent Note: GILBERT was shown document CTS-0100419 which was an e-mail correspondence dated February 5, 2015 through February 6, 2015 with the subject "RE: Revised Compliance Update Deck"}

The presentation for the Audit Committee was stripped down to a point where it was ineffective. In 2015, COGNIZANT's compliance team was composed of five team members. GILBERT was only able to dedicate 20% of her time on compliance since GILBERT had responsibilities with the legal team.

COGNIZANT should have been in the "High" category because of the geographical areas that COGNIZANT operated in and that the majority of COGNIZANT's customers were in highly regulated industries. COGNIZANT had a large presence in India. India was known for corruption and the majority of COGNIZANT's workforce in India was young individuals. COGNIZANT did not have a compliance presence in India. On several occasions, GILBERT discussed the lack of compliance in India to be a risk to the Audit Committee.

{Agent Note: GILBERT was shown document CTS-0100421 which was an e-mail correspondence dated February 5, 2015 through February 6, 2015 with the subject "RE: Revised Compliance Update Deck"}

GILBERT did not know what SCHWARTZ meant when he wrote that SCHWARTZ was "getting personally beaten up by the Audit Committee". SCHWARTZ was frustrated that COBURN did not want to give the compliance department resources. GILBERT did not speak to SCHWARTZ about the e-mail correspondence. BREAKIRON-EVANS questioned SCHWARTZ during the Q2 Audit Committee meeting regarding resources and the compliance program. GILBERT did not attend the Q2 Audit Committee meeting. SCHWARTZ wanted to do a full review of the compliance program and requested GILBERT's assistance with the project.

{Agent Note: GILBERT was shown document CTS-0100448 which was an e-mail correspondence dated September 9, 2015 with the subject "RE: Compliance Sheet" with an attachments titled "Compliance Staff August 2015.pptx" and "Compliance Program-2020 Goals and Functions.docx"}

GILBERT did not recall the purpose for the attachments. COGNIZANT's leadership had 2020 goal setting for each program. SCHWARTZ was responsible for the compliance department and requested GILBERT to provide materials for a presentation to the leadership committee. GILBERT provided too much detail in the above listed attachments and was not in the correct format for the leadership committee. GILBERT was not involved in the leadership meeting. The result of the leadership committee was that the compliance department was a critical function for COGNIZANT and the department was under funded.

{Agent Note: GILBERT was shown document CTS-0100333 which was an e-mail correspondence dated November 16, 2015 with the subject "RE: Internal Audit Report-Global Anti-Corruption Review" with an attachment titled "Global Anti-Corruption Review Report-pdf"}

An anti-corruption review for COGNIZANT was performed by Internal Audit in 2015 as part of the audit plan. The Internal Audit team

interviewed GILBERT. GILBERT expressed concerns for increased training and procedures on anti-corruption. GILBERT reviewed the report and provided feedback. This was the only report on anti-corruption that GILBERT remembered during her employment with COGNIZANT.

The real estate industry in India and payments to vendors were identified as risks during the anti-corruption review. The risk was that the Admin team at COGNIZANT controlled all of the functions for real estate and reported to the finance department. There was no segregation of duties with the Admin Team. GILBERT felt that there should be an independent review of the work that was produced by the Admin Team. GILBERT did not recall the suggestions to address the risks.

Approximately around the same time as the anti-corruption review, the Board was focused on COGNIZANT only utilizing L&T for all of the real estate projects in India. COBURN responded to the Board that L&T was cost competitive compared to other construction companies in the industry and that L&T was the "cleanest of the bunch". GILBERT thought that COBURN meant that L&T was the largest company in India so that they had power to get permits without be subjected to bribes or corruption. There were frequent conversations about the real estate program at COGNIZANT since it was COGNIZANT's largest expense.

In 2013, GILBERT vocalized that there should be more compliance over the real estate program in India.

In 2013, Internal Audit conducted a review and discovered an $80K line item on a L&T invoice for statutory permits. Internal Audit viewed this line item as a red flag as advised outside counsel to assist with determining the validity of the line item. L&T provided documentation for the $80K and the documentation for the expense was legitimate. COGNIZANT sent an employee to India to review the COGNIZANT Foreign Corrupt Practices Act (FCPA) policy with L&T. L&T signed an agreement with COGNIZANT that L&T reviewed the FCPA policy and was going to conduct business within the policy. As a result, SCHWARTZ implemented that all contracts with L&T needed to be reviewed by the legal department prior to COGNIZANT signing contracts or paying invoices. GILBERT was responsible for the team that reviewed the change orders. The team did not report any significant issues to GILBERT about the contract reviews.

### STEVEN SCHWARTZ

GILBERT and SCHWARTZ interviewed MANI on August 3, 2016 via telephone regarding a potential bribe demand for the permit regarding the power lines at the KITS facility. A second interview of MANI was conducted on August 8, 2016. SCHWARTZ called GILBERT several times between August 3,

2016 through August 8, 2016. SCHWARTZ was concerned about MANI because of MANI's demeanor on the call. MANI was nervous, spoke very quickly, and was very difficult to understand. GILBERT was shopping with her parents during one of the conversations with SCHWARTZ in which SCHWARTZ told GILBERT: "why is MANI bringing this up?", "what is MANI's angle", "MANI will do anything to throw any of us under the bus", and that "they are all rats on a sinking ship right now". SCHWARTZ continued the conversation saying that the India team was desperate and "who knows what they would say about us". In addition on the telephone call, SCHWARTZ referenced an environmental matter at the PUNE facility in which SCHWARTZ and COBURN had a final approval. SCHWARTZ was concerned about the things that MANI would say regarding the PUNE approval and the things that MANI did for the environmental matter. SCHWARTZ did not go into detail about the environmental matter at the PUNE facility. GILBERT responded to SCHWARTZ that she was not involved with any approvals so there was nothing that MANI could say about her. SCHWARTZ acknowledged that GILBERT was not involved by saying "oh you weren't a part of that". SCHWARTZ changed the subject of the telephone call. GILBERT's interpretation of the telephone call was that SCHWARTZ was bothered that MANI would lie about SCHWARTZ, GILBERT, or the legal department. GILBERT was not concerned that MANI would say anything that was untrue. SCHWARTZ did not mention the KITS facility on the telephone call.

SCHWARTZ was particularly interested in the internal investigation and the conversations with MANI. SCHWARTZ was concerned that MANI would blame him for something. In general, SCHWARTZ took an interest in items that he was interested in. SCHWARTZ very quickly transitioned from very interested to manic/worrisome as a result of being removed from the internal investigation at the end of August 2016. GILBERT did not tell SCHWARTZ the new development that caused SCHWARTZ to be removed from the internal investigation.

GILBERT worked on a daily basis with DLA Piper, outside counsel, about the FCPA internal investigation. GILBERT did not take notes on the telephone calls with SCHWARTZ in early August 2016. GILBERT took notes of the telephone calls with SCHWARTZ in late August 2016 at the advice of outside counsel.

### Pricewaterhouse Coopers (PWC)

GILBERT worked with PWC, COGNIZANT's external auditors, regarding audit updates. PWC had concerns about the integrity of the books and records in India that stemmed from new Indian legislation. In anticipation

of India's year end, PWC needed to submit a report to ensure that the books and records were correct. GILBERT updated PWC about the status of the internal investigation weekly.

*{Agent Note: GILBERT was shown document CTS-0099818 which was an e-mail correspondence dated July 19, 2016 through July 19, 2018 with the subject "RE: India FCPA Discussion"}*

GILBERT did not recall that SARAH WILSON was a key PWC team member. GILBERT did not recall the update that occurred on the conference call.

*{Agent Note: The participants from the SEC exited the interview}*

### HENRY SHIEMBOB

SHIEMBOB was the Senior Vice President and Chief Security Officer for COGNIZANT.

*{Agent Note: GILBERT was shown document CTS-0100458 through CTS-0100459 which was an e-mail correspondence dated June 7, 2016 with the subject "RE: India case"}*

GILBERT recalled an e-mail from SHIEMBOB that stated that COBURN wanted the FCPA investigation wrapped up. GILBERT did not recall any other conversations with SHIEMBOB outside of CTS-0100458 and CTS-0100459. The delay in the internal investigation was due to the eDiscovery with the forensic review of the employee's laptops.

GILBERT's understanding was that the Admin Team complained about the disruptiveness of the investigation since their laptops were collected, they were being interviewed, team members wanted to quit, and there was unrest on the team. SRIDHAR and MANI expressed the concerns to COBURN. GILBERT advised the Human Resources Department and ROBERT MOLINA that she would resign if COBURN pushed to finalize the investigation in a month since that deadline was improper and she would not want to represent the company anymore.

GILBERT had no contact with COBURN or SCHWARTZ since the previous interview with the Federal Bureau of Investigation, Department of Justice, and the Securities Exchange Commission on October 17, 2017.

DOJ-302-00000065