# Exhibit 24



# FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/12/2017

   FRANCISCO D'SOUZA, COGNIZANT Chief Executive Officer (CEO), was interviewed at the Securities and Exchange office, 200 Vesey Street, Suite 400, New York, NY 10281. D'SOUZA's legal representation, Richards, Kibe, & Orbe LLP attended the interview. Participants of Richards, Kibbe, & Orbe LLP were Lee S. Richards, III and Margot Laporte. Members participating in the interview of D'SOUZA included, FBI Special Agent (SA) Kelly Blanchfield, Assistant United States Attorney (AUSA) Andrew Bruck, United States Attorney's Office, District of New Jersey, SEC investigator Paul W. Sharratt, SEC investigator Mike Cono and John Bowers, SEC trial attorney. After being advised of the identity of the interviewing Agent and the nature of the interview, D'SOUZA provided the following information:

   D'SOUZA attended the University of Macau for an undergraduate degree. D'SOUZA moved to the United States in 1990 and received a Master's in Business Administration (MBA) from Carnegie Mellon University in 1992. Subsequent to graduation from Carnegie Mellon, D'SOUZA joined Dun & Bradstreet as a management associate. D'SOUZA had various roles with Dun & Bradstreet, which included the establishment of COGNIZANT TECHNOLOGIES SOLUTIONS (COGNIZANT). D'SOUZA's first role with COGNIZANT was Director of US Operations. D'SOUZA held the following positions with COGNIZANT: Vice President of US Operations and Business Development, Senior Vice President, Chief Operating Officer, and President and CEO in 2007. D'SOUZA became solely the CEO in 2013 which at that time GORDON COBURN became president of COGNIZANT. D'SOUZA was the CEO of COGNIZANT as of October 4, 2017.

   The CEO and president role in COGNIZANT evolved over the years. COBURN's role as president was to manage the internal functions of the organization that included the finance, human resources, real estate, and admin departments. The CEO role oversaw the president's lines of business and commercial functions. Commercial functions included selling to clients and delivering work products.

   D'SOUZA's direct reports in 2016 were COBURN, STEVEN SCHWARTZ, Cognizant general counsel, RAJ MEHTA, Industry and Solutions, SEAN MIDDLETON, COGNIZANT accelerator. COBURN and SCHWARTZ were direct reports of D'SOUZA in 2014, as well.

Investigation on   10/04/2017    at   New York, New York, United States (In Person)

File #  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                                Date drafted   10/04/2017

by  BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000021

### *2013 AUDIT REPORT AND INTERNAL AUDIT REPORT*

The audit report and the internal audit report in 2013 mentioned risk issues with statutory permits in India. The reports made note that the company was beginning construction before obtaining the necessary approvals and permits. The practice was common in the construction industry in India. The discussion about the risks was with the Audit Committee.

In 2014, COGNIZANT took steps to remediate the risks identified in the audit report and the internal audit report. COGNIZANT inserted FCPA language in contracts with construction suppliers and conducted FCPA training for front line employees that were involved in real estate operations. The real estate team was instructed to have the required permits as needed. D'SOUZA was unsure of the timeline for the remediation.

The training that was provided to employees mitigated ongoing and new projects. The FCPA language that was applied to contracts was on a going forward basis. D'SOUZA had no knowledge if older contracts were rewritten to include FCPA language. The mitigation efforts were tasked by the real estate team for implementation. Ultimately, it was COBURN's responsibility since he was in board rooms during the conversations; however, COBURN could have delegated the duties to a member of his team. The compliance team was responsible for the training.

### *KITS DELAY*

D'SOUZA was unsure of the time period when he initially learned about the delay to occupy the KITS facility. It was common for delays in occupation of the building for the construction projects for COGNIZANT. The delays could be from scheduling, availability of materials, or construction progress. D'SOUZA was briefed on delays with facilities if the delay significantly impacted the business. COBURN was focused on the delays with the COGNIZANT facilities. D'SOUZA recalled 1 or 2 times when delays were brought to his attention, which was the early PUNE facility when COGNIZANT was new to PUNE.

### *Internal Investigation*

In the beginning of August 2016, an internal investigation was conducted that was supervised by SCHWARTZ. SCHWARTZ was actively involved in the investigation. On August 20, 2016, SCHWARTZ was removed from the investigation.

Continuation of FD-302 of (U) FRANCISCO D'SOUZA interview , On 10/04/2017 , Page 3 of 10

{Agent note: D'SOUZA and D'SOUZA's legal counsel provided SA Blanchfield with a packet of relevant documents. Refer to the 1A for the documents}

In July 2016, D'SOUZA had a phone call with COBURN and RAJ MEHTA. The telephone call discussed the review of various parts and divisions of the organization since the company was in the midst of organizational changes. The telephone call focused on division by division, and when the topic of real estate was brought up, COBURN indicated that the reporting structure for the real estate group should remain the same. COBURN expressed this concern because there was a Foreign Corrupt Practices Act (FCPA) investigation that involved members of that group. COBURN advised D'SOUZA that here was the potential for a large number of employees to be fired in the real estate group due to that investigation. COBURN wanted to keep the reporting structure because of the investigation. D'SOUZA was irate and surprised that he was unaware of the investigation. On the call, D'SOUZA asked how it was possible that an investigation had risen to the level of terminating employees and D'SOUZA wasn't aware of the issue. COBURN told D'SOUZA that he thought SCHWARTZ briefed D'SOUZA on the investigation.

The compliance function was part of SCHWARTZ's reporting structure but given that the subject of the investigation was real estate, D'SOUZA would have expected COBURN to raise the issue to D'SOUZA.

COBURN and SCHWARTZ notified D'SOUZA of the profit fund issue as it was unfolding. The profit fund was not an investigation but COBURN and SCHWARTZ kept him involved.

Following the call, D'SOUZA called SCHWARTZ.

### INTERNAL INVESTIGATION BACKGROUND

In the beginning of 2013, the board of directors visited India; however, D'SOUZA did not attend due to medical reasons. During the visit, a presentation was given regarding the real estate program. In 2013, there were concerns that were raised through internal audit and were further explored with the company. Internal audit and Ernst & Young investigated the concerns.

In July 2016, D'SOUZA was aware of a $300,000 potential payment that was investigated by DLA Piper, COGNIZANT's outside legal counsel.

In early August 2016, following the telephone call with SCHWARTZ, D'SOUZA called JOHN KLEIN, Chairman of the Board for COGNIZANT, and MAUREEN BREAKIRON-EVANS, Head of the Audit Committee for COGNIZANT, to discuss the internal investigation. D'SOUZA was concerned and something

didn't seem right about the investigation. D'SOUZA scheduled a face to face meeting with BREAKIRON-EVANS in September 2016 because of scheduled vacations and earnings for the company.

**{Agent Note: D'SOUZA provide Tab A, CTS-DAOUZA-0000517, which was a call log of the telephone details of D'SOUZA's work telephone, 201-281-6163}**

D'SOUZA was in Rio, Brazil at the Olympics on August 20, 2016. On August 20, 2016, D'SOUZA received a telephone call from ROBERT MOLINA, Corporate Security of COGNIZANT, requesting D'SOUZA to join a conference call, displayed by #1 on the call log. #2 on the call log displayed D'SOUZA joining the conference call. The participants on the telephone call were BREAKIRON-EVANS, DLA Piper, DANA GILBERT, Chief Compliance Officer, and MOLINA. The call discussed that the ongoing investigation uncovered potential facts that indicated COBURN and SCHWARTZ might have had knowledge relative to the investigation. As a result of that knowledge, the Audit Committee assumed oversight of the investigation. Initially, D'SOUZA was responsible for talking to COBURN and SCHWARTZ about the changes to the structure of the investigation. By the end of the call, it was determined that D'SOUZA would inform COBURN, instruct SCHWARTZ that he was no longer leading the investigation, and take COBURN's laptop to preserve documents. D'SOUZA was instructed to speak to SCHWARTZ right away due to the change in supervision and talk to COBURN as soon as possible. D'SOUZA requested talking points for the discussion with SCHWARTZ in the above call or in a subsequent with GILBERT. D'SOUZA received talking points from DLA Piper. D'SOUZA became aware of the $2.5 million potential bribe payment on the call.

Up until the August 20, 2016 telephone calls, D'SOUZA understood that the investigation was focused on improper payments in India related to the COGNIZANT facilities. D'SOUZA had no knowledge about whether or not COBURN or SCHWARTZ had knowledge of the improper payments. D'SOUZA was not given documents; however, D'SOUZA was told the preliminary results of the investigation on the August 20, 2016 call.

D'SOUZA did not speak to COBURN about the investigation due to logistics. D'SOUZA was unable to get a flight out of Rio sooner than his scheduled flight.

**{Agent Note: D'SOUZA provide Tab B, CTS-DAOUZA-0000512, which was a screenshot of text messages between D'SOUZA and SCHWARTZ on August 20, 2016 through August 21, 2016}**

GILBERT contacted SCHWARTZ to get his laptop to preserve the documents. SCHWARTZ sent D'SOUZA a text message and wanted to talk. D'SOUZA was in a

public place and had limited privacy. SCHWARTZ knew something was up since GILBERT took his computer. D'SOUZA did not remember if he received the talking points during the time of the text message exchange.

**{Agent Note: D'SOUZA provide Tab C, CTS-DAOUZA-0000515, which was an e-mail correspondence between SCHWARTZ and D'SOUZA on August 20, 2016 through August 21, 2016}**

GE was for General Electric. D'SOUZA was on the board of GE. D'SOUZA believed that he received the talking points by the time of the e-mail correspondence.

**{Agent Note: D'SOUZA provide Tab D, CTS-DAOUZA-0000516, which was an e-mail correspondence between SCHWARTZ and D'SOUZA on August 20, 2016 through August 21, 2016}**

The call with SCHWARTZ is listed as #6 on the call log. The number was blocked and was twenty-one minutes long. D'SOUZA took the call from his hotel room. The initial conversation on the call was about the Olympics. D'SOUZA delivered the talking points and that the investigation uncovered that he might have facts relevant to the investigation and as a matter of caution the Audit Committee would assume supervision. D'SOUZA told SCHWARTZ that there were no determinations made as of date and that the investigation was going to be handled as quickly and efficiently as possible. SCHWARTZ was advised that the investigation team would report directly to the Audit Committee and D'SOUZA advised that all employees should refrain from discussing the investigation.

SCHWARTZ was perplexed and reminded D'SOUZA that real estate was not SCHWARTZ's responsibility and that real estate was COBURN's responsbility. SCHWARTZ told D'SOUZA that he was only involved in two occasions related to real estate:
    1. related to a transactional matter and SCHWARTZ did not provide details
    2. SCHWARTZ had a short meeting with COBURN, where COBURN pulled SCHWARTZ into his office

D'SOUZA was instructed to deliver the talking points and not engage in conversation. D'SOUZA told SCHWARTZ that SCHWARTZ "helped to design the process in this place and have faith in the process". SCHWARTZ was perplexed and anxious about the call.

D'SOUZA did not write notes of the contents of the call.

{Agent Note: D'SOUZA provide Tab E, CTS-DAOUZA-0000513, which was a screenshot of text messages between D'SOUZA and SCHWARTZ on August 21, 2016 through September 12, 2016}

D'SOUZA was unable to identify calls #7 through #11 on the call log. Some of the calls were with GILBERT and DLA Piper.

On August 21, 2017, D'SOUZA received a text message from SCHWARTZ requesting to talk on the phone. The call was #12 on the call log and the call lasted approximately 10 minutes. Subsequent to the call, D'SOUZA made notes in his phone about the topics that were discussed with SCHWARTZ.

The last text message on Tab E concerned D'SOUZA because D'SOUZA and SCHWARTZ did not communicated regularly via text message. D'SOUZA did not remember the substance of the text message but believed that it was not material to the investigation and could have been about photography.

{Agent Note: D'SOUZA provide Tab F, CTS-DAOUZA-0000514, which was a screenshot of notes that D'SOUZA wrote in his phone regarding the telephone call with SCHWARTZ}

SCHWARTZ understood that he couldn't act but expressed concerns that the company needed a general counsel to give advice on the investigation. SCHWARTZ said that the FCPA had plenty of nuances as opposed to being black and white. SCHWARTZ suggested that his interests were in the best interest of the company and that he was prepared to step aside. D'SOUZA understood that to mean that SCHWARTZ was prepared to leave the company altogether instead of switching to another role within the company. SCHWARTZ said that he was an "open book" and had nothing to hide. SCHWARTZ requested that he be interviewed as soon as possible and wanted to get everything out in the open and cleared up. SCHWARTZ reminded D'SOUZA of the provident fund issue in India and how SCHWARTZ was an advocate for not paying a bribe and that SCHWARTZ brought the issue to the Board of Directors. SCHWARTZ emphasized that why would he behave in one way and behave differently with a similar set of circumstances.

D'SOUZA did not say that much in response to SCHWARTZ since D'SOUZA was given instructions to not engage in conversation. SCHWARTZ's demeanor was the same as the first telephone call. SCHWARTZ did not specifically mention a payment to a government official or that an employee of COGNIZANT violated the FCPA.

It was not a common practice for D'SOUZA to take notes of telephone calls. D'SOUZA discussed the earlier call with SCHWARTZ with GILBERT and DLA Piper. GILBERT and DLA Piper were very interested in the context of

the conversation. D'SOUZA took notes of the second call to remember the context.

SCHWARTZ was the general counsel for all other COGNIZANT matters except the investigation. D'SOUZA had interactions with SCHWARTZ about other matters. SCHWARTZ did ask D'SOUZA the status of the investigation and how the investigation was progressing. D'SOUZA replied with saying that the investigation was moving as quickly as possible and that he would inform SCHWARTZ of any significant update. SCHWARTZ increased the frequency of telephone calls with D'SOUZA about other issues within the normal course of business for COGNIZANT. D'SOUZA believed that SCHWARTZ wanted to get more face time with him.

Subsequent to D'SOUZA's return from Brazil, D'SOUZA retained BRACKETT to provide counsel to D'SOUZA and COGNIZANT regarding the investigation. BRACKETT was the former general counsel of COGNIZANT. BRACKETT and D'SOUZA had conference calls with COBURN and SCHWARTZ separately, that provided ground rules for the separation of duties as a result of the investigation.

### INTERACTIONS WITH SCHWARTZ

SCHWARTZ was a smart and a private person that did not speak about his family. D'SOUZA met SCHWARTZ's son once but did not meet anyone else in SCHWARTZ's family. SCHWARTZ was the first lawyer that COGNIZANT ever hired and was very protective of his legal team. SCHWARTZ grew the legal function to several 100 lawyers during his employment at COGNIZANT. SCHWARTZ had difficulty delegating to the legal team. D'SOUZA expressed concerns about the lack of seniority in the contract area, especially internationally, of the legal department. The legal team in India had a strong presence with the company.

### SCHWARTZ's MEDICAL PROCEDURE

D'SOUZA spoke to SCHWARTZ about SCHWARTZ's medical procedure. D'SOUZA and SCHWARTZ had weekly interactions that not speaking would have been impossible. SCHWARTZ told D'SOUZA that SCHWARTZ was having a procedure done related to a skin condition or basal cell. SCHWARTZ reassured D'SOUZA that the procedure was manageable. SCHWARTZ said that he needed some recovery time but that he would be back at work. SCHWARTZ claimed that the surgery was quick and the recovery period was a few weeks but that SCHWARTZ would be physically at work. SCHWARTZ e-mailed D'SOUZA about the procedure as well. D'SOUZA was surprised at the level of detail that SCHWARTZ provided. SCHWARTZ was not concerned about the procedure and expected a full recovery.

D'SOUZA does not recall SCHWARTZ acting out of the ordinary after SCHWARTZ's medical procedure. No one at COGNIZANT brought up any issues with SCHWARTZ's behavior subsequent to the procedure. The medical procedure did not affect SCHWARTZ's mental capacity or cause any memory loss.

The majority of work was done virtually so D'SOUZA did not know exactly how long SCHWARTZ took off due of the procedure. SCHWARTZ came back to work quickly. There was nothing out of the ordinary with the communications between D'SOUZA and SCHWARTZ after the medical procedure.

### *SCHWARTZ's RESIGNATION*

SCHWARTZ sent a resignation letter to D'SOUZA via e-mail. D'SOUZA might have had a transitional conversation with SCHWARTZ following the resignation letter. Following SCHWARTZ's separation from the company, SCHWARTZ e-mailed D'SOUZA at least twice. The e-mails were friendly in nature and did not discuss the investigation. Through communication with lawyers, D'SOUZA requested that SCHWARTZ stop contacting him because D'SOUZA "has nothing to say to those guys".

### *GORDON COBURN*

COBURN joined COGNIZANT in approximately 1997. Initially, D'SOUZA and COBURN worked together as peers. COBURN was smart, introverted, very involved with the business, and very intellectually curious. COBURN was working on his delegation skills and needed further development. From 1997 to 2007 approximately, COBURN had the finance function and was very involved in the details. Subsequent to 2007, COBURN's area of responsibility increased which caused more of a need of delegation. COBURN struggled with delegation and was still involved in the details of the finance department when he was president of the company. COBURN was very process oriented and was very regimented with finance operations, like closing the books; however, COBURN had an entrepreneurial side. COBURN thought outside of the box to create a solution where COGNIZANT and the clients' objectives were met. D'SOUZA and COBURN did not socialize outside of work. D'SOUZA went to COBURN's home two or three times.

D'SOUZA did not recall a time that COBURN expressed concerns related to the KITS facility. D'SOUZA did not recall of any time that there were any conversations with COBURN about building or planning permits for the KITS facility in the spring of 2014.

In January or February 2013, D'SOUZA attended a social event where there was a conversation about the development of personal real estate in India along with the corruption risks associated with the sale and

purchase of real estate in India. This conversation raised a red flag to D'SOUZA and he spoke to COBURN about his concerns. D'SOUZA told COBURN about the construction industry in India and the corruption associated with the industry. D'SOUZA wanted to ensure that the company was doing the right thing in regards to FCPA and the standard in which the company holds itself. COBURN's response was that was the reason that he was "personally watching it".

COBURN was not in a position to be removed from supervising the investigation. D'SOUZA had a general conversation with COBURN and went over the talking points. COBURN was made aware about the update in the investigation from GILBERT. COBURN became more and more anxious from the time of the initial conversation to his resignation at the end of September.

D'SOUZA had one conversation with COBURN about the investigation. D'SOUZA requested that COBURN not attend a client presentation for HCSC and requested that MEHTA take COBURN's place. COBURN was concerned about that decision and asked if it was because of the investigation. D'SOUZA was concerned about the direction of the investigation and didn't want COBURN to make customer relationships. In addition, MEHTA had a relationship with HCSC.

COBURN sent D'SOUZA a resignation letter via e-mail. D'SOUZA did not speak to COBURN about the resignation, except a conversation about the transition of work. COBURN's work was transitioned to KAREN MCLOUGHLIN, CFO.

### *LAKSHMI NARAYANAN*

D'SOUZA worked with LAKSHMI and was D'SOUZA's predecessor. LAKSHMI and D'SOUZA met in 1995/1996. D'SOUZA did not recall any conversations with LAKSHMI regarding the investigation or the KITS project. LAKSHMI was on the board of directors for COGNIZANT.

### *L&T*

D'SOUZA first learned of the allegations that L&T was involved 3-4 days after his return from Brazil. D'SOUZA looked through all the documents from the investigation.

D'SOUZA believed that COGNIZANT utilized other vendors in India besides L&T; however, L&T was the primary vendor. L&T assisted COGNIZANT with approximately 8 buildings. D'SOUZA did not recall any issues that were raised with L&T.

### PAYMENT APPROVAL STRUCTURE

In 2014, the individuals that had authority to approve a $2 million payment was D'SOUZA, COBURN, MCLOUGHLIN, and possibly individuals in the finance departments. D'SOUZA did not think that anyone in India had that authority.

### COMPLIANCE

GILBERT expressed the importance of compliance and was put in charge of compliance for the company. GILBERT was one of the earliest lawyers that COGNIZANT hired. D'SOUZA felt that the compliance at COGNIZANT was well on their way of having a strong compliance team. The compliance team was always looking for ways to improve and there was opportunities that the company could have done better with.

### TRAINING

The earliest FCPA training that D'SOUZA received was when he was employed with D&B. During D'SOUZA's time at COGNIZANT, he received training formally and informally around 5 times. The most recent training was in the last 12 months provided for the board of directors by DLA piper and the compliance team. The training occurred in the New York area. The formal training sessions were in a smaller group session that was provided by the legal and compliance team. The informal training sessions were conversations about the FCPA with legal team.

In addition, all employees at COGNIZANT were required to complete a code of conduct training, that included a section on the FCPA.

D'SOUZA was aware that it is a violation of the FCPA for COGNIZANT to authorize a third party to pay a government official on behalf of the company. D'SOUZA would have had that understanding in 2013. COBURN and SCHWARTZ would have that understanding too because training was provided and there was no ambiguity around that topic.

{Agent Note: there were topics discussed during the interview that COGNIZANT has declared privileged since all privilege issues were not resolved as of that time. The deemed privileged items were not discussed during the interview.}