# Exhibit 30



FEDERAL BUREAU OF INVESTIGATION

Date of entry   03/07/2017

On February 7, 2017, at approximately 10:30 a.m., SRIMANIKANDAN RAMAMOORTHY (MANI), date of birth (DOB) ▮▮▮▮, place of birth (POB) Tamil Nadu, India, was interviewed at the U.S. Embassy, Via Vittorio Veneto, 121, 00187, Rome, Italy. Members participating in the interview of MANI included, FBI Special Agent (SA) Kelly Blanchfield, FBI Supervisory Special Agent (SSA) Courtney Foster, Department of Justice (DOJ) Trial Attorney Kevin Gingas, and Assistant United States Attorney (AUSA) Osmar Benvenuto, United States Attorney's Office, District of New Jersey. SEC investigator Paul W. Sharratt and SEC investigator Mike Cono participated on behalf of the SEC via telephone. Legal counsel present on behalf of MANI were Chiesa Shahinian & Giantomasi PC Law Firm members to include, Matthew E. Beck and Scott Hollander. MANI and Chiesa Shahinian & Giantomasi PC were presented with proffer letters on behalf of SEC and DOJ, which were reviewed and signed. After being advised of the identities of the interviewing agents, DOJ personnel, SEC, AUSA personnel and the nature of the interview, MANI provided the following information:

MANI attended Badruka College, where he received a Bachelor's Degree and a Professional License in Cost Accounting. MANI's professional career began in October 1993, where he worked for an Indian organization, Satyam, in a general accounting role from October 1993 through March 1993. Satyam's headquarters was located in Hyderabad, India. In or around March 1993, MANI relocated to the Chennai location for Satyam to assist in the initiation of a joint venture project with Dun & Bradstreet. The joint venture name was Dun & Bradstreet Software and was incorporated in January 1994. The Chennai location became the Headquarters branch office for Dun & Bradstreet Software. The Headquarters branch office had approximately thirty (30) employees in 1994. MANI transitioned the books for the accounting and finance functions from the branch office to the joint venture company. MANI gained exposure to other areas of the organization that included payroll, billing, etc since the company was small. Dun & Bradstreet Software changed the name to COGNIZANT in 1997 and COGNIZANT went public with an Initial Public Offering (IPO) in 1998. Following the IPO, MANI transferred to Teaneck, New Jersey for COGNIZANT. MANI was responsible for the payroll and accounting functions in New Jersey and reported to ROSS WILLIAMS, former Financial Controller for COGNIZANT. MANI worked in Teaneck for three (3) months and returned to India after that time period to obtain an L1 Visa in

Investigation on  02/07/2017  at  Rome, Italy (In Person)

File #  ▮▮▮▮▮▮▮▮▮                                   Date drafted  02/13/2017

by  BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000078

or about April 1999. After MANI received an L1 Visa, MANI returned to New Jersey and worked for an additional two (2) years.

MANI met GORDON COBURN, President of COGNIZANT, in or about 1996-1997 in Chennai, India. MANI was unsure of COBURN's role in the company during 1996-1997; however, MANI knew that COBURN worked with the Chief Financial Officer (CFO) in India. MANI worked directly with COBURN during the two (2) years that MANI worked in New Jersey. MANI and COBURN worked on the transition of the IPO and the company's functionality post IPO. COBURN became the Chief Financial Officer of COGNIZANT after the IPO. MANI and COBURN had regular weekly interactions following the IPO.

MANI was unsure when he met STEVEN SCHWARTZ, former General Counsel of COGNIZANT. SCHWARTZ was hired after 2002. MANI met SCHWARTZ in India since SCHWARTZ traveled to India on several occasions for meetings with the COGNIZANT Indian team.

In or around 2001-2002, MANI went back to Chennai, India to care for his elderly parents. COBURN wanted MANI to stay in the United States since COBURN valued MANI's work ethic. MANI received a decrease in salary upon his transfer to Chennai. In 2003, COBURN called MANI and offered MANI a Financial Planning and Analysis position in New Jersey. MANI denied the position and KAREN MCLOUGHLIN was hired by COGNIZANT to fulfill the Financial Planning and Analysis position in New Jersey. In 2006, MCLOUGHLIN became MANI's supervisor. In 2007, COBURN called MANI to offer a position in the Special Economic Zones(SEZ) Department. SEZ was a government program that was utilized to promote exports in India. Companies that complied with the SEZ program received financial incentives from the government. COGNIZANT built offices in SEZ specified zones. MANI accepted the position and became the Director of SEZ Operations in the Program Manager's Office (PMO). The role of the Director of SEZ Operations was to assist Cognizant teams with the adaptation to the SEZ rules and regulations and ensured that Cognizant met the export requirements and regulations.

MANI was additionally responsible for the Administration functions in 2009. The Administration role included maintaining real estate, health and safety of the offices, and client relations. MANI reported to SRIDHAR THIRVENGADAM, Vice President of the Strategic Initiative Department, for the Administration function. The SEZ responsibilities were minimized in 2009 since the program became mainstream and policies and procedures were established.

In 2012 through 2016, MANI incurred additional responsibilities with infrastructure of Real Estate. KC Last Name Unknown (LNU), MANI's predecessor, retired from COGNIZANT. MANI was responsible for the infrastructure of the facilities in eleven (11) cities. The cities

included:
- Noida
- Chennai
- Bengaluru
- Hyderabad
- Kalkutta
- Coimbatore
- Mumbai
- Kochi
- Gurgaon
- Mangalore
- Pune

All the projects were in different stages of construction at the time that MANI was placed in the infrastructure of Real Estate role. COGNIZANT's strategy was to have a mixed portfolio of leased and owned facilities. COGNIZANT relied on government allocated lands to lease property and to attract talented employees. The strategy to have leased and owned properties was cost effective for COGNIZANT. COGNIZANT was a cash rich company and utilized company funds to build a COGNIZANT campus to promote COGNIZANT's business culture.

In 2015 through 2016, MANI reported to SRIDHAR THIRVENGADAM (SRIDHAR). MANI had two teams of employees that worked under him: JOE LNU, Corporate Work Place Services, and P, GANESH, Corporate Real Estate. COGNIZANT utilized a turnkey contract model with contracts. The turnkey model was established at the beginning of a project and listed out the requirements for the project. The turnkey had a fixed price for the final product of the specified project. The final delivery includes furniture. COGNIZANT's projects are negotiated on a case to case basis. LARSEN & TUBRO (L&T) did most of the contracting work for COGNIZANT. There were two ways to bid for COGNIZANT projects: Sole Bidding and Competive Bidding. The majority of the sole bidding was done by L&T. L&T was the biggest construction company in India and won all the sole bidding and most of the competitive bidding for COGNIZANT projects.

### PUNE PROJECT

{Agent Note: MANI was shown document number CTS 5714-5716 that was an e-mail correspondance from GANESH to COBURN, CHANDRA, SRIDHAR, and THIAGARJAN KRISHNARAJ, COGNIZANT Finance Department dated November 26, 2012. The e-mail correspondence discussed the Environmental clearance approval for the PUNE project.}

S.N. SUBRAHMANYAN (SNS)was the Vice Chairman of L&T in 2012. Prior to

2012, MANI did not have direct communication with SNS; however, MANI was familiar with the identity of SNS. MANI was new to the infrastructure position and had to handle problems with the approval process in order to start the construction. Each construction project had to have a Consult to Establish, or an environmental approval, prior to the start of construction from the central government. After the completion of a project, the company receives a Consent to Operate (CTO) from the Pollution Control Board. The Pollution Control Board was a division of the local government where the project is located. In regards to the Pune project, MANI was waiting for L&T to obtain the environmental approvals. The project operated using the turnkey model, which made approvals L&T's responsibility. The head of the Administration function at the time of the Pune project had a meeting with L&T and state government officials to discuss the method that the permits were to be handled. COGNIZANT took legal action for the approval process and continued to build prior to obtaining the permits. L&T got the approval for the environmental permits.

MANI was unaware of a demand from a government official at the time that the environmental clearances were obtained for the PUNe location. At a later date, MANI was informed that L&T incurred additional expenses that were the result of a demand from a government official for approximately $600K. GANESH or a L&T employee told MANI about the demand payment amount. MANI became aware of the payment during the year long delay of the environmental permit from a senior employee at L&T or a COGNIZANT team member. MANI's main contact at L&T was RAMESH VADIVELU (RAMESH). MANI did not remember the conversation about the government demand; however, the demand did not make a "big impression" on MANI. Due to MANI's inexperience with the Real Estate function at COGNIZANT, MANI thought that L&T had to pay demands as part of the process to obtain approvals.

L&T used the term "speed payment" for payments that were made to expedite the approval process and eliminate delays. MANI first saw the term "speed payment" in an e-mail from L&T. At the time MANI was unsure what the term implied but "speed payments" to obtain environmental permits were not a normal expense for construction projects. The payment from L&T to obtain the environmental permits was a "unique situation". MANI's understanding of the definition of a "speed payment" was a "substitute word for improper payment". MANI did not know who L&T paid to obtain the environmental approvals and did not remember discussing the payments with another COGNIZANT employee.

MANI understood that the "speed payment" was improper because COGNIZANT would have received a physical demand note from the government, if the payment was to obtain the environmental clearance. The process to obtain the environmental clearance was delayed and the "speed payment" was linked

so MANI assumed that L&T paid someone to expedite the process. MANI was uncomfortable with the concept; however, he did not have enough experience in real estate to be enraged by the concept of paying a "speed payment".

MANI attended a management review meeting about KITS in CHENNAI and the finalization of the PUNE project was discussed. The attendees of the meeting were MANI, GANESH, RAMESH, and lower level employees on GANESH's team. The COGNIZANT and L&T teams agreed on 14 Krons instead of 16 Krons that L&T proposed in a change order request. The negotiations were about settling on a final amount. L&T incurred expenses for obtaining approvals and foreign exchange rates.

MANI was unaware about the details of the break out or rationale behind the final approved amount. MANI pushed to get 20 Krons approved for L&T from COBURN for the foreign exchange fluctuation. MANI was unsure if the approval from COBURN was obtained via telephone call or an e-mail. At the meeting, MANI knew that it was clear that the additional expenses were for an improper payment. MANI said that he "did not think it was normal".

MANI's reaction when he realized that there was a demand at the PUNE location was that it was a "normal or regular type of transaction". MANI was in the real estate role for a year and used GANESH's recommendations on how to handle the PUNE project. GANESH recommended that COGNIZANT should pay the demand to the government official.

The PUNE project was the fist time that MANI heard of a payment to a government official, "to the best of my knowledge". MANI was unsure if he spoke to SNS about PUNE.

L&T followed the process to obtain the environmental permit correctly with the legal department and the approval process was on track. MANI did not recall any conversations of why L&T made the demand payment.

### *KITS PROJECT*

COGNIZANT started the construction at the KITS location prior to obtaining certain approvals, which was not an uncommon business practice in India. The regulatory environment in India took a long time to obtain approvals and the Indian government was aware that it was common practice to start construction prior to obtaining permits. The construction of the KITS project began in late 2011, prior to MANI being in the real estate function of COGNIZANT. The KITS project was the largest COGNIZANT building and included 17,500 seats and was 2.7 million square feet.

{Agent Note: MANI was shown document number CTS 317-318 that was an e-mail correspondence from MANI to CHANDRA, SRIDHAR, and GANESH dated January 20,

2014. The e-mail correspondence discussed the meeting with the CM.}

RAMESH, Project Manager for L&T, was the main contact for L&T. Per document number CTS 317-318, MANI did not recall the conversation that was referenced in the e-mail that stated "discussion we had last Friday". P. GANESH communicated directly with RAMESH without MANI; however, GANESH would not have e-mailed RAMESH before speaking to MANI about any issue related to the KITS project.

L&T requested an Executive intervention of L&T and COGNIZANT executives to meet with Chief Minister of TAMIL NADU STATE, JAYALALITHAA JAYARAM (CM) to get the approval process expedited. L&T went to COGNIZANT to discuss the permit delay and potential ideas to expedite the delay. L&T requested that CHANDRA SEKARAN attend the meeting since SEKARAN had an established relationship with the CM. MANI was against SEKARAN attending a meeting with the CM out of concern that a demand payment would be discussed during the meeting. MANI did not want to put COGNIZANT Executive Management in an "uncontrollable situation". SEKARAN agreed that the meeting was not a good idea. L&T's reaction to the refusal of the meting was not violent or angry.

The CM was a strong lady that made her way through a male society with a strong reputation. There were stories that the CM was involved with corruption but it was hearsay from companies that were in similar situations as COGNIZANT. During the CM's trial for corruption in India, the CM passed away.

Following the meeting with L&T, MANI received a phone call from SNS. SNS aggressively stated that L&T would not be responsible to get the permits. MANI took the telephone call in his office. There was a chance that RAMESH was on the telephone call as well; however, MANI believed he was the only COGNIZANT employee on the call. SNS respected MANI and COGNIZANT as a customer and SNS's behavior was unusual. SNS and L&T did not obtain approvals and permits for other customer's construction projects. MANI was aware of SNS's position on the permits. SNS made a point to communicate that the demand was well known to both parties from the government official. SNS was aware that it would be illegal and/or inappropriate to pay a demand to a government official. SNS did not use the words legal or illegal to describe the demand payment; however, SNS emphasized that L&T was in the business of construction and not in obtaining approvals. MANI replied to SNS's concerns that approvals and permits were included in the turnkey contract that L&T had with COGNIZANT in regards to KITS. This conversation was the most vocal and aggressive SNS was with MANI.

In India, the act of paying a demand to a government official was illegal but common based on the state of the country. SNS was aware of the

laws against bribery since he was in the construction business. MANI spoke to SRIDHAR and BISWAJIT GHOSH (BG) about the conversation with SNS. BG's direct supervisor was RAJ GHOSH (GHOSH). GHOSH reported to KAREN MCLOUGHLIN.

{Agent Note: MANI was shown document number CTS 5551 that was an e-mail from SRIDHAR to MANI dated February 17, 2014. The e-mail referenced the KITS project regarding an update received from L&T.}

   MANI did not recall if CTS 5551 was an e-mail that referenced the SNS call.

{Agent Note: MANI was shown document number CTS 314-315 that was an e-mail correspondence between MANI and SRIDHAR dated March 3, 2014 through March 4, 2014. The e-mail correspondence referenced a meeting with SNS and SATISH.}

   The document described a meeting with SNS about the planning permit. MANI and SRIDHAR agreed to meet with with SATISH LNU. SATISH was the L&T employee under SNS. SRIDHAR attended the meeting because SNS viewed SRIDHAR as a counterpart for COGNIZANT and an equal. SNS would not have attended the meeting if SRIDHAR was not in attendance. The meeting occurred on March 4, 2014 at the DLF office in Chennai, India. The participants of the meeting included SATISH, KANNAN or RAMESH from L&T and MANI from COGNIZANT. The meeting was short and MANI told L&T that L&T was responsible to get the permits. MANI did not remember L&T's position at the meeting.

{Agent Note: MANI was shown document number CTS 5535 that was a e-mail correspondence between MANI and GANESH on March 14, 2014.}

   CTS 5535 was a management review meeting at KITS that was used for "relationship building". The meeting was a lunch with RAMESH and RAMESH's team. There was a large audience so the planning permit was not discussed.

{Agent Note: MANI was shown document number CTS 5893 that was an e-mail invitation for a Capacity Planning call on March 7, 2014.}

   The purpose of the Capacity Planning Call was a quarterly exercise for all Real Estate projects for updates and to brainstorm future plans. The company planned ahead three to four years for construction projects and one year ahead for leased projects. All the individuals listed on CTS 5893 attended the quarterly Capacity Planning Call.

{Agent Note: MANI was shown document number CTS 5899 that was a slide from the Agenda Call for the Chennai location.}

There was no talk of the demand during the Agenda Call. MANI discussed the delay at KITS on the Agenda Call since the delay was a big issue with the KITS project. If COBURN was not aware of the delay at KITS, COBURN was made aware of the delay during the Agenda Call.

{Agent Note: MANI was shown document number CTS 261-262 that was an e-mail correspondence dated March 10, 2014 through August 3, 2014.}

MANI did not recall having the conversations described in CTS 261-262 after the planning call. MANI acknowledged the conversation was in reference to the Department Secretary but MANI did not know what government agency was being described. COGNIZANT employees did not have a reason to talk to any government officials. The state government agency that handled the planning permit was the Chennai Metro Development Authority (CMDA). The CMDA was a part of the Planning Department Authority. There was a possibility that there was a Department Secretary that handled the approval at the CMDA.

The e-mail stated "contact can't be explained over mail". MANI advised that the contents of the e-mail imply that the subject was about the demand payment but MANI did not think the e-mail was about the demand. Based on the relationship between GANESH and MANI, GANESH would have spoke to MANI about talking to the Department Secretary. MANI did not recall a conversation with GANESH about the demand. MANI discussed the demand with SRIDHAR.

SRIDHAR participated in weekly telephone calls with COBURN every Monday that usually lasted a half hour. SRIDHAR requested that MANI join the telephone conference via the Tamburg system to discuss the demand with COBURN on April 21, 2014. The Tamburg system was on all COGNIZANT computers and it was the standard conference method for COGNIZANT. The senior executives of COGNIZANT had the Tamburg system on their home computers. MANI did not participate in the weekly phone calls; however, SRIDHAR called MANI via telephone and requested that MANI dial into the conference call to discuss KITS with COBURN.

The participants on the conference call were MANI, SRIDHAR, and COBURN. MANI was unsure how long COBURN was on the conference call with SRIDHAR prior to MANI joining the call. MANI provided SRIDHAR and COBURN a status update on the project, L&T's position on the permits, and the demand from the government official to obtain the permits. MANI told COBURN that the demand was a result of obtaining the planning permit and the permit was required to begin operations at KITS. This was the first time that MANI discussed the demand payment with COBURN. MANI seeked guidance from COBURN on steps to handle the demand payment. During the conversation, COBURN

suggested for STEVEN SCHWARTZ, Cognizant General Counsel, dial into the telephone conference.

COBURN gave SCHWARTZ the facts of the demand after he joined the conference call. COBURN asked MANI the dollar amount of the demand and MANI said the demand was for $2.0 million. COBURN's stated that the demand amount was a lot and that he could understand why L&T was having difficulty making the demand payment. COBURN was shocked and surprised by the demand amount. CORBURN asked MANI, "How do we know it was right", meaning how do they know the amount was reasonable. The government demand amount was not validated since there were no comparable demands for other projects. SCHWARTZ was concerned about future demands from the government if L&T paid the demand for the planning permit at the KITS campus. There were no other projects mentioned on the telephone call. There was no discussion of the identity of the government official on the telephone call.

MANI discussed the strategy COGNIZANT should take for L&T to get reimbursed for the demand payment. MANI suggested putting the reimbursement in as a change request. A change request was a list of changes in construction projects from contractors that are continually updated until the completion of the project. Change requests included additional expenses or modifications to the project. COBURN asked SCHWARTZ if that method "would be OK?". SCHWARTZ responded "don't quote me" and agreed that the change order request would be acceptable to reimburse L&T for the demand payment. All participants on the telephone conference understood that the government demand would be paid via change order request and no one on the telephone call contested the idea of paying the demand. The meeting with CHENDRA and the CM was discussed. COBURN and SCHWARTZ agreed that CHENDRA should not participate in the meeting with the CM.

At the conclusion of the telephone call, MANI understood that L&T would get the permit by paying the demand to the government official and COGNIZANT would reimburse L&T through a change request. COBURN and SCHWARTZ agreed with the plan to move the project forward by paying the demand.

MANI and other COGNIZANT employees did not put the demand in any e-mail because it was known that the demand was not appropriate for corporate e-mail.

On April 22, 2014, COBURN e-mailed MANI to join a conference call with COBURN, SCHWARTZ, and SRIDHAR. MANI briefed COBURN and SCHWARTZ at the beginning of the call about the money that was paid to L&T as of April 22, 2014 and the amount that was owed to L&T for the KITS campus. COBURN did the majority of the talking during the telephone conference. COBURN expressed that it was L&T's responsibility to get the planning permit and that COGNIZANT would withhold all future payments to L&T until the permits

were obtained. COBURN wanted MANI to deliver the message that if L&T did not get the permit that future business with L&T would be in jeapordy. COBURN expressed that L&T would take COGNIZANT seriously when L&T realized that COGNIZANT froze all payments. SCHWARTZ did not contribute to the discussion. COBURN told MANI to relay the message to L&T that COBURN discussed the permit issue with COGNIZANT's Board of Directors. MANI was unsure if COBURN did discuss this issue with the Board of Directors.

Following the April 22, 2014 telephone call, MANI discussed with RAMESH to think about L&T's future business with COGNIZANT. RAMESH spoke to SNS to deliver COGNIZANT's message and to get approval to pay the demand. After several weeks of conversation, RAMESH told MANI that SNS approved and L&T hired a new consultant. L&T generally hired well-known consulants; however, the new consultant was not linked to L&T. The new consultant was hired because L&T had a lot of other projects and did not want to be "shaken down" by government officials for the other projects. MANI acknowledged the new consultant and ensured that the consultant would not advertise themselves with COGNIZANT. MANI was unsure the identity of the consultant.

After the April 21, 2014 and April 22, 2014 telephone calls, MANI spoke to GANESH and BG, which was standard company policy. GANESH and BG were aware that the reason that MANI was doing the change order was to reimburse L&T for the government demand. RAJ GHOSH (RAJ) approached MANI about the conversation with COBURN and SCHWARTZ. RAJ was annoyed that he was not included in the conversations with COBURN and SCHWARTZ. RAJ did not like feeling left out of conversations with COBURN and SCHWARTZ. BG reported to RAJ. BG was responsible for the Real Estate procurement pillars. RAJ hired HARI SINGH to cover the remaining two pillars of procurement. BG and RAJ had creative differences regarding COGNIZANT and BG confided more in MANI than RAJ. BG was on long leave as a result of the COGNIZANT investigation. RAJ was from West Bengala, India and was hired by COGNIZANT in the United States. In 2014, RAJ transferred to College Station, Texas to further his career in a smaller center at COGNIZANT.

Also, MANI discussed the demand with SRIDHAR during one of MANI's regular vists to the MEPS location. SRIDHAR had a similar reaction to MANI. SRIDHAR stated that since MANI brought it to his attention, SRIDHAR had to handle it. SRIDHAR seemed annoyed that either MANI brought up the situation to him or MANI told him that MANI would handle the situation. SRIDHAR did not have any other suggestions on how to handle the government demand and felt that the government would not go away or reverse the demand.

MANI took a problem up his chain of command and received a solution to progress the project. The first time MANI learned about the demand to the government official, MANI "burned inside since COGNIZANT was a great

organization" that did good work for the economy and the country. MANI expected India to "roll out the red carpet but COGNIZANT was being put in this situation" which referred to the 17,000 new jobs that COGNIZANT was bringing to India. MANI felt that COGNIZANT did "all the right things" and he was annoyed that the Indian government made the demand.

The government demand at the KITS location effected MANI more than the PUNE demand because MANI was not directly involved with PUNE. MANI was directly involved with KITS and part of MANI's job responsibilities was the progress of projects. The KITS project was the first job that MANI had overseen from the beginning of the project.

PUNE was the first Real Estate project that MANI handled and he thought that demands from government officials happened. After the KITS demand, MANI realized that "it is not correct and no one should be asking me for this". MANI took the KITS demand payment more personal and referred to the KITS location as "my state". MANI stated that "when COGNIZANT spent money on something that they don't get anything in return, it bothers me a lot".

{Agent Note: MANI was shown document number CTS 263 that was an e-mail correspondence between SRIDHAR, MANI, and GANESH dated March 10, 2014. The e-mail correspondence discussed a conversation with the Deputy secretary.}

GANESH gave an update to MANI that GANESH updated the COGNIZANT legal department. GANESH requested a call with RAMESH. After GNASH requested a phone call with RAMESH, MANI forwarded the request to SRIDHAR and requested a call with SRIDHAR. MANI did not believe that the demand was discussed during the telephone calls.

### KITS CHANGE ORDER

L&T tracked all changes for construction projects and sent an updated list to COGNIZANT to obtain approval for the updated monetary amount. MANI was unsure when the initial change order from L&T was received. The change orders contained the work performed and there was a line item for statutory approval. L&T hoped that COGNIZANT would agree to all the expenses in the change order and pay the balance. COGNIZANT negotiated the change order for each project with L&T and would be paid as standard procedures a portion of the change order.

There were different ways that MANI could have concealed the demand payment, which included the change order request or adding the demand payment into the next project's expenses. MANI suggested that the demand be paid by the change order request so that the payment did not stick out.

The statutory approval or government demand was listed as a separate

line item to ensure that the expense was paid. L&T and COGNIZANT did not want the language of "demand" to be included in the change order. The intention was to hide the demand in the change order request so there would be no attention drawn to the payment. MANI, COBURN, and SCHWARTZ did not have conversations that spoke explicitly about hiding the demand payment in a change order request. It was implied based on the conversations with COBURN and SCHWARTZ.

{Agent Note: MANI was shown document number CTS 16-66 that is a Variation List (Change Order) from L&T to COGNIZANT for the KITS campus dated 11/12/2014}

The document titled Variation-Approvals/Campus Regulations included seven (7) items that totaled 23,94,00,000 Rs that were items that L&T seeked for COGNIZANT approval. Item #2 on the list, Statutory Approvals-Planning Permit for 15,20,00,000 Rs was the improper payment. The legitimate fee for the planning permit was paid by COGNIZANT during the application approval process. The 15,20,00,000 Rs converted to $2.5 million. The difference between the initial bribe payment of $2.0 million and $2.5 million was commission that L&T incurred to generate the cash that was paid to the government officials. RAMESH told MANI that the demand would take time to get paid since L&T would have to find a way to generate the cash. The variation list is a line by line breakdown of the expenses. The seven items included on the Variation-Approvals/Campus Regularization is the breakdown from the Variation List-Points to be concluded with Top Management under #1 Approvals/Campus Regulation.

Upon receipt of the Variation List, negotiations started with L&T regarding the payment amount for the additional expenses of the KITS project. The statutory approval was listed under the points that should be discussed with top management. The negotiations were not about whether or not COGNIZANT would pay the statutory approval amount but how much COGNIZANT would pay L&T.

MANI had an approval limit of $500,000 for capital expenditures in the variation reports. Any amount above $500,000, MANI can give commitment of payment but had to get approval from SRIDHAR for Administration Expenses and COBURN for Real Estate Expenses. MANI circulated the information via e-mail to COBURN and that a formal approval would be sent separately. MANI sent an initial e-mail to COBURN in January that included a breakout of the expense reimbursement for L&T. MANI followed up with COBURN a few days later and asked COBURN if he needed further information for his approval. MANI handled the inappropriate payment the same way that he handled all real estate transactions. MANI had "a lot of responsibility" for COGNIZANT and wanted his supervisors to trust his work product.

{Agent Note: MANI was shown document number CTS 67-87, CTS 88.1-88.9, CTS 3614-3617, CTS 3620. CTS 67-87 was an e-mail from MANI to COBURN with the change order request and the Specification Enrichment presentation for the KITS location from L&T. CTS 88.1-88.9 was a detail listing of items that were not approved by COGNIZANT from L&T. CTS 3614-3617 and CTS 3620 was an e-mail correspondence regarding the statutory payments dated November 27, 2014 through December 23, 2014.}

 Documents CTS 3614-3617 and CTS 3620 was the legitimate payment to the government for the planning permit. COGNIZANT wrote a check to the government that paid for the planning permit. MANI looked for approval for the "statutory payment for government regulation". MANI believed that he utilized the terminology "statutory payment" to differentiate the legitimate payment for the planning permit with the illegitimate payment to the government official for the planning permit. In addition to the demand from the government official, L&T wanted reimbursement for the foreign exchange rate of the Indian Rupee. MANI was sympathetic for L&T's loss position with the exchange rate fluctuations. Document CTS 88.5 was the total amount that was approved by COBURN. The document included items that were approved, the statutory approval amount, and the items that were above and beyond the pre-approved amount.

{Agent Note: MANI was shown document number CTS 3840 that is a was an e-mail from MANI to KRISHNA, NARASIMHAN VARADHACHARI, Cognizant Finance, GANESH, and BJ dated March 5, 2015 through March 6, 2015. The document described three tasks that GANESH did to the Formal Approval for the KITS campus.}

 CTS 3840 was drafted prior to the final approval of the change order request from COBURN. MANI wanted the excel spreadsheet to be more clear and more user friendly since it was to be sent to COBURN. MANI did not remember the comments that he wanted changed to the document.

{Agent Note: MANI was shown document number CTS 5387 that was an e-mail correspnodence with COBURN, MANI, GANESH, SRIDHAR, BG, N. VENKATESAN, and VENKATASUBRAMANI NARASIMHAN dated January 13, 2015 through February 3, 2015}

 CORBURN replied "Approved" to MANI's e-mail. MANI did not think that this document was the formal approval since the original e-mail to COBURN was the "heads up" e-mail. COBURN and MANI did not speak about the demand around the time of document CTS 5387.

 MANI had a discussion with SRIDHAR and COBURN to finalize the total amount approved in February 2015. The total amount that was initially approved was $8.5 million, which included the improper payment. MANI

Continuation of FD-302 of  (U) Srimanikandan Ramamoorthy                   , On  02/07/2017 , Page 14 of 19

requested approximately an additional $1.0 million to compensate L&T for the foreign exchange rate. COBURN approved the additional amount that brought the total to $10.0 million. COBURN told MANI that L&T should know to hedge the foreign exchange rate despite approving the additional funds. MANI stated that it is likely that he advised COBURN that the statutory approval line item also contained expenses from previous projects.

MANI stated that there was "no doubt in my mind" that CORBURN understood that the demand payment was included in the approval amount. MANI stated that he was "very positive that I informed him of the change order process", in reference to the demand payment and COBURN's knowledge that the demand payment was listed in the change order request. MANI provided COBURN with a "clean list" that did "not show the statutory approval". COBURN's response was okay and had a "old news" demeanor. MANI did not remember any "out of ordinary response" from COBURN in response to the demand payment.

MANI spoke to GANESH and BG regarding the final excel file of the expenses to be paid to L&T. The conversation was centered around the final amount of the excel that matched to the balance on the Variation PowerPoint slide deck from L&T. MANI directed GANESH to manipulate the excel spreadsheet for the total $10 million that would be paid to L&T, which included the demand payment. The $2.5 million demand payment was concealed by approving expenses and furniture that were not included in the original contract with COGNIZANT. MANI instructed GANESH to find more items that were previously unapproved and put those items in the approved column to get the balance to the total $10 million. The idea was "to show the $10 million is accounted for and physically present".

MANI provided an example for clarification of the demand payment. For example, if L&T provided a laptop, phone, and glass to COGNIZANT, and there was no demand payment, COGNIZANT paid for only the glass and received all three items. For a project with a demand payment, COGNIZANT paid for the phone and the glass, and received all three items.

{Agent Note: MANI was shown document number CTS 201 that was a formal approval for the KITS location from COGNIZANT Finance Department to COBURN on March 11, 2015}

MANI did not recall the conversation with COBURN that was documented in CTS 201. MANI did not think that the conversation was related to the statutory approval since the total amount to be paid to L&T was finalized by March 2015.

Periodically, COGNIZANT updated the Board of Directors (Board) on real estate projects. The Board of Directors approved funding for real estate

projects every year to two years. COBURN usually briefed the Board and MANI did not attend all the Board meetings. MANI stated that the Board was aware that COGNIZANT paid an additional $10 million to L&T for the KITS location.

   The Board visited India in February 2011, February 2013 and February 2015. The meeting was about expanding capital expenditure projects for COGNIZANT. MANI did not discuss the bribe demand to anyone on the Board.

{Agent Note: MANI was shown document number CTS 302-309 that was an e-mail correspondence between GANESH, MANI, VADIVELU, and VENKATESAN dated December 3, 2013 through March 12, 2014.}

   The document stated the status of the planning permit for the KITS campus and detailed that the approval is L&T's responsibility to obtain.

{Agent Note: MANI was shown document number CTS 267 that was an e-mail from MANI to KANNAN and VADIVELU dated April 21, 2014. The e-mail requested an update after a meeting with SNS.}

   MANI did not recall getting an update from L&T.

{Agent Note: MANI was shown document number CTS 268-272 that was an e-mail correspondence with MANI, GANESH, COBURN, SRIDHAR, MCLOUGHLIN, and BG dated May 17, 2014 through July 1, 2014.}

   RAMESH did not want anyone to be aware that L&T was going forward with the demand payment. RAMESH did not want anyone to know of the demand payment because it was improper or because L&T did not normally obtain statutory approvals. RAMESH was familiar with the hierarchy of COGNIZANT and was aware of the executives that were involved in the approval process. MANI informed COBURN via e-mail that L&T hired a new liaison consultant as the new contractor. MANI voiced concerns to COBURN about the payment freeze for L&T and the impact the freeze would have on the KITS project. COBURN approved the release of $7 million and wanted to hold $5 million until all the approvals were received.

{Agent Note: MANI was shown document number CTS 296 that was an e-mail from RAMESH to MANI, GANESH, and BG dated June 30, 2014 regarding the planning permit for the KITS campus.}

   After the statutory payment, COGNIZANT waited for the government order. The government order was issued by the Pollution Control Board (PCB) through the CMDA. COGNIZANT received the government order from L&T not immediately but after the demand payment. The receipt of the government order allowed COGNIZANT to continue regular payments to L&T. The government

order was the most significant hurdle for COGNIZANT to overcome for the KITS project. Once the order was received, the remaining project was standard procedures.

{Agent Note: MANI was shown document number CTS 5594 that was an e-mail from SRIDHAR to MANI dated May 15, 2014.}

MANI did not remember the Tandburg conversation that was referenced in document CTS 5594.

In or about August or September 2014, MANI traveled to San Francisco, California for a banking financial services meeting. Following San Fransico, MANI traveled to New Jersey and stayed with friends for two (2) days. MANI attempted to get an appointment to see COBURN or MCLOUGHLIN; however, MANI was unable to set up a time with them. MANI went to COGNIZANT and spoke to COBURN for ten-fifteen minutes. MANI wanted a new position with COGNIZANT due to health issues and stress. MANI spoke to COBURN about the new position during the meeting in New Jersey. COBURN asked MANI if MANI wanted to return to the United States to work in the New Jersey location. COBURN created a position for MANI as a Chief Operating Officer (COO) of one of COGNIZANT's business units in India. MANI agreed to take the position.

GANESH was requested to go on long leave from COGNIZANT following the initiation of the investigation. MANI hired a replacement for GANESH. GANESH resigned after he was informed that a successor was hired. GANESH had a skill set of being an engineer that MANI felt was valuable and respected. MANI and GANESH worked well together since both parties had skills that complimented each other. After the investigation was initiated with COGNIZANT, MANI and GANESH spoke about the status of the interviews that they were involved in with DLA PIPER, COGNIZANT's legal counsel. MANI did not divulge in details of the interviews with DLA Piper with GANESH.

After the news of COGNIZANT went public on September 30, 2016, MANI did not get out of bed for three (3) days. MANI knew that the reason for the news was becuase of the events that happened at KITS. MANI told GANESH and BG that the change order request was the reason that everyone at COGNIZANT was in trouble.

{Agent Note: MANI was shown document number CTS 5001 that was an e-mail correspondence dated September 8, 2014 between GANESH, MANI, SRIDHAR, and GAURSHARAN M RAO}

COGNIZANT made a tax decision in reference to KITS. According to the SEZ, five (5) years after operations commenced, the location is 100% exempt from tax and the following five (5) years are 50% exempt. Thet tax exempt

calculation was based on the year and not by the specific date of operation. The subject of the e-mail stated "Don't Forward" for business strategy. COGNIZANT did not want business units to be aware of the tax decisions or reasons to commence operations for certain projects.

### *Training*

COGNIZANT did not have in person or classroom based training on the policies and procedures to handle improper payment requests from a government official. In or about 2014-2015, COGNIZANT employees had to read and sign a Code of Business Ethics Policy that stated the policies and procedures regarding Foreign Corrupt Practices Act (FCPA). Employees were instructed to report all FCPA violations to SCHWARTZ. MANI understood the fundamentals of the FCPA violations and that the payment in 2013 was wrong based on the "common sense approach". MANI did not need FCPA training to know that making payments to government officials was illegal. Corruption in India is prevalent but MANI knew that it was wrong.

In or about January 2017 through February 2017, DLA Piper hosted a legal training on FCPA in Chennai, India. During the training, videos were shown about improper payments to government officials.

Corruption in India is prevalent but MANI knew that it was wrong.

### *KITS Electricity*

After a project is completed and put into operation, the project is issued a Completion Certificate. The Completion Certificate was the trigger to get permanent electricity to the campus. KITS was on diesel generators in or about April 2015. The diesel generators were not environmentally sound. According to the turnkey contract model, the process to energize the campus was L&T's responsibility.

There were two (2) phases to get electricity to the KITS campus. The electricity board (EB) substation laid the cable from the EB substation to the electrical power grid. COGNIZANT paid the upfront costs of the cable and was reimbursed by the EB. EB owned all of the cable and provided a rebate to COGNIZANT. L&T was responsible to get the power to all of the buildings in the campus.

L&T worked with EB officials and created two options to get electricity to the campus:

1. Appoint L&T to lay the cable from EB as a consultant.
2. EB lay the cable as a turnkey and do the work.

MANI did not want to rely on the EB to complete the electricity work since the EB is a government agency and the work would have been delayed. MANI agreed for L&T to do the work so that the work would be completed quicker. MANI discussed the electricity decision with SRDIHAR and LAKSHIMI. L&T was the only contractor to bid for the electrical work and the project totaled $2.0 million.

In late 2015, MANI sent an e-mail with an approval for L&T to perform the work, with the following conditions:

1. L&T was to commit time to the project
2. There would be a penalty in place if L&T missed a deadline
3. L&T would have to comply with all FCPA regulations

The conditions were suggested by LAKSHIMI or SRIDAR. MANI had conversations with LAKSHIMI or SRIDAHR about L&T and the electrical project. MANI was unsure if LAKSHIMI knew of the improper payment for the planning permit at KITS.

{Agent Note: MANI was shown document number CTS 4155-4156 that was an e-mail correspondence with GANESH, VADIVELU, MANI, and BG dated March 1, 2016 through March 2, 2016.}

In or about March 2016, L&T received an order from the EB to give electricity throughout the KITS campus. The e-mail included a breakout of expenses for the electricity. Within the expense breakout was a line item for "incidental expenses". MANI did not pay attention to the original e-mail since the e-mail was forwarded to MANI. At a later time in March 2016, MANI became aware that the "incidental expenses" was an improper payment made to obtain the electrical permit from GANESH or BG on a telephone conference call. The improper payment was for approximately $300K. By the time MANI learned of the improper payment, L&T already made the payment. The telephone conference was a due diligence call about the status of the project.

In or about May or June 2016, COGNIZANT hired a third party vendor to verify the cost of the project. The third party vendor ensured that a $2.0 million project cost was reasonable.

{Agent Note: MANI was shown document number CTS 2120-2123 that was an e-mail correspondence regarding the EB electrical project dated April 26, 2016 though April 29, 2016.}

MANI drafted an e-mail on May 6, 2016 to COBURN but did not send the e-mail. MANI did not send the e-mail because of the ongoing investigation with DLA Piper. MANI did not speak to COBURN about the improper payment

until August 2016 because MANI knew that he had to do something about the improper payment.

DLA Piper began the investigation at COGNIZANT after the third party vendor was hired. MANI stated that the investigation started in May since his computer was imaged by DLA Piper. The organizational structure at COGNIZANT changed. MCLOUGHLIN was promoted to the Head of Global Real Estate and was to be involved with all conversations that MANI had with COBURN. MANI spoke to COBURN about the restructuring of COGNIZANT and told COBURN about the improper payment for the electrical permit. COBURN instructed MANI to follow up with SCHWARTZ and DANA LNU, in the legal department at COGNIZANT, to seek guidance on how to proceed. KARL H. Buch, DLA Piper, was on the telephone call with MANI, SCHWARTZ, and DANA.

MANI did not speak to any other legal counsel prior to the DLA Piper investigation. COBURN and SCHWARTZ have not been in contact with MANI since the initiation of the investigation. MANI updated COBURN about interviews with DLA Piper that were scheduled and gave updates that MANI's computer was imaged. MANI asked COBURN the subject of the investigation and COBURN replied with that it was important to get the investigation done properly. COBURN did not tell MANI a lot of details except that the investigation was related to improper payments in which MANI automatically thought of the KITS project.

MANI did not speak to people about the investigation or the interviews that were conducted by DLA Piper. COBURN's resignation had a big impact on MANI. MANI tried to call COBURN on the telephone to see how he was but MANI never heard back from COBURN. MANI was very upset that he did not receive a telephone call back from COBURN because MANI thought that he and COBURN had a close friendship.