# Exhibit 31

**Information Provided by counsel for Ramasamy Nakkiran, Balaji Subramanian ("Balaji"), and Ramesh Vadivelu (on a hypothetical basis):**

- Vadivelu, Nakkiran, and Balaji were all in the airports construction unit. When the projects started, Vadivelu was in charge and reporting to Kannan, and Nakkiran was a dotted line to Kannan, below Vadivelu. He was the relationship guy with Cognizant— the key account relations manager. Balaji was lowest and was an onsite engineer trying to ensure everything is built as it should be; he was in charge of the day-to-day operations and is an actual engineer. In 2014, Vadivelu took over Kannan's job as the head of the business unit, after which he oversaw Nakkiran and Balaji.

- Venkatesan was Vadivelu's equivalent. Ganesh was the project head on Cognizant KITS. Those are the two recurring people on Cognizant's side with whom they interacted.

- With respect to the tendering process, Vadivelu recalled 2-3 other companies bidding, as well as rounds of negotiations on the contract price with Cognizant. Vadivelu was the Tendering Manager for community buildings and airports unit. Once it was won, Vadivelu handed it off to the design and construction teams. Vadivelu also recalled that Kannan and NV Satish were more involved in the negotiation with Cognizant on L&T side for the tender and final pricing of bids.

- According to Vadivelu, he was watching the negotiation take place. His role changed in 2014, and he eventually became the business head of community buildings and airports, which was substantive.

- Nakkiran and Balaji played no role in the tendering process. They were given the contract and price after completion.

- KITS was a lump sum contract/project – the total price received by L&T was negotiated at the outset. The preliminaries were startup costs of the project. Payments under KITS were milestones established during negotiations, as laid out in the documents. Payments were a prearranged percentage of the overall contract. There was a running account of bills.

- There was an initial payment made for preliminaries, after which, on a monthly basis, there were account bills for the completion of certain benchmarks. Amounts were tied to given milestones, not to the cost of achieving the milestone. It did not necessarily cost .5% to complete that step, it was just a point in negotiations and there was agreement to pay that amount at that time. L&T met milestones to continue the cash flow, and wanted money up front.

- Payment issue at this point: even though the contract was negotiated as a lump sum, expectation of delays and changes were anticipated. A provision was included that

51

allowed L&T to be compensated for delays, and there was an expectation that delays and cost overruns would allow L&T to be compensated for delays.

- On the Cognizant side—internally reserved 3% price to cover costs they might incur, such as extra claims or variations process. This was 3% -- in page 6 of presentation. Agreed on variation prices.

- It was not a surprise to Vadivelu, Nakkiran, and Balaji that there were changes. A number of the delays were due to conduct and activities undertaken by Cognizant due to changes.

- There was a recurring debate between L&T and Cognizant concerning responsibility for statutory approvals and permits. This was unique to Cognizant as a client. Typically, contractors are not responsible for ongoing approvals. L&T took responsibility here. It seemed contrary to industry practice, but Cognizant dictated to L&T, as a valued customer. It was unique to L&T that they did this for Cognizant. The role that L&T played in the process was a flashpoint later in the relationship. Cognizant believed that L&T had complete responsibility for the approvals and was accountable for delays. Cognizant pressured L&T and was frustrated (citing DOJ_RN 000012). On the other hand, L&T had a different interpretation of the contract. L&T thought the contract was limited to L&T producing drawings and designs that would be sufficient for the regulations. Preparing the documents requires too much bureaucracy, and they thought that they were just required to expeditiously create the underlying documentation. They incorporated changes from the client, obtained signatures, and incorporated edits. L&T's view is seen in the correspondence.

- Vadivelu would say that L&T saw to eliminate responsibility for statutory approvals at the tendering stage and that legal departments met to discuss the issue. It remained a recurring issue throughout relationship, despite being flagged at outset. The issue was not resolved; both sides believed themselves to be correct.

- Vadivelu recalled a call with legal on both sides at the outset. When they were tendering and L&T was explaining scope, Cognizant came back and said it wanted them to be responsible for statutory approvals. Cognizant pushed back against dropping it. The ultimate result is in the contract—language can be ambiguous. Both parties never agreed on the final responsibility.

- In 2014, there was a suggestion that, given the importance of the project to Tamil Nadu and jobs, Cognizant should meet with a local politician to avoid delays. Vadivelu, Nakkiran, and Balaji had no knowledge on whether the meeting took place and did not attempt to organize the meeting.

- The Chief Minister of Tamil Nadu was Jayalalithaa. Cognizant would have had difficulty getting approvals from the minister. Vadivelu, Nakkiran, and Balaji did not think Cognizant would have luck meeting with Jayalalithaa, nor luck going through normal channels. Vadivelu thought the meeting was just a suggestion and did not think Cognizant would have been able to get a meeting. Nakkiran was aware that a meeting was suggested, but did not know whether it took place. Balaji knew nothing of the suggested meeting.

- In correspondence, SNS emailed that it was not L&T's responsibility, and that the onus should be on Cognizant.

- With respect to KITS project delays, there were a number of permits to be obtained. There were a number of delays, but the planning permit was the main one.

- There were three key steps: (1) obtain ELCOT master plan approval; (2) obtain environmental clearance; and (3) obtain the planning permit.

- Regarding (1): Starts master plan approval—building plans submitted to CMDA in Chennai. This first step caused the most significant delay in the process with a cascading effect on the approvals. Land deed received, which incorrectly laid out plan for the KITS project—parceling mistake. The deed had to be reissued and drawn. It was supposed to be done by February 2012, but it did not happen until January 2013, which pushed everything back because nothing else could be launched.

- Regarding (2): Planning permit for environmental clearance from statutory environmental impact assessment authority (SEIA). Hired ENSYS to attain that approval, which was ultimately obtained in September 2013 (should have been February 2013).

- Regarding (3): Once the application for the planning permit was done, they were in position to occupy the campus.

- In obtaining the consultant, L&T suggested that it was going above and beyond – this piece was so intricate and technical; a one-off task. Although there were names for the consultant, Vadivelu, Nakkiran, and Balaji just knew it as ENSYS. They had no role in choosing the consultant or interacting with them. They just knew they were obtaining a permit and it was delayed. Balaji may have had limited interaction with someone from ENSYS—but only for handing off documents.

- According to Vadivelu, Nakkiran, and Balaji, there was nothing L&T could have done to speed up the approvals. Vadivelu was aware of delays because the issue was raised to senior management. He did not know the source of the delays or the specifics of why there were delays. He would refer to Balaji, who was on site and was responsible for the day-to-day. He recalled an issue with land title and that changes in designs were delayed.

53

Cognizant seemed complicit for changing plans. After the project was complete, he learned that Cognizant purposefully delayed the project apart from statutory approvals. An internal document from Cognizant was inadvertently shared with L&T that suggested that Cognizant wanted this delay for tax reasons.

- Nakkiran did not see a responsibility to address issues. He attended meetings regarding delays, but did not take action on delays. His role as relationship manager was to make sure that nothing fell between the cracks, and to facilitate communication between Cognizant and L&T. He triaged and was not focused on communication unless it was directly going to him; he was copied on a lot of emails and was not focused unless an email was addressed to him.

- Balaji worked at site level and had the best insight on delays. He kept a chart of KITS progress. Not all delays lack of approvals. Balaji thought the Cognizant team was responsible for delays due to revisions of design plans.

- Cognizant made payments to L&T on a monthly basis through running account bills, and payments were requested monthly. In 2014, Cognizant fell behind and the issue was raised with senior management and L&T. Counsel for L&T advised that payments be made on some bills and not others. Vadivelu, Nakkiran, and Balaji did not have insight into this issue. They knew some payments had been delayed; they were not involved in discussions between Cognizant and L&T on that issue. Vadivelu did not recall why there were delays, but speculated that they were due to delays on the KITS project. Vadivelu, Nakkiran, and Balaji all did not think that L&T could have obtained the approvals quicker.

- With respect to the variations and extra claims process, by the time KITS was closed—over schedule by more than a year—Cognizant had made many changes. The final cost was negotiated through the variations process. The parties had to agree on a significant amount to compensate L&T. In theory, the variation process was to address additional charges, but it was viewed by L&T as a chance to renegotiate the contract price due to losses through delays and changes. They wanted a 15% margin—due to delays, their profit margin shrank completely. Variations attempted to capture margins back and 5% was captured back.

- Vadivelu had the most involvement in the process. The project had overrun due to delays—L&T required 60 crores to make a project profitable. KITS would be less profitable than expected. Vadivelu requested cost figures from Balaji—Rule is variation claims should be 3 times the amount. Vadivelu knew this would be negotiated down. He included any cost he could, including costs from other projects. The rule of thumb was to multiply by three. The process that L&T engages in inversely with its own vendors. There is a cultural practice in India around this.

54

- With respect to the cost of statutory approvals, there was a perceived cost of delays. In November 2014, Balaji estimated a 15.2 crore cost. Vadivelu took the number and added costs that were not covered through Siruseri. Balaji collected in spreadsheets to justify variations [DOJ-BS-0007—shows how came to 22.6 crores]. The Siruseri amount was still owed at the time. It is not possible to find supporting documentation for the chart; this was roughly the amount.

- According to Vadivelu, the line items in documents calculating variations are meaningless. The amount required by L&T would be used for purposes of negotiation. As seen in the documents, after 60 crores was agreed on, Thiyagarajan at L&T agreed to negotiate the prices. Vadivelu was aware that Cognizant only cared about the final figure. How it was presented in the line items did not matter. It just needed to be enough to cover L&T.

- Vadivelu told people at the time to inflate the numbers. So the 22.6 was the number they actually needed—so they inflated it to cover the margins.

- Out of Vadivelu, Nakkiran, and Balaji, Vadivelu had the most involvement in the variations process. He relied on Bajaji to obtain the figures to use in negotiating with Cognizant. Nakkiran was not significantly involved in variations. He was forwarded correspondence from Vadivelu so that he could print the emails. Balaji was trying to catch cost overruns and spread them across different line items. Assuming L&T would submit a number to Cognizant and Cognizant would refuse, this would spread costs among as many line items as possible.

- The variations process was unique in this industry.

- Vadivelu, Nakkiran, and Balaji were unaware of meetings with government officials.

- According to counsel for Vadivelu, Nakkiran, and Balaji, with respect to variations, there was a tension point between Vadivelu, Nakkiran, and Balaji. Vadivelu viewed the numbers as fudgeable— and just wanted total amount. Balaji was on site putting together spreadsheets—there was a substantiation and basis for each of the numbers. This may be difference in their levels at the company. Vadivelu just viewed the spreadsheets created by Balaji as a negotiating device to recover the crores.

- Nakkiran forwarded emails to print, but had no other real involvement.