# Exhibit 33



# FEDERAL BUREAU OF INVESTIGATION

Date of entry  06/12/2018

S. N. SUBRAHMANYAN (SNS), L&T's Chief Executive Officer (CEO) and Managing Director, was interviewed at the Ritz-Carlton Millenia located at Marina Bay, 7 Raffles Ave, Singapore. Trial Attorney Kevin Gingras, Department of Justice, Fraud Section (DOJ), AUSA Courtney Howard, United States Attorney's Office, District of New Jersey, and FBI Special Agent (SA) Kelly Blanchfield participated in the interview. SNS was represented by legal counsel Jeffrey Know from Simpson, Thacher, & Barlett LLP.

Prior to the interview commencing, SNS reviewed and signed a proffer agreement with the DOJ. SNS was told to be truthful as to whatever he can remember. SNS was advised that at any point, he can discuss with his legal counsel or take breaks as needed. After being advised of the identity of the interviewing agent, DOJ, and AUSA, and the nature of the interview, SNS provided the following information:

SNS attended the National Institute of Technology (NIT) for civil engineering. SNS earned his Masters of Business Administration (MBA) in 1984. In August 1984, SNS started working for L&T.

SNS worked in the following positions at L&T:

- Assistant Planning Engineer. SNS' responsibilities included facility assistance with costing for nuclear buildings. SNS was promoted to the Assistant Managing Director for 4-5 years and focused on implementing systems for L&T.

- SNS transitioned to the Head of Proposals for the Civil Division. SNS' responsibilities included bidding for projects in the Civil Division, which included car factories, buildings, and factories. In addition, SNS was responsible for construction contracts and serving as a liason with the government offices in relation to construction projects.

-SNS was promoted to the Head of Proposals for L&T for two years.

Investigation on  05/21/2018  at  Singapore, Singapore (In Person)

File #  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Date drafted  06/07/2018

by  BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000144

  -SNS transitioned to the Head of Institutional and Commercial Buildings for one year and then the Head of Buildings and Factories for one year. The Buildings and Factories Division included residential properties.

  -In 2011, SNS was promoted to the Head of Total Construction. From 2011 through 2016, SNS handled 60% of the operations of L&T.

  -In July 2016, SNS was promoted to the Chief Executive Officer (CEO) and Managing Director.

## *COGNIZANT*

 SNS worked with COGNIZANT as a client since 1999, when SNS was the Head of Proposals for L&T. SNS submitted bids for COGNIZANT projects. In 2004 through 2007, SNS had a "decent relationship" with COGNIZANT. Subsequent to 2007, SNS was promoted internally into a management role. In the new role, SNS reviewed budget amounts to actual amounts that were generated from COGNIZANT projects. SNS reviewed sales, expenses, and production status from COGNIZANT projects.

 At the start of the relationship, SNS interacted with COGNIZANT's project management to include CHANDRA SEKARAN, K.C LNU, and LAKSHMI NARAYANAN. After SNS took a management role with L&T, the interactions with COGNIZANT "got confusing". SNS was reluctant to meet with SRIMANIKANDAN RAMAMOORTHY (MANI) since the project manager should have the ability to manage the projects. MANI replaced K.C. at COGNIZANT.

 The first meeting with COGNIZANT occurred in 2009 or 2010 at the COGNIZANT office. After pleasantries were exchanged, MANI "gave a lecture on corporate social responsibilities" and requested L&T assistance with the installation of solar panels on a COGNIZANT building. SNS provided the contact information from an employee at L&T that COGNIZANT could discuss the new project with.

 COGNIZANT requested a meeting with SNS after SRIDHAR THIRUVENGADAM became the Chief Operating Officer for COGNIZANT. SNS agreed to the meeting request since COGNIZANT was a good client and the sales growth with COGNIZANT was high. A lunch was scheduled with SNS, SRIDHAR, MANI, P. GANESH, K. KANNAN, RAMASH VADIVELU, and a design employee. The COGNIZANT projects were broadly discussed during the lunch meeting. After the meeting, SNS told his team that he did not want to go to anymore lunches with COGNIZANT.

 SNS barely spoke to COGNIZANT besides the two meetings listed above.

### GORDON COBURN, COGNIZANT CHIEF EXECUTIVE OFFICER (CEO)

SNS met COBURN three times. SNS was unsure of COBURN's title and did not know COGNIZANT's corporate structure. In 2013 or 2014, SNS met COBURN for approximately 15-20 minutes as a courtesy meeting in New Jersey. SNS and COBURN had an additional courtesy meeting about the potential for new projects with L&T in 2015 or 2016.

COBURN visited the KITS facility in CHENNAI, INDIA and met with SNS and SNS' team. COBURN made SNS feel beneath him which caused SNS to not want to meet with COBURN. SNS did not speak to COBURN on the telephone. SNS and COBURN only e-mailed each other seeking appointments for meetings.

COBURN always seemed like a "busy guy".

*{Agent Note: SNS was shown document DOJ_SNS000001, which was an e-mail correspondence dated November 21, 2012 regarding the PUNE project}*

SNS did not recall the e-mail correspondence but based on the context of e-mail it was a status update to COGNIZANT. SNS was not involved in the details of the PUNE project. SNS was aware that there was a project in PUNE for COGNIZANT. SNS was unaware who KRISHNARAJ THIAGARAJAN was from COGNIZANT.

In general, L&T did not get involved with statutory approvals with a client. L&T needed certain licenses and permits for environmental clearances in order to run the construction sites. Statutory approvals were the client's responsibility since it was the client's project. L&T was the designer, architect, and builder for COGNIZANT projects. L&T assisted the client in filling out the required paperwork to obtain the statutory approvals, since L&T had the information needed about the design of the buildings. In addition to assisting clients with filling out the required paperwork, L&T assisted with the submission of the paperwork to the government agencies. It was the client's responsibility to follow up with the government agencies to obtain the statutory approvals.

L&T's process for handling statutory approvals was on a case to case basis with different customers. L&T provided coordination and assistance as a liaison between the customer and the government agencies for statutory approvals. This was not a unique arrangement with COGNIZANT.

The Pollution Control permit was rejected by the government agency since it failed to meet the standard of the Pollution Control Board. This posed a big challenge for COGNIZANT. The word "consultant" in the e-mail correspondence was a "misused word". SNS believed that L&T could have used

a consultant to assist with completing the government forms since they are lengthy and the consultant would have expertise knowledge of the laws and bylaws of the reason. The responsibility of the consultant would have been to liaison with the Pollution Control Board to assist with the permit process.

SNS was unaware of a second consultant. In general, if a consultant did not meet the standards, L&T would replace the consultant with an individual that had better technical knowledge. The hiring of consultants were project level decisions that SNS was not involved with. The local team determines the need for a consultant. The consultants are approved at the site level then the cluster level then the business head level.

SNS did not recall any conversations with COGNIZANT about the PUNE facility. SNS visited the PUNE facility once.

SNS did not have any conversations or hear anything about a demand payment for the PUNE project.

## KITS

In 2013-2014, there was an issue with the planning permit for the KITS facility. SNS reviewed the verticals for each project on a monthly or quarterly basis. The KITS project was included in a 5 year strategy plan for L&T. During the review, SNS became aware of a shortfall from funds for COGNIZANT. SNS inquired from the project team and the following came to SNS' attention:
- There were issues with the land documents and L&T was not able to get details for the building plan.
- COGNIZANT insisted on multiple design changes after the start of construction.
- There were changes that were requested of the architecture.
- Other minor matters.

During the time, SNS was told that L&T was unable to submit paperwork. There was no mention of a planning permit during the initial review meeting. In a subsequent review meeting, the planning permit paperwork for KITS was submitted and L&T and COGNIZANT were waiting for the planning permit to be issued by the government. SNS does not recall if a consultant was used for the planning permit at the KITS facility. The planning permit was taking time to be processed by the government agencies. COGNIZANT pressured L&T to get the planning permit faster and placed the blame for the delay on L&T. L&T blamed COGNIZANT for the delay in the land paperwork. The contract with COGNIZANT showed that the responsibility of statutory approvals was on COGNIZANT.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Interview of S. N. SUBRAHMANYAN , On 05/21/2018 , Page 5 of 8

    SNS reviewed the outstanding Accounts Receivable (AR) Aging and noticed that COGNIZANT was over six months delinquent on paying their bills with L&T. The outstanding AR balance with COGNIZANT did not concern SNS because COGNIZANT was a cash rich organization.

**{Agent Note: SNS was shown document DOJ_SNS000003, which was an e-mail correspondence dated January 20, 2014 with the subject of "Re: Discussions we had last Fri in connection with KITS approvals}**

    SNS was unsure why RAMESH wrote the e-mail correspondence to P. GANESH. There was a large difference between the budget and the actual amounts, which was due to the substantial delays that were caused by the land delay and the planning permit. L&T had no obligation beyond "pure coordination and follow up" to get the planning permit. There was nothing more that L&T could have done to expedite the planning permit process.

    SNS did not recall DOJ_SNS000003 but SNS said that he must have seen it since he responded to the e-mail.

    It was not a regular practice for L&T to request meetings with a client and the Chief Minister (CM). SNS did not recall having any conversations with anyone about L&T requesting COGNIZANT to meet with the CM. In response to the e-mail, SNS stated that someone "took an initiative and not sure what they were trying to accomplish".

    Per the e-mail: "Put the onus on them"- L&T should put the pressure back on COGNIZANT. SNS did not want to get L&T involved with financial or legal issues. In a meeting, there was a discussion that COGNIZANT was going to get the legal department involved. In response, SNS instructed RAMESH to discuss the issues with the L&T legal department in order to protect the interests of the organization.

    SNS did not think that the issue was significant. SNS was annoyed because the budget varied significantly from the actual numbers. Senior management from COGNIZANT did not reach out to SNS about the issues related to the KITS facility. SNS would have remembered if they did.

    SNS did not have conversations with SRIDHAR about the issues with the KITS facility. SNS spoke to MANI about the delays for the KITS project; however, SNS did not recall if the planning permit was discussed. SNS would have remembered if he spoke to MANI about the planning permit.

SNS was aware of the CM's reputation of alleged corruption through media outlets. SNS did not have personal knowledge of the alleged corruption involving the CM. It was not concerning that an L&T employee requested COGNIZANT to meet with the CM.

**{Agent Note: SNS was shown document DOJ_SNS000005, which was an e-mail correspondence dated March 6, 2014 with the subject "RE:CTS-Contract}**

Per the e-mail correspondence: "do we rethink our views for getting the OC"- In a review meeting, M.V.SATISH and K. JAGANNATHAN (KAN) had an argument about the need to push the KITS project along. SNS' position was that as an organization, they will never take the responsibility to get permits and that their obligation rested at coordination. In addition, SNS stated that there should be no payments done on behalf of L&T. The meeting was finished after SNS made the above points. SATISH and KAN pushed for L&T to pay the statutory fee in order to expedite the process. L&T's position was firm that they would not pay fees for the planning permit. In regards to the statutory fees, SNS said that it was COGNIZANT that "needed to pay, it was very clear".

SNS was unsure how the contracts with COGNIZANT were designed. There were two ways that the contract could have been set up: 1. included in the client's lump sum payment was the amount for the fees. 2. L&T pays the fees and provides a proof of payment to the client for reimbursement. The contract that was discussed in the meeting only included an obligation to coordinate between the client and the government agencies.

Per the e-mail correspondence: "we just cannot"- SNS was unsure of the context but believed that it would be clear that L&T can't do anything and just to let COGNIZANT take care of the planning permit.

SNS did not hear of a demand from the government to get the government order for the KITS facility. SNS did not have any internal conversations at L&T about a demand payment to the government.

SNS did not speak to BG about the delay at the KITS facility.

SNS spoke to SRIDHAR about the general projects; however, SNS does not remember if the planning permit was discussed.

**{Agent Note: SNS was shown document DOJ_SNS000007 through DOJ_SNS000008, which was an attachment to SOJ_SNS000005}**

SNS did not recall the letter, reading the letter, or the individual who drafted the letter. SNS usually did not review contractual letters. SNS did not draft the letter. It was a common practice for L&T to draft legal letters to clients.

SNS did not know the context of the letter. SNS recalled that L&T and COGNIZANT both took a firm position about the planning permit for the KITS facility. The project was delayed and COGNIZANT did not take responsibility for the delays. L&T did not want COGNIZANT to take a financial stance on the contract due to the delays. Any agreement with a client is a give and take relationship. The issue was not elevated to SNS. SNS was only aware of the issues because the delays were mentioned during the review meetings. The issues with COGNIZANT were being handled on the business side.

*{Agent Note: SNS was shown document DOJ_SNS000014, which was an e-mail correspondence dated July 17. 2014 through July 19, 2014 with the subject "FW:Kochi"}*

SNS did not know the details of the actions taken by L&T to get the planning permit at the KITS facility. SNS thought that it could have been the consequences of many things that happened on the business level. L&T must have fulfilled the contractual obligation in regards to the planning permit. SNS was unaware of any new consultants for the KITS facility.

SNS recalled that COGNIZANT froze payments to L&T; however, SNS did not believe it was a significant matter.

*{Agent Note: SNS was shown document DOJ_SNS000015, which was an e-mail correspondence dated July 23, 2014 with the subject "RE: Outstanding payment-CTS Projects"}*

SNS reviewed 900 contracts and there were many clients that did not pay L&T. SNS had to include pleasantries in the e-mail correspondence since there was an established relationship with COGNIZANT. SNS did not recall the context of the e-mail correspondence. SNS did not recall speaking to MANI after the e-mail correspondence.

There are two ways in which SNS sent e-mails:
    1. Wrote the e-mail himself
    2. Dictate to his executive assistant

*{Agent Note: SNS was shown document DOJ_SNS000018, which was an e-mail correspondence dated July 23, 2014 with the subject "Fwd: Outstanding Payment-CTS Projects}*

SNS forwarded the e-mail to SATISH and KANNAN as part of normal business practices. The various reasons in the e-mail were the delay in the design of the KITS facility, the late submission of paperwork, specification changes, and the planning permit.

*{Agent Note: SNS was shown document DOJ_SNS000019, which was an e-mail correspondence dated November 4, 2014 with the subject "FW: KITS-Planning Permit"}*

There was a building collapse in India. L&T did a residential project in close proximity to the collapse. SNS received a telephone call that requested his assistance to clear debris and locate victims.

SNS did not know how L&T obtained the planning permit for KITS. SNS thought that the team might have worked together to get the permit or over time it was resolved.

SNS did not know what "facing with the current government" meant. The planning permit issue was not a big deal to SNS. SNS looked at the e-mail as simply as "thank you" e-mail from a client and that the problem was solved so "move on with life".